**VOLUME I, Appx1-11821**

**Appeal No. 25-2098**

# United States Court of Appeals for the Federal Circuit

OMNITRACS, LLC, XRS CORP., SMARTDRIVE SYSTEMS, INC.,

PLAINTIFFS-APPELLANTS

V.

MOTIVE TECHNOLOGIES, INC., FKA KEEPTRUCKIN, INC.,

*Defendant-Appellee*

Appeal from the United States District Court for the
Northern District of California in
No. 3:23-cv-05261-RFL, Judge Rita F. Lin

## NON-CONFIDENTIAL JOINT APPENDIX, VOLUME I OF II

Adam R. Alper
Akshay S. Deoras
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
(415) 439-1876

Michael W. De Vries
KIRKLAND & ELLIS LLP
695 Town Center Drive
Costa Mesa, CA 92626
(714) 982-8822

Leslie M. Schmidt
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
(212) 446-4800

John C. O'Quinn
Jason M. Wilcox
Diva Hollis
KIRKLAND & ELLIS LLP
1301 Pennsylvania
Ave., NW
Washington, DC 20004
(202) 389-5000

*Counsel for Appellants*

June 17, 2026

**VOLUME I, Appx1-11821**

Paul Alessio Mezzina
*Counsel of Record*
Zachary M. Coots
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
pmezzina@kslaw.com
zcoots@kslaw.com

Angela Tarasi
Eric Valuyev
Roy Falik
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
atarasi@kslaw.com
evaluyev@kslaw.com
rfalik@kslaw.com

Brent P. Ray
ARNOLD & PORTER LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602
(312) 583-2325
brent.ray@arnoldporter.com

*Counsel for Appellee*

**Non-Confidential Joint Appendix**
*Omnitracs, LLC et al. v. Motive Techs., Inc.*
No. 25-2098 (Fed. Cir.)


| Date | Dkt. No. | Document | Appx Pages |
|---|---|---|---|
| **Volume I (Appx1-11821)** | | | |
| 8/15/2025 | 513 | Judgment | Appx1-2 |
| 8/5/2025 | 510 | Order on Post-Trial Motions re: 486, 489 | Appx3-19 |
| 5/5/2025 | 493-3 | U.S. Patent No. 9,402,060 (Trial Exhibit No. 4) | Appx20-48 |
| 5/5/2025 | 493-4 | U.S. Patent No. 9,911,253 (Trial Exhibit No. 5) | Appx49-74 |
| 4/22/2025 | 465 | Final Jury Instructions | Appx75, Appx78-83, Appx99-100 |
| 4/24/2025 | 473 | Jury Verdict | Appx101-108 |
| | | Docket Sheet | Appx119-188 |
| 10/13/2023 | 1 | Complaint | Appx189-193, Appx201-203 |
| 8/26/2024 | 185 | Order re: Claim Construction and 133 Motion for Clarification | Appx287-310 |
| 4/7/2025 | 413 | Omnitracs' Selection of Narrowed Asserted Claims | Appx311-313 |
| | 464 | Final Verdict Form | Appx314-326 |
| 5/1/2025 | 489 (public); 487-3 (sealed) | Motion for Judgment as a Matter of Law | Appx327-346 |
| 5/8/2025 | 498 | Opposition/Response re 489 Motion for Judgment as a Matter of Law | Appx360, Appx377-379 |
| 5/15/2025 | 500 | Reply re 489 Motion for Judgment as a Matter of Law | Appx408, Appx417-419 |
| 9/4/2025 | 524 | Notice of Appeal | Appx429-431 |

| Date | Dkt. No. | Document | Appx Pages |
|---|---|---|---|
| 2/12/2024 | 51 | Order Granting in Part and Denying in Part Motion to Dismiss | Appx432-436 |
| 4/5/2024 | 60 | First Amended Complaint | Appx440-444 |
| 4/15/2025 | 445-2 | Exhibit B to April 15, 2025 Joint Notification of Objections to Deposition Designation Testimony | Appx558, Appx565-568 |
| 4/27/2025 | 475 | Trial Transcript, Vol. 2 (4-14-2025 Jury Trial Day 2) | Appx10128, Appx10160-10162, Appx10216-10256, Appx10278-10281, Appx10299-10301, Appx10371-10374 |
| 4/27/2025 | 476 | Trial Transcript, Vol. 3 (4-15-2025 Jury Trial Day 3) | Appx10389, Appx10420-10423, Appx10437-10445, Appx10450-10453, Appx10520-10527, Appx10533-10535 |
| 4/27/2025 | 477 | Trial Transcript, Vol. 4 (4-16-2025 Jury Trial Day 4) | Appx10590, Appx10611-10622, Appx10625-10636, Appx10680-10682, Appx10714-10767, Appx10781-10789 |
| 4/27/2025 | 478 | Trial Transcript, Vol. 5 (4-17-2025 Jury Trial Day 5) | Appx10808, Appx10866-10881, Appx10885-10888, Appx10893-10895, Appx10913-10915, Appx11003-11006, Appx11026-11028 |
| 4/27/2025 | 479 | Trial Transcript, Vol. 6 (4-18-2025 Jury Trial Day 6) | Appx11074, Appx11098-11100, Appx11106-11118, Appx11139- |

| Date | Dkt. No. | Document | Appx Pages |
|---|---|---|---|
| | | | 11142, Appx11147-11149, Appx11166-11171 |
| 4/27/2025 | 480 (public); 481 (sealed) | Trial Transcript, Vol. 7 (4-21-2025 Jury Trial Day 7) | Appx11231, Appx11257-11260, Appx11273-11282, Appx11288-11293, Appx11386-11388, Appx11396-11468 |
| 4/27/2025 | 482 | Trial Transcript, Vol. 8 (4-22-2025 Jury Trial Day 8) | Appx11472, Appx11479-11500, Appx11506-11509, Appx11629-11635 |
| 4/27/2025 | 483 | Trial Transcript, Vol. 9 (4-23-2025 Jury Trial Day 9) | Appx11722, Appx11773-11778, Appx11819-11821 |
| **Volume II (Appx11875-12917)** | | | |
| 1/30/2024 | 46 | Protective Order | Appx11875-11900 |
| 5/5/2025 | 493-20 | Trial Exhibit No. 163 | Appx12563-12564 |
| 5/5/2025 | 493-32 | Trial Exhibit No. 282 | Appx12565-12709 |
| 5/5/2025 | 493-33 | Trial Exhibit No. 287 | Appx12710-12728 |
| 5/5/2025 | 493-42 | Trial Exhibit No. 305 | Appx12729-12730 |
| 5/5/2025 | 493-45 | Trial Exhibit No. 314 | Appx12731-12737 |
| 5/5/2025 | 493-57 | Trial Exhibit No. 361 | Appx12738-12750 |
| 5/5/2025 | 493-62 | Trial Exhibit No. 395 | Appx12751 |
| 5/5/2025 | 493-68 | Trial Exhibit No. 446 | Appx12752 |
| 5/5/2025 | 493-82 | Trial Exhibit No. 511 | Appx12753-12756 |
| 5/5/2025 | 493-84 | Trial Exhibit No. 521 | Appx12757-12773 |
| 5/5/2025 | 493-90 | Trial Exhibit No. 542 | Appx12774-12777 |
| 5/5/2025 | 493-93 | Trial Exhibit No. 557 | Appx12778 |
| 5/5/2025 | 493-94 | Trial Exhibit No. 561 | Appx12779-12795 |
| 5/5/2025 | 493-102 | Trial Exhibit No. 731 | Appx12796 |
| 5/5/2025 | 493-103 | Trial Exhibit No. 749 | Appx12797-12805 |
| 5/5/2025 | 493-116 | Trial Exhibit No. 897 | Appx12806-12807 |
| 5/5/2025 | 493-134 | Trial Exhibit No. 1832 | Appx12808-12810 |

| Date | Dkt. No. | Document | Appx Pages |
|---|---|---|---|
| 5/5/2025 | 493-139 | Trial Exhibit No. 1957 | Appx12811-12816 |
| 5/5/2025 | 493-141 | Trial Exhibit No. 1964 | Appx12817-12818 |
| 5/5/2025 | 493-172 | Trial Exhibit No. 3459 | Appx12819-12820 |
| 5/5/2025 | 493-213 | Trial Exhibit No. 4074 | Appx12823, Appx12890-12892 |
| 5/5/2025 | 493-168 | Trial Exhibit No. 3294 | Appx12896, Appx12915-12917 |

## Statement Regarding Confidential Material
## (Fed. Cir. R. 25.1(e)(1)(B))

Material that was filed under seal pursuant to the district court's protective order entered on January 30, 2024, in *Omnitracs, LLC et al., v. Motive Technologies, Inc.*, No. 23-CV-05261 (N.D. Cal.), has been redacted in the non-confidential joint appendix. Materials have been redacted from the following pages of the non-confidential joint appendix:

Appx332, Appx336, Appx338, Appx340-341, Appx11257-11260, Appx11273-11282, Appx11288-11293.

The redacted material involves confidential source code, information contained in confidential internal technical documents, and personally identifiable information.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMNITRACS, LLC, et al.,<br>Plaintiffs,<br>v.<br>MOTIVE TECHNOLOGIES, INC.,<br>Defendant. | Case No. 23-cv-05261-RFL<br><br>**JUDGMENT** |

On October 13, 2023, Omnitracs, LLC, SmartDrive Systems, Inc., and XRS Corporation (collectively, "Omnitracs") filed this suit against Motive Technologies, Inc. ("Motive") alleging willful infringement of the following seven United States patents: U.S. Patent Nos. 9,402,060 (the "'060 Patent"); 9,761,067 (the "'067 Patent"); 10,957,130 (the "'130 Patent"); 9,262,873 (the "'873 Patent"); 9,014,943 (the "'943 Patent"); 9,014,906 (the "'906 Patent"); and 9,020,733 (the "'733 Patent"). (Dkt. No. 1.)

On February 12, 2024, the Court dismissed Omnitracs' claims with respect to the '873 Patent and '067 Patent with prejudice. (Dkt. No. 51.)

On April 5, 2024, Omnitracs filed an amended complaint alleging willful infringement of the five patents remaining in the case and four additional patents: U.S. Patent Nos. 9,064,422 (the "'422 patent"); 9,390,628 (the "'628 patent"); 9,911,253 (the "'253 patent"); and 9,208,129 (the "'129 patent"). (Dkt. No. 60.)

On April 19, 2024, Motive filed counterclaims seeking a declaratory judgment that each of the Patents in the case is invalid. (Dkt. No. 63.)

After the parties had narrowed the asserted claims and invalidity grounds in stages pursuant to an agreed-upon schedule, on April 4, 2025, the Court agreed with Omnitracs'

proposal to further narrow its claims to ten claims or less, while denying Motive's motion for an even further narrowing. (Dkt. No. 409.) Omnitracs narrowed its asserted claims to ten claims across the '906, '628, '060, and '253 Patents. (Dkt. No. 413.)

On April 14, 2025, a jury trial with respect to infringement and validity of the asserted claims of the '906, '628, '060, and '253 Patents began.

On April 21, 2025, during its case presentation, Motive narrowed its invalidity counterclaims to the asserted claims of the '906 and '628 Patents. (Dkt. No. 457.)

On April 24, 2025, the jury rendered a verdict. (Dkt. No. 473.)

The Court now issues its final judgment disposing of all remaining claims and defenses based upon the jury's verdict (Dkt. No. 473) and its ruling on the parties' motions for judgment as a matter of law (Dkt. No. 510).

**IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1. Motive does not infringe any of the asserted claims of the '906, '628, '060, and '253 Patents.
2. The asserted claims of the '628 and '906 Patents are ineligible under 35 U.S.C. § 101.
3. Omnitracs shall take nothing on its claims against Motive Technologies with respect to the '906, '628, '060, and '253 Patents.

**IT IS SO ORDERED.**

Dated: August 15, 2025

RITA F. LIN
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OMNITRACS, LLC, et al.,
Plaintiffs,
v.
MOTIVE TECHNOLOGIES, INC.,
Defendant.

Case No. 23-cv-05261-RFL

**ORDER ON POST-TRIAL MOTIONS**

Re: Dkt. Nos. 486, 489

On April 24, 2025, the jury returned a verdict in this patent infringement case that Motive Technologies Inc. ("Motive") did not infringe the asserted claims of the '906, '628, '060, and '253 Patents owned by Plaintiffs ("Omnitracs"). While the jury found that the asserted claims of the '906 and '628 Patents were not invalid, it found that they "involve only activities which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional at the time the patent application was filed." (Dkt. No. 473 at 6.)

The parties now move for post-trial relief. Motive moves for judgment as a matter of law that the asserted claims of the '628 and '906 Patents are ineligible under 35 U.S.C. § 101. Omnitracs moves for judgment as a matter of law that the asserted claims of the '628, '060, and '253 Patents are infringed, and that the asserted claims of the '628 and '906 Patents are not well-understood, routine, and conventional. Omnitracs further moves for a new trial on all issues. For the reasons described below, the Court **GRANTS** Motive's motion and **DENIES** Omnitracs' motion.

## I. MOTIVE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

The parties dispute what standard should be used to evaluate Motive's motion.

Omnitracs argues that the jury's verdict that the asserted claims of the '628 and '906 Patents were "well understood, routine, and conventional" was merely advisory, and that Rule 52(a)(1) should apply. *See* Fed. R. Civ. Pro. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."). In support, Omnitracs points out that it stated multiple times during pre-trial proceedings and trial that the question at issue was advisory and that Motive did not contest these statements. (*See e.g.*, Dkt. No. 430 at 21:16-22 (Omnitracs stating that for "the 101 issue" "the jury's verdict form will be advisory").) Omnitracs also emphasizes that the verdict form itself does not mention the ultimate question of eligibility. However, the Court has never stated that the question was advisory, and nothing in the verdict form indicated that the jury was not rendering a finding of fact on this issue. Omnitracs cites no authority stating that Motive's failure to object to Omnitracs' characterizations constitutes waiver or overrides the clear intention of the Court. Therefore, Motive's motion is properly evaluated under Rule 50(b).

Under Rule 50(b), a court may grant a renewed motion for judgment as a matter of law. When the jury returns a verdict, the "jury's verdict must be upheld if it is supported by substantial evidence." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). The Court may not weigh evidence or order a result it finds more reasonable if substantial evidence supports the jury verdict. *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir. 1984). "When a special verdict is sought from a jury, the appropriate procedure is for the court to accept the findings of fact explicitly made or implicit in the jury's answers and, based thereon and on such additional findings as the court may find necessary to make [] direct entry of judgment under Rule 58." *Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1452 (Fed. Cir. 1984).

**A. Eligibility of the '628 Patent**

**1. Step One**

The Court previously held that the asserted claims of the '628 Patent are directed to an abstract idea, and though it is free to reassess its rulings prior to entry of judgment, it sees no

reason to deviate from that holding. Whether a claim is directed to an abstract idea is a determination of law based on the claim language and specification. *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1356-57 (Fed. Cir. 2023). In its Order denying Motive's motion for judgment on the pleadings, the Court explained that "[t]he asserted '628 patent claims are directed at the abstract idea of receiving, associating, and presenting data because they only 'require the collection, analysis, and display of available information' in the fleet management field and state 'those functions in general terms, without limiting them to technical means for performing the functions that are arguably an advance over conventional computer and network technology." (Dkt. No. 131 at 7-8 (*citing Elec. Power*, 830 F.3d at 1351); *accord Immersion Corp. v. Fitbit, Inc.*, 313 F. Supp. 3d 1005, 1028-29 (N.D. Cal. 2018).) Nothing at trial changes that determination.

Omnitracs argues that the evidence at trial showed that the asserted '628 patent claims are directed to a novel two-device hardware solution and that such a system enabled numerous benefits. The Court, however, was already aware of this two-device hardware solution and considered its benefits when it issued its Order. (Dkt. No. 131 at 8-9.) Moreover, the presence of two generic computer components—a "data acquisition device" and a "portable wireless data transfer and display device"—does not preclude a finding that the claims are directed to an abstract idea. *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612-14 (Fed. Cir. 2016) (finding that the claimed computer components served merely as a "conduit" for implementing the abstract idea). Nor do unclaimed benefits render a claim patent-eligible where the claims involve only "result-based functional language." *Immersion*, 313 F. Supp. 3d at 1028-29; *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (explaining that a claim may be patent ineligible even if it improves accuracy or efficiency).

**2. Step Two**

If the claims are directed to an abstract idea under step one, the Court then asks whether the claims embody some "inventive concept." Claims fail the second step of the *Alice* test when, viewed individually or as an ordered combination, the limitations "merely recite well-

understood, routine, conventional activities." *Miller Mendel, Inc. v. City of Anna, Texas*, 107 F.4th 1345, 1353 (Fed. Cir.), *cert. denied*, 145 S. Ct. 593 (2024). The Court previously declined to enter judgment on the step two inquiry as there were "factual questions about whether the decision to split the functionality of the vehicle event recorder into an onboard recorder (*e.g.*, the dash cam) and separate portable unit (*e.g.*, the cell phone) was non-generic and unconventional." (Dkt. No. 131 at 9.) Because the jury found that the asserted claims were "well-understood, routine, and conventional at the time the patent application was filed," and substantial evidence supports that verdict, the asserted claims of the '628 Patent also fail step two of the *Alice* test. (Dkt. No. 473 at 6.)

During trial, Motive presented evidence that the prior art, including the Turnpike system and the '568 Patent, used a similar two-device hardware solution and was widely available at the time. (Dkt. No. 493-158 (Ex. 3050), fig. 2 ('568 Patent); Trial Tr. at 1313:19-1314:4 (Turnpike).) For example, the Turnpike system was commercially sold and installed in over 5,800 vehicles by the time the '628 patent application was filed in 2012. (Dkt. No. 493-6 (Ex. 8) at 553.) There is also evidence that the 2010 Department of Transportation (DOT) regulations themselves—which were described in the testimony as being widely known throughout the industry—referenced "mobile phone solutions" used with electronic on-board recorders, a type of data acquisition device. (Dkt. No. 493-218 (Ex. 4147) at 23-24.) Even Omnitracs' witness Sekula agreed that "the '906 and '628 inventors were not the first to create a fleet management system that used an in-vehicle device to communicate over Bluetooth to a mobile device that communicated over cellular network to the back-end laptop or back-end servers." (Trial Tr. at 324:20-325:4.) Taken together with Motive's expert Wilson's testimony, the jury had more than sufficient evidence to conclude that the two-device system was well-understood, routine, conventional. (Trial Tr. at 1312:15-1313:23.)

Omnitracs argues that Claim 17, which depends on Claim 15, adds requirements that

provide an "inventive concept."[1] Claim 17 recites sending data at "predetermined times" rather than in real-time, which Omnitracs claims is an inventive concept that improved the efficiency of data transfer. However, the specification states that "predetermined times" includes sending data in "real-time." (Dkt. No. 493-2 (Ex. 3) at 9:4-10 ("Remote control center 104 is configured to receive . . . the driver summary electronic report, at predetermined times, such as at real-time.").) And even if "predetermined times" was construed as excluding real-time, substantial evidence supports the jury's verdict that sending data in that manner was routine, conventional, and well-understood. Mr. Znidarsic testified that the Turnpike source code, for example, indicated that its systems sent data every seven seconds. (Trial Tr. at 1275:20-1276:5; *see also* Dkt. No. 485-12 at 184:12-185:18 (inventor Mohn stating that Turnpike sent information to the network at periodic times).)

### B. Eligibility of the '906 Patent

#### 1. Step One

For the same reasons as with the '628 Patent, the asserted claims of the '906 Patent are directed to a patent-ineligible abstract idea. Independent Claim 10 recites a method comprising four functional steps: (i) "receiving" data, (ii) "processing" the data into a report with a composite driver score based on certain factors, (iii) "sending" the report, and (iv) "presenting" the report. Independent Claim 1 similarly recites a "network device" comprising generic computer components—a "network communication module," "processor," and "display"—that are "configured to" perform these same method steps, with the additional step of "storing" some of the data in "memory." These claims, like those in the '628 Patent, are directed to the abstract idea of receiving, analyzing, and displaying information in the context of fleet management. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016). The specification further explains that virtually any standard computing environment, such as a "standard server,"

---

[1] Omnitracs does not appear to contend that dependent Claim 18, which requires receiving a unique vehicle identification of the vehicle and associating the vehicle data and driver information, supplies a further "inventive concept."

"group of such servers," "rack server system," or "personal computer such as a laptop computer," can be used to implement the claimed invention. (Dkt. No. 493-1 (Ex. 1) at 24:57-25:23, 25:58-64.) Thus, these claims do not recite any particular improvement in how these components operate, nor do they provide a specific or unconventional way of processing or presenting the data.

Omnitracs argues that the claims are directed to a novel two-device hardware solution. But this argument is even less convincing here than for the '628 Patent. Such a two-step hardware configuration is not meaningfully recited in the asserted claims. Apart from Claim 15, which references a "data acquisition device," none of the claims require a second device, and even Claim 15 does not require the involvement of a separate "data acquisition device." (*See* Dkt. No. 493-1 (Ex. 1) ("remotely updating . . . the at least one portable wireless data transfer and display device *or* at least one data acquisition device associated with the at least one portable wireless data transfer and display device" (emphasis added)).) Even if a two-step hardware system was sufficiently recited, for reasons discussed above, the presence of two generic computing devices—each operating according to routine and conventional functionality—does not preclude a finding that the claims are directed to an abstract idea. *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612-14 (Fed. Cir. 2016).

Nor do the "composite scores" render the claims any less abstract. The Federal Circuit in *Electric Power Group* rejected the argument that calculating a "composite indicator of reliability" saved otherwise abstract claims, holding that such functionality still fell squarely within the realm of abstract ideas. 830 F.3d at 1351-54. Similarly, courts have found that claims reciting the generation of "efficiency scores" based on enumerated factors is directed to the abstract idea of "collecting, organizing and analyzing medical claims data" under *Alice* step one. *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-cv-02177-SI, 2017 WL 6405621, at *6 (N.D. Cal. Dec. 15, 2017), *aff'd*, 756 F. App'x 997 (Fed. Cir. 2019).

Lastly, to the extent Omnitracs contends that the claims improve the interface between drivers and fleet managers, that improvement appears to be the end result of processing and

presenting data to users in a useful form, which—without more—is insufficient to establish patent eligibility under step one. *See In re Salwan*, 681 Fed. App'x. 938, 939-41 (Fed. Cir. 2017) (invalidating method claims that recited "receiving" information, "storing" information, "selectively retrieving [stored medical information], [and] generating one or more healthcare reports").

### 2. Step Two

The jury found that the asserted claims of the '906 Patent, "considered individually and as an ordered combination, involve only activities which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional at the time the patent application was filed." (Dkt. 473 at 6.) That verdict is supported by substantial evidence in the trial record. To the extent the asserted claims recite a two-part in-vehicle hardware solution and transmitting data at "predetermined times," Motive has presented evidence demonstrating that these elements are not inventive, as explained above.

Nor does Claim 15 fare any better. That claim recites a method of "remotely updating, by the processor via the long-range wireless network, the . . . portable wireless data transfer and display device or . . . [a] data acquisition device[.]" (Dkt. No. 493-1 (Ex. 1).) Substantial evidence supports the jury's determination that updating software remotely is itself a conventional function in multi-device systems. As Wilson testified, "updating an app on a cell phone" was "pretty routine" as of 2012. (Trial Tr. at 1322:19-1323:1; *see also id.* at 1339:15-24 (noting that Turnpike provided remote updates).) Thus, Claim 15 merely recites the same abstract functionality as the independent claims—gathering and processing data using standard hardware—with the addition of a well-understood, routine, and conventional feature.

## II. OMNITRACS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. Infringement of the '628 Patent

The jury's conclusion that Motive did not infringe the asserted claims of the '628 Patent is supported by substantial evidence. Specifically, a reasonable jury could find that Motive's

accused products did not meet the limitations of Claim 15, which includes the step of "sending the driver summary electronic report through a long range wireless communication module to a remote network device via a long-range wireless network." (Dkt. No. 493-2 (Ex. 3) at 43.) During claim construction, the Court agreed with Omnitracs that "driver summary electronic report" should be construed according to its plain and ordinary meaning. (Dkt. No. 185 at 22.). The jury was instructed to that effect. (Dkt. No. 465-1 at 7.)

At trial, several Motive witnesses testified that while some of the information comprising the driver summary electronic report is sent to the backend, the actual report is not sent. (*See* Trial Tr. at 1310:11-13 (Wilson testifying that Motive products did not infringe because "there is no sending of . . . the Driver Summary Electronic Report, only sending data and information"); Trial Tr. at 1147:24-1148:22, 1149:5-16 (Motive employee Choi testifying that the "ELD messages" and "ELD events" sent to the backend "are just the data points used to create" the driver summary electronic reports, which are generated locally by the driver app and fleet dashboard); Trial Tr. at 1265:1-12 (Znidarsic stating that he "saw no source code that showed . . . the [driver summary electronic report] is sent from the driver app to the Fleet Dashboard").) Omnitracs' expert Dr. Wicker did not contest this source code analysis, but urged the jury to nonetheless find that the individual datapoints, taken together, constituted a driver summary electronic report. The jury could reasonably conclude from Motive's evidence that the data points sent to the backend did not constitute a driver summary electronic report within the ordinary meaning of the term. Nor does this conclusion contradict Dr. Wicker's testimony that the driver and vehicle data on the Driver App is "synced with the KeepTruckin server" (Trial Tr. at 652:24-654:20), as syncing may occur piecemeal via ELD messages.

Because substantial evidence supports a finding of non-infringement on this basis, the Court declines to consider the other bases outlined in the briefing.

**B. Infringement of the '060 Patent**

There is substantial evidence to conclude that Motive did not infringe the asserted claims of the '060 Patent. The claims require that the accused functionality "facilitate wireless

communication of information between a web server in the vehicle event recorder [*i.e.*, the Vehicle Gateway] and a remotely located computing device using HTTP." (Dkt. No. 185 at 6.) At trial, Motive presented evidence that the Vehicle Gateway does not use HTTP to communicate when it is acting as a server. Motive's expert explained that though the VG communicates over HTTP, it does so as a web client. (*See* Trial Tr. at 1273:23-1274:2, 1446:7-8.) And while the evidence shows that the VG may also contain a server that receives and responds to requests, Motive engineer Gorski testified that the VG uses MQTT, rather than HTTP, to the perform those functions. (Trial Tr. at 1404:3-1405:21 (referring to Dkt. No. 493-169 (Ex. 3294)).) Znidarsic further clarified that the code Dr. Wicker relied on to show that the VG operated as an HTTP server, when viewed in context, actually demonstrated that the VG was opening a socket connection as a client. (Trial Tr. at 1272:23-1273:22.) Indeed, even Dr. Wicker admitted that the diagrams he examined "do[] not show the ELD receiving the request over HTTP." (Trial Tr. at 867:17-21.) Taken as a whole, this is sufficient for a reasonable jury to conclude that there is no web server in the VG that "us[es] HTTP" to communicate with the backend.

### C. Infringement of the '253 Patent

There is sufficient evidence for the jury to reasonably conclude that the accused products did not "determine values of individual frames in the set of consecutive frames, wherein the values of the individual frames decrease with increasing time away from the particular time of the particular vehicle event" as required by the asserted claims of the '253 Patent. (Dkt. No. 493-4 (Ex. 5).) The evidence showed that Motive's AI Dashcam determines "confidence values" based on the likelihood that the camera's vision model detected an object, not time or proximity to "the particular vehicle event." (Trial Tr. at 1267:23-1268:20, 1406:6-21.)

Indeed, Motive identified many instances in which the values of the frames *increase* with increasing time away from the time of the event. For example, Gorski testified that as a car is pulling up to a stop sign, Motive's system will assign increasingly high confidence values to the frames as the stop sign becomes more easily detected. But once the car drives past the stop

sign—potentially triggering a "rolling stop event"—the confidence value will drop to zero because the stop sign is no longer in view. (Trial Tr. at 1407:4-24.) Similarly, Znidarsic demonstrated that the AI Dashcam may assign a medium confidence value to a frame containing a cell phone that is mostly obscured behind a hand, assign a low confidence value to the next frame in which the cell phone is fully obscured, and then assign a high confidence value to the following frame in which the cell phone is fully visible, thereby triggering a cell phone use event. (Trial Tr. at 1270:5-20.) While there may also be instances in which the values assigned to individual frames happen to decrease with increasing time away from the time of the event, as Omnitracs contends, there is more than sufficient evidence to conclude that Motive's system does not "determine" values on that basis as required by the claim.

### D. Patent Eligibility

Because the Court is granting Motive's motion for judgment as a matter of law on the same issue, Omnitracs' motion as to patent eligibility is denied for the same reasons stated above.

## III. OMNITRACS' MOTION FOR A NEW TRIAL

Under Rule 59, the Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A new trial should be granted when "the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). "Unlike a Rule 50 determination, a Rule 59 motion for a new trial does not require the district court judge to 'view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses.'" *Cones v. Cnty. of Los Angeles*, No. CV 14-8281 PSG (PLAx), 2016 WL 7438817, at *7 (C.D. Cal. Sept. 28, 2016) (citing *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014)).

**A. Motive's Reference to Khan's Muslim Identity**

Motive's cross-examination of Dr. Wicker about why Motive used the "Frank Williams" alias when evaluating other companies—and subsequent reference to Khan's intent to hide his Muslim identity—was not improper or prejudicial. As the Court stated during trial, Omnitracs placed this issue "in a prominent position in the case" when it asked Dr. Wicker about Motive's use of the alias during direct examination. (Trial Tr. at 617:22-619:18 ("[T]here is no Frank Williams. As I understand it, this is an alias that was used by Mr. Khan to contact other companies."); *see also id.* at 822:4-8.) It was therefore "fair game" for Motive to cross-examine Dr. Wicker about the reason for use of the name and attempt to dispel Omnitracs' suggestion that Motive used deceptive tactics to gather business intelligence. (Trial Tr. at 822:9-11); *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988) ("[O]pening the door" to a particular issue by one party entitles the other party "to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission.").

Nor did Motive's counsel "misrepresent anything" during questioning. (Trial Tr. at 819:13-18.) Counsel's question about whether Wicker knew "Mr. Khan used an alias because he's Muslim, and he wanted to have a more American sounding name to interface with truckers" was grounded in Johns's deposition testimony. (Trial Tr. at 797:11-14.) As discussed outside the presence of the jury, Johns's deposition testimony, which Dr. Wicker admitted having an opportunity to review, stated that Khan was using an American name for his Muslim name. (Trial Tr. at 819:13-820:6.) As such, Motive had a good faith basis for asking the question about a topic that Omnitracs had put in issue, and no curative instruction was required. The reference did not violate the parties' stipulated Motion in Limine No. 2, as Khan was not a witness in the case. (Trial Tr. at 820:7-9.)

Omnitracs contends it was also prejudiced by Motive's subsequent failure to correct Dr. Wicker's misstatement that Khan, rather than Johns, testified to that effect. (*See* Tr. at 796:25-797:18 ("A: [Khan] did say that. It is in his deposition.").) But Omnitracs cured this misstatement during its cross examination of Dr. Wicker by clarifying that Khan never gave a

deposition. (*See* Tr. at 883:14-24 ("Q. Do you remember that Mr. Khan was not actually deposed at all in this case? He didn't give a deposition? A. That's correct.").) Omnitracs also had the opportunity on cross to further clarify that Johns, not Khan, testified about Khan's reason for using the alias, but chose not to do so, presumably because that additional point would be of limited relevance once it was established that Khan himself had not been deposed.

**B. Makani's Reference to a Legal Investigation**

Makani's violations of the Court's motion in limine order did not result in prejudice because the offending testimony was promptly struck and Makani was "significant[ly] sanction[ed]." (Trial Tr. at 1065:18-1066:3, 1074:18-23.) The Court had previously precluded Motive from "present[ing] any evidence of its investigation in response to the 2018 notice letters, because Motive has declined to provide discovery on that topic and has asserted attorney-client privilege over it." (Dkt. No. 392 at 9.) During his direct examination, Makani violated the order twice—within a fairly short amount of time—by stating that he had forwarded the patents onto Motive's legal team. (Trial Tr. at 1023:11-14, 1027:5-8.) Each time, the Court promptly instructed the jury to disregard that testimony and stated that Makani had violated the Court's orders. (Trial Tr. at 1026:5-9, 1034:1-5.) Following these instructions, Makani's demeanor in Court had noticeably changed—his tone grew quieter and he appeared much more tentative and uncomfortable. The Court took this shift in demeanor into account in determining that the sanction imposed was sufficiently severe. Moreover, to issue a more severe sanction would have risked potential unfair prejudice to Motive. A key issue at trial was whether Motive willfully disregarded patent laws in the alleged infringement, and additional instructions regarding the violation of court orders by Motive's CEO could have unduly prejudiced the jury as to that issue. The jury was specifically instructed at the beginning and end of the trial not to consider any testimony stricken from the record, and there is no basis to believe they disregarded that instruction.

Omnitracs also raises for the first time an objection to Motive's questioning of Makani about Motive's October 15, 2018 letter. (*See* Trial Tr. at 1036:24-1037:3 ("Q: And she says

next: 'That maybe outside counsel should talk about patents.' Right? A: Yes." (referring to Dkt. No. 493-142 (Ex. 1965))).) Omnitracs contends that Motive improperly revealed text that had been redacted from that letter. While admittedly close to the line, Motive's questioning did not reveal anything that could not have been reasonably inferred from the unredacted portions of the letter, which Omnitracs admitted into evidence. (*See* Ex. 1965 (letter stating that "it may make sense to set a meeting to allow Omnitracs to present on the specifics of how or why it believes its patents would be of interest to KeepTruckin. . . . Let us know if a sit-down meeting would be of interest, and we can ask *our respective lawyers* to shepherd schedules." (emphasis added)).) Motive's counsel did not specifically state that Motive had retained outside counsel, which would have been prohibited by the redactions. In any event, Omnitracs' failure to object to Motive's questioning during trial constitutes waiver. *Mitchell v. Black & Decker (USA) Inc.*, 6 Fed. App'x. 652, 653 (9th Cir. 2001) (holding that absent a showing of gross injustice or an explanation of the failure to object, a defendant's failure to object to an alleged error generally precludes him from asserting the claimed error in a motion for new trial).

**C. Bifurcation of the Verdict Form**

The Court's decision to bifurcate the case with a two-part verdict form was proper given the complexity of the case. Courts have broad discretion to bifurcate trials under Federal Rule of Civil Procedure 42(b). *See Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 603 (9th Cir. 2016). In deciding whether to bifurcate, courts generally consider whether (i) the issues are separable, (ii) the trial would confuse the jury, (iii) the issues are complex, and (iv) judicial economy is improved or hindered. *Mformation Techs., Inc. v. Research in Motion Ltd.*, No. C 08–04990, 2012 WL 1142537, at *1-*2 (N.D. Cal. March 29, 2012). This trial involved four patents, ten distinct claims, multiple infringement and invalidity theories, willful infringement, and lost profits and reasonable royalty damages calculations. The Court's first proposed verdict form, pre-bifurcation, was ten pages long and contained many instructions that required jurors to assess their prior answers and navigate the form accordingly. (Dkt. No. 388-1.) In light of these circumstances, the Court exercised its discretion to issue a two-part verdict form, which would

be "simpler," 'more efficient," and less confusing for the jury. (*See* Dkt. No. 420 at 1; Trial Tr. at 1768:11-13.)

Omnitracs further takes issue with the Court's analogizing of the verdict form to a "choose-your-own-adventure" book, which it contends encouraged the jury to find non-infringement so they could skip part two of the verdict form. But Omnitracs did not raise this objection during the trial or ask for a corrective instruction to the jury. And even if it did, the Court's "choose-your-own-adventure" analogy did not instruct the jury to choose the path of least resistance. To the contrary, in conjunction with the other instructions, the analogy explained that the jury needed to carefully follow the instructions at each step and determine, based on their prior answers, whether to answer or skip subsequent questions. (*See, e.g.*, Trial Tr. at 1766:10-13 ("There is a choose-your-own-adventure component to this in that, as you're going through, it will give you instructions as to what question to answer next and in what order."); Dkt. No. 430 at 26 (the Court explaining what it planned to say to the jury at the final pretrial conference).) Those instructions applied to numerous aspects of the complex verdict form, which resulted from trying ten claims across four patents to the jury, and did not relate only to the bifurcated portion of the form. The Court also articulated to the jury that they should "not read into the verdict form, the two-part process, or these instructions that [the Court has] an opinion regarding the evidence or what your verdict should be." (Trial Tr. at 1765:19-23.)

Nor is Motive's counsel's statement during closing argument that "[a] finding of non-infringement for Motive ends the case[, as] [i]n-the-choose-your-own-adventure, it's the everyone-gets-to-go-home choice" sufficiently prejudicial to warrant a new trial. (Trial Tr. 1811:22–24.) Again, Omnitracs should have raised their objection at trial. While the statement is on the border of what is acceptable, the Court did not find it so prejudicial as to require a sua sponte order to strike. The statement did not cross the line into urging the jury to violate their duty to render a verdict based on the evidence and the law, which would have been contrary to the other instructions given to the jurors throughout the case. Nor is there any evidence that the jury actually did violate that duty. And, of course, the jury would have been aware that a finding

of non-infringement would have ended deliberations prior to reaching damages issues, regardless of whether the verdict form was bifurcated.

Lastly, Omnitracs argues that the Court's statement to the jury prior to deliberations that they would be released at midday on Friday, April 25, 2025, was prejudicial because it somehow suggested to the jury that part two of the verdict form could be especially burdensome and time consuming. (Trial Tr. at 1845:19-25.) There is no basis for that conclusion. The parties had previously agreed to this trial schedule, and the Court had previewed the schedule with the jury earlier in the case during the defense case, when there was no indication of when deliberations might begin or how long they would last. (Trial Tr. at 1470:10-24.)

**D. Other Conduct**

Omnitracs also challenges a host of other conduct. None of the conduct is prejudicial, let alone warrants a new trial.

*First*, Omnitracs contends that Motive improperly argued that the "driver information" transmitted to the Vehicle Gateway ("VG") needs to be same "driver information" as the username and password input by the user. But that is in fact in line with the Court's construction that "the 'driver information' transmitted be the same 'driver information' whose inputs were accepted." (Dkt. 465-1 at 7.) While the construction also provided that the "inputs of driver information" need not be the "same sequence of data as what is transmitted to the data acquisition device," Motive did not argue that it did not infringe because the sequence of data had changed. (*Id.*) Motive's expert Wilson testified as to why the Driver ID Motive sends to the VG is *qualitatively* a different piece of driver information from the username and password. (Trial Tr. at 1307:22-1308:1.)

*Second*, Omnitracs argues that Motive's expert Andrews improperly testified that the preamble of Claim 1 of the '253 Patent is limiting. That does not provide a basis for a new trial. Omnitracs had not requested any construction of the preamble at claim construction or in motions in limine. Accordingly, at the time Motive's expert testified, the Court had not provided any instruction to the jury on that point. Nor did Omnitracs request one at the time or seek to

strike Andrews' testimony. Instead, Omnitracs aptly cured the issue in the moment by obtaining an admission from Andrews that "[i]f the preamble isn't a requirement, yes, this argument would go away because the claim would be irrelevant." (Trial Tr. at 1478:10-1480:8). After the close of evidence, Omnitracs requested for the first time an instruction that the preamble was not limiting, which was granted and included in the final jury instructions. Omnitracs then featured the instruction prominently in its closing argument on the issue.

*Third*, Omnitracs asserts that Motive improperly suggested that Sekula and the XRS inventors committed inequitable conduct by failing to submit Turnpike source code to the Patent Office. But Motive's references were not made as an inequitable conduct accusation, which is not at issue in this case. Rather, they were a legitimate rebuttal to Wicker's testimony that the PTO considered "all" Turnpike prior art and a proper attempt by Motive to defend its invalidity arguments. (*See* Trial Tr. at 1630:13-17 ("Q: [Y]ou would agree that Mr. Wilson is using a different document regarding Turnpike to prove invalidity in this case than the ones that were submitted to the Patent Office; correct? A: That I'm not certain about."); *see also id.* at 1592:10-18.)

*Fourth*, Omnitracs contends Motive misrepresented the extent of Dr. Wicker's source code review by obfuscating the difference between reviewing source code on a computer and reviewing printouts. However, to the extent any obfuscation occurred, Omnitracs did not object, and further had ample opportunity to clarify or rebut any such impression during its redirect and cross-examination. Indeed, on redirect, Dr. Wicker was asked about the suggestion that he had only spent seven to eight hours reviewing source code. He testified, "I spent a day with the source code computer. . . . I spent a day identifying code that I wanted printed out. The printouts were handed to me. I spent a little over 50 hours studying the printouts and the code. So I had quite a bit of time with the source code." (Trial Tr. at 881:10-22.) It is difficult to imagine the jury was confused by the straightforward testimony on that issue.

*Fifth*, Omnitracs asserts that Motive's references to the absence of evidence of theft or misappropriation unfairly prejudiced the jury. But Motive was entitled to defend itself against

Omnitracs' allegations of willfulness and copying, especially as Omnitracs placed Motive's hiring of former XRS employee Dan Fuglewicz at the core of their case. (*See* Trial Tr. at 822:14-825:23.)

**E. Weight of the Evidence**

For the reasons described above, the jury's verdict that Motive's products did not infringe the asserted claims of the '628, '060, and '253 Patents is supported by substantial evidence and is not against the weight of the evidence.

Nor was the jury's verdict that Motive did not infringe the asserted claims of the '906 Patent "contrary to the clear weight of the evidence." *See Molski,* 481 F.3d at 729. The evidence at trial supported a conclusion that "distance driven" was a factor in calculating the DRIVE score and that this factor was not within the closed group of factors listed in the asserted claims. (*See, e.g.*, Trial Tr. at 1257:3-1259:16 (Znidarsic stating that "miles driven was a factor; albeit a normalization factor, but still a factor"); Trial Tr. at 852:4-854:2 (Dr. Wicker admitting that distance driven "has an effect on the driver's score" and is a "normalization factor").) While Omnitracs' witnesses opined that "distance driven" was a weight rather than a factor, the jury's determination to believe instead the testimony describing it as a factor is not contrary to the clear weight of the evidence.

Accordingly, there is no basis for a new trial on these grounds.

**IT IS SO ORDERED.**

Dated: August 5, 2025

RITA F. LIN
United States District Judge

8455019

# THE UNITED STATES OF AMERICA

**TO ALL TO WHOM THESE PRESENTS SHALL COME:**

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**February 1, 2024**

**THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:**

**PATENT NUMBER:** ***9,402,060***
**ISSUE DATE:** ***July 26, 2016***

**By Authority of the**
**Under Secretary of Commerce for Intellectual Property**
**and Director of the United States Patent and Trademark Office**

**Breaun Johnson**
**Certifying Officer**

US009402060B2

(12) **United States Patent**
**Plante**

(10) **Patent No.: US 9,402,060 B2**
(45) **Date of Patent: *Jul. 26, 2016**

(54) **VEHICLE EVENT RECORDERS WITH INTEGRATED WEB SERVER**

(71) Applicant: **SmartDrive Systems, Inc.**, San Diego, CA (US)

(72) Inventor: **James Plante**, San Diego, CA (US)

(73) Assignee: **SMARTDRIVE SYSTEMS, INC.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/634,688**

(22) Filed: **Feb. 27, 2015**

(65) **Prior Publication Data**

US 2015/0181172 A1 Jun. 25, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 11/377,164, filed on Mar. 16, 2006, now Pat. No. 8,996,240.

(51) **Int. Cl.**
***G01M 17/00*** (2006.01)
***H04N 7/18*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. ***H04N 7/181*** (2013.01); ***G06F 9/4443*** (2013.01); ***G07C 5/008*** (2013.01); ***G07C 5/085*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ...... G07C 5/0891; G07C 5/085; B60R 11/04; B60R 2300/8006
USPC ......... 701/29.1, 33.3, 33.9, 36; 348/142, 143, 348/155, 148; 340/438, 439, 937
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

673,203 A 4/1901 Freund
673,795 A 5/1901 Hammer
(Continued)

FOREIGN PATENT DOCUMENTS

CA 2469728 12/2005
CA 2469728 A1 12/2005
(Continued)

OTHER PUBLICATIONS

Preliminary Claim Construction and Identification of Extrinsic Evidence of Defendant/Counterclaimant *SmartDriveSystems, Inc.' in DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H (RBB), for the Southern District of California. Nov. 8, 2011. (13 pgs.).

(Continued)

*Primary Examiner* — Gertrude Arthur Jeanglaud
(74) *Attorney, Agent, or Firm* — Sheppard Mullin Richter & Hampton LLP

(57) **ABSTRACT**

Vehicle event recorders are arranged with integrated web servers to provide a simple user interface and control mechanism which may be address with commonly available hardware and software. A vehicle event recorder of these inventions couples to a network having a workstation node. The workstation having either of the many available web browsers can be used to view, address, control, perform data transfer, et cetera, by way of data exchange in accordance with simple IP protocols. A vehicle equipped with these systems returns to a household to make a network connection. A local server is used to see all exposed system controls as provided by predefined web pages provided by a web server integrated as part of the vehicle event recorder unit.

**20 Claims, 9 Drawing Sheets**



(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 9/44*** | (2006.01) |
| ***G07C 5/00*** | (2006.01) |
| ***G07C 5/08*** | (2006.01) |
| ***H04L 29/06*** | (2006.01) |
| ***H04L 29/08*** | (2006.01) |
| ***H04L 12/24*** | (2006.01) |
| ***H04N 5/232*** | (2006.01) |

(52) **U.S. Cl.**
CPC ................ ***H04L 41/22*** (2013.01); ***H04L 65/60*** (2013.01); ***H04L 67/12*** (2013.01); ***H04L 67/42*** (2013.01); ***H04N 5/23206*** (2013.01); ***H04N 5/23216*** (2013.01); *G07C 5/0891* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 673,907 | A | 5/1901 | Johnson |
| 676,075 | A | 6/1901 | McDougall |
| 679,511 | A | 7/1901 | Richards |
| 681,036 | A | 8/1901 | Burg |
| 681,283 | A | 8/1901 | Waynick |
| 681,998 | A | 9/1901 | Swift |
| 683,155 | A | 9/1901 | Thompson |
| 683,214 | A | 9/1901 | Mansfield |
| 684,276 | A | 10/1901 | Lonergan |
| 685,082 | A | 10/1901 | Wood |
| 685,969 | A | 11/1901 | Campbell |
| 686,545 | A | 11/1901 | Selph |
| 689,849 | A | 12/1901 | Brown |
| 691,982 | A | 1/1902 | Sturgis |
| 692,834 | A | 2/1902 | Davis |
| 694,781 | A | 3/1902 | Prinz |
| 2,943,141 | A | 6/1960 | Knight |
| 3,634,866 | A | 1/1972 | Meyer |
| 3,781,824 | A | 12/1973 | Caiati |
| 3,812,287 | A | 5/1974 | Lemelson |
| 3,885,090 | A | 5/1975 | Rosenbaum |
| 3,992,656 | A | 11/1976 | Joy |
| 4,054,752 | A | 10/1977 | Dennis |
| 4,072,850 | A | 2/1978 | McGlynn |
| 4,258,421 | A | 3/1981 | Juhasz |
| 4,271,358 | A | 6/1981 | Schwarz |
| 4,276,609 | A | 6/1981 | Patel |
| 4,280,151 | A | 7/1981 | Tsunekawa |
| 4,281,354 | A | 7/1981 | Conte |
| 4,401,976 | A | 8/1983 | Stadelmayr |
| 4,409,670 | A | 10/1983 | Herndon |
| 4,420,773 | A | 12/1983 | Toyoda |
| 4,425,097 | A | 1/1984 | Owens |
| 4,456,931 | A | 6/1984 | Toyoda |
| 4,489,351 | A | 12/1984 | d'Alayer de Costemore |
| 4,496,995 | A | 1/1985 | Colles |
| 4,500,868 | A | 2/1985 | Tokitsu |
| 4,528,547 | A | 7/1985 | Rodney |
| 4,533,962 | A | 8/1985 | Decker |
| 4,558,379 | A | 12/1985 | Hutter |
| 4,588,267 | A | 5/1986 | Pastore |
| 4,593,313 | A | 6/1986 | Nagasaki |
| 4,621,335 | A | 11/1986 | Bluish |
| 4,625,210 | A | 11/1986 | Sagl |
| 4,630,110 | A | 12/1986 | Cotton |
| 4,632,348 | A | 12/1986 | Keesling |
| 4,638,289 | A | 1/1987 | Zottnik |
| 4,646,241 | A | 2/1987 | Ratchford |
| 4,651,143 | A | 3/1987 | Yamanaka |
| 4,671,111 | A | 6/1987 | Lemelson |
| 4,718,685 | A | 1/1988 | Kawabe |
| 4,754,255 | A | 6/1988 | Sanders |
| 4,758,888 | A | 7/1988 | Lapidot |
| 4,763,745 | A | 8/1988 | Eto |
| 4,785,474 | A | 11/1988 | Bernstein |
| 4,789,904 | A | 12/1988 | Peterson |
| 4,794,566 | A | 12/1988 | Richards |
| 4,804,937 | A | 2/1989 | Barbiaux |
| 4,806,931 | A | 2/1989 | Nelson |
| 4,807,096 | A | 2/1989 | Skogler |
| 4,814,896 | A | 3/1989 | Heitzman |
| 4,837,628 | A | 6/1989 | Sasaki |
| 4,839,631 | A | 6/1989 | Tsuji |
| 4,843,463 | A | 6/1989 | Michetti |
| 4,843,578 | A | 6/1989 | Wade |
| 4,853,856 | A | 8/1989 | Hanway |
| 4,853,859 | A | 8/1989 | Morita |
| 4,866,616 | A | 9/1989 | Takeuchi |
| 4,876,597 | A | 10/1989 | Roy |
| 4,883,349 | A | 11/1989 | Mittelhauser |
| 4,896,855 | A | 1/1990 | Furnish |
| 4,926,331 | A | 5/1990 | Windle |
| 4,930,742 | A | 6/1990 | Schofield |
| 4,936,533 | A | 6/1990 | Adams |
| 4,939,652 | A | 7/1990 | Steiner |
| 4,942,464 | A | 7/1990 | Milatz |
| 4,945,244 | A | 7/1990 | Castleman |
| 4,949,186 | A | 8/1990 | Peterson |
| 4,980,913 | A | 12/1990 | Skret |
| 4,987,541 | A | 1/1991 | Levente |
| 4,992,943 | A | 2/1991 | McCracken |
| 4,993,068 | A | 2/1991 | Piosenka |
| 4,995,086 | A | 2/1991 | Lilley |
| 5,012,335 | A | 4/1991 | Cohodar |
| 5,027,104 | A | 6/1991 | Reid |
| 5,046,007 | A | 9/1991 | McCrery |
| 5,050,166 | A | 9/1991 | Cantoni |
| 5,056,056 | A | 10/1991 | Gustin |
| 5,057,820 | A | 10/1991 | Markson |
| 5,096,287 | A | 3/1992 | Kakinami |
| 5,100,095 | A | 3/1992 | Haan |
| 5,111,289 | A | 5/1992 | Lucas |
| 5,140,434 | A | 8/1992 | Van |
| 5,140,436 | A | 8/1992 | Blessinger |
| 5,144,661 | A | 9/1992 | Shamosh |
| 5,178,448 | A | 1/1993 | Adams |
| 5,185,700 | A | 2/1993 | Bezos |
| 5,196,938 | A | 3/1993 | Blessinger |
| 5,223,844 | A | 6/1993 | Mansell |
| 5,224,211 | A | 6/1993 | Roe |
| 5,262,813 | A | 11/1993 | Scharton |
| 5,283,433 | A | 2/1994 | Tsien |
| 5,294,978 | A | 3/1994 | Katayama |
| 5,305,214 | A | 4/1994 | Komatsu |
| 5,305,216 | A | 4/1994 | Okura |
| 5,308,247 | A | 5/1994 | Dyrdek |
| 5,309,485 | A | 5/1994 | Chao |
| 5,311,197 | A | 5/1994 | Sorden |
| 5,321,753 | A | 6/1994 | Gritton |
| 5,327,288 | A | 7/1994 | Wellington |
| 5,330,149 | A | 7/1994 | Haan |
| 5,343,527 | A | 8/1994 | Moore |
| 5,353,023 | A | 10/1994 | Mitsugi |
| 5,361,326 | A | 11/1994 | Aparicio |
| 5,387,926 | A | 2/1995 | Bellan |
| 5,388,045 | A | 2/1995 | Kamiya |
| 5,388,208 | A | 2/1995 | Weingartner |
| 5,404,330 | A | 4/1995 | Lee |
| 5,408,330 | A | 4/1995 | Squicciarini |
| 5,422,543 | A | 6/1995 | Weinberg |
| 5,430,431 | A | 7/1995 | Nelson |
| 5,430,432 | A | 7/1995 | Camhi |
| 5,435,184 | A | 7/1995 | Pineroli |
| 5,445,024 | A | 8/1995 | Riley |
| 5,445,027 | A | 8/1995 | Zoerner |
| 5,446,659 | A | 8/1995 | Yamawaki |
| 5,455,625 | A | 10/1995 | Englander |
| 5,455,716 | A | 10/1995 | Suman |
| 5,465,079 | A | 11/1995 | Bouchard |
| 5,473,729 | A | 12/1995 | Bryant |
| 5,477,141 | A | 12/1995 | Naether |
| 5,495,242 | A | 2/1996 | Kick |
| 5,495,243 | A | 2/1996 | McKenna |
| 5,497,419 | A | 3/1996 | Hill |
| 5,499,182 | A | 3/1996 | Ousborne |
| 5,504,482 | A | 4/1996 | Schreder |
| 5,513,011 | A | 4/1996 | Matsumoto |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,515,285 | A | 5/1996 | Garrett |
| 5,519,260 | A | 5/1996 | Washington |
| 5,521,633 | A | 5/1996 | Nakajima |
| 5,523,811 | A | 6/1996 | Wada |
| 5,526,269 | A | 6/1996 | Ishibashi |
| 5,530,420 | A | 6/1996 | Tsuchiya |
| 5,532,678 | A | 7/1996 | Kin |
| 5,537,156 | A | 7/1996 | Katayama |
| 5,539,454 | A | 7/1996 | Williams |
| 5,541,590 | A | 7/1996 | Nishio |
| 5,544,060 | A | 8/1996 | Fujii |
| 5,546,191 | A | 8/1996 | Hibi |
| 5,546,305 | A | 8/1996 | Kondo |
| 5,548,273 | A | 8/1996 | Nicol |
| 5,552,990 | A | 9/1996 | Ihara |
| 5,559,496 | A | 9/1996 | Dubats |
| 5,568,211 | A | 10/1996 | Bamford |
| 5,570,087 | A | 10/1996 | Lemelson |
| 5,570,127 | A | 10/1996 | Schmidt |
| 5,574,424 | A | 11/1996 | Nguyen |
| 5,574,443 | A | 11/1996 | Hsieh |
| D376,571 | S | 12/1996 | Kokat |
| 5,581,464 | A | 12/1996 | Woll |
| 5,586,130 | A | 12/1996 | Doyle |
| 5,590,948 | A | 1/1997 | Moreno |
| 5,596,382 | A | 1/1997 | Bamford |
| 5,600,775 | A | 2/1997 | King |
| 5,608,272 | A | 3/1997 | Tanguay |
| 5,610,580 | A | 3/1997 | Lai |
| 5,612,686 | A | 3/1997 | Takano |
| 5,631,638 | A | 5/1997 | Kaspar |
| 5,638,273 | A | 6/1997 | Coiner |
| 5,642,106 | A | 6/1997 | Hancock |
| 5,646,856 | A | 7/1997 | Kaesser |
| 5,652,706 | A | 7/1997 | Morimoto |
| RE35,590 | E | 8/1997 | Bezos |
| 5,654,892 | A | 8/1997 | Fujii |
| 5,659,355 | A | 8/1997 | Barron |
| 5,666,120 | A | 9/1997 | Kline |
| 5,667,176 | A | 9/1997 | Zamarripa |
| 5,669,698 | A | 9/1997 | Veldman |
| 5,671,451 | A | 9/1997 | Takahashi |
| 5,677,979 | A | 10/1997 | Squicciarini |
| 5,680,117 | A | 10/1997 | Arai |
| 5,680,123 | A | 10/1997 | Lee |
| 5,686,765 | A | 11/1997 | Washington |
| 5,686,889 | A | 11/1997 | Hillis |
| 5,689,442 | A | 11/1997 | Swanson |
| 5,696,705 | A | 12/1997 | Zykan |
| 5,706,362 | A | 1/1998 | Yabe |
| 5,706,909 | A | 1/1998 | Bevins |
| 5,712,679 | A | 1/1998 | Coles |
| 5,717,456 | A | 2/1998 | Rudt |
| 5,719,554 | A | 2/1998 | Gagnon |
| 5,758,299 | A | 5/1998 | Sandborg |
| 5,781,101 | A | 7/1998 | Stephen |
| 5,781,145 | A | 7/1998 | Williams |
| 5,784,007 | A | 7/1998 | Pepper |
| 5,784,021 | A | 7/1998 | Oliva |
| 5,784,521 | A | 7/1998 | Nakatani |
| 5,790,403 | A | 8/1998 | Nakayama |
| 5,790,973 | A | 8/1998 | Blaker |
| 5,793,308 | A | 8/1998 | Rosinski |
| 5,793,420 | A | 8/1998 | Schmidt |
| 5,793,739 | A | 8/1998 | Tanaka |
| 5,793,985 | A | 8/1998 | Natarajan |
| 5,794,165 | A | 8/1998 | Minowa |
| 5,797,134 | A | 8/1998 | McMillan |
| 5,798,458 | A | 8/1998 | Monroe |
| 5,800,040 | A | 9/1998 | Santo |
| 5,802,545 | A | 9/1998 | Coverdill |
| 5,802,727 | A | 9/1998 | Blank |
| 5,805,079 | A | 9/1998 | Lemelson |
| 5,813,745 | A | 9/1998 | Fant |
| 5,815,071 | A | 9/1998 | Doyle |
| 5,815,093 | A | 9/1998 | Kikinis |
| 5,819,198 | A | 10/1998 | Peretz |
| 5,825,284 | A | 10/1998 | Dunwoody |
| 5,825,412 | A | 10/1998 | Hobson |
| 5,844,505 | A | 12/1998 | Van |
| 5,845,733 | A | 12/1998 | Wolfsen |
| 5,867,802 | A | 2/1999 | Borza |
| 5,877,897 | A | 3/1999 | Schofield |
| 5,896,167 | A | 4/1999 | Omae |
| 5,897,602 | A | 4/1999 | Mizuta |
| 5,897,606 | A | 4/1999 | Miura |
| 5,899,956 | A | 5/1999 | Chan |
| 5,901,806 | A | 5/1999 | Takahashi |
| 5,914,748 | A | 6/1999 | Parulski |
| 5,919,239 | A | 7/1999 | Fraker |
| 5,926,210 | A | 7/1999 | Hackett |
| 5,928,291 | A | 7/1999 | Jenkins |
| 5,938,321 | A | 8/1999 | Bos |
| 5,946,404 | A | 8/1999 | Bakshi |
| 5,948,038 | A | 9/1999 | Daly et al. |
| 5,959,367 | A | 9/1999 | OFarrell |
| 5,978,017 | A | 11/1999 | Tino |
| 6,002,326 | A | 12/1999 | Turner |
| 6,006,148 | A | 12/1999 | Strong |
| 6,008,723 | A | 12/1999 | Yassan |
| 6,008,841 | A | 12/1999 | Charlson |
| 6,009,370 | A | 12/1999 | Minowa |
| 6,011,492 | A | 1/2000 | Garesche |
| 6,028,528 | A | 2/2000 | Lorenzetti |
| 6,037,860 | A | 3/2000 | Zander |
| 6,037,977 | A | 3/2000 | Peterson |
| 6,041,410 | A | 3/2000 | Hsu |
| 6,049,079 | A | 4/2000 | Noordam |
| 6,057,754 | A | 5/2000 | Kinoshita |
| 6,060,989 | A | 5/2000 | Gehlot |
| 6,064,792 | A | 5/2000 | Fox |
| 6,067,488 | A | 5/2000 | Tano |
| 6,076,026 | A | 6/2000 | Jambhekar |
| 6,084,870 | A | 7/2000 | Wooten |
| 6,088,635 | A | 7/2000 | Cox |
| 6,092,008 | A | 7/2000 | Bateman |
| 6,092,193 | A | 7/2000 | Loomis |
| 6,100,811 | A | 8/2000 | Hsu |
| 6,111,254 | A | 8/2000 | Eden |
| 6,118,768 | A | 9/2000 | Bhatia |
| 6,122,738 | A | 9/2000 | Millard |
| 6,141,611 | A | 10/2000 | Mackey |
| 6,144,296 | A | 11/2000 | Ishida |
| 6,147,598 | A | 11/2000 | Murphy |
| 6,151,065 | A | 11/2000 | Steed |
| 6,163,338 | A | 12/2000 | Johnson |
| 6,163,749 | A | 12/2000 | McDonough |
| 6,167,186 | A | 12/2000 | Kawasaki |
| 6,170,742 | B1 | 1/2001 | Yacoob |
| 6,181,373 | B1 | 1/2001 | Coles |
| 6,182,010 | B1 * | 1/2001 | Berstis ............... G01C 21/3647 340/995.11 |
| 6,185,490 | B1 | 2/2001 | Ferguson |
| 6,195,605 | B1 | 2/2001 | Tabler |
| 6,200,139 | B1 | 3/2001 | Clapper |
| 6,208,919 | B1 | 3/2001 | Barkesseh |
| 6,211,907 | B1 | 4/2001 | Scaman |
| 6,218,960 | B1 | 4/2001 | Ishikawa |
| 6,246,933 | B1 | 6/2001 | Baque |
| 6,246,934 | B1 | 6/2001 | Otake |
| 6,252,544 | B1 | 6/2001 | Hoffberg |
| 6,253,129 | B1 | 6/2001 | Jenkins |
| 6,259,475 | B1 | 7/2001 | Ramachandran |
| 6,263,265 | B1 | 7/2001 | Fera |
| 6,266,588 | B1 | 7/2001 | McClellan |
| 6,298,290 | B1 | 10/2001 | Abe |
| 6,300,875 | B1 | 10/2001 | Schafer |
| 6,324,450 | B1 | 11/2001 | Iwama |
| 6,333,759 | B1 | 12/2001 | Mazzilli |
| 6,337,622 | B1 | 1/2002 | Sugano |
| 6,349,250 | B1 | 2/2002 | Hart |
| 6,353,734 | B1 | 3/2002 | Wright |
| 6,356,823 | B1 | 3/2002 | Iannotti |
| 6,360,147 | B1 | 3/2002 | Lee |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,366,207 | B1 | 4/2002 | Murphy |
| 6,389,339 | B1 | 5/2002 | Just |
| 6,389,340 | B1 | 5/2002 | Rayner |
| 6,400,835 | B1 | 6/2002 | Lemelson |
| 6,405,112 | B1 | 6/2002 | Rayner |
| 6,405,132 | B1 | 6/2002 | Breed |
| 6,408,232 | B1 | 6/2002 | Cannon |
| 6,411,874 | B2 | 6/2002 | Morgan |
| 6,421,080 | B1 | 7/2002 | Lambert |
| 6,434,510 | B1 | 8/2002 | Callaghan |
| 6,449,540 | B1 | 9/2002 | Rayner |
| 6,456,321 | B1 | 9/2002 | Ito |
| 6,459,988 | B1 | 10/2002 | Fan |
| 6,470,241 | B2 | 10/2002 | Yoshikawa |
| 6,472,771 | B1 | 10/2002 | Frese |
| 6,490,513 | B1 | 12/2002 | Fish |
| 6,493,650 | B1 | 12/2002 | Rodgers |
| 6,505,106 | B1 | 1/2003 | Lawrence |
| 6,507,838 | B1 | 1/2003 | Syeda-Mahmood |
| 6,508,400 | B1 | 1/2003 | Ishifuji |
| 6,516,256 | B1 | 2/2003 | Hartmann |
| 6,518,881 | B2 | 2/2003 | Monroe |
| 6,525,672 | B2 | 2/2003 | Chainer |
| 6,529,159 | B1 | 3/2003 | Fan |
| 6,535,804 | B1 | 3/2003 | Chun |
| 6,552,682 | B1 | 4/2003 | Fan |
| 6,556,905 | B1 | 4/2003 | Mittelsteadt |
| 6,559,769 | B2 | 5/2003 | Anthony |
| 6,574,538 | B2 | 6/2003 | Sasaki |
| 6,575,902 | B1 | 6/2003 | Burton |
| 6,580,373 | B1 | 6/2003 | Ohashi |
| 6,580,983 | B2 | 6/2003 | Laguer-Diaz |
| 6,593,848 | B1 | 7/2003 | Atkins, III |
| 6,594,576 | B2 | 7/2003 | Fan |
| 6,611,740 | B2 | 8/2003 | Lowrey |
| 6,611,755 | B1 | 8/2003 | Coffee |
| 6,624,611 | B2 | 9/2003 | Kirmuss |
| 6,629,029 | B1 | 9/2003 | Giles |
| 6,629,030 | B2 | 9/2003 | Klausner |
| 6,636,791 | B2 | 10/2003 | Okada |
| 6,664,922 | B1 | 12/2003 | Fan |
| 6,665,613 | B2 | 12/2003 | Duvall |
| 6,679,702 | B1 | 1/2004 | Rau |
| 6,684,137 | B2 | 1/2004 | Takagi |
| 6,694,483 | B1 | 2/2004 | Nagata |
| 6,701,234 | B1 | 3/2004 | Vogelsang |
| 6,714,894 | B1 | 3/2004 | Tobey |
| 6,718,239 | B2 | 4/2004 | Rayner |
| 6,721,640 | B2 | 4/2004 | Glenn |
| 6,721,652 | B1 | 4/2004 | Sanqunetti |
| 6,728,612 | B1 | 4/2004 | Carver |
| 6,732,031 | B1 | 5/2004 | Lightner |
| 6,732,032 | B1 | 5/2004 | Lowrey |
| 6,735,503 | B2 | 5/2004 | Ames |
| 6,737,954 | B2 | 5/2004 | Chainer |
| 6,738,697 | B2 | 5/2004 | Breed |
| 6,739,078 | B2 | 5/2004 | Morley |
| 6,741,168 | B2 | 5/2004 | Webb |
| 6,745,153 | B2 | 6/2004 | White |
| 6,747,692 | B2 | 6/2004 | Patel |
| 6,748,305 | B1 | 6/2004 | Klausner |
| 6,760,757 | B1 | 7/2004 | Lundberg |
| 6,762,513 | B2 | 7/2004 | Landgraf |
| 6,795,017 | B1 | 9/2004 | Puranik |
| 6,795,111 | B1 | 9/2004 | Mazzilli |
| 6,795,759 | B2 | 9/2004 | Doyle |
| 6,798,743 | B1 | 9/2004 | Ma |
| 6,804,590 | B2 | 10/2004 | Sato |
| 6,810,362 | B2 | 10/2004 | Adachi |
| 6,812,831 | B2 | 11/2004 | Ikeda |
| 6,819,989 | B2 | 11/2004 | Maeda |
| 6,831,556 | B1 | 12/2004 | Boykin |
| 6,832,140 | B2 | 12/2004 | Fan |
| 6,832,141 | B2 | 12/2004 | Skeen |
| 6,836,712 | B2 | 12/2004 | Nishina |
| 6,842,762 | B2 | 1/2005 | Raithel |
| 6,847,873 | B1 | 1/2005 | Li |
| 6,850,823 | B2 | 2/2005 | Eun |
| 6,859,695 | B2 | 2/2005 | Klausner |
| 6,859,705 | B2 | 2/2005 | Rao |
| 6,862,524 | B1 | 3/2005 | Nagda |
| 6,865,457 | B1 | 3/2005 | Mittelsteadt |
| 6,867,733 | B2 | 3/2005 | Sandhu |
| 6,873,261 | B2 | 3/2005 | Anthony |
| 6,882,313 | B1 | 4/2005 | Fan |
| 6,882,912 | B2 | 4/2005 | DiLodovico |
| 6,894,606 | B2 | 5/2005 | Forbes |
| 6,895,248 | B1 | 5/2005 | Akyol |
| 6,898,492 | B2 | 5/2005 | de Leon |
| 6,898,493 | B2 | 5/2005 | Ehrman |
| 6,919,823 | B1 | 7/2005 | Lock |
| 6,922,566 | B2 | 7/2005 | Puranik |
| 6,928,348 | B1 | 8/2005 | Lightner |
| 6,931,309 | B2 | 8/2005 | Phelan |
| 6,947,817 | B2 | 9/2005 | Diem |
| 6,950,122 | B1 | 9/2005 | Mirabile |
| 6,954,223 | B2 | 10/2005 | Miyazawa |
| 6,988,034 | B1 | 1/2006 | Marlatt |
| 7,003,289 | B1 * | 2/2006 | Kolls .................... G08G 1/205 455/422.1 |
| 7,012,632 | B2 | 3/2006 | Freeman |
| 7,020,548 | B2 | 3/2006 | Saito |
| 7,023,333 | B2 | 4/2006 | Blanco |
| 7,039,510 | B2 | 5/2006 | Gumpinger |
| 7,076,348 | B2 | 7/2006 | Bucher |
| 7,079,927 | B1 | 7/2006 | Tano |
| 7,082,359 | B2 | 7/2006 | Breed |
| 7,082,382 | B1 | 7/2006 | Rose et al. |
| 7,088,387 | B1 | 8/2006 | Freeman |
| 7,095,782 | B1 | 8/2006 | Cohen |
| 7,098,812 | B2 | 8/2006 | Hirota |
| 7,100,190 | B2 | 8/2006 | Johnson |
| 7,113,853 | B2 | 9/2006 | Hecklinger |
| 7,117,075 | B1 | 10/2006 | Larschan |
| 7,119,832 | B2 | 10/2006 | Blanco |
| 7,138,904 | B1 | 11/2006 | Dutu |
| 7,155,321 | B2 | 12/2006 | Bromley |
| 7,177,738 | B2 | 2/2007 | Diaz |
| 7,209,833 | B2 | 4/2007 | Isaji |
| 7,239,252 | B2 | 7/2007 | Kato |
| 7,254,482 | B2 | 8/2007 | Kawasaki |
| 7,265,663 | B2 | 9/2007 | Steele |
| 7,266,507 | B2 | 9/2007 | Simon |
| 7,272,179 | B2 | 9/2007 | Siemens |
| 7,308,341 | B2 | 12/2007 | Schofield |
| 7,317,974 | B2 | 1/2008 | Luskin |
| 7,343,306 | B1 | 3/2008 | Bates |
| 7,348,895 | B2 | 3/2008 | Lagassey |
| 7,349,027 | B2 | 3/2008 | Endo |
| 7,370,261 | B2 | 5/2008 | Winarski |
| 7,382,933 | B2 | 6/2008 | Dorai |
| 7,386,376 | B2 | 6/2008 | Basir |
| 7,389,178 | B2 | 6/2008 | Raz |
| 7,457,693 | B2 | 11/2008 | Olsen |
| 7,471,189 | B2 | 12/2008 | Vastad |
| 7,471,192 | B2 | 12/2008 | Hara |
| 7,536,457 | B2 | 5/2009 | Miller |
| 7,561,054 | B2 | 7/2009 | Raz |
| 7,584,033 | B2 | 9/2009 | Mittelsteadt |
| 7,623,754 | B1 | 11/2009 | McKain |
| 7,659,827 | B2 | 2/2010 | Gunderson |
| 7,659,835 | B2 | 2/2010 | Jung |
| 7,667,731 | B2 | 2/2010 | Kreiner |
| 7,702,442 | B2 | 4/2010 | Takenaka |
| 7,725,216 | B2 | 5/2010 | Kim |
| 7,768,548 | B2 | 8/2010 | Silvernail |
| 7,769,499 | B2 | 8/2010 | McQuade |
| 7,783,956 | B2 | 8/2010 | Ko |
| 7,804,426 | B2 | 9/2010 | Etcheson |
| 7,821,421 | B2 | 10/2010 | Tamir |
| 7,853,376 | B2 | 12/2010 | Peng |
| 7,893,958 | B1 | 2/2011 | DAgostino |
| 7,940,250 | B2 | 5/2011 | Forstall |
| 7,941,258 | B1 | 5/2011 | Mittelsteadt |

(56) **References Cited**

U.S. PATENT DOCUMENTS

7,974,748 B2 7/2011 Goerick
8,054,168 B2 11/2011 McCormick
8,068,979 B2 11/2011 Breed
8,090,598 B2 1/2012 Bauer
8,113,844 B2 2/2012 Huang
8,139,820 B2 3/2012 Plante
8,140,265 B2 3/2012 Grush
8,140,358 B1 3/2012 Ling
8,152,198 B2 4/2012 Breed
8,239,092 B2 8/2012 Plante
8,269,617 B2 9/2012 Cook
8,311,858 B2 11/2012 Everett
8,314,708 B2 11/2012 Gunderson
8,321,066 B2 11/2012 Becker
8,373,567 B2 2/2013 Denson
8,417,562 B1 4/2013 Siemens
8,442,690 B2 * 5/2013 Goldstein .............. G05B 15/02 700/275
8,471,701 B2 6/2013 Yariv
8,508,353 B2 8/2013 Cook
8,538,696 B1 9/2013 Cassanova
8,538,785 B2 9/2013 Coleman
8,564,426 B2 10/2013 Cook
8,564,446 B2 10/2013 Gunderson
8,571,755 B2 10/2013 Plante
8,577,703 B2 11/2013 McClellan
8,606,492 B1 12/2013 Botnen
8,635,557 B2 1/2014 Geise
8,676,428 B2 3/2014 Richardson
8,744,642 B2 6/2014 Nemat-Nasser
8,775,067 B2 7/2014 Cho
8,803,695 B2 8/2014 Denson
8,805,110 B2 8/2014 Rhoads
8,849,501 B2 9/2014 Cook
8,855,847 B2 10/2014 Uehara
8,868,288 B2 10/2014 Plante
8,880,279 B2 11/2014 Plante
8,892,310 B1 11/2014 Palmer
8,989,959 B2 3/2015 Plante
8,996,234 B1 3/2015 Tamari
8,996,240 B2 * 3/2015 Plante .................. G06F 9/4443 340/539.16
9,047,721 B1 6/2015 Botnen
9,183,679 B2 11/2015 Plante
9,201,842 B2 12/2015 Plante
9,208,129 B2 12/2015 Plante
9,226,004 B1 12/2015 Plante
9,240,079 B2 1/2016 Lambert
2001/0005217 A1 6/2001 Hamilton
2001/0005804 A1 6/2001 Rayner
2001/0018628 A1 8/2001 Jenkins
2001/0020204 A1 9/2001 Runyon
2001/0052730 A1 12/2001 Baur
2002/0019689 A1 2/2002 Harrison
2002/0027502 A1 3/2002 Mayor
2002/0029109 A1 3/2002 Wong
2002/0035422 A1 3/2002 Sasaki
2002/0044225 A1 4/2002 Rakib
2002/0059453 A1 5/2002 Eriksson
2002/0061758 A1 5/2002 Zarlengo
2002/0067076 A1 6/2002 Talbot
2002/0087240 A1 7/2002 Raithel
2002/0091473 A1 7/2002 Gardner
2002/0105438 A1 8/2002 Forbes
2002/0107619 A1 8/2002 Klausner
2002/0111725 A1 8/2002 Burge
2002/0111756 A1 8/2002 Modgil
2002/0118206 A1 8/2002 Knittel
2002/0120374 A1 8/2002 Douros
2002/0135679 A1 9/2002 Scaman
2002/0138587 A1 9/2002 Koehler
2002/0163532 A1 11/2002 Thomas
2002/0169529 A1 11/2002 Kim
2002/0169530 A1 11/2002 Laguer-Diaz
2002/0183905 A1 12/2002 Maeda
2003/0016753 A1 1/2003 Kim
2003/0028298 A1 2/2003 Macky
2003/0053433 A1 3/2003 Chun
2003/0055557 A1 3/2003 Dutta
2003/0065805 A1 4/2003 Barnes
2003/0067541 A1 4/2003 Joao
2003/0079041 A1 4/2003 Parrella
2003/0080713 A1 5/2003 Kirmuss
2003/0080878 A1 5/2003 Kirmuss
2003/0081121 A1 5/2003 Kirmuss
2003/0081122 A1 5/2003 Kirmuss
2003/0081127 A1 5/2003 Kirmuss
2003/0081128 A1 5/2003 Kirmuss
2003/0081934 A1 5/2003 Kirmuss
2003/0081935 A1 5/2003 Kirmuss
2003/0095688 A1 5/2003 Kirmuss
2003/0112133 A1 6/2003 Webb
2003/0125854 A1 7/2003 Kawasaki
2003/0144775 A1 7/2003 Klausner
2003/0152145 A1 8/2003 Kawakita
2003/0154009 A1 8/2003 Basir
2003/0158638 A1 8/2003 Yakes
2003/0177187 A1 9/2003 Levine
2003/0187704 A1 10/2003 Hashiguchi
2003/0191568 A1 10/2003 Breed
2003/0195678 A1 10/2003 Betters et al.
2003/0214585 A1 11/2003 Bakewell
2003/0220835 A1 11/2003 Barnes
2003/0222880 A1 12/2003 Waterman
2004/0008255 A1 1/2004 Lewellen
2004/0033058 A1 2/2004 Reich
2004/0039503 A1 2/2004 Doyle
2004/0039504 A1 2/2004 Coffee
2004/0044452 A1 3/2004 Bauer
2004/0044592 A1 3/2004 Ubik
2004/0054444 A1 3/2004 Abeska
2004/0054513 A1 3/2004 Laird
2004/0054689 A1 3/2004 Salmonsen
2004/0064245 A1 4/2004 Knockeart
2004/0070926 A1 4/2004 Boykin
2004/0083041 A1 4/2004 Skeen
2004/0088090 A1 5/2004 Wee
2004/0103008 A1 5/2004 Wahlbin
2004/0103010 A1 5/2004 Wahlbin
2004/0104842 A1 6/2004 Drury
2004/0111189 A1 6/2004 Miyazawa
2004/0138794 A1 7/2004 Saito
2004/0145457 A1 7/2004 Schofield et al.
2004/0153244 A1 8/2004 Kellum
2004/0153362 A1 8/2004 Bauer
2004/0167689 A1 8/2004 Bromley
2004/0179600 A1 9/2004 Wells
2004/0181326 A1 9/2004 Adams
2004/0184548 A1 9/2004 Kerbiriou
2004/0203903 A1 10/2004 Wilson
2004/0209594 A1 10/2004 Naboulsi
2004/0210353 A1 10/2004 Rice
2004/0230345 A1 11/2004 Tzamaloukas
2004/0230370 A1 11/2004 Tzamaloukas
2004/0230373 A1 11/2004 Tzamaloukas
2004/0230374 A1 11/2004 Tzamaloukas
2004/0233284 A1 11/2004 Lesesky
2004/0236474 A1 11/2004 Chowdhary
2004/0243285 A1 12/2004 Gounder
2004/0243308 A1 12/2004 Irish
2004/0243668 A1 12/2004 Harjanto
2004/0254689 A1 12/2004 Blazic
2004/0254698 A1 12/2004 Hubbard
2005/0021199 A1 1/2005 Zimmerman
2005/0043869 A1 2/2005 Funkhouser
2005/0060070 A1 3/2005 Kapolka
2005/0060071 A1 3/2005 Winner
2005/0065682 A1 3/2005 Kapadia
2005/0065716 A1 3/2005 Timko
2005/0073585 A1 4/2005 Ettinger
2005/0078423 A1 4/2005 Kim
2005/0088291 A1 4/2005 Blanco
2005/0099498 A1 5/2005 Lao
2005/0100329 A1 5/2005 Lao

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2005/0102074 | A1 | 5/2005 | Kolls |
| 2005/0125117 | A1 | 6/2005 | Breed |
| 2005/0131585 | A1 | 6/2005 | Luskin |
| 2005/0131595 | A1 | 6/2005 | Luskin |
| 2005/0131597 | A1 | 6/2005 | Raz |
| 2005/0136949 | A1 | 6/2005 | Barnes |
| 2005/0137757 | A1 | 6/2005 | Phelan |
| 2005/0137796 | A1 | 6/2005 | Gumpinger |
| 2005/0146458 | A1 | 7/2005 | Carmichael |
| 2005/0149238 | A1 | 7/2005 | Stefani |
| 2005/0149259 | A1 | 7/2005 | Cherveny |
| 2005/0159964 | A1 | 7/2005 | Sonnenrein |
| 2005/0166258 | A1 | 7/2005 | Vasilevsky |
| 2005/0171692 | A1 | 8/2005 | Hamblen |
| 2005/0174217 | A1 | 8/2005 | Basir |
| 2005/0182538 | A1 | 8/2005 | Phelan |
| 2005/0182824 | A1 | 8/2005 | Cotte |
| 2005/0185052 | A1 | 8/2005 | Raisinghani |
| 2005/0185936 | A9 | 8/2005 | Lao |
| 2005/0192749 | A1 | 9/2005 | Flann |
| 2005/0197748 | A1 | 9/2005 | Hoist |
| 2005/0200714 | A1 | 9/2005 | Marchese |
| 2005/0203683 | A1 | 9/2005 | Olsen |
| 2005/0206741 | A1 | 9/2005 | Raber |
| 2005/0209776 | A1 | 9/2005 | Ogino |
| 2005/0212920 | A1 | 9/2005 | Evans |
| 2005/0216144 | A1 | 9/2005 | Baldassa |
| 2005/0228560 | A1 | 10/2005 | Doherty |
| 2005/0233805 | A1 | 10/2005 | Okajima |
| 2005/0251304 | A1 | 11/2005 | Cancellara |
| 2005/0256681 | A1 | 11/2005 | Brinton |
| 2005/0258942 | A1 | 11/2005 | Manasseh |
| 2005/0264691 | A1 | 12/2005 | Endo |
| 2005/0283284 | A1 | 12/2005 | Grenier |
| 2006/0001671 | A1 | 1/2006 | Kamijo |
| 2006/0007151 | A1 | 1/2006 | Ram |
| 2006/0011399 | A1 | 1/2006 | Brockway |
| 2006/0015233 | A1 | 1/2006 | Olsen |
| 2006/0022842 | A1 | 2/2006 | Zoladek |
| 2006/0025897 | A1 | 2/2006 | Shostak |
| 2006/0030986 | A1 | 2/2006 | Peng |
| 2006/0040239 | A1 | 2/2006 | Cummins |
| 2006/0047380 | A1 | 3/2006 | Welch |
| 2006/0053038 | A1 | 3/2006 | Warren |
| 2006/0055521 | A1 | 3/2006 | Blanco |
| 2006/0057543 | A1 | 3/2006 | Roald |
| 2006/0058950 | A1 | 3/2006 | Kato |
| 2006/0072792 | A1 | 4/2006 | Toda |
| 2006/0078853 | A1 | 4/2006 | Lanktree |
| 2006/0082438 | A1 | 4/2006 | Bazakos |
| 2006/0092043 | A1 | 5/2006 | Lagassey |
| 2006/0095175 | A1 | 5/2006 | Dewaal |
| 2006/0095199 | A1 | 5/2006 | Lagassey |
| 2006/0095349 | A1 | 5/2006 | Morgan |
| 2006/0103127 | A1 | 5/2006 | Lie |
| 2006/0106514 | A1 | 5/2006 | Liebl |
| 2006/0111817 | A1 | 5/2006 | Phelan |
| 2006/0122749 | A1 | 6/2006 | Phelan |
| 2006/0129578 | A1 | 6/2006 | Kim |
| 2006/0142913 | A1 | 6/2006 | Coffee |
| 2006/0143435 | A1 | 6/2006 | Kwon |
| 2006/0147187 | A1 | 7/2006 | Takemoto |
| 2006/0161960 | A1 | 7/2006 | Benoit |
| 2006/0168271 | A1 | 7/2006 | Pabari |
| 2006/0178793 | A1 | 8/2006 | Hecklinger |
| 2006/0180647 | A1 | 8/2006 | Hansen |
| 2006/0192658 | A1 | 8/2006 | Yamamura |
| 2006/0200008 | A1 | 9/2006 | Moore-Ede |
| 2006/0200305 | A1 | 9/2006 | Sheha |
| 2006/0204059 | A1 | 9/2006 | Ido |
| 2006/0209090 | A1 | 9/2006 | Kelly et al. |
| 2006/0209840 | A1 | 9/2006 | Paatela |
| 2006/0212195 | A1 | 9/2006 | Veith |
| 2006/0215884 | A1 | 9/2006 | Ota |
| 2006/0226344 | A1 | 10/2006 | Werth |
| 2006/0229780 | A1 | 10/2006 | Underdahl |
| 2006/0242680 | A1 | 10/2006 | Johnson |
| 2006/0247833 | A1 | 11/2006 | Malhotra |
| 2006/0253307 | A1 | 11/2006 | Warren |
| 2006/0259218 | A1 | 11/2006 | Wu |
| 2006/0261931 | A1 | 11/2006 | Cheng |
| 2007/0001831 | A1 | 1/2007 | Raz |
| 2007/0005404 | A1 | 1/2007 | Raz |
| 2007/0027583 | A1 | 2/2007 | Tamir |
| 2007/0027726 | A1 | 2/2007 | Warren |
| 2007/0035632 | A1 | 2/2007 | Silvernail |
| 2007/0043487 | A1 | 2/2007 | Krzystofczyk |
| 2007/0120948 | A1 | 5/2007 | Fujioka |
| 2007/0124332 | A1 | 5/2007 | Ballesty |
| 2007/0127833 | A1 | 6/2007 | Singh |
| 2007/0132773 | A1 | 6/2007 | Plante |
| 2007/0135979 | A1 | 6/2007 | Plante |
| 2007/0135980 | A1 | 6/2007 | Plante |
| 2007/0136078 | A1 | 6/2007 | Plante |
| 2007/0142986 | A1 | 6/2007 | Alaous |
| 2007/0143499 | A1 | 6/2007 | Chang |
| 2007/0150138 | A1 | 6/2007 | Plante |
| 2007/0150140 | A1 | 6/2007 | Seymour |
| 2007/0173994 | A1 | 7/2007 | Kubo |
| 2007/0179691 | A1 | 8/2007 | Grenn |
| 2007/0183635 | A1 | 8/2007 | Weidhaas |
| 2007/0208494 | A1 | 9/2007 | Chapman |
| 2007/0216521 | A1 | 9/2007 | Guensler |
| 2007/0219685 | A1 | 9/2007 | Plante |
| 2007/0219686 | A1 | 9/2007 | Plante |
| 2007/0241874 | A1 | 10/2007 | Okpysh |
| 2007/0244614 | A1 | 10/2007 | Nathanson |
| 2007/0257781 | A1 | 11/2007 | Denson |
| 2007/0257782 | A1 | 11/2007 | Etcheson |
| 2007/0257804 | A1 | 11/2007 | Gunderson |
| 2007/0257815 | A1 | 11/2007 | Gunderson |
| 2007/0260677 | A1 | 11/2007 | DeMarco |
| 2007/0263984 | A1 | 11/2007 | Sterner |
| 2007/0268158 | A1 | 11/2007 | Gunderson |
| 2007/0271105 | A1 | 11/2007 | Gunderson |
| 2007/0273480 | A1 | 11/2007 | Burkman |
| 2007/0279214 | A1 | 12/2007 | Buehler |
| 2007/0299612 | A1 | 12/2007 | Kimura |
| 2008/0035108 | A1 | 2/2008 | Ancimer |
| 2008/0059019 | A1 | 3/2008 | Delia |
| 2008/0071827 | A1 | 3/2008 | Hengel |
| 2008/0111666 | A1 | 5/2008 | Plante |
| 2008/0122603 | A1 | 5/2008 | Plante |
| 2008/0143834 | A1 | 6/2008 | Comeau |
| 2008/0147267 | A1 | 6/2008 | Plante et al. |
| 2008/0157510 | A1 | 7/2008 | Breed |
| 2008/0167775 | A1 | 7/2008 | Kuttenberger |
| 2008/0169914 | A1 | 7/2008 | Albertson |
| 2008/0177436 | A1 | 7/2008 | Fortson |
| 2008/0195261 | A1 | 8/2008 | Breed |
| 2008/0204556 | A1 | 8/2008 | deMiranda |
| 2008/0211779 | A1 | 9/2008 | Pryor |
| 2008/0234920 | A1 | 9/2008 | Nurminen |
| 2008/0243389 | A1 | 10/2008 | Inoue |
| 2008/0252412 | A1 | 10/2008 | Larsson |
| 2008/0252485 | A1 | 10/2008 | Lagassey |
| 2008/0252487 | A1 | 10/2008 | McClellan |
| 2008/0269978 | A1 | 10/2008 | Shirole |
| 2008/0281485 | A1 | 11/2008 | Plante |
| 2008/0309762 | A1 | 12/2008 | Howard et al. |
| 2008/0319604 | A1 | 12/2008 | Follmer |
| 2009/0009321 | A1 | 1/2009 | McClellan |
| 2009/0043500 | A1 | 2/2009 | Satoh |
| 2009/0043971 | A1 | 2/2009 | Kim |
| 2009/0051510 | A1 | 2/2009 | Follmer |
| 2009/0138191 | A1 | 5/2009 | Engelhard |
| 2009/0157255 | A1 | 6/2009 | Plante |
| 2009/0216775 | A1 | 8/2009 | Ratliff et al. |
| 2009/0224869 | A1 | 9/2009 | Baker |
| 2009/0290848 | A1 | 11/2009 | Brown |
| 2009/0299622 | A1 | 12/2009 | Denaro |
| 2009/0312998 | A1 | 12/2009 | Berckmans |
| 2009/0326796 | A1 | 12/2009 | Prokhorov |
| 2009/0327856 | A1 | 12/2009 | Mouilleseaux |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2010/0030423 | A1 | 2/2010 | Nathanson |
| 2010/0045451 | A1 | 2/2010 | Periwal |
| 2010/0049516 | A1 | 2/2010 | Talwar |
| 2010/0054709 | A1 | 3/2010 | Misawa |
| 2010/0057342 | A1 | 3/2010 | Muramatsu |
| 2010/0063672 | A1 | 3/2010 | Anderson |
| 2010/0063680 | A1 | 3/2010 | Tolstedt |
| 2010/0063850 | A1 | 3/2010 | Daniel |
| 2010/0070175 | A1 | 3/2010 | Soulchin |
| 2010/0076621 | A1 | 3/2010 | Kubotani |
| 2010/0085193 | A1 | 4/2010 | Boss |
| 2010/0085430 | A1 | 4/2010 | Kreiner |
| 2010/0087984 | A1 | 4/2010 | Joseph |
| 2010/0100315 | A1 | 4/2010 | Davidson |
| 2010/0103165 | A1 | 4/2010 | Lee |
| 2010/0104199 | A1 | 4/2010 | Zhang |
| 2010/0153146 | A1 | 6/2010 | Angell |
| 2010/0157061 | A1 | 6/2010 | Katsman |
| 2010/0191411 | A1 | 7/2010 | Cook |
| 2010/0201875 | A1 | 8/2010 | Rood |
| 2010/0220892 | A1 | 9/2010 | Kawakubo |
| 2010/0250020 | A1 | 9/2010 | Lee |
| 2010/0250021 | A1 | 9/2010 | Cook |
| 2010/0250060 | A1 | 9/2010 | Maeda |
| 2010/0250116 | A1 | 9/2010 | Yamaguchi |
| 2010/0253918 | A1 | 10/2010 | Seder |
| 2010/0268415 | A1 | 10/2010 | Ishikawa |
| 2010/0283633 | A1 | 11/2010 | Becker |
| 2010/0312464 | A1 | 12/2010 | Fitzgerald |
| 2011/0035139 | A1 | 2/2011 | Konlditslotis |
| 2011/0043624 | A1 | 2/2011 | Haug |
| 2011/0060496 | A1 | 3/2011 | Nielsen |
| 2011/0077028 | A1 | 3/2011 | Wilkes |
| 2011/0091079 | A1 | 4/2011 | Yu-Song |
| 2011/0093159 | A1 | 4/2011 | Boling |
| 2011/0112995 | A1 | 5/2011 | Chang |
| 2011/0121960 | A1 | 5/2011 | Tsai |
| 2011/0125365 | A1 | 5/2011 | Larschan |
| 2011/0130916 | A1 | 6/2011 | Mayer |
| 2011/0140884 | A1 | 6/2011 | Santiago |
| 2011/0153367 | A1 | 6/2011 | Amigo |
| 2011/0161116 | A1 | 6/2011 | Peak |
| 2011/0173015 | A1 | 7/2011 | Chapman |
| 2011/0208428 | A1 | 8/2011 | Matsubara |
| 2011/0213628 | A1 | 9/2011 | Peak |
| 2011/0224891 | A1 | 9/2011 | Iwuchukwu |
| 2011/0251752 | A1 | 10/2011 | DeLarocheliere |
| 2011/0254676 | A1 | 10/2011 | Marumoto |
| 2011/0257882 | A1 | 10/2011 | McBurney |
| 2011/0273568 | A1 | 11/2011 | Lagassey |
| 2011/0283223 | A1 | 11/2011 | Vaittinen et al. |
| 2011/0304446 | A1 | 12/2011 | Basson |
| 2012/0021386 | A1 | 1/2012 | Anderson |
| 2012/0035788 | A1 | 2/2012 | Trepagnier |
| 2012/0041675 | A1 | 2/2012 | Juliver |
| 2012/0046803 | A1 | 2/2012 | Inou |
| 2012/0071140 | A1 | 3/2012 | Oesterling |
| 2012/0078063 | A1 | 3/2012 | Moore-Ede |
| 2012/0081567 | A1 | 4/2012 | Cote |
| 2012/0100509 | A1 | 4/2012 | Gunderson |
| 2012/0109447 | A1 | 5/2012 | Yousefi |
| 2012/0123806 | A1 | 5/2012 | Schumann |
| 2012/0134547 | A1 | 5/2012 | Jung |
| 2012/0150436 | A1 | 6/2012 | Rossano |
| 2012/0176234 | A1 | 7/2012 | Taneyhill |
| 2012/0190001 | A1 | 7/2012 | Knight |
| 2012/0210252 | A1 | 8/2012 | Fedoseyeva |
| 2012/0277950 | A1 | 11/2012 | Plante |
| 2012/0283895 | A1 | 11/2012 | Noda |
| 2013/0004138 | A1 | 1/2013 | Kilar |
| 2013/0006469 | A1 | 1/2013 | Green |
| 2013/0021148 | A1 | 1/2013 | Cook |
| 2013/0030660 | A1 | 1/2013 | Fujimoto |
| 2013/0073114 | A1 | 3/2013 | Nemat-Nasser |
| 2013/0096731 | A1 | 4/2013 | Tamari |
| 2013/0151980 | A1 | 6/2013 | Lee |
| 2013/0197774 | A1 | 8/2013 | Denson |
| 2013/0274950 | A1 | 10/2013 | Richardson |
| 2013/0317711 | A1 | 11/2013 | Plante |
| 2013/0332004 | A1 | 12/2013 | Gompert et al. |
| 2013/0345927 | A1 | 12/2013 | Cook |
| 2014/0025225 | A1 | 1/2014 | Armitage |
| 2014/0025254 | A1 | 1/2014 | Plante |
| 2014/0046550 | A1 | 2/2014 | Palmer |
| 2014/0047371 | A1 | 2/2014 | Palmer |
| 2014/0098228 | A1 | 4/2014 | Plante |
| 2014/0152828 | A1 | 6/2014 | Plante |
| 2014/0226010 | A1 | 8/2014 | Molin et al. |
| 2014/0279707 | A1 | 9/2014 | Joshua |
| 2014/0280204 | A1 | 9/2014 | Avery |
| 2014/0300739 | A1 | 10/2014 | Mimar |
| 2014/0309849 | A1 | 10/2014 | Ricci |
| 2014/0335902 | A1 | 11/2014 | Guba |
| 2015/0035665 | A1 | 2/2015 | Plante |
| 2015/0057836 | A1 | 2/2015 | Plante |
| 2015/0105934 | A1 | 4/2015 | Palmer |
| 2015/0134226 | A1 | 5/2015 | Palmer |
| 2015/0135240 | A1 | 5/2015 | Shibuya |
| 2015/0189042 | A1 | 7/2015 | Sun |
| 2015/0222449 | A1 | 8/2015 | Salinger |
| 2015/0317846 | A1 | 11/2015 | Plante |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2692415 | | 8/2011 |
| CA | 2692415 | A1 | 8/2011 |
| DE | 4416991 | A1 | 11/1995 |
| DE | 20311262 | | 9/2003 |
| DE | 20311262UU1 | | 9/2003 |
| DE | 202005008238 | | 9/2005 |
| DE | 102004004669 | | 12/2005 |
| DE | 102004004669 | A1 | 12/2005 |
| EP | 0708427 | A2 | 4/1996 |
| EP | 0840270 | A2 | 5/1998 |
| EP | 0848270 | A2 | 5/1998 |
| EP | 1170697 | A2 | 1/2002 |
| EP | 1324274 | A2 | 7/2003 |
| EP | 1355278 | A1 | 10/2003 |
| EP | 1427165 | A2 | 6/2004 |
| EP | 1818873 | A1 | 8/2007 |
| EP | 2104075 | | 9/2009 |
| GB | 2268608 | A | 1/1994 |
| GB | 2402530 | | 12/2004 |
| GB | 2402530 | A | 12/2004 |
| GB | 2451485 | | 2/2009 |
| GB | 2447184 | B | 6/2011 |
| GB | 2446994 | | 8/2011 |
| JP | 58085110 | | 5/1983 |
| JP | S5885110 | A | 5/1983 |
| JP | 62091092 | | 4/1987 |
| JP | S6291092 | A | 4/1987 |
| JP | S62166135 | A | 7/1987 |
| JP | 02056197 | | 2/1990 |
| JP | H0256197 | A | 2/1990 |
| JP | H04257189 | A | 9/1992 |
| JP | H05137144 | A | 6/1993 |
| JP | 5294188 | | 11/1993 |
| JP | H08124069 | A | 5/1996 |
| JP | H09163357 | A | 6/1997 |
| JP | H09272399 | A | 10/1997 |
| JP | 10076880 | | 3/1998 |
| JP | H1076880 | A | 3/1998 |
| JP | 2002191017 | | 7/2002 |
| JP | 2002191017 | A | 7/2002 |
| KR | 1000588169 | | 12/2000 |
| WO | 8809023 | A1 | 11/1988 |
| WO | 9005076 | | 5/1990 |
| WO | 9427844 | | 12/1994 |
| WO | 9600957 | A1 | 1/1996 |
| WO | 9701246 | | 1/1997 |
| WO | 9726750 | A1 | 7/1997 |
| WO | 9937503 | | 7/1999 |
| WO | 9940545 | A1 | 8/1999 |
| WO | 9962741 | | 12/1999 |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | 0007150 | A1 | 2/2000 |
| WO | 0028410 | A1 | 5/2000 |
| WO | 0048033 | | 8/2000 |
| WO | 0077620 | | 12/2000 |
| WO | 0123214 | | 4/2001 |
| WO | 0125054 | | 4/2001 |
| WO | 0146710 | A2 | 6/2001 |
| WO | 03045514 | | 6/2003 |
| WO | 2006022824 | | 3/2006 |
| WO | 2006022824 | A2 | 3/2006 |
| WO | 2007067767 | | 6/2007 |
| WO | 2011055743 | A1 | 5/2011 |

OTHER PUBLICATIONS

DriveCam's Disclosure of Asserted Claims and Preliminary Infringement Contentions in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H-RBB, for the Southern District of California. Aug. 19, 2011. (6 pgs.).

Supplement to DriveCam's Disclosure of Asserted Claims and Preliminary Infringement Contentions' in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H-RBB, for the Southern District of California. Oct. 14, 2011. (7 pgs.).

DriveCam, Inc.'s Infringement Contentions Exhibit C, U.S. Pat. No. 7,804,426. Aug. 19, 2011. (47 pgs.).

DriveCam, Inc.'s Infringement Contentions Exhibit B, U.S. Pat. No. 7,659,827. Aug. 19, 2011. (29 pgs.).

Notice of Allowance for U.S. Appl. No. 13/957,810, mailed Jun. 8, 2015, 10 pages.

"DriveCam, Inc's Disclosure of Proposed Constructions and Extrinsic Evidence Pursuant to Patent L.R. 4.1.a & 4.1.b" Disclosure and Extrinsic Evidence in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H-RBB, for the Southern District of California. Nov. 8, 2011.

"DriveCam Driving Feedback System", DriveCam brochure, Jun. 12, 2001, Document #6600128.

"DriveCam Driving Feedback System" DriveCam brochure, Mar. 15, 2004.

"DriveCam Passenger Transportation Module", DriveCam brochure, Oct. 26, 2001.

"DriveCam Video Event Data Recorder", DriveCam brochure, Nov. 6, 2002, Document #6600127.

"Responsive Claim Construction and Identification of Extrinsic Evidence of Defendani/Counterclaimant SmartDrive Systems, Inc." Claim Construction and and Extrinsic Evidence in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H (RBB), for the Southern District of California. Nov. 15, 2011.

"Sonic MyDVD 4.0: Tutorial: Trimming video segments". Tutorial for software bundled with Adaptec VideoOh! DVD USB 2.0 Edition, 2003.

"User's Manual for DriveCam Video Systems' HindSight 20/20 Software Version 4.0" DriveCam Manual, San Diego, 2003, Document #6600141-1.

Canadian Office Action issued in Application No. 2,632,685 dated Jan. 30, 2015; 5 pages.

Dan Maher, "DriveCam Taking Risk Out of Driving", DriveCam brochure folder, Jun. 6, 2005.

Del Lisk, "DriveCam Training Seminar" Handout, 2004.

European Examination Report issued in EP 07772812.9 on Jan. 22, 2015; 5 pages.

Jean (DriveCam vendor) "DriveCam Driving Feedback System", DriveCam brochure, Nov. 6, 2002, Document #6600128-1.

Notice of Allowance Allowance for U.S. Appl. No. 14/036,299, mailed Mar. 20, 2015, xx pages.

Notice of Allowance Application for U.S. Appl. No. 11/566,424, mailed Feb. 26, 2010, 6 pages.

Notice of Allowance for U.S. Appl. No. 11/377,164, mailed Dec. 3, 2014, 5 pages.

Notice of Allowance for U.S. Appl. No. 11/377,164, mailed Feb. 13, 2015, 2 pages.

Notice of Allowance for U.S. Appl. No. 11/377,164, mailed Feb. 25, 2014, 2 pages.

Notice of Allowance for U.S. Appl. No. 11/377,164, mailed Nov. 18, 2013, 7 pages.

Notice of Allowance for U.S. Appl. No. 11/377,167, mailed Apr. 1, 2015, 7 pages.

Notice of Allowance for U.S. Appl. No. 11/800,876, mailed Apr. 19, 2012, 8 pages.

USPTO Final Office Action for U.S. Appl. No. 11/296,906, mailed Aug. 8, 2012, 15 pages.

USPTO Final Office Action for U.S. Appl. No. 12/096,591, mailed Dec. 5, 2014, 23 pages.

USPTO Final Office Action for U.S. Appl. No. 12/096,591, mailed Jul. 18, 2012, 15 pages.

USPTO Final Office Action for U.S. Appl. No. 12/096,591, mailed Nov. 7, 2013, 14 pages.

USPTO Final Office Action for U.S. Appl. No. 13/957,810, mailed Jun. 27, 2014, 22 pages.

USPTO Final Office Action for U.S. Appl. No. 14/036,299, mailed Feb. 24, 2015, 9 pages.

USPTO Non-Final Office Action for U.S. Appl. No. 11/296,906, mailed Apr. 8, 2014, 19 pages.

USPTO Non-Final Office Action for U.S. Appl. No. 11/296,906, mailed Jun. 12, 2012, 13 pages.

USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, mailed Apr. 7, 2014, 7 pages.

USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, mailed Aug. 18, 2014, 5 pages.

USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, mailed Sep. 10, 2012, 10 pages.

USPTO Non-Final Office Action for U.S. Appl. No. 11/377,167, mailed Jun. 27, 2013, 11 pages.

USPTO Non-Final Office Action for U.S. Appl. No. 12/096,591, mailed Jun. 14, 2011, 8 pages.

USPTO Non-Final Office Action for U.S. Appl. No. 12/096,591, mailed Mar. 27, 2013, 16 pages.

USPTO Non-Final Office Action for U.S. Appl. No. 13/957,810, mailed Apr. 17, 2015, 6 pages.

USPTO Non-final Office Action for U.S. Appl. No. 13/957,810, mailed Nov. 27, 2013, 18 pages.

Adaptec published and sold its VideoOh! DVD software USB 2.0 Edition in at least Jan. 24, 2003.

Ambulance Companies Use Video Technology to Improve Driving Behavior, Ambulance Industry Journal, Spring 2003.

Amended Complaint for Patent Infringement, Trade Secret Misappropriation, Unfair Competition and Conversion in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H-RBB, for the Southern District of California, Document 34, filed Oct. 20, 2011, pp. 1-15.

Amendment filed Dec. 23, 2009 during prosecution of U.S. Appl. No. 11/566,424.

Answer to Amended Complaint; Counterclaims; and Demand for Jury Trial in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997 H (RBB), for the Southern District of California, Document 47, filed Dec. 13, 2011, pp. 1-15.

U.S. Appl. No. 11/296,906, filed Dec. 8, 2005, File History.

U.S. Appl. No. 11/297,669, filed Dec. 8, 2005, File History.

U.S. Appl. No. 11/297,889, filed Dec. 8, 2005, File History.

U.S. Appl. No. 11/298,069, filed Dec. 9, 2005, File History.

U.S. Appl. No. 11/299,028, filed Dec. 9, 2005, File History.

U.S. Appl. No. 11/593,659, filed Nov. 7, 2006, File History.

U.S. Appl. No. 11/593,682, filed Nov. 7, 2006, File History.

U.S. Appl. No. 11/593,882, filed Nov. 7, 2006, File History.

U.S. Appl. No. 11/595,015, filed Nov. 9, 2006, File History.

U.S. Appl. No. 11/637,754, filed Dec. 13, 2006, File History.

U.S. Appl. No. 11/637,755, filed Dec. 13, 2006, File History.

Bill, 'DriveCam—FAQ', Dec. 12, 2003.

Bill Siuru, 'DriveCam Could Save You Big Bucks', Land Line Magazine, May-Jun. 2000.

Chris Woodyard, 'Shuttles save with DriveCam', Dec. 9, 2003.

Dan Carr, Flash Video Template: Video Presentation with Navigation, Jan. 16, 2006, http://www.adobe.com/devnet/fiash/articles/vidtemplate_mediapreso_flash8.html.

(56) **References Cited**

OTHER PUBLICATIONS

David Cullen, 'Getting a real eyeful', Fleet Owner Magazine, Feb. 2002.
David Maher, 'DriveCam Brochure Folder', Jun. 6, 2005.
David Maher, "DriveCam Brochure Folder", Jun. 8, 2005.
David Vogeleer et al., Macromedia Flash Professional 8UNLEASHED (Sams Oct. 12, 2005).
Del Lisk, 'DriveCam Training Handout Ver4', Feb. 3, 2005.
Drivecam, Inc., User's Manual for Drivecam Video Systems' Hindsight 20/20 Software Version 4.0 (2003).
DriveCam, Inc.'s Infringement Contentions Exhibit A, U.S. Pat. No. 6,389,340, Document 34.1, Oct. 20, 2011.
DriveCam, Inc.'s Infringement Contentions Exhibit B, U.S. Pat. No. 7,659,827. Aug. 19, 2011.
DriveCam, Inc.'s Infringement Contentions Exhibit B, U.S. Pat. No. 7,804,426, Document 34.2, Oct. 20, 2011.
DriveCam, Inc.'s Infringement Contentions Exhibit C, U.S. Pat. No. 7,659,827, Document 34.3, Oct. 20, 2011.
DriveCam, Inc.'s Infringement Contentions Exhibit C, U.S. Pat. No. 7,804,426. Aug. 19, 2011.
DriveCam, Inc.'s Infringement Contentions Exhibit D, Document 34.4, Oct. 20, 2011.
DriveCam—Illuminator Data Sheet, Oct. 2, 2004.
Drivecam.com as retrieved by the Internet Wayback Machine as of Mar. 5, 2005.
DriveCam's Disclosure of Asserted Claims and Preliminary Infringement Contentions in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H-RBB, for the Southern District of California. Aug. 19, 2011.
DriveCam Driving Feedback System, Mar. 15, 2004.
DriveCam Extrinsic Evidence with Patent LR 4.1 .a Disclosures, Nov. 3, 2011.
DriveCam Extrinsic Evidence with Patent LR 4.1 .a Disclosures, Nov. 8, 2011.
Driver Feedback System, Jun. 12, 2001.
First Amended Answer to Amended Complaint and First Amended Counterclaims; and Demand for Jury Trial in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997 H (RBB), for the Southern District of California, Document 53, filed Dec. 20, 2011, pp. 1-48.
First Amended Answer to Amended Complaint and First Amended Counterclaims; and Demand for Jury Trial in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997 H (RBB), for the Southern District of California, Document 55, filed Jan. 1, 2012, pp. 86-103.
First Amended Answer to Amended Complaint and First Amended Counterclaims; and Demand for Jury Trial in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997 H (RBB), for the Southern District of California, Document 55, filed Jan. 3, 2012, pp. 86-103.
First Amended Answer to Amended Complaint and First Amended Counterclaims; and Demand for Jury Trial in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11 -CV-00997 H (RBB), for the Southern District of California, Exhibit A, Document 55, filed Jan. 3, 2012, pp. 49-103.
Franke, U., et al., Autonomous Driving Goes Downtown, IEEE Intelligent Systems, 13(6):40-48 (1988); Digital Object Identifier 10.1109/5254.736001.
Gallagher, B., et al., Wireless Communications for Vehicle Safety: Radio Link Performance and Wireless Connectivity Methods, Vehicular Technology Magazine, IEEE, 1(4):4- 24 (2006); Digital Object Identifier 10.1109/MVT.2006.343641.
Gandhi, T., et al., Pedestrian Protection Systems: Issues, Survey, and Challenges, IEEE Transactions on Intelligent Transportation Systems, 8(3):413-430 (2007); Digital Object Identifier 10.1109/TITS. 2007.903444.
Gary and Sophia Rayner, Final Report for Innovations Deserving Exploratory Analysis (Idea) Intelligent Transportation Systems (ITS) Programs' Project 84, I-Witness Black Box Recorder, San Diego, CA. Nov. 2001.
GE published its VCR User's Guide for Model VG4255 in 1995.
Glenn Oster, 'Hindsight 20/20 v4.0 Software Installation', 1 of 2, Jun. 20, 2003.
Glenn Oster, 'HindSight 20/20 v4.0 Software Installation', 2 of 2, Jun. 20, 2003.
Glenn Oster, 'Illuminator Installation', Oct. 3, 2004.
Hans Fantel, Video; Search Methods Make a Difference in Picking VCR's, NY Times, Aug. 13, 1989.
I/O Port Racing Supplies' website discloses using Traqmate's Data Acquisition with Video Overlay system in conjunction with professional driver coaching sessions (available at http://www.ioportracing.com/Merchant2/merchant.mvc?Screen=CTGY&Categorysub.--Code=coaching)., printed from site on Jan. 11, 2012.
Interior Camera Data Sheet, Oct. 26, 2001.
International Search Report and Written Opinion issued in PCT/US07/68325 on Feb. 27, 2008.
International Search Report and Written Opinion issued in PCT/US07/68328 on Oct. 15, 2007.
International Search Report and Written Opinion issued in PCT/US07/68329 on Mar. 3, 2008.
International Search Report and Written Opinion issued in PCT/US07/68332 on Mar. 3, 2008.
International Search Report and Written Opinion issued in PCT/US07/68334 on Mar. 5, 2008.
International Search Report for PCT/US2006/47055, Mailed Mar. 20, 2008 (2 pages).
International Search Report issued in PCT/US2006/47042 mailed Feb. 25, 2008.
J. Gallagher, 'Lancer Recommends Tech Tool', Insurance and Technology Magazine, Feb. 2002.
Jean (DriveCam vendor), 'DC Data Sheet', Nov. 6, 2002.
Jean (DriveCam vendor), 'DriveCam brochure', Nov. 6, 2002.
Jean (DriveCam vendor), 'Feedback Data Sheet', Nov. 6, 2002.
Jean (DriveCam vendor), 'Hindsight 20-20 Data Sheet', Nov. 4, 2002.
Jessyca Wallace, 'Analyzing and Processing DriveCam Recorded Events', Oct. 6, 2003.
Jessyca Wallace, 'Overview of the DriveCam Program', Dec. 15, 2005.
Jessyca Wallace, 'The DriveCam Driver Feedback System', Apr. 6, 2004.
Joint Claim Construction Chart, U.S. Pat. No. 6,389,340, 'Vehicle Data Recorder' for Case No. 3:11-CV-00997-H-RBB, Document 43-1, filed Dec. 1, 2011, pp. 1-33.
Joint Claim Construction Chart in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 11-CV-0997-H (RBB), for the Southern District of California, Document 43, filed Dec. 1, 2011, pp. 1-2.
Joint Claim Construction Worksheet, U.S. Pat. No. 6,389,340, 'Vehicle Data Reporter' for Case No. 3:11-CV-00997-H-RBB, Document 44-1, filed Dec. 1, 2011, pp. 1-10.
Joint Claim Construction Worksheet, U.S. Pat. No. 6,389,340, "Vehicle Data Reporter" for Case No. 3:11-CV-00997-H-RBB, Document 44-1, filed Dec. 1, 2011, pp. 1-10.
Joint Claim Construction Worksheet in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997 H (RBB), for the Southern District of California, Document 44, filed Dec. 1, 2011, pp. 1-2.
Joint Motion for Leave to Supplement Disclosure of Asserted Claims and Preliminary Infringement Contentions in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-cv-00997-H-RBB, Document 29, filed Oct. 12, 2011, pp. 1-7.
Julie Stevens, 'DriveCam Services', Nov. 15, 2004.
Julie Stevens, 'Program Support Roll-Out & Monitoring', Jul. 13, 2004.
Jung, Sang-Hack, et al., Egomotion Estimation in Monocular Infrared Image Sequence for Night Vision Applications, IEEE Workshop on Applications of Computer Vision (WACV '07), Feb. 2007, pp. 8-8; Digital Object Identifier 10.1109/WACV.2007.20.
JVC Company of America, JVC Video Cassette Recorder HR-IP820U Instructions (1996).
Kamijo, S., et al., A Real-Time Traffic Monitoring System by Stochastic Model Combination, IEEE International Conference on Systems, Man and Cybernetics, 4:3275-3281 (2003).

(56) **References Cited**

OTHER PUBLICATIONS

Kamijo, S., et al., An Incident Detection System Based on Semantic Hierarchy, Proceedings of the 7th International IEEE Intelligent Transportation Systems Conference, Oct. 3-6, 2004, pp. 853-858; Digital Object Identifier 10.1109/ITS0.2004.1399015.
Karen, 'Downloading Options to HindSight 20120', Aug. 6, 2002.
Karen, 'Managers Guide to the DriveCam Driving Feedback System', Jul. 30, 2002.
Kathy Latus (Latus Design), 'Case Study—Cloud 9 Shuttle', Sep. 23, 2005.
Kathy Latus (Latus Design), 'Case Study—Lloyd Pest Control', Jul. 19, 2005.
Kathy Latus (Latus Design), 'Case Study13 Time Warner Cable', Sep. 23, 2005.
Ki, Yong-Kul, et al., A Traffic Accident Detection Model using Metadala Registry, Proceedings of the Fourth International Conference on Software Engineering Research, Management and Applications; Aug. 9-11, 2006 pp. 255-259 Digital Object Identifier 10.1109/SERA.2006.8.
Kitchin, Charles. "Understanding accelerometer scale factor and offset adjustments." Analog Devices (1995).
Lin, Chin-Teng et al., EEG-based drowsiness estimation for safety driving using independent component analysis; IEEE Transactions on Circuits and Systems-I: Regular Papers, 52(12):2726-2738 (2005); Digital Object Identifier 10.1109/TCSI.2005.857555.
Lisa Mckenna, 'A Fly on the Windshield?', Pest Control Technology Magazine, Apr. 2003.
Miller, D.P., Evaluation of Vision Systems for Teleoperated Land Vehicles. Control Systems Magazine, IEEE, 8(3):37-41 (1988); Digital Identifier 10.1109/37.475.
Munder, S., et al., Pedestrian Detection and Tracking Using a Mixture of View-Based Shape-Texture Models, IEEE Transactions on Intelligent Transportation Systems, 9(2):333-343 (2008); Digital Identifier 10.1109/TITS.2008.922943.
Panasonic Corporation, Video Cassette Recorder (VCR) Operating Instructions for Models No. PV-V4020/PV-V4520.
Passenger Transportation Mode Brochure, May 2, 2005.
Patent Abstracts of Japan vol. 007, No. 180 (P-215), Aug. 9, 1983 & JP 58 085110 A (Mitsuhisa Ichikawa), May 21, 1983.
Patent Abstracts of Japan vol. 011, No. 292 (E-543), Sep. 19, 1987 & JP 62 091092 A (OK ENG:KK), Apr. 25, 1987.
Patent Abstracts of Japan vol. 012, No. 001 (M-656), Jan. 6, 1988 & JP 62 166135 A (Fuji Electric Co Ltd), Jul. 22, 1987.
Patent Abstracts of Japan vol. 014, No. 222 (E-0926), May 10, 1990 & JP 02 056197 A (Sanyo Electric Co Ltd), Feb. 26, 1990.
Patent Abstracts of Japan vol. 017, No. 039 (E-1311), Jan. 25, 1993 & JP 04 257189 A (Sony Corp), Sep. 11, 1992.
Patent Abstracts of Japan vol. 017, No. 521 (E-1435), Sep. 20, 1993 & JP 05 137144 A (Kyocera Corp), Jun. 1, 1993.
Patent Abstracts of Japan vol. 1996, No. 09, Sep. 30, 1996 & JP 08 124069 A (Toyota Motor Corp), May 17, 1996.
Patent Abstracts of Japan vol. 1997, No. 10, Oct. 31, 1997 & JP 09 163357 A (Nippon Soken Inc), Jun. 20, 1997.
Patent Abstracts of Japan vol. 1998, No. 02, Jan. 30, 1998 & JP 09 272399 A (Nippon Soken Inc), Oct. 21, 1997.
Patent Abstracts of Japan vol. 1998, No. 8, Jun. 30, 1998 & JP 10 076880 A (Muakami Corp), Mar. 24, 1998.
PCT/US2010/022012, Invitation to Pay Additional Fees with Communication of Partial International Search, Jul. 21, 2010.
Peter G. Thurlow, Letter (including exhibits) Regarding Patent Owner's Response to Initial Office Action in Ex Parte Reexamination, Mar. 27, 2012.
Preliminary Claim Construction and Identification of Extrinsic Evidence of Defendant/Counterclaimant SmartDriveSystems, Inc.' in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H (RBB), for the Southern District of California. Nov. 8, 2011.
Quinn Maughan, 'DriveCam Enterprise Services', Jan. 5, 2006.
Quinn Maughan, 'DriveCam Managed Services', Jan. 5, 2006.
Quinn Maughan, 'DriveCam Standard Edition', Jan. 5, 2006.
Quinn Maughan, 'DriveCam Unit Installation', Jul. 21, 2005.
Quinn Maughan, 'Enterprise Services', Apr. 17, 2006.
Quinn Maughan, 'Enterprise Services', Apr. 7, 2006.
Quinn Maughan, 'Hindsight Installation Guide', Sep. 29, 2005.
Quinn Maughan, 'Hindsight Users Guide', Jun. 7, 2005.
Ronnie Rittenberry, 'Eyes on the Road', Jul. 2004.
SmartDrives Systems, Inc's Production, SO14246-S014255, Nov. 16, 2011.
Supplement to DriveCam's Disclosure of Asserted Claims and Preliminary Infringement Contentions' in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H-RBB, for the Southern District of California. Oct. 14, 2011.
The DriveCam, Nov. 6, 2002.
The DriveCam, Nov. 8, 2002.
Traqmate GPS Data Acquisition's Traqmate Data Acquisition with Video Overlay system was used to create a video of a driving event on Oct. 2, 2005 (available at http://www.trackvision.net/phpBB2/viewtopic.php? t=51&sid=1184fbbcbe3be5c87ffa0f2ee6e2da76), printed from site on Jan. 11, 2012.
U.S. Appl. No. 12/691,639, entitled 'Driver Risk Assessment System and Method Employing Selectively Automatic Event Scoring', filed Jan. 21, 2010.
U.S. Appl. No. 11/377,167, Final Office Action dated Nov. 8, 2013.
U.S. Appl. No. 11/377,157, filed Mar. 16, 2006 entitled, "Vehicle Event Recorder Systems and Networks Having Parallel Communications Links".
U.S. Appl. No. 11/377,167, filed Mar. 16, 2006 entitled, "Vehicle Event Recorder Systems and Networks Having Integrated Cellular Wireless Communications Systems".
USPTO Final Office Action for U.S. Appl. No. 11/297,669, mailed Nov. 7, 2011, 15 pages.
USPTO Final Office Action for U.S. Appl. No. 13/957,810, mailed Jun. 27, 2014, 24 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/296,906, mailed Apr. 2, 2009, 7 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/296,906, mailed Nov. 6, 2009, 9 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/297,669, mailed Apr. 28, 2011, 11 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/299,028, mailed Apr. 24, 2008, 9 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, mailed Nov. 19, 2007, 7 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, mailed Nov. 25, 2011, 9 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, mailed Sep. 11, 2008, 8 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,167, mailed Jun. 5, 2008, 11 pages.
USPTO Non-Final Office Action for 11/800,876, mailed Dec. 1, 2010, 12 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/800,876, mailed Dec. 20, 2011, 8 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 12/096,591, mailed May 20, 2014, 19 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/296,907, Mailed Mar. 22, 2007 ( 17 pages).
USPTO Non-final Office Action mailed Aug. 27, 2009 during prosecution of U.S. Appl. No. 11/566,424.
USPTO Non-Final Office Action mailed Nov. 27, 2013 in U.S. Appl. No. 13/957,810, filed Aug. 2, 2013.
Veeraraghavan, H., et al., Computer Vision Algorithms for Intersection Monitoring, IEEE Transactions on Intelligent Transportation Systems, 4(2):78- 89 (2003); Digital Object Identifier 10.1109/TITS.2003.821212.
Wijesoma, W.S., et al., Road Curb Tracking in an Urban Environment, Proceedings of the Sixth International Conference of Information Fusion, 1:261-268 (2003).
World News Tonight, CBC Television New Program discussing teen drivers using the DriveCam Program and DriveCam Technology, Oct. 10, 2005, on PC formatted CD-R, World News Tonight.wmv, 7.02 MB, Created Jan. 12, 2011.

(56) **References Cited**

OTHER PUBLICATIONS

Written Opinion issued in PCT/US07/68328 on Oct. 15, 2007.
Written Opinion of the International Searching Authority for PCT/US2006/47042. Mailed Feb. 25. 2008 (5 pages).
Written Opinion of the International Searching Authority for PCT/US2006/47055, Mailed Mar. 20, 2008 (5 pages).
Inovate Motorsports, OT-1 16 Channel OBD-II Interface User Manual, Version 1.0, Nov. 28, 2007, pp. 3, 4, 21 & 27.
Trivinci Systems, LLC, Race-Keeper Systems User Guide, Jan. 2011, v1, 1.02, pp. 34 and 39.
USPTO Non-Final Office Action for U.S. Appl. No. 14/036,299, mailed Aug. 12, 2014.
USPTO Non-Final Office Action mailed Jan. 4, 2016 in U.S. Appl. No. 14/529,134, filed Oct. 30, 2014 (65 pgs).
PCT International Search Report and Written Opinion for PCT/US15/60721 dated Feb. 26, 2016, 11 pages.
Trivinci Systems, LLC, "Race-Keeper System User Guide", V1 .1.02, Jan. 2011, p. 21.

* cited by examiner


3
1
Vehicle Event Recorder
Web Server
2
4
8
7
Workstation
Web Browser
5
6

Fig. 1


21
Vehicle Event Recorder
μP
Web Server
23
22
Memory
25
24
26
Comm. Port

Fig. 2


31
Vehicle Event Recorder
33
32
35
μP
Event
Trigger
Web Server
34
Memory
37
36
38
39
Comm. Port

Fig. 3


45
43
Vehicle Event Recorder
Web Server
44
POST
48
47
GET
41
49
46
Workstation
Web Browser
42

Fig. 4


51
52
53
SmartDrive™ Camera Setup - Internet Explorer
File Edit View Favorites Tools Help
54
Address
http://192.168.1.8/camerasettings.htm
Google
55
56
Submit
511
System
Camera
Memory
Event Trigger
Output Port
57
58
Color
B and W
Grayscale
Brightness
Contrast
Intensity
59
Framerate 4
Zoom value 8
640 x 640
320 x 320
510
512

Fig. 5


61
SmartDrive Setup - Internet Explorer
File Edit View Favorites Tools Help
Address
http://192.168.1.8/systemsettings.htm
Google
63
62
System
Camera
Memory
Event Trigger
Output Port
64
IP address
192.168.1.8
65
constant timeline
Enhanced Timeline
66
68
67
Add user
user type
Trigger Threshold
69

Fig. 6


71
75
WiFi
74
WiFi
76
Vehicle Event Recorder
72
Web Server
73
77
78
Workstation
79
Web Browser

Fig. 7


82
81
Vehicle Event Recorder
Web Server
83
FTP Server
84
e-mail Server
85
87
Workstation
Web Browser
86

Fig. 8




Fig. 9

# VEHICLE EVENT RECORDERS WITH INTEGRATED WEB SERVER

## BACKGROUND OF THE INVENTIONS

1. Field

The following inventions disclosure is generally concerned with vehicle event recorder systems and specifically concerned with vehicle event recorder systems having integrated web server modules.

2. Prior Art

The inventions presented in U.S. Pat. No. 6,947,817 by inventor Diem for nonintrusive diagnostic tools for testing oxygen sensor operation relates to a diagnostic system for testing a vehicle where such systems include a wireless communications link between a vehicle any remote network of server computers. In particular, a WiFi type access points allowed an analyzer to communicate by way the Internet with a server computer hosting and oxygen sensor SOAP (simple object access protocol) service. In a nutshell, the system relates to smog sensors for automobiles which communicate with remote servers by way of a WiFi communications links.

Video surveillance systems are used to provide video records of events, incidents, happenings, et cetera in locations of special interest. For example, retail banking offices are generally protected with video surveillance systems which provide video evidence in case of robbery. While video surveillance systems are generally used in fixed location scenarios, mobile video surveillance systems are also commonly used today.

In particular, video systems have been configured for use in conjunction with an automobile and especially for use with police cruiser type automobiles. As a police cruiser is frequently quite near the scene of an active crime, important image information may be captured by video cameras installed on the police cruiser. Specific activity of interest which may occur about an automobile is not always associated with crime and criminals. Sometimes events which occur in the environments immediately about an automobile are of interest for reasons having nothing to do with crime. In example, a simple traffic accident where two cars come together in a collision may be the subject of video evidence of value. Events and circumstances leading up to the collision accident may be preserved such that an accurate reconstruction can be created. This information is useful when trying come to a determination as to cause, fault and liability. As such, general use of video systems in conjunction with automobiles is quickly becoming an important tool useful for the protection of all. Some examples of the systems are illustrated below with reference to pertinent documents.

Inventor Schmidt presents in U.S. Pat. No. 5,570,127, a video recording system for a passenger vehicle, namely a school bus, which has two video cameras one for an inside bus view and one for a traffic view, a single recorder, and a system whereby the two cameras are multiplexed at appropriate times, to the recording device. A switching signal determines which of the two video cameras is in communication with the video recorder so as to view passengers on the passenger vehicle at certain times and passing traffic at other times.

Thomas Doyle of San Diego, Calif. and QUALCOMM Inc. also of San Diego, present an invention for a method and apparatus for detecting fault conditions in a vehicle data recording device to detect tampering or unauthorized access, in U.S. Pat. No. 5,586,130. The system includes vehicle sensors for monitoring one or more operational parameters of the vehicle. The fault detection technique contemplates storing a current time value at regular intervals during periods in which



the recording device is provided with a source of main power. Inventor Doyle also teaches in the U.S. Pat. No. 5,815,071, a method and apparatus for monitoring parameters of vehicle electronic control units.

A "computerized vehicle log" is presented by Dan Kikinis of Saratoga Calif. in U.S. Pat. No. 5,815,093. The vehicle accident recording system employs a digital camera connected to a controller in nonvolatile memory, and an accident sensing interrupter. The oldest memory is overwritten by the newest images, until an accident is detected at which time the memory is blocked from further overwrites to protect the more vital images, which may include important information about the accident. Mr. Kikinis instructs that in preferred embodiments, the system has a communications port whereby stored images are downloaded after an accident to a digital device capable of displaying images. This feature is described in greater detail in the specification which indicates a wired download to a server having specialized image handling and processing software thereon.

Inventor Mr. Turner of Compton, Calif., no less, teaches an antitheft device for an automotive vehicle having both an audible alarm and visual monitor system. Video monitor operators are responsible for monitoring and handling an emergency situation and informing a 911 emergency station. This system is presented in U.S. Pat. No. 6,002,326.

A vehicle accident video recorder, in particular, a railroad vehicle accident video recorder, is taught by inventors Cox et al. In this system, a method and monitoring unit for recording the status of the railroad vehicle prior to a potential accident is presented. The monitoring unit continuously monitors the status of an emergency brake of the railroad vehicle and the status of a horn of the railroad vehicle. Video images are recorded and captured for a predetermined period of time after detecting that the emergency brake or horn blast has been applied as an event trigger. This invention is the subject of U.S. Pat. No. 6,088,635.

A vehicle crash data recorder is presented by inventor Ferguson of Bellaire, Ohio in U.S. Pat. No. 6,185,490. The apparatus is arranged with a three stage memory to record and retain information. And further it is equipped with a series and parallel connectors to provide instant on-scene access to accident data. It is important to note that Ferguson finds it important to include the possibility of on-site access to the data. Further, that Ferguson teaches use of a wired connection in the form of a serial or parallel hardwire connector. This teaching of Ferguson is common in many advanced systems configured as vehicle event recorders.

A traffic accident data recorder and traffic accident reproduction system and method is presented as U.S. Pat. No. 6,246,933. A plurality of sensors for registering vehicle operation parameters including at least one vehicle mounted digital video, audio camera is included for sensing storing and updating operational parameters. A rewritable, nonvolatile memory is provided for storing those processed operational parameters and video images and audio signals, which are provided by the microprocessor controller. Data is converted to a computer readable form and read by a computer such that an accident can be reconstructed via data collected.

U.S. Pat. No. 6,298,290 presented by Abe et al, teaches a memory apparatus for vehicle information data. A plurality of sensors including a CCD camera collision center of vehicle speed sensors, steering angle sensor, brake pressure sensor, acceleration sensor, are all coupled to a control unit. Further, the control unit passes information to a flash memory and a RAM memory subject to an encoder. The information collected is passed through a video output terminal. This illustrates another hardwire system and the importance placed by

experts in the art on a computer hardware interface. This is partly due to the fact that video systems are typically data intensive and wired systems are necessary as they have bandwidth sufficient for transfers of large amounts of data.

Mazzilli of Bayside, N.Y. teaches in U.S. Pat. No. 6,333,759 a 360° automobile video camera system. A complex mechanical mount provides for a single camera to adjust its viewing angle giving a 360° range for video recording inside and outside of an automotive vehicle.

U.S. Pat. No. 6,389,339 granted to Inventor Just, of Alpharetta, Ga. teaches a vehicle operation monitoring system and method. Operation of a vehicle is monitored with an onboard video camera linked with a radio transceiver. A monitoring service includes a cellular telecommunications network to view a video data received from the transceiver to a home-base computer. These systems are aimed at parental monitoring of adolescent driving. The mobile modem is designed for transmitting live video information into the network as the vehicle travels.

Morgan, Hausman, Chilek, Hubenak, Kappler, Witz, and Wright with their heads together invented an advanced law enforcement and response technology in U.S. Pat. No. 6,411,874 granted Jun. 25, 2002. A central control system affords intuitive and easy control of numerous subsystems associated with a police car or other emergency vehicle. This highly integrated system provides advanced control apparatus which drives a plurality of detector systems including video and audio systems distributed about the vehicle. A primary feature included in this device includes an advanced user interface and display system, which permits high level driver interaction with the system.

Inventor Lambert teaches in U.S. Pat. No. 6,421,080 a "digital surveillance system with pre-event recording". Pre-event recording is important in accident recording systems, because detection of the accident generally happens after the accident has occurred. A first memory is used for temporary storage. Images are stored in the temporary storage continuously until a trigger is activated which indicates an accident has occurred at which time images are transferred to a more permanent memory.

Systems taught by Gary Rayner in U.S. Pat. Nos. 6,389,340; 6,405,112; 6,449,540; and 6,718,239, each directed to cameras for automobiles which capture video images, both of forward-looking and driver views, and store recorded images locally on a mass storage system. An operator, at the end of the vehicle service day, puts a wired connector into a device port and downloads information into a desktop computer system having specialized application software whereby the images and other information can be played-back and analyzed at a highly integrated user display interface.

It is not possible in the systems Rayner teaches for an administrative operator to manipulate or otherwise handle the data captured in the vehicle at an off-site location without human intervention. It is necessary for a download operator to transfer data captured from the recorder unit device to a disconnected computer system. While proprietary 'DriveCam' files can be e-mailed or otherwise transferred through the Internet, those files are in a format with a can only be digested by desktop software running at a remote computer. It is necessary to have the DriveCam desktop application on the remote computer. In order that the files be properly read. In this way, data captured by the vehicles is totally unavailable to some parties having an interest in the data. Namely those parties who do not have access to a computer appropriately arranged with the specific DriveCam application software. A second and major disadvantage is systems presented by Rayner includes necessity that a human operator service the equipment each day in a manual download action.



Remote reporting and manipulation of automobile systems is not entirely new. The following are very important teachings relating to some automobile systems having a wireless communications link component.

Inventors Fan et al, teach inventions of methods and systems for detecting vehicle collision using global positioning system GPS. The disclosure of Jun. 12, 2001 resulted in granted U.S. Pat. No. 6,459,988. A GPS receiver is combined with wireless technology to automatically report accident and third parties remotely located. A system uses the GPS signals to determine when an acceleration value exceeds the preset threshold which is meant to be indicative of an accident having occurred.

Of particular interest include inventions presented by inventors Nagda et al., in the document numbered U.S. Pat. No. 6,862,524 entitled using location data to determine trafficking route information. In this system for determining and disseminating traffic information or route information, traffic condition information is collected from mobile units that provide their location or position information. Further route information may be utilized to determine whether a mobile unit is allowed or prohibited from traveling along a certain route.

A common assignee, @Road Inc., owns the preceding two patents in addition to the following: U.S. Pat. Nos. 6,529,159; 6,552,682; 6,594,576; 6,664,922; 6,795,017; 6,832,140; 6,867,733; 6,882,313; and 6,922,566. As such, @Road Inc., must be considered a major innovator in position technologies arts as they relate to mobile vehicles and remote server computers.

General Motors Corp. teaches in U.S. Pat. No. 6,728,612, an automated telematics test system and method. The invention provides a method and system testing a telematics system in a mobile vehicle a test command from a test center to a call center is based on a test script. The mobile vehicle is continuously in contact by way of cellular communication networks with a remotely located host computer.

Inventor Earl Diem and Delphi Technologies Inc., had granted to them on Sep. 20, 2005, U.S. Pat. No. 6,947,817. The nonintrusive diagnostic tool for sensing oxygen sensor operation include a scheme or an oxygen analyzer deployed in a mobile vehicle communicates by way of an access point to a remotely located server. A diagnostic heuristic is used to analyze the data and confirm proper operation of the sensor. Analysis may be performed by a mainframe computer quickly note from the actual oxygen sensor.

Similar patents including special relationships between mobile vehicles and remote host computers include those presented by various inventors in U.S. Pat. Nos. 6,735,503; 6,739,078; 6,760,757; 6,810,362; 6,832,141; and 6,850,823.

Another special group of inventions owned by Reynolds and Reynolds Holding Inc., is taught first by Lightner et al, in U.S. Pat. No. 6,928,348 issued Aug. 9, 2005. In these inventions, Internet based emission tests are performed on vehicles having special wireless couplings to computer networks. Data may be further transferred to entities of particular interest including the EPA or California Air Resources Board, for example, or particular insurance companies and other organizations concerned with vehicle emissions and environment.

Other patents held by Reynolds and Reynolds Holding Inc., include those relating to reporting of automobile performance parameters to remote servers via wireless links. Specifically, an onboard data bus OBD system is coupled to a microprocessor, by way of a standard electrical connector. The microprocessor periodically receives data and transmits

it into the wireless communications system. This information is more fully described in U.S. Pat. No. 6,636,790 granted Oct. 21, 2003. Inventors Lightner et al, present method and apparatus for remotely characterizing the vehicle performance. Data at the onboard data by his periodically received by a microprocessor and passed into a local transmitter. The invention specifically calls out transmission of data on a predetermined time interval. Thus these inventions do not anticipate nor include processing and analysis steps which result in data being passed at time other than expiration of the predetermined time period.

Reynolds and Reynolds Holding Inc., further describes systems where motor vehicles are coupled by wireless communications links to remote host servers in U.S. Pat. No. 6,732,031.

While systems and inventions of the art are designed to achieve particular goals and objectives, some of those being no less than remarkable, these inventions have limitations which prevent their use in new ways now possible. Inventions of the art are not used and cannot be used to realize the advantages and objectives of the inventions taught herefollowing.

The inventions disclosure of U.S. patent application filed Dec. 9, 2005 having Ser. No. 11/299,028 is presented by this same inventor. Further, another U.S. application filed Dec. 8, 2005 having Ser. No. 11/297,669 is similarly presented by same inventor. In addition, another U.S. application filed Dec. 7, 2005, entitled: “Memory Management in Event Recording Systems” serial number unknown; this application will be amended to properly reflect the serial number as soon as it is known, is also presented by instant inventor. Each of these disclosures include material which is critically important to a full understanding of important concepts relating to vehicle event recording systems. Accordingly, these disclosures are hereby incorporated here by explicit reference.

## SUMMARY OF THESE INVENTIONS

Comes now, James Plante with inventions of vehicle event recorders having integrated web servers.

Vehicle event recorders having integrated web server modules are first presented herein this disclosure. A vehicle event recorder is arranged as a video camera, microprocessor, memory among other supporting subsystems such that when a predetermined event occurs, in example a car crash or unexpected impact, a video record of the incident is preserved. In these inventions, such vehicle event recorders are further provided with an advanced interface system. A web server module is incorporated and arranged as part of the included computer system. Thus, the system and all its subsystems may be addressed via hypertext transfer protocol, http, type transactions and commands. Users can interact with vehicle event recorder units of these inventions with nothing other than any standard computer. It is no longer necessary to load, manage, and maintain, proprietary application specific software on a user’s workstation computer. Rather, a user may manipulate system settings, view and transfer files, receive e-mail alerts, and otherwise completely control the device as its functionality is entirely exposed by the integrated web server and complementary computing systems.

As a consumer product, a vehicle event recorder may be installed in a family vehicle without special knowledge or skill. The device operates to collect video and other vehicle performance information while the vehicle is in normal operation. Upon connection to a computer network, or more specifically a home computer network, a simple computer workstation equipped with a web browser can address the vehicle event recorder as the web server is responsive to requests sent by the web browser.

In addition, these systems include pre-programmed ‘web pages’ or ‘web forms’. These pages may be implemented as computer files stored in a ROM or DRAM, et cetera, of the vehicle event recorder. They are pre-programmed with interconnects and preset relationships with subsystems. For example, these pages may be provide an interface to camera settings such as brightness and contrast, et cetera.

Further, in some versions, a file transfer protocol server and simple mail transfer protocol servers are also included. These servers also support general interface mechanisms which permit standard computers to interact with these vehicle event recorders without requiring installation of special software and hardware systems.

## OBJECTIVES OF THESE INVENTIONS

It is a primary object of these inventions to provide vehicle event recorders and vehicle event recorder systems.

It is an object of these inventions to provide vehicle event recorders with an improved user interface.

It is a further object to eliminate previously required workstation desktop applications and complex external communications mechanisms and protocol.

It is an object of these inventions to provide interface to vehicle event recording systems via standard computing platforms and ubiquitous software.

A better understanding can be had with reference to detailed description of preferred embodiments and with reference to appended drawings. Embodiments presented are particular ways to realize these inventions and are not inclusive of all ways possible. Therefore, there may exist embodiments that do not deviate from the spirit and scope of this disclosure as set forth by appended claims, but do not appear here as specific examples. It will be appreciated that a great plurality of alternative versions are possible.

## BRIEF DESCRIPTION OF THE DRAWING FIGURES

These and other features, aspects, and advantages of the present invention will become better understood with regard to the following description, appended claims and drawings where:

FIG. **1** is a simple block diagram showing relationships between primary elements of systems of these inventions;

FIG. **2** is a block diagram of a vehicle event recorder head;

FIG. **3** illustrates the relationship a vehicle event recorder video camera has with its exterior and further illustrates other important elements of the vehicle event recorder head;

FIG. **4** illustrates transactions over a network element of these vehicle event recorder systems;

FIG. **5** illustrates an example browser type user interface associated with these systems;

FIG. **6** illustrates a second page of a browser having various system control functions which may be manipulated via the browser;

FIG. **7** illustrates an important network architecture and connection associated with these systems;

FIG. **8** illustrates in diagram several additional important functions which may be incorporated within a vehicle event recorder head; and

FIG. **9** illustrates an important network configuration which permits remote access to vehicle event recorder heads.

## GLOSSARY OF SPECIAL TERMS

Throughout this disclosure, reference is made to some terms which may or may not be exactly defined in popular

dictionaries as they are defined here. To provide a more precise disclosure, the following terms are presented with a view to clarity so that the true breadth and scope may be more readily appreciated. Although every attempt is made to be precise and thorough, it is a necessary condition that not all meanings associated with each term can be completely set forth. Accordingly, each term is intended to also include its common meaning which may be derived from general usage within the pertinent arts or by dictionary meaning. Where the presented definition is in conflict with a dictionary or arts definition, one must use the context of use and liberal discretion to arrive at an intended meaning. One will be well advised to error on the side of attaching broader meanings to terms used in order to fully appreciate the depth of the teaching and to understand all the intended variations.

Web Browser

A web browser is a computer graphical user interface operable for receiving computer files and presenting a graphical display which may have interactive elements sometimes called 'controls' or web controls. Further, a browser is operable for sending requests in the form of a computer file—generally both received and sent files are in a format such as XML or more familiarly HTML.

Web Server

A web server is implemented as a special module of a computer and is operable for exchanging information via computer files—generally files in XML/HTML formats. A web server receives requests and returns responses to external parties via a communications link.

Web Request

A web request is a data transmission arranged in agreement with Internet protocol directed to a specific web server.

Web Response

A web response is a data transmission by a web server arranged in agreement with Internet protocol and directed toward a requesting agent usually a web browser.

Physical Anomaly

Any change in a prescribed physical parameter which is defined as outside the scope of normal operating conditions.

Managed Loop Memory

A 'managed loop memory' is a memory system arranged to preserve in detail data captured during a period immediately past with respect to any instant but to overwrite that data with newer data when that data has sufficiently aged in accordance with a predefined expiration definition.

Vehicle Environments

The environment in and about a vehicle includes those spaces interior or exterior with respect to the car body. That is to say, traffic ahead of, behind, towards the sides of, and inside the driver compartment are all included as vehicle environments.

Communications Port

Includes means for supporting a data communications link including a transceiver or modem arrangement and suitable connection apparatus. Some examples include: a mobile cellular transceiver; WiFi; WiMax; bluetooth; Ethernet; serial port such as RS-232; among others.

## PREFERRED EMBODIMENTS OF THESE INVENTIONS

In accordance with each of preferred embodiments of these inventions, vehicle event recorders having integrated Web servers are provided. It will be appreciated that each of embodiments described include apparatus and that the apparatus of one preferred embodiment may be different than an apparatus of an alternative embodiment.

Vehicle event recorders first presented here are generally characterized as including: a video camera, microprocessor, memory, and web server module. Video images are captured during use of the vehicle. When a particular 'event' occurs, a captured video series is saved to a durable memory. When the vehicle is returned to a location where network connectivity is available, the captured video series is made available for review via a web server. The integrated web server, when connected to a TCP/IP network, can receive requests for information from external web browsers. These requests for information may be directed as requests to view data captured during a recent previous operation period. The web server is suitably coupled to a memory whereby data and files stored there may be transferred to the requesting web browser. Accordingly, web servers of these systems expose data captured by the device, including video data of scenes about the vehicle captured during vehicle use. In addition, these web servers are also coupled to system settings and operational parameters whereby adjustments to those settings and parameters may be effected via a web browser. For example, trigger threshold values may be set to be more or less sensitive. An event trigger system arranged to detect an abrupt acceleration action may include an adjustable sensitivity level. Via web browser interface, the event trigger threshold can be set by a remote user operating a standard web browser in communication with the device web server. A web server is part of a complement pair which forms a user interface system. A web server and web browser connected together via a TCP/IP network form an interface system which is convenient and very powerful. Complete control of the device is permitted because prerecorded "web pages" or "web forms" may be prepared as part of the web server. These pages and the controls thereon may be coupled to physical systems of the device. In this way, the user having no other tools than a standard computer with a web browser is able to completely interface with the system. As such, proprietary software and the complexity and inconvenience associated therewith are completely eliminated.

With reference to FIG. **1**, the reader will gain further appreciation of architecture relating to apparatus of these inventions. In particular, vehicle event recorder head unit **1** with integrated web server **2** is installed in a motor vehicle such as a common family car **3**. The vehicle event recorder head is coupled by way of a data communications link **4**, preferably a TCP/IP network to a computer workstation **5** operable for running a web browser **6**. The arrangement provides a graphical user interface to a remotely located user **7**, and further, means of remote input and interaction with the vehicle event recorder by way of common computer keyboard **8** for example. A user, in the comfort of a computer workplace, can provide a vehicle event recorder mounted in an automobile with instruction, update, interaction, download, review, among others. Functionality exposed by the vehicle event recorder becomes available to users working at a workstation by way of a common computer or 'Internet browser' graphical user interface. For example, a user can use simple browser control interfaces to set the camera contrast and brightness while at a workstation not in, or even not near, the car.

A vehicle event recorder with integrated web server is installed in the vehicle whereby a video camera has a clear view of the space and surroundings in front of the car. In this way, should the unfortunate occasion of a traffic accident occur, the video camera can provide a video record of traffic conditions and events leading up to the accident. A video series, including images captured just prior and just after an event moment as initiated by an event trigger, the series relating to an accident, is saved in a vehicle event recorder

local memory. At a later time, when the vehicle is appropriately coupled to a workstation by suitable communications link, video series data can be transferred to the workstation where it may be further viewed and analyzed. A vehicle may be coupled to a workstation by communications link of several alternative forms including at least an Ethernet hardware connection, a WiFi wireless communications link, a Bluetooth communications link, a wireless mobile telephone network link, among others. Workstations used in these arrangements are of the type common to nearly every desktop in every home or office. While a workstation alone is insufficient for interacting with vehicle event recorders of these inventions, a workstation with a 'web browser' or 'Internet browser' such as the Windows™ Internet Explorer is an ideal combination for providing access to vehicle event recorders so arranged. Of course, competing web browsers such as FireFox, Opera, Konqueror, Safari, Gecko, et cetera may be used with nearly identical effect. In all cases, these browsers will communicate with a vehicle event recorder because they all can read, parse and produce appropriate XML and HTML transactions. Thus, it is not necessary for users of these systems to buy, subscribe to, install, learn to use, maintain, update, re-install, among others, any proprietary software. Rather, these vehicle event recorders expose their functionality to any computer running a web browser of a user's choice.

In all prior art versions of similar systems, workstations are coupled to vehicle event recorders by way of proprietary application-specific software running on the workstation. Thus, it is impossible in those systems to manipulate and control a vehicle event recorder with a general purpose computer not having specially prepared programming. Data exchanges between a workstation application of the prior art and those vehicle event recorders typically include proprietary calls and file and object formats not compatible with general-purpose applications. In contrast, as the unique vehicle event recorders first presented here include a built-in web server, users have access to inner workings and settings of the vehicle event recorder by way of 'http' transactions. Further, simple data transfer including large video files may be taken up and handled by the same web server or by an accompanying ftp (file transfer protocol) server.

In some preferred versions, data communications link **4** is a common home network. A vehicle parked in the household garage becomes coupled to the home network by way of its proximity to a WiFi router for example. When a teenage driver returns home, mom instantly has access to information including video of her children's driving activity by way of her Internet browser.

A top-level block diagram of a video event recorder is presented as FIG. **2**. Video event recorders **21** of these inventions are comprised of the primary elements including: a video camera **22**, a microprocessor **23**, a web server **24**, memory **25**, and a communications port **26**. A typical arrangement of a vehicle event recorder includes having these elements combined within a small plastic housing suitable for being mounted near or at a car windshield. It is preferable to install these devices on the interior portions of a vehicle in the passenger/occupant space. While the elements described together in combination form a vehicle event recorder head, sometimes reference herein is made to a 'vehicle event recorder system'. When a head unit is coupled with a network or communications path which includes a workstation or other server remote from the vehicle event recorder head, the ensemble is considered a 'vehicle event recorder system'.

FIG. **3** presents further detail with regard to the architecture of these vehicle event recorders **31**. The camera field-of-view **32** may be arranged in 'forward looking' direction such that images of activity ahead of the vehicle are captured by the camera. Thus, it is said that the camera is coupled to environments about the vehicle. The video camera is further coupled electronically **33** to the microprocessor whereby the camera may transmit image data thereto. The microprocessor is further coupled electronically **34** to a memory which may be managed by the microprocessor to store image series associated with particular events such as traffic accidents. For example, upon receipt of signal from an event trigger **35**, a short video series stored in managed loop memory **36**, may be transferred to a more permanent stable memory, such as a high-capacity flash type memory **37**. Finally, the web server **38** is coupled to a communications port **39** which permits the web server to interact with exterior computing systems.



In some preferred versions, cameras are arranged as forward looking cameras, others are rearward looking cameras, and still others as driver compartment view cameras. The number of cameras associated with a single vehicle recorder unit is meant to be not limited to one.

In preferred versions, a local memory is arranged to capture and preserve video information associated with a time prior to, and after, an important event. A managed loop memory includes an overwrite process which preserves data for a limited time and overwrites data as soon as it has aged in accordance with an overwrite scheme. Upon the occurrence of a 'triggered event'—a car crash for example—the loop memory data is transferred to a buffer where it may be saved without subject to overwrite for an extended time.

An event trigger is arranged to detect a physical anomaly such as a high acceleration associated with a crash or other impact; alternatively a heavy swear or excessive braking maneuver; or even as a response to a panic button strike. The event trigger declares the occurrence of an incident and sets the memory to preserve all data associated with the incident or event.

A web server of these systems preferably includes preformed 'web pages' or sometimes 'web forms'. In some advanced versions, these can be arranged in accordance with the Microsoft technology ASP.NET or sometimes referred to as Active Server Pages. These pages offer great latitude in providing web controls which are coupled to the internal systems of the vehicle event recorder systems. For example, the video camera may be controlled in that its contrast, brightness and intensity can be manipulated via such web controls on ASP.NET pages.

Because a car is easily coupled to a home computer network via a WiFi system, preferred versions include vehicle event recorder units having an output port fashioned as a WiFi or WiMax transceiver. Alternatives may include other radio type transceivers such as bluetooth, or optical type wireless links such as those which exploit infrared optical coupling. Of course, while not as convenient, it is entirely possible that a parked car be coupled to a home network via a hardwired Ethernet connection. A vehicle event recorder arranged with a common network interface card could be plugged in with hardwire (RJ45 type connector) to a local Ethernet system.

A web server is sometimes considered a part of the microprocessor or other computing platform, as it may be embodied as a computer code module running thereon. In FIG. **3**, it is drawn separately from the microprocessor to bring emphasis to its importance. While known vehicle event recorders have been arranged with common microprocessors, it is first suggested here that a web server module be included and provide interface between a vehicle event recorder microprocessor and an external computing system. In this way, access to the microprocessor and vehicle event recorder subsystem

functionality is provided to any computer system which address the web server with appropriate http transactions. That is, the web server is arranged to receive well-formed http requests (in example, http 'GET' commands), and further to provide responses constructed as http answers (http 'POST' responses).

FIG. **4** illustrates more clearly a particular example of a transaction between a user operating at a computer workstation **41**, with installed Web browser **42**, linked by a communications link to a vehicle event recorder **43** having integrated web server **44** installed in a common family automobile **45**. From the workstation keyboard, the user **46** may inquire as to the state of the vehicle event recorder by sending an http request in the form of a GET type command **47**. A GET command is fashioned as an http request and includes the URL of the source being addressed—the 'web address' of the vehicle event recorder; and perhaps an introduction web form or home/default web form. For example, a particular web page providing access to certain desired functionality may have a URL as follows: "http://192.168.1.8/camerasettings.aspx". A GET command **47** including that URL is formed by and transmitted from the workstation's web browser to the vehicle event recorder's web server (having IP address 192.168.1.8). Upon receipt of the GET command, the web server responds by providing a POST action **48**—an http response. The POST action may include transmission of an XML or/and HTML coded web page, which may be appropriately interpreted and displayed by the web browser and its graphical user interface or sometimes 'window' presented to the user on a system monitor **49**.

To better explain what is meant by the phrase: 'the state of the vehicle event recorder' presented above, one might consider the following text in conjunction with the drawing presented as FIG. **5**. FIG. **5** illustrates an example of a web page served by the web server of a vehicle event recorder. A web page is sometimes comprised a interactive objects sometimes and herein referred to as "web controls". These include such controls commonly known as: 'menus'; 'toolbars'; 'drop-down boxes'; 'listboxes'; 'radio buttons'; 'checkboxes'; 'sliders'; 'textboxes', among others. In FIG. **5**, browser window **51** includes a field having a page title **52**: "SmartDrive™ Camera Setup". Further, the browser window includes a graphical element known as a menu or menu bar **53**, and toolbar **54**. Icons associated with various functionality are laid across a horizontal strip. When a user 'clicks' any of these icons, it sets into motion a computer code module to effect some operation. A very important aspect of any web browser include the address line **55**. An address line may contain the URL or web address of the source currently displayed. This address may be typed-in manually by a user, or it may have been arrived at by way of a hyperlink from another page displayed previously in the browser window. Typical web browser windows further include other interactive objects such as a search engine interface including a drop-down box **56**, a command button controls **57**, slider controls **58**, textboxes **59**, an 'option' or radio buttons **510**. From these web controls, a user interface is brought about and designed for interaction with the available functions in a vehicle event recorder hosting the associated web pages on its web server. A user may adjust a control and thereafter send the state of the web page to the vehicle event recorder unit. This is accomplished by 'pointing' and 'clicking' to change the control settings and then submitting the page or posting the page to the web server in the vehicle event recorder. In example, one may adjust the contrast of the camera by using slider control **58** and thereafter submit button **511** which results in the page being posted back to the web server and ultimately the contrast being improved. A careful observer will note that each of command button controls **57** may lead to a different association of certain functions in groups. The functions of the camera are grouped into those which are displayed in that field **512**. If the command button associated with system functions is chosen, then the available functions in field may change without appreciable change to the general form of the page. FIG. **6** illustrates.



A group of controls associated with system function is presented in the diagram of FIG. **6** which is a graphical user interface embodied as a web page **61**. Command button control **62** associated with the system settings is called at the browser by way of this page's URL http://192.168.1.8/systemsettings.htm **63**. The page permits a user to adjust the IP address **64** of the vehicle event recorder at textbox **65**. A user may choose a particular enhanced timeline at a drop down box **66** as prescribed by those available in a managed loop memory system. User data/profile can be entered at textbox **67** and command button **68** can be used to save a username to a memory in the vehicle event recorder. Finally, a trigger threshold can be set on a continuous slider control **69** to make an event trigger in the vehicle event recorder either more or less sensitive. In this way, a user at a remote computer running a simple internet browser makes adjustments directly to a vehicle event recorder installed in a vehicle.

While sometimes these web servers are arranged with pre-programmed 'web page' objects addressable via web request actions, they may also include programmed modules known as web services. These functions, properties and events, do not have a user interface associated with them, however they include transaction interface which permits their being addressed via TCP/IP web requests. These functions, properties and events may be coupled to subsystems of the vehicle event recorder head. For example, an 'authorized users list' may be adjusted whereby log-on actions by users are enabled/disabled. This web service may be taken up automatically in response to some condition being met. Therefore, without user interaction via a web page, but rather by purely automated processes, i.e. web services, these vehicle event recorder systems may be adjusted and otherwise manipulated.

Best modes of these inventions are illustrated in FIG. **7**. A vehicle **71** is prepared with a vehicle event recorder unit **72** having therewith an integrated web server **73**. A communications port, in example a WiFi transceiver **74** permits the vehicle event recorder to connect wirelessly to a home network by way of complimentary WiFi transceiver/router **75**. When the car enters a zone or space **76** served by the transceiver/router, the vehicle event recorder web server is accessible by a user **77** operating workstation **78** running a web browser **79** program. The user may adjust, upload, download, browse, and otherwise interact with the vehicle event record and data stored on the vehicle event recorder.

In special advanced versions, vehicle event recorders additionally include modules other than a simple web server. For example, an vehicle event recorder may additionally include a file exchange and e-mail server systems. FIG. **8** shows graphically a vehicle event recorder **81** for use in conjunction with vehicle **82**, the vehicle event recorder comprising an integrated web server **83**, a file transport protocol ftp server **84**, and an e-mail (SMTP) server **85**. The web browser **86** at a user workstation **87** similarly communicates with these elements in a conventional way to bring about these functions in a vehicle event recorder. In this way, automatic triggers can be arranged in the vehicle event recorder such that it can send e-mail messages in response to certain events having been 'fired' in the normal processing of the system. When some-

thing of interest occurs, an e-mail message is prepared and queued. On the next occasion where the vehicle event recorder is connected to the internet, the SMTP sends the e-mail to the intended recipient. In a similar fashion, the vehicle event recorder ftp server operates to send and receive data files.

While most preferred versions are arranged with the primary objective being a home, family or small number user local systems, these inventions are also meant to include as a special case the need for remote operation. A private home computer network can be arranged with a public port which exposes certain services through a firewall to the public internet. In this way, a vacationing parent can still have a look at the vehicle use records from afar. Vehicle **91** equipped with vehicle event recorder **92** having integrated web server communicates with local radio **93** as it enters communications space **94**. the mere act of the vehicle entering **95** the space causes the vehicle event recorder to become connected to the network which may include the Internet. Accordingly, a communications link **96** of many thousands of miles is possible whereby a user **97** working on any workstation **98** equipped with a browser can address the web, file and mail servers of the remotely located vehicle event recorder.

One will now fully appreciate how a vehicle event recorder having an integrated web server is used to provide simple user access to operation and function of these systems. Although the present inventions have been described in considerable detail with clear and concise language and with reference to certain preferred versions thereof including best modes anticipated by the inventors, other versions are possible. Therefore, the spirit and scope of the invention should not be limited by the description of the preferred versions contained therein, but rather by the claims appended hereto.

It is claimed:

**1**. A vehicle event recorder comprising:

a video camera configured to acquire visual information representing a vehicle environment, the vehicle environment including spaces in and around an interior and an exterior of a vehicle;

a memory configured to electronically store information;

an event trigger configured to detect a vehicle event responsive to an event parameter breaching an event trigger threshold level; and

a microprocessor configured to:

responsive to detection of the vehicle event, effectuate storage of visual information associated with the vehicle event in the memory;

facilitate wireless communication of information between the vehicle event recorder and a remotely located computing device using HTTP;

receive settings information from the remotely located computing device, wherein the settings information is operable to adjust vehicle event recorder settings pertaining to operation of one or both of the video camera and the event trigger, and

adjust the vehicle event recorder settings based on the received settings information.

**2**. The vehicle event recorder of claim **1**, wherein the microprocessor is further configured to cause communication of the visual information associated with the vehicle event stored in the memory to the remotely located computing device.

**3**. The vehicle event recorder of claim **2**, wherein the remotely located computing device:

determines adjustments to the vehicle event recorder settings based on one or more previously detected vehicle events, the one or more previously detected vehicle events including the vehicle event detected by the event trigger; and

communicates the settings information indicating the determined adjustments to the microprocessor.

**4**. The vehicle event recorder of claim **1**, wherein the microprocessor is further configured to adjust the vehicle event recorder settings based on settings information received from a user via the remotely located computing device.

**5**. The vehicle event recorder of claim **4**, wherein the microprocessor is further configured such that facilitating wireless communication includes generating one or more web pages for presentation to the user via a web browser on the remotely located computing device, the one or more web pages configured to receive entry and/or selection of the settings information from the user.

**6**. The vehicle event recorder of claim **5**, wherein the microprocessor is further configured such that the one or more web pages comprise one or more fields configured to receive entry and/or selection of the settings information from the user.

**7**. The vehicle event recorder of claim **1**, wherein the microprocessor is further configured such that the vehicle event recorder settings include an event trigger threshold level, the event trigger threshold level adjusted based on threshold settings information received from the remotely located computing device, the threshold settings information entered and/or selected by a user via a trigger threshold control field presented by the remotely located computing device, the threshold settings information indicating a desired event trigger threshold level from the user.

**8**. The vehicle event recorder of claim **7**, wherein the microprocessor is further configured such that the trigger threshold control field facilitates adjustment of a sensitivity of the event trigger, wherein adjusting a sensitivity of the event trigger comprises an increase and/or decrease in the event trigger threshold level made directly by the user via the trigger threshold control field.

**9**. The vehicle event recorder of claim **8**, wherein the microprocessor is further configured such that the trigger threshold control field includes a web page object control button configured to be manipulated by the user to adjust the sensitivity of the event trigger.

**10**. The vehicle event recorder of claim **1**, further comprising

an output port configured to facilitate the wireless communication between the vehicle event recorder and the remotely located computing device,

wherein the microprocessor is further configured such that the vehicle event recorder settings are associated with one or more of the video camera, the memory, the event trigger, or the output port.

**11**. A computer implemented method for adjusting vehicle event recorder settings with a vehicle event recorder, the vehicle event recorder comprising a video camera, a memory, an event trigger, and a processor, the method comprising:

acquiring, with the video camera, visual information representing a vehicle environment, the vehicle environment including spaces in and around an interior and an exterior of a vehicle;

detecting, with the event trigger, a vehicle event responsive to an event parameter breaching an event trigger threshold level;

responsive to detecting the vehicle event, effectuate, with the processor, storage of visual information associated with the vehicle event in an electronic memory;

facilitating, with the processor, wireless communication of information between the vehicle event recorder and a remotely located computing device using HTTP;

receiving settings information from the remotely located computing device, wherein the settings information is operable to adjust vehicle event recorder settings pertaining to operation of one or both of the video camera and the event trigger; and

adjusting, with the processor, the vehicle event recorder settings based on the received settings information.

**12**. The method of claim **11**, further comprising causing communication of the visual information associated with the vehicle event stored in the memory to the remotely located computing device.

**13**. The method of claim **12**, further comprising:

determining adjustments to the vehicle event recorder settings based on one or more previously detected vehicle events; and

communicating the settings information indicating the determined adjustments.

**14**. The method of claim **11**, further comprising adjusting the vehicle event recorder settings based on settings information received from a user via the remotely located computing device.

**15**. The method of claim **14**, wherein facilitating wireless communication includes generating one or more web pages for presentation to the user via a web browser on the remotely located computing device, the one or more web pages configured to receive entry and/or selection of the settings information from the user.

**16**. The method of claim **15**, wherein the one or more web pages comprise one or more fields configured to receive entry and/or selection of the settings information from the user.

**17**. The method of claim **11**, wherein the vehicle event recorder settings include an event trigger threshold level, the event trigger threshold level adjusted based on threshold settings information received from the remotely located computing device, the threshold settings information entered and/or selected by a user via a trigger threshold control field presented by the remotely located computing device, the threshold settings information indicating a desired event trigger threshold level from the user.

**18**. The method of claim **17**, wherein the trigger threshold control field facilitates adjustment of a sensitivity of the event trigger, wherein adjusting a sensitivity of the event trigger comprises an increase and/or decrease in the event trigger threshold level made directly by the user via the trigger threshold control field.

**19**. The method of claim **18**, wherein the trigger threshold control field includes a web page object control button configured to be manipulated by the user to adjust the sensitivity of the event trigger.

**20**. The method of claim **19**, further comprising

facilitating the wireless communication between the vehicle event recorder and the remotely located computing device with an output port of the vehicle event recorder,

wherein the vehicle event recorder settings are associated with one or more of the video camera, the memory, the event trigger, or the output port.

* * * * *

8468738

# THE UNITED STATES OF AMERICA

**TO ALL TO WHOM THESE PRESENTS SHALL COME:**

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

March 15, 2024

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *9,911,253*

ISSUE DATE: *March 6, 2018*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Paula Smith

Paula Smith
Certifying Officer

US009911253B2

(12) **United States Patent**
**Plante**

(10) **Patent No.: US 9,911,253 B2**
(45) **Date of Patent: *Mar. 6, 2018**

(54) **MEMORY MANAGEMENT IN EVENT RECORDING SYSTEMS**

(71) Applicant: **SMARTDRIVE SYSTEMS, INC.**, San DieGO, CA (US)

(72) Inventor: **James Plante**, San Diego, CA (US)

(73) Assignee: **SmartDrive Systems, Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 46 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/981,384**

(22) Filed: **Dec. 28, 2015**

(65) **Prior Publication Data**

US 2016/0117872 A1 Apr. 28, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/531,854, filed on Nov. 3, 2014, now Pat. No. 9,226,004, which is a

(Continued)

(51) **Int. Cl.**
***G07C 5/08*** (2006.01)
***H04N 21/234*** (2011.01)

(Continued)

(52) **U.S. Cl.**
CPC ............ ***G07C 5/0866*** (2013.01); ***G07C 5/02*** (2013.01); ***H04N 5/77*** (2013.01); ***H04N 7/181*** (2013.01);

(Continued)

(58) **Field of Classification Search**
CPC ......... H04N 21/41422; H04N 21/4223; H04N 21/42692; H04N 21/44004; H04N 21/4435

(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,943,141 A 6/1960 Knight
3,634,866 A 1/1972 Meyer

(Continued)

FOREIGN PATENT DOCUMENTS

CA 2469728 12/2005
CA 2469728 A1 12/2005

(Continued)

OTHER PUBLICATIONS

PCT International Search Report and Written Opinion for PCT/US15/60721 dated Feb. 26, 2016, 11 pages.

(Continued)

*Primary Examiner* — Khoi H Tran
*Assistant Examiner* — Jorge O Peche
(74) *Attorney, Agent, or Firm* — Sheppard Mullin Richter & Hampton LLP

(57) **ABSTRACT**

A vehicle event recorder is provided that includes a camera for capturing a video as discrete image frames, and that further includes a managed loop memory and a management system for generating a virtual 'timeline dilation' effect. To overcome size limits in the buffer memory of the video event recorder, the maximum time extension of a video series is increased by enabling a reduction in temporal resolution in exchange for an increase in the temporal extension. Memory cells are overwritten in an 'interleaved' fashion to produce a reduced frame rate for the recording of certain time periods connected to an event moment. In time periods furthest from the event moment, the resulting frame rate is minimized while in time periods closest to the event moment, the resulting frame rate is maximized.

**20 Claims, 11 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 13/734,800, filed on Jan. 4, 2013, now Pat. No. 8,880,279, which is a continuation of application No. 12/096,592, filed as application No. PCT/US2006/047055 on Dec. 7, 2006, now Pat. No. 8,374,746, which is a continuation of application No. 11/296,907, filed on Dec. 8, 2005, now abandoned.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04N 21/414*** | (2011.01) |
| ***H04N 21/4223*** | (2011.01) |
| ***H04N 21/426*** | (2011.01) |
| ***H04N 21/433*** | (2011.01) |
| ***H04N 21/44*** | (2011.01) |
| ***H04N 21/4402*** | (2011.01) |
| ***H04N 21/443*** | (2011.01) |
| ***H04N 7/18*** | (2006.01) |
| ***H04N 5/77*** | (2006.01) |
| ***G07C 5/02*** | (2006.01) |

(52) **U.S. Cl.**

CPC ....... ***H04N 7/183*** (2013.01); ***H04N 21/23406*** (2013.01); ***H04N 21/41422*** (2013.01); ***H04N 21/4223*** (2013.01); ***H04N 21/42692*** (2013.01); ***H04N 21/4334*** (2013.01); ***H04N 21/44*** (2013.01); ***H04N 21/44004*** (2013.01); ***H04N 21/4435*** (2013.01); ***H04N 21/440281*** (2013.01)

(58) **Field of Classification Search**

USPC .................. 701/32.2, 33.3, 33.4; 711/147, 5; 345/545, 546, 547, 531–538; 710/56, 53; 375/372; 348/567, 231.1

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


3,781,824 A 12/1973 Caiati
3,812,287 A 5/1974 Lemelson
3,885,090 A 5/1975 Rosenbaum
3,992,656 A 11/1976 Joy
4,054,752 A 10/1977 Dennis, Jr.
4,072,850 A 2/1978 McGlynn
4,258,421 A 3/1981 Juhasz
4,271,358 A 6/1981 Schwarz
4,276,609 A 6/1981 Patel
4,280,151 A 7/1981 Tsunekawa
4,281,354 A 7/1981 Conte
4,401,976 A 8/1983 Stadelmayr
4,409,670 A 10/1983 Herndon
4,420,773 A 12/1983 Toyoda
4,425,097 A 1/1984 Owens
4,456,931 A 6/1984 Toyoda
4,489,351 A 12/1984 dAlayer de Costemore dArc
4,496,995 A 1/1985 Colles
4,500,868 A 2/1985 Tokitsu
4,528,547 A 7/1985 Rodney
4,533,962 A 8/1985 Decker
4,558,379 A 12/1985 Hutter
4,588,267 A 5/1986 Pastore
4,593,313 A 6/1986 Nagasaki
4,621,335 A 11/1986 Bluish
4,625,210 A 11/1986 Sagl
4,630,110 A 12/1986 Cotton
4,632,348 A 12/1986 Keesling
4,638,289 A 1/1987 Zottnik
4,646,241 A 2/1987 Ratchford
4,651,143 A 3/1987 Yamanaka
4,671,111 A 6/1987 Lemelson
4,718,685 A 1/1988 Kawabe
4,754,255 A 6/1988 Sanders
4,758,888 A 7/1988 Lapidot
4,763,745 A 8/1988 Eto
4,785,474 A 11/1988 Bernstein
4,789,904 A 12/1988 Peterson
4,794,566 A 12/1988 Richards
4,804,937 A 2/1989 Barbiaux
4,806,931 A 2/1989 Nelson
4,807,096 A 2/1989 Skogler
4,814,896 A 3/1989 Heitzman
4,837,628 A 6/1989 Sasaki
4,839,631 A 6/1989 Tsuji
4,843,463 A 6/1989 Michetti
4,843,578 A 6/1989 Wade
4,853,856 A 8/1989 Hanway
4,853,859 A 8/1989 Morita
4,866,616 A 9/1989 Takeuchi
4,876,597 A 10/1989 Roy
4,883,349 A 11/1989 Mittelhauser
4,896,855 A 1/1990 Furnish
4,926,331 A 5/1990 Windle
4,930,742 A 6/1990 Schofield
4,936,533 A 6/1990 Adams
4,939,652 A 7/1990 Steiner
4,942,464 A 7/1990 Milatz
4,945,244 A 7/1990 Castleman
4,949,186 A 8/1990 Peterson
4,980,913 A 12/1990 Skret
4,987,541 A 1/1991 Levente
4,992,943 A 2/1991 McCracken
4,993,068 A 2/1991 Piosenka
4,995,086 A 2/1991 Lilley
5,012,335 A 4/1991 Cohodar
5,027,104 A 6/1991 Reid
5,046,007 A 9/1991 McCrery
5,050,166 A 9/1991 Cantoni
5,056,056 A 10/1991 Gustin
5,057,820 A 10/1991 Markson
5,096,287 A 3/1992 Kakinami
5,100,095 A 3/1992 Haan
5,111,289 A 5/1992 Lucas
5,140,434 A 8/1992 Van Blessinger
5,140,436 A 8/1992 Blessinger
5,140,438 A 8/1992 Kurahashi
5,144,661 A 9/1992 Shamosh
5,178,448 A 1/1993 Adams
5,185,700 A 2/1993 Bezos
5,196,938 A 3/1993 Blessinger
5,223,844 A 6/1993 Mansell
5,224,211 A 6/1993 Roe
5,262,813 A 11/1993 Scharton
5,283,433 A * 2/1994 Tsien .................. G02B 21/008
250/234
5,294,978 A 3/1994 Katayama
5,305,214 A 4/1994 Komatsu
5,305,216 A 4/1994 Okura
5,308,247 A 5/1994 Dyrdek
5,309,485 A 5/1994 Chao
5,311,197 A 5/1994 Sorden
5,321,753 A 6/1994 Gritton
5,327,288 A 7/1994 Wellington
5,330,149 A 7/1994 Haan
5,333,759 A 8/1994 Deering
5,343,527 A 8/1994 Moore
5,353,023 A 10/1994 Mitsugi
5,361,326 A 11/1994 Aparicio, IV
5,387,926 A 2/1995 Bellan
5,388,045 A 2/1995 Kamiya
5,388,208 A * 2/1995 Weingartner ......... G09G 5/399
345/531
5,404,330 A 4/1995 Lee
5,408,330 A 4/1995 Squicciarini
5,422,543 A 6/1995 Weinberg
5,430,431 A 7/1995 Nelson
5,430,432 A 7/1995 Camhi
5,435,184 A 7/1995 Pineroli
5,445,024 A 8/1995 Riley, Jr.
5,445,027 A 8/1995 Zorner
5,446,659 A 8/1995 Yamawaki

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,455,625 A | 10/1995 | Englander | |
| 5,455,716 A | 10/1995 | Suman | |
| 5,465,079 A | 11/1995 | Bouchard | |
| 5,473,729 A | 12/1995 | Bryant | |
| 5,477,141 A | 12/1995 | Nather | |
| 5,495,242 A | 2/1996 | Kick | |
| 5,495,243 A | 2/1996 | McKenna | |
| 5,497,419 A | 3/1996 | Hill | |
| 5,499,182 A | 3/1996 | Ousborne | |
| 5,504,482 A | 4/1996 | Schreder | |
| 5,513,011 A * | 4/1996 | Matsumoto | G11B 20/00007 360/222.1 |
| 5,515,285 A | 5/1996 | Garrett, Sr. | |
| 5,519,260 A | 5/1996 | Washington | |
| 5,521,633 A | 5/1996 | Nakajima | |
| 5,523,811 A | 6/1996 | Wada | |
| 5,526,269 A | 6/1996 | Ishibashi | |
| 5,530,420 A | 6/1996 | Tsuchiya | |
| 5,532,678 A | 7/1996 | Kin | |
| 5,537,156 A | 7/1996 | Katayama | |
| 5,539,454 A | 7/1996 | Williams | |
| 5,541,590 A | 7/1996 | Nishio | |
| 5,544,060 A | 8/1996 | Fujii | |
| 5,546,191 A | 8/1996 | Hibi | |
| 5,546,305 A | 8/1996 | Kondo | |
| 5,548,273 A | 8/1996 | Nicol | |
| 5,552,990 A | 9/1996 | Ihara | |
| 5,559,496 A | 9/1996 | Dubats | |
| 5,568,211 A | 10/1996 | Bamford | |
| 5,570,087 A | 10/1996 | Lemelson | |
| 5,570,127 A | 10/1996 | Schmidt | |
| 5,574,424 A | 11/1996 | Nguyen | |
| 5,574,443 A | 11/1996 | Hsieh | |
| 5,581,464 A | 12/1996 | Woll | |
| 5,586,130 A | 12/1996 | Doyle | |
| 5,590,948 A | 1/1997 | Moreno | |
| 5,596,382 A | 1/1997 | Bamford | |
| 5,596,647 A | 1/1997 | Wakai | |
| 5,600,775 A | 2/1997 | King | |
| 5,608,272 A | 3/1997 | Tanguay | |
| 5,610,580 A | 3/1997 | Lai | |
| 5,612,686 A | 3/1997 | Takano | |
| 5,631,638 A | 5/1997 | Kaspar | |
| 5,638,273 A | 6/1997 | Coiner | |
| 5,642,106 A | 6/1997 | Hancock | |
| 5,646,856 A | 7/1997 | Kaesser | |
| 5,652,706 A | 7/1997 | Morimoto | |
| 5,654,892 A | 8/1997 | Fujii | |
| 5,659,355 A | 8/1997 | Barron | |
| 5,666,120 A | 9/1997 | Kline | |
| 5,667,176 A | 9/1997 | Zamarripa | |
| 5,669,698 A | 9/1997 | Veldman | |
| 5,671,451 A | 9/1997 | Takahashi | |
| 5,677,979 A | 10/1997 | Squicciarini | |
| 5,680,117 A | 10/1997 | Arai | |
| 5,680,123 A | 10/1997 | Lee | |
| 5,686,765 A | 11/1997 | Washington | |
| 5,686,889 A | 11/1997 | Hillis | |
| 5,689,442 A | 11/1997 | Swanson | |
| 5,696,705 A | 12/1997 | Zykan | |
| 5,706,362 A | 1/1998 | Yabe | |
| 5,706,909 A | 1/1998 | Bevins | |
| 5,712,679 A | 1/1998 | Coles | |
| 5,717,456 A | 2/1998 | Rudt | |
| 5,719,554 A | 2/1998 | Gagnon | |
| 5,758,299 A | 5/1998 | Sandborg | |
| 5,781,101 A | 7/1998 | Stephen | |
| 5,781,145 A | 7/1998 | Williams | |
| 5,784,007 A | 7/1998 | Pepper | |
| 5,784,021 A | 7/1998 | Oliva | |
| 5,784,521 A | 7/1998 | Nakatani | |
| 5,790,403 A | 8/1998 | Nakayama | |
| 5,790,973 A | 8/1998 | Blaker | |
| 5,793,308 A | 8/1998 | Rosinski | |
| 5,793,420 A | 8/1998 | Schmidt | |
| 5,793,739 A * | 8/1998 | Tanaka | G10H 1/0041 369/124.14 |
| 5,793,985 A | 8/1998 | Natarajan | |
| 5,794,165 A | 8/1998 | Minowa | |
| 5,797,134 A | 8/1998 | McMillan | |
| 5,798,458 A | 8/1998 | Monroe | |
| 5,800,040 A | 9/1998 | Santo | |
| 5,802,545 A | 9/1998 | Coverdill | |
| 5,802,727 A | 9/1998 | Blank | |
| 5,805,079 A | 9/1998 | Lemelson | |
| 5,813,745 A | 9/1998 | Fant, Jr. | |
| 5,815,071 A | 9/1998 | Doyle | |
| 5,815,093 A | 9/1998 | Kikinis | |
| 5,819,198 A | 10/1998 | Peretz | |
| 5,825,284 A | 10/1998 | Dunwoody | |
| 5,825,412 A | 10/1998 | Hobson | |
| 5,844,505 A | 12/1998 | Van Ryzin | |
| 5,845,733 A | 12/1998 | Wolfsen | |
| 5,867,802 A | 2/1999 | Borza | |
| 5,877,897 A | 3/1999 | Schofield | |
| 5,896,167 A | 4/1999 | Omae | |
| 5,897,602 A | 4/1999 | Mizuta | |
| 5,897,606 A | 4/1999 | Miura | |
| 5,899,956 A | 5/1999 | Chan | |
| 5,901,806 A | 5/1999 | Takahashi | |
| 5,914,748 A | 6/1999 | Parulski | |
| 5,919,239 A | 7/1999 | Fraker | |
| 5,926,210 A | 7/1999 | Hackett | |
| 5,928,291 A | 7/1999 | Jenkins | |
| 5,938,321 A | 8/1999 | Bos | |
| 5,946,404 A | 8/1999 | Bakshi | |
| 5,948,038 A | 9/1999 | Daly | |
| 5,959,367 A | 9/1999 | O'Farrell | |
| 5,978,017 A | 11/1999 | Tino | |
| 6,002,326 A | 12/1999 | Turner | |
| 6,006,148 A | 12/1999 | Strong | |
| 6,008,723 A | 12/1999 | Yassan | |
| 6,008,841 A | 12/1999 | Charlson | |
| 6,009,370 A | 12/1999 | Minowa | |
| 6,011,492 A | 1/2000 | Garesche | |
| 6,028,528 A | 2/2000 | Lorenzetti | |
| 6,037,860 A | 3/2000 | Zander | |
| 6,037,977 A | 3/2000 | Peterson | |
| 6,041,410 A | 3/2000 | Hsu | |
| 6,049,079 A | 4/2000 | Noordam | |
| 6,057,754 A | 5/2000 | Kinoshita | |
| 6,060,989 A | 5/2000 | Gehlot | |
| 6,064,792 A | 5/2000 | Fox | |
| 6,067,488 A | 5/2000 | Tano | |
| 6,076,026 A | 6/2000 | Jambhekar | |
| 6,084,870 A | 7/2000 | Wooten | |
| 6,088,635 A | 7/2000 | Cox | |
| 6,092,008 A | 7/2000 | Bateman | |
| 6,092,021 A | 7/2000 | Ehlbeck | |
| 6,092,193 A | 7/2000 | Loomis | |
| 6,100,811 A | 8/2000 | Hsu | |
| 6,111,254 A | 8/2000 | Eden | |
| 6,118,768 A | 9/2000 | Bhatia | |
| 6,122,738 A | 9/2000 | Millard | |
| 6,141,611 A | 10/2000 | Mackey | |
| 6,144,296 A | 11/2000 | Ishida | |
| 6,147,598 A | 11/2000 | Murphy | |
| 6,151,065 A | 11/2000 | Steed | |
| 6,163,338 A | 12/2000 | Johnson | |
| 6,163,749 A | 12/2000 | McDonough | |
| 6,167,186 A | 12/2000 | Kawasaki | |
| 6,170,742 B1 | 1/2001 | Yacoob | |
| 6,181,373 B1 | 1/2001 | Coles | |
| 6,182,010 B1 | 1/2001 | Berstis | |
| 6,185,490 B1 | 2/2001 | Ferguson | |
| 6,195,605 B1 | 2/2001 | Tabler | |
| 6,200,139 B1 | 3/2001 | Clapper | |
| 6,208,919 B1 | 3/2001 | Barkesseh | |
| 6,211,907 B1 | 4/2001 | Scaman | |
| 6,218,960 B1 | 4/2001 | Ishikawa | |
| 6,246,933 B1 | 6/2001 | Bague | |
| 6,246,934 B1 | 6/2001 | Otake | |
| 6,252,544 B1 | 6/2001 | Hoffberg | |
| 6,253,129 B1 | 6/2001 | Jenkins | |

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,259,475 B1 7/2001 Ramachandran
6,263,265 B1 7/2001 Fera
6,266,588 B1 7/2001 McClellan
6,298,290 B1 10/2001 Abe
6,300,875 B1 10/2001 Schafer
6,324,450 B1 11/2001 Iwama
6,333,759 B1 12/2001 Mazzilli
6,337,622 B1 1/2002 Sugano
6,349,250 B1 2/2002 Hart
6,353,734 B1 3/2002 Wright
6,356,823 B1 3/2002 Iannotti
6,360,147 B1 3/2002 Lee
6,366,207 B1 4/2002 Murphy
6,389,339 B1 5/2002 Just
6,389,340 B1 5/2002 Rayner
6,400,835 B1 6/2002 Lemelson
6,405,112 B1 6/2002 Rayner
6,405,132 B1 6/2002 Breed
6,408,232 B1 6/2002 Cannon
6,411,874 B2 6/2002 Morgan
6,421,080 B1 7/2002 Lambert
6,434,510 B1 8/2002 Callaghan
6,449,540 B1 9/2002 Rayner
6,456,321 B1 9/2002 Ito
6,459,988 B1 10/2002 Fan
6,470,241 B2 10/2002 Yoshikawa
6,472,771 B1 10/2002 Frese
6,490,513 B1 12/2002 Fish
6,493,650 B1 12/2002 Rodgers
6,505,106 B1 1/2003 Lawrence
6,507,838 B1 1/2003 Syeda-Mahmood
6,508,400 B1 1/2003 Ishifuji
6,516,256 B1 2/2003 Hartmann
6,518,881 B2 2/2003 Monroe
6,525,672 B2 2/2003 Chainer
6,529,159 B1 3/2003 Fan
6,535,804 B1 3/2003 Chun
6,552,682 B1 4/2003 Fan
6,629,030 B2 9/2003 Klausner
7,382,933 B2 6/2008 Dorai
2002/0005895 A1* 1/2002 Freeman ................ H04N 5/772 348/143
2003/0095688 A1* 5/2003 Kirmuss ................ B60R 11/02 382/105
2003/0125854 A1* 7/2003 Kawasaki .............. G07C 5/008 701/431
2003/0154009 A1* 8/2003 Basir ...................... G07C 5/085 701/32.2
2003/0220835 A1* 11/2003 Barnes, Jr. ......... G06Q 10/1053 705/14.36
2003/0222880 A1* 12/2003 Waterman .............. G09G 5/005 345/531
2004/0008255 A1* 1/2004 Lewellen ............ G07C 5/0891 348/148
2004/0044452 A1* 3/2004 Bauer ...................... B60L 3/12 701/31.4
2004/0054444 A1* 3/2004 Abeska .................. G07C 5/008 701/1
2004/0083041 A1* 4/2004 Skeen .................... G07C 5/008 701/31.4
2004/0088090 A1* 5/2004 Wee ....................... G07C 5/085 701/33.4
2004/0111189 A1* 6/2004 Miyazawa ............. G01C 21/32 701/1
2004/0138794 A1* 7/2004 Saito ..................... G01M 15/04 701/32.6
2004/0210353 A1* 10/2004 Rice ....................... G01C 21/26 701/1
2004/0254698 A1* 12/2004 Hubbard ............. G08G 1/0104 701/32.7
2005/0099498 A1* 5/2005 Lao ........................ H04N 5/765 348/207.99
2005/0100329 A1* 5/2005 Lao .................. G08B 13/19647 386/216
2005/0137796 A1* 6/2005 Gumpinger ............ G07C 5/008 701/32.6
2005/0174217 A1* 8/2005 Basir ...................... G07C 5/008 340/425.5
2005/0258942 A1* 11/2005 Manasseh ............. G07C 5/008 340/425.5
2005/0264691 A1* 12/2005 Endo ...................... H04N 7/012 348/446
2006/0001671 A1* 1/2006 Kamijo ................... G06F 12/06 345/531
2006/0030986 A1* 2/2006 Peng ...................... G07C 5/085 701/33.4
2006/0047380 A1* 3/2006 Welch .................. G07C 5/0808 701/33.4
2006/0092043 A1* 5/2006 Lagassey .............. G07C 5/008 340/907
2006/0095175 A1* 5/2006 deWaal .................. G07C 5/008 701/31.4
2006/0095199 A1* 5/2006 Lagassey .............. G07C 5/008 701/117
2006/0147187 A1* 7/2006 Takemoto ............. H04N 5/772 386/226
2006/0259218 A1* 11/2006 Wu ........................ G07C 5/085 701/33.4
2007/0132773 A1* 6/2007 Plante .................. G07C 5/0891 345/564
2007/0150138 A1* 6/2007 Plante ............. H04N 21/23406 701/33.4
2008/0204556 A1 8/2008 deMiranda
2009/0043971 A1* 2/2009 Kim .................. G06F 17/30171 711/150
2009/0290848 A1* 11/2009 Brown ................... H04N 5/232 386/223
2010/0250060 A1* 9/2010 Maeda ................. G07C 5/0858 701/33.4
2012/0081567 A1* 4/2012 Cote ............... H04N 21/41407 348/222.1
2014/0309849 A1 10/2014 Ricci

FOREIGN PATENT DOCUMENTS

CA 2692415 8/2011
CA 2692415 A1 8/2011
DE 4416991 A1 11/1995
DE 20311262 9/2003
DE 202005008238 8/2005
DE 102004004669 12/2005
DE 102004004669 A1 12/2005
EP 0708427 A2 4/1996
EP 0840270 A2 5/1998
EP 0848270 A2 6/1998
EP 1170697 A2 1/2002
EP 1324274 A2 7/2003
EP 1355278 A1 10/2003
EP 1427165 A2 6/2004
EP 1818873 A1 8/2007
EP 2104075 9/2009
EP 2320387 5/2011
EP 2407943 1/2012
GB 2268608 A 1/1994
GB 2402530 12/2004
GB 2402530 A 12/2004
GB 244694 8/2008
GB 2451485 2/2009
GB 2447184 B 6/2011
JP 58085110 5/1983
JP S5885110 A 5/1983
JP 62091092 4/1987
JP S6291092 A 4/1987
JP S62166135 A 7/1987
JP 02056197 2/1990
JP H0256197 A 2/1990
JP H04257189 A 9/1992
JP H05137144 A 6/1993
JP H08124069 A 5/1996

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | H09163357 A | | 6/1997 |
| JP | H09272399 A | | 10/1997 |
| JP | 10076880 | | 3/1998 |
| JP | H1076880 A | | 3/1998 |
| JP | 2002191017 | | 7/2002 |
| JP | 2002191017 A | * | 7/2002 |
| JP | 2002191017 A | | 7/2002 |
| JP | 5294188 | | 9/2013 |
| KR | 1000588169 | | 6/2006 |
| WO | 0007150 A1 | | 2/2000 |
| WO | 0048033 | | 2/2000 |
| WO | 0077620 | | 2/2000 |
| WO | 0028410 A1 | | 5/2000 |
| WO | 0123214 | | 4/2001 |

OTHER PUBLICATIONS


"DriveCam Driving Feedback System" DriveCam brochure, Mar. 15, 2004, 4 pages.

"DriveCam Driving Feedback System", DriveCam brochure, Jun. 12, 2001, Document #6600128, 2 pages.

"DriveCam Passenger Transportation Module", DriveCam brochure, Oct. 26, 2001, 2 pages.

"DriveCam Video Event Data Recorder", DriveCam brochure, Nov. 6, 2002, Document #6600127, 2 pages.

"DriveCam, Inc's Disclosure of Proposed Constructions and Extrinsic Evidence Pursuant to Patent L.R. 4.1.a & 4.1.b" Disclosure and Extrinsic Evidence in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H-RBB, for the Southern District of California. Nov. 8, 2011, 68 pages.

"Responsive Claim Construction and Identification of Extrinsic Evidence of Defendani/Counterclaimant SmartDrive Systems, Inc." Claim Construction and and Extrinsic Evidence in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H (RBB), for the Southern District of California. Nov. 15, 2011, 20 pages.

"Sonic MyDVD 4.0: Tutorial: Trimming video segments". Tutorial for software bundled with Adaptec VideoOh! DVD USB 2.0 Edition, 2003, 13 pages.

"User's Manual for DriveCam Video Systems' HindSight 20/20 Software Version 4.0" DriveCam Manual, San Diego, 2003, Document #6600141-1, 54 pages.

Adaptec published and sold its VideoOh! DVD software USB 2.0 Edition in at least Jan. 24, 2003. (1 pg.).

Ambulance Companies Use Video Technology to Improve Driving Behavior, Ambulance Industry Journal, Spring 2003 (2 pgs.).

Amended Complaint for Patent Infringement, Trade Secret Misappropriation, Unfair Competition and Conversion in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997-H-RBB, for the Southern District of California, Document 34, filed Oct. 20, 2011, pp. 1-15.

Amendment filed Dec. 23, 2009 during prosecution of U.S. Appl. No. 11/566,424 (13 pgs.).

Answer to Amended Complaint; Counterclaims; and Demand for Jury Trial in *DriveCam, Inc.* v. *SmartDrive Systems, Inc.*, Case No. 3:11-CV-00997 H (RBB), for the Southern District of California, Document 47, filed Dec. 13, 2011, pp. 1-15.

U.S. Appl. No. 11/296,906, filed Dec. 8, 2005, File History (279 pgs.).

U.S. Appl. No. 11/297,669, filed Dec. 8, 2005, File History (183 pgs.).

U.S. Appl. No. 11/297,889, filed Dec. 8, 2005, File History (77 pgs.).

U.S. Appl. No. 11/298,069, filed Dec. 9, 2005, File History (105 pgs.).

U.S. Appl. No. 11/299,028, filed Dec. 9, 2005, File History (181 pgs.).

U.S. Appl. No. 11/593,659, filed Nov. 7, 2006, File History (296 pgs.).

U.S. Appl. No. 11/593,682, filed Nov. 7, 2006, File History (173 pgs.).

U.S. Appl. No. 11/593,882, filed Nov. 7, 2006, File History (94 pgs.).

U.S. Appl. No. 11/595,015, filed Nov. 9, 2006, File History (171 pgs.).

U.S. Appl. No. 11/637,754, filed Dec. 13, 2006, File History (241 pgs.).

U.S. Appl. No. 11/637,755, filed Dec. 13, 2006, File History (171 pgs.).

Bill Siuru, 'DriveCam Could Save You Big Bucks', Land Line Magazine, May-Jun. 2000 (1 pg.).

Bill, 'DriveCam—FAQ', Dec. 12, 2003 (3 pgs.).

Canadian Office Action issued in Application No. 2,632,685 dated Jan. 30, 2015; 5 pages.

Chris Woodyard, 'Shuttles save with DriveCam', Dec. 9, 2003 (1 pg.).

Dan Carr, Flash Video Template: Video Presentation with Navigation, Jan. 16, 2006, http://www.adobe.com/devnet/fiash/articles/vidtemplate_mediapreso_flash8.html (13 pgs.).

Dan Maher, "DriveCam Taking Risk Out of Driving", DriveCam brochure folder, Jun. 6, 2005, 6 pages.

David Cullen, 'Getting a real eyeful', Fleet Owner Magazine, Feb. 2002 (1 pg.).

David Maher, 'DriveCam Brochure Folder', Jun. 6, 2005 (2 pg.).

David Maher, "DriveCam Brochure Folder", Jun. 8, 2005 (2 pg.).

David Vogeleer et al., Macromedia Flash Professional 8UNLEASHED (Sams Oct. 12, 2005). (4 pgs.).

Del Lisk, 'DriveCam Training Handout Ver4', Feb. 3, 2005 (16 pgs.).

Del Lisk, "DriveCam Training Seminar" Handout, 2004, 16 pages.

DriveCam Driving Feedback System, Mar. 15, 2004 (12 pgs.).

DriveCam Extrinsic Evidence with Patent LR 4.1 .a Disclosures, Nov. 3, 2011. (1 pg.).

DriveCam Extrinsic Evidence with Patent LR 4.1 .a Disclosures, Nov. 8, 2011. (1 pg.).

DriveCam—Illuminator Data Sheet, Oct. 2, 2004. (1 pg.).

Drivecam, Inc., User's Manual for Drivecam Video Systems' Hindsight 20/20 Software Version 4.0 (2003). (54 pgs.).

DriveCam, Inc.'s Infringement Contentions Exhibit A, U.S. Pat. No. 6,389,340, Document 34.1, Oct. 20, 2011. (10 pgs.).

DriveCam, Inc.'s Infringement Contentions Exhibit B, U.S. Pat. No. 7,659,827. Aug. 19, 2011. (29 pgs.).

DriveCam, Inc.'s Infringement Contentions Exhibit B, U.S. Pat. No. 7,804,426, Document 34.2, Oct. 20, 2011. (20 pg.).

DriveCam, Inc.'s Infringement Contentions Exhibit C, U.S. Pat. No. 7,659,827, Document 34.3, Oct. 20, 2011. (17 pgs.).

DriveCam, Inc.'s Infringement Contentions Exhibit C, U.S. Pat. No. 7,804,426. Aug. 19, 2011. (47 pgs.).

DriveCam, Inc.'s Infringement Contentions Exhibit D, Document 34.4, Oct. 20, 2011. (2 pgs.).

Traqmate GPS Data Acquisition's Traqmate Data Acquisition with Video Overlay system was used to create a video of a driving event on Oct. 2, 2005 (available at http://www.trackvision.net/phpBB2/viewtopic.php?t=51&sid=1184fbbcbe3be5c87ffa0f2ee6e2da76), printed from site on Jan. 11, 2012. (4 pgs.).

Trivinci Systems, LLC, "Race-Keeper System User Guide", V1 .1.02, Jan. 2011, p. 21.

Trivinci Systems, LLC, Race-Keeper Systems User Guide, Jan. 2011, v1, 1.02, pp. 34 and 39.

U.S. Appl. No. 12/691,639, entitled 'Driver Risk Assessment System and Method Employing Selectively Automatic Event Scoring', filed Jan. 21, 2010. (52 pgs.).

U.S. Appl. No. 11/377,167, Final Office Action dated Nov. 8, 2013. (19 pgs.).

U.S. Appl. No. 11/377,157, filed Mar. 16, 2006 entitled, "Vehicle Event Recorder Systems and Networks Having Parallel Communications Links" (28 pgs.).

U.S. Appl. No. 11/377,167, filed Mar. 16, 2006 entitled, "Vehicle Event Recorder Systems and Networks Having Integrated Cellular Wireless Communications Systems" (29 pgs.).

USPTO Final Office Action for U.S. Appl. No. 11/296,906, dated Aug. 8, 2012, 15 pages.

(56) **References Cited**

OTHER PUBLICATIONS

USPTO Final Office Action for U.S. Appl. No. 11/297,669, dated Nov. 7, 2011, 15 pages.
USPTO Final Office Action for U.S. Appl. No. 12/096,591, dated Dec. 5, 2014, 23 pages.
USPTO Final Office Action for U.S. Appl. No. 12/096,591, dated Jul. 18, 2012, 15 pages.
USPTO Final Office Action for U.S. Appl. No. 12/096,591, dated Nov. 7, 2013, 14 pages.
USPTO Final Office Action for U.S. Appl. No. 13/957,810, dated Jun. 27, 2014, 22 pages.
USPTO Final Office Action for U.S. Appl. No. 13/957,810, dated Jun. 27, 2014, 24 pages.
USPTO Final Office Action for U.S. Appl. No. 14/036,299, dated Feb. 24, 2015, 9 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/296,906, dated Apr. 2, 2009, 7 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/296,906, dated Apr. 8, 2014, 19 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/296,906, dated Jun. 12, 2012, 13 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/296,906, dated Nov. 6, 2009, 9 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/297,669, dated Apr. 28, 2011, 11 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/299,028, dated Apr. 24, 2008, 9 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, dated Apr. 7, 2014, 7 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, dated Aug. 18, 2014, 5 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, dated Nov. 19, 2007, 7 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, dated Nov. 25, 2011, 9 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, dated Sep. 10, 2012, 10 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,164, dated Sep. 11, 2008, 8 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,167, dated Jun. 27, 2013, 11 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/377,167, dated Jun. 5, 2008, 11 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/800,876, dated Dec. 1, 2010, 12 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 11/800,876, dated Dec. 20, 2011, 8 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 12/096,591, dated Jun. 14, 2011, 8 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 12/096,591, dated Mar. 27, 2013, 16 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 12/096,591, dated May 20, 2014, 19 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 13/957,810, dated Apr. 17, 2015, 6 pages.
USPTO Non-final Office Action for U.S. Appl. No. 13/957,810, dated Nov. 27, 2013, 18 pages.
USPTO Non-Final Office Action for U.S. Appl. No. 14/036,299, dated Aug. 12, 2014. (14 pgs.).
USPTO Non-Final Office Action for U.S. Appl. No. 11/296,907, dated Mar. 22, 2007 (17 pages).
USPTO Non-final Office Action dated Aug. 27, 2009 during prosecution of U.S. Appl. No. 11/566,424 (25 pgs.).
USPTO Non-Final Office Action dated Jan. 4, 2016 in U.S. Appl. No. 14/529,134, filed Oct. 30, 2014 (65 pgs).
USPTO Non-Final Office Action dated Nov. 27, 2013 in U.S. Appl. No. 13/957,810, filed Aug. 2, 2013. (19 pgs.).
Veeraraghavan, H., et al., Computer Vision Algorithms for Intersection Monitoring, IEEE Transactions on Intelligent Transportation Systems, 4(2):78-89 (2003); Digital Object Identifier 10.1109/TITS.2003.821212.
Wijesoma, W.S., et al., Road Curb Tracking in an Urban Environment, Proceedings of the Sixth International Conference of Information Fusion, 1:261-268 (2003).
World News Tonight, CBC Television New Program discussing teen drivers using the DriveCam Program and DriveCam Technology, Oct. 10, 2005, on PC formatted CD-R, World News Tonight.wmv, 7.02 MB, Created Jan. 12, 2011. (1 pg.).
Written Opinion issued in PCT/US07/68328 dated Oct. 15, 2007. (3 pgs.).
Written Opinion of the International Searching Authority for PCT/US2006/47042, dated Feb. 25, 2008 (5 pages).
Written Opinion of the International Searching Authority for PCT/US2006/47055, dated Mar. 20, 2008 (5 pages).
Edwin Olson, A Passive Solution to the Sensor Synchronization Problem, the 2010 IEEE/RSJ International Conference on Intelligent Robots and Systems, Oct. 18-22, 2010, 6 pages.

* cited by examiner




Fig 1
(prior art)




Fig 2
(prior art)




Fig 3
(prior art)


41
5
10
15
20
25
30
42
A
B
D
E
F
video: t = 0 - 30
overwritten (erased)
t = 29
44
45
43
video: t = 30 - 44

Fig 4


51
52
5
10
15
20
25
30
skipped (saved)
video: t = 0 - 30
t = 29
overwritten (erased)
54
53
55
56
video: t = 30 - 41
57

Fig 5


61
62
5
10
15
20
25
30
OK to erase
must be saved
63
64
OK to erase
must be saved
t = 29
69
66
65
68
video: t = 30 - 41
video: t = 42 - 54
(@ 1frm/s)
67

Fig 6


71
72
5
10
15
20
25
30
OK to erase
must be saved
73
OK to erase
t = 29
76
75
77
video: t = 30 - 41
video: t = 42 - 54
(@ 1frm/s)
74

Fig 7


81
82
12 secs.
12 secs.
12 secs
12 secs.
86
84
83
85
87
20 secs.
10 secs.
10 secs.
20 secs.
88
20 secs.
4 secs.
16 secs.
20 secs.
89
8 secs.
8 secs.
9 secs.
9 secs.
8 secs.
8 secs.
1 fps
2 fps
4 fps

Fig 8



92
91
Trigger
Overwrite Manager
93
96
Buffer Memory
94
Flush Module
95
97
High Capacity
Long term
storage (e.g. Flash)


Fig. 9


Receive Frame Data from Camera
101
102
Write new data over 'next discard' bin

Fig. 10


111
Receive Frame Data from Camera
112
113
114
write frame to bin marked 'open'
115
determine frame no longer needed in agreement with timeline definition
116
mark bin as 'open' for writing
117
Is data set complete?
Yes
No
118
Transfer data to flash
119

Fig. 11

# MEMORY MANAGEMENT IN EVENT RECORDING SYSTEMS

## FIELD OF THE INVENTION

The following invention relates to electronic storage of data. More particularly, the present invention relates to systems and methods for memory allocation and writing in devices recording vehicle events.

## BACKGROUND OF THE INVENTION

Video recording systems are commonly used to monitor places where it may be desirable to monitor security levels. For example, in a security zone, breaches of security may be recorded if video monitors area arranged around the space to be monitored. When an incident occurs, a video record of the related activity is available from the recording system.

During periods when no breaches of security occur, a considerable amount of data is still generated by the video recording system, which has little or no value. Thus, such data can be readily discarded without loss. The act of 'discarding' data amounts to merely rewriting new data over old recorded data. Indeed, most video security systems are arranged with a recording medium that is reused continuously.

When a video camera generates an amount of image data sufficient to fully consume the available memory, newly collected data is recorded at the beginning of the memory. Therefore, the act of writing newly acquired data causes old data to be discarded; that is, the old data is lost to the 'write' operation of the newly collected data.

In old videotape systems, this is sometimes called a 'round robin' arrangement. A memory medium fashioned as a tape in a continuous loop provides data storage for those video security systems. In such systems the tape has no end and no-beginning, but instead the tape continuously passes by a recording head where new images are written to the tape and at the same time old images are discarded.

When an incident of interest occurs, the tape may be stopped to prevent loss of data which relates to the relevant incident. The related images may be recovered from the tape and transferred to a permanent medium, while the tape is returned to the video system for further recording. Such re-use of memory is well known in the prior art.

In a round-robin scheme, the data that is overwritten, or discarded, is the data which came into the system earliest, or was 'first in' the system. This arrangement is sometimes referred to as "first-in, first overwritten," which is analogous to the "first-in, first-out" arrangement in electronic buffer systems. In both cases, we will refer to this method as FIFO.

A FIFO base system is generally a very good system for buffer management, because the oldest data in a buffer is typically the least valuable. Therefore, the oldest data, or the least valuable data, may be discarded without regard for its loss. However, in buffer systems the earliest received data, or the 'first-in' data, may not always be the least valuable data. In some instances it may be advisable not to overwrite the oldest data, but rather to provide an overwrite scheme which preserves certain portions of interest of the oldest data.

With specific reference to the monitoring of vehicle activities, vehicle event recorders are video recorder systems mounted within the vehicle to provide a video record related to the environment surrounding a vehicle during its operation. These systems are known in the art and are employed, for example, in conjunction with police activity. Many



police departments in the United States are equipped with vehicle event recorders, which capture activity, sometimes criminal, occurring in the proximity of a police vehicle.

The application of vehicle event recorders is not limited to police vehicles. More and more commercial vehicles are now equipped with systems that record activity associated with the use of the vehicle and within the environments in which the vehicle is used. These systems are particularly advantageous with fleet vehicles that are subject to heavy professional use and frequent incidents, including traffic accidents, theft, and vandalism, among others. With a video record, vehicle fleet managers are better equipped to manage and control costs associated with operations of large vehicle fleets. Safety is improved, driver performance is improved, a better understanding of accidents is achieved, and other benefits are derived from the use of vehicle recorder systems.

Vehicle recorder systems are described, for example, in U.S. Pat. Nos. 6,389,340, 6,405,112, 6,449,540, and 6,718,239, all to Rayner. In general, these inventions relate to a small device mounted on the vehicle rearview mirror to capture video images of traffic incidents ahead of the vehicle.

In particular, the '112 patent discloses a system that includes a vehicle operator performance monitor, which records a video of the vehicle operator, and which may be used to determine how the operator's actions affect use of the vehicle.

The '540 patent instead is an event recorder mounted in a vehicle, which includes one or more wave pattern detectors for detection and recognition of a predetermined wave produced outside the vehicle, and for producing a trigger signal denoting the presence of the predetermined wave. In particular, a detective wave is a wave of the type produced by a police or fire department emergency vehicle. Detection of this wave triggers a capture function which stores video images a long-term storage memory.

The '329 patent includes a video recorder system having a one-way hash function to perform a validation function. This way, the integrity of the recorded video data can be protected.

Finally, the '340 patent teaches a recording system having a certain relationship between two different types of memory. A first memory is arranged to store video for the short-term and to transfer some of that stored video in response to a trigger event. Data from this short term memory is transferred to a more durable and long term memory, and the short term memory is continuously overwritten in a scheme described by Rayner as "first-in, first-overwritten". This way, Rayner teaches the coupling of a high-speed, high-performance volatile semiconductor memory with a flashlight memory good for long-term storage of large amounts of data even when power is removed. As will be described in detail later, Rayner's first in first overwritten scheme necessarily creates a loss of important and valuable data.

While systems and inventions in the prior art are designed to achieve particular goals and objectives, these inventions also include limitations which prevent their use in more extended applications, and cannot be used to realize the advantages and objectives of the inventions taught hereinafter.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide high-performance memory allocation systems for vehicle event recorders.

It also is an object of the present invention to provide for set memory allowances and for extended recording periods.

It is a further object to provide memory overwrite schemes that provide a time dilation on either end of a recording period.

These and other objects of the present invention are accomplished by apparatus and methods for allocating memory in vehicle event recording systems that provide improved memory allocation and writing schemes to preserve data over extended time periods, thereby improving prior art devices and methods that cannot record events over a large time range when equipped with a memory of a predetermined size.

One difference between memory allocation of the present invention and the prior art can be seen in relation to time dilation, which may be applied on the extremities of discrete capture periods. In one embodiment, a memory of limited size is subject to an advanced managed loop memory allocation scheme and the rate of storage frame is adjusted throughout a predetermined capture time period. At the extremities of a time period, a frame capture process is subject to a reduced frame rate. In the proximity to an event of interest, or an 'event moment', the frame rate-is increased to improve detail around that particular time, enabling a greater temporal range at the expense of temporal resolution. Losses in temporal resolution are however pushed away from the event moment and allocated to the extremities of the capture time period.

An overwrite scheme selects which frames are expired and subject to being discarded. At any random moment, video is continuously captured at a maximum frame rate. However, these frames are not stored into memory in a conventional first-in, first overwritten manner, but rather, these frames are added to the memory locations which are determined to be available in accordance with the overwrite scheme. Therefore, the oldest frames are not necessarily those that are overwritten. Quite to the contrary, an overwrite action may be applied to a frame which is newer than at least one other frame stored in the memory.

As a result, newly acquired frames are placed into memory in processes which necessarily cause older frames to be discarded. However, the newly captured frames are written to memory positions in an 'interleaved' fashion, whereby some of older frames are preserved. When a capture event occurs, data in the memory may be transferred to a more permanent storage. When data is transferred, a timeline is reconstructed. The recorded timeline is unique in that it contains various frame rates over the capture period. At both the beginning and at the end of the capture period, the frame rate is modest. At the point of greatest interest in the capture period, the frame rate is the highest. This throttling of frame rate provides for a memory of given size to accommodate a timeline of greater temporal extent.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects and advantages of the present inventions will become better understood upon consideration of the following description, taken in conjunction with the accompanying drawings, in which:

FIG. **1** is a timeline illustration in conjunction with a graphic that illustrates a plurality of memory bin units;

FIG. **2** is a timeline illustration and memory graphic illustrating an overwrite operation;

FIG. **3** illustrates the overwrite operation in conjunction with a trigger event;

FIG. **4** illustrates particular memory bins with various levels of importance associated therewith;

FIG. **5** illustrates an advanced overwrite scheme to protect certain 'high-value' video frames;

FIG. **6** further illustrates this overwrite scheme near the end of memory space;

FIG. **7** illustrates memory allocation with pointers to memory bins to be saved and pointers to those bins to be erased;

FIG. **8** illustrates four alternative timeline illustration in different embodiments of the invention;

FIG. **9** is a block diagram of one embodiment of the invention;

FIG. **10** is a block diagram representing an embodiment of a methods for memory management; and

FIG. **11** is a more detailed block diagram of the method of FIG. **10**.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention relates to apparatus and methods are provided for overwriting memory in vehicle event recorder systems. Embodiments are described hereinafter, that are constructed in accordance with the principles of the present invention, In order to facilitate the understanding of the described embodiments, definitions are provided for terms that may not be readily available in popular dictionaries.

Vehicle Event Recorders: Video image recording systems which are responsive to triggers indicative of some event of interest.

Time Dilation: An expansion of a video sequence timeline by way of frame rate manipulation.

Trigger: Electronic means for setting some instant in time associated with a particular event of interest and further for causing initiation of some associative processes.

Expanded Timeline Definition: A prescribed set of rules which sets forth and defines a timeline associated with a video frames sequence having more than one frame rate associated with any particular portion of the timeline.

Overwrite Manager: A computer module determining, in accordance with an expanded timeline definition, which data recorded in memory and associated with a particular video frame is to be discarded and may be overwritten with data from a newly collected video frame.

Video event recorder systems are typically built around and deployed with memories of limited sizes, in order to contain cost. While mass storage and mass storage management may be included in such devices, for example, a computer-type hard drive, these types of components remains quite expensive, causing overall systems to double in cost if such memories were included. Instead, a 'light-weight' memory solution is envisioned in the present invention, in which an abbreviated memory or memory buffer is used to temporarily store information collected during a predetermined time of service, for example a day, of a vehicle equipped with this type of video event recorder. Upon return to base, a vehicle may transfer the information collected to a different memory for management and analysis. Accordingly, the present invention makes it possible to equip vehicles with video event recorders having very inexpensive cameras and memory.

Memories of such video event recording systems are preferably handled in the following manner. A memory system is divided into two portions: a fast, managed loop memory buffer, and a temporary mass storage memory.

Video continuously received from a video camera may be put into the fast memory buffer. However, the amount of data generated by a video system is quite extensive and most of the time totally uninteresting, but certain portions of the video may become of great interest. For example, when a vehicle is involved in a traffic accident, the captured video may yield important clues as to fault, cause, identity, and response, among others. In this event, it is important to preserve video data associated with these select video capture periods.

To this end, a trigger is arranged, whereby the occurrence of some incident of interest, such as an automobile accident, causes data stored in the memory buffer to be transferred to a more permanent memory facility. Old data in the memory buffer is continuously overwritten by new data received from the video camera in real-time. In common and simplistic versions, this step is performed in a "first-in, first-overwritten" manner.

Because the memory buffer is limited in its capacity to store video frames, "first in first overwritten" schemes provide a timeline of limited extent. For example, at a frame rate of four frames per second, a given memory buffer may be suitable for storing 30 seconds of video frame data, or a 30 second video timeline. In 'first-in, first overwritten' schemes, this timeline may be arranged as 15 seconds of continuous video before a trigger event and 15 seconds of continuous video after a trigger event.

However, a continuous frame rate throughout the entire event capture period need not be maintained. It is possible to have a modest frame rate at times associated with the capture period extremities, and a high frame rate during periods around an event trigger. Therefore, the storage frame rate may be adjusted throughout a prescribed capture time period, allowing for an extended temporal range. Instead of a 30 second timeline, is entirely possible to have a 48 second timeline for the same memory. Such a timeline may be embodied as 12 seconds of video at a frame rate of one frame per second for the periods of time furthest apart from the event trigger, both before and after. In addition, the video sequence may include video for 24 continuous seconds, 12 seconds before and 12 seconds after an event trigger, at a video frame rate of four frames per second. This way, the temporal range is extended but the temporal resolution is compromised in the time periods furthest from the trigger event.

To create such a managed loop memory buffer management system, an overwrite scheme is provided to select which frames are 'expired' and no longer part of the particular extended timeline scheme. It should be remembered that video is continuously captured at all times, and that video is captured at the maximum frame rate, because it is not known in advance when an event trigger will occur. Accordingly, the system always captures video at the maximum frame rate as the capture frame rate cannot be adjusted in view of any event trigger which may come in the future.

Video captured at the maximum frame rate is put into the memory and as it is put in the memory it displaces previously recorded video frames. These frames are added to the memory locations determined to be available in accordance with a prescribed overwrite scheme such as the one mentioned above. However, this step is provided differently from a first in first overwritten scheme. In the presently described embodiment, most frames being overwritten are actually newer than at least one other frame stored elsewhere in the memory buffer. Newly captured frames are written to memory positions in a pseudo-'interleaved' fashion while some of older frames are preserved.

When a trigger event occurs, data in memory is transferred from the memory buffer to a memory of more permanent nature. When such data is transferred, an expanded timeline is reconstructed as a timeline having at least two frame rates. At the extremities of the capture period timeline, the frame rate is reduced. At and about the point of greatest interest (trigger event) the frame rate is maximized during the capture period. This 'throttling' of frame rate provides for a memory of preset size to accommodate a timeline of greater temporal extent, although in some places resolution may be reduced.

Referring now to FIG. **1**, a first timeline is shown that is associated with a memory system divided into a plurality of memory bins. For exemplary purposes, some arbitrary numbers for memory size, number of bins, video frame rates, etcetera, have been selected. It is to be understood that these are not necessarily preferred values, but values selected to promote an understanding of the example provided.

The memory related to FIG. **1** is a high-speed, high-performance memory of limited extent, and is arranged as a buffer. This memory communicates with incoming video data recorded by a video camera, and its output is directed to another means for data storage means, such as a memory system having a greater capacity but lower speed, for example a semiconductor DRAM type memory. Alternatively, the memory of FIG. **1** may be a non-volatile, high-performance memory based on ferromagnetic principles, which can respond in real-time to video collected by a video camera, but is of limited size and not suitable for saving the mass amounts of data generated by video image systems.

In general, the memory of FIG. **1** may be limited to a few megabytes and may temporarily hold a limited number of video frames, which may or may not be transferred to a more permanent memory in a transfer operation. In particular, the memory may be divided into 120 bins, with each bin be sufficient for storing the data associated with a single video frame.

A timeline **1** is associated timeline **1** with this memory, and is comprised of a 30 second time interval. The timeline is marked in the Figure from 0 to 30. A one second interval **2** is illustrated at the beginning of the timeline. Further, that one second interval is divided into quadrants, representing a quarter of a second interval **3**. For the video systems of immediate interest, his quarter of a second interval nicely accommodates a single video frame (implicitly setting a frame rate of four frames per second). While most modern video systems have far higher performance than recording four frames per second, four frames per second is a useful rate for vehicle recorder systems, which tend to have limited memories in the interest of maintaining a low cost. Further, the kinds of events being recorded in vehicle recorder systems are appropriately captured with frame rates of a few frames per second.

When video images are captured by a camera, frame-by-frame, each frame images can be recorded into a memory bin **4**. A first frame is recorded and put into a first memory bin. Thereafter, a quarter of second later, a second frame is recorded and put into an another memory bin, for example, an adjacent bin. This frame-by-frame recording scheme may continue for up to 30 seconds before all memory bins becomes full and the supply of empty bins is exhausted. In FIG. **1**, the first 116 memory bins are shaded to indicate that one frame each of video data has been written to those bins. This is equivalent to recording of a video signal **5** of four frames per second for 29 seconds. FIG. **1** also illustrates four empty memory bins **6**, which would be filled in the next

second of video recording. Because the recording of video images in this manner is known in the art, Figure a is labeled as prior art.

FIG. **2** illustrates a similar timeline **21** in conjunction with a graphical illustration of a memory having 120 memory bins. As in FIG. **1**, a time interval equivalent to one second **22** as well as a time interval of one quarter second **23** is illustrated for reference. The graphical depiction of the memory includes lightly shaded areas **24** and **25**. The memory bins presented as **24** represent those bins having data written thereto from a video which was collected from a time t=14 up to a time t=30. The demarcation indicated as dotted line **26** indicates time t=14. At time t=30, the memory is completely full. Video data collected for 30 seconds at four frames per second fills 120 memory bins. The video data collected at time t=31 cannot be saved to memory unless a portion of the memory already allocated and consumed in a previous data write step is overwritten. Thus, in the graphic of FIG. **2**, memory bins indicated by **25** on a second line represent-that video frame data that is recorded in these memory bins at the expense of data captured 30 seconds prior. Accordingly, for the time period indicated, i.e. video data collected from t=0 to t=14, that video data is lost to an overwrite step. In FIG. **2**, those bins shaded dark are indicated as **27**, representing the over-written bins. This illustrates the so-called 'round-robin' or 'first-in, first-over-written' FIFO memory management schemes. Since these schemes are also known in the art, FIG. **2** is also labeled as prior art.

The FIFO memory management scheme is very useful. When a new video frame is collected by the video camera, it is placed into memory at the same location as the oldest frame in the memory which is discarded in the overwrite step. Therefore, the FIFO memory management scheme implies that the oldest video information in the memory is the least valuable.

The memory described is a buffer memory, that is, this memory temporarily holds the data of a video series for some specified time, but also continuously discards previously recorded information. When the buffer contains a data set associated with an important event, that data is transferred from the buffer memory to a more permanent memory before becoming subject to being lost by overwrite actions. A video series becomes 'important' when a detectable event occurs which implicitly indicates video is valuable; for example, if a vehicle is involved in a traffic accident, accelerometers can detect the accident and trigger a transfer of data from the buffer memory to a permanent memory.

In those vehicle event recorder systems, a trigger is sometimes arranged to indicate that such an event has occurred, that is, an event for which the video images associated therewith may be of extreme importance. In this case, the short term buffer memory of 120 video frames should be transferred to a more permanent long-term memory for example, a durable flash type memory.

FIG. **3** is directed at illustrating a timeline which includes an event moment. FIG. **3** includes a timeline **31**, and the dashed line **32** to indicate the 29th second along with a marker 'X' **33** to indicate a trigger event has occurred at the 29th second. When a trigger event occurs, it is important to preserve the video data which occurred after the accident as well as the video data which occurred before the accident. Video images collected during a time period starting 15 seconds before the accident are in the bins indicated by **34**; i.e. those video image frames collected between t=14 and t=29. Memory bins at the end of the time line indicated by **35** include four video frames collected during the first second after the accident. Video image frames collected between t=30 and t 44 are placed in the memory bins indicated by **36**. Thus, the memory buffer contains video images for the 15 seconds prior to the accident and the 15 seconds after the accident. Because the memory is of limited size, it can only hold video image data which represents 30 seconds of video recording.

At this point in time, no new frames are recorded to memory; overwrite is prevented, and the memory buffer is "locked". Rather, the system pauses to transfer data in the buffer memory to a permanent flash memory. After data is successfully transferred to the flash memory, the buffer is "unlocked" and may be used again in the fashion described. As video data which was placed into buffer memory bins between time t=30 and time t=44, it caused older data to be displaced, overwritten and forever destroyed. Data which was recorded between t=0 and t=14 is completely lost and no access is possible any more to this information, which at one time resided in those memory bins, because that information was destroyed in the overwrite step. However, some of this information may be very valuable and, accordingly, it is quite undesirable to lose it entirely; in fact, some of this data may be more important than data which saved in its place.

Since the moments leading to a vehicle accident can explain a great deal about the what actually happened, it is highly desirable to have at least some limited information that relates to the accident scene at t=1, for example. If one can just see one frame at t=1, that may be extremely valuable in explaining what happened in the accident. Therefore, the FIFO scheme may actually destroy critically useful data.

This is also apparent from FIG. **4**, which explicitly shows certain bins A-F associated with various points of the timeline **41** and with reference to trigger event **42** time at time t=29. The following discussion further illustrates the importance of bins A-F.

In a FIFO system, all memory bins, indicated by reference numerals **44** and **45**, are preserved in the memory buffer. Amongst the oldest recorded video frames remaining are those which reside in memory bins A and B, and which represent two adjacent frames, or frames captured within a quarter of a second from each other. Since these frames represent images very close in time, these frames are expected to be quite similar to each other. While it is sometimes desirable in video systems to have high temporal resolution, i.e. as many frames per second as possible, one will appreciate that at higher frame rates, a frame will contain very similar information as the frame closest thereto. Accordingly, where memory is limited, these adjacent frames lose their importance as most of the information contained in each frame is similarly contained in the adjacent frame. Thus, if we keep frame A and discard frame B, most of the information of frame B can be known by examining frame A.

On the other hand, frames D, E and F, which are discarded in a FIFO system, may actually contain extremely important information. Frame D is separated in time from frame E by one second. In a video scene, there may be considerable differences between one frame captured an entire second later than another frame. Further, frame D occurs a full 29 seconds before the trigger event. In a traffic accident, it can be quite useful to know about what was happening at time periods before and after a trigger moment. Thus, it may be possible in a memory having a finite number of memory bins to trade some of the bins associated with less important time slots for bins associated with time slots having a greater importance. If we discard frame B, and preserve frame D,

we may gain a greater overall understanding of the incident being recorded. In effect, we can trade some time resolution (frame rate) at t=15, for improved overall temporal range to realize an extended timeline.

One skilled in the art will notice that if video data associated with a frame rate of one frame per second was preserved, in seconds 1-12, then 36 memory bins into would remain available, which would accommodate newly captured video data. Thus, rather than completely overriding the oldest video data in memory, one can perform an overwrite action on 3 of every 4 memory bins in the overwrite portion of the timeline, thereby maintaining $\frac{1}{4}^{th}$ of the oldest video data in those memory bins. That is to say, for the oldest video data in memory, it may be useful to save one frame per second. To this end, when the overwrite operation is executed, new data is written to three memory bins, before one bin is skipped, and the process is repeated.

Timeline **51** includes a trigger event **52** at time t=29. In one overwrite scheme of interest, it is required that a timeline be comprised of 12 seconds of low temporal resolution, 24 seconds full temporal resolution and a further 12 seconds of low temporal resolution. This is further defined in detail as: a 12 second period of one frame per second video, a 24 second period of four frames per second video, and finally a 12 second period of one frame per second; for a total video sequence of 48 seconds. Since it cannot be known at what time in the future an event trigger will occur, a data overwrite scheme must preserve data associated with various frames, of which a prescribed timeline is comprised. In the present example, continuous video data at a frame rate of four frames per second is preserved for a period of 12 seconds **54** before the trigger event; that data is in memory bins indicated by **53**. While in the FIFO system one can preserve data at four frames per second for up to 15 seconds before and after the trigger event, in the system of the present embodiment only 12 seconds of four frames per second data be kept. However, it will be shown that the present embodiment enables the expansion of the total timeline of the video sequence to 48 seconds in contrast to the 30-second timeline of the FIFO system.

In the 31st second, the first overwrite operation begins. Whether or not a trigger has occurred, newly captured video data is written to every three out of four memory bins, leaving the fourth memory bin undisturbed. Therefore, old data is preserved, albeit at one quarter of the frame rate from which it was originally recorded. Video data after the trigger event is recorded in the memory bins **55** at a frame rate of four frames per second. Just because some bins are skipped, the frame rate of video data collected after the trigger event is not necessarily reduced. This is readily understood in consideration of the time point indicated by **57** which indicates the time t=41 seconds, while, without skipping bins, this point in memory would have been time t=45. Careful observation will prove that the bins indicated by **55** will accommodate data at four frames per second for the entire 12 seconds after the event trigger.

After the time point indicated by **57**, several memory bins remain available for further overwrite operation before reaching the memory bins which contain data to be preserved in agreement with the timeline definition **12/24/12**. At least some of those memory bins up to the position indicated by **54** are available for overwrite. After the full 12 seconds of four frames per second video is recorded, it is desirable to continue recording video data at one frame per second for an additional 12 seconds. Data captured in this period can be stored in memory bins, which are scattered in various locations about the memory buffer. FIG. **6** illustrates on example of such locations.

More particularly, FIG. **6** illustrates memory bin locations which are available for overwrite as the memory approaches its full capacity for the particular schemes presented herein. Once a trigger event occurs, i.e. is set in time, it is possible to compute which video frames must be saved in accordance with the particular timeline definition, and which frames may be discarded. For example, 48 frames at four frames per second may be preserved immediately before the trigger event. In addition, 12 frames at a video rate of one frame per second may be preserved for the time t=5 up to t=17. These frames must be protected from any further overwrite operation, and are marked "must be saved" in FIG. **6**. These frames are saved as they are included in the timeline definition.

All frames which precede t=5 are in condition for being discarded. that is, such frame lie outside the time range which is to be preserved. Accordingly, frames indicated for example as **69** have aged sufficiently and are may be erased. These are the frames which originally were preserved in the overwrite operation as skipped frames.

Video frames captured after the trigger event are also saved in the memory. For 12 seconds after the trigger event, t=29 to t=41, video is captured at a rate of four frames per second. Such a video data **65** is put into memory in accordance with the need to save particular frames of the oldest video data. When all video frames from the period t=29 to t=41 are properly recorded, the system continues to record data at the frame rate of one frame per second. This is different from the earlier operation, in which the overwrite action resulted in the preservation of one frame per second.

For the time period 12 seconds after the event trigger up to 24 seconds after the event trigger, data is put into memory at the reduced frame rate of one frame per second. Other frames may be captured by the camera, but are discarded before entering the memory or instantly thereupon. Thus, the frames represented by **67** are put into memory bins which are available in accordance with the "OK to erase" label in the drawing. A person skilled in the art will note that after three of these frames are placed in the memory, the fourth frame **68** cannot be placed into the memory in the same repeating geometric position. That is to say, those memory bins are not available for overwrite. Therefore, video captured after that time must be carefully managed and fit into the available memory bins.

FIG. **7** illustrates the steps taken in the final filling of the remaining memory bins. In timeline **71**, event trigger **72** is situated at time t=29. In agreement with this exemplary timeline definition, video captured at a frame rate of four frames per second from t=17 to t=29 is stored in memory, as indicated by **73**. Similarly, video captured for a 12 second period at a frame rate of four frames per second from t=29 to t=41 is stored in memory, as shown by reference numeral **74**. Finally, video frames captured during a 12 second period from t=42 to t=54 at a frame rate of one frame per second include those particular frames represented as **75**, which must be inserted into the memory bins remaining available for overwrite.

Arrows **76** indicate that these frames may be placed in locations near the beginning of the memory, where data had once been stored but is now expired because the trigger event occurs at t=29. Once a trigger event is established, the bins which may be overwritten can be determined according to the particular rules defining the timeline.

The example of FIG. **7** clearly illustrates that careful management of an overwrite scheme enables a memory buffer to dilate a timeline by manipulating which video frames are preserved and which are overwritten. Consequently, temporal resolution is sacrificed to extend temporal range, that is, the frame rate of "saved data" is altered in order to make more space available for video frames captured further in time from the event trigger. Accordingly, the greatest amount of information can be preserved in a memory buffer of the limited size.

While the example of FIG. **7** illustrates where the data may be written in memory, those skilled in the art will note that the physical positions of memory bins may be altered. Therefore, after a timeline definition is set, an algorithm may be developed defining the bins containing data that has expired and thus implicitly defining a bin available for overwrite at any moment time.

While the example presented of FIGS. **5-7** illustrates one possible solution, it should be understood that other arrangements may provide for a time dilation in accordance with the spirit of the present invention, and that specific values may be used that are different from those presented in the above exemplary timeline definition. In another exemplary timeline definition, one might arrange a system whereby two periods of eight seconds are used to capture video of a high frame rate, and two periods of 28 seconds are used to capture data at a low frame rate, thus achieving a total expanded timeline of 72 seconds.

The advantages offered by the above examples do not depend upon the particular values chosen in these examples. One should also recognize that because capturing/saving video at two different frame rates enables a user one to expand the timeline, capturing/saving video at three different frame rates also enables a user to expand the timeline with greater flexibility. Accordingly, the memory may be manages to preserve frames for some time periods at a rate of four frames per second, and in other time periods at a rate of two frames per second, and in still other time periods at a rate of one frame per second. This arrangement provides for very high temporal resolutions for the periods immediately surrounding an accident (trigger event), for medium level resolutions for periods further away from the trigger event, and finally for low temporal resolutions at the extremities of the time range.

In addition, asymmetric timeline definitions are possible, that is, the time periods on either side of the event trigger may not be equal in extent or in number. A timeline definition may be devised that has a long, high resolution period before the event trigger, and a short high resolution period after the event trigger. FIG. **8** illustrates various timeline definitions of interest, and is related to several examples each working equally well within the common concept of timeline dilation. FIG. **8** graphically illustrates a first memory buffer **81**, which was discussed in detail in a previous example, and in which there are two frame rates, namely, a high video frame rate of four frames per second and a low video frame rate of one frame per second.

A trigger event **82** occurring at some instant in time implicitly sets the time periods for any particular example, and time period **83** starts immediately after the trigger event and extends for 12 seconds. A second time period **84** extends from the trigger event to 12 seconds prior to the trigger event. In both of these time periods, video is captured and put into the memory buffer at a rate of four frames per second.

The number of shaded memory bins reflects a frame rate of 4 frames per second. Time periods at the extremities of the timeline, periods **85** and **86**, are each also configured to be 12 seconds in length. However, since only one frame per second is collected in those time periods, the number of memory bins consumed is considerably smaller, i.e. ¼ of those consumed in the other time periods. This arrangement provides for a total timeline of 48 seconds, and in memory buffers that do not overwrite/store data at variable rates, the same memory size could only accommodate a timeline of 30 seconds. FIFO memories of the same size are restricted to 30 seconds.

A second example presented as **87** in FIG. **8** suggests two high temporal resolution periods of 10 seconds each. In addition, there are two low temporal resolution periods of 20 seconds each. While there is a reduced overall period of high-resolution video data, the total timeline is extended to 60 seconds.

A third example is presented through the memory buffer of graphic **88**, and illustrates that an asymmetric timeline definition may also be configured. The two periods with a high rate of video recording need not be the same in extent. In fact, video may be recorded at a high frame rate for a longer period after a trigger event than that in the period immediately preceding the trigger event. In the present example, video is recorded in the memory buffer for 16 seconds after the trigger event, but only for four seconds prior to the trigger event. Accordingly, the total high-resolution time period is the same as in the previous example, 20 seconds, but greatly favors preserving information after the trigger event, at the expense of information preceding the trigger event.

In a fourth example, there are six distinct time periods comprised in the timeline. Two 9 second periods occur symmetrically about an event trigger. In these time periods video may be captured a rate of four frames per second. Two additional periods each of 8 seconds may be used to record/overwrite data at a frame rate of two frames per second. Two additional 8 second periods are provided to store data at a frame rate of one frame per second. One skilled in the art will appreciate that in the timeline of this example, two of the 8 second periods are of different sizes with respect to memory capacity, i.e. greater number of bins, than the other two 8 second periods. This is consistent with the higher frame rate used in two of the 8 second periods.

One skilled in the art will also appreciate the great latitude available for managing a memory buffer of limited capacity to expand a timeline. One skilled in the art will further appreciates that where memory buffers deploy FIFO or 'round-robin' strategies for overwrite operations, very important data may be lost. FIFO and 'round-robin' strategies discriminate against the oldest data in a memory buffer, and in situations where the oldest data is not the least valuable, FIFO and round-robin systems are inferior to the system of the present invention.

Referring now to FIG. **9**, the fundamental elements of apparatus according to the present invention is described. Video camera **91** is operable for collecting optical energy and for converting the image of a scene into electrical signals, suitable for processing by common electronic means such as digital semiconductor memories and processors. In addition, these systems include a trigger mechanism **92**.

In one embodiment, a trigger mechanism is the device arranged to provide an electrical signal that indo indicates that a particular video series should be transferred to permanent memory for long-term storage. A trigger may be an accelerometer operable for detecting abrupt changes in

speed, for example, speed changes related to a traffic accident. Triggers may be activated by other events such as heavy braking or swerving maneuvers, and may be activated by means other than accelerometers. For example, a user panic button can be used to activate a trigger event.

When the user believes that a video series should be saved, he can hit a panic button to activate one type of trigger. It is not relevant what precisely causes a trigger to be activated, but rather how memory performs once a trigger event has occurred. Overwrite manager **93** is a control module that interfaces with the trigger and a video camera, and also with a buffer memory **94**. An overwrite manager includes means where a timeline definition may be set and further means for executing overwrite operations in agreement with the stored timeline definitions. Further, an overwrite manager may additionally integrate with flush-module **95**.

When a trigger event occurs, overwrite manager **93** continues to overwrite data to buffer memory **94** in accordance with the timeline definition, by way of an overwrite pointer which is associated with a cell subject to an impending overwrite action. Overwrite manager **93** sends a signal **96** to flush module **95** that cause flush module **95** to copy buffer memory **94** and to transfer the video data set with the prescribed expanded timeline to high-capacity long-term storage **97**. Overwrite manager **93** controls the algorithms and the necessary processing components for writing to buffer memory **94** and save selected data while purging redundant data in accordance with a particular expanded timeline definition.

FIGS. **10** and **11** which illustrate the primary steps of methods in accordance with the present invention. In particular, FIG. **10** describe such methods in the most general sense to include step **101**, whereby frame data is received from a video camera, and step **102**, whereby the newly received data is written over old data stored in the memory buffer according to an expanded timeline definition.

FIG. **11** illustrates these methods in greater detail. Frame data **111** is received from a video camera in a first step. Buffer memory data write step **113** includes sub-step **114**, in which the frame is written to a bin marked open. It is important that data be written in the buffer memory in an organized fashion, without disturbing particular data frames, necessary to fill the prescribed expanded timeline definition. Therefore, a bin is marked 'open' when it no longer contains frame data necessary for the expanded timeline definition.

In second sub-step **115**, a determination is made as to which memory bin contains frame data that is no longer needed in agreement with the timeline definition. This determination made during each cycle. For every new frame entering the buffer memory, another frame becomes no longer necessary at the same instant.

Finally, in third sub-step **116**, the bin which contained data that is no longer required is marked 'open'. In following cycle **112**, the next incoming frame is written to the appropriate bin. It is helpful to set a buffer memory pointer to direct the incoming frame to a bin marked 'open'.

One skilled in the art will appreciate that advanced memory management schemes may be deployed to expand a recorded timeline in memory buffers having limited capacity.

While embodiments of the invention have been described above, it will be apparent to one skilled in the art that various changes and modifications may be made. The appended claims are intended to cover all such changes and modifications that fall within the true spirit and scope of the invention.



What is claimed is:

**1**. A vehicle event recorder system configured to be mounted in a vehicle, the vehicle event recorder system comprising:

a camera configured to capture image data, wherein the camera has a field-of-view that includes an environment in and/or around the vehicle, wherein the image data includes a set of consecutive frames of visual information;

a buffer memory configured to electronically store information, wherein the information includes the image data;

a long-term storage memory configured to store information, wherein the stored information includes a subset of the set of consecutive frames of visual information;

one or more sensors configured to generate output signals conveying vehicle information related to a particular vehicle event at a particular time; and

a controller configured to:

detect the particular vehicle event based on the generated output signals;

effectuate storage of the set of consecutive frames of visual information in the buffer memory;

determine values of individual frames in the set of consecutive frames, wherein the values of the individual frames decrease with increasing time away from the particular time of the particular vehicle event;

facilitate overwriting of the individual frames stored in the buffer memory based on the determined values; and

responsive to detecting the particular vehicle event, transfer information stored in the buffer memory to the long-term storage memory, wherein the transferred information includes frames of visual information for a period of time that begins before the particular vehicle event and lasts until after the particular vehicle event.

**2**. The vehicle event recorder system of claim **1**, wherein the values of the individual frames further decrease based on similarity of the visual information of the individual frames.

**3**. The vehicle event recorder system of claim **1**, wherein the controller is configured such that the individual frame having the lowest determined value is not the oldest frame stored in the buffer memory.

**4**. The vehicle event recorder system of claim **3**, wherein the controller is configured to assign individual value scores to the set of consecutive frames of visual information such that every n-$^{th}$ frame, where n is an integer, is assigned a higher score than frames that immediately precede and immediately follow the n-$^{th}$ frame, which results in a first portion of the frames of visual information stored in the buffer memory having a first higher frame storage rate and a second portion of the frames of visual information stored in the buffer memory having a second lower frame storage rate that is less than or equal to the first higher frame rate divided by n.

**5**. The vehicle event recorder system of claim **4**, wherein the controller is configured such that the second storage density has a variable frame storage rate that corresponds to one or more of the proximity in time to the particular time of the particular vehicle event, a distance traveled by the vehicle, a speed of the vehicle, a pixel difference between consecutive frames of visual information, or a geographic location of the vehicle.

**6**. The vehicle event recorder system of claim **1**, wherein the controller is configured to assign individual value scores

to individual frames of visual information stored in the buffer memory based on a pixel difference between consecutive individual frames such that a second individual additional frame that follows a first individual additional frame and has a low pixel difference relative to the first individual additional frame is assigned a low value score and a third individual additional frame that follows the first individual additional frame and has a high pixel difference relative to the first individual additional frame is assigned a high value score.

**7**. The vehicle event recorder system of claim **1**, wherein the controller is configured to assign individual value scores to individual frames of visual information stored in the buffer memory based on one or more of whether the vehicle was moving when the camera captured the individual frames of visual information, whether an operator was present in the vehicle when the camera captured the individual frames of information, a distance traveled by the vehicle, a speed of the vehicle, or a geographic location of the vehicle.

**8**. The vehicle event recorder system of claim **1**, further comprising a flush module configured to facilitate the transfer of the frames of visual information from the buffer memory to the long-term storage memory, the flush module configured to facilitate the transfer of the frames of visual information from the buffer memory, responsive to the detection of the particular vehicle event, at a transfer rate that exceeds a rate at which the frames of visual information are captured by the camera.

**9**. The vehicle event recorder system of claim **8**, wherein the flush module is configured to start the transfer immediately after the detection of the particular vehicle event rather than waiting for all video frames associated with the particular vehicle event to be stored in the buffer memory.

**10**. The vehicle event recorder system of claim **8**, wherein the flush module is configured, responsive to detection of a second vehicle event in temporal proximity to the particular vehicle event, to dynamically extend a duration of the period of time that begins before the particular vehicle event and lasts until after the second vehicle event such that the transferred frames of visual information include frames of visual information for an extended period of time that begins before the particular vehicle event and lasts until after the second vehicle event.

**11**. A method for storing frames of visual information with a vehicle event recording system, the method comprising:
- capturing a set of consecutive frames of visual information representing an environment in and/or around a vehicle with a camera of the vehicle event recording system;
- generating output signals conveying vehicle information related to a particular vehicle event with one or more sensors of the vehicle event recording system;
- detecting the particular vehicle event based on the generated output signals;
- effectuating storage of the consecutively captured frames of visual information in a buffer memory of the vehicle event recording system;
- determining values of individual frames in the set of consecutive frames, wherein the values of the individual frames decreases with increasing time away from the particular time of the particular vehicle event;
- facilitating overwriting of the individual frames stored in the buffer memory based on the determined values; and
- responsive to detecting the particular vehicle event, transferring information stored in the buffer memory to a long-term storage memory, wherein the transferred information includes frames of visual information for a period of time that begins before the particular vehicle event and lasts until after the particular vehicle event.

**12**. The method of claim **11**, wherein the values of the individual frames further decrease based on similarity of the visual information of the individual frames.

**13**. The method of claim **11**, wherein the individual frame having the lowest determined value is not the oldest frame stored in the buffer memory.

**14**. The method of claim **13**, wherein every n-$^{th}$ frame of the consecutively captured frames of visual information, where n is an integer, is assigned a higher score than frames that immediately preceding and immediately following the n-$^{th}$ frame, which results in a first portion of the frames of visual information stored in the buffer memory having a first higher frame storage rate and a second portion of the frames of visual information stored in the buffer memory having a second lower frame storage rate that is less than or equal to the first higher frame rate divided by n.

**15**. The method of claim **14**, wherein the second storage density has a variable frame storage rate that corresponds to one or more of the proximity in time to the time of the particular vehicle event, a distance traveled by the vehicle, a speed of the vehicle, a pixel difference between consecutively captured frames of visual information, or a geographic location of the vehicle.

**16**. The method of claim **11**, wherein individual value scores are assigned to individual frames of visual information stored in the buffer memory based on a pixel difference between consecutive individual frames captured by the camera such that a second individual additional frame that consecutively follows a first individual additional frame and has a low pixel difference relative to the first individual additional frame is assigned a low value score and a third individual additional frame that consecutively follows the first individual additional frame and has a high pixel difference relative to the first individual additional frame is assigned a high value score.

**17**. The method of claim **11**, wherein individual value scores are assigned to individual frames of visual information stored in the buffer memory based on one or more of whether the vehicle was moving when the camera captured the individual frames of visual information, whether an operator was present in the vehicle when the camera captured the individual frames of information, a distance travelled by the vehicle, a speed of the vehicle, or a geographic location of the vehicle.

**18**. The method of claim **11**, further comprising facilitating the transfer of the frames of visual information from the buffer memory, responsive to the detection of the particular vehicle event, at a transfer rate that exceeds a rate at which the frames of visual information are captured by the camera.

**19**. The method of claim **18**, wherein the transfer starts immediately after the detection of the particular vehicle event rather than waiting for all video frames associated with the particular vehicle event to be stored in the buffer memory.

**20**. The method of claim **18**, further comprising, responsive to detection of a second vehicle event in temporal proximity to the particular vehicle event, dynamically extending a duration of the period of time that begins before the particular vehicle event and lasts until after the second vehicle event such that the transferred frames of visual information include frames of visual information for an extended period of time that begins before the particular vehicle event and lasts until after the second vehicle event.

* * * * *

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMNITRACS, LLC, et al.,<br>Plaintiffs,<br>v.<br>MOTIVE TECHNOLOGIES, INC.,<br>Defendant. | Case No. 23-cv-05261-RFL<br><br>**FINAL JURY INSTRUCTIONS** |

the meaning of the claims before you retire to deliberate your verdict.

**INSTRUCTION NO. 3:**
**BURDEN OF PROOF – PREPONDERANCE OF THE EVIDENCE**

When a party has the burden of proving any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

**INSTRUCTION NO. 4:**
**BURDEN OF PROOF – CLEAR AND CONVINCING EVIDENCE**

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means that the party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true. This is a higher standard of proof than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

**INSTRUCTION NO. 5:**
**WHAT IS EVIDENCE**

The evidence you are to consider in deciding what the facts are consists of:

1. the sworn testimony of any witness;
2. the exhibits that are admitted into evidence;
3. any facts to which the lawyers have agreed; and
4. any facts that I may instruct you to accept as proved.

**INSTRUCTION NO. 6:**
**WHAT IS NOT EVIDENCE**

In reaching your verdict, you may consider only the admitted evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your

memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that is excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

(4) Demonstrative exhibits are not evidence. Certain charts and graphics have been used to illustrate testimony from witnesses. Unless I have specifically admitted them into evidence, these charts and graphics are not themselves evidence even if they refer to, identify, or summarize evidence.

(5) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

**INSTRUCTION NO. 7:**
**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence, such as a turned-on garden hose, may provide a different explanation for the presence of water on the sidewalk. Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

**INSTRUCTION NO. 8:**
**CREDIBILITY OF WITNESSES**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case, if any;

(5) the witness's bias or prejudice, if any;

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

(8) any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**INSTRUCTION NO. 9:**
**DEPOSITION TESTIMONY**

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded.

Depositions were presented during the trial. Insofar as possible, you should consider deposition testimony, presented to you in court in lieu of live testimony, in the same way as if the witness had been present to testify.

## INSTRUCTION NO. 10: EXPERT TESTIMONY

You have heard testimony from Stephen Wicker, Jim Bergman, Christopher Wilson, Scott Andrews, David Znidarsic, David Franklyn, and Carrie Distler, who testified about their opinions and the reasons for those opinions. This opinion testimony was allowed, because of the specialized knowledge, skill, experience, training, or education of each witness.

Such opinion testimony should be judged like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's specialized knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case.

## INSTRUCTION NO. 11: INTERPRETATION OF CLAIMS

Before you decide whether Motive has infringed the Asserted Claims of the Asserted Patents or whether the claims are invalid, you will need to understand the patent claims. As I mentioned at the beginning of the case, the patent claims are numbered sentences at the end of the patent that describes the boundaries of the patent's protection. It is my job as judge to explain to you the meaning of any language in the claims that needs interpretation.

I have interpreted the meaning of some of the language in the patent claims involved in this case. You must accept those interpretations as correct. My interpretation of the language should not be taken as an indication that I have a view regarding the issues of infringement and invalidity. The decisions regarding infringement and invalidity are yours to make.

When deciding the issues you are being asked to decide, you must apply my definitions of the following claim terms:

The use of the terms "**a**" or "**an**" in a patent claim refers to "one or more."

The term "**[facilitate] / [facilitating, with the processor,] wireless communication of information between the vehicle event recorder and a remotely located computing device using HTTP**," as it appears in the asserted claims of the '060 Patent, means "facilitate wireless communication of the information between a web server in the vehicle event recorder and a remotely located computing device using HTTP."

The term "**hours of service record**," as it appears in the asserted claims of the '906 and '628 Patents, means "record[s] that include hours of service information for a driver and any co-driver(s)."

The term "**electronic driver scorecard**," as it appears in the asserted claims of the '628 patent, means "electronic presentation of driver scores."

The term "**alphanumerical ratings**," as it appears in the '628 Patent, means "number

ratings, letter ratings, or ratings containing both numbers and letters."

The term "**accepting inputs of driver information from a user via a user interface and transmitting the driver information to the data acquisition device**" as it appears in the '628 Patent has its plain and ordinary meaning. This phrase requires that the "driver information" transmitted be the same "driver information" whose inputs were accepted. But this phrase does not require that the "inputs of driver information" be the same sequence of data as what is transmitted to the data acquisition device.

The term "**a composite driver score based on a plurality of a group consisting of: fuel efficiency; occurrences of stop idle; occurrences of speeding; occurrences of hard braking; occurrences of high speed braking; and occurrences of safety violations**," as it appears in the asserted claims of the '906 Patent, is a closed group that encompasses a composite driver score based on two or more factors from the recited group and no other unrecited factors.

The preamble of Claim 1 of the '253 Patent refers to a "**vehicle event recorder system configured to be mounted in a vehicle**." This preamble is not a limitation on the claim.

The term "**frame(s) of visual information**," as it appears in the asserted claims of the '253 Patent, means "video frames."

## INSTRUCTION NO. 12:
## TYPES OF PATENT CLAIMS

This case involves two types of patent claims: independent claims and dependent claims.

An "independent claim" sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers.

In this case, Claims 1 and 10 of the '906 Patent, Claim 15 of the '628 Patent, Claim 1 of the '060 Patent, and Claims 1 and 11 of the '253 Patent are each independent claims.

The remaining Asserted Claims, Claim 15 of the '906 Patent, Claims 17 and 18 of the '628 Patent, and Claim 12 of the '060 Patent, are "dependent claims."

A dependent claim does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements. In this way, the claim "depends" on another claim. A dependent claim incorporates all of the requirements of the claim to which it refers. The dependent claim then adds its own additional requirements. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claim to which it refers. A product or process that meets all of the requirements of both the dependent claim and the claim to which it refers is covered by that dependent claim.

## INSTRUCTION NO. 13:
## INFRINGEMENT – OVERVIEW

I will now instruct you on the rules you must follow in deciding whether Omnitracs has proven that Motive has infringed one or more of the Asserted Claims of the Asserted Patents. To prove infringement of any claim, Omnitracs must persuade you that it is more likely than not that Motive has infringed that claim.

## INSTRUCTION NO. 14:
## DIRECT INFRINGEMENT

A patent's claims define what is covered by the patent. A product or method directly infringes a patent if it is covered by at least one claim of the patent.

Deciding whether a claim has been directly infringed is a two-step process. The first step is to decide the meaning of the patent claim. I have already made this decision, and I have already instructed you as to the meaning of the terms in the asserted patent claims. The second step is to decide whether Motive has made, used, sold, offered for sale, or imported within the United States a product or method covered by a claim of the Asserted Patents. If it has, it infringes. You, the jury, make this decision.

With one exception, you must consider each of the asserted claims of the patent individually, and decide whether Motive's products or methods infringe that claim. The one exception to considering claims individually concerns dependent claims. A dependent claim includes all of the requirements of a particular independent claim, plus additional requirements of its own. As a result, if you find that an independent claim is not infringed, you must also find that its dependent claims are not infringed. On the other hand, if you find that an independent claim has been infringed, you must still separately decide whether the additional requirements of its dependent claims have also been infringed.

You have heard evidence about both Omnitracs' commercial products and methods and Motive's accused products and methods. However, in deciding the issue of infringement you may not compare Motive's accused products or methods to Omnitracs' commercial products or methods. Rather, you must compare Motive's accused products and methods to the claims of the Asserted Patents when making your decision regarding infringement. In deciding whether there is infringement, you must compare Motive's accused products to the Asserted Claims, and not to the specification or a preferred embodiment described in the Asserted Patents.

Whether or not Motive knew its products or methods infringed or even knew of the patent does not matter in determining direct infringement.

There are two ways in which a patent claim may be directly infringed. A claim may be "literally" infringed, or it may be infringed under the "doctrine of equivalents." The following instructions will provide more detail on these two types of direct infringement.

**INSTRUCTION NO. 46:**
**CONDUCT OF THE JURY**

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, via text messaging, or any internet chat room, blog, website or application, including but not limited to Facebook, YouTube, X (formerly known as “Twitter”), Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own. Do not visit or view any place discussed in this case, and do not use Internet programs or other devices to search for or view any place discussed during the trial. Also, do not do any research about this case, the law, or the people involved—including the parties, the witnesses, or the lawyers—until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party’s right to have this case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom, or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial. Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

**INSTRUCTION NO. 47:**
**COMMUNICATIONS WITH COURT**

If it becomes necessary during your deliberations to communicate with me, you may send a

note through the clerk, signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including the court—how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

**INSTRUCTION NO. 48:**
**VERDICT**

A verdict form has been prepared for you with questions you must answer. I have already instructed you on the law that you are to use in answering these questions. You must follow my instructions and the form carefully. You must consider each question separately. Although you may discuss the evidence and the issues to be decided in any order, you must answer the questions on the verdict form in the order they appear. After you answer a question, the form tells you what to do next. All nine of you must agree on an answer before you can move on to the next question.

The verdict form in this case has two parts. You will be given only Part One of the verdict form when you retire to deliberate. When you have finished filling out Part One according to your deliberations, your presiding juror should sign and date the verdict form, and advise the clerk that you are ready to return to the courtroom.

After Part One of the verdict form has been completed, you will be provided Part Two of the verdict form, based on your answers to Part One. This two-part process is intended to simplify the instructions on the verdict form. Please do not read into the verdict form, the two-part process, or these instructions that I have an opinion regarding the evidence or what your verdict should be.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMNITRACS, LLC, et al.,<br>Plaintiffs,<br>v.<br>MOTIVE TECHNOLOGIES, INC.,<br>Defendant. | Case No. 23-cv-05261-RFL<br><br>**JURY VERDICT** |

**VERDICT FORM (PHASE 1)**

When answering the following questions (which begin on the next page) and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

Answer each of the following Questions 1–3 by following the Jury Instructions and the instructions given on this Verdict Form.

- "The '906 Patent" refers to U.S. Patent No. 9,014,906
- "The '628 Patent" refers to U.S. Patent No. 9,390,628
- "The '060 Patent" refers to U.S. Patent No. 9,402,060
- "The '253 Patent" refers to U.S. Patent No. 9,911,253

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of the Court as the verdict in our case.

**QUESTION 1 – INFRINGEMENT**

Did Omnitracs prove by a preponderance of the evidence that Motive infringed the following claims of the '906, '628, '060, and '253 Patents?

Check "Yes" (for Omnitracs) or "No" (for Motive) for each claim:

| **'906 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 1** | | no |
| **Claim 10** | | no |
| **Claim 15** | | no |

| **'628 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 15** | | no |
| **Claim 17** | | no |
| **Claim 18** | | |

| **'060 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 1** | | no |
| **Claim 12** | | no |

| **’253 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 1** | | no |
| **Claim 11** | | no |

**Continue to Question 2 if you checked “Yes” for at least one Asserted Claim in Question 1. If not, go directly to Question 3.**

**QUESTION 2 – WILLFUL INFRINGEMENT**

Did Omnitracs prove by a preponderance of the evidence that Motive's infringement was willful? Check "Yes" (for Omnitracs) or "No" (for Motive).

**Do not check a box below for any asserted claim where you answered "No" in Question 1.**

| **'906 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 1** | | |
| **Claim 10** | | |
| **Claim 15** | | |

| **'628 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 15** | | |
| **Claim 17** | | |
| **Claim 18** | | |

| **'060 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 1** | | |
| **Claim 12** | | |

**Continue to Question 3.**

**QUESTION 3 – INVALIDITY**

**Answer Questions 3A and 3B for each asserted claim regardless of your answers in Questions 1 or 2.**

**QUESTION 3A – PATENT ELIGIBILITY.**

Did Motive prove by clear and convincing evidence that the elements in the following claims of the '906 and '628 Patents, considered individually and as an ordered combination, involve only activities which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional at the time the patent application was filed?

Check "Yes" (for Motive) or "No" (for Omnitracs).

| **'906 Patent** | **Yes** (for Motive) | **No** (for Omnitracs) |
|---|---|---|
| **Claim 1** | yes | |
| **Claim 10** | yes | |
| **Claim 15** | yes | |

| **'628 Patent** | **Yes** (for Motive) | **No** (for Omnitracs) |
|---|---|---|
| **Claim 15** | yes | |
| **Claim 17** | yes | |
| **Claim 18** | yes | |

**QUESTION 3B – INVALIDITY**

Did Motive prove by clear and convincing evidence that any of the following asserted claims of the ’906, and ’628 Patents are invalid?

Check “Yes” (for Motive) or “No” (for Omnitracs).

| **’906 Patent** | **Yes** (for Motive) | **No** (for Omnitracs) |
|---|---|---|
| **Claim 1** | | no |
| **Claim 10** | | no |
| **Claim 15** | | no |

| **’628 Patent** | **Yes** (for Motive) | **No** (for Omnitracs) |
|---|---|---|
| **Claim 15** | | no |
| **Claim 17** | | no |
| **Claim 18** | | no |

**Continue to final page of the Verdict Form.**

You have now reached the end of the Verdict Form and should review it to ensure it accurately reflects your unanimous determinations. The Presiding Juror should then sign and date the Verdict Form in the spaces below and notify the Clerk that you have reached a verdict. The Presiding Juror should retain possession of the Verdict Form and bring it when the jury is called back in to read the verdict.

**Please have the Presiding Juror date and sign this form.**

Dated: 24 Apr 2025

Carrie Cordeiro

Presiding Juror

Query Reports Utilities Help Log Out

ADRMOP,AO279,APPEAL,CLOSED,PRVADR,REFDIS

# U.S. District Court
# California Northern District (San Francisco)
# CIVIL DOCKET FOR CASE #: 3:23-cv-05261-RFL

Omnitracs, LLC et al v. Motive Technologies, Inc.
Assigned to: Judge Rita F. Lin
Referred to: Magistrate Judge Laurel Beeler
Case in other court: for the Federal Circuit, 25-02098
Cause: 15:1126 Patent Infringement

Date Filed: 10/13/2023
Date Terminated: 08/29/2025
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 10/13/2023 | 1 | COMPLAINT against Motive Technologies, Inc. with jury demand ( Filing fee $ 402, receipt number ACANDC-18736965.). Filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Civil Cover Sheet)(Alper, Adam) (Filed on 10/13/2023) Modified on 10/16/2023 (jml, COURT STAFF). (Entered: 10/13/2023) |
| 10/13/2023 | 2 | Proposed Summons. (Alper, Adam) (Filed on 10/13/2023) (Entered: 10/13/2023) |
| 10/13/2023 | 3 | Certificate of Interested Entities by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation identifying Corporate Parent Ruxton Superior Holdings Corporation for XRS Corporation; Corporate Parent Solera Holdings, LLC for Omnitracs, LLC. (Alper, Adam) (Filed on 10/13/2023) (Entered: 10/13/2023) |
| 10/13/2023 | 4 | Case assigned to Magistrate Judge Lisa J. Cisneros.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 10/27/2023. (bar, COURT STAFF) (Filed on 10/13/2023) (Entered: 10/13/2023) |
| 10/13/2023 | 5 | Corporate Disclosure Statement by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation (Alper, Adam) (Filed on 10/13/2023) (Entered: 10/13/2023) |
| 10/13/2023 | 6 | NOTICE of Appearance by Michael Woodrow De Vries *for Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.* (De Vries, Michael) (Filed on 10/13/2023) (Entered: 10/13/2023) |

| | | |
|---|---|---|
| 10/13/2023 | 7 | NOTICE of Appearance by Akshay Sunil Deoras *for Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.*. (Deoras, Akshay) (Filed on 10/13/2023) (Entered: 10/13/2023) |
| 10/16/2023 | 8 | Summons Issued as to Motive Technologies, Inc.. (jml, COURT STAFF) (Filed on 10/16/2023) (Entered: 10/16/2023) |
| 10/16/2023 | 9 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 1/4/2024. Initial Case Management Conference set for 1/11/2024 01:30 PM in San Francisco, Courtroom G, 15th Floor. (jml, COURT STAFF) (Filed on 10/16/2023) (Entered: 10/16/2023)** |
| 10/16/2023 | | Electronic filing error. AO-CAND-120 Form is missing. Please complete and file the Report on the filing or determination of an action regarding a patent or trademark. Submit your document using Other Documents> Patent/Trademark Report. Re: 1 Complaint,, filed by SmartDrive Systems, Inc., XRS Corporation, Omnitracs, LLC (jml, COURT STAFF) (Filed on 10/16/2023) (Entered: 10/16/2023) |
| 10/16/2023 | 10 | REPORT on the filing or determination of an action regarding *Patents* (cc: form mailed to register). (Alper, Adam) (Filed on 10/16/2023) (Entered: 10/16/2023) |
| 10/17/2023 | 11 | SUMMONS Returned Executed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. Motive Technologies, Inc. served on 10/16/2023, answer due 11/6/2023. (Alper, Adam) (Filed on 10/17/2023) (Entered: 10/17/2023) |
| 10/20/2023 | 12 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18756407.) filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Certificate of Good Standing)(Schmidt, Leslie) (Filed on 10/20/2023) (Entered: 10/20/2023) |
| 10/23/2023 | 13 | **Order by Magistrate Judge Lisa J. Cisneros granting 12 Motion for Pro Hac Vice for Leslie M. Schmidt.(bns, COURT STAFF) (Filed on 10/23/2023) (Entered: 10/23/2023)** |
| 10/27/2023 | 14 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation.. (Alper, Adam) (Filed on 10/27/2023) (Entered: 10/27/2023) |
| 10/30/2023 | 15 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (bns, COURT STAFF) (Filed on 10/30/2023) (Entered: 10/30/2023) |
| 10/30/2023 | 16 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge James Donato for all further proceedings. Magistrate Judge Lisa J. Cisneros no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Signed by** |

| | | |
|---|---|---|
| | | **Clerk on 10/30/2023. (Attachments: # 1 Notice of Eligibility for Video Recording) (mbc, COURT STAFF) (Filed on 10/30/2023) (Entered: 10/30/2023)** |
| 10/31/2023 | 17 | CERTIFICATE OF SERVICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 14 Consent/Declination to Proceed Before a US Magistrate Judge (Deoras, Akshay) (Filed on 10/31/2023) (Entered: 10/31/2023) |
| 10/31/2023 | 18 | STIPULATION *Extending Time to Respond to the Complaint Pursuant to Local Rule 6-1(A)* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation and Motive Technologies, Inc.. (Deoras, Akshay) (Filed on 10/31/2023) Modified on 11/1/2023 (jml, COURT STAFF). (Entered: 10/31/2023) |
| 10/31/2023 | 19 | **CASE MANAGEMENT SCHEDULING ORDER: Initial Case Management Conference set for 2/1/2024 10:00 AM in San Francisco, Courtroom 11, 19th Floor. Case Management Statement due by 1/25/2024. Signed by Judge James Donato on 10/31/2023. (lrc, COURT STAFF) (Filed on 10/31/2023) (Entered: 10/31/2023)** |
| 11/21/2023 | 20 | NOTICE of Appearance by David Shane Brun (Brun, David) (Filed on 11/21/2023) (Entered: 11/21/2023) |
| 11/21/2023 | 21 | Certificate of Interested Entities by Motive Technologies, Inc. (Brun, David) (Filed on 11/21/2023) (Entered: 11/21/2023) |
| 11/21/2023 | 22 | NOTICE of Appearance by Thomas J. Friel, Jr (Friel, Thomas) (Filed on 11/21/2023) (Entered: 11/21/2023) |
| 11/22/2023 | | Electronic filing error. **NOTICE TO COUNSEL:** DAVID SHANE BRUN. The docket shows a different address from what is appearing on the document (dkt. #: 20 Notice of Appearance filed by Motive Technologies, Inc.). Please update your personal profile on ECF. (jml, COURT STAFF) (Filed on 11/22/2023) (Entered: 11/22/2023) |
| 11/22/2023 | 23 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18864630.) filed by Motive Technologies, Inc.. (Attachments: # 1 CO Certificate of Good Standing)(Tarasi, Angela) (Filed on 11/22/2023) (Entered: 11/22/2023) |
| 11/27/2023 | 24 | **ORDER by Judge James Donato granting 23 Motion for Pro Hac Vice as to Angela Tarasi. (lrc, COURT STAFF) (Filed on 11/27/2023) (Entered: 11/27/2023)** |
| 11/27/2023 | 25 | **ORDER REASSIGNING CASE.**<br><br>IT IS ORDERED that this case is reassigned to the Honorable Rita F. Lin in the San Francisco Division for all further proceedings.<br><br>1. All future filings shall bear the initials RFL immediately after the case number.<br><br>2. All case management conference dates are vacated and will be reset by the Court.<br><br>3. All hearing dates presently scheduled are **VACATED**. However, existing briefing schedules for motions remain unchanged. All pending motions (regardless of whether they are presently scheduled for hearing) must be **RENOTICED** for hearing before Judge Lin by the moving party for a date consistent with the Court's law and motion calendar, but the renoticing of the hearing does not affect the prior briefing schedule.<br><br>4. Deadlines for ADR compliance and discovery cutoffs remain unchanged.<br><br>5. All pretrial conference and trial dates currently set for after **March 4, 2024**, and all other deadlines associated with the case, will remain in place unless otherwise ordered. |

6. All pretrial conference and trial dates scheduled on or before **March 4, 2024,** are vacated. Other pretrial deadlines (*eg.*, motions in limine, pretrial statements, proposed joint trial exhibits, etc.) will remain in place. The Court will notify the parties when a status conference will be held to schedule a new pretrial conference and trial dates for affected cases.

7. Matters currently referred to a Magistrate Judge will remain before that Magistrate Judge absent further notice.

8. Each party is expected to review and become familiar with all applicable standing orders and scheduling notes.

9. On or before **December 11, 2023**, the parties shall file a Joint Case Management Statement (separate statements are appropriate if either party is proceeding without counsel). The statement should not exceed ten pages in length and should address the following items in the following order:

a. Date Filed: The date the case was filed;

b. Parties: A list or description of each party;

c. Claims: A summary of all claims, counter-claims, cross-claims, or third party claims;

d. Facts: A brief chronology of the facts and a statement of the principal factual issues in dispute;

e. Legal Issues: A brief statement, without extended legal argument, of the disputed points of law, including reference to specific statutes and decisions;

f. Relief: A description of the relief sought and the damages claimed with an explanation as to how damages have been (or will be) computed;

g. Discovery: The status of discovery, including any significant discovery management issues, as well as any limits or cutoff dates;

h. Related Cases: The status, case name, and case number of any related cases or proceedings pending before another judge of this court, or before another court or administrative body;

i. Procedural History: A procedural history of the case, including any previous motions that were decided or submitted, any ADR proceedings or settlement conferences that have been scheduled or concluded, any appellate proceedings that are pending or concluded, and any previous referral to a magistrate judge;

j. Deadlines: A description of any other deadlines in place before reassignment, including those for ADR, dispositive motions, pretrial conferences, and trials;

k. Any modification of deadlines: Any requested modification of these dates, and the reasons for the request;

l. Consent to Magistrate: Whether the parties will consent to a magistrate judge for trial; and

| | | |
|---|---|---|
| | | m. Emergency: Whether there exists an immediate need for a case management conference to be scheduled in the action, and why the parties believe such a need exists.<br><br>10. The Joint Case Management Statement will not constitute a motion to extend or modify dates. If emergency relief is needed to modify a deadline, and the deadline is not of the type that can be modified via stipulation of the parties without a court order, the requesting party or parties shall additionally file a motion or stipulation for such relief in compliance with Local Rule 6.<br><br>11. The assigned judge participates in the Cameras in the Courtroom Pilot Project. Hearings and trials in any civil case assigned to a judge participating in the Pilot Project are eligible for video recording, upon request and with the consent of the parties and the presiding judge. Please see the Northern Districts webpage about participation in the Pilot Project and General Order 65 for more information.<br><br>IT IS SO ORDERED.<br><br>Dated: 11/27/2023<br>FOR THE EXECUTIVE COMMITTEE<br>Mark B. Busby, Clerk of Court<br><br>(kab-adi, COURT STAFF) (Filed on 11/27/2023) (Entered: 11/27/2023) |
| 11/27/2023 | 26 | NOTICE of Appearance by David Shane Brun *(corrected)* (Brun, David) (Filed on 11/27/2023) (Entered: 11/27/2023) |
| 11/27/2023 | 27 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18871840.) filed by Motive Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing (IL))(Ray, Brent) (Filed on 11/27/2023) (Entered: 11/27/2023) |
| 11/29/2023 | 28 | Case Reassigned to Judge Rita F. Lin. Judge James Donato no longer assigned to the case. Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. (as, COURT STAFF) (Filed on 11/29/2023) (Entered: 11/29/2023) |
| 11/29/2023 | 29 | **Order by Judge Rita F. Lin granting 27 Motion for Pro Hac Vice as to Brent Ray. (tmi, COURT STAFF) (Filed on 11/29/2023) (Entered: 11/29/2023)** |
| 12/06/2023 | 30 | MOTION to Dismiss *the Complaint* filed by Motive Technologies, Inc.. Motion to Dismiss Hearing set for 1/30/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor. Responses due by 12/20/2023. Replies due by 12/27/2023. (Attachments: # 1 Appendix 1 & 2, # 2 Declaration of Angela Tarasi, # 3 Exhibit A, # 4 Exhibit B, # 5 Proposed Order) (Ray, Brent) (Filed on 12/6/2023) (Entered: 12/06/2023) |
| 12/11/2023 | 31 | JOINT CASE MANAGEMENT STATEMENT filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation and Motive Technologies, Inc.. (Attachments: # 1 Exhibit A (Proposed Case Schedule))(Alper, Adam) (Filed on 12/11/2023) Modified on 12/12/2023 (jml, COURT STAFF). (Entered: 12/11/2023) |
| 12/13/2023 | 32 | STIPULATION WITH PROPOSED ORDER *Extending Time for Briefing Responsive to Defendant's Motion to Dismiss* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation and Motive Technologies, Inc.. (Alper, Adam) (Filed on 12/13/2023) Modified on 12/13/2023 (jml, COURT STAFF). (Entered: 12/13/2023) |
| 12/14/2023 | 33 | CLERK'S NOTICE Setting Case Management Conference:<br><br>Notice is hereby given that an Initial Case Management Conference is set for 1/31/2024 10:00 AM in San Francisco - Videoconference Only. Updated Case Management |

| | | |
|---|---|---|
| | | Statement due by 1/24/2024.<br><br>This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/judges/lin-rita-f-rfl/<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Filed on 12/14/2023) (Entered: 12/14/2023) |
| 12/14/2023 | 34 | **ORDER by Judge Rita F. Lin granting 32 Stipulation to Extend Briefing Schedule for Defendant's Motion to Dismiss. (mkl, COURT STAFF) (Filed on 12/14/2023) (Entered: 12/14/2023)** |
| 12/14/2023 | | Set/Reset Deadlines as to 30 MOTION to Dismiss *the Complaint*. Responses due by 1/3/2024. Replies due by 1/16/2024. (mkl, COURT STAFF) (Filed on 12/14/2023) (Entered: 12/14/2023) |
| 12/21/2023 | 35 | NOTICE of Appearance by Jiaxiao Zhang (Zhang, Jiaxiao) (Filed on 12/21/2023) (Entered: 12/21/2023) |
| 12/21/2023 | 36 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Alper, Adam) (Filed on 12/21/2023) (Entered: 12/21/2023) |
| 12/21/2023 | 37 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Ray, Brent) (Filed on 12/21/2023) (Entered: 12/21/2023) |
| 12/21/2023 | 38 | *Stipulated Protective Order* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation and Motive Technologies, Inc.. (Alper, Adam) (Filed on 12/21/2023) Modified on 12/22/2023 (jml, COURT STAFF). (Entered: 12/21/2023) |
| 12/22/2023 | 39 | **ORDER by Judge Rita F. Lin denying without prejudice 38 Stipulated Protective Order. The proposed protective order does not comply with the Court's civil standing order. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 12/22/2023) (Entered: 12/22/2023)** |
| 01/03/2024 | 40 | OPPOSITION/RESPONSE (re 30 MOTION to Dismiss *the Complaint* ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Alper, Adam) (Filed on 1/3/2024) (Entered: 01/03/2024) |
| 01/16/2024 | 41 | REPLY (re 30 MOTION to Dismiss *the Complaint* ) filed byMotive Technologies, Inc.. (Ray, Brent) (Filed on 1/16/2024) (Entered: 01/16/2024) |
| 01/17/2024 | 42 | Joint MOTION for Entry of [Proposed] Stipulated ESI Order filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation, Motive Technologies, Inc.. Responses due by 1/31/2024. Replies due by 2/7/2024. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Alper, Adam) (Filed on 1/17/2024) Modified on 1/18/2024 (jml, COURT STAFF). (Entered: 01/17/2024) |
| 01/22/2024 | 43 | **ORDER by Judge Rita F. Lin granting 42 Stipulation Regarding Electronically Stored Information. (mkl, COURT STAFF) (Filed on 1/22/2024) (Entered:** |

| | | |
|---|---|---|
| | | **01/22/2024)** |
| 01/24/2024 | 44 | UPDATED JOINT CASE MANAGEMENT STATEMENT filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. Motive Technologies, Inc (Attachments: # 1 Exhibit A (Proposed Case Schedule))(Alper, Adam) (Filed on 1/24/2024) Modified on 1/25/2024 (cjl, COURT STAFF). (Entered: 01/24/2024) |
| 01/29/2024 | 45 | Joint MOTION for Protective Order filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation and Motive Technologies, Inc.. Responses due by 2/12/2024. Replies due by 2/20/2024. (Attachments: # 1 Exhibit A (Proposed Stipulated Protective Order), # 2 Exhibit B (Redline))(Alper, Adam) (Filed on 1/29/2024) Modified on 1/30/2024 (jml, COURT STAFF). (Entered: 01/29/2024) |
| 01/30/2024 | 46 | **STIPULATED PROTECTIVE ORDER (granting 45 Stipulation) by Judge Rita F. Lin. (mkl, COURT STAFF) (Filed on 1/30/2024) (Entered: 01/30/2024)** |
| 01/30/2024 | 47 | **Minute Entry for proceedings held before Judge Rita F. Lin:**<br><br>**Motion Hearing held on 1/30/2024 re 30 MOTION to Dismiss *the Complaint* filed by Motive Technologies, Inc.**<br><br>**Argument heard. The Court takes the matter under submission and will issue a written order.**<br><br>**Initial Case Management Conference held on 1/30/2024.**<br><br>**The Court adopted the parties' proposed case schedule contained in docket [44-1] with the modifications noted on the record.**<br><br>**The deadline to amend the pleadings is 4/12/2024.**<br>**Claims Construction and Tutorial Hearing set for 7/16/2024 01:30 PM in San Francisco - Videoconference Only.**<br>**Close of Fact Discovery is 7/26/2024.**<br>**Last day to file motions to compel related to fact discovery is 8/2/2024.**<br>**Initial Expert Reports due by 8/2/2024.**<br>**Rebuttal Expert Reports due by 8/30/2024.**<br>**Close of Expert Discovery is 9/20/2024.**<br>**Last day to hear dispositive and Daubert Motions is 11/12/2024.**<br>**Pretrial Conference set for 2/4/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin.**<br>**Jury Selection/Jury Trial set for 2/10/2025 09:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin.**<br><br>**The parties are directed to refer to Judge Lin's standing order for civil trials for pretrial deadlines.**<br><br>**The parties plan to participate in private mediation. A joint letter with the name of the mediator and date of the mediation is due by 2/23/2024. The deadline to complete ADR is 5/17/2024.**<br><br>**The Court requests that the parties meet and confer about possibly consenting to magistrate judge jurisdiction and include an update on that topic in the joint letter due on 2/23/2024.**<br><br>**Updated Case Management Statement due by 6/20/2024. Further Case Management Conference set for 6/26/2024 10:00 AM in San Francisco - Videoconference Only.** |

| | | |
|---|---|---|
| | | **Total Time in Court: 49 minutes.**<br>**Court Reporter: Ana Dub.**<br><br>**Attorneys for Plaintiff: Adam Alper, Akshay Deoras, and Michael De Vries.**<br>**Attorney for Defendant: Brendt Ray, Angela Tarasi, and Shane Brun.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Date Filed: 1/30/2024) (Entered: 01/30/2024)** |
| 01/30/2024 | | CASE REFERRED to Private ADR. (cmf, COURT STAFF) (Filed on 1/30/2024) (Entered: 01/31/2024) |
| 01/31/2024 | 48 | TRANSCRIPT ORDER for proceedings held on 01/30/2024 before Judge Rita F. Lin by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation, for Court Reporter Ana Dub. (Deoras, Akshay) (Filed on 1/31/2024) (Entered: 01/31/2024) |
| 02/06/2024 | 49 | Transcript of Proceedings held on January 30, 2024, before Judge Rita F. Lin. Court Reporter Ana Dub, CSR 7445, RDR, RMR, CRR, CCRR, CRG, CCG, telephone number 415-290-1651; ana_dub@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re48 Transcript Order ) Release of Transcript Restriction set for 5/6/2024. (Related documents(s) 48 ) (amd, COURT STAFF) (Filed on 2/6/2024) (Entered: 02/06/2024) |
| 02/06/2024 | 50 | TRANSCRIPT ORDER for proceedings held on 01/30/20204 before Judge Rita F. Lin by Motive Technologies, Inc., for Court Reporter Ana Dub. (Ray, Brent) (Filed on 2/6/2024) (Entered: 02/06/2024) |
| 02/12/2024 | 51 | **ORDER by Judge Rita F. Lin granting in part and denying in part 30 Motion to Dismiss. Amended Complaint due by 3/13/2024. (mkl, COURT STAFF) (Filed on 2/12/2024) (Entered: 02/12/2024)** |
| 02/23/2024 | 52 | Letter from Adam R. Alper and Brent Ray *regarding status of selection of private mediator and declination to proceed before a magistrate*. (Alper, Adam) (Filed on 2/23/2024) (Entered: 02/23/2024) |
| 02/26/2024 | 53 | **ORDER. Pursuant to the parties' Letter (Dkt. No 52 ), the deadline to file a joint letter with the name of the mediator and the date of the mediation is extended to March 1, 2024. Signed by Judge Rita F. Lin on February 26, 2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 2/26/2024) (Entered: 02/26/2024)** |
| 03/01/2024 | 54 | Letter from Leslie M. Schmidt *regarding selection of mediator and date of mediation*. (Schmidt, Leslie) (Filed on 3/1/2024) Modified on 3/4/2024 (jml, COURT STAFF). (Entered: 03/01/2024) |
| 03/13/2024 | 55 | MOTION for Leave to File *First Amended Complaint* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Jiaxiao Zhang, # 2 Proposed Order, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit A, # 7 Exhibit B, # 8 Exhibit C, # 9 Exhibit D, # 10 Exhibit E, # 11 Exhibit F, # 12 Exhibit G, # 13 Exhibit H, # 14 Exhibit I, # 15 Exhibit J, # 16 Exhibit K, # 17 Exhibit L, # 18 Exhibit M, # 19 Exhibit N, # 20 Exhibit O, # 21 Exhibit P, # 22 Exhibit Q, # 23 Exhibit R, # 24 Exhibit S, # 25 Exhibit T, # 26 Exhibit U, # 27 Exhibit V)(Deoras, Akshay) (Filed on 3/13/2024) (Entered: 03/13/2024) |

| | | |
|---|---|---|
| 03/14/2024 | | Set/Reset Deadlines as to 55 MOTION for Leave to File *First Amended Complaint*. Motion Hearing set for 5/7/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. (mkl, COURT STAFF) (Filed on 3/14/2024) (Entered: 03/14/2024) |
| 03/27/2024 | 56 | OPPOSITION/RESPONSE (re 55 MOTION for Leave to File *First Amended Complaint* ) filed byMotive Technologies, Inc.. (Ray, Brent) (Filed on 3/27/2024) (Entered: 03/27/2024) |
| 03/27/2024 | 57 | ANSWER to Complaint with Jury Demand , COUNTERCLAIM against Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation by Motive Technologies, Inc.. (Ray, Brent) (Filed on 3/27/2024) (Entered: 03/27/2024) |
| 04/03/2024 | 58 | REPLY (re 55 MOTION for Leave to File *First Amended Complaint* ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Deoras, Akshay) (Filed on 4/3/2024) (Entered: 04/03/2024) |
| 04/05/2024 | 59 | **ORDER by Judge Rita F. Lin granting 55 Motion for Leave to File First Amended Complaint. (mkl, COURT STAFF) (Filed on 4/5/2024) (Entered: 04/05/2024)** |
| 04/05/2024 | 60 | AMENDED COMPLAINT against All Defendants. Filed by SmartDrive Systems, Inc., XRS Corporation, Omnitracs, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V)(Alper, Adam) (Filed on 4/5/2024) (Entered: 04/05/2024) |
| 04/12/2024 | 61 | STIPULATION *ENLARGING TIME FOR PATENT LOCAL RULE 4-1 EXCHANGE* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation and Motive Technologies, Inc.. (Zhang, Jiaxiao) (Filed on 4/12/2024) Modified on 4/15/2024 (jml, COURT STAFF). (Entered: 04/12/2024) |
| 04/17/2024 | 62 | ANSWER TO COUNTERCLAIM by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Deoras, Akshay) (Filed on 4/17/2024) (Entered: 04/17/2024) |
| 04/19/2024 | 63 | *Defendant Motive Technologies, Inc.'s* ANSWER to Amended Complaint , COUNTERCLAIM against Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation by Motive Technologies, Inc.. (Ray, Brent) (Filed on 4/19/2024) (Entered: 04/19/2024) |
| 05/03/2024 | 64 | *Stipulated Request for Order Changing Time for Markman Hearing and Modifying Scheduling Order to Add Claim Narrowing* filed by Motive Technologies, Inc., Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.. (Tarasi, Angela) (Filed on 5/3/2024) Modified on 5/6/2024 (jml, COURT STAFF). (Entered: 05/03/2024) |
| 05/06/2024 | 65 | **ORDER. The parties are directed to file a joint Proposed Order corresponding to their Stipulated Request (Dkt. No. 64 ) and to email a Word-compatible copy of their Stipulated Request and Proposed Order to rflpo@cand.uscourts.gov. Signed by Judge Rita F. Lin on May 6, 2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 5/6/2024) (Entered: 05/06/2024)** |
| 05/08/2024 | 66 | Joint Proposed Order *re Stipulated Request for an Order Changing Time for Markman Hearing and Modifying Scheduling Order to Add Claim Narrowing* re 65 Order, 64 Stipulation, by Motive Technologies, Inc.. (Tarasi, Angela) (Filed on 5/8/2024) Modified on 5/8/2024 (jml, COURT STAFF). (Entered: 05/08/2024) |

| | | |
|---|---|---|
| 05/08/2024 | 67 | NOTICE *OF DISCOVERY DISPUTE* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation (Deoras, Akshay) (Filed on 5/8/2024) Modified on 5/9/2024 (jml, COURT STAFF). (Entered: 05/08/2024) |
| 05/09/2024 | 68 | **ORDER re 64 Stipulation for an Order Changing Time for Markman Hearing and Modifying Scheduling Order to Add Claim Narrowing. Signed by Judge Rita F. Lin on 5/9/2024.**<br><br>**Claims Construction and Tutorial Hearing set for 7/19/2024 01:30 PM in San Francisco - Videoconference Only. This proceeding will be held via a Zoom webinar.**<br><br>**Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/judges/lin-rita-f-rfl/**<br><br>**General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.**<br><br>**Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/.**<br><br>**(mkl, COURT STAFF) (Filed on 5/9/2024) (Entered: 05/09/2024)** |
| 05/10/2024 | 69 | **ORDER OF REFERRAL FOR DISCOVERY PURPOSES. Signed by Judge Rita F. Lin on 5/10/2024. (mkl, COURT STAFF) (Filed on 5/10/2024) (Entered: 05/10/2024)** |
| 05/10/2024 | 70 | ANSWER TO COUNTERCLAIM 63 Answer to Amended Complaint, Counterclaim by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Alper, Adam) (Filed on 5/10/2024) (Entered: 05/10/2024) |
| 05/12/2024 | 71 | **Discovery Order**<br><br>**For the pending discovery dispute, the parties must comply with the dispute-resolution procedures in the attached order, which has a joint-brief process to resolve disputes. Please be sure to file the letter brief in the manner reflected in the standing order: the process sets a flag that alerts the court in a way that a regular filing does not.**<br><br>**(Beeler, Laurel) (Filed on 5/12/2024) (Entered: 05/12/2024)** |
| 05/15/2024 | 72 | NOTICE of Appearance by Mark Anthony Zambarda - *Counsel for Defendant Motive Technologies, Inc.* (Zambarda, Mark) (Filed on 5/15/2024) (Entered: 05/15/2024) |
| 05/17/2024 | 73 | JOINT CLAIM CONSTRUCTION *and Prehearing Statement* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit A (Agreed Terms) to Joint Claim Construction and Prehearing Statement, # 2 Exhibit B (Disputed Terms and Evidence) to Joint Claim Construction and Prehearing Statement, # 3 Exhibit C (Wicker Decl.) to Joint Claim Construction and Prehearing Statement, # 4 Exhibit D (Wilson Decl.) to Joint Claim Construction and Prehearing Statement)(Deoras, Akshay) (Filed on 5/17/2024) Modified on 5/20/2024 (jml, COURT STAFF). (Entered: 05/17/2024) |
| 05/20/2024 | 74 | Notice of Motion and MOTION for *Partial Judgment On The Pleadings Pursuant To Fed. R. Civ. P. 12(c)* filed by Motive Technologies, Inc.. Motion Hearing set for 6/25/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 6/3/2024. Replies due by 6/10/2024. (Attachments: # 1 Proposed |

| | | |
|---|---|---|
| | | Order)(Tarasi, Angela) (Filed on 5/20/2024) Modified on 5/21/2024 (jml, COURT STAFF). (Entered: 05/20/2024) |
| 05/29/2024 | 75 | STIPULATION WITH PROPOSED ORDER *Extending Time For Briefing Responsive To Defendants Motion For Partial Judgment On The Pleadings [Dkt. 74]* filed by Omnitracs, LLC, SmartDrive Systems, Inc.. (Deoras, Akshay) (Filed on 5/29/2024) (Entered: 05/29/2024) |
| 05/30/2024 | 76 | **ORDER by Judge Rita F. Lin granting 75 Stipulation as Modified. Plaintiffs' deadline to oppose Defendant's Motion for Judgment on the Pleadings (Dkt. No. 74 ) is 6/6/2024. Defendant's deadline to reply is 6/13/2024.**<br><br>**The hearing on Defendant's Motion for Judgment on the Pleadings is reset for 7/2/2024 at 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. If the parties are unavailable on 7/2/2024, they may file a stipulation requesting a different hearing date.**<br><br>**The Further Case Management Conference is reset for 8/28/2024 at 10:00 AM in San Francisco - Videoconference Only. Joint Case Management Statement due by 8/21/2024.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 5/30/2024) (Entered: 05/30/2024)** |
| 05/30/2024 | | Set/Reset Deadlines as to 74 MOTION for Judgment on the Pleadings. Response due by 6/6/2024. Reply due by 6/13/2024. Motion Hearing reset for 7/2/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. (mkl, COURT STAFF) (Filed on 5/30/2024) (Entered: 05/30/2024) |
| 05/30/2024 | | Set Deadlines/Hearings: Further Case Management Conference set for 8/28/2024 10:00 AM in San Francisco - Videoconference Only.<br><br>This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/judges/lin-rita-f-rfl/<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>(mkl, COURT STAFF) (Filed on 5/30/2024) (Entered: 05/30/2024) |
| 06/05/2024 | 77 | STIPULATION WITH PROPOSED ORDER *Extending Deadline to File Claim Construction Briefing and Requesting Remote Hearing* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Deoras, Akshay) (Filed on 6/5/2024) (Entered: 06/05/2024) |
| 06/06/2024 | 78 | NOTICE of Appearance by Kyle Calhoun *on behalf of Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.* (Calhoun, Kyle) (Filed on 6/6/2024) (Entered: 06/06/2024) |

| | | |
|---|---|---|
| 06/06/2024 | 79 | NOTICE of Appearance by Ingrid Marie Haslund Petersen *on behalf of Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.* (Petersen, Ingrid) (Filed on 6/6/2024) (Entered: 06/06/2024) |
| 06/06/2024 | 80 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-19494048.) filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Certificate of Good Standing)(Li, Kat) (Filed on 6/6/2024) (Entered: 06/06/2024) |
| 06/06/2024 | 81 | OPPOSITION/RESPONSE (re 74 MOTION for Judgment on the Pleadings ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Dr. Stephen B. Wicker, # 2 Declaration of Kyle Calhoun, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3)(Deoras, Akshay) (Filed on 6/6/2024) (Entered: 06/06/2024) |
| 06/07/2024 | 82 | **ORDER AS MODIFIED by Judge Rita F. Lin granting 77 Stipulation Extending Deadline to File Claim Construction Briefing and Requesting Remote Hearing. (mkl, COURT STAFF) (Filed on 6/7/2024) (Entered: 06/07/2024)** |
| 06/07/2024 | | Set/Reset Deadlines as to 74 MOTION for Judgment on the Pleadings. Motion Hearing reset for 7/2/2024 01:30 PM in San Francisco - Videoconference Only before Judge Rita F. Lin.<br><br>This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/judges/lin-rita-f-rfl/<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>(mkl, COURT STAFF) (Filed on 6/7/2024) (Entered: 06/07/2024) |
| 06/07/2024 | 83 | **ORDER by Judge Rita F. Lin granting 80 Motion for Pro Hac Vice as to Kat Li. (mkl, COURT STAFF) (Filed on 6/7/2024) (Entered: 06/07/2024)** |
| 06/07/2024 | 84 | OPPOSITION/RESPONSE (re 74 MOTION for Judgment on the Pleadings ) *Corrected Opposition to Defendant's Motion for Partial Judgment on the Pleadings* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Dr. Stephen B. Wicker, # 2 Declaration of Kyle Calhoun, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3)(Deoras, Akshay) (Filed on 6/7/2024) (Entered: 06/07/2024) |
| 06/11/2024 | 85 | STIPULATION WITH PROPOSED ORDER *Extending Deadline to File Reply in Support of Motion for Judgment on the Pleadings* re 74 MOTION for Judgment on the Pleadings filed by Motive Technologies, Inc.. (Ray, Brent) (Filed on 6/11/2024) Modified on 6/12/2024 (jml, COURT STAFF). (Entered: 06/11/2024) |
| 06/11/2024 | 86 | **ORDER by Judge Rita F. Lin granting 85 Stipulation Extending Deadline to File Reply in Support of Motion for Judgment on the Pleadings. (mkl, COURT STAFF) (Filed on 6/11/2024) (Entered: 06/11/2024)** |
| 06/11/2024 | | Set/Reset Deadlines as to 74 MOTION for Judgment on the Pleadings. Replies due by 6/14/2024. (mkl, COURT STAFF) (Filed on 6/11/2024) (Entered: 06/11/2024) |

| | | |
|---|---|---|
| 06/11/2024 | 87 | *Plaintiffs' Opening Claim Construction Brief* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle Calhoun in Support of Plaintiffs' Opening Claim Construction Brief, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15)(Deoras, Akshay) (Filed on 6/11/2024) Modified on 6/12/2024 (jml, COURT STAFF). (Entered: 06/11/2024) |
| 06/13/2024 | 88 | STIPULATION WITH PROPOSED ORDER *Modifying Scheduling Order* filed by Motive Technologies, Inc.. (Tarasi, Angela) (Filed on 6/13/2024) Modified on 6/14/2024 (jml, COURT STAFF). (Entered: 06/13/2024) |
| 06/14/2024 | 89 | **ORDER by Judge Rita F. Lin granting 88 Stipulation Modifying Scheduling Order. Close of Fact Discovery is 8/9/2024. Initial Expert Reports due by 8/16/2024. Rebuttal Expert Reports due by 9/13/2024. Close of Expert Discovery is 9/27/2024. Dispositive and Daubert Motions due by 10/8/2024. (mkl, COURT STAFF) (Filed on 6/14/2024) (Entered: 06/14/2024)** |
| 06/14/2024 | 90 | REPLY (re 74 MOTION for Judgment on the Pleadings ) filed byMotive Technologies, Inc.. (Ray, Brent) (Filed on 6/14/2024) (Entered: 06/14/2024) |
| 06/18/2024 | 91 | STIPULATION WITH PROPOSED ORDER *Modifying Scheduling Order* filed by Motive Technologies, Inc.. (Tarasi, Angela) (Filed on 6/18/2024) Modified on 6/18/2024 (jml, COURT STAFF). (Entered: 06/18/2024) |
| 06/20/2024 | 92 | **ORDER by Judge Rita F. Lin granting 91 Stipulation Modifying Scheduling Order. (mkl, COURT STAFF) (Filed on 6/20/2024) (Entered: 06/20/2024)** |
| 06/25/2024 | 93 | Defendant Motive Technologies, Inc.'s Responsive Claim Construction Brief filed by Motive Technologies, Inc. (Attachments: # 1 Declaration of Angela Tarasi, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7) (Ray, Brent) (Filed on 6/25/2024) Modified on 6/26/2024 (cjl, COURT STAFF). (Entered: 06/25/2024) |
| 06/27/2024 | 94 | MOTION for leave to appear in Pro Hac Vice *Roy Falik* ( Filing fee $ 328, receipt number ACANDC-19561825.) filed by Motive Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing: The Supreme Court of Texas)(Falik, Roy) (Filed on 6/27/2024) (Entered: 06/27/2024) |
| 06/27/2024 | 95 | MOTION for leave to appear in Pro Hac Vice *Zachary Michael Coots* ( Filing fee $ 328, receipt number ACANDC-19562089.) filed by Motive Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing: District of Columbia Court of Appeals)(Coots, Zachary) (Filed on 6/27/2024) (Entered: 06/27/2024) |
| 06/27/2024 | 96 | **NOTICE OF QUESTIONS FOR HEARING. Signed by Judge Rita F. Lin on 6/27/2024. (mkl, COURT STAFF) (Filed on 6/27/2024) (Entered: 06/27/2024)** |
| 06/27/2024 | 97 | **ORDER by Judge Rita F. Lin granting 94 Motion for Pro Hac Vice as to Roy Falik. (mkl, COURT STAFF) (Filed on 6/27/2024) (Entered: 06/27/2024)** |
| 06/27/2024 | 98 | **ORDER by Judge Rita F. Lin granting 95 Motion for Pro Hac Vice as to Zachary Coots. (mkl, COURT STAFF) (Filed on 6/27/2024) (Entered: 06/27/2024)** |
| 06/30/2024 | 99 | NOTICE of Appearance by Yan-Xin Li (Li, Yan-Xin) (Filed on 6/30/2024) (Entered: 06/30/2024) |
| 07/01/2024 | 100 | MOTION for leave to appear in Pro Hac Vice *(Jeremy D. Roux)* ( Filing fee $ 328, receipt number ACANDC-19576983.) filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS |

| | | |
|---|---|---|
| | | Corporation. (Attachments: # 1 Certificate of Good Standing)(Roux, Jeremy) (Filed on 7/1/2024) (Entered: 07/01/2024) |
| 07/01/2024 | 101 | Brief *Plaintiffs' Reply Claim Construction Brief* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Jiaxiao Zhang in Support of Plaintiffs' Reply Claim Construction Brief, # 2 Exhibit 16, # 3 Exhibit 17, # 4 Exhibit 18, # 5 Exhibit 19, # 6 Exhibit 20)(Deoras, Akshay) (Filed on 7/1/2024) (Entered: 07/01/2024) |
| 07/02/2024 | 102 | **ORDER by Judge Rita F. Lin granting 100 Motion for Pro Hac Vice as to Jeremy Roux. (mkl, COURT STAFF) (Filed on 7/2/2024) (Entered: 07/02/2024)** |
| 07/02/2024 | 103 | MOTION for leave to appear in Pro Hac Vice *of Gianni Cutri* ( Filing fee $ 328, receipt number ACANDC-19577989.) filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Certificate of Good Standing)(Cutri, Gianni) (Filed on 7/2/2024) (Entered: 07/02/2024) |
| 07/02/2024 | 104 | **ORDER by Judge Rita F. Lin granting 103 Motion for Pro Hac Vice as to Gianni Cutri. (mkl, COURT STAFF) (Filed on 7/2/2024) (Entered: 07/02/2024)** |
| 07/02/2024 | 105 | **Minute Entry for proceedings held by Zoom before Judge Rita F. Lin: Motion Hearing held on 7/2/2024 re 74 MOTION for Judgment on the Pleadings filed by Motive Technologies, Inc.**<br><br>**Argument heard. The Court takes the matter under submission and will issue a written order.**<br><br>**Total Time in Court: 1 hour, 33 minutes.**<br>**Court Reporter: Kendra Steppler.**<br><br>**Attorneys for Plaintiffs: Akshay Deoras, Kati Li, Gianni Cutri, and Jeremy Roux.**<br>**Attorneys for Defendant: Angela Tarasi, Zachary Coots, Roy Falik, and Brent Ray.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Date Filed: 7/2/2024) (Entered: 07/02/2024)** |
| 07/03/2024 | 106 | **ORDER re 74 Motion for Partial Judgment on the Pleadings. The motion is denied as to the '130 patent without prejudice to renewal after claim construction regarding the term "image processing device." The Court will issue an order on the motion that explains its reasoning at a later time. The parties remain limited to 10 terms for claim construction. Accordingly, the parties may decide to (1) proceed with the claim construction briefing as filed, with or without a stipulation as to the meaning of the term "image processing device"; (2) file supplemental claim construction briefing by July 12 and have all terms heard at the July 19 hearing; or (3) file supplemental briefing by July 26 and propose a separate date for a limited 30-minute hearing with respect to the term "image processing device" only. The supplemental opening and response briefs may be no longer than 2 pages and the supplemental reply brief may be no longer than 1 page. If the parties elect to supplement their claim construction briefing, they shall identify which claim will be dropped from the current claim construction hearing. The parties shall file a joint stipulation and proposed order with their proposed course of action by July 10, 2024, or if they cannot agree, a joint statement setting forth their respective positions. Signed by Judge Rita F. Lin on July 3, 2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 7/3/2024) Modified on 7/3/2024 (rfllc2, COURT STAFF). (Entered: 07/03/2024)** |

| | | |
|---|---|---|
| 07/04/2024 | 107 | TRANSCRIPT ORDER for proceedings held on 07/02/2024 before Judge Rita F. Lin by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation, for Court Reporter Kendra Steppler. (Deoras, Akshay) (Filed on 7/4/2024) (Entered: 07/04/2024) |
| 07/05/2024 | 108 | NOTICE of Appearance by Andrew John Morrill (Morrill, Andrew) (Filed on 7/5/2024) (Entered: 07/05/2024) |
| 07/08/2024 | 109 | TRANSCRIPT ORDER for proceedings held on 07/02/2024 before Judge Rita F. Lin by Motive Technologies, Inc., for Court Reporter Kendra Steppler. (Ray, Brent) (Filed on 7/8/2024) (Entered: 07/08/2024) |
| 07/09/2024 | 110 | Transcript of Proceedings held on July 2, 2024, before Judge Rita F. Lin. Court Reporter Kendra Steppler, telephone number 406-489-3498. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re107 Transcript Order ) Release of Transcript Restriction set for 10/7/2024. (Related documents(s) 107 ) (Steppler, Kendra) (Filed on 7/9/2024) (Entered: 07/09/2024) |
| 07/10/2024 | 111 | JOINT CLAIM CONSTRUCTION STATEMENT *Regarding Claim Construction of "Image Processing Device"* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Roux, Jeremy) (Filed on 7/10/2024) Modified on 7/11/2024 (jml, COURT STAFF). (Entered: 07/10/2024) |
| 07/11/2024 | 112 | **ORDER RE CLAIM CONSTRUCTION OF THE TERM "IMAGE PROCESSING DEVICE." The Court adopts Plaintiffs' briefing schedule set forth in the parties' 111 joint statement. Plaintiffs' two-page opening brief shall be filed by July 17, 2024; Defendant's two-page responsive brief shall be filed by July 24, 2024; and Plaintiffs' one-page reply brief shall be filed by July 26, 2024. A limited claim construction hearing is set for August 1, 2024, at 10:00 AM, via videoconference. Signed by Judge Rita F. Lin on 7/11/2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc1, COURT STAFF) (Filed on 7/11/2024) (Entered: 07/11/2024)** |
| 07/11/2024 | | Set Deadlines/Hearings: Limited Claim Construction Hearing set for 8/1/2024 10:00 AM. This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/judges/lin-rita-f-rfl/<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>(mkl, COURT STAFF) (Filed on 7/11/2024) (Entered: 07/11/2024) |
| 07/11/2024 | 113 | CLERK'S NOTICE Regarding Tutorial and Claims Construction Hearing:<br><br>Notice is hereby given that the Tutorial and Claims Construction Hearing set for 7/19/2024 will now be held at **10:00 AM** in San Francisco - Videoconference Only. The first of session of the hearing will last for 90 minutes. There will then be a 60 minute break followed by another 60-90 minute session, with the balance of time being reserved |

| | | |
|---|---|---|
| | | for the limited claim construction hearing on 8/1/2024 regarding the term "image processing device".<br><br>This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/judges/lin-rita-f-rfl/<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Filed on 7/11/2024) (Entered: 07/11/2024) |
| 07/16/2024 | 114 | **TENTATIVE CLAIM CONSTRUCTION CHART. Signed by Judge Rita F. Lin on July 16, 2024. (Attachments: # 1 Exhibit A: Tentative claim construction rulings) (rfllc2, COURT STAFF) (Filed on 7/16/2024) (Entered: 07/16/2024)** |
| 07/17/2024 | 115 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-19629630.) filed by Motive Technologies, Inc.. (Attachments: # 1 COGS (DC Bar))(Lafferty, Patrick) (Filed on 7/17/2024) (Entered: 07/17/2024) |
| 07/17/2024 | 116 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-19629854.) filed by Motive Technologies, Inc.. (Attachments: # 1 COGS (GA))(Min, Ellen) (Filed on 7/17/2024) (Entered: 07/17/2024) |
| 07/17/2024 | 117 | *PLAINTIFFS CLAIM CONSTRUCTION BRIEF RE "IMAGE PROCESSING DEVICE"* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Stephen B. Wicker)(Cutri, Gianni) (Filed on 7/17/2024) Modified on 7/18/2024 (jml, COURT STAFF). (Entered: 07/17/2024) |
| 07/18/2024 | 118 | **ORDER by Judge Rita F. Lin granting 115 Motion for Pro Hac Vice as to Patrick Lafferty. (mkl, COURT STAFF) (Filed on 7/18/2024) (Entered: 07/18/2024)** |
| 07/18/2024 | 119 | **ORDER by Judge Rita F. Lin granting 116 Motion for Pro Hac Vice as to Ellen Min. (mkl, COURT STAFF) (Filed on 7/18/2024) (Entered: 07/18/2024)** |
| 07/18/2024 | 120 | NOTICE of Appearance by Jeffrey David Mills (Mills, Jeffrey) (Filed on 7/18/2024) (Entered: 07/18/2024) |
| 07/18/2024 | | Electronic filing error. **NOTICE TO COUNSEL:** Jeffrey David Mills. The docket shows a different address from what is appearing on the document (dkt. #: 120 Notice of Appearance filed by Motive Technologies, Inc.). Please update your personal profile on ECF. (jml, COURT STAFF) (Filed on 7/18/2024) (Entered: 07/18/2024) |
| 07/19/2024 | 121 | **Minute Entry for proceedings held by Zoom before Judge Rita F. Lin: Claims Construction and Tutorial Hearing held on 7/19/2024.**<br><br>**Argument heard. The Court takes the matter under submission and will issue a written order. The parties are directed to meet and confer and file a joint statement with their positions on additional terms for the Court to construe by next Friday 7/26/2024. For the next hearing, which is currently scheduled on 8/1/2024, plaintiffs have 17 minutes remaining and defendant has 13 minutes remaining.** |

| | | |
|---|---|---|
| | | **Total Time in Court: 1 hour, 55 minutes.**<br>**Court Reporter: Ruth Levine Ekhaus.**<br><br>**Attorneys for Plaintiffs: Kat Li, Gianni Cutri, Jeremy Roux, and Jiaxiao Zhang.**<br>**Attorney for Defendant: Brent Ray, Patrick Lafferty, Roy Falik, Angela Tarasi, Zachary Coots, Ellen Min, and Jeff Mills.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(mkl, COURT STAFF) (Date Filed: 7/19/2024) (Entered: 07/19/2024)** |
| 07/22/2024 | 122 | TRANSCRIPT ORDER for proceedings held on 07/19/2024 before Judge Rita F. Lin by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation, for Court Reporter Ruth Ekhaus. (Deoras, Akshay) (Filed on 7/22/2024) (Entered: 07/22/2024) |
| 07/22/2024 | 123 | **CLAIM CONSTRUCTION DISPOSITION ORDER. Signed by Judge Rita F. Lin on 7/22/2024. (mkl, COURT STAFF) (Filed on 7/22/2024) (Entered: 07/22/2024)** |
| 07/24/2024 | 124 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-19651949.) filed by Motive Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing (IL))(Sieger, Nicholas) (Filed on 7/24/2024) (Entered: 07/24/2024) |
| 07/24/2024 | 125 | **ORDER by Judge Rita F. Lin granting 124 Motion for Pro Hac Vice as to Nicholas Sieger. (mkl, COURT STAFF) (Filed on 7/24/2024) (Entered: 07/24/2024)** |
| 07/24/2024 | 126 | *Supplemental Claim Construction Brief re "Image Processing Device"* filed byMotive Technologies, Inc.. (Attachments: # 1 Declaration of Scott Andrews, # 2 Exhibit 1001, # 3 Exhibit 1002, # 4 Exhibit 1003, # 5 Exhibit 1004)(Ray, Brent) (Filed on 7/24/2024) Modified on 7/25/2024 (jml, COURT STAFF). (Entered: 07/24/2024) |
| 07/25/2024 | 127 | Transcript of Proceedings held on 07/19/2024, before Judge Rita F. Lin. Court Reporter Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219, telephone number ruth_ekhaus@cand.uscourts.gov /(415)336-5223 . Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re122 Transcript Order ) Release of Transcript Restriction set for 10/23/2024. (Related documents(s) 122 ) (rre, COURT STAFF) (Filed on 7/25/2024) (Entered: 07/25/2024) |
| 07/26/2024 | 128 | *Plaintiffs' Reply Brief re "Image Processing Device"* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Cutri, Gianni) (Filed on 7/26/2024) Modified on 7/29/2024 (jml, COURT STAFF). (Entered: 07/26/2024) |
| 07/26/2024 | 129 | *Joint Statement Regarding Claim Construction of Additional Terms* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit 1)(Cutri, Gianni) (Filed on 7/26/2024) Modified on 7/29/2024 (jml, COURT STAFF). (Entered: 07/26/2024) |
| 07/29/2024 | 130 | **SCHEDULING ORDER. Pretrial Conference reset for 2/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Jury Selection/Jury Trial reset for 3/17/2025 09:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Signed by Judge Rita F. Lin on 7/29/2024. (mkl, COURT STAFF) (Filed on 7/29/2024) (Entered: 07/29/2024)** |
| 07/29/2024 | 131 | **ORDER by Judge Rita F. Lin denying 74 Motion for Judgment on the Pleadings. (mkl, COURT STAFF) (Filed on 7/29/2024) (Entered: 07/29/2024)** |

| | | |
|---|---|---|
| 07/30/2024 | 132 | NOTICE of Appearance by Justin Singh (Singh, Justin) (Filed on 7/30/2024) (Entered: 07/30/2024) |
| 07/30/2024 | 133 | MOTION for Clarification of the Claim Construction Disposition Order (Dkt. 123) filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. Motion Hearing set for 9/3/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 8/13/2024. Replies due by 8/20/2024. (Attachments: # 1 Declaration of Gianni Cutri (Dkt. 123), # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3)(Cutri, Gianni) (Filed on 7/30/2024) Modified on 7/31/2024 (kmm2, COURT STAFF). (Entered: 07/30/2024) |
| 07/31/2024 | 134 | **TENTATIVE CLAIM CONSTRUCTION CHART. Signed by Judge Rita F. Lin on 7/31/2024. (Attachments: # 1 Exhibit A)(mkl, COURT STAFF) (Filed on 7/31/2024) (Entered: 07/31/2024)** |
| 07/31/2024 | 135 | MOTION for leave to appear in Pro Hac Vice *Katherine Vessels* ( Filing fee $ 328, receipt number ACANDC-19678106.) filed by Motive Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing: District of Columbia Court of Appeals)(Vessels, Katherine) (Filed on 7/31/2024) (Entered: 07/31/2024) |
| 07/31/2024 | 136 | NOTICE of Appearance of Fan Chen for Plaintiffs by Fan Chen (Chen, Fan) (Filed on 7/31/2024) Modified on 8/1/2024 (kmm2, COURT STAFF). (Entered: 07/31/2024) |
| 07/31/2024 | 137 | **ORDER by Judge Rita F. Lin granting 135 Motion for Pro Hac Vice as to Katherine Vessels. (mkl, COURT STAFF) (Filed on 7/31/2024) (Entered: 07/31/2024)** |
| 07/31/2024 | 138 | NOTICE of Appearance of Natalie Sinzig for Plaintiffs by Natalie Karrin Sinzig (Sinzig, Natalie) (Filed on 7/31/2024) Modified on 8/1/2024 (kmm2, COURT STAFF). (Entered: 07/31/2024) |
| 07/31/2024 | 139 | NOTICE of Appearance of Hannah Alice Suh for Plaintiffs by Hannah Suh (Suh, Hannah) (Filed on 7/31/2024) Modified on 8/1/2024 (kmm2, COURT STAFF). (Entered: 07/31/2024) |
| 07/31/2024 | 140 | NOTICE of Appearance of Yungmoon Chang for Plaintiffs by Yungmoon Chang (Chang, Yungmoon) (Filed on 7/31/2024) Modified on 8/1/2024 (kmm2, COURT STAFF). (Entered: 07/31/2024) |
| 07/31/2024 | 141 | NOTICE of Appearance of N. Yvonne Beeler for Plaintiffs by N. Yvonne Stoddard Beeler (Beeler, N. Yvonne) (Filed on 7/31/2024) Modified on 8/1/2024 (kmm2, COURT STAFF). (Entered: 07/31/2024) |
| 08/01/2024 | 142 | **Minute Entry for proceedings held by Zoom before Judge Rita F. Lin: Claim Construction held on 8/1/2024.**<br><br>**The Court and parties came to an agreement on the construction for the term "image processing device". A written order will issue.**<br><br>**Total Time in Court: 45 minutes.**<br>**Court Reporter: Ruth Levine Ekhaus.**<br><br>**Attorneys for Plaintiffs: Kat Li, Jeremy Roux, and Akshay Deoras.**<br>**Attorneys for Defendant: Zachary Coots, Angela Tarasi, and Brent Ray.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Date Filed: 8/1/2024) Modified on 8/1/2024 (mkl, COURT STAFF). (Entered: 08/01/2024)** |

| | | |
|---|---|---|
| 08/01/2024 | 143 | STIPULATION WITH PROPOSED ORDER *Modifying Scheduling Order* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Deoras, Akshay) (Filed on 8/1/2024) Modified on 8/2/2024 (jml, COURT STAFF). (Entered: 08/01/2024) |
| 08/01/2024 | 144 | TRANSCRIPT ORDER for proceedings held on 08/01/2024 before Judge Rita F. Lin by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation, for Court Reporter Ruth Ekhaus. (Deoras, Akshay) (Filed on 8/1/2024) (Entered: 08/01/2024) |
| 08/01/2024 | 145 | TRANSCRIPT ORDER for proceedings held on 8/1/2024 before Judge Rita F. Lin by Motive Technologies, Inc., for Court Reporter Ruth Ekhaus. (Ray, Brent) (Filed on 8/1/2024) (Entered: 08/01/2024) |
| 08/01/2024 | 146 | TRANSCRIPT ORDER for proceedings held on 7/19/2024 before Judge Rita F. Lin by Motive Technologies, Inc., for Court Reporter Ruth Ekhaus. (Ray, Brent) (Filed on 8/1/2024) (Entered: 08/01/2024) |
| 08/02/2024 | 147 | **ORDER AS MODIFIED by Judge Rita F. Lin granting 143 Stipulation to Modify Scheduling Order. Close of Fact Discovery is 8/15/2024. Initial Expert Reports due by 8/29/2024. Rebuttal Expert Reports due by 9/26/2024. Close of Expert Discovery is 10/15/2024. Dispositive and Daubert Motions due by 10/22/2024. Oppositions due by 11/5/2024. Replies due by 11/12/2024. Dispositive and Daubert Motion Hearing set for 12/10/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. (mkl, COURT STAFF) (Filed on 8/2/2024) (Entered: 08/02/2024)** |
| 08/02/2024 | 148 | Transcript of Proceedings held on 08/01/2024, before Judge Rita F. Lin. Court Reporter Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219, telephone number ruth_ekhaus@cand.uscourts.gov /(415)336-5223 . Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re145 Transcript Order, 144 Transcript Order ) Release of Transcript Restriction set for 10/31/2024. (Related documents(s) 145 , 144 ) (rre, COURT STAFF) (Filed on 8/2/2024) (Entered: 08/02/2024) |
| 08/06/2024 | 149 | NOTICE of Appearance by John L Polansky (Polansky, John) (Filed on 8/6/2024) (Entered: 08/06/2024) |
| 08/08/2024 | 150 | NOTICE of Appearance by Sharre S Lotfollahi (Lotfollahi, Sharre) (Filed on 8/8/2024) (Entered: 08/08/2024) |
| 08/13/2024 | 151 | OPPOSITION/RESPONSE (re 133 MOTION for Clarification of the Claim Construction Disposition Order (Dkt. 123) ) filed byMotive Technologies, Inc.. (Attachments: # 1 Declaration of Patrick Lafferty, # 2 Exhibit A, # 3 Exhibit B)(Ray, Brent) (Filed on 8/13/2024) (Entered: 08/13/2024) |
| 08/15/2024 | 152 | STIPULATION WITH PROPOSED ORDER *FOR LEAVE TO TAKE DEPOSITIONS OUT OF TIME* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Akshay Deoras)(Deoras, Akshay) (Filed on 8/15/2024) (Entered: 08/15/2024) |
| 08/16/2024 | 153 | **ORDER by Judge Rita F. Lin granting 152 Stipulation to Take Certain Deposition Out of Time. (mkl, COURT STAFF) (Filed on 8/16/2024) (Entered: 08/16/2024)** |
| 08/20/2024 | 154 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Proposed Order, # 3 Unredacted Version of Reply in Support of Motion for Clarification of the Claim Construction Disposition Order, # 4 |

| | | |
|---|---|---|
| | | Unredacted Version of Exhibit 6, # 5 Unredacted Version of Exhibit 9, # 6 Unredacted Version of Exhibit 10, # 7 Unredacted Version of Exhibit 11, # 8 Unredacted Version of Exhibit 12)(Cutri, Gianni) (Filed on 8/20/2024) (Entered: 08/20/2024) |
| 08/20/2024 | 155 | REPLY (re 133 MOTION for Clarification of the Claim Construction Disposition Order (Dkt. 123) ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Exhibit 4, # 3 Exhibit 5, # 4 Exhibit 6, # 5 Exhibit 7, # 6 Exhibit 8, # 7 Exhibit 9, # 8 Exhibit 10, # 9 Exhibit 11, # 10 Exhibit 12)(Cutri, Gianni) (Filed on 8/20/2024) (Entered: 08/20/2024) |
| 08/20/2024 | 156 | CERTIFICATE OF SERVICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 154 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed (Cutri, Gianni) (Filed on 8/20/2024) (Entered: 08/20/2024) |
| 08/21/2024 | 157 | STIPULATION WITH PROPOSED ORDER *Requesting Remote Hearing* filed by Motive Technologies, Inc.. (Tarasi, Angela) (Filed on 8/21/2024) (Entered: 08/21/2024) |
| 08/21/2024 | 158 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Proposed Order, # 3 Unredacted version of Joint Letter re discovery dispute, # 4 Unredacted version of Exhibit 3, # 5 Unredacted version of Exhibit 4)(Cutri, Gianni) (Filed on 8/21/2024) (Entered: 08/21/2024) |
| 08/21/2024 | 159 | Discovery Letter Brief filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Cutri, Gianni) (Filed on 8/21/2024) (Entered: 08/21/2024) |
| 08/21/2024 | 160 | CERTIFICATE OF SERVICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 158 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed (Cutri, Gianni) (Filed on 8/21/2024) (Entered: 08/21/2024) |
| 08/21/2024 | 161 | *Second Updated Joint Case Management Statement* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Deoras, Akshay) (Filed on 8/21/2024) Modified on 8/22/2024 (jml, COURT STAFF). (Entered: 08/21/2024) |
| 08/22/2024 | 162 | CLERK'S NOTICE Vacating Hearing:<br><br>Notice is hereby given that the 133 Motion for Clarification of the Claim Construction Disposition Order is submitted without oral argument pursuant to Civil Local Rule 7-1(b). The hearing set for 9/3/2024 is VACATED. The Court will issue a written order on the motion. The 157 Stipulation for Remote Appearance is terminated as moot.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Filed on 8/22/2024) (Entered: 08/22/2024) |
| 08/22/2024 | 163 | ***ERROR ON PDF, DOCUMENT REFILED AT 175 ***<br>Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Proposed Order, # 3 Unredacted version of Discovery Dispute letter, # 4 Unredacted version of Exhibit 1, # 5 Unredacted version of Exhibit 3) (Cutri, Gianni) (Filed on 8/22/2024) Modified on 8/27/2024 (cjl, COURT STAFF). (Entered: 08/22/2024) |
| 08/22/2024 | 164 | Discovery Letter Brief filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Cutri, Gianni) (Filed on 8/22/2024) (Entered: 08/22/2024) |

| | | |
|---|---|---|
| 08/22/2024 | 165 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *re Motion to Strike - Plaintiffs PLR 3-1G Contentions* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Brent P. Ray, # 2 Proposed Order, # 3 Motion to Strike (SEALED), # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L, # 16 Exhibit M, # 17 Exhibit N, # 18 Exhibit R, # 19 Exhibit T, # 20 Exhibit U, # 21 Exhibit V, # 22 Exhibit W)(Ray, Brent) (Filed on 8/22/2024) (Entered: 08/22/2024) |
| 08/22/2024 | 166 | MOTION to Strike *Plaintiffs' PLR 3-1(G) Contentions (redacted)* filed by Motive Technologies, Inc.. Motion Hearing set for 10/3/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 9/5/2024. Replies due by 9/12/2024. (Attachments: # 1 Declaration of Brent P. Ray, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Proposed Order, # 25 Exhibit F)(Ray, Brent) (Filed on 8/22/2024) (Entered: 08/22/2024) |
| 08/23/2024 | 167 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Proposed Order, # 3 Unredacted Version of Discovery Dispute letter, # 4 Unredacted Version of Exhibit 1, # 5 Unredacted Version of Exhibit 2, # 6 Unredacted Version of Exhibit 3, # 7 Unredacted Version of Exhibit 4)(Cutri, Gianni) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 168 | Discovery Letter Brief filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Cutri, Gianni) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 169 | CERTIFICATE OF SERVICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 163 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed (Cutri, Gianni) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 170 | CERTIFICATE OF SERVICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 167 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed (Cutri, Gianni) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 171 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Letter Brief (SEALED))(Ray, Brent) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 172 | Discovery Letter Brief*re Sekula (Redacted)* filed by Motive Technologies, Inc.. (Ray, Brent) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 173 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *re Defendant Motive Technologies, Inc.'s Motion to Amended Invalidity Contentions* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Zachary Coots, # 2 [Proposed] Order, # 3 Declaration of Zachary Coots In Support of Motion to Amend (SEALED), # 4 Exhibit A (SEALED), # 5 Exhibit B (SEALED), # 6 Exhibit C (SEALED), # 7 Exhibit D (SEALED), # 8 Exhibit E (SEALED), # 9 Exhibit F (SEALED), # 10 Exhibit G (SEALED), # 11 Exhibit H (SEALED), # 12 Exhibit I (SEALED), # 13 Exhibit J (SEALED), # 14 Exhibit K (SEALED), # 15 Exhibit L (SEALED), # 16 Exhibit N (SEALED), # 17 Exhibit O (SEALED), # 18 Exhibit P (SEALED), # 19 Exhibit T (SEALED), # 20 Exhibit U (SEALED), # 21 Exhibit V |

| | | |
|---|---|---|
| | | (SEALED), # 22 Exhibit W (SEALED))(Ray, Brent) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 174 | MOTION to Amend/Correct *to Amend Invalidity Contentions* filed by Motive Technologies, Inc.. Motion Hearing set for 10/1/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 9/6/2024. Replies due by 9/13/2024. (Attachments: # 1 Declaration of Zachary Coots In Support of Motion to Amend Invalidity Contentions (SEALED), # 2 Declaration of Brent P. Ray In Support of Motion To Amend Invalidity Contentions, # 3 Exhibit A (SEALED), # 4 Exhibit B (SEALED), # 5 Exhibit C (SEALED), # 6 Exhibit D (SEALED), # 7 Exhibit E (SEALED), # 8 Exhibit F (SEALED), # 9 Exhibit G (SEALED), # 10 Exhibit H (SEALED), # 11 Exhibit I (SEALED), # 12 Exhibit J (SEALED), # 13 Exhibit K(SEALED), # 14 Exhibit L (SEALED), # 15 Exhibit M, # 16 Exhibit N (SEALED), # 17 Exhibit O (SEALED), # 18 Exhibit P (SEALED), # 19 Exhibit Q, # 20 Exhibit R, # 21 Exhibit S, # 22 Exhibit T (SEALED), # 23 Exhibit U (SEALED), # 24 Exhibit V (SEALED), # 25 Exhibit W(SEALED), # 26 [Proposed] Order)(Ray, Brent) (Filed on 8/23/2024) Modified on 8/23/2024 (jml, COURT STAFF). (Entered: 08/23/2024) |
| 08/23/2024 | 175 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF DOCKET # 163* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Proposed Order, # 3 Unredacted version of Discovery Dispute letter, # 4 Unredacted version of Exhibit 1, # 5 Unredacted version of Exhibit 3)(Cutri, Gianni) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 176 | Administrative Motion to File Under Seal filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Proposed Order, # 3 Unredacted Version of Discovery Dispute letter, # 4 Unredacted Version of Exhibit 1, # 5 Unredacted Version of Exhibit 3)(Cutri, Gianni) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 177 | Discovery Letter Brief *regarding the deposition of Chris Sekula* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Cutri, Gianni) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 178 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Re Plaintiffs' Materials* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit U, # 16 Exhibit V, # 17 Exhibit W)(Ray, Brent) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 179 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *re Third Party Lytx Materials* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Declaration, # 2 Proposed Order, # 3 Exhibit N, # 4 Exhibit P)(Ray, Brent) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 180 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *re Third Party Netradyne's Materials* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Exhibit O)(Ray, Brent) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 181 | MOTION to Amend/Correct *Motive Technologies, Inc.'s Motion CORRECTION OF DOCKET # 174 to Amend Invalidity Contentions* filed by Motive Technologies, Inc.. Motion Hearing set for 10/1/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 9/6/2024. Replies due by 9/13/2024. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Declaration of Zachary Coots in Support of Motion to Amend Inv Contentions, # 2 Declaration of Brent P. Ray, # 3 Exhibit A (SEALED), # 4 Exhibit B (SEALED), # 5 Exhibit C (sEALED), # 6 Exhibit D (SEALED), # 7 Exhibit E (SEALED), # 8 Exhibit F (SEALED), # 9 Exhibit G (SEALED), # 10 Exhibit H (SEALED), # 11 Exhibit I (SEALED), # 12 Exhibit J (SEALED), # 13 Exhibit K (SEALED), # 14 Exhibit L (SEALED), # 15 Exhibit M, # 16 Exhibit N (SEALED), # 17 Exhibit O (SEALED), # 18 Exhibit P (SEALED), # 19 Exhibit Q, # 20 Exhibit R, # 21 Exhibit S, # 22 Exhibit T (SEALED), # 23 Exhibit U (SEALED), # 24 Exhibit V (SEALED), # 25 Exhibit W (SEALED))(Ray, Brent) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/24/2024 | 182 | **ORDER**<br><br>**By no later than noon on Tuesday, August 27 (and preferably during business hours on Monday), the parties must submit chambers copies of all discovery disputes (with exhibits tabbed) and must deliver them directly and not use the drop box. They must include the following items three-hole punched: the docket sheet, the operative complaint, and all substantive rulings issued by the trial court. They must email the court at lbcrd@cand.uscourts.gov when this has been accomplished.)**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (Beeler, Laurel) (Filed on 8/24/2024) (Entered: 08/24/2024)** |
| 08/26/2024 | 183 | Motive Technologies, Inc.'s Objection to 155 Plaintiffs' Reply Evidence and Argument by Motive Technologies, Inc. (Ray, Brent) (Filed on 8/26/2024) Modified on 8/27/2024 (cjl, COURT STAFF). (Entered: 08/26/2024) |
| 08/26/2024 | 184 | CLERK'S NOTICE Re: 166 MOTION to Strike *Plaintiffs' PLR 3-1(G) Contentions (redacted)*:<br><br>The Court holds civil law and motion on Tuesdays at 10:00 AM. Accordingly, the Motion Hearing is reset for 10/1/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Filed on 8/26/2024) (Entered: 08/26/2024) |
| 08/26/2024 | 185 | **ORDER RE: CLAIM CONSTRUCTION AND 133 MOTION FOR CLARIFICATION by Judge Rita F. Lin. (mkl, COURT STAFF) (Filed on 8/26/2024) (Entered: 08/26/2024)** |
| 08/26/2024 | 186 | Patent Local Rule 3-10 Certification by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Singh, Justin) (Filed on 8/26/2024) Modified on 8/27/2024 (cjl, COURT STAFF). (Entered: 08/26/2024) |
| 08/26/2024 | 187 | Motive's Corrected Motion to Amend Invalidity Contentions filed by Motive Technologies, Inc. Motion Hearing set for 10/1/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 9/9/2024. Replies due by 9/16/2024. (Attachments: # 1 Declaration of Zachary Coots, # 2 Declaration of Brent P. Ray, # 3 Exhibit A (SEALED), # 4 Exhibit B (SEALED), # 5 Exhibit C (SEALED), # 6 Exhibit D (SEALED), # 7 Exhibit E (SEALED), # 8 Exhibit F (SEALED), # 9 Exhibit G (SEALED), # 10 Exhibit H (SEALED), # 11 Exhibit I (SEALED), # 12 Exhibit J (SEALED), # 13 Exhibit K (SEALED), # 14 Exhibit L (SEALED), # 15 Exhibit M, # 16 Exhibit N (SEALED), # 17 Exhibit O (SEALED), # 18 Exhibit P (SEALED), # 19 Exhibit Q, # 20 Exhibit R, # 21 Exhibit S, # 22 Exhibit T (SEALED), # 23 Exhibit U (SEALED), # 24 Exhibit V (SEALED), # 25 Exhibit W |

| | | |
|---|---|---|
| | | (SEALED), # 26 Proposed Order)(Ray, Brent) (Filed on 8/26/2024) Modified on 8/27/2024 (cjl, COURT STAFF). (Entered: 08/26/2024) |
| 08/26/2024 | 188 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle Calhoun, # 2 Proposed Order, # 3 Unredacted Version of Motion for Leave, # 4 Unredacted Version of Ex. 2, # 5 Unredacted Version of Ex. 3, # 6 Unredacted Version of Ex. 4, # 7 Unredacted Version of Ex. 5, # 8 Unredacted Version of Ex. 7, # 9 Unredacted Version of Ex. 8, # 10 Unredacted Version of Ex. 9, # 11 Unredacted Version of Ex. 11, # 12 Unredacted Version of Ex. 14, # 13 Unredacted Version of Ex. 16, # 14 Unredacted Version of Ex. 17, # 15 Unredacted Version of Ex. 18, # 16 Unredacted Version of Ex. 19, # 17 Unredacted Version of Ex. 20, # 18 Unredacted Version of Ex. 21, # 19 Unredacted Version of Ex. 22, # 20 Unredacted Version of Ex. 24)(Calhoun, Kyle) (Filed on 8/26/2024) (Entered: 08/26/2024) |
| 08/26/2024 | 189 | Motion for Leave to Supplement Infringement Contentions filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. Motion Hearing set for 10/1/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 9/9/2024. Replies due by 9/16/2024. (Attachments: # 1 Declaration of Kyle Calhoun, # 2 Proposed Order, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22, # 25 Exhibit 23, # 26 Exhibit 24)(Calhoun, Kyle) (Filed on 8/26/2024) Modified on 8/27/2024 (cjl, COURT STAFF). (Entered: 08/26/2024) |
| 08/28/2024 | 190 | **Minute Entry for proceedings held by Zoom before Judge Rita F. Lin: Further Case Management Conference held on 8/28/2024.**<br><br>**The Court will wait until the pending motions are resolved for the parties to determine whether any modifications to the current case schedule may be needed.**<br><br>**Digital Recording Time: 10:12-10:16.**<br>**Attorneys for Plaintiffs: Gianni Cutri, Kat Li, Jeremy Roux, and Yan Xin Li.**<br>**Attorneys for Defendant: Brent Ray and Angela Tarasi.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(mkl, COURT STAFF) (Date Filed: 8/28/2024) Transcriber - Tara Jauregui, email: echoreporting@yahoo.com on 9/26/2024 (bns, COURT STAFF). (Entered: 08/28/2024)** |
| 08/28/2024 | 191 | STIPULATION WITH PROPOSED ORDER Modifying Scheduling Order filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Cutri, Gianni) (Filed on 8/28/2024) Modified on 8/29/2024 (anj, COURT STAFF). (Entered: 08/28/2024) |
| 08/29/2024 | 192 | **ORDER by Judge Rita F. Lin granting 191 Stipulation Modifying Scheduling Order. Rebuttal Reports due by 10/2/2024. (mkl, COURT STAFF) (Filed on 8/29/2024) (Entered: 08/29/2024)** |
| 08/29/2024 | 193 | CORRECTION OF DOCKET # 163 - Declaration of Katherine Vessels in Support of 175 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed byMotive Technologies, Inc.. (Related document(s) 175 ) (Vessels, Katherine) (Filed on 8/29/2024) Modified on 8/30/2024 (anj, COURT STAFF). (Entered: 08/29/2024) |
| 08/29/2024 | 194 | Declaration of Katherine Vessels in Support of 167 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed byMotive Technologies, Inc.. |

| | | |
|---|---|---|
| | | (Related document(s) 167 ) (Vessels, Katherine) (Filed on 8/29/2024) (Entered: 08/29/2024) |
| 08/29/2024 | 195 | Declaration of Natalie Sinzig in Support of 165 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *re Motion to Strike - Plaintiffs PLR 3-1G Contentions* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit C, # 2 Exhibit D, # 3 Exhibit E, # 4 Exhibit F, # 5 Exhibit G, # 6 Exhibit H, # 7 Exhibit K, # 8 Exhibit L)(Related document(s) 165 ) (Sinzig, Natalie) (Filed on 8/29/2024) (Entered: 08/29/2024) |
| 08/30/2024 | 196 | Declaration of Brett McKean in Support of 179 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *re Third Party Lytx Materials* filed byMotive Technologies, Inc.. (Related document(s) 179 ) (Galoyan, Ani) (Filed on 8/30/2024) (Entered: 08/30/2024) |
| 08/30/2024 | 197 | Unopposed Administrative Motion to Enlarge Time to Submit a Declaration in Support of Defendant's Administrative Motion to File Document Under Seal) filed by Netradyne. (Attachments: # 1 Declaration of Sami Al-Marzoog, # 2 Proposed Order)(Sandford, Brett) (Filed on 8/30/2024) Modified on 9/3/2024 (cjl, COURT STAFF). (Entered: 08/30/2024) |
| 08/30/2024 | 198 | Declaration of Yan-Xin Li in Support of 173 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *re Defendant Motive Technologies, Inc.'s Motion to Amended Invalidity Contentions*, 178 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Re Plaintiffs' Materials* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C (PART 1), # 4 Exhibit C (PART 2), # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F (PART 1), # 8 Exhibit F (PART 2), # 9 Exhibit G (PART 1), # 10 Exhibit G (PART 2), # 11 Exhibit H (PART 1), # 12 Exhibit H (PART 2), # 13 Exhibit I (PART 1), # 14 Exhibit I (PART 2), # 15 Exhibit I (PART 3), # 16 Exhibit J, # 17 Exhibit K, # 18 Exhibit L)(Related document(s) 173 , 178 ) (Li, Yan-Xin) (Filed on 8/30/2024) (Entered: 08/30/2024) |
| 09/03/2024 | 199 | **Order by Magistrate Judge Laurel Beeler granting 197 Motion for Extension of Time to File. Deadline for Non-Party Netradyne to file its statement or declaration in support of Defendants Administrative Motion to Consider Whether Third Party Netradynes Materials Should be Sealed is extended to 9/6/2024. (ejk, COURT STAFF) (Filed on 9/3/2024) (Entered: 09/03/2024)** |
| 09/03/2024 | 200 | Declaration of Katherine Vessels in Support of 188 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed byMotive Technologies, Inc.. (Related document(s) 188 ) (Vessels, Katherine) (Filed on 9/3/2024) (Entered: 09/03/2024) |
| 09/05/2024 | 201 | Administrative Motion to File Under Seal *Plaintiffs' Opposition to Defendant's Motion to Strike Plaintiffs PLR 3- 1(G) Contentions and Exhibits 24-26 and 28* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Proposed Order, # 3 Unredacted Version of Plaintiffs' Opposition to Defendant's Motion to Strike, # 4 Unredacted Version of Exhibit 24, # 5 Unredacted Version of Exhibit 25, # 6 Unredacted Version of Exhibit 26, # 7 Unredacted Version of Exhibit 28)(Cutri, Gianni) (Filed on 9/5/2024) (Entered: 09/05/2024) |
| 09/05/2024 | 202 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *regarding Exhibits 3-21 to Plaintiffs Opposition to Defendants Motion to Strike Plaintiffs PLR 3-1(G) Contentions* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Proposed Order, # 3 Unredacted Version of Exhibit 3, # 4 Unredacted Version of Exhibit 4, # 5 Unredacted Version of Exhibit 5, # 6 Unredacted Version of Exhibit 6, # 7 Unredacted Version of |

| | | |
|---|---|---|
| | | Exhibit 7, # 8 Unredacted Version of Exhibit 8, # 9 Unredacted Version of Exhibit 9, # 10 Unredacted Version of Exhibit 10, # 11 Unredacted Version of Exhibit 11, # 12 Unredacted Version of Exhibit 12, # 13 Unredacted Version of Exhibit 13, # 14 Unredacted Version of Exhibit 14, # 15 Unredacted Version of Exhibit 15, # 16 Unredacted Version of Exhibit 16, # 17 Unredacted Version of Exhibit 17, # 18 Unredacted Version of Exhibit 18, # 19 Unredacted Version of Exhibit 19, # 20 Unredacted Version of Exhibit 20, # 21 Unredacted Version of Exhibit 21)(Cutri, Gianni) (Filed on 9/5/2024) (Entered: 09/05/2024) |
| 09/05/2024 | 203 | OPPOSITION/RESPONSE (re 166 MOTION to Strike *Plaintiffs' PLR 3-1(G) Contentions (redacted)* ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28)(Cutri, Gianni) (Filed on 9/5/2024) (Entered: 09/05/2024) |
| 09/06/2024 | 204 | EXHIBITS re 180 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *re Third Party Netradyne's Materials (Non-Party Netradyne's Statement in Support of Defendant's Administrative Motion to Consider Whether Third Party Netradyne's Materials Should Be Sealed)* filed byNetradyne. (Attachments: # 1 Declaration of Sami Al-Marzoog, # 2 Proposed Order, # 3 Exhibit A [Filed Under Seal]) (Related document(s) 180 ) (Sandford, Brett) (Filed on 9/6/2024) (Entered: 09/06/2024) |
| 09/06/2024 | 205 | CERTIFICATE OF SERVICE by Netradyne *re Exhibit A to the Declaration of Sami Al-Marzoog in Support of 204 Non-Party Netradyne's Statement in Support of Defendant's Administrative Motion to Consider Whether Third Party Netradyne's Materials Should Be Sealed* (Sandford, Brett) (Filed on 9/6/2024) (Entered: 09/06/2024) |
| 09/08/2024 | 206 | **Order denying 158 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed entered by Magistrate Judge Laurel Beeler.**<br><br>**No declaration was filed under Civil L.R. 79-5. Given the modest proposed redactions and responses for the other letter briefs, the court assumes that this was intentional and denies the motion to seal. If this is wrong, the parties can send an email to lbcrd@cand.uscourts.gov flagging where on the docket the response is.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(Entered: 09/08/2024)** |
| 09/08/2024 | 207 | **Order denying 171 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed entered by Magistrate Judge Laurel Beeler.**<br><br>**No declaration was filed under Civil L.R. 79-5. Given the nature of the redactions the court assumes that this was intentional and denies the motion to seal. If this is wrong, the parties can send an email to lbcrd@cand.uscourts.gov flagging where on the docket the response is.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(Entered: 09/08/2024)** |
| 09/08/2024 | 208 | **Order denying 176 Administrative Motion to File Under Seal entered by Magistrate Judge Laurel Beeler.** |

| | | |
|---|---|---|
| | | **No declaration was filed under Civil L.R. 79-5. Given timely filings for other briefs, the court assumes that this was intentional and denies the motion to seal. If this is wrong, the parties can send an email to lbcrd@cand.uscourts.gov flagging where on the docket the response is.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (Entered: 09/08/2024)** |
| 09/08/2024 | | **Order Setting Discovery Hearing on Pending Discovery Disputes set for 9/12/2024 09:30 AM in San Francisco, Courtroom B, 15th Floor before Magistrate Judge Laurel Beeler.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (Beeler, Laurel) (Filed on 9/8/2024) (Entered: 09/08/2024)** |
| 09/09/2024 | 209 | **Order by Magistrate Judge Laurel Beeler granting 175 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed. (ejk, COURT STAFF) (Filed on 9/9/2024) (Entered: 09/09/2024)** |
| 09/09/2024 | 210 | **Order by Magistrate Judge Laurel Beeler granting 167 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed. (ejk, COURT STAFF) (Filed on 9/9/2024) (Entered: 09/09/2024)** |
| 09/09/2024 | 211 | STIPULATION WITH PROPOSED ORDER Requesting Remote Hearing on the Parties' Pending Discovery Disputes filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Cutri, Gianni) (Filed on 9/9/2024) Modified on 9/10/2024 (anj, COURT STAFF). (Entered: 09/09/2024) |
| 09/09/2024 | 212 | **ORDER re 176 Administrative Motion to File Under Seal. Signed by Judge Laurel Beeler on 09/09/2024. (ejk, COURT STAFF) (Filed on 9/9/2024) (Entered: 09/09/2024)** |
| 09/09/2024 | 213 | OPPOSITION/RESPONSE (re 189 Motion for Leave to Supplement Infringement Contentions ) filed byMotive Technologies, Inc.. (Tarasi, Angela) (Filed on 9/9/2024) (Entered: 09/09/2024) |
| 09/09/2024 | 214 | Administrative Motion to File Under Seal Plaintiffs' Opposition to Defendant's Motion to Amend Invalidity Contentions, Supporting Declaration of Jeremy Roux, and Exhibits 19 and 22 filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Proposed Order, # 3 Unredacted Version of Opposition to Motion to Amend, # 4 Unredacted Version of Declaration of Jeremy Roux, # 5 Unredacted Version of Exhibit 19, # 6 Unredacted Version of Exhibit 22)(Cutri, Gianni) (Filed on 9/9/2024) Modified on 9/10/2024 (anj, COURT STAFF). (Entered: 09/09/2024) |
| 09/09/2024 | 215 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed regarding Exhibits 8 and 9 to Plaintiffs' Opposition to Defendant's Motion to Amend Invalidity Contentions filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Gianni Cutri, # 2 Proposed Order, # 3 Unredacted Version of Exhibit 8, # 4 Unredacted Version of Exhibit 9)(Cutri, Gianni) (Filed on 9/9/2024) Modified on 9/10/2024 (anj, COURT STAFF). (Entered: 09/09/2024) |
| 09/09/2024 | 216 | OPPOSITION/RESPONSE (re 187 Motive's Corrected Motion to Amend Invalidity Contentions ) filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Jeremy Roux, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 |

| | | |
|---|---|---|
| | | Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31)(Cutri, Gianni) (Filed on 9/9/2024) Modified on 9/10/2024 (anj, COURT STAFF). (Entered: 09/09/2024) |
| 09/09/2024 | 217 | CERTIFICATE OF SERVICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 215 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed regarding Exhibits 8 and 9 to Plaintiffs' Opposition to Defendant's Motion to Amend Invalidity Contentions (Cutri, Gianni) (Filed on 9/9/2024) Modified on 9/10/2024 (anj, COURT STAFF). (Entered: 09/09/2024) |
| 09/10/2024 | 218 | **ORDER re: 211 Stipulation Requesting Remote Hearing on the Parties' Pending Discovery Disputes.**<br><br>**Discovery Hearing set for 9/12/2024 at 9:30 AM in San Francisco - Videoconference Only before Magistrate Judge Laurel Beeler. This proceeding will be held via a Zoom webinar.**<br><br>**Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/lb**<br><br>**General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.**<br><br>**Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/.**<br><br>**Signed by Judge Laurel Beeler on 09/10/2024. (ejk, COURT STAFF) (Filed on 9/10/2024) (Entered: 09/10/2024)** |
| 09/12/2024 | 219 | CLERKS NOTICE RESETTING HEARING TIME. The court has a conflict that will delay the start time of the calendar to 10:30 a.m.<br><br>Discovery Hearing set for 9/12/2024 at **10:30 AM** in San Francisco - Videoconference Only before Magistrate Judge Laurel Beeler. This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/lb<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ejk, COURT STAFF) (Filed on 9/12/2024) (Entered: 09/12/2024) |
| 09/12/2024 | 220 | **Minute Entry for proceedings held before Magistrate Judge Laurel Beeler: Discovery Hearing held via Zoom on 9/12/2024. Matters are argued, submitted, and taken under submission. Court to issue order.**<br><br>**Total Time in Court: 28 minutes.**<br>**Zoom Recording Time: 1:32 - 2:00.** |

| | | |
|---|---|---|
| | | **Plaintiffs' Attorneys: Gianni Cutri, Ingrid Petersen, Jeremy Roux, Justin Singh, Kyle Calhoun, Sharre S Lotfollahi, and Kat Li.**<br>**Defendant's Attorneys: Brent P. Ray, Angela Tarasi, and Mark Zambarda.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(ejk, COURT STAFF) (Date Filed: 9/12/2024) Transcriber - Tara Jauregui, email: echoreporting@yahoo.com on 9/13/2024 (bns, COURT STAFF). (Entered: 09/12/2024)** |
| 09/12/2024 | 221 | Declaration of Katherine Vessels in Support of 202 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *regarding Exhibits 3-21 to Plaintiffs Opposition to Defendants Motion to Strike Plaintiffs PLR 3-1(G) Contentions* filed byMotive Technologies, Inc.. (Related document(s) 202 ) (Vessels, Katherine) (Filed on 9/12/2024) (Entered: 09/12/2024) |
| 09/12/2024 | 222 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *(re Omnitracs)* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Brent P. Ray, # 2 Proposed Order, # 3 Sealed Reply iso Motion to Strike, # 4 Exhibit X (Sealed), # 5 Exhibit Y (Sealed))(Ray, Brent) (Filed on 9/12/2024) (Entered: 09/12/2024) |
| 09/12/2024 | 223 | Administrative Motion to File Under Seal *re Motion to Strike Reply and Exs X-Y (submitted at Dkt. 222-3 to 222-5))* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Brent P. Ray, # 2 Proposed Order)(Ray, Brent) (Filed on 9/12/2024) (Entered: 09/12/2024) |
| 09/12/2024 | 224 | REPLY (re 166 MOTION to Strike *Plaintiffs' PLR 3-1(G) Contentions (redacted)* ) *Redacted* filed byMotive Technologies, Inc.. (Attachments: # 1 Exhibit X (Sealed), # 2 Exhibit Y (Sealed))(Ray, Brent) (Filed on 9/12/2024) (Entered: 09/12/2024) |
| 09/13/2024 | 225 | Declaration of Brett McKean in Support of 215 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed regarding Exhibits 8 and 9 to Plaintiffs' Opposition to Defendant's Motion to Amend Invalidity Contentions filed byOmnitracs, LLC. (Related document(s) 215 ) (Galoyan, Ani) (Filed on 9/13/2024) (Entered: 09/13/2024) |
| 09/13/2024 | 226 | TRANSCRIPT ORDER for proceedings held on 09/12/2024 before Magistrate Judge Laurel Beeler by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation, for Recorded Proceeding - San Francisco. (Deoras, Akshay) (Filed on 9/13/2024) (Entered: 09/13/2024) |
| 09/15/2024 | 227 | **DISCOVERY ORDER**<br><br>**In the attached order, the court resolves the discovery disputes in the five pending discovery letters (ECF Nos. 159 , 164 , 168 , 172 , and 177 ).**<br><br>**(Beeler, Laurel) (Filed on 9/15/2024) (Entered: 09/15/2024)** |
| 09/15/2024 | 228 | Transcript of Proceedings held on 09/12/24, before Judge Laurel Beeler. Court Reporter/Transcriber Echo Reporting, Inc., telephone number echoreporting@yahoo.com. Tape Number: 1:32 - 2:00. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 226 Transcript Order ) Redaction Request due 10/7/2024. Redacted Transcript Deadline set for 10/16/2024. Release of Transcript Restriction set for 12/16/2024. (Related documents(s) 226 ) (Jauregui, Tara) (Filed on 9/15/2024) (Entered: 09/15/2024) |

| | | |
|---|---|---|
| 09/16/2024 | 229 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *(Plaintiffs Materials) re Reply iso Motion to Amend* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Zachary Coots, # 2 Proposed Order, # 3 Reply (Sealed), # 4 Exhibit Y, # 5 Exhibit Z)(Ray, Brent) (Filed on 9/16/2024) (Entered: 09/16/2024) |
| 09/16/2024 | 230 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *(Third Party Lytx Materials re Reply iso Motion to Amend)* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Zachary Coots, # 2 Proposed Order, # 3 Exhibit X (Sealed))(Ray, Brent) (Filed on 9/16/2024) (Entered: 09/16/2024) |
| 09/16/2024 | 231 | REPLY (re 187 Motive's Corrected Motion to Amend Invalidity Contentions ) *[Redacted]* filed byMotive Technologies, Inc.. (Attachments: # 1 Declaration of Zachary Coots, # 2 Exhibit X (Sealed), # 3 Exhibit Y (Sealed), # 4 Exhibit Z (Sealed))(Ray, Brent) (Filed on 9/16/2024) (Entered: 09/16/2024) |
| 09/16/2024 | 232 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *(Motive) regarding Plaintiffs' Reply in Support of Motion to Supplement Infringement Contentions and Exhibits 25, 32, 36, 37, 38, 42, 45, 47, and 48* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order, # 3 Unredacted Version of Reply, # 4 Unredacted Version of Exhibit 25, # 5 Unredacted Version of Exhibit 32, # 6 Unredacted Version of Exhibit 36, # 7 Unredacted Version of Exhibit 37, # 8 Unredacted Version of Exhibit 38, # 9 Unredacted Version of Exhibit 42, # 10 Unredacted Version of Exhibit 45, # 11 Unredacted Version of Exhibit 47, # 12 Unredacted Version of Exhibit 48)(Calhoun, Kyle) (Filed on 9/16/2024) (Entered: 09/16/2024) |
| 09/16/2024 | 233 | REPLY (re 189 Motion for Leave to Supplement Infringement Contentions ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Exhibit 25, # 3 Exhibit 26, # 4 Exhibit 27, # 5 Exhibit 28, # 6 Exhibit 29, # 7 Exhibit 30, # 8 Exhibit 31, # 9 Exhibit 32, # 10 Exhibit 33, # 11 Exhibit 34, # 12 Exhibit 35, # 13 Exhibit 36, # 14 Exhibit 37, # 15 Exhibit 38, # 16 Exhibit 39, # 17 Exhibit 40, # 18 Exhibit 41, # 19 Exhibit 42, # 20 Exhibit 43, # 21 Exhibit 44, # 22 Exhibit 45, # 23 Exhibit 46, # 24 Exhibit 47, # 25 Exhibit 48, # 26 Exhibit 49)(Cutri, Gianni) (Filed on 9/16/2024) (Entered: 09/16/2024) |
| 09/19/2024 | 234 | STIPULATION WITH PROPOSED ORDER *modifying scheduling order* re 192 Order on Stipulation filed by Motive Technologies, Inc.. (Tarasi, Angela) (Filed on 9/19/2024) Modified on 9/20/2024 (jml, COURT STAFF). (Entered: 09/19/2024) |
| 09/19/2024 | 235 | OBJECTIONS to *to Defendant's Evidence and Argument* re 224 Reply to Opposition/Response, by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Cutri, Gianni) (Filed on 9/19/2024) Modified on 9/20/2024 (jml, COURT STAFF). (Entered: 09/19/2024) |
| 09/19/2024 | 236 | Declaration of Ingrid Petersen in Support of 222 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *(re Omnitracs)* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Related document(s) 222 ) (Petersen, Ingrid) (Filed on 9/19/2024) (Entered: 09/19/2024) |
| 09/20/2024 | 237 | **ORDER by Judge Rita F. Lin granting 234 Stipulation Modifying Scheduling Order. (mkl, COURT STAFF) (Filed on 9/20/2024) (Entered: 09/20/2024)** |
| 09/25/2024 | 238 | **ORDER by Judge Rita F. Lin denying 166 Motion to Strike *Plaintiffs' PLR 3-1(G) Contentions (redacted)*; granting in part and denying in part 187 Motive's Corrected Motion to Amend Invalidity Contentions; granting 189 Motion for Leave to Supplement Infringement Contentions. (mkl, COURT STAFF) (Filed on 9/25/2024) (Entered: 09/25/2024)** |

| | | |
|---|---|---|
| 09/26/2024 | 239 | TRANSCRIPT ORDER for proceedings held on 08/28/2024 before Judge Rita F. Lin by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation, for Recorded Proceeding - San Francisco. (Cutri, Gianni) (Filed on 9/26/2024) (Entered: 09/26/2024) |
| 09/26/2024 | 240 | **ORDER. The parties are ordered to file a table summarizing the outstanding motions to seal. A template for this chart can be found on the Standing Orders section of Judge Lins website. Signed by Judge Rita F. Lin on September 26, 2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 9/26/2024) (Entered: 09/26/2024)** |
| 09/26/2024 | 241 | MOTION to Amend/Correct 237 Order on Stipulation *Defendant Motive Technologies, Inc.'s Motion To Amend Scheduling Order* filed by Motive Technologies, Inc.. Responses due by 9/30/2024. (Attachments: # 1 Declaration of Brent P. Ray, # 2 Proposed Order) (Tarasi, Angela) (Filed on 9/26/2024) (Entered: 09/26/2024) |
| 09/27/2024 | 242 | **ORDER. In view of the 241 Motion to Amend/Correct Order on Stipulation, all deadlines are STAYED by thirty days, to be reset via a new scheduling order. Plaintiff Omnitracs is ORDERED to respond by 10/1. Signed by Judge Rita F. Lin on September 27, 2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 9/27/2024) (Entered: 09/27/2024)** |
| 10/01/2024 | 243 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *regarding Plaintiffs' Response to Defendant's Motion to Amend Scheduling Order and Exhibit 3* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order, # 3 Unredacted Version of Response to Motion to Amend Scheduling Order, # 4 Unredacted Version of Exhibit 3)(Calhoun, Kyle) (Filed on 10/1/2024) (Entered: 10/01/2024) |
| 10/01/2024 | 244 | OPPOSITION/RESPONSE (re 241 MOTION to Amend/Correct 237 Order on Stipulation *Defendant Motive Technologies, Inc.'s Motion To Amend Scheduling Order* ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Proposed Order, # 2 Declaration of Kyle A. Calhoun, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3)(Alper, Adam) (Filed on 10/1/2024) (Entered: 10/01/2024) |
| 10/02/2024 | 245 | TRANSCRIPT ORDER for proceedings held on 9/12/2024 before Magistrate Judge Laurel Beeler by Motive Technologies, Inc., for Recorded Proceeding - San Francisco. (Ray, Brent) (Filed on 10/2/2024) (Entered: 10/02/2024) |
| 10/02/2024 | 246 | MOTION for Leave to File *Out of Time Declaration In Support of Administrative Motion to Seal (Dkt. No. 232)* filed by Motive Technologies, Inc.. (Attachments: # 1 Exhibit A: Declaration of Katherine Vessels In Support of Docket 232, # 2 Proposed Order)(Ray, Brent) (Filed on 10/2/2024) Modified on 10/3/2024 (jml, COURT STAFF). (Entered: 10/02/2024) |
| 10/03/2024 | 247 | **ORDER by Judge Rita F. Lin granting 232 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed. (mkl, COURT STAFF) (Filed on 10/3/2024) (Entered: 10/03/2024)** |
| 10/03/2024 | 248 | **SCHEDULING ORDER. Signed by Judge Rita F. Lin on 10/3/2024. Supplemental Opening Expert Reports due by 10/25/2024. Rebuttal Expert Reports due by 11/6/2024. Close of Expert Discovery is 11/19/2024. Dispositive/Daubert Motions due by 11/26/2024. Responses due by 12/12/2024. Replies due by 12/19/2024. Dispositive/Daubert Motion Hearing set for 1/14/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Pretrial Conference set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Jury Selection/Jury Trial set for 4/14/2025 09:00 AM in San Francisco,** |

| | | |
|---|---|---|
| | | **Courtroom 15, 18th Floor before Judge Rita F. Lin. (See attachment for complete list of deadlines.) (mkl, COURT STAFF) (Filed on 10/3/2024) (Entered: 10/03/2024)** |
| 10/04/2024 | 249 | NOTICE of Appearance filed by Ryan Maister on behalf of Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation (Maister, Ryan) (Filed on 10/4/2024) (Entered: 10/04/2024) |
| 10/08/2024 | 250 | Transcript of Proceedings held on 08/28/24, before Judge Rita F. Lin. Court Reporter/Transcriber Echo Reporting, Inc., telephone number echoreporting@yahoo.com. Tape Number: 10:12 - 10:16. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 239 Transcript Order ) Redaction Request due 10/29/2024. Redacted Transcript Deadline set for 11/8/2024. Release of Transcript Restriction set for 1/6/2025. (Related documents(s) 239 ) (Jauregui, Tara) (Filed on 10/8/2024) (Entered: 10/08/2024) |
| 10/11/2024 | 251 | **ORDER. As stated in the Court's 240 order, the parties are ORDERED to file a table summarizing the outstanding motions to seal and shall do so by 10/18/24. A template for this chart can be found on the Standing Orders section of Judge Lin's website. Signed by Judge Rita F. Lin on October 11, 2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 10/11/2024) Modified on 10/14/2024 (rfllc2, COURT STAFF). (Entered: 10/11/2024)** |
| 10/14/2024 | 252 | Discovery Letter Brief *regarding certain discovery disputes that were previously raised with the Court at the September 12, 2024 hearing* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Appendix 1, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5)(Cutri, Gianni) (Filed on 10/14/2024) (Entered: 10/14/2024) |
| 10/14/2024 | 253 | Declaration of Brett McKean in Support of 230 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *(Third Party Lytx Materials re Reply iso Motion to Amend)* filed byMotive Technologies, Inc.. (Related document(s) 230 ) (Galoyan, Ani) (Filed on 10/14/2024) (Entered: 10/14/2024) |
| 10/18/2024 | 254 | *Joint Submission of Table Summarizing Outstanding Motions to Seal* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 251 Order,, (Attachments: # 1 Table Summarizing Outstanding Motions to Seal)(Petersen, Ingrid) (Filed on 10/18/2024) Modified on 10/21/2024 (jml, COURT STAFF). (Entered: 10/18/2024) |
| 10/24/2024 | 255 | *Motive's Renewed Motion for Partial Judgment on the Pleadings* filed by Motive Technologies, Inc.. Motion Hearing set for 12/10/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 11/7/2024. Replies due by 11/14/2024. (Attachments: # 1 Declaration of Angela Tarasi, # 2 Exhibit 1)(Tarasi, Angela) (Filed on 10/24/2024) Modified on 10/25/2024 (jml, COURT STAFF). (Entered: 10/24/2024) |
| 10/29/2024 | 256 | **ORDER TO SHOW CAUSE WHY ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL SHOULD NOT BE DENIED. Signed by Judge Rita F. Lin on 10/29/2024. (mkl, COURT STAFF) (Filed on 10/29/2024) (Entered: 10/29/2024)** |
| 10/31/2024 | 258 | **ORDER**<br><br>**In the attached order, the court orders pre-2015 ESI and denies (on this record) the request for Motive to answer interrogatory number 25.** |

| | | |
|---|---|---|
| | | **(Beeler, Laurel) (Filed on 10/31/2024) (Entered: 11/01/2024)** |
| 11/01/2024 | 257 | STIPULATION WITH PROPOSED ORDER re 255 MOTION for Judgment on the Pleadings filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Calhoun, Kyle) (Filed on 11/1/2024) (Entered: 11/01/2024) |
| 11/04/2024 | 259 | *****PLEASE DISREGARD. FILED IN ERROR. - SEE-260***<br><br>JOINT STIPULATION AND ORDER MODIFYING BRIEFING SCHEDULE AND HEARING DATE FOR DEFENDANTS RENEWED MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS re 257 Stipulation. Signed by Judge Rita F. Lin on 11/4/2024. (jlg, COURT STAFF) (Filed on 11/4/2024) Modified on 11/4/2024 (jlg, COURT STAFF). (Entered: 11/04/2024)** |
| 11/04/2024 | 260 | **JOINT STIPULATION AND ORDER MODIFYING BRIEFING SCHEDULE AND HEARING DATE FOR DEFENDANTS RENEWED MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS re 257 Stipulation. Signed by Judge Rita F. Lin on 11/4/2024. (jlg, COURT STAFF) (Filed on 11/4/2024) (Entered: 11/04/2024)** |
| 11/12/2024 | 261 | RESPONSE TO ORDER TO SHOW CAUSE by Motive Technologies, Inc. *regarding Docket Nos. 256 and 188*. (Vessels, Katherine) (Filed on 11/12/2024) (Entered: 11/12/2024) |
| 11/12/2024 | 262 | EXHIBITS re 188 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *[Revised Sealed and Redacted versions of Exs re Dkt. 261 (Response to Order to Show Cause)]* filed byMotive Technologies, Inc.. (Attachments: # 1 Revised SEALED Dkt 188-04 (Ex. 2), # 2 Revised Redacted Dkt. 188-05 (Ex. 3), # 3 Revised SEALED Dkt. 188-05 (Ex. 3), # 4 Revised Redacted Dkt. 188-06 (Ex. 4) - part 1, # 5 Revised Redacted Dkt. 188-06 (Ex. 4) - part 2, # 6 Revised SEALED Dkt. 188-06 (Ex. 4), # 7 Revised Redacted Dkt. 188-07 (Ex. 5), # 8 Revised SEALED Dkt. 188-07 (Ex. 5), # 9 Revised Redacted Dkt. 188-08 (Ex. 7), # 10 Revised SEALED Dkt. 188-08 (Ex. 7), # 11 Revised Redacted Dkt. 188-09 (Ex. 8) - part 1, # 12 Revised Redacted Dkt. 188-09 (Ex. 8) - part 2, # 13 Revised SEALED Dkt. 188-09 (Ex. 8), # 14 Revised Redacted Dkt. 199-10 (Ex. 9) - part 1, # 15 Revised Redacted Dkt. 199-10 (Ex. 9) - part 2, # 16 Revised Redacted Dkt. 199-10 (Ex. 9) - part 3, # 17 Revised Redacted Dkt. 199-10 (Ex. 9) - part 4, # 18 Revised SEALED Dkt. 199-10 (Ex. 9))(Related document(s) 188 ) (Vessels, Katherine) (Filed on 11/12/2024) (Entered: 11/12/2024) |
| 11/13/2024 | | Electronic filing error. No title Page. Exhibits e-filed separately and not as an attachment, require a title page. Please refer to Civil Local Rules 3-4 re first page requirement. **Please re-file in its entirety.** Re: 262 Exhibits to an Administrative Motion to File Under Seal filed by Motive Technologies, Inc. (jml, COURT STAFF) (Filed on 11/13/2024) (Entered: 11/13/2024) |
| 11/13/2024 | 263 | MOTION to Strike *(Redacted)* filed by Motive Technologies, Inc.. Motion Hearing set for 1/14/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 11/27/2024. Replies due by 12/4/2024. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Exhibit 1 (Sealed), # 4 Exhibit 2 (Sealed), # 5 Exhibit 3 (Sealed), # 6 Exhibit 4 (Sealed), # 7 Exhibit 5 (Sealed), # 8 Exhibit 6, # 9 Exhibit 7 (Sealed), # 10 Exhibit 8 (Sealed), # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11 (Sealed))(Ray, Brent) (Filed on 11/13/2024) (Entered: 11/13/2024) |
| 11/13/2024 | 264 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Motion to Strike (Sealed), # 4 Exhibit 1 (Sealed), # 5 Exhibit 2 (Sealed), # 6 Exhibit 3 (Sealed), # 7 Exhibit 4 (Sealed), # 8 Exhibit 5 (Sealed), # 9 |

| | | |
|---|---|---|
| | | Exhibit 7 (Sealed), # 10 Exhibit 8 (Sealed), # 11 Exhibit 11 (Sealed))(Ray, Brent) (Filed on 11/13/2024) (Entered: 11/13/2024) |
| 11/13/2024 | 265 | EXHIBITS re 188 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *filed re Dkt. 261 (Response to Order to Show Cause)* filed byMotive Technologies, Inc.. (Attachments: # 1 Revised Redacted Dkt 188-04 (Ex. 2), # 2 Revised SEALED Dkt 188-04 (Ex. 2), # 3 Revised Redacted Dkt. 188-05 (Ex. 3), # 4 Revised Sealed Dkt. 188-05 (Ex. 3), # 5 Revised Redacted Dkt. 188-06 (Ex. 4) - part 1, # 6 Revised Redacted Dkt. 188-06 (Ex. 4) - part 2, # 7 Revised SEALED Dkt. 188-06 (Ex. 4), # 8 Revised Redacted Dkt. 188-07 (Ex. 5), # 9 Revised SEALED Dkt. 188-07 (Ex. 5), # 10 Revised Redacted Dkt. 188-08 (Ex. 7),, # 11 Revised SEALED Dkt. 188-08 (Ex. 7), # 12 Revised Redacted Dkt. 188-09 (Ex. 8) - part 1, # 13 Revised Redacted Dkt. 188-09 (Ex. 8) - part 2, # 14 Revised SEALED Dkt. 188-09 (Ex. 8), # 15 ) Revised Redacted Dkt. 188-10 (Ex. 9) - part 1, # 16 ) Revised Redacted Dkt. 188-10 (Ex. 9) - part 2, # 17 ) Revised Redacted Dkt. 188-10 (Ex. 9) - part 3, # 18 ) Revised Redacted Dkt. 188-10 (Ex. 9) - part 4, # 19 Revised SEALED Dkt. 199-10 (Ex. 9))(Related document(s) 188 ) (Vessels, Katherine) (Filed on 11/13/2024) (Entered: 11/13/2024) |
| 11/14/2024 | 266 | STIPULATION WITH PROPOSED ORDER *Modifying Scheduling Order* filed by Motive Technologies, Inc.. (Tarasi, Angela) (Filed on 11/14/2024) (Entered: 11/14/2024) |
| 11/14/2024 | 267 | **ORDER. The parties are directed to email a Word compatible copy of their 266 stipulation and proposed order to rflpo@cand.uscourts.gov. Signed by Judge Rita F. Lin on November 14, 2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 11/14/2024) (Entered: 11/14/2024)** |
| 11/14/2024 | 268 | MOTION to Amend/Correct *Invalidity Contentions (Redacted)* filed by Motive Technologies, Inc.. Motion Hearing set for 1/14/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 11/29/2024. Replies due by 12/6/2024. (Attachments: # 1 Appendix A (redacted), # 2 Declaration of Brent P. Ray, # 3 Proposed Order, # 4 Exhibit A, # 5 Exhibit B (sealed), # 6 Exhibit C (sealed), # 7 Exhibit D (sealed), # 8 Exhibit E (sealed), # 9 Exhibit F (sealed), # 10 Exhibit G (sealed))(Ray, Brent) (Filed on 11/14/2024) (Entered: 11/14/2024) |
| 11/14/2024 | 269 | *****DISREGARD. ERROR IN FILING PER FILER. SEE DOCKET # 271 FOR CORRECTED FILING.*****<br><br>Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Motion to Amend (Sealed), # 4 Appendix A (Sealed), # 5 Exhibit B (Sealed), # 6 Exhibit C (Sealed), # 7 Exhibit D (Sealed), # 8 Exhibit E (Sealed), # 9 Exhibit F (Sealed), # 10 Exhibit G (Sealed))(Ray, Brent) (Filed on 11/14/2024) Modified on 11/15/2024 (jml, COURT STAFF). (Entered: 11/14/2024) |
| 11/15/2024 | 270 | **JOINT STIPULATION AND ORDER MODIFYING SCHEDULING ORDER re 266 Stipulation with Proposed Order filed by Motive Technologies, Inc. Signed by Judge Rita F. Lin on 11/15/2024.**<br><br>**Daubert Motion related to Scott Andrew's testimony due by 12/2/2024. Oppositions Daubert Motion related to Scott Andrew's testimony due by 12/13/2024. Replies in Support of Daubert Motion related to Scott Andrew's testimony due by 12/20/2024.**<br><br>**(jlg, COURT STAFF) (Filed on 11/15/2024) Modified on 11/15/2024 (jlg, COURT STAFF). (Entered: 11/15/2024)** |

| | | |
|---|---|---|
| 11/15/2024 | 271 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF DOCKET # 269* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Motion to Amend (Sealed), # 4 Appendix A (Sealed), # 5 Exhibit B (Sealed), # 6 Exhibit C (Sealed), # 7 Exhibit D (Sealed), # 8 Exhibit E (Sealed), # 9 Exhibit F (Sealed), # 10 Exhibit G (Sealed))(Ray, Brent) (Filed on 11/15/2024) (Entered: 11/15/2024) |
| 11/18/2024 | 272 | ADMINISTRATIVE MOTION to Exceed Page Limits for its Motion for Summary Judgment and Daubert of Plaintiffs' Technical Expert filed by Motive Technologies, Inc.. Responses due by 11/22/2024. (Attachments: # 1 Proposed Order)(Ray, Brent) (Filed on 11/18/2024) (Entered: 11/18/2024) |
| 11/18/2024 | 273 | **ORDER GRANTING DEFENDANT MOTIVE TECHNOLOGIES, INC.S ADMINISTRATIVE MOTION TO EXCEED PAGE LIMITS FOR ITS MOTION FOR SUMMARY JUDGMENT AND DAUBERT OF PLAINTIFFS TECHNICAL EXPERT re 272 Administrative Motion. Signed by Judge Rita F. Lin on 11/18/2024. (jlg, COURT STAFF) (Filed on 11/18/2024) (Entered: 11/18/2024)** |
| 11/20/2024 | 274 | STIPULATION WITH PROPOSED ORDER *Modifying Briefing Schedule for Motive's Motion to Strike [Dkt. 263]* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Singh, Justin) (Filed on 11/20/2024) (Entered: 11/20/2024) |
| 11/20/2024 | 275 | Declaration of Kyle A. Calhoun in Support of 264 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Related document(s) 264 ) (Calhoun, Kyle) (Filed on 11/20/2024) (Entered: 11/20/2024) |
| 11/21/2024 | 276 | **JOINT STIPULATION AND ORDER MODIFYING BRIEFING SCHEDULE FOR MOTIVES MOTION TO STRIKE; granting 274 Stipulation. Signed by Judge Rita F. Lin on 11/21/2024. Responses due by 12/6/2024. Replies due by 12/13/2024. (jlg, COURT STAFF) (Filed on 11/21/2024) (Entered: 11/21/2024)** |
| 11/21/2024 | 277 | Declaration of Jeremy D. Roux in Support of 271 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF DOCKET # 269* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Related document(s) 271 ) (Roux, Jeremy) (Filed on 11/21/2024) (Entered: 11/21/2024) |
| 11/21/2024 | 278 | Statement *Plaintiffs' Opposition to Motive's Administrative Motion for Additional Pages for Its Summary Judgment and Daubert Motions* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit 1)(Schmidt, Leslie) (Filed on 11/21/2024) (Entered: 11/21/2024) |
| 11/22/2024 | 279 | **ORDER. The Court has considered the 278 Opposition to the Motion to Exceed Page Limits, and its 273 ruling remains the same. Signed by Judge Rita F. Lin on November 22, 2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 11/22/2024) (Entered: 11/22/2024)** |
| 11/25/2024 | | Set/Reset Deadlines as to 255 MOTION for Judgment on the Pleadings. Opposition due by 11/26/2024. Reply due by 12/12/2024. Motion Hearing reset for 1/14/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. (mkl, COURT STAFF) (Filed on 11/25/2024) (Entered: 11/25/2024) |
| 11/26/2024 | 280 | Administrative Motion to File Under Seal *Portions of and Exhibits to Motive's Daubert Motion for Jim W. Bergman* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Katherine Vessels, # 2 Proposed Order, # 3 Defendant Motive Technologies, Inc.'s Notice of and Daubert Motion To Exclude Opinions and Testimony |

| | | |
|---|---|---|
| | | by Jim W. Bergman (SEALED), # 4 Exhibit 4 to Brent Ray Declaration (SEALED))(Ray, Brent) (Filed on 11/26/2024) (Entered: 11/26/2024) |
| 11/26/2024 | 281 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *In Motive's Jim W. Bergman Daubert Motion 280* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Katherine Vessels, # 2 Proposed Order, # 3 Exhibit 1 to Brent Ray Declaration (SEALED), # 4 Exhibit 2 to Brent Ray Declaration (SEALED), # 5 Exhibit 3 to Brent Ray Declaration (SEALED), # 6 Exhibit 5 to Brent Ray Declaration (SEALED), # 7 Exhibit 6 to Brent Ray Declaration (SEALED), # 8 Exhibit 7 to Brent Ray Declaration (SEALED))(Ray, Brent) (Filed on 11/26/2024) (Entered: 11/26/2024) |
| 11/26/2024 | 282 | Defendant Motive Technologies, Inc.'s Notice of and Daubert Motion to Exclude Opinions and Testimony by Jim W. Bergman (REDACTED) filed by Motive Technologies, Inc. Motion Hearing set for 1/14/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 12/10/2024. Replies due by 12/17/2024. (Attachments: # 1 Declaration of Brent P. Ray, # 2 Proposed Order, # 3 Ex. 1 to Brent Ray Declaration (SEALED), # 4 Ex. 2 to Brent Ray Declaration (SEALED), # 5 Ex. 3 to Brent Ray Declaration (SEALED), # 6 Ex. 4 to Brent Ray Declaration (SEALED), # 7 Ex. 5 to Brent Ray Declaration (SEALED), # 8 Ex. 6 to Brent Ray Declaration (SEALED), # 9 Ex.7 to Brent Ray Declaration (SEALED))(Ray, Brent) (Filed on 11/26/2024) Modified on 11/27/2024 (cjl, COURT STAFF). (Entered: 11/26/2024) |
| 11/26/2024 | 283 | Administrative Motion to File Under Seal *Portions of and Exhibits to Motive's Daubert Motion for Dr. Stephen B. Wicker* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Katherine Vessels, # 2 Proposed Order, # 3 Defendant Motive Technologies, Inc.'s Notice of Motion and Daubert Motion For Dr. Stephen B. Wicker (SEALED), # 4 Ex. 7 to Katherine Vessels Declaration (SEALED), # 5 Ex. 8 to Katherine Vessels Declaration (SEALED), # 6 Ex. 10 to Katherine Vessels Declaration (SEALED), # 7 Ex. 11 to Katherine Vessels Declaration (SEALED), # 8 Ex. 12 to Katherine Vessels Declaration (SEALED), # 9 Ex. 13 to Katherine Vessels Declaration (SEALED), # 10 Ex.14 to Katherine Vessels Declaration (SEALED), # 11 Ex. 15 to Katherine Vessels Declaration (SEALED), # 12 Ex. 16 to Katherine Vessels Declaration (SEALED), # 13 Ex. 17 to Katherine Vessels Declaration (SEALED))(Ray, Brent) (Filed on 11/26/2024) (Entered: 11/26/2024) |
| 11/26/2024 | 284 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *In Motive's Daubert Motion For Dr. Stephen B. Wicker 283* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Katherine Vessels, # 2 Proposed Order, # 3 Ex.1 to Katherine Vessels Declaration (SEALED), # 4 Ex.2 to Katherine Vessels Declaration (SEALED), # 5 Ex.3 to Katherine Vessels Declaration (SEALED), # 6 Ex.4 to Katherine Vessels Declaration (SEALED), # 7 Ex.5 to Katherine Vessels Declaration (SEALED), # 8 Ex.18 to Katherine Vessels Declaration (SEALED), # 9 Ex.19 to Katherine Vessels Declaration (SEALED), # 10 Ex.20 to Katherine Vessels Declaration (SEALED))(Ray, Brent) (Filed on 11/26/2024) (Entered: 11/26/2024) |
| 11/26/2024 | 285 | Defendant Motive Technologies, Inc.'s Notice of Motion and Daubert Motion For Dr. Stephen B. Wicker (REDACTED) filed by Motive Technologies, Inc.. Motion Hearing set for 1/14/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 12/10/2024. Replies due by 12/17/2024. (Attachments: # 1 Declaration of Katherine Vessels, # 2 Proposed Order, # 3 Ex.1 to Katherine Vessels Declaration (SEALED), # 4 Ex.2 to Katherine Vessels Declaration (SEALED), # 5 Ex.3 to Katherine Vessels Declaration (SEALED), # 6 Ex.4 to Katherine Vessels Declaration (SEALED), # 7 Ex.5 to Katherine Vessels Declaration (SEALED), # 8 Ex.6 to Katherine Vessels Declaration, # 9 Ex.7 to Katherine Vessels Declaration (SEALED), # 10 Ex.8 to Katherine Vessels Declaration (SEALED), # 11 Ex.9 to Katherine Vessels Declaration, # |

| | | |
|---|---|---|
| | | 12 Ex.10 to Katherine Vessels Declaration (SEALED), # 13 Ex.11 to Katherine Vessels Declaration (SEALED), # 14 Ex.12 to Katherine Vessels Declaration (SEALED), # 15 Ex.13 to Katherine Vessels Declaration (SEALED), # 16 Ex.14 to Katherine Vessels Declaration (SEALED), # 17 Ex.15 to Katherine Vessels Declaration (SEALED), # 18 Ex.16 to Katherine Vessels Declaration (SEALED), # 19 Ex.17 to Katherine Vessels Declaration (SEALED), # 20 Ex.18 to Katherine Vessels Declaration (SEALED), # 21 Ex.19 to Katherine Vessels Declaration (SEALED), # 22 Ex.20 to Katherine Vessels Declaration (SEALED), # 23 Ex.21 to Katherine Vessels Declaration, # 24 Ex.22 to Katherine Vessels Declaration)(Ray, Brent) (Filed on 11/26/2024) Modified on 11/27/2024 (cjl, COURT STAFF). (Entered: 11/26/2024) |
| 11/26/2024 | 286 | Administrative Motion to File Under Seal *Portions of and Certain Exhibits to Motive's Motion for Summary Judgment* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Exhibit Ex. 2 (Sealed), # 4 Exhibit 3 (Sealed), # 5 Exhibit 4 (Sealed), # 6 Exhibit 5 (Sealed), # 7 Exhibit 7 (Sealed), # 8 Exhibit 8 (Sealed), # 9 Exhibit 9 (Sealed), # 10 Exhibit 10 (Sealed), # 11 Exhibit 11 (Sealed), # 12 Exhibit 13 (Sealed), # 13 Exhibit 21 (Sealed), # 14 Exhibit 22 (Sealed), # 15 Exhibit 23 (Sealed), # 16 Exhibit 25 (Sealed), # 17 Exhibit 26 (Sealed), # 18 Exhibit 27 (Sealed), # 19 Exhibit 28 (Sealed), # 20 Exhibit 29 (Sealed), # 21 Exhibit 30 (Sealed), # 22 Exhibit 31 (Sealed), # 23 Exhibit 32 (Sealed), # 24 Exhibit 33 (Sealed), # 25 Exhibit 35 (Sealed), # 26 Exhibit 36 (Sealed), # 27 Exhibit 46 (Sealed), # 28 Exhibit 47 (Sealed), # 29 Exhibit 48 (Sealed))(Zambarda, Mark) (Filed on 11/26/2024) (Entered: 11/26/2024) |
| 11/26/2024 | 287 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *[Plaintiffs' Material in Motive's Motion for Summary Judgment] see also [Dkt. 286]* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Exhibit 12 (sealed), # 4 Exhibit 14 (Sealed), # 5 Exhibit 17 (sealed), # 6 Exhibit 18 (sealed), # 7 Exhibit 19 (Sealed), # 8 Exhibit 20 (sealed), # 9 Exhibit 34 (sealed), # 10 Exhibit 39 (sealed), # 11 Exhibit 41 (sealed), # 12 Exhibit 42 (sealed))(Zambarda, Mark) (Filed on 11/26/2024) (Entered: 11/26/2024) |
| 11/26/2024 | 288 | MOTION for Summary Judgment *[Redacted]* filed by Motive Technologies, Inc.. Motion for Summary Judgment Hearing set for 1/14/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 12/10/2024. Replies due by 12/17/2024. (Attachments: # 1 Declaration of Nicholas Sieger, # 2 Exhibit 1 (Sealed), # 3 Exhibit 2 (sealed), # 4 Exhibit 3 (Sealed), # 5 Exhibit 4 (Sealed), # 6 Exhibit 5 (Sealed), # 7 Exhibit NOT USED, # 8 Exhibit 7 (Sealed), # 9 Exhibit 8 (sealed), # 10 Exhibit 9 (Sealed), # 11 Exhibit 10 (Sealed), # 12 Exhibit 11 (Sealed), # 13 Exhibit 12 (Sealed), # 14 Exhibit 13 (Sealed), # 15 Exhibit 14 (Sealed), # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17 (Sealed), # 19 Exhibit 18 (Sealed), # 20 Exhibit 19 (Sealed), # 21 Exhibit 20 (Sealed), # 22 Exhibit 21 (Sealed), # 23 Exhibit 22 (Sealed), # 24 Exhibit 23 (Sealed), # 25 Exhibit 24, # 26 Exhibit 25 (Sealed), # 27 Exhibit 26 (Sealed), # 28 Exhibit 27 (Sealed), # 29 Exhibit 28 (Sealed), # 30 Exhibit 29 (Sealed), # 31 Exhibit 30 (Sealed), # 32 Exhibit 31 (Sealed), # 33 Exhibit 32 (Sealed), # 34 Exhibit 33 (Sealed), # 35 Exhibit 34 (Sealed), # 36 Exhibit 35 (Sealed), # 37 Exhibit 36 (Sealed), # 38 Exhibit 37 (Sealed), # 39 Exhibit 38, # 40 Exhibit 39 (Sealed), # 41 Exhibit 40, # 42 Exhibit 41 (Sealed), # 43 Exhibit 42 (Sealed), # 44 Exhibit 43, # 45 Exhibit 44, # 46 Exhibit 45, # 47 Exhibit 46 (Sealed), # 48 Exhibit 47 (Sealed), # 49 Exhibit 48 (Sealed), # 50 Exhibit 49)(Ray, Brent) (Filed on 11/26/2024) (Entered: 11/26/2024) |
| 11/26/2024 | 289 | EXHIBITS re 286 Administrative Motion to File Under Seal *Portions of and Certain Exhibits to Motive's Motion for Summary Judgment* filed byMotive Technologies, Inc.. (Attachments: # 1 Motion for Summary Judgment (Sealed))(Related document(s) 286 ) (Zambarda, Mark) (Filed on 11/26/2024) (Entered: 11/26/2024) |

| | | |
|---|---|---|
| 11/26/2024 | 290 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *regarding Plaintiffs' Opposition to Defendant's Renewed Motion for Partial Judgment on the Pleadings* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order, # 3 Unredacted Version of Opposition, # 4 Unredacted Version of Exhibit A, # 5 Unredacted Version of Exhibit D)(Calhoun, Kyle) (Filed on 11/26/2024) (Entered: 11/26/2024) |
| 11/26/2024 | 291 | OPPOSITION/RESPONSE (re 255 MOTION for Judgment on the Pleadings ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I)(Alper, Adam) (Filed on 11/26/2024) (Entered: 11/26/2024) |
| 12/02/2024 | 292 | EXHIBITS re 286 Administrative Motion to File Under Seal *Portions of and Certain Exhibits to Motive's Motion for Summary Judgment* filed byMotive Technologies, Inc.. (Attachments: # 1 Exhibit 1 to Sieger Declaration (sealed))(Related document(s) 286 ) (Zambarda, Mark) (Filed on 12/2/2024) (Entered: 12/02/2024) |
| 12/03/2024 | 293 | Declaration of Katherine Vessels in Support of 290 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *regarding Plaintiffs' Opposition to Defendant's Renewed Motion for Partial Judgment on the Pleadings* filed byMotive Technologies, Inc.. (Related document(s) 290 ) (Vessels, Katherine) (Filed on 12/3/2024) (Entered: 12/03/2024) |
| 12/03/2024 | 294 | Declaration of Andrew Morrill in Support of 281 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *In Motive's Jim W. Bergman Daubert Motion 280* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Related document(s) 281 ) (Morrill, Andrew) (Filed on 12/3/2024) (Entered: 12/03/2024) |
| 12/03/2024 | 295 | Declaration of Kyle A. Calhoun in Support of 287 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *[Plaintiffs' Material in Motive's Motion for Summary Judgment] see also [Dkt. 286]* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Related document(s) 287 ) (Calhoun, Kyle) (Filed on 12/3/2024) (Entered: 12/03/2024) |
| 12/03/2024 | 296 | Declaration of Kyle A. Calhoun in Support of 284 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *In Motive's Daubert Motion For Dr. Stephen B. Wicker 283* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Related document(s) 284 ) (Calhoun, Kyle) (Filed on 12/3/2024) (Entered: 12/03/2024) |
| 12/06/2024 | 297 | Administrative Motion to File Under Seal *regarding Plaintiffs' Opposition to Defendant's Motion to Strike* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Jeremy Roux, # 2 Proposed Order, # 3 Unredacted Version of Opposition, # 4 Unredacted Version of Exhibit A, # 5 Unredacted Version of Exhibit B, # 6 Unredacted Version of Exhibit D, # 7 Unredacted Version of Exhibit Unredacted Version of Exhibit F, # 8 Unredacted Version of Exhibit G, # 9 Unredacted Version of Exhibit I)(Roux, Jeremy) (Filed on 12/6/2024) (Entered: 12/06/2024) |
| 12/06/2024 | 298 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *regarding Plaintiffs' Opposition to Motion to Strike* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Jeremy Roux, # 2 Proposed Order, # 3 Unredacted Version of Exhibit J, # 4 Unredacted Version of Exhibit K, # 5 Unredacted Version of Exhibit L, # 6 Unredacted Version of Exhibit P, # 7 Unredacted Version of Exhibit Q)(Roux, Jeremy) (Filed on 12/6/2024) (Entered: 12/06/2024) |

| | | |
|---|---|---|
| 12/06/2024 | 299 | OPPOSITION/RESPONSE (re 263 MOTION to Strike *(Redacted)* ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Jeremy Roux, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q)(Schmidt, Leslie) (Filed on 12/6/2024) (Entered: 12/06/2024) |
| 12/09/2024 | 300 | **ORDER. The parties are ORDERED to send a Word-compatible version of the 254 Sealing Chart to rflpo@cand.uscourts.gov. Signed by Judge Rita F. Lin on December 9, 2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 12/9/2024) (Entered: 12/09/2024)** |
| 12/10/2024 | 301 | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO SEAL (Dkt. Nos. 154 , 165 , 178 , 179 , 180 , 188 , 201 , 202 , 204 , 214 , 215 , 222 , 229 , 230 , 232 , 243 , and 254 ) by Judge Rita F. Lin. (mkl, COURT STAFF) (Filed on 12/10/2024) (Entered: 12/10/2024)** |
| 12/10/2024 | 302 | STIPULATION WITH PROPOSED ORDER *Modifying Briefing Schedule for Opposition and Reply Briefs for Dispositive and Daubert Motions* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Calhoun, Kyle) (Filed on 12/10/2024) (Entered: 12/10/2024) |
| 12/11/2024 | 303 | **ORDER by Judge Rita F. Lin granting 302 Stipulation Modifying Briefing Schedule for Opposition and Reply Briefs for Dispositive and Daubert Motions. (mkl, COURT STAFF) (Filed on 12/11/2024) (Entered: 12/11/2024)** |
| 12/11/2024 | | Set/Reset Deadlines as to 255 Renewed Motion for Judgment on the Pleadings. Reply due by 12/17/2024. (mkl, COURT STAFF) (Filed on 12/11/2024) (Entered: 12/11/2024) |
| 12/11/2024 | | Set/Reset Deadlines as to 282 Defendant Motive Technologies, Inc.'s Notice of and Daubert Motion to Exclude Opinions and Testimony by Jim W. Bergman (REDACTED), 285 Defendant Motive Technologies, Inc.'s Notice of Motion and Daubert Motion For Dr. Stephen B. Wicker (REDACTED), and 288 MOTION for Summary Judgment *[Redacted]*. Oppositions due by 12/16/2024. Replies due by 12/30/2024. (mkl, COURT STAFF) (Filed on 12/11/2024) (Entered: 12/11/2024) |
| 12/11/2024 | 304 | Declaration of Katherine Vessels in Support of 298 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *regarding Plaintiffs' Opposition to Motion to Strike* filed byMotive Technologies, Inc.. (Related document(s) 298 ) (Vessels, Katherine) (Filed on 12/11/2024) (Entered: 12/11/2024) |
| 12/13/2024 | 305 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Motive Technologies, Inc.'s Reply In Support of Motion to Strike and M. Zambarda Declaration Exhibits 12 and 13* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Motive Technologies, Inc.'s Reply In Support of Motion to Strike (SEALED), # 4 Exhibit 12 to Mark Zambarda (SEALED), # 5 Exhibit 13 to Mark Zambarda (SEALED))(Ray, Brent) (Filed on 12/13/2024) (Entered: 12/13/2024) |
| 12/13/2024 | 306 | REPLY (re 263 MOTION to Strike *(Redacted)* ) *Motive Technologies, Inc.'s Reply In Support (Redacted)* filed byMotive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Exhibit 12 to Mark Zambarda (SEALED), # 3 Exhibit 13 to Mark Zambarda (SEALED))(Ray, Brent) (Filed on 12/13/2024) (Entered: 12/13/2024) |
| 12/16/2024 | 307 | Administrative Motion to File Under Seal *Exhibits A, B, I, and K to Plaintiffs' Opposition to Defendant's Daubert Motion to Exclude Opinions and Testimony by Jim W. Bergman* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Declaration of Justin Singh, # 2 Proposed Order, # 3 Unredacted Version of Exhibit A, # 4 Unredacted Version of Exhibit B, # 5 Unredacted Version of Exhibit I, # 6 Unredacted Version of Exhibit K)(Singh, Justin) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/16/2024 | 308 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Opposition to Defendant's Daubert Motion to Exclude Opinions and Testimony by Jim W. Bergman and Exhibits A-K* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Justin Singh, # 2 Proposed Order, # 3 Unredacted Version of Opposition to Bergman Daubert Motion, # 4 Unredacted Version of Exhibit C, # 5 Unredacted Version of Exhibit D, # 6 Unredacted Version of Exhibit E, # 7 Unredacted Version of Exhibit F, # 8 Unredacted Version of Exhibit G, # 9 Unredacted Version of Exhibit H, # 10 Unredacted Version of Exhibit J)(Singh, Justin) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/16/2024 | 309 | OPPOSITION/RESPONSE (re 282 Defendant Motive Technologies, Inc.'s Notice of and Daubert Motion to Exclude Opinions and Testimony by Jim W. Bergman (REDACTED) ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Justin Singh, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K)(Schmidt, Leslie) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/16/2024 | 310 | Administrative Motion to File Under Seal *Exhibits A-D to Plaintiffs' Opposition to Defendant's Daubert Motion for Dr. Stephen B. Wicker* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Justin Singh, # 2 Proposed Order, # 3 Unredacted Version of Exhibit A, # 4 Unredacted Version of Exhibit B, # 5 Unredacted Version of Exhibit C, # 6 Unredacted Version of Exhibit D)(Singh, Justin) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/16/2024 | 311 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *regarding Defendant's Confidential Information in Plaintiffs' Opposition to Defendant's Daubert Motion for Dr. Stephen Wicker and Exhibits A-G and I* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Justin Singh, # 2 Proposed Order, # 3 Unredacted Version of Opposition to Wicker Daubert Motion, # 4 Unredacted Version of Exhibit E, # 5 Unredacted Version of Exhibit F, # 6 Unredacted Version of Exhibit G, # 7 Unredacted Version of Exhibit I)(Singh, Justin) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/16/2024 | 312 | OPPOSITION/RESPONSE (re 285 Defendant Motive Technologies, Inc.'s Notice of Motion and Daubert Motion For Dr. Stephen B. Wicker (REDACTED) ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Justin Singh, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K)(Schmidt, Leslie) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/16/2024 | 313 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *regarding Motive's Confidential Information in Plaintiffs' Opposition to Motive's Motion for Summary Judgment and Exhibits* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order, # 3 Exhibit Unredacted Version of Exhibit A, # 4 Exhibit Unredacted Version of Exhibit B, # 5 Exhibit Unredacted Version of Exhibit C, # 6 Exhibit Unredacted Version of Exhibit D, # 7 Exhibit Unredacted Version of Exhibit F, # 8 Exhibit Unredacted Version of Exhibit G, # 9 Exhibit Unredacted Version of Exhibit H, # 10 Exhibit Unredacted Version of Exhibit J, # 11 Exhibit Unredacted Version of Exhibit K, # 12 Exhibit Unredacted Version of Exhibit L, # 13 Exhibit Unredacted Version of Exhibit M, # 14 Exhibit Unredacted Version of Exhibit N, # 15 Exhibit Unredacted Version of Exhibit O, # 16 Exhibit Unredacted Version of Exhibit P, # 17 Exhibit Unredacted Version |

| | | |
|---|---|---|
| | | of Exhibit R, # 18 Exhibit Unredacted Version of Exhibit S, # 19 Exhibit Unredacted Version of Exhibit T, # 20 Exhibit Unredacted Version of Exhibit U, # 21 Exhibit Unredacted Version of Exhibit V, # 22 Exhibit Unredacted Version of Exhibit W, # 23 Exhibit Unredacted Version of Exhibit X, # 24 Exhibit Unredacted Version of Exhibit Z, # 25 Exhibit Unredacted Version of Exhibit KK, # 26 Exhibit Unredacted Version of Exhibit LL, # 27 Exhibit Unredacted Version of Exhibit MM, # 28 Exhibit Unredacted Version of Exhibit NN, # 29 Exhibit Unredacted Version of Exhibit OO, # 30 Exhibit Unredacted Version of Exhibit VVV, # 31 Exhibit Unredacted Version of Exhibit WWW, # 32 Exhibit Unredacted Version of Exhibit XXX, # 33 Exhibit Unredacted Version of Exhibit ZZZ, # 34 Exhibit Unredacted Version of Exhibit AAAA, # 35 Exhibit Unredacted Version of Exhibit BBBB, # 36 Exhibit Unredacted Version of Exhibit CCCC, # 37 Exhibit Unredacted Version of Exhibit DDDD, # 38 Exhibit Unredacted Version of Exhibit FFFF, # 39 Exhibit Unredacted Version of Exhibit GGGG, # 40 Exhibit Unredacted Version of Exhibit HHHH, # 41 Exhibit Unredacted Version of Exhibit JJJJ, # 42 Exhibit Unredacted Version of Exhibit KKKK, # 43 Exhibit Unredacted Version of Exhibit LLLL, # 44 Exhibit Unredacted Version of Exhibit MMMM, # 45 Exhibit Unredacted Version of Exhibit PPPP, # 46 Exhibit Unredacted Version of Exhibit QQQQ, # 47 Exhibit Unredacted Version of Exhibit SSSS, # 48 Exhibit Unredacted Version of Exhibit TTTT)(Calhoun, Kyle) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/16/2024 | 314 | Administrative Motion to File Under Seal *Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Exhibits* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order, # 3 Unredacted Version of Opposition to Summary Judgment Motion, # 4 Unredacted Version of Exhibit VV, # 5 Unredacted Version of Exhibit WW, # 6 Unredacted Version of Exhibit XX, # 7 Unredacted Version of Exhibit YY, # 8 Unredacted Version of Exhibit AAA, # 9 Unredacted Version of Exhibit BBB, # 10 Unredacted Version of Exhibit EEE, # 11 Unredacted Version of Exhibit FFF, # 12 Unredacted Version of Exhibit GGG, # 13 Unredacted Version of Exhibit III, # 14 Unredacted Version of Exhibit QQQ, # 15 Unredacted Version of Exhibit TTT, # 16 Unredacted Version of Exhibit UUU, # 17 Unredacted Version of Exhibit YYY, # 18 Unredacted Version of Exhibit IIII, # 19 Unredacted Version of Exhibit NNNN, # 20 Unredacted Version of Exhibit OOOO, # 21 Unredacted Version of Exhibit RRRR) (Calhoun, Kyle) (Filed on 12/16/2024) (Entered: 12/17/2024) |
| 12/17/2024 | 315 | OPPOSITION/RESPONSE (re 288 MOTION for Summary Judgment *[Redacted]* ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T, # 22 Exhibit U, # 23 Exhibit V, # 24 Exhibit W, # 25 Exhibit X, # 26 Exhibit Y, # 27 Exhibit Z, # 28 Exhibit AA, # 29 Exhibit BB, # 30 Exhibit CC, # 31 Exhibit DD, # 32 Exhibit EE, # 33 Exhibit FF, # 34 Exhibit GG, # 35 Exhibit HH, # 36 Exhibit II, # 37 Exhibit JJ, # 38 Exhibit KK, # 39 Exhibit LL, # 40 Exhibit MM, # 41 Exhibit NN, # 42 Exhibit OO, # 43 Exhibit PP, # 44 Exhibit QQ, # 45 Exhibit RR, # 46 Exhibit SS, # 47 Exhibit TT, # 48 Exhibit UU, # 49 Exhibit VV, # 50 Exhibit WW, # 51 Exhibit XX, # 52 Exhibit YY, # 53 Exhibit ZZ, # 54 Exhibit AAA, # 55 Exhibit BBB, # 56 Exhibit CCC, # 57 Exhibit DDD, # 58 Exhibit EEE, # 59 Exhibit FFF, # 60 Exhibit GGG, # 61 Exhibit HHH, # 62 Exhibit III, # 63 Exhibit JJJ, # 64 Exhibit KKK, # 65 Exhibit LLL, # 66 Exhibit MMM, # 67 Exhibit NNN, # 68 Exhibit OOO, # 69 Exhibit PPP, # 70 Exhibit QQQ, # 71 Exhibit RRR, # 72 Exhibit SSS, # 73 Exhibit TTT, # 74 Exhibit UUU, # 75 Exhibit VVV, # 76 Exhibit WWW, # 77 Exhibit XXX, # 78 Exhibit YYY, # 79 Exhibit ZZZ, # 80 Exhibit AAAA, # 81 Exhibit BBBB, # 82 Exhibit CCCC, # 83 Exhibit DDDD, # 84 Exhibit EEEE, # 85 Exhibit FFFF, # 86 Exhibit GGGG, # 87 Exhibit HHHH, # 88 Exhibit IIII, # |

| | | |
|---|---|---|
| | | 89 Exhibit JJJJ, # 90 Exhibit KKKK, # 91 Exhibit LLLL, # 92 Exhibit MMMM, # 93 Exhibit NNNN, # 94 Exhibit OOOO, # 95 Exhibit PPPP, # 96 Exhibit QQQQ, # 97 Exhibit RRRR, # 98 Exhibit SSSS, # 99 Exhibit TTTT)(Alper, Adam) (Filed on 12/17/2024) (Entered: 12/17/2024) |
| 12/17/2024 | 316 | Brief re 155 Reply to Opposition/Response, *Unsealed version of Reply in Support of Motion for Clarification of Claim Construction Diposition Order* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Unsealed version of Exhibit 6, # 2 Unsealed version of Exhibit 9, # 3 Unsealed version of Exhibit 10, # 4 Unsealed version of Exhibit 11, # 5 Unsealed version of Exhibit 12)(Related document(s) 155 ) (Petersen, Ingrid) (Filed on 12/17/2024) (Entered: 12/17/2024) |
| 12/17/2024 | 317 | Brief re 244 Opposition/Response to Motion, *Unsealed Version of Plaintiffs' Response to Defendant's Motion to Amend Scheduling Order* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Unsealed Version of Exhibit 3) (Related document(s) 244 ) (Petersen, Ingrid) (Filed on 12/17/2024) (Entered: 12/17/2024) |
| 12/17/2024 | 318 | NOTICE by Motive Technologies, Inc. *re 166 Motion to Strike PLR 3-1G (Unsealed version of 165-3) per Court's Order 301* (Attachments: # 1 Unsealed version of Ex. B [165-05], # 2 Unsealed version of Ex. I [165-12], # 3 Unsealed version of Ex. J [165-13, # 4 Unsealed version of Ex. M [165-16], # 5 Unsealed version of Ex. N [165-17], # 6 Unsealed version of Ex. R [165-18], # 7 Unsealed version of Ex. T [165-19], # 8 Unsealed version of Ex. U [165-20], # 9 Unsealed version of Ex. V [165-21], # 10 Unsealed version of Ex. W [165-22])(Zambarda, Mark) (Filed on 12/17/2024) (Entered: 12/17/2024) |
| 12/17/2024 | 319 | NOTICE by Motive Technologies, Inc. *re 181 Motion to Amend Invalidity Contentions - per the Court's Order 301* (Attachments: # 1 Redacted version of Ex. N [179-3], # 2 Redacted version of Ex. O [204-3], # 3 Redacted version of Ex. P [179-4], # 4 Unsealed version of Ex. U [178-15])(Zambarda, Mark) (Filed on 12/17/2024) (Entered: 12/17/2024) |
| 12/17/2024 | 320 | NOTICE by Motive Technologies, Inc. *re 231 Reply iso Motion to Amend Invalidity Contentions (Unsealed version of 229-3 per Court's Order 301 )* (Attachments: # 1 Redacted version of Ex. X [230-3], # 2 Unsealed version of Ex. Y [229-4], # 3 Unsealed version of Ex. Z [229-5])(Zambarda, Mark) (Filed on 12/17/2024) (Entered: 12/17/2024) |
| 12/17/2024 | 321 | REPLY (re 255 MOTION for Judgment on the Pleadings ) filed byMotive Technologies, Inc.. (Tarasi, Angela) (Filed on 12/17/2024) (Entered: 12/17/2024) |
| 12/20/2024 | 322 | Declaration of Justin Singh in Support of 305 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Motive Technologies, Inc.'s Reply In Support of Motion to Strike and M. Zambarda Declaration Exhibits 12 and 13* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Related document(s) 305 ) (Singh, Justin) (Filed on 12/20/2024) (Entered: 12/20/2024) |
| 12/23/2024 | 323 | Declaration of Katherine Vessels in Support of 308 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Opposition to Defendant's Daubert Motion to Exclude Opinions and Testimony by Jim W. Bergman and Exhibits A-K* filed byMotive Technologies, Inc.. (Related document(s) 308 ) (Vessels, Katherine) (Filed on 12/23/2024) (Entered: 12/23/2024) |

| | | |
|---|---|---|
| 12/23/2024 | 324 | Declaration of Katherine Vessels in Support of 311 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *regarding Defendant's Confidential Information in Plaintiffs' Opposition to Defendant's Daubert Motion for Dr. Stephen Wicker and Exhibits A-G a filed byMotive Technologies, Inc.. (Related document(s) 311 ) (Vessels, Katherine) (Filed on 12/23/2024) (Entered: 12/23/2024)* |
| 12/23/2024 | 325 | Declaration of Katherine Vessels in Support of 313 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *regarding Motive's Confidential Information in Plaintiffs' Opposition to Motive's Motion for Summary Judgment and Exhibits* filed byMotive Technologies, Inc.. (Related document(s) 313 ) (Vessels, Katherine) (Filed on 12/23/2024) (Entered: 12/23/2024) |
| 12/23/2024 | 326 | *Plaintiffs' Notice of Errata Regarding Plaintiffs' Opposition to Defendant's Summary Judgment Motion* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 315 Opposition/Response to Motion,,,,,,,, (Calhoun, Kyle) (Filed on 12/23/2024) Modified on 12/26/2024 (jml, COURT STAFF). (Entered: 12/23/2024) |
| 12/23/2024 | 327 | REPLY (re 282 Defendant Motive Technologies, Inc.'s Notice of and Daubert Motion to Exclude Opinions and Testimony by Jim W. Bergman (REDACTED) ) *; Defendant Motive Technologies, Inc.'s Reply to Plaintiff's Opposition to Defendant's Daubert Motion* filed byMotive Technologies, Inc.. (Ray, Brent) (Filed on 12/23/2024) (Entered: 12/23/2024) |
| 12/26/2024 | | Electronic filing error. Incorrect event used. [err101] The correct event is Errata. The correct event can be found at: Civil Events > Other Filings > Other Documents > Errata. **Please use the correct event for future filings of this type. Corrected by Clerk's Office. No further action is necessary.** Re: 326 Notice (Other), filed by SmartDrive Systems, Inc., XRS Corporation, Omnitracs, LLC (jml, COURT STAFF) (Filed on 12/26/2024) (Entered: 12/26/2024) |
| 12/30/2024 | 328 | Administrative Motion to File Under Seal filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Katherine Vessels, # 2 Proposed Order, # 3 Sealed Reply iso Daubert Motion for Dr. Stephen B. Wicker)(Ray, Brent) (Filed on 12/30/2024) (Entered: 12/30/2024) |
| 12/30/2024 | 329 | [REDACTED] REPLY (re 285 Defendant Motive Technologies, Inc.'s Notice of Motion and Daubert Motion For Dr. Stephen B. Wicker), filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Katherine Vessels, # 2 Ex. 23, # 3 Ex. 24)(Ray, Brent) (Filed on 12/30/2024) Modified on 12/31/2024 (jlm, COURT STAFF). (Entered: 12/30/2024) |
| 12/30/2024 | 330 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Sealed Reply iso Motion for Summary Judgment, # 4 Ex. 51 (Sealed), # 5 Ex. 55 (Sealed), # 6 Ex. 57 (Sealed))(Ray, Brent) (Filed on 12/30/2024) (Entered: 12/30/2024) |
| 12/30/2024 | 331 | Administrative Motion to File Under Seal filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Mark Zambarda, # 2 Proposed Order, # 3 Ex. 54 (Sealed), # 4 Ex. 56 (Sealed))(Ray, Brent) (Filed on 12/30/2024) (Entered: 12/30/2024) |
| 12/30/2024 | 332 | [REDACTED] REPLY (re 288 MOTION for Summary Judgment) filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Nick Sieger, # 2 Ex. 50, # 3 Ex. 51 (Sealed), # 4 Ex. 52, # 5 Ex. 53, # 6 Ex. 54 (Sealed), # 7 Ex. 55 (Sealed), # 8 Ex. 56 (Sealed), # 9 Ex. 57 (Sealed))(Ray, Brent) (Filed on 12/30/2024) Modified on 12/31/2024 (jlm, COURT STAFF). (Entered: 12/30/2024) |

| | | |
|---|---|---|
| 01/06/2025 | 333 | **ORDER by Judge Rita F. Lin granting 268 Motion to Amend Invalidity Contentions. (mkl, COURT STAFF) (Filed on 1/6/2025) (Entered: 01/06/2025)** |
| 01/09/2025 | 334 | EXHIBITS re 286 Administrative Motion to File Under Seal *Portions of and Certain Exhibits to Motive's Motion for Summary Judgment [Corrected Ex. 5 to Motive's Motion for Summary Judgment - originally filed at 286-06]* filed byMotive Technologies, Inc.. (Attachments: # 1 Exhibit 5 (Corrected))(Related document(s) 286 ) (Ray, Brent) (Filed on 1/9/2025) (Entered: 01/09/2025) |
| 01/09/2025 | 335 | **TENTATIVE RULINGS CHART FOR HEARING. Signed by Judge Rita F. Lin on January 9, 2025. (Attachments: # 1 Exhibit)(rfllc2, COURT STAFF) (Filed on 1/9/2025) (Entered: 01/09/2025)** |
| 01/14/2025 | 336 | **Minute Entry for proceedings held before Judge Rita F. Lin: Motion Hearing held on 1/14/2025 re 255 MOTION for Judgment on the Pleadings filed by Motive Technologies, Inc., 263 MOTION to Strike *(Redacted)* filed by Motive Technologies, Inc., 282 Defendant Motive Technologies, Inc.'s Notice of and Daubert Motion to Exclude Opinions and Testimony by Jim W. Bergman (REDACTED) filed by Motive Technologies, Inc., 285 Defendant Motive Technologies, Inc.'s Notice of Motion and Daubert Motion For Dr. Stephen B. Wicker (REDACTED) filed by Motive Technologies, Inc., and 288 MOTION for Summary Judgment *[Redacted]* filed by Motive Technologies, Inc.**<br><br>**Argument heard. The Court takes the motions under submission and will issue a written order.**<br><br>**Total Time in Court: 1 hour, 29 minutes.**<br>**Court Reporter: Kelly Shainline.**<br><br>**Attorneys for Plaintiffs: Adam Alper, Akshay Deoras, Leslie Schmidt, Kyle Calhoun, and Mike DeVries.**<br>**Attorneys for Defendant: Angela Tarasi and Brent Ray.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Date Filed: 1/14/2025) (Entered: 01/14/2025)** |
| 01/15/2025 | 337 | TRANSCRIPT ORDER for proceedings held on 01/14/2025 before Judge Rita F. Lin by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation, for Court Reporter Kelly Shainline. (Calhoun, Kyle) (Filed on 1/15/2025) (Entered: 01/15/2025) |
| 01/15/2025 | 338 | TRANSCRIPT ORDER for proceedings held on 1/14/2025 before Judge Rita F. Lin by Motive Technologies, Inc., for Court Reporter Kelly Shainline. (Ray, Brent) (Filed on 1/15/2025) (Entered: 01/15/2025) |
| 01/19/2025 | 339 | Transcript of Proceedings held on 1/14/2025, before Judge Rita F. Lin. Court Reporter/Transcriber Kelly Shainline, Official Court Reporter, telephone number (510)828-9404, Email: courtreporter232@gmail.com. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re337 Transcript Order, 338 Transcript Order ) Release of Transcript Restriction set for 4/21/2025. (Related documents(s) 337 , 338 ) (Shainline, Kelly) (Filed on 1/19/2025) (Entered: 01/19/2025) |
| 01/22/2025 | 340 | **ORDER. The parties are ordered to file a table summarizing the outstanding motions to seal by 1/29/2025. A template for this chart can be found on the Standing** |

| | | |
|---|---|---|
| | | **Orders section of Judge Lin's website. Signed by Judge Rita F. Lin on January 22, 2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 1/22/2025) (Entered: 01/22/2025)** |
| 01/29/2025 | 341 | *Joint Submission of Table Summarizing Outstanding Motions to Seal* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation (Attachments: # 1 Table Summarizing Outstanding Motions to Seal)(Calhoun, Kyle) (Filed on 1/29/2025) Modified on 1/30/2025 (jml, COURT STAFF). (Entered: 01/29/2025) |
| 02/03/2025 | 343 | **ORDER. The parties must jointly submit within fourteen (14) days of this Order a single proposed public version of the 342 Order with any proposed redactions indicated in red. If no proposed public version is submitted by the deadline, the document will be unsealed.**<br><br>**To the extent possible, the proposed redactions should be made electronically, in a single pdf file of the issued Order, using the Redact Tool within Adobe Acrobat. The proposed redactions should be submitted as marked but not yet applied. To provide the basis for each redaction, the parties shall cite to the existing motion to seal declarations. The proposed redactions or statement of no redactions should be submitted via email to rflpo@cand.uscourts.gov and not filed on ECF. Signed by Judge Rita F. Lin on February 3, 2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 2/3/2025) (Entered: 02/03/2025)** |
| 02/17/2025 | 344 | MOTION For Clarification of Summary Judgment Order (Dkt. 342) filed by Motive Technologies, Inc.. Motion Hearing set for 4/1/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 3/3/2025. Replies due by 3/10/2025. (Attachments: # 1 Declaration of Brent Ray In Support of Motive's Motion for Clarification, # 2 Exhibit 1 to Decl. of Brent Ray, # 3 Exhibit 2 to Decl. of Brent Ray, # 4 Exhibit 3 to Decl. of Brent Ray, # 5 Exhibit 4 to Decl. of Brent Ray, # 6 Exhibit 5 to Decl. of Brent Ray, # 7 Exhibit 6 to Decl. of Brent Ray, # 8 Exhibit 7 to Decl. of Brent Ray, # 9 Exhibit 8 to Decl. of Brent Ray, # 10 Proposed Order)(Ray, Brent) (Filed on 2/17/2025) (Entered: 02/17/2025) |
| 02/18/2025 | 345 | **ORDER by Judge Rita F. Lin denying 344 Motion for Clarification of Summary Judgment Order. (mkl, COURT STAFF) (Filed on 2/18/2025) (Entered: 02/18/2025)** |
| 02/20/2025 | 346 | CLERK'S NOTICE Regarding Proposed Redactions:<br><br>In the Order at Dkt. No. 343, the parties were directed to submit proposed redactions to the Court's summary judgment order within 14 days. That deadline has passed and no proposed redactions were filed. The Court will give the parties an additional 14 days until 3/6/2025 to file any proposed redactions in accordance with the Court's prior order (Dkt. No. 343). If no redactions are filed, the Court's summary judgment order will be unsealed without further notice.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Filed on 2/20/2025) (Entered: 02/20/2025) |
| 02/25/2025 | 347 | *Proposed Supplemental Juror Questionnaire* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation (Calhoun, Kyle) (Filed on 2/25/2025) Modified on 2/26/2025 (jml, COURT STAFF). (Entered: 02/25/2025) |
| 02/25/2025 | 348 | Proposed Jury Instructions by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation . (Calhoun, Kyle) (Filed on 2/25/2025) Modified on 2/26/2025 (jml, COURT STAFF). (Entered: 02/25/2025) |

| | | |
|---|---|---|
| 02/25/2025 | 349 | Proposed Jury Instructions by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation . (Calhoun, Kyle) (Filed on 2/25/2025) Modified on 2/26/2025 (jml, COURT STAFF). (Entered: 02/25/2025) |
| 03/04/2025 | 350 | NOTICE of Change of Address by Brent P. Ray (Ray, Brent) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 351 | MOTION in Limine *No. 1 re Motive's Activities at Pariso and Omnitracs Opposition (REDACTED)* filed by Motive Technologies, Inc.. Motion Hearing set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 3/18/2025. Replies due by 3/25/2025. (Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 352 | MOTION in Limine *#2 re Improper Alleged copying re '060 Patent and Omnitracs Opposition (REDACTED)* filed by Motive Technologies, Inc.. Motion Hearing set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 3/18/2025. Replies due by 3/25/2025. (Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 353 | MOTION in Limine *No. 3 re Improper Alleged Copying of XRS Patents and Omnitracs Opposition (REDACTED)* filed by Motive Technologies, Inc.. Motion Hearing set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 3/18/2025. Replies due by 3/25/2025. (Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 354 | MOTION in Limine *No. 4 re Plaintiffs' Untimely "Alphanumerical Rating" Theories and Omnitracs Opposition* filed by Motive Technologies, Inc.. Motion Hearing set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 3/18/2025. Replies due by 3/25/2025. (Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 355 | MOTION in Limine *No. 5 re Improper Evidence Regarding Alleged Willful Infringement (REDACTED)* filed by Motive Technologies, Inc.. Motion Hearing set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 3/18/2025. Replies due by 3/25/2025. (Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 356 | MOTION in Limine *No. 6 re Improper Alleged Wrongdoing by Plaintiffs' Former Employees and Omnitracs Opposition (REDACTED)* filed by Motive Technologies, Inc.. Motion Hearing set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 3/18/2025. Replies due by 3/25/2025. (Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 357 | MOTION in Limine *No. 7 re Infringement of Claim Limitations Based on the Doctrine of Equivalents and Omnitracs Opposition* filed by Motive Technologies, Inc.. Motion Hearing set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 3/18/2025. Replies due by 3/25/2025. (Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 358 | MOTION in Limine *No. 8 re Spoliation and Omnitracs Opposition (REDACTED)* filed by Motive Technologies, Inc.. Motion Hearing set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 3/18/2025. Replies due by 3/25/2025. (Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 359 | MOTION in Limine *No. 9 re Omnitracs Evidence and Omnitracs Opposition (REDACTED)* filed by Motive Technologies, Inc.. Motion Hearing set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. |

| | | |
|---|---|---|
| | | Responses due by 3/18/2025. Replies due by 3/25/2025. (Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 360 | *****DISREGARD. ERROR IN FILING PER FILER. SEE DOCKET # 376 FOR CORRECTED FILING.*****<br><br>Declaration of Angela Tarasi in Support of 355 MOTION in Limine *No. 5 re Improper Evidence Regarding Alleged Willful Infringement (REDACTED)*, 358 MOTION in Limine *No. 8 re Spoliation and Omnitracs Opposition (REDACTED)*, 359 MOTION in Limine *No. 9 re Omnitracs Evidence and Omnitracs Opposition (REDACTED)*, 354 MOTION in Limine *No. 4 re Plaintiffs' Untimely "Alphanumerical Rating" Theories and Omnitracs Opposition*, 351 MOTION in Limine *No. 1 re Motive's Activities at Pariso and Omnitracs Opposition (REDACTED)*, 357 MOTION in Limine *No. 7 re Infringement of Claim Limitations Based on the Doctrine of Equivalents and Omnitracs Opposition*, 356 MOTION in Limine *No. 6 re Improper Alleged Wrongdoing by Plaintiffs' Former Employees and Omnitracs Opposition (REDACTED)*, 352 MOTION in Limine *#2 re Improper Alleged copying re '060 Patent and Omnitracs Opposition (REDACTED)*, 353 MOTION in Limine *No. 3 re Improper Alleged Copying of XRS Patents and Omnitracs Opposition (REDACTED) [Declaration of Angela Tarasi in support of Motive's Motions in Limine Nos. 1-9]* filed byMotive Technologies, Inc.. (Attachments: # 1 Exhibit 1 (Sealed), # 2 Exhibit 2 (Sealed), # 3 Exhibit 3 (Sealed), # 4 Exhibit 4 (Sealed), # 5 Exhibit 5 (Sealed), # 6 Exhibit 6 (Sealed), # 7 Exhibit 7 (Sealed), # 8 Exhibit 8 (Sealed), # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12 (Sealed), # 13 Exhibit 13 (Sealed), # 14 Exhibit 14 (Sealed), # 15 Exhibit 15 (Sealed), # 16 Exhibit 16 (Sealed), # 17 Exhibit 17 (Sealed), # 18 Exhibit 18, # 19 Exhibit 19 (Sealed), # 20 Exhibit 20 (Sealed), # 21 Exhibit 21, # 22 Exhibit 22 (Sealed), # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26 (Sealed), # 27 Exhibit 27 (Sealed), # 28 Exhibit 28 (Sealed), # 29 Exhibit 29 (Sealed), # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33 (Sealed), # 34 Exhibit 34 (Sealed), # 35 Exhibit 35 (Sealed))(Related document(s) 355 , 358 , 359 , 354 , 351 , 357 , 356 , 352 , 353 ) (Tarasi, Angela) (Filed on 3/4/2025) Modified on 3/6/2025 (jml, COURT STAFF). (Entered: 03/04/2025) |
| 03/04/2025 | 361 | DECLARATION of Kyle A. Calhoun in Opposition to 355 MOTION in Limine *No. 5 re Improper Evidence Regarding Alleged Willful Infringement (REDACTED)*, 358 MOTION in Limine *No. 8 re Spoliation and Omnitracs Opposition (REDACTED)*, 359 MOTION in Limine *No. 9 re Omnitracs Evidence and Omnitracs Opposition (REDACTED)*, 354 MOTION in Limine *No. 4 re Plaintiffs' Untimely "Alphanumerical Rating" Theories and Omnitracs Opposition*, 351 MOTION in Limine *No. 1 re Motive's Activities at Pariso and Omnitracs Opposition (REDACTED)*, 357 MOTION in Limine *No. 7 re Infringement of Claim Limitations Based on the Doctrine of Equivalents and Omnitracs Opposition*, 356 MOTION in Limine *No. 6 re Improper Alleged Wrongdoing by Plaintiffs' Former Employees and Omnitracs Opposition (REDACTED)*, 352 MOTION in Limine *#2 re Improper Alleged copying re '060 Patent and Omnitracs Opposition (REDACTED)*, 353 MOTION in Limine *No. 3 re Improper Alleged Copying of XRS Patents and Omnitracs Opposition (REDACTED)* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL, # 39 Exhibit MM, # 40 Exhibit NN, # 41 Exhibit OO, # 42 Exhibit PP, # 43 Exhibit QQ, # 44 Exhibit RR, # 45 Exhibit SS, # 46 Exhibit TT, # 47 Exhibit UU, # 48 Exhibit VV, # 49 Exhibit WW, # 50 Exhibit XX, # 51 Exhibit YY, # 52 Exhibit ZZ, # 53 |

| | | |
|---|---|---|
| | | Exhibit AAA, # 54 Exhibit BBB, # 55 Exhibit CCC, # 56 Exhibit DDD)(Related document(s) 355 , 358 , 359 , 354 , 351 , 357 , 356 , 352 , 353 ) (Calhoun, Kyle) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 362 | Administrative Motion to File Under Seal *[Defendant's Motion to Seal Portions of and Exhibits to Defendant's Motions in Limine]* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Katherine Vessels, # 2 Proposed Order, # 3 Motive MIL 1, # 4 Motive MIL 2, # 5 Motive MIL 3, # 6 Motive MIL 5, # 7 Motive MIL 6, # 8 Motive MIL 8, # 9 Ex. 1, # 10 Ex. 2, # 11 Ex. 3, # 12 Ex. 4, # 13 Ex. 5, # 14 Ex. 8, # 15 Ex. 12, # 16 Ex. 13, # 17 Ex. 14, # 18 Ex. 15, # 19 Ex. 16, # 20 Ex. 17, # 21 Ex. 19, # 22 Ex. 26, # 23 Ex. 28, # 24 Ex. 29, # 25 Ex. 33, # 26 Ex. 34, # 27 Ex. 35)(Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 363 | DECLARATION of Angela Tarasi *in Support of Defendant Motive Technologies, Inc.'s Oppositions to Plaintiffs Motions in Limine* filed byMotive Technologies, Inc.. (Attachments: # 1 Exhibit 1 (Sealed), # 2 Exhibit 2 (Sealed), # 3 Exhibit 3 (Sealed), # 4 Exhibit 4 (Sealed), # 5 Exhibit 5 (Sealed), # 6 Exhibit 6 (Sealed), # 7 Exhibit 7 (Sealed), # 8 Exhibit 8 (Sealed), # 9 Exhibit 9, # 10 Exhibit 10 (Sealed))(Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 364 | MOTION in Limine *No. 1 Re: Motive's Alleged Good Faith Belief of Noninfringement as Defense to Willful Infringement* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. Motion Hearing set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 3/18/2025. Replies due by 3/25/2025. (Attachments: # 1 Proposed Order)(Calhoun, Kyle) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 365 | MOTION in Limine *No. 2 Re: Precluding Motive from Introducing Testimony Disparaging Omnitracs or Omnitracs' Products Prior to Acquiring Smartdrive* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. Motion Hearing set for 3/18/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 3/18/2025. Replies due by 3/25/2025. (Attachments: # 1 Proposed Order)(Calhoun, Kyle) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 366 | Administrative Motion to File Under Seal *[Defendant's Motion to Seal Portions of and Exhibits to Defendant's Oppositions to Plaintiffs Motion in Limine]* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Katherine Vessels, # 2 Proposed Order, # 3 Motion Opp to OT MIL 1, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7)(Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 367 | Declaration of Kyle A. Calhoun in Support of 364 MOTION in Limine *No. 1 Re: Motive's Alleged Good Faith Belief of Noninfringement as Defense to Willful Infringement*, 365 MOTION in Limine *No. 2 Re: Precluding Motive from Introducing Testimony Disparaging Omnitracs or Omnitracs' Products Prior to Acquiring Smartdrive* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25)(Related document(s) 364 , 365 ) (Calhoun, Kyle) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 368 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *[Defendant's Administrative Motion to Consider Whether Plaintiffs' Information in Defendant's Motions in Limine & Defendant's Oppositions to Plaintiff's Motions in Limine Should be Sealed]* filed by Motive Technologies, Inc.. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Declaration of Katherine Vessels, # 2 Proposed Order, # 3 Motive Opp to OT MIL 2, # 4 Exhibit 6, # 5 Exhibit 7, # 6 Exhibit 20, # 7 Exhibit 22, # 8 Exhibit 27, # 9 Exhibit Opp Ex. 8, # 10 Exhibit Opp Ex. 10)(Tarasi, Angela) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 369 | Administrative Motion to File Under Seal *Plaintiffs' Confidential Information in Plaintiffs' Motion in Limine No. 2 and Certain Exhibits in Support of Motions in Limine* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order, # 3 Motion in Limine No. 2, # 4 Exhibit 16, # 5 Exhibit 17, # 6 Exhibit 18, # 7 Exhibit 19, # 8 Exhibit 20, # 9 Exhibit 21, # 10 Exhibit 22, # 11 Exhibit 23, # 12 Exhibit 24, # 13 Exhibit 25)(Calhoun, Kyle) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 370 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Plaintiffs' Administrative Motion to Consider Whether Motive's Material in Plaintiffs' Motion in Limine No. 1 and Certain Exhibits in Support of Motions in Limine should be Sealed* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order, # 3 Plaintiffs' MIL No. 1, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 15)(Calhoun, Kyle) (Filed on 3/4/2025) (Entered: 03/04/2025) |
| 03/04/2025 | 371 | *****DISREGARD. ERROR IN FILING PER FILER, SEE CORRECTED FILING AT DOCKET # 375 .***** Administrative Motion to File Under Seal *Plaintiffs' Opposition to Motive's Motion in Limine No. 9 and Certain Exhibits in Support of Oppositions to Motions in Limine* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order, # 3 Exhibit A, # 4 Exhibit G, # 5 Exhibit H, # 6 Exhibit I, # 7 Exhibit K, # 8 Exhibit L, # 9 Exhibit M, # 10 Exhibit N, # 11 Exhibit O, # 12 Exhibit T, # 13 Exhibit X, # 14 Exhibit Y, # 15 Exhibit II, # 16 Exhibit LL, # 17 Exhibit SS, # 18 Exhibit YY) (Calhoun, Kyle) (Filed on 3/4/2025) Modified on 3/5/2025 (anj, COURT STAFF). Modified on 3/5/2025 (jml, COURT STAFF). (Entered: 03/04/2025) |
| 03/04/2025 | 372 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Plaintiffs' Administrative Motion to Consider Whether Motive's Material in Plaintiffs' Oppositions to Motive's Motions In Limine Nos. 1 and 8 and Certain Exhibits in Support of Oppositions to Motions in Limine Should be Sealed* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order, # 3 Plaintiffs' Opposition to MIL No. 1, # 4 Plaintiffs' Opposition to MIL No. 8, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit P, # 11 Exhibit Q, # 12 Exhibit U, # 13 Exhibit V, # 14 Exhibit W, # 15 Exhibit Z, # 16 Exhibit AA, # 17 Exhibit BB, # 18 Exhibit CC, # 19 Exhibit DD, # 20 Exhibit EE, # 21 Exhibit FF, # 22 Exhibit GG, # 23 Exhibit JJ, # 24 Exhibit KK, # 25 Exhibit MM, # 26 Exhibit NN, # 27 Exhibit OO, # 28 Exhibit PP, # 29 Exhibit RR, # 30 Exhibit TT, # 31 Exhibit UU, # 32 Exhibit VV, # 33 Exhibit WW, # 34 Exhibit BBB, # 35 Exhibit CCC, # 36 Exhibit DDD)(Calhoun, Kyle) (Filed on 3/4/2025) (Entered: 03/05/2025) |
| 03/05/2025 | 373 | Pretrial Conference Statement by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation *Joint Pretrial Conference Statement*. (Calhoun, Kyle) (Filed on 3/5/2025) (Entered: 03/05/2025) |
| 03/05/2025 | 374 | **ORDER. The parties are ORDERED to deliver to the Court a USB flash drive containing the following materials by 3/10/2025:** |

| | | |
|---|---|---|
| | | **- Each unsealed motion in limine, collated into a single document with the corresponding unsealed opposition. If the motion in limine and/or opposition contains no redactions, it should still be included in its original form on the flash drive.<br>- All exhibits referenced in the motions in limine and oppositions, in either their unsealed form (if the exhibit contains redactions) or their original form (if the exhibit did not contain redactions).<br><br>Signed by Judge Rita F. Lin on March 5, 2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 3/5/2025) (Entered: 03/05/2025)** |
| 03/05/2025 | 375 | Administrative Motion to File Under Seal *Plaintiffs' Opposition to Motive's Motion in Limine No. 9 and Certain Exhibits in Support of Plaintiffs' Oppositions to Motions in Limine CORRECTION OF DOCKET # 371* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order, # 3 Opposition to MIL No. 9, # 4 Exhibit A, # 5 Exhibit G, # 6 Exhibit H, # 7 Exhibit I, # 8 Exhibit K, # 9 Exhibit L, # 10 Exhibit M, # 11 Exhibit N, # 12 Exhibit O, # 13 Exhibit T, # 14 Exhibit X, # 15 Exhibit Y, # 16 Exhibit II, # 17 Exhibit LL, # 18 Exhibit SS, # 19 Exhibit YY)(Calhoun, Kyle) (Filed on 3/5/2025) (Entered: 03/05/2025) |
| 03/05/2025 | 376 | Declaration of Angela Tarasi in Support of 355 MOTION in Limine *No. 5 re Improper Evidence Regarding Alleged Willful Infringement (REDACTED)*, 358 MOTION in Limine *No. 8 re Spoliation and Omnitracs Opposition (REDACTED)*, 359 MOTION in Limine *No. 9 re Omnitracs Evidence and Omnitracs Opposition (REDACTED)*, 354 MOTION in Limine *No. 4 re Plaintiffs' Untimely "Alphanumerical Rating" Theories and Omnitracs Opposition*, 351 MOTION in Limine *No. 1 re Motive's Activities at Pariso and Omnitracs Opposition (REDACTED)*, 357 MOTION in Limine *No. 7 re Infringement of Claim Limitations Based on the Doctrine of Equivalents and Omnitracs Opposition*, 356 MOTION in Limine *No. 6 re Improper Alleged Wrongdoing by Plaintiffs' Former Employees and Omnitracs Opposition (REDACTED)*, 352 MOTION in Limine *#2 re Improper Alleged copying re '060 Patent and Omnitracs Opposition (REDACTED)*, 353 MOTION in Limine *No. 3 re Improper Alleged Copying of XRS Patents and Omnitracs Opposition (REDACTED) [Declaration of Angela Tarasi in support of Motive's Motions in Limine Nos. 1-9] CORRECTION OF DOCKET # 360* filed byMotive Technologies, Inc.. (Attachments: # 1 Exhibit 1 (Sealed), # 2 Exhibit 2 (Sealed), # 3 Exhibit 3 (Sealed), # 4 Exhibit 4 (Sealed), # 5 Exhibit 5 (Sealed), # 6 Exhibit 6 (Sealed), # 7 Exhibit 7 (Sealed), # 8 Exhibit 8 (Sealed), # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12 (Sealed), # 13 Exhibit 13 (Sealed), # 14 Exhibit 14 (Sealed), # 15 Exhibit 15 (Sealed), # 16 Exhibit 16 (Sealed), # 17 Exhibit 17 (Sealed), # 18 Exhibit 18, # 19 Exhibit 19 (Sealed), # 20 Exhibit 20 (Sealed), # 21 Exhibit 21, # 22 Exhibit 22 (Sealed), # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26 (Redacted), # 27 Exhibit 27 (Redacted), # 28 Exhibit 28 (Sealed), # 29 Exhibit 29 (Sealed), # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33 (Sealed), # 34 Exhibit 34 (Sealed), # 35 Exhibit 35 (Sealed))(Related document(s) 355 , 358 , 359 , 354 , 351 , 357 , 356 , 352 , 353 ) (Tarasi, Angela) (Filed on 3/5/2025) (Entered: 03/05/2025) |
| 03/05/2025 | 377 | NOTICE of Change of Address by Thomas J. Friel, Jr *[Motive's Notice of Address Change re Thomas J. Friel, Jr. and Shane Brun]* (Friel, Thomas) (Filed on 3/5/2025) (Entered: 03/05/2025) |
| 03/11/2025 | 378 | *Joint Involved Individuals List* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation (Calhoun, Kyle) (Filed on 3/11/2025) Modified on 3/12/2025 (jml, COURT STAFF). (Entered: 03/11/2025) |

| | | |
|---|---|---|
| 03/11/2025 | 379 | *Joint Trial Exhibit List* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Calhoun, Kyle) (Filed on 3/11/2025) Modified on 3/12/2025 (jml, COURT STAFF). (Entered: 03/11/2025) |
| 03/11/2025 | 380 | Proposed Form of Verdict by Motive Technologies, Inc. . (Tarasi, Angela) (Filed on 3/11/2025) (Entered: 03/11/2025) |
| 03/11/2025 | 381 | Declaration in Support of 368 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *[Defendant's Administrative Motion to Consider Whether Plaintiffs' Information in Defendant's Motions in Limine & Defendant's Oppositions t filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Related document(s) 368 ) (Calhoun, Kyle) (Filed on 3/11/2025) (Entered: 03/11/2025)* |
| 03/11/2025 | 382 | *Joint Notice of Supplemental Joint Pretrial Conference Statement* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 373 Pretrial Conference Statement (Attachments: # 1 Exhibit A (Supplemental Joint Pretrial Conference Statement), # 2 Exhibit B (Redline of Supplemental Joint Pretrial Conference Statement))(Calhoun, Kyle) (Filed on 3/11/2025) Modified on 3/12/2025 (jml, COURT STAFF). (Entered: 03/11/2025) |
| 03/11/2025 | 383 | Proposed Form of Verdict by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation . (Calhoun, Kyle) (Filed on 3/11/2025) (Entered: 03/11/2025) |
| 03/11/2025 | 384 | *Joint Filing Re Disputed Proposed Statement of the Case* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Calhoun, Kyle) (Filed on 3/11/2025) Modified on 3/12/2025 (jml, COURT STAFF). (Entered: 03/11/2025) |
| 03/11/2025 | 385 | Declaration of Katherine Vessels in Support of 370 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Plaintiffs' Administrative Motion to Consider Whether Motive's Material in Plaintiffs' Motion in Limine No. 1 and Certain Exhibits in Support of filed byMotive Technologies, Inc.. (Related document(s) 370 ) (Vessels, Katherine) (Filed on 3/11/2025) (Entered: 03/11/2025)* |
| 03/11/2025 | 386 | Declaration of Katherine Vessels in Support of 372 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Plaintiffs' Administrative Motion to Consider Whether Motive's Material in Plaintiffs' Oppositions to Motive's Motions In Limine Nos. 1 and filed byMotive Technologies, Inc.. (Related document(s) 372 ) (Vessels, Katherine) (Filed on 3/11/2025) (Entered: 03/11/2025)* |
| 03/14/2025 | 387 | **TENTATIVE RULINGS ON PRE-TRIAL MATTERS. Signed by Judge Rita F. Lin on 3/14/2025. (Attachments: # 1 Exhibit A - Tentative Rulings on Disputed Final Jury Instructions, # 2 Exhibit B - Tentative Rulings on Disputed Preliminary Jury Instructions, # 3 Exhibit C - Tentative Order on Motions in Limine and Pretrial Matters)(mkl, COURT STAFF) (Filed on 3/14/2025) (Entered: 03/14/2025)** |
| 03/17/2025 | 388 | **SUPPLEMENTAL TENTATIVE RULINGS ON PRE-TRIAL MATTERS re Dkt. No. 387 . Signed by Judge Rita F. Lin on 3/17/2025. (Attachments: # 1 Exhibit D - Tentative Verdict Form)(mkl, COURT STAFF) (Filed on 3/17/2025) (Entered: 03/17/2025)** |
| 03/18/2025 | 389 | **Minute Entry for proceedings held before Judge Rita F. Lin: Pretrial Conference held on 3/18/2025.**<br><br>**Excusal Hearing/Final Pretrial Conference set for 4/9/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor.**<br><br>**Total Time in Court: 1 hour, 41 minutes.**<br>**Court Reporter: April Brott.** |

| | | |
|---|---|---|
| | | **Attorneys for Plaintiffs: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler, and Kyle Calhoun.**<br>**Attorneys for Defendant: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Mikaela Stone, Patrick Lafferty, Roy Falik, and Zachary Coots.**<br><br>**(mkl, COURT STAFF) (Date Filed: 3/18/2025) (Entered: 03/19/2025)** |
| 03/19/2025 | 390 | TRANSCRIPT ORDER for proceedings held on March 18, 2025 before Judge Rita F. Lin by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation, for Court Reporter April Brott. (Calhoun, Kyle) (Filed on 3/19/2025) (Entered: 03/19/2025) |
| 03/19/2025 | 391 | TRANSCRIPT ORDER for proceedings held on March 18, 2025 before Judge Rita F. Lin by Motive Technologies, Inc., for Court Reporter April Brott. (Tarasi, Angela) (Filed on 3/19/2025) (Entered: 03/19/2025) |
| 03/24/2025 | 392 | **ORDER REGARDING MOTIONS IN LIMINE AND PRETRIAL MATTERS. Signed by Judge Rita F. Lin on 3/24/2025. (mkl, COURT STAFF) (Filed on 3/24/2025) (Entered: 03/24/2025)** |
| 03/24/2025 | | Set Deadlines/Hearings: Jury Selection set for 4/14/2025 08:15 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Jury Trial set for 4/14/2025 - 4/25/2025 08:15 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. (mkl, COURT STAFF) (Filed on 3/24/2025) (Entered: 03/24/2025) |
| 03/25/2025 | 393 | Clerk's Notice re Trial Deadline for Ordering Daily Transcript and/or Realtime Reporting:<br><br>The deadline to request daily transcripts or Realtime reporting for counsel during trial is 3/28/2025.<br><br>More details regarding daily transcripts or Realtime during trial are available on the Transcripts/Court Reporters webpage (see section III) at https://www.cand.uscourts.gov/about/clerks-office/transcripts-court-reporters/<br><br>Contact Court Reporter Supervisor Kristen Melen with questions at kristen_melen@cand.uscourts.gov by the deadline above.<br><br>(knm, COURT STAFF) (Filed on 3/25/2025) (Entered: 03/25/2025) |
| 03/25/2025 | 394 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Calhoun, Kyle) (Filed on 3/25/2025) (Entered: 03/25/2025) |
| 03/26/2025 | 395 | Transcript of Proceedings held on March 18, 2025, before Judge Rita Lin. Court Reporter/Transcriber April Wood Brott, telephone number 510-225-8350 april_brott@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re390 Transcript Order ) Release of Transcript Restriction set for 6/24/2025. (Related documents(s) 390 ) (Brott, April) (Filed on 3/26/2025) (Entered: 03/26/2025) |
| 03/26/2025 | 396 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts by Motive Technologies, Inc.. (Tarasi, Angela) (Filed on 3/26/2025) (Entered: 03/26/2025) |
| 03/31/2025 | 397 | Joint ADMINISTRATIVE MOTION to Permit Entry and Use of Electronic Equipment in the Courtroom During Trial filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS |

| | | |
|---|---|---|
| | | Corporation. Responses due by 4/4/2025. (Attachments: # 1 Proposed Order)(Calhoun, Kyle) (Filed on 3/31/2025) (Entered: 03/31/2025) |
| 04/01/2025 | 398 | **REDACTED ORDER GRANTING IN PART AND DENYING IN PART MOTIVE'S MOTION FOR SUMMARY JUDGMENT; GRANTING MOTIVE'S MOTION FOR JUDGMENT ON THE PLEADINGS; DENYING MOTIVE'S DAUBERT MOTIONS; GRANTING IN PART AND DENYING IN PART MOTIVE'S MOTION TO STRIKE BERGMAN AND DR. WICKER'S REPORTS. Signed by Judge Rita F. Lin on 2/3/2025. (mkl, COURT STAFF) (Filed on 4/1/2025) (Entered: 04/01/2025)** |
| 04/01/2025 | 399 | **ORDER by Judge Rita F. Lin granting 397 Administrative Motion Permitting Entry and Use of Electronic Equipment in the Courtroom During Trial. (mkl, COURT STAFF) (Filed on 4/1/2025) (Entered: 04/01/2025)** |
| 04/01/2025 | 400 | **TENTATIVE VERDICT FORM AND PROPOSED BIFURCATION OF DAMAGES. Signed by Judge Rita F. Lin on 4/1/2025. (Attachments: # 1 Exhibit A - Tentative Verdict Form)(mkl, COURT STAFF) (Filed on 4/1/2025) (Entered: 04/01/2025)** |
| 04/01/2025 | 401 | ADMINISTRATIVE MOTION for Claim Narrowing Before Trial filed by Motive Technologies, Inc.. Responses due by 4/7/2025. (Attachments: # 1 Declaration of Angela Tarasi, # 2 Proposed Order)(Tarasi, Angela) (Filed on 4/1/2025) (Entered: 04/01/2025) |
| 04/02/2025 | 402 | **ORDER. Due to the time-sensitivity of the matter, Plaintiffs are ORDERED to file a response to the 401 Administrative Motion by April 4, 2025 at 11 a.m. PT. Signed by Judge Rita F. Lin on April 2, 2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 4/2/2025) (Entered: 04/02/2025)** |
| 04/02/2025 | 403 | ADMINISTRATIVE MOTION to Seal the Courtroom for Portions of Trial filed by Motive Technologies, Inc.. Responses due by 4/7/2025. (Attachments: # 1 Joint Stipulation in support of Motion, # 2 Proposed Order)(Tarasi, Angela) (Filed on 4/2/2025) (Entered: 04/02/2025) |
| 04/02/2025 | 404 | Proposed Jury Instructions by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation *Proposed Final Jury Instruction Nos. 35 and 50*. (Calhoun, Kyle) (Filed on 4/2/2025) (Entered: 04/03/2025) |
| 04/03/2025 | 405 | CLERK'S NOTICE Regarding Jury Selection:<br><br>Notice is hereby given that the Jury Selection set for 4/14/2025 will now take place on **4/11/2025** 08:15 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Filed on 4/3/2025) (Entered: 04/03/2025) |
| 04/03/2025 | 406 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-20530340.) filed by Motive Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing (GA))(Whittaker, Andrew) (Filed on 4/3/2025) (Entered: 04/03/2025) |
| 04/04/2025 | 407 | OPPOSITION/RESPONSE (re 401 ADMINISTRATIVE MOTION for Claim Narrowing Before Trial ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Exhibit 1)(Calhoun, Kyle) (Filed on 4/4/2025) (Entered: 04/04/2025) |

| | | |
|---|---|---|
| 04/04/2025 | 408 | **ORDER by Judge Rita F. Lin granting 406 Motion for Pro Hac Vice as to Andrew Whittaker. (mkl, COURT STAFF) (Filed on 4/4/2025) (Entered: 04/04/2025)** |
| 04/04/2025 | 409 | **ORDER by Judge Rita F. Lin granting in part and denying in part 401 Administrative Motion for Claim Narrowing Before Trial. (mkl, COURT STAFF) (Filed on 4/4/2025) (Entered: 04/04/2025)** |
| 04/07/2025 | 410 | **PROPOSED FINAL JURY INSTRUCTIONS. Signed by Judge Rita F. Lin on 4/7/2025. (Attachments: # 1 Exhibit A - Proposed Final Jury Instructions, # 2 Exhibit B - Court's Reasoning)(mkl, COURT STAFF) (Filed on 4/7/2025) (Entered: 04/07/2025)** |
| 04/07/2025 | 411 | **ORDER TO SHOW CAUSE WHY ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL SHOULD NOT BE DENIED. Show Cause Response due by 5/5/2025. Signed by Judge Rita F. Lin on 4/7/2025. (mkl, COURT STAFF) (Filed on 4/7/2025) (Entered: 04/07/2025)** |
| 04/07/2025 | 412 | *Joint Filing of Designations of Deposition Testimony*by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Calhoun, Kyle) (Filed on 4/7/2025) Modified on 4/8/2025 (jml, COURT STAFF). (Entered: 04/07/2025) |
| 04/07/2025 | 413 | *Omnitracs' Selection of Narrowed Asserted Claims* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation (Calhoun, Kyle) (Filed on 4/7/2025) Modified on 4/8/2025 (jml, COURT STAFF). (Entered: 04/07/2025) |
| 04/08/2025 | 414 | **ORDER. The parties are ORDERED to file the excerpts of deposition testimony referenced in the 412 designations and counter-designations by April 9, 2025. Signed by Judge Rita F. Lin on April 8, 2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 4/8/2025) (Entered: 04/08/2025)** |
| 04/08/2025 | 415 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-20542522.) filed by Motive Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing)(Kennedy, Mary) (Filed on 4/8/2025) (Entered: 04/08/2025) |
| 04/08/2025 | 416 | **FINAL PRELIMINARY JURY INSTRUCTIONS. Signed by Judge Rita F. Lin on April 8, 2025. (rfllc2, COURT STAFF) (Filed on 4/8/2025) (Entered: 04/08/2025)** |
| 04/08/2025 | 417 | *Supplemental Joint Involved Individuals List* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation (Calhoun, Kyle) (Filed on 4/8/2025) Modified on 4/9/2025 (jml, COURT STAFF). (Entered: 04/08/2025) |
| 04/09/2025 | 418 | **ORDER by Judge Rita F. Lin granting 415 Motion for Pro Hac Vice as to Mary Kennedy. (mkl, COURT STAFF) (Filed on 4/9/2025) (Entered: 04/09/2025)** |
| 04/09/2025 | 419 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-20547049.) filed by Motive Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing)(Valuyev, Eric) (Filed on 4/9/2025) (Entered: 04/09/2025) |
| 04/09/2025 | 420 | **ORDER REGARDING BIFURCATION. Signed by Judge Rita F. Lin on 4/9/2025. (klh, COURT STAFF) (Filed on 4/9/2025) (Entered: 04/09/2025)** |
| 04/09/2025 | 421 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-20549590.) filed by Motive Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing)(Stone, Mikaela) (Filed on 4/9/2025) (Entered: 04/09/2025) |
| 04/09/2025 | 422 | *Supplemental Joint Trial Exhibit List* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Calhoun, Kyle) |

| | | |
|---|---|---|
| | | (Filed on 4/9/2025) Modified on 4/10/2025 (jml, COURT STAFF). (Entered: 04/09/2025) |
| 04/09/2025 | 423 | **Minute Entry for proceedings held before Judge Rita F. Lin:**<br><br>**Final Pretrial Conference/Excusal Hearing held on 4/9/2025.**<br>**Joint brief, no longer than 10 pages, due by Friday, 4/11/2025.**<br>**Court vacated the 4/9/2025 date to submit excerpts of deposition testimony.**<br>**Counsel shall arrive by 8:30 AM on Friday, 4/11/2025 for jury selection.**<br><br>**Total Time in Court: 1 H 3 M.**<br>**Court Reporter: Ruth Levine Ekhaus.**<br>**Attorneys for Plaintiff: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler, and Kyle Calhoun.**<br>**Attorneys for Defendants: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Andrew Whittaker, Mark Zambarda.**<br><br>**(klh, COURT STAFF) (Date Filed: 4/9/2025) (Entered: 04/10/2025)** |
| 04/10/2025 | 424 | CLERK'S NOTICE. Local counsel Shane Brun's address listed in the the pro hac application for Mikaela Stone 421 , does not match what is on ECF. Mr. Brun needs to update his address in his ECF Attorney Account.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (klh, COURT STAFF) (Filed on 4/10/2025) (Entered: 04/10/2025) |
| 04/10/2025 | 425 | **Order. Signed 4/10/2025 by Judge Rita F. Lin granting 421 Motion for Pro Hac Vice for Mikaela Stone.(klh, COURT STAFF) (Filed on 4/10/2025) (Entered: 04/10/2025)** |
| 04/10/2025 | 426 | **Order. Signed 4/10/2025 by Judge Rita F. Lin granting 419 Motion for Pro Hac Vice for Eric Valuyev.(klh, COURT STAFF) (Filed on 4/10/2025) (Entered: 04/10/2025)** |
| 04/10/2025 | 427 | TRANSCRIPT ORDER for proceedings held on 04/09/2025 before Judge Rita F. Lin by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation, for Court Reporter Ruth Ekhaus. (Calhoun, Kyle) (Filed on 4/10/2025) (Entered: 04/10/2025) |
| 04/10/2025 | 428 | TRANSCRIPT ORDER for proceedings held on 4/9/2025 before Judge Rita F. Lin by Motive Technologies, Inc., for Court Reporter Ruth Ekhaus. (Tarasi, Angela) (Filed on 4/10/2025) (Entered: 04/10/2025) |
| 04/11/2025 | 429 | **Minute Entry for proceedings held before Judge Rita F. Lin:**<br><br>**Jury Selection held on 4/11/2025.**<br><br>**Total Time in Court: 3 H 45 M.**<br>**Court Reporter: Debra Pas.**<br>**Attorneys for Plaintiff: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler.**<br>**Attorneys for Defendants: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Mikaela Stone, Andrew Whittaker.**<br><br>**(klh, COURT STAFF) (Date Filed: 4/11/2025) (Entered: 04/11/2025)** |
| 04/11/2025 | 430 | Transcript of Proceedings held on 04/09/2025, before Judge Rita F. Lin. Court Reporter Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG CSR No. 12219, telephone number ruth_ekhaus@cand.uscourts.gov /(415)336-5223 . Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date, it may be obtained through PACER. |

| | | |
|---|---|---|
| | | Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re427 Transcript Order, 428 Transcript Order ) Release of Transcript Restriction set for 7/10/2025. (Related documents(s) 427 , 428 ) (rre, COURT STAFF) (Filed on 4/11/2025) (Entered: 04/11/2025) |
| 04/11/2025 | 431 | Brief *Joint Submission Regarding Whether the Issue of Omnitracs Being an Implied Exclusive Licensee to the Asserted Patents is a Question of Law for the Judge or a Question of Fact* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Schmidt, Leslie) (Filed on 4/11/2025) (Entered: 04/11/2025) |
| 04/12/2025 | 432 | NOTICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation *April 12, 2025 Joint Notification of Objections to Deposition Designations Testimony* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Schmidt, Leslie) (Filed on 4/12/2025) (Entered: 04/12/2025) |
| 04/13/2025 | 433 | **ORDER. It appears that Dkt. 432-4 contains the the Pulver deposition transcript, not the Johns deposition transcript as indicated by the parties' 432 joint notification of objections. The parties are ORDERED to submit a corrected exhibit as soon as possible and no later than 8 a.m. on 4/14/2025. Signed by Judge Rita F. Lin on 4/13/2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 4/13/2025) Modified on 4/13/2025 (rfllc2, COURT STAFF). (Entered: 04/13/2025)** |
| 04/13/2025 | 434 | NOTICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 432 Notice (Other), 433 Order,, *Supplemental Submission to Dkt. 432 Regarding Objections to Deposition Testimony* (Attachments: # 1 Corrected Exhibit A, # 2 Corrected Exhibit B, # 3 Corrected Exhibit D)(Schmidt, Leslie) (Filed on 4/13/2025) (Entered: 04/13/2025) |
| 04/13/2025 | 435 | Exhibit List *Second Supplemental Joint Trial Exhibit List* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Calhoun, Kyle) (Filed on 4/13/2025) (Entered: 04/13/2025) |
| 04/14/2025 | 436 | **Amended Minute Entry for proceedings held before Judge Rita F. Lin:**<br><br>**Jury Selection held on 4/11/2025.**<br><br>**Total Time in Court: 3 H 45 M.**<br>**Court Reporter: Debra Pas.**<br>**Attorneys for Plaintiff: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler.**<br>**Attorneys for Defendants: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Mikaela Stone, Andrew Whittaker.**<br><br>See Minute Entry 429 for trial log.<br><br>*amended to correct typographical error. See 429 for trial log.(klh, COURT STAFF) (Filed on 4/14/2025) (Entered: 04/14/2025) |
| 04/14/2025 | 437 | **ORDER REGARDING APRIL 12, 2025 OBJECTIONS TO DEPOSITION DESIGNATIONS TESTIMONY. Signed by Judge Rita F. Lin on April 14, 2025. (rfllc2, COURT STAFF) (Filed on 4/14/2025) (Entered: 04/14/2025)** |
| 04/14/2025 | 438 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-20565062.) filed by Omnitracs, LLC, XRS Corporation. (Attachments: # 1 Exhibit Cert of Good Standing - TX State Bar, # 2 Exhibit Cert of Good Standing - Austin SC)(Melde, Ryan) (Filed on 4/14/2025) (Entered: 04/14/2025) |
| 04/14/2025 | 439 | Exhibit List *Third Supplemental Joint Trial Exhibit List* by Motive Technologies, Inc... (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Tarasi, Angela) (Filed on |

| | | |
|---|---|---|
| | | 4/14/2025) (Entered: 04/14/2025) |
| 04/15/2025 | 440 | STIPULATION WITH PROPOSED ORDER *Concerning Jury Instruction to Redacted Materials* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Alper, Adam) (Filed on 4/15/2025) (Entered: 04/15/2025) |
| 04/15/2025 | 441 | **Minute Entry for proceedings held before Judge Rita F. Lin:**<br><br>**Jury Trial began on 4/14/2025. Jury trial continues on 4/15/2025 at 8:15 AM. See attached trial log.**<br><br>**Total Time in Court: 5 H 54 M.**<br>**Court Reporter: Debra Pas.**<br>**Attorneys for Plaintiff: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler, and Kyle Calhoun.**<br>**Attorneys for Defendants: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Mikaela Stone, Patrick Lafferty, Roy Falik, and Zachary Coots, Andrew Whittaker, Mary Katherine Kennedy, Ellen Min.**<br><br>**(Attachments: # 1 Exhibit Trial Log 4-14-2025)(klh, COURT STAFF) (Date Filed: 4/15/2025) (Entered: 04/15/2025)** |
| 04/15/2025 | 442 | **Order by Judge Rita F. Lin granting 440 Stipulation and Order Concerning Jury Instruction to Redacted Materials. (rfllc2, COURT STAFF) (Filed on 4/15/2025) (Entered: 04/15/2025)** |
| 04/15/2025 | 443 | TRIAL BRIEF *RE MOTIVE IMPERMISSABLE CLAIM CONSTRUCTION ARGUMENT* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Alper, Adam) (Filed on 4/15/2025) (Entered: 04/15/2025) |
| 04/15/2025 | 444 | **Order. Signed 4/15/2025 by Judge Rita F. Lin granting 438 Motion for Pro Hac Vice for Ryan Melde.(klh, COURT STAFF) (Filed on 4/15/2025) (Entered: 04/15/2025)** |
| 04/15/2025 | 445 | NOTICE by Motive Technologies, Inc. *Motive's Submission of Objections To Trial Day 1 Deposition Designations* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Tarasi, Angela) (Filed on 4/15/2025) (Entered: 04/15/2025) |
| 04/16/2025 | 446 | **Minute Entry for proceedings held before Judge Rita F. Lin:**<br><br>**Jury Trial held on 4/15/2025.**<br><br>**Total Time in Court: 5 H 25 M.**<br>**Court Reporter: Debra Pas.**<br>**Attorneys for Plaintiff: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler, and Kyle Calhoun.**<br>**Attorneys for Defendants: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Mikaela Stone, Patrick Lafferty, Roy Falik, Zachary Coots, Andrew Whittaker, Mary Katherine Kennedy, Ellen Min.**<br><br>**(Attachments: # 1 Exhibit Trial Log 4-15-2025)(klh, COURT STAFF) (Date Filed: 4/16/2025) (Entered: 04/16/2025)** |
| 04/16/2025 | 447 | **ORDER REGARDING APRIL 15, 2025 OBJECTIONS TO DEPOSITION DESIGNATIONS TESTIMONY. Signed by Judge Rita F. Lin on April 16, 2025. (rfllc2, COURT STAFF) (Filed on 4/16/2025) (Entered: 04/16/2025)** |
| 04/16/2025 | 448 | TRIAL BRIEF *Defendant Motive Technologies, Inc.'s Response To Plaintiffs' Trial Brief Re: Motive's Impermissible Claim Construction Argument* by Motive Technologies, Inc.. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Tarasi, Angela) (Filed on 4/16/2025) (Entered: 04/16/2025) |
| 04/16/2025 | 449 | **Minute Entry for proceedings held before Judge Rita F. Lin:**<br><br>**Jury Trial held on 4/16/2025. Jury trial continues on 4/17/2025.**<br><br>**Total Time in Court: 5 H 8 M.**<br>**Court Reporter: Debra Pas.**<br>**Attorneys for Plaintiff: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler, and Kyle Calhoun.**<br>**Attorneys for Defendants: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Mikaela Stone, Patrick Lafferty, Roy Falik, Zachary Coots, Andrew Whittaker, Mary Katherine Kennedy, Ellen Min.**<br><br>**(Attachments: # 1 Exhibit Trial Log 4-16-2025)(klh, COURT STAFF) (Date Filed: 4/16/2025) (Entered: 04/17/2025)** |
| 04/17/2025 | 450 | **ORDER AND NOTICE OF QUESTIONS REGARDING WHETHER OMNITRACS IS AN IMPLIED EXCLUSIVE LICENSEE. Signed by Judge Rita F. Lin on April 17, 2025. (rfllc2, COURT STAFF) (Filed on 4/17/2025) (Entered: 04/17/2025)** |
| 04/17/2025 | 451 | TRIAL BRIEF *Defendant Motive's Brief on Stricken Testimony and Privilege* by Motive Technologies, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Tarasi, Angela) (Filed on 4/17/2025) (Entered: 04/17/2025) |
| 04/17/2025 | 452 | TRIAL BRIEF *Brief re Motive's Violation of the Court's Order re Omitracs' Motion in Limine No. 1 [Dkt. 392]]* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit 1)(De Vries, Michael) (Filed on 4/17/2025) (Entered: 04/18/2025) |
| 04/17/2025 | 453 | **Minute Entry for proceedings held before Judge Rita F. Lin:**<br><br>**Jury Trial held on 4/17/2025. Jury trial continues on 4/18/2025 at 8:15 AM.**<br><br>**Total Time in Court: 6 H 13 M.**<br>**Court Reporter: Debra Pas.**<br>**Attorneys for Plaintiff: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler, and Kyle Calhoun.**<br>**Attorneys for Defendants: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Mikaela Stone, Patrick Lafferty, Roy Falik, Zachary Coots, Andrew Whittaker, Mary Katherine Kennedy, Ellen Min.**<br><br>**(Attachments: # 1 Exhibit Trial Log 4-17-2025)(klh, COURT STAFF) (Date Filed: 4/17/2025) (Entered: 04/18/2025)** |
| 04/18/2025 | 456 | **Minute Entry for proceedings held before Judge Rita F. Lin:**<br><br>**Jury Trial held on 4/18/2025. Jury trial continues on 4/21/2025 at 8:15 AM.**<br><br>**Total Time in Court: 5 H 27 M.**<br>**Court Reporter: Debra Pas.**<br>**Attorneys for Plaintiff: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler, and Kyle Calhoun.**<br>**Attorneys for Defendants: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels,** |

| | | |
|---|---|---|
| | | **Mikaela Stone, Patrick Lafferty, Roy Falik, Zachary Coots, Andrew Whittaker, Mary Katherine Kennedy, Ellen Min.**<br><br>**(Attachments: # 1 Exhibit Trial Log 4-18-2025)**<br>**(klh, COURT STAFF) (Date Filed: 4/18/2025) (Entered: 04/21/2025)** |
| 04/21/2025 | 454 | NOTICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 450 Order *Omnitracs' Response to the Court's Questions in Dkt. 450 re Omnitracs' Implied Exclusive License to the Asserted Patents* (Schmidt, Leslie) (Filed on 4/21/2025) (Entered: 04/21/2025) |
| 04/21/2025 | 455 | TRIAL BRIEF *Motive's Brief on Wuestions Whether Omnitracs is an Exclusive Licensee* by Motive Technologies, Inc.. (Tarasi, Angela) (Filed on 4/21/2025) (Entered: 04/21/2025) |
| 04/21/2025 | 457 | NOTICE by Motive Technologies, Inc. *Motive's Notice of Claim Narrowing* (Tarasi, Angela) (Filed on 4/21/2025) (Entered: 04/21/2025) |
| 04/21/2025 | 458 | **AMENDED PROPOSED FINAL JURY INSTRUCTIONS. Signed by Judge Rita F. Lin on April 21, 2025. (rfllc2, COURT STAFF) (Filed on 4/21/2025) (Entered: 04/21/2025)** |
| 04/21/2025 | 459 | **AMENDED PROPOSED VERDICT FORM. Signed by Judge Rita F. Lin on April 21, 2025. (Attachments: # 1 Exhibit Phase 1, # 2 Exhibit Phase 2)(rfllc2, COURT STAFF) (Filed on 4/21/2025) (Entered: 04/21/2025)** |
| 04/21/2025 | 461 | **Minute Entry for proceedings held before Judge Rita F. Lin: Jury Trial (Day 7) held on 4/21/2025.**<br><br>**Further Jury Trial set for 4/22/2025 at 8:15 AM.**<br><br>**Total Time in Court: 5 hours, 10 minutes.**<br>**Court Reporter: Debra Pas.**<br><br>**Attorneys for Plaintiffs: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler, and Kyle Calhoun.**<br>**Attorneys for Defendant: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Mikaela Stone, Patrick Lafferty, Roy Falik, Zachary Coots, Andrew Whittaker, Ellen Min, Mark Zambarda, and Eric Valuyev.**<br><br>**(Attachments: # 1 Trial Log)(mkl, COURT STAFF) (Date Filed: 4/21/2025) Modified on 4/24/2025 (mkl, COURT STAFF). (Entered: 04/22/2025)** |
| 04/22/2025 | 460 | Proposed Jury Instructions by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation *Joint Filing re Amended Proposed Final Jury Instructions [Dkt. 458]*. (Attachments: # 1 Exhibit A)(Beeler, N. Yvonne) (Filed on 4/22/2025) (Entered: 04/22/2025) |
| 04/22/2025 | 462 | **ORDER FOR JURY MEALS DURING DELIBERATIONS. Signed by Judge Rita F. Lin on 4/22/2025. (mkl, COURT STAFF) (Filed on 4/22/2025) (Entered: 04/22/2025)** |
| 04/22/2025 | 463 | NOTICE of Appearance filed by Argie Lagrimas Mina on behalf of Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation (Mina, Argie) (Filed on 4/22/2025) (Entered: 04/22/2025) |
| 04/22/2025 | 464 | **FINAL VERDICT FORMS. Signed by Judge Rita F. Lin on April 22, 2025. (Attachments: # 1 Exhibit Phase 1, # 2 Exhibit Phase 2)(rfllc2, COURT STAFF) (Filed on 4/22/2025) (Entered: 04/22/2025)** |

| | | |
|---|---|---|
| 04/22/2025 | 465 | **FINAL JURY INSTRUCTIONS. Signed by Judge Rita F. Lin on April 22, 2025. (Attachments: # 1 Exhibit)(rfllc2, COURT STAFF) (Filed on 4/22/2025) (Entered: 04/22/2025)** |
| 04/22/2025 | 466 | **Minute Entry for proceedings held before Judge Rita F. Lin: Jury Trial (Day 8) held on 4/22/2025.<br><br>Further Jury Trial set for 4/23/2025 at 8:15 AM.<br><br>Total Time in Court: 5 hours, 26 minutes.<br>Court Reporter: Debra Pas.<br><br>Attorneys for Plaintiffs: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler, Kyle Calhoun, Ryan Melde, and Argie Mina.<br>Attorneys for Defendant: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Mikaela Stone, Roy Falik, Zachary Coots, Andrew Whittaker, Ellen Min, Mark Zambarda, and Eric Valuyev.<br><br>(Attachments: # 1 Trial Log)(mkl, COURT STAFF) (Date Filed: 4/22/2025) (Entered: 04/23/2025)** |
| 04/23/2025 | 467 | ****Filed in error. Wrong document attached. Please refer to Dkt. No. 468 .** ORDER REGARDING WHETHER OMNITRACS IS AN IMPLIED EXCLUSIVE LICENSEE. Signed by Judge Rita F. Lin on 4/23/2025. (mkl, COURT STAFF) (Filed on 4/23/2025) Modified on 4/23/2025 (mkl, COURT STAFF). (Entered: 04/23/2025)** |
| 04/23/2025 | 468 | **ORDER REGARDING WHETHER OMNITRACS IS AN IMPLIED EXCLUSIVE LICENSEE. Signed by Judge Rita F. Lin on 4/23/2025. (mkl, COURT STAFF) (Filed on 4/23/2025) (Entered: 04/23/2025)** |
| 04/23/2025 | 469 | **CLAIM CONSTRUCTION ORDER RE: PREAMBLE OF CLAIM 1 OF THE 253 PATENT. Signed by Judge Rita F. Lin on April 23, 2025. (rfllc2, COURT STAFF) (Filed on 4/23/2025) (Entered: 04/23/2025)** |
| 04/23/2025 | 470 | **Minute Entry for proceedings held before Judge Rita F. Lin: Jury Trial (Day 9) held on 4/23/2025.<br><br>Further Jury Trial set for 4/24/2025 at 9:00 AM.<br><br>Total Time in Court: 3 hours, 44 minutes.<br>Court Reporter: Debra Pas.<br><br>Attorneys for Plaintiffs: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike DeVries, Yvonne Beeler, and Kyle Calhoun.<br>Defendant Attorney: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Mikaela Stone, Roy Falik, Zachary Coots, Andrew Whittaker, Ellen Min, Mark Zambarda, and Eric Valuyev.<br><br>(Attachments: # 1 Trial Log)(mkl, COURT STAFF) (Date Filed: 4/23/2025) (Entered: 04/24/2025)** |
| 04/24/2025 | 471 | **Minute Entry for proceedings held before Judge Rita F. Lin: Jury Trial (Day 10) completed on 4/24/2025.<br><br>Deadline to file exhibits pursuant to Civil Local Rule 5-1(g) is 5/5/2025.** |

| | | |
|---|---|---|
| | | **Total Time in Court: 16 minutes.**<br>**Court Reporter: Debra Pas.**<br><br>**Attorneys for Plaintiffs: Akshay Deoras, Leslie Schmidt, Adam Alper, Mike De Vries, Yvonne Beeler, and Kyle Calhoun.**<br>**Attorneys for Defendant: Brent Ray, Angela Tarasi, Jeff Mills, Katherine Vessels, Mikaela Stone, Roy Falik, Zachary Coots, Andrew Whittaker, Ellen Min, Mark Zambarda, and Eric Valuyev.**<br><br>**(Attachments: # 1 Trial Log)(mkl, COURT STAFF) (Date Filed: 4/24/2025) Modified on 4/24/2025 (mkl, COURT STAFF). (Entered: 04/24/2025)** |
| 04/24/2025 | 472 | Jury Notes. (mkl, COURT STAFF) (Filed on 4/24/2025) (Entered: 04/24/2025) |
| 04/24/2025 | 473 | JURY VERDICT. (mkl, COURT STAFF) (Filed on 4/24/2025) (Entered: 04/24/2025) |
| 04/27/2025 | 474 | Transcript of Jury Trial Proceedings, Volume 1, held on 4-11-2025, before Judge Rita F. Lin. Court Reporter/Transcriber Debra Pas, CRR, telephone number (415) 431-1477 /Email: Debra_Pas@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re396 Transcript Order - Future Trial with Daily Transcripts, 394 Transcript Order - Future Trial with Daily Transcripts ) Release of Transcript Restriction set for 7/28/2025. (Attachments: # 1 Master Index) (Related documents(s) 396 , 394 ) (Pas, Debra) (Filed on 4/27/2025) (Entered: 04/27/2025) |
| 04/27/2025 | 475 | Transcript of Jury Trial Proceedings, Volume 2, held on 4-14-2025, before Judge Rita F. Lin. Court Reporter/Transcriber Debra Pas, CRR, telephone number (415) 431-1477 /Email: Debra_Pas@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 7/28/2025. (Pas, Debra) (Filed on 4/27/2025) (Entered: 04/27/2025) |
| 04/27/2025 | 476 | Transcript of Jury Trial Proceedings, Volume 3, held on 4-15-2025, before Judge Rita F. Lin. Court Reporter/Transcriber Debra Pas, CRR, telephone number (415) 431-1477 /Email: Debra_Pas@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 7/28/2025. (Pas, Debra) (Filed on 4/27/2025) (Entered: 04/27/2025) |
| 04/27/2025 | 477 | Transcript of Jury Trial Proceedings, Volume 4, held on 4-16-2025, before Judge Rita F. Lin. Court Reporter/Transcriber Debra Pas, CRR, telephone number (415) 431-1477 /Email: Debra_Pas@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 |

| | | |
|---|---|---|
| | | business days from date of this filing. Release of Transcript Restriction set for 7/28/2025. (Pas, Debra) (Filed on 4/27/2025) (Entered: 04/27/2025) |
| 04/27/2025 | 478 | Transcript of Jury Trial Proceedings, Volume 5, held on 4-17-2025, before Judge Rita F. Lin. Court Reporter/Transcriber Debra Pas, CRR, telephone number (415) 431-1477 /Email: Debra_Pas@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 7/28/2025. (Pas, Debra) (Filed on 4/27/2025) (Entered: 04/27/2025) |
| 04/27/2025 | 479 | Transcript of Jury Trial Proceedings, Volume 6, held on 4-18-2025, before Judge Rita F. Lin. Court Reporter/Transcriber Debra Pas, CRR, telephone number (415) 431-1477 /Email: Debra_Pas@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 7/28/2025. (Pas, Debra) (Filed on 4/27/2025) (Entered: 04/27/2025) |
| 04/27/2025 | 480 | Transcript of Jury Trial Proceedings, Volume 7 -- Sealed Proceedings contained therein redacted -- held on 4-21-2022, before Judge Rita F. Lin. Court Reporter/Transcriber Debra Pas, CRR, telephone number (415) 431-1477 /Email: Debra_Pas@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 7/28/2025. (Pas, Debra) (Filed on 4/27/2025) (Entered: 04/27/2025) |
| 04/27/2025 | 481 | Sealed Transcript of Jury Trial Proceedings, contains proceedings held under seal by Order of Court, held on 4-21-2022, before Judge Rita F. Lin. Court Reporter/Transcriber Debra Pas, CRR, Telephone number (415) 431-1477 /Email: Debra_Pas@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy,any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Pas, Debra) (Filed on 4/27/2025) (Entered: 04/27/2025) |
| 04/27/2025 | 482 | Transcript of Jury Trial Proceedings, Volume 8, held on 4-22-2025, before Judge Rita F. Lin. Court Reporter/Transcriber Debra Pas, CRR, telephone number (415) 431-1477 /Email: Debra_Pas@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 7/28/2025. (Pas, Debra) (Filed on 4/27/2025) (Entered: 04/27/2025) |
| 04/27/2025 | 483 | Transcript of Jury Trial Proceedings, Volume 9, held on 4-23-2025, before Judge Rita F. Lin. Court Reporter/Transcriber Debra Pas, CRR, telephone number (415) 431-1477 /Email: Debra_Pas@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public |

| | | |
|---|---|---|
| | | terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 7/28/2025. (Pas, Debra) (Filed on 4/27/2025) (Entered: 04/27/2025) |
| 04/27/2025 | 484 | Transcript of Jury Trial Proceedings, Volume 10, held on 4-24-2025, before Judge Rita F. Lin. Court Reporter/Transcriber Debra Pas, CRR, telephone number (415) 431-1477 /Email: Debra_Pas@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 7/28/2025. (Pas, Debra) (Filed on 4/27/2025) (Entered: 04/27/2025) |
| 04/30/2025 | 485 | NOTICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation *Joint Filing of Final Designations of Deposition Testimony as Played at Trial* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M)(Beeler, N. Yvonne) (Filed on 4/30/2025) (Entered: 04/30/2025) |
| 05/01/2025 | 486 | MOTION for Judgment as a Matter of Law *Defendant Motive Technologies, Inc.'s Post-Trial Motion That The 628 and 906 Patents Are Ineligible Under 35 U.S.C. § 101* filed by Motive Technologies, Inc.. Responses due by 5/15/2025. Replies due by 5/22/2025. (Attachments: # 1 Defendant Motive Technologies, Inc.'s Proposed Findings of Fact and Conclusions of Law In Support Of Opening Post-Trial Brief On Patent Ineligibility of the XRS Patents)(Tarasi, Angela) (Filed on 5/1/2025) (Entered: 05/01/2025) |
| 05/01/2025 | 487 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Omnitracs' Motion to Consider Whether Motive's Material in Omnitracs' Motion for Judgment as a Matter of Law and a New Trial Should be Sealed* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order, # 3 Unredacted Version of Motion for JMOL and New Trial)(Calhoun, Kyle) (Filed on 5/1/2025) (Entered: 05/01/2025) |
| 05/01/2025 | 488 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Omnitracs' Motion to Consider Whether Juror Information in Omnitracs' Motion for Judgment as a Matter of Law and a New Trial Should be Sealed* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Kyle A. Calhoun, # 2 Proposed Order)(Calhoun, Kyle) (Filed on 5/1/2025) (Entered: 05/01/2025) |
| 05/01/2025 | 489 | MOTION for Judgment as a Matter of Law , MOTION for New Trial filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. Responses due by 5/8/2025. Replies due by 5/15/2025. (Attachments: # 1 Proposed Order)(Deoras, Akshay) (Filed on 5/1/2025) (Entered: 05/01/2025) |
| 05/05/2025 | 490 | Declaration of Jeremy Roux in Support of 411 Order to Show Cause *Declaration of Jeremy Roux in Support of Omnitracs' Renewed and Tailored Requests to Seal Plaintiffs' Confidential Information Pursuant to the Court's April 7, 2025 Order (Dkt. 411)* filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit G, # 4 Exhibit I, # 5 Exhibit FFF)(Related document(s) 411 ) (Beeler, N. Yvonne) (Filed on 5/5/2025) (Entered: 05/05/2025) |
| 05/05/2025 | 491 | Final Joint Trial Exhibit List by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation.. (Attachments: # 1 Exhibit A)(Beeler, N. Yvonne) (Filed on 5/5/2025) Modified on 5/7/2025 (anj, COURT STAFF). (Entered: 05/05/2025) |

| | | |
|---|---|---|
| 05/05/2025 | 492 | Renewed Administrative Motion to Seal in Response to the Court's Order to Show Cause why Administrative Motions to File Under Seal Should Not Be Denied [Dkt. 411] filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Katherine Vessels, # 2 Exhibit 310-04 (sealed), # 3 Exhibit 334-1 (sealed), # 4 Proposed Order)(Tarasi, Angela) (Filed on 5/5/2025) Modified on 5/7/2025 (anj, COURT STAFF). (Entered: 05/05/2025) |
| 05/05/2025 | 493 | Joint Certification of Counsel Regarding Admitted Trial Exhibits by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 8, # 7 Exhibit 16, # 8 Exhibit 111, # 9 Exhibit 114, # 10 Exhibit 118, # 11 Exhibit 121, # 12 Exhibit 122, # 13 Exhibit 134, # 14 Exhibit 144, # 15 Exhibit 147, # 16 Exhibit 149, # 17 Exhibit 155, # 18 Exhibit 159, # 19 Exhibit 161, # 20 Exhibit 163, # 21 Exhibit 176, # 22 Exhibit 235, # 23 Exhibit 236, # 24 Exhibit 237, # 25 Exhibit 238, # 26 Exhibit 252, # 27 Exhibit 272, # 28 Exhibit 273, # 29 Exhibit 277, # 30 Exhibit 278, # 31 Exhibit 280, # 32 Exhibit 282, # 33 Exhibit 287, # 34 Exhibit 288, # 35 Exhibit 292, # 36 Exhibit 295, # 37 Exhibit 296, # 38 Exhibit 300, # 39 Exhibit 301, # 40 Exhibit 303, # 41 Exhibit 304, # 42 Exhibit 305, # 43 Exhibit 311, # 44 Exhibit 312, # 45 Exhibit 314, # 46 Exhibit 315, # 47 Exhibit 316, # 48 Exhibit 317, # 49 Exhibit 318, # 50 Exhibit 325, # 51 Exhibit 329, # 52 Exhibit 333, # 53 Exhibit 336, # 54 Exhibit 339, # 55 Exhibit 341, # 56 Exhibit 342, # 57 Exhibit 361, # 58 Exhibit 362, # 59 Exhibit 388, # 60 Exhibit 390, # 61 Exhibit 391, # 62 Exhibit 395, # 63 Exhibit 415, # 64 Exhibit 416, # 65 Exhibit 427, # 66 Exhibit 429, # 67 Exhibit 440, # 68 Exhibit 446, # 69 Exhibit 447, # 70 Exhibit 452, # 71 Exhibit 456, # 72 Exhibit 458, # 73 Exhibit 470, # 74 Exhibit 492, # 75 Exhibit 496, # 76 Exhibit 497, # 77 Exhibit 498, # 78 Exhibit 499, # 79 Exhibit 504, # 80 Exhibit 505, # 81 Exhibit 508, # 82 Exhibit 511, # 83 Exhibit 517, # 84 Exhibit 521, # 85 Exhibit 522, # 86 Exhibit 524, # 87 Exhibit 525, # 88 Exhibit 526, # 89 Exhibit 536, # 90 Exhibit 542, # 91 Exhibit 555, # 92 Exhibit 556, # 93 Exhibit 557, # 94 Exhibit 561, # 95 Exhibit 568, # 96 Exhibit 588, # 97 Exhibit 604, # 98 Exhibit 625, # 99 Exhibit 674, # 100 Exhibit 711, # 101 Exhibit 715, # 102 Exhibit 731, # 103 Exhibit 749, # 104 Exhibit 756, # 105 Exhibit 826, # 106 Exhibit 851, # 107 Exhibit 852, # 108 Exhibit 853, # 109 Exhibit 873, # 110 Exhibit 875, # 111 Exhibit 876, # 112 Exhibit 878, # 113 Exhibit 883, # 114 Exhibit 888, # 115 Exhibit 894, # 116 Exhibit 897, # 117 Exhibit 931, # 118 Exhibit 1313, # 119 Exhibit 1397, # 120 Exhibit 1557, # 121 Exhibit 1558, # 122 Exhibit 1622, # 123 Exhibit 1629, # 124 Exhibit 1719, # 125 Exhibit 1736, # 126 Exhibit 1737, # 127 Exhibit 1755, # 128 Exhibit 1763, # 129 Exhibit 1789, # 130 Exhibit 1802, # 131 Exhibit 1821, # 132 Exhibit 1824, # 133 Exhibit 1827, # 134 Exhibit 1832, # 135 Exhibit 1834, # 136 Exhibit 1836, # 137 Exhibit 1838, # 138 Exhibit 1839, # 139 Exhibit 1957, # 140 Exhibit 1959, # 141 Exhibit 1964, # 142 Exhibit 1965, # 143 Exhibit 2017, # 144 Exhibit 2019, # 145 Exhibit 2020, # 146 Exhibit 2021, # 147 Exhibit 2022, # 148 Exhibit 2023, # 149 Exhibit 2028A, # 150 Exhibit 2028B, # 151 Exhibit 2028C, # 152 Exhibit 2091, # 153 Exhibit 2094, # 154 Exhibit 2095, # 155 Exhibit 2101, # 156 Exhibit 2103, # 157 Exhibit 2104, # 158 Exhibit 3050, # 159 Exhibit 3072, # 160 Exhibit 3092, # 161 Exhibit 3101, # 162 Exhibit 3120, # 163 Exhibit 3121, # 164 Exhibit 3140, # 165 Exhibit 3198, # 166 Exhibit 3222, # 167 Exhibit 3283, # 168 Exhibit 3294, # 169 Exhibit 3358, # 170 Exhibit 3425, # 171 Exhibit 3429, # 172 Exhibit 3459, # 173 Exhibit 3466, # 174 Exhibit 3470, # 175 Exhibit 3502, # 176 Exhibit 3503, # 177 Exhibit 3544, # 178 Exhibit 3582, # 179 Exhibit 3584, # 180 Exhibit 3645, # 181 Exhibit 3647, # 182 Exhibit 3701, # 183 Exhibit 3719, # 184 Exhibit 3720, # 185 Exhibit 3759, # 186 Exhibit 3775, # 187 Exhibit 3778, # 188 Exhibit 3781, # 189 Exhibit 3786, # 190 Exhibit 3805, # 191 Exhibit 3807, # 192 Exhibit 3822, # 193 Exhibit 3826, # 194 Exhibit 3844, # 195 Exhibit 3860, # 196 Exhibit 3886, # 197 Exhibit 3888, # 198 Exhibit 3890, # 199 Exhibit 3901, # 200 Exhibit 3903, # 201 Exhibit 3909, # 202 Exhibit 3916, # 203 Exhibit 3917, # 204 Exhibit 3918, # 205 Exhibit 3938, # 206 Exhibit 3945, # 207 Exhibit 4005, # 208 Exhibit 4006, # 209 Exhibit 4007, # 210 Exhibit 4048, # 211 Exhibit 4052, # 212 Exhibit 4070, # 213 Exhibit 4074, # 214 Exhibit 4079, # 215 Exhibit 4080, # 216 Exhibit 4103, # |

| | | |
|---|---|---|
| | | 217 Exhibit 4119, # 218 Exhibit 4147, # 219 Exhibit 4229, # 220 Exhibit 4230, # 221 Exhibit 4232, # 222 Exhibit 4292, # 223 Exhibit 4293, # 224 Exhibit 4294, # 225 Exhibit 4309, # 226 Exhibit 4310, # 227 Exhibit 4314, # 228 Exhibit 4315, # 229 Exhibit 4338, # 230 Exhibit 4339, # 231 Exhibit 4340)(Beeler, N. Yvonne) (Filed on 5/5/2025) Modified on 5/7/2025 (anj, COURT STAFF). (Entered: 05/05/2025) |
| 05/05/2025 | 494 | Sealed admitted trial exhibits re Dkts. 403 and 493 filed by Motive Technologies, Inc.. (Attachments: # 1 Exhibit 111 (Sealed), # 2 Exhibit 3092 (Sealed), # 3 Exhibit 4292 part 1 (Sealed), # 4 Exhibit 4292 part 2 (Sealed), # 5 Exhibit 4292 part 3 (Sealed), # 6 Exhibit 4292 part 4 (Sealed), # 7 Exhibit 4293 (Sealed), # 8 Exhibit 4294 (Sealed))(Tarasi, Angela) (Filed on 5/5/2025) Modified on 5/7/2025 (anj, COURT STAFF). (Entered: 05/05/2025) |
| 05/07/2025 | 495 | Declaration of Katherine Vessels in Support of 487 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Omnitracs' Motion to Consider Whether Motive's Material in Omnitracs' Motion for Judgment as a Matter of Law and a New Trial Should be Sealed* filed byMotive Technologies, Inc.. (Related document(s) 487 ) (Vessels, Katherine) (Filed on 5/7/2025) (Entered: 05/07/2025) |
| 05/07/2025 | 496 | Declaration of Katherine Vessels in Support of 488 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Omnitracs' Motion to Consider Whether Juror Information in Omnitracs' Motion for Judgment as a Matter of Law and a New Trial Should be Sealed* filed byMotive Technologies, Inc.. (Related document(s) 488 ) (Vessels, Katherine) (Filed on 5/7/2025) (Entered: 05/07/2025) |
| 05/08/2025 | 497 | OPPOSITION/RESPONSE (re 486 MOTION for Judgment as a Matter of Law *Defendant Motive Technologies, Inc.'s Post-Trial Motion That The 628 and 906 Patents Are Ineligible Under 35 U.S.C. § 101* ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Responsive Proposed Findings of Fact and Conclusions of Law)(Deoras, Akshay) (Filed on 5/8/2025) (Entered: 05/08/2025) |
| 05/08/2025 | 498 | OPPOSITION/RESPONSE (re 489 MOTION for Judgment as a Matter of Law MOTION for New Trial ) *[Defendant Motive's Opposition to Plaintiffs' Post-Trial Brief]* filed byMotive Technologies, Inc.. (Tarasi, Angela) (Filed on 5/8/2025) (Entered: 05/08/2025) |
| 05/15/2025 | 499 | REPLY (re 486 MOTION for Judgment as a Matter of Law *Defendant Motive Technologies, Inc.'s Post-Trial Motion That The 628 and 906 Patents Are Ineligible Under 35 U.S.C. § 101* ) filed byMotive Technologies, Inc.. (Attachments: # 1 Responses to Omnitracs Responsive Proposed Findings of Fact and Conclusions of Law)(Tarasi, Angela) (Filed on 5/15/2025) (Entered: 05/15/2025) |
| 05/15/2025 | 500 | REPLY (re 489 MOTION for Judgment as a Matter of Law MOTION for New Trial ) filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Deoras, Akshay) (Filed on 5/15/2025) (Entered: 05/15/2025) |
| 05/20/2025 | 501 | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO SEAL (Dkt. Nos. 297 , 298 , 307 , 308 , 310 , 311 , 313 , 314 , 328 , 330 , 331 , 264 , 271 , 280 , 281 , 283 , 284 , 286 , 287 , 290 ). The parties are ORDERED to file redacted versions of the documents for partial sealing requests that were granted to the extent those have not already been filed, and unsealed versions of the requests that were denied by 5/30/25. (rfllc2, COURT STAFF) (Filed on 5/20/2025) (Entered: 05/20/2025)** |
| 05/30/2025 | 502 | **AMENDED ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO SEAL. Signed by Judge Rita F. Lin on May 30, 2025. (rfllc2, COURT STAFF) (Filed on 5/30/2025) (Entered: 05/30/2025)** |
| 05/30/2025 | 503 | NOTICE of unopposed motion to amend invalidity contentions by Motive Technologies, Inc. re 501 Order on Administrative Motion to File Under Seal,, Order on Administrative |

| | | |
|---|---|---|
| | | Motion to Consider Whether Another Partys Material Should Be Sealed (Attachments: # 1 Unredacted version of Appx A [271-4], # 2 Redacted version of Ex. B [271-5], # 3 Redacted version of Ex. C [271-6], # 4 Redacted version of Ex. D [271-7], # 5 Redated version of Ex. E [271-8] part 1, # 6 Redated version of Ex. E [271-8] part 2, # 7 Redacted version of Ex. F [271-9] part 1, # 8 Redacted version of Ex. F [271-9] part 2, # 9 Redacted version of Ex. G [271-10])(Tarasi, Angela) (Filed on 5/30/2025) Modified on 6/3/2025 (kxo, COURT STAFF). (Entered: 05/30/2025) |
| 05/30/2025 | 504 | NOTICE of filings of redacted and unsealed documents by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 315 Opposition/Response to Motion,,,,,,,, 291 Opposition/Response to Motion, 309 Opposition/Response to Motion,, 299 Opposition/Response to Motion,, 312 Opposition/Response to Motion,, *Omnitracs' Filing of Redacted and Unsealed Documents Pursuant to the Court's May 20, 2025 Order (Dkt. 501)* (Attachments: # 1 Exhibit Unsealed Version of Dkt. 291-2, # 2 Exhibit Unsealed Version of Dkt. 291-5, # 3 Exhibit Unsealed Version of Dkt. 299-9, # 4 Exhibit Unsealed Version of Dkt. 299-15, # 5 Exhibit Unsealed Version of Dkt. 309-11, # 6 Exhibit Unsealed Version of Dkt. 312-3, # 7 Exhibit Unsealed Version of Dkt. 312-8, # 8 Exhibit Unsealed Version of Dkt. 312-10, # 9 Exhibit Unsealed Version of Dkt. 315-15, # 10 Exhibit Unsealed Version of Dkt. 315-16, # 11 Exhibit Unsealed Version of Dkt. 315-74, # 12 Exhibit Unsealed Version of Dkt. 315-93, # 13 Exhibit Unsealed Version of Dkt. 315-94, # 14 Exhibit Unsealed Version of Dkt. 315-97)(Calhoun, Kyle) (Filed on 5/30/2025) Modified on 6/3/2025 (kxo, COURT STAFF). (Entered: 05/30/2025) |
| 05/30/2025 | 505 | NOTICE by Motive Technologies, Inc. re 501 Order on Administrative Motion to File Under Seal,, Order on Administrative Motion to Consider Whether Another Partys Material Should Be Sealed,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, *Unredacted Version of Dkt. 286-4* (Attachments: # 1 Unredacted version of Dkt. 286-8, # 2 Unredacted version of Dkt. 286-15, # 3 Unredacted version of Dkt. 286-27, # 4 Unredacted version of Dkt. 334-1)(Tarasi, Angela) (Filed on 5/30/2025) (Entered: 05/30/2025) |
| 06/03/2025 | | Electronic filing error. REMINDER: No title Page. Exhibits or Proof of Service e-filed separately, not as an attachment, requires a title page. Please refer to Civil Local Rules 3-4 re first page requirement. Please re-file dkt 505 in its entirety with Caption Page. Re: 505 Notice (Other), filed by Motive Technologies, Inc. (kxo, COURT STAFF) (Filed on 6/3/2025) (Entered: 06/03/2025) |
| 06/10/2025 | 506 | **ORDER. Motive is ORDERED to show cause by 6/17/25 why the documents referenced in Dkt. Nos. 264, 281, 284, 287, and 330 should not be unsealed to the extent specified in the 502 Order. Motive did not include these requests to seal in the 341 joint table summarizing outstanding requests to seal. Signed by Judge Rita F. Lin on June 10, 2025.** ***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(rfllc2, COURT STAFF) (Filed on 6/10/2025) (Entered: 06/10/2025)** |
| 06/10/2025 | | **ORDER. The parties are ordered to file a table summarizing the outstanding motions to seal by 6/24/2025. A template for this chart can be found on the Standing Orders section of Judge Lin's website. Signed by Judge Rita F. Lin on June 10, 2025.** ***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(rfllc2, COURT STAFF) (Filed on 6/10/2025) (Entered: 06/10/2025)** |
| 06/11/2025 | 507 | NOTICE of Change of Address by N. Yvonne Stoddard Beeler *Omnitracs' Notice of Change of Address for Attorneys Michael W. De Vries, N. Yvonne Beeler, Ingrid Petersen, Andrew Morrill, and Jiaxiao Zhang* (Beeler, N. Yvonne) (Filed on 6/11/2025) (Entered: 06/11/2025) |
| 06/17/2025 | 508 | RESPONSE TO ORDER TO SHOW CAUSE by Motive Technologies, Inc. *[Declaration of Eric Valuyev in Response to the Court's Order (Dkt. 506) to Show Cause Re Dkt. Nos.* |

| | | |
|---|---|---|
| | | *264, 281, 284, 287 and 330 - Administrative Motions to Seal]*. (Valuyev, Eric) (Filed on 6/17/2025) (Entered: 06/17/2025) |
| 06/24/2025 | 509 | NOTICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation *Joint Submission of Table Summarizing Outstanding Motions to Seal* (Attachments: # 1 Table Summarizing Outstanding Motions to Seal)(Calhoun, Kyle) (Filed on 6/24/2025) (Entered: 06/24/2025) |
| 08/05/2025 | 510 | **ORDER ON POST-TRIAL MOTIONS RE: 486 489 . Signed by Judge Rita F. Lin on 8/5/2025. (afm, COURT STAFF) (Filed on 8/5/2025) (Entered: 08/05/2025)** |
| 08/05/2025 | 511 | **ORDER GRANTING DEFENDANT MOTIVE TECHNOLOGIES, INC.'S 403 ADMINISTRATIVE MOTION TO SEAL THE COURTROOM FOR PORTIONS OF TRIALORDER. Signed by Judge Rita F. Lin on 8/5/2025. (afm, COURT STAFF) (Filed on 8/5/2025) (Entered: 08/05/2025)** |
| 08/13/2025 | 512 | **Order by Judge Rita F. Lin granting 246 Motion for Leave to File. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 8/13/2025) (Entered: 08/13/2025)** |
| 08/15/2025 | 513 | **JUDGMENT. Signed by Judge Rita F. Lin on 8/15/2025. (afm, COURT STAFF) (Filed on 8/15/2025) (Entered: 08/15/2025)** |
| 08/18/2025 | 514 | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO SEAL re: Dkt. Nos. 305 , 362 , 366 , 368 , 369 , 370 , 372 , 375 , 487 , 488 , 492 . Where indicated in the sealing table, the parties may file a declaration providing additional information as to why sealing is sought for that document and/or submit narrowed redactions for the document by 9/1/25. By that date, the parties shall also submit a new proposed order with a table of those remaining sealing motions that have either been withdrawn, narrowed, or supplemented. If insufficient further information is received or if the renewed requests are overbroad, the documents may be unsealed without further notice. The parties are further ORDERED to file redacted versions of the documents for partial sealing requests that were granted to the extent those have not already been filed, and unsealed versions of the requests that were denied by 9/1/25. Signed by Judge Rita F. Lin on 8/18/2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 8/18/2025) Modified on 8/18/2025 (rfllc2, COURT STAFF). (Entered: 08/18/2025)** |
| 08/19/2025 | 515 | NOTICE of Withdrawal filed by Ryan Melde, no longer appearing on behalf of Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation in this case (Melde, Ryan) (Filed on 8/19/2025) (Entered: 08/19/2025) |
| 08/29/2025 | | ***Civil Case Terminated. (afm, COURT STAFF) (Filed on 8/29/2025) (Entered: 08/29/2025) |
| 08/29/2025 | 516 | REPORT on the determination of an action regarding patent (cc: form emailed to register). (Attachments: # 1 Judgment)(kmm2, COURT STAFF) (Filed on 8/29/2025) (Entered: 08/29/2025) |
| 08/29/2025 | 517 | Administrative Motion to File Under Seal *re Bill of Costs* filed by Motive Technologies, Inc.. (Attachments: # 1 Declaration of Ellen Min, # 2 Proposed Order, # 3 Exhibit C (SEALED), # 4 Exhibit D (SEALED))(Tarasi, Angela) (Filed on 8/29/2025) (Entered: 08/29/2025) |
| 08/29/2025 | 518 | BILL OF COSTS by Motive Technologies, Inc.. Objections due by 9/12/2025. (Attachments: # 1 Declaration of Ellen Min, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C |

| | | |
|---|---|---|
| | | (Sealed), # 5 Exhibit D (Sealed))(Tarasi, Angela) (Filed on 8/29/2025) (Entered: 08/29/2025) |
| 09/02/2025 | 519 | NOTICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation *Joint Submission of Table Summarizing Remaining Sealing Requests Pursuant to the Court's August 18, 2025 Order (Dkt. 514)* (Attachments: # 1 Table Summarizing Remaining Sealing Requests)(Calhoun, Kyle) (Filed on 9/2/2025) (Entered: 09/02/2025) |
| 09/02/2025 | 520 | Declaration of Kyle A. Calhoun in Support of 519 Notice (Other), filed byOmnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Related document(s) 519 ) (Calhoun, Kyle) (Filed on 9/2/2025) (Entered: 09/02/2025) |
| 09/02/2025 | 521 | NOTICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 514 Order on Administrative Motion to Consider Whether Another Partys Material Should Be Sealed,,,,, Order on Administrative Motion to File Under Seal,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, (Attachments: # 1 Exhibit Unsealed Version of Dkt. 370-6, # 2 Exhibit Unsealed Version of Dkt. 370-10,, # 3 Exhibit Unsealed Version of Dkt. 370-11, # 4 Exhibit Unsealed Version of Dkt. 370-12, # 5 Exhibit Unsealed Version of Dkt. 370-13, # 6 Exhibit Unsealed Version of Dkt. 370-14, # 7 Exhibit Unsealed Version of Dkt. 370-15, # 8 Exhibit Unsealed Version of Dkt. 370-16, # 9 Exhibit Unsealed Version of Dkt. 372-23, # 10 Exhibit Unsealed Version of Dkt. 372-30, # 11 Exhibit Unsealed Version of Dkt. 372-32, # 12 Exhibit Unsealed Version of Dkt. 372-33, # 13 Exhibit Unsealed Version of Dkt. 372-34, # 14 Exhibit Unsealed Version of Dkt. 372-35, # 15 Exhibit Unsealed Version of Dkt. 375-12, # 16 Exhibit Unsealed Version of Dkt. 375-16)(Calhoun, Kyle) (Filed on 9/2/2025) (Entered: 09/02/2025) |
| 09/02/2025 | 522 | Declaration of Eric Valuyev in Support of 519 Notice (Other), filed byMotive Technologies, Inc.. (Related document(s) 519 ) (Valuyev, Eric) (Filed on 9/2/2025) (Entered: 09/02/2025) |
| 09/02/2025 | 523 | NOTICE by Motive Technologies, Inc. re 514 Order on Administrative Motion to Consider Whether Another Partys Material Should Be Sealed,,,,, Order on Administrative Motion to File Under Seal,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, (Attachments: # 1 Redacted version of 264-4, # 2 Redacted version of 264-7, # 3 Redacted version of 264-8, # 4 Redacted version of 264-10, # 5 Redacted version of 264-11, # 6 Redacted version of 284-3, # 7 Redacted version of 284-5, # 8 Unsealed version of 284-8, # 9 Unsealed version of 284-9, # 10 Unsealed version of 284-10, # 11 Unsealed version of 287-3, # 12 Unsealed version of 287-4, # 13 Unsealed version of 287-5, # 14 Unsealed version of 287-8, # 15 Unsealed version of 287-10, # 16 Redacted version of 287-11, # 17 Unsealed version of 287-12, # 18 Redacted version of 305-3, # 19 Unsealed version of 305-5, # 20 Redacted version of 330-3, # 21 Unsealed version of 330-5, # 22 Unsealed version of 330-6, # 23 Redacted version of 362-22, # 24 Unsealed version of 368-3, # 25 Redacted version of 368-6, # 26 Redacted version of 368-8, # 27 Redacted version of 368-9, # 28 Redacted version of 368-10)(Tarasi, Angela) (Filed on 9/2/2025) (Entered: 09/02/2025) |
| 09/04/2025 | 524 | NOTICE OF APPEAL to the Federal Circuit by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. Filing fee $ 605, receipt number ACANDC-21090686. Appeal Record due by 10/6/2025. (Deoras, Akshay) (Filed on 9/4/2025) (Entered: 09/04/2025) |
| 09/08/2025 | 525 | **ORDER. For good cause shown, the 517 motion to seal is granted. Signed by Judge Rita F. Lin on September 8, 2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 9/8/2025) (Entered: 09/08/2025)** |
| 09/10/2025 | 526 | **ORDER. The Court resolves the outstanding sealing requests as set forth in the attached chart. (See also Dkt. Nos. 519 , 520 , 522 .) The Parties shall file redacted copies of the documents in question by September 24, 2025. Signed by Judge Rita F.** |

| | | |
|---|---|---|
| | | **Lin on September 10, 2025. (rfllc2, COURT STAFF) (Filed on 9/10/2025) (Entered: 09/10/2025)** |
| 09/11/2025 | 530 | USCA Case Number 2025-2098 for the Federal Circuit for 524 Notice of Appeal to the Federal Circuit filed by SmartDrive Systems, Inc., XRS Corporation, Omnitracs, LLC. (jml, COURT STAFF) (Filed on 9/11/2025) (Entered: 09/22/2025) |
| 09/12/2025 | 527 | Administrative Motion to File Under Seal *re Amended Bill of Costs* filed by Motive Technologies, Inc.. (Attachments: # 1 Min Declaration, # 2 Ex. C (Sealed), # 3 Ex. D (Sealed), # 4 Proposed Order)(Tarasi, Angela) (Filed on 9/12/2025) (Entered: 09/12/2025) |
| 09/12/2025 | 528 | BILL OF COSTS *(Amended)* by Motive Technologies, Inc.. Objections due by 9/26/2025. (Attachments: # 1 Min Declaration, # 2 Ex. A, # 3 Ex. B, # 4 Ex. C (Sealed), # 5 Ex. D (Sealed))(Tarasi, Angela) (Filed on 9/12/2025) (Entered: 09/12/2025) |
| 09/12/2025 | 529 | **ORDER. For good cause shown, the 527 motion to seal is granted. Signed by Judge Rita F. Lin on September 12, 2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 9/12/2025) (Entered: 09/12/2025)** |
| 09/24/2025 | 531 | NOTICE by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation re 526 Order, (Attachments: # 1 Exhibit Public Redacted Version of 369-4, # 2 Exhibit Unsealed Version of 370-6, # 3 Exhibit Public Redacted Version of 370-7, # 4 Exhibit Unsealed Version of 370-10, # 5 Exhibit Public Redacted Version of 372-22, # 6 Exhibit Public Redacted Version of 372-36, # 7 Exhibit Public Redacted Version of 375-6, # 8 Exhibit Public Redacted Version of 375-13, # 9 Exhibit Public Redacted Version of 375-19)(Calhoun, Kyle) (Filed on 9/24/2025) (Entered: 09/24/2025) |
| 09/24/2025 | 532 | NOTICE by Motive Technologies, Inc. re 526 Order, *on Motions to Seal* (Attachments: # 1 Redacted version of 264-5, # 2 Redacted version of 281-3, # 3 Redacted version of 281-6, # 4 Unsealed Version of 305-5, # 5 Redacted Version of 330-4, # 6 Redacted version of 362-9, # 7 Redacted version of 362-14, # 8 Redacted version of 366-10)(Tarasi, Angela) (Filed on 9/24/2025) (Entered: 09/24/2025) |
| 09/26/2025 | 533 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Yvonne Beeler, # 2 Proposed Order, # 3 Omnitracs' Objections to Motive's Bill of Costs [UNREDACTED])(Beeler, N. Yvonne) (Filed on 9/26/2025) (Entered: 09/26/2025) |
| 09/26/2025 | 534 | OBJECTIONS to re 528 Bill of Costs *Omnitracs' Objections to Motive's Bill of Costs* by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Exhibit 1)(Beeler, N. Yvonne) (Filed on 9/26/2025) (Entered: 09/26/2025) |
| 09/29/2025 | 535 | Amended Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Omnitracs' Corrected Administrative Motion to Consider Whether Motive's Material in Omnitracs' Objections to Motive's Bill of Costs Should Be Sealed* filed by Omnitracs, LLC, SmartDrive Systems, Inc., XRS Corporation. (Attachments: # 1 Declaration of Yvonne Beeler, # 2 Proposed Order, # 3 Omnitracs' Objections to Motive's Bill of Costs [UNREDACTED])(Beeler, N. Yvonne) (Filed on 9/29/2025) (Entered: 09/29/2025) |
| 09/29/2025 | 536 | **ORDER. The 533 motion to seal is terminated in light of the amended motion filed at Dkt. No. 535 . Signed by Judge Rita F. Lin on September 29, 2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 9/29/2025) (Entered: 09/29/2025)** |

| | | |
|---|---|---|
| 10/06/2025 | 537 | Declaration of Ellen Min in Support of 535 Amended Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Omnitracs' Corrected Administrative Motion to Consider Whether Motive's Material in Omnitracs' Objections to Motive's Bill of Costs filed byMotive Technologies, Inc.. (Related document(s) 535 ) (Min, Ellen) (Filed on 10/6/2025) (Entered: 10/06/2025)* |
| 10/13/2025 | 538 | **ORDER. The 535 motion to seal is granted. Signed by Judge Rita F. Lin on October 13, 2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc2, COURT STAFF) (Filed on 10/13/2025) (Entered: 10/13/2025)** |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 12/08/2025 09:50:14 | | | |
| **PACER Login:** | PACERkirkland | **Client Code:** | 17196-0023/47888 |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-05261-RFL |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
adam.alper@kirkland.com
akshay.deoras@kirkland.com

Michael W. De Vries (SBN 211001)
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
michael.devries@kirkland.com

Leslie M. Schmidt (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
leslie.schmidt@kirkland.com

*Attorneys for Plaintiffs Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OMNITRACS, LLC, XRS CORPORATION, AND SMARTDRIVE SYSTEMS, INC., | Case No. 23-cv-05261 |
| Plaintiffs, | **<u>COMPLAINT</u>** |
| v. | **DEMAND FOR JURY TRIAL** |
| MOTIVE TECHNOLOGIES, INC. (F/K/A KEEPTRUCKIN, INC.), | |
| Defendant. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

1. Plaintiffs Omnitracs, LLC ("Omnitracs"), XRS Corporation ("XRS"), and SmartDrive Systems, Inc. ("SmartDrive") (collectively, "Plaintiffs" or "Omnitracs") are leading providers of fleet management solutions to transportation and logistics companies. For over three decades, Plaintiffs have invested hundreds of millions of dollars in cutting-edge safety and fleet technologies that have transformed the fleet management and telematics industries. That investment has resulted in a variety of innovative hardware and software solutions, including artificial intelligence, driver safety, and vehicle dispatch technologies. Plaintiffs' novel technologies are foundational to the transportation and logistics industries and are increasingly relied upon by fleets around the world to manage fleet activity, improve driver safety, and reduce the costs of running transportation fleets.

2. In 2013, almost thirty years after Omnitracs' first satellite mobile communications system revolutionized the fleet management and telematics industry, Motive Technologies, Inc. (f/k/a KeepTruckin, Inc., collectively referred to as "Motive") entered the fleet management industry with an electronic logbook app for drivers to record their hours of service. Over the years, Motive expanded its platform to include products for vehicle and equipment tracking, driver safety, compliance, maintenance, and spend management, among others.

3. In December 2015, Motive (then known as KeepTruckin) hired Dan Fuglewicz, a senior engineering director, from XRS. Mr. Fuglewicz is listed as an inventor on several patents at issue in this case ("Patents-in-Suit" or "Asserted Patents"). Upon hiring Mr. Fuglewicz, Motive immediately began using XRS's technology to develop new and improved products to gain a larger share of the fleet management market—products Motive continues to market and sell to this day, including, *e.g.*, Motive's Fleet Dashboard, AI Dashcam, Smart Dashcam, AI Omnicam, Vehicle Gateway, Asset Gateway, Environmental Sensor, and Motive Driver App, and the hardware and/or software associated thereto (collectively, the "Accused Products"). Motive's employment of Mr. Fuglewicz enabled Motive's rapid development and marketing of the Accused Products, despite its much later arrival in the fleet management industry.

4. In July 2018, Omnitracs notified Motive at an in-person meeting and via letter correspondence its concerns about Mr. Fuglewicz's employment by Motive and how rapidly Motive's

products came to market after Mr. Fuglewicz joined Motive. Omnitracs also expressed that Motive's products look/looked strikingly similar to Omnitracs' products. Omnitracs further noted that it appeared that Motive's products use the same parts as Plaintiffs' products, and that Motive used the same product development contractor that Plaintiffs used. In August 2018 Motive responded to Omnitracs' concerns and informed Omnitracs that "Dan is no longer with our company, having decided to pursue another opportunity," and that KeepTruckin had conducted an investigation into the circumstances of Mr. Fuglewicz's time with KeepTruckin and discovered no issues. KeepTruckin "decline[d] to share any further details … regarding [their] evaluation of Mr. Fuglewicz's employment," citing privacy concerns.

5. Relying on Motive's representations that it was not using Omnitracs' technology, Omnitracs declined to file suit against Motive at the time. Years later, however, it has become clear that Motive not only started its business using technology that Omnitracs developed, but it has also continued to use that technology to expand its business and compete unfairly in the market.

6. Today, Motive offers fleet management, safety, and compliance software applications and in-vehicle telematics hardware. Rather than design and develop its own services and technologies to provide legitimate competition to Plaintiffs, Motive has taken shortcuts and used the innovative technologies designed, developed, and patented by Plaintiffs. Motive copied Plaintiffs' products and patented technology by leveraging the knowledge of former Omnitracs employees. It did so despite full knowledge of Plaintiffs' broad suite of patented technologies, and with full knowledge of the patents asserted by Plaintiffs in this Complaint. As a result of Motive's continuing and willful conduct, Plaintiffs now find themselves competing for the same customers against the very technologies they invented and patented.

7. Plaintiffs bring this lawsuit to protect their intellectual property investments and to hold Motive accountable for its willful infringement. Motive's actions have caused harm to Plaintiffs, as alleged below, by incorporating Plaintiffs' patented technologies into Motive's products. Motive's actions also significantly harm innovation and undermine the intent of the U.S. patent laws. If Motive's improper copying and use of Plaintiffs' technologies allows it to avoid what is needed to develop new products, other companies will be encouraged to simply copy others' proprietary technologies rather than hire their own engineers, invest in innovation, and develop new technologies independently and organically.

Plaintiffs therefore need injunctive relief to stop Motive's improper infringement of Plaintiffs' lawful patent rights.

## NATURE OF THE ACTION

8. Plaintiffs bring claims under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, for the willful infringement of the following seven United States patents: U.S. Patent Nos. 9,402,060 (the "'060 patent"); 9,761,067 (the "'067 patent"); 10,957,130 (the "'130 patent"); 9,262,873 (the "'873 patent"); 9,014,943 (the "'943 patent"); 9,014,906 (the "'906 patent"); and 9,020,733 (the "'733 patent") (collectively, the "Patents-in-Suit" or "Asserted Patents").

## PARTIES

9. Omnitracs is a Delaware limited liability company with its principal place of business at 1500 Solana Blvd, Suite 6300, Bldg. 6, Westlake, Texas 76262.

10. XRS is a Minnesota corporation and a wholly owned subsidiary of Omnitracs, and maintains its principal place of business at 1500 Solana Blvd, Suite 6300, Bldg. 6, Westlake, Texas 76262.

11. SmartDrive is a Delaware corporation and a wholly owned subsidiary of Omnitracs, and maintains its principal place of business at 1500 Solana Blvd, Suite 6300, Bldg. 6, Westlake, Texas 76262.

12. Defendant Motive Technologies, Inc. (f/k/a KeepTruckin, Inc.) is a Delaware corporation with its principal place of business at 55 Hawthorne Street, 4th Floor, San Francisco, California 94105.

## JURISDICTION AND VENUE

13. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

14. The Court has personal jurisdiction over Motive at least because Motive maintains a regular and established place of business in this District at 55 Hawthorne Street, 4th Floor, San Francisco, California 94105, and from that location conducts and/or directs the acts accused of infringement in this action. *See* https://gomotive.com/company/contact-us/. Moreover, Motive conducts business in this District by making, shipping, distributing, offering for sale, selling, and advertising (including the provision of an interactive company website) its products and services in both the State of California and in this District. Motive has, either directly or through intermediaries, purposefully and voluntarily placed one or more of its infringing products and/or services into the stream of commerce with the intention and

expectation that they will be purchased and used by customers in this District. Furthermore, on its company website Motive advertises that it has sold infringing products to customers in this District, including, for example, Biagi Bros., located in Napa, California, and Rosendin Electric Inc., located in San Jose, California. *See* https://gomotive.com/customers/biagi-bros-fleet-management; https://gomotive.com/customers/rosendin-electric/.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b) because Motive directs and regularly conducts business within this District, has a regular and established place of business in this District, and has committed acts of infringement within this District. Motive maintains a regular and established place of business in this District at 55 Hawthorne Street, 4th Floor, San Francisco, California 94105.

## BACKGROUND

### Omnitracs, XRS and SmartDrive

16. For more than 30 years, Omnitracs has been a global pioneer of fleet management solutions for transportation and logistics companies. Omnitracs provides innovative fleet management solutions, including integrated systems, software-as-a-service (SaaS) applications, and analytics platforms designed for commercial trucking fleets. Omnitracs applies its expertise in artificial intelligence and machine learning to provide end-to-end fleet intelligence.

17. XRS is a wholly-owned subsidiary of Omnitracs and is also a leader in fleet management solutions for transportation and logistics companies. XRS provides smartphone- and tablet-based solutions that enable trucking companies to manage their fleets, comply with regulations, and reduce operating costs. Omnitracs completed its acquisition of XRS on November 2, 2014.

18. SmartDrive is a wholly-owned subsidiary of Omnitracs and is also a leader in fleet management software for transportation and logistics companies. SmartDrive provides a transportation intelligence platform with AI-based driver monitoring to provide improved performance insights and analysis, and a video-based safety program that helps fleets improve driving skills, lower operating costs, and deliver significant return on investment. Omnitracs completed its acquisition of SmartDrive on September 9, 2020.

The ’130 Patent

30. On March 23, 2021, the USPTO duly and legally issued the ’130 patent, entitled, “Driving Event Assessment System.” Omnitracs owns all rights, title and interest in and to the ’130 patent, and possesses all rights of recovery under the ’130 patent. A true and accurate copy of the ’130 patent is attached hereto as Ex. C.

31. The ’130 patent is valid and enforceable.

The ’873 Patent

32. On February 16, 2016, the USPTO duly and legally issued the ’873 patent, entitled, “Systems and Methods for Processing Vehicle Data to Report Performance Data Interchangeably.” Omnitracs owns all rights, title and interest in and to the ’873 patent and possesses all rights of recovery under the ’873 patent. A true and accurate copy of the ’873 patent is attached hereto as Ex. D.

33. The ’873 patent is valid and enforceable.

The ’943 Patent

34. On April 21, 2015, the USPTO duly and legally issued the ’943 patent, entitled, “Transportation Management Techniques.” XRS owns all rights, title and interest in and to the ’943 patent and possesses all rights of recovery under the ’943 patent. A true and accurate copy of the ’943 patent is attached hereto as Ex. E.

35. The ’943 patent is valid and enforceable.

The ’906 Patent

36. On April 21, 2015, the USPTO duly and legally issued the ’906 patent, entitled, “Remote Distribution of Software Updates in a Transportation Management Network.” XRS owns all rights, title and interest in and to the ’906 patent and possesses all rights of recovery under the ’906 patent. A true and accurate copy of the ’906 patent is attached hereto as Ex. F.

37. The ’906 patent is valid and enforceable.

The ’733 Patent

38. On April 28, 2015, the USPTO duly and legally issued the ’733 patent, entitled, “Vehicle Data Acquisition for Transportation Management.” XRS owns all rights, title and interest in and to the

’733 patent and possesses all rights of recovery under the ’733 patent. A true and accurate copy of the ’733 patent is attached hereto as Ex. G.

39. The ’733 patent is valid and enforceable.

## ACCUSED PRODUCTS

40. The accused products in this case include, but are not limited to, Motive’s Fleet Dashboard, AI Dashcam, Smart Dashcam, AI Omnicam, Vehicle Gateway, Asset Gateway, Environmental Sensor, and Motive Driver App, and the hardware and/or software associated thereto (collectively, the “Accused Products”).

## COUNT I

### Infringement of U.S. Patent No. 9,402,060

41. Plaintiffs repeat and reallege the allegations in paragraphs 1–40 as though fully set forth herein.

42. The ’060 patent, titled “Vehicle event recorders with integrated web server,” discloses novel video safety devices that record visual information about events that occur in vehicles and provide an advanced interface system that improves users’ ease of use by allowing for specific types of remote configuration. Exhibit A (’060 patent), 5:39-6:14. The ’060 patent explains that prior-art video systems were cumbersome and difficult to use, and provided significantly limited functionality in what video data could be recorded or how it could be retrieved. *Id.*, 1:12-5:15. The ’060 patent solves these problems through its inventions that include a specific structural device comprising a video camera, memory, and “event trigger,” which detects events “responsive to an event parameter breaching an event trigger threshold level,” along with a microprocessor for flexibly receiving settings information from a remote device. *Id.*, cl. 1. The microprocessor “facilitate[s] wireless communication of information between the vehicle event recorder and a remotely located computing device using HTTP” and “receive[s] settings information from the remotely located computing device . . . operable to adjust vehicle event recorder settings pertaining to operation of one or both of the video camera and the event trigger.” *Id.*

43. Motive’s products and/or services that infringe the ’060 patent include, but are not limited to, the Accused Products and use thereof.

44. Motive makes, uses, sells, offers for sale, and/or imports the Accused Products and components thereof in the United States.

45. Motive directly infringes—literally and/or under the doctrine of equivalents—at least claim 1 of the ’060 patent by making, using, selling, offering for sale, and/or importing into the United States its Accused Products and components thereof.

46. For example, claim 1 of the ’060 patent recites:

> 1. A vehicle event recorder comprising:
>
> a video camera configured to acquire visual information representing a vehicle environment, the vehicle environment including spaces in and around an interior and an exterior of a vehicle;
>
> a memory configured to electronically store information;
>
> an event trigger configured to detect a vehicle event responsive to an event parameter breaching an event trigger threshold level; and
>
> a microprocessor configured to:
>
> responsive to detection of the vehicle event, effectuate storage of visual information associated with the vehicle event in the memory;
>
> facilitate wireless communication of information between the vehicle event recorder and a remotely located computing device using HTTP;
>
> receive settings information from the remotely located computing device, wherein the settings information is operable to adjust vehicle event recorder settings pertaining to operation of one or both of the video camera and the event trigger, and
>
> adjust the vehicle event recorder settings based on the received settings information.

47. The Accused Products practice each limitation of at least claim 1 of the ’060 patent.

48. Motive, at least by using the Accused Products, performs each step of claim 1 of the ’060 patent. *See* Exhibit H.

49. To the extent the preamble is construed to be limiting, Motive, at least by using the Accused Products, performs the requirements of the preamble. For example, Motive Vehicle Gateway (ELD) with Smart Dashcam, AI Dashcam, and AI Omnicam provide “a vehicle event recorder.”

50. Motive, at least when using the Smart Dashcam, AI Dashcam and/or AI Omnicam includes “a video camera configured to acquire visual information representing a vehicle environment, the vehicle

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMNITRACS, LLC, et al.,<br>Plaintiffs,<br>v.<br>MOTIVE TECHNOLOGIES, INC.,<br>Defendant. | Case No. 23-cv-05261-RFL<br><br>**ORDER RE: CLAIM CONSTRUCTION AND MOTION FOR CLARIFICATION**<br><br>Re: Dkt. Nos. 73, 129, 133 |

On July 19, 2024, a claim construction hearing was held concerning the disputed constructions of nine terms whose resolution was identified by the parties as most significant pursuant to Patent Local Rule 4-3(c) concerning U.S. Patent Nos. 9,402,060 (the "'060 patent"); 10,957,130 (the "'130 patent"); 9,014,943 (the "'943 patent"); 9,014,906 (the "'906 patent"); 9,020,733 (the "'733 patent"); 9,064,422 (the "'422 patent"); 9,390,628 (the "'628 patent"); 9,911,253 (the "'253 patent"); and 9,208,129 (the "'129 patent"). To allow the parties to move forward most efficiently in the litigation, the Court published the claim constructions for those nine terms without an explanation of its reasoning on July 22, 2024, and stated that a further Order with the Court's reasoning would be provided later. (Dkt. No. 123 ("Claim Construction Disposition Order").) The reasoning for those constructions is provided in this Order. On August 1, 2024, a further claim construction hearing was held as to a tenth term identified by the parties ("image processing device"), and the parties agreed upon a construction with the Court at the hearing, which is included below. The Court declines to construe at this juncture any additional terms beyond the ten terms identified by the parties as their top priorities, without prejudice to the parties seeking additional rulings as to claim construction at a later phase of the

litigation.

On July 30, 2024, Omnitracs moved for clarification as to how the Court's ruling in the Claim Construction Disposition Order applied to certain dependent claims employing the term "intervals that approximate real-time." (Dkt. No. 133.) Because this order addresses those claims directly, the motion to clarify is denied as moot.

## I. LEGAL STANDARD

The claim construction inquiry begins with the intrinsic evidence. "[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

In interpreting the claim language, the court looks to "the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Id.* The words are given their "ordinary and customary meaning," which refers to "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

The claim language is read "in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. "However, claims are not to be interpreted by adding limitations appearing only in the specification." *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994). "Thus, although the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such

embodiments." *Id.* On the flip side, an interpretation that would exclude the preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support[.]" *Vitronics*, 90 F.3d at 1583. But where "claim language is unambiguous," claims may be construed "to exclude all disclosed embodiments." *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215–16 (Fed. Cir. 2008).

In addition, "[l]ike the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

The court may also consider extrinsic evidence, such as expert testimony, dictionaries, and technical treatises "[o]nly if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence[.]" *Vitronics*, 90 F.3d at 1584. In such situations, "it is entirely appropriate . . . for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999). However, the "extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language" or "contradict the import of other parts of the specification." *Vitronics*, 90 F.3d at 1584.

Patent claims are presumed to be valid and definite. 35 U.S.C. § 282. However, "this presumption of validity does not alter the degree of clarity that [35 U.S.C.] § 112, ¶ 2 demands from patent applicants[.]" *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 912 n.10

(2014). A claim term is indefinite under Section 112 where, after considering the specification, prosecution history, and extrinsic evidence, the term does not "inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.* at 901. A party asserting indefiniteness bears the burden of proof by clear and convincing evidence. *Id.* at 912 n.10. Indefiniteness is measured "from the viewpoint of a person skilled in the art at the time the patent was filed." *Id.* at 908 (cleaned up). The claim language must "provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). However, an express definition is not required. *See Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1382–84 (Fed. Cir. 2015).

## II. CONSTRUCTIONS

### A. Claim term "detailed complete dataset" in '129 patent, claims 1, 3–5, 7–9, 11

This term is construed as "data as collected from a video camera, vehicle systems transducers, or other measurement systems associated with vehicle use," which was the construction proposed by Omnitracs. Motive proposed a construction of "video data stored together with vehicle usage information and associated with an event."

Claim 1 is representative:

> A vehicle event recorder system configured to couple with a vehicle, the system comprising:
>
> > a camera configured to acquire visual information representing a vehicle environment, the vehicle environment including spaces in and around an interior and an exterior of the vehicle;
> > one or more vehicle systems transducers configured to generate output signals conveying vehicle usage information . . .
> > a managed loop memory . . .
> > a buffer memory . . .
> > a transceiver configured to wirelessly transmit information to a remotely located server . . .
> > and a microprocessor configured to:
> >
> > > effectuate storage of the visual information and the vehicle usage information in the managed loop memory;
> > > responsive to physical anomaly event triggers, . . .
> > > compress and/or parse the detailed complete datasets

> into abbreviated datasets such that the abbreviated datasets comprise less bytes of data than the detailed complete datasets;
> effectuate storage of the abbreviated datasets in the buffer memory, and
> facilitate wireless transmission of the detailed complete datasets and the abbreviated datasets via the transceiver,
>
>> wherein transmission of the abbreviated datasets is prioritized over the detailed complete datasets such that
>> a high priority individual abbreviated dataset associated with a single vehicle physical anomaly event trigger is transmitted instantly via the cellular communication network, and then
>> a lower priority individual detailed complete dataset associated with the same physical anomaly event trigger event is transmitted responsive to a higher bandwidth link becoming available.

Nothing in the claim language supports limiting the ordinary meaning of the term to situations in which the video data is stored together with vehicle usage or event data. Moreover, the specification provides strong intrinsic evidence that the term does not require storage of the video data with vehicle usage and event data. Motive correctly notes that the specification describes some examples of embodiments where vehicle usage or event data is indeed associated with the video data. However, the specification also describes an embodiment in which the detailed complete dataset contains *only* video data, without requiring it to be associated with vehicle usage data or event data. '129 Patent at 9:63–10:8. That supports the view that the video data is sometimes, but not always, associated with vehicle usage or event data. "We normally do not interpret claim terms in a way that excludes disclosed examples in the specification." *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1280–82 (Fed. Cir. 2017) (where specification was "rife with exemplary embodiments where the switching signal propagates in both wireless and wired form," construing the patent to include "both wired and wireless transmissions").

Additionally, Motive's interpretation would render superfluous the language in dependent Claim 3: "[t]he vehicle event recorder of claim 1, wherein the microprocessor is configured such

that the lower priority individual detailed complete dataset includes visual information and vehicle usage information from before and after the single physical anomaly event trigger." If Motive's interpretation were correct, Claim 3 could have just been drafted to recite a claim wherein "the microprocessor is configured such that the lower priority individual detailed complete dataset includes such data from before and after the single physical anomaly event trigger." That claim language would be sufficient to convey inclusion of visual information coupled with vehicle usage information from before and after the event if, as Motive contends, the detailed complete dataset must always include both forms of data coupled together. Dependent Claim 7 contains the same language. The use of the phrase "wherein the . . . detailed complete dataset includes visual information and vehicle usage information" in those dependent claims is further intrinsic evidence that such information is not inherently included in the meaning of the term "detailed complete dataset." *See Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016) ("Ideally, claim constructions give meaning to all of a claim's terms. Construing a claim term to include features of that term already recited in the claims would make those expressly recited features redundant." (internal citation omitted)).

### B. Claim term "[facilitate] / [facilitating, with the processor,] wireless communication of information between the vehicle event recorder and a remotely located computing device using HTTP" in '060 patent, claims 1, 11.

This term is construed to mean "facilitate wireless communication of the information between a web server in the vehicle event recorder and a remotely located computing device using HTTP." At the claim construction hearing, the parties agreed upon this construction of the term, and it is hereby adopted.

### C. Claim term "frame(s) of visual information" in '253 patent, claims 1, 11.

This term is construed to mean "video frames." Omnitracs agreed to this definition at the claim construction hearing. Motive argues that the term should be construed to mean "Complete still image(s)," which Motive argues would exclude images that have been encoded. The intrinsic evidence refutes Motive's proposal to add this additional limitation.

Claim 1 is representative:

> A vehicle event recorder system configured to be mounted in a vehicle, the vehicle event recorder system comprising:
>
> > a camera configured to capture image data, wherein the camera has a field-of-view that includes an environment in and/or around the vehicle, wherein the image data includes a set of consecutive frames of visual information;
> > a buffer memory . . .
> > a long-term storage memory configured to store information, wherein the stored information includes a subset of the set of consecutive frames of visual information;
> > one or more sensors configured to generate output signals . . . and
> > a controller configured to:
> >
> > > detect the particular vehicle event based on the generated output signals;
> > > effectuate storage of the set of consecutive frames of visual information in the buffer memory;
> > > determine values of individual frames in the set of consecutive frames, wherein the values of the individual frames decrease with increasing time away from the particular time of the particular vehicle event;
> > > facilitate overwriting of the individual frames stored in the buffer memory based on the determined values; and
> > > responsive to detecting the particular vehicle event, transfer information stored in the buffer memory to the long-term storage memory, wherein the transferred information includes frames of visual information for a period of time that begins before the particular vehicle event and lasts until after the particular vehicle event.

Nothing in the claim language supports a requirement that the images be complete or unencoded, and the specification refers to the frames at issue as "video frames" without further qualification. '253 Patent at 8:39–42.

In addition, the prosecution history of the '253 patent repeatedly references storing the video data using "software components" that incorporated "a real time video compression application program (*e.g.*, AVI, MPEG II)[.]" (Dkt. No. 87-16 at 5; *see also id.* at 9–10 (describing a preferred embodiment as including "a real time video compression application program . . . (*e.g.* MPEG II), and an encryption application program").[1] The MPEG standard

[1] For record cites, the page numbers in this Order refer to the page number stamped on the top of each page by the electronic case filing system.

referenced in the prosecution history describes itself as "a coded representation that can be used for compressing video sequences to bitrates around 1,5 Mbit/s." (Dkt. No. 101-4 at 4.) It defines compression as a "[r]eduction in the number of bits used to represent an item of data." (*Id.* at 9.) In the "overview of the algorithm" section, the MPEG standard further states that the algorithm "is not lossless[.]" (*Id.* at 4.) The prosecution history's repeated references to the use of MPEG compression undercuts a construction that requires the "complete" image to be retained.

Motive protests that, in its view, the '253 patent would be inoperable if the frames were incomplete images. At the hearing, Motive argued that a distinction should be drawn between compression and encoding, and that whereas compressed images contained all the necessary information to be complete, encoded images did not, because encoding can rely on data from prior and subsequent frames to reconstruct the complete picture in a given frame. Motive argued that the '253 patent contemplates removing some frames, instead of preserving the chronological order of frames, to allow more efficient transmission, and therefore that there might be no prior or subsequent frame to rely upon if a given frame is encoded. On that basis, Motive asserts that the'253 patent would be inoperable if the frames could include encoded images.

Motive cites no expert testimony in support of this conclusion. The sole evidence on which Motive relies is an unrelated patent from 2007 that describes a method of video encoding that involves relying on prior and subsequent video frames. (Dkt. No. 93 at 5 (citing Dkt. No. 93-2 at 3:13–34).) But Motive's reference to this unrelated patent does not explain how the '253 patent would be rendered inoperable if the frames were encoded by the described method. Moreover, Motive's argument contradicts the intrinsic evidence from the prosecution history. As noted above, the prosecution history repeatedly describes the storage of video data to which MPEG's algorithm was applied. That algorithm relies on prior and subsequent video frames. The MPEG standard states that "[a] number of techniques are used to achieve a high compression ratio," including "prediction of the current picture from a previous picture," "prediction of the current picture from a future picture," and "interpolative prediction from past and future pictures." (Dkt. No. 101-4 at 5.) Motive offers no evidence explaining why a person

of ordinary skill would understand "frames of visual information" to preclude encoded images when the specification contemplates, through reference to the MPEG, several encoding and compression techniques.

Motive further contends that video encoding was not yet widely adopted in 2005, relying on the background section to the unrelated 2007 patent. (Dkt. No. 93 at 5.) However, that reference states only that "[w]ith MPEG compression algorithms and the increased capacity of today's disk drives, the problem [of storing large surveillance videos] has been reduced, but it is far from being solved." (Dkt. No. 93-2 at 1:19–26.) That supports the notion that MPEG compression was well-known at that time, as reflected in the prosecution history, but that the overall technical problem of storing increasing amounts of data remained unsolved. Indeed, the MPEG standard quoted above dates from 1993. (Dkt. No. 101-4 at 3.)

In sum, the intrinsic evidence in the claim language, specification, and prosecution history all point toward construing the term as "video frames," and not restricting it to unencoded, uncompressed, or complete still images.

**D. Claim term "electronic driver scorecard" in '943 patent, claim 1; '628 patent, claim 15.**

This term is construed as "electronic presentation of driver scores," which was the construction proposed by Omnitracs. Motive proposed the term be construed to mean "a set of user-selected safety and efficiency criteria and one or more calculated alphanumerical ratings."

Claim 1 of the '943 patent is representative:

> A system for managing a vehicle fleet of a plurality of vehicles comprising:
>
> > a data acquisition device . . . wherein the data acquisition device is further configured to output, upon demand by an enforcement official, a driver summary electronic report including hours of service records for a driver of the vehicle, to a device accessed by the enforcement official;
> > a portable wireless data transfer and display device; and
> > a remote network device for managing the vehicle fleet of the plurality of vehicles, . . .
> > wherein the remote network device is configured to receive the vehicle data, the driver information, the communication information, and the driver summary electronic report at

> predetermined times from the portable wireless data transfer and display device, and present an electronic driver scorecard to a second user via a second display,
> wherein the electronic driver scorecard includes a composite driver score based on a plurality of a group consisting of:
>
> > fuel efficiency;
> > occurrences of stop idle;
> > occurrences of speeding;
> > occurrences of hard braking;
> > occurrences of high speed braking; and
> > occurrences of safety violations.

The claim language and the specifications do not impose the additional restrictions proposed by Motive. The '943 and '628 specifications describe various examples where the information is processed into "an electronic driver scorecard according to specified safety and efficiency criteria." *See, e.g.*, '943 at Fig. 12 (showing an "example" where the driver scorecard lists various safety and efficiency criteria); '628 patent at 7:14–47. However, nothing in the specifications defines the scorecard as limited to those criteria. Instead, the specification language contemplates the possibility of a wide variety of criteria, noting that in some examples users may select their own criteria. *See, e.g.*, '628 patent at 35:24–32. Nor do the specifications require the factors to be user-selected, though "[i]n some examples, the factors may be selectable by the user[.]" *Id.* at 35:24. The specifications do not require an alphanumeric rating in the sense of requiring both a letter and a number either. *See, e.g.*, *id.* at Fig. 12 (describing preferred embodiment with a purely numerical rating).

Instead, Motive's principal basis for its proposed construction appears to be the prosecution history of the '628 patent. (As Motive conceded at the hearing, there was no pertinent prosecution history regarding the '943 patent.) The examiner initially rejected the pertinent claims in the '628 patent based on the Davidson prior art reference. (Dkt. No. 87-5 at 11–14.) In response, the applicant added the limitation "wherein the portable wireless data transfer and display device is configured to process the vehicle data, the driver information, and driver communications into an electronic driver scorecard, the electronic driver scorecard including one or more alphanumerical ratings according to a selection of drivers[.]" (*Id.* at 12.) In explaining the amendment, the applicant noted that Davidson had "not been shown to disclose

or suggest" the new limitation. (*Id.*) The applicant further stated:

> The claimed subject matter differs from Davidson in that the claimed subject matter recited by amended claim 1 includes "wherein the portable wireless data transfer and display device is configured to process the vehicle data, the driver information, and driver communications into an electronic driver scorecard, the electronic driver scorecard including one or more alphanumerical ratings according to a selection of drivers." In contrast, Davidson merely discloses identifying inefficiencies within a driver's routine and practices. Davidson merely discloses that allowing fleet operators to correct inefficient practices of a driver's routine and reduce the amount of idle time for deliveries. However, Davidson performs these actions without modifying a scoreboard based on a set of selected safety and efficiency criteria and calculating one or more alphanumerical ratings based on adjustable weights for the set of selected safety and efficiency criteria. As such, Davidson fails to disclose or suggest the aforementioned features of claim 1.

(*Id.* at 13.) On that basis, Motive argues that the applicant disavowed scorecards other than those "based on a set of selected safety and efficiency criteria and calculating one or more alphanumerical ratings based on adjustable weights for the set of selected safety and efficiency criteria."

The prosecution history, however, does not support a finding of a clear and unmistakable disavowal. Only when a patentee "has unequivocally disavowed a certain meaning to obtain his patent" in a way that is "clear and unmistakable" does the disavowal "narrow[] the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324–26 (Fed. Cir. 2003). In *Omega*, for example, the applicant overcame prior art by explaining that the "clear advantage offered by [the invention] is that it only directs energy at the edge of the energy zone . . ., and as such, has virtually no effect on the temperature measurement[.]" *Id.* at 1326. The Federal Circuit found that the applicant did not "deliberately and unambiguously define its invention as a device whose laser beams would remain outside of the energy zone." *Id.* The applicant's statement could be read as distinguishing the prior art based on the "crucial feature" that the invention "would not add appreciable heat to the energy zone." *Id.*

The '628 applicant likewise did not clearly and unmistakably disavow other forms of

electronic driver scorecards, but instead identified the scorecard as the crucial feature that was missing from the Davidson prior art reference. While also mentioning other advantages of the invention over Davidson, the thrust of the applicant's explanation was its thrice-repeated statement that Davidson did not disclose the new scorecard limitation. (Dkt. No. 87-5 at 12–13.) *See Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 798–99 (Fed. Cir. 2019) (merely "comparing and contrasting the present technique to that of the prior art does not rise to the level of a clear disavowal of claim scope" (cleaned up)).

### E. Claim term "a composite driver score based on a plurality of a group consisting of: fuel efficiency; occurrences of stop idle; occurrences of speeding; occurrences of hard braking; occurrences of high speed braking; and occurrences of safety violations" in '906 patent, claims 1, 10; '943 patent, claim 1; '733 patent, claim 1.

This term is construed as a closed group, as proposed by Motive, and encompasses a composite driver score based on two or more factors from the recited group and no other unrecited factors. At the hearing, Omnitracs proposed an alternative construction that "the plurality is closed and encompasses a composite driver score based on two or more factors from the recited list," without including language prohibiting the addition of unrecited factors.

Claim 1 of the '906 patent is representative:

> A network device for managing a vehicle fleet of a plurality of vehicles comprising:
> . . .
> wherein the processor is configured to process at least one of: the vehicle data, the driver information, and the driver communications into a driver summary electronic report, wherein the driver summary electronic report includes a composite driver score based on a plurality of a group consisting of:
>
> > fuel efficiency;
> > occurrences of stop idle;
> > occurrences of speeding;
> > occurrences of hard braking;
> > occurrences of high speed braking; and
> > occurrences of safety violations . . .

The term "consisting of" denotes a closed group.[2] "[T]o overcome the exceptionally

---

[2] Because this Order relies on the term "comprising" to find the recited group to be closed, it is not necessary to reach whether the group otherwise qualifies as a "Markush group."

strong presumption that a claim term set off with 'consisting of' is closed to unrecited elements, the specification and prosecution history must unmistakably manifest an alternative meaning." *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1359 (Fed. Cir. 2016). Although the specification refers to "examples" of other factors that could be displayed and do not fall in the closed group above (such as "delivery history" and "cargo maintenance"), the specification does not unmistakably manifest an alternative definition of the term "consisting" as used here. '906 patent at 35:12–23. *See Multilayer*, 831 F.3d at 1360 (finding that "listing of these other resins [outside the closed group] in the specification" was not "sufficient to overcome the presumption created by the 'consisting of' claim language").

In its briefs, Omnitracs asserts that the use of the term "comprising" in the preamble to the claims renders the group open, relying on *Amgen Inc. v. Amneal Pharm. LLC*, 945 F.3d 1368 (Fed. Cir. 2020). *Amgen*, however, holds that the term "comprising" recites an open list of elements, but that those elements can themselves contain sublists that are closed. Amgen claimed a chemical composition "comprising" several components, including "at least one binder selected from the group consisting of" various members. *Id.* at 1371. The Federal Circuit treated the sublist of binders as a closed list, because the members of that sublist came after the term "consisting of." *Id.* However, an accused composition could still infringe if it included at least one binder selected from that list and a second binder not on the list, since the "comprising" language meant the chemical composition could have a number of different binders. *Id.* As another district court has explained, "Under the proper construction, the Markush group is closed (i.e., at least one agent is limited to one of the Markush group options) while the components that comprise the sample are open (i.e., can include more than one agent)." *Ravgen, Inc. v. Natera, Inc.*, 2024 WL 116317 at *2 (W.D. Tex. 2024). Omnitracs appeared to abandon this argument at the hearing.

Instead, Omnitracs argued at the hearing that the term "based on" in the phrase "based on a plurality of a group consisting of" rendered the list open. Omnitracs does not cite anything in the specification or prosecution history that defines the term "based on," or any extrinsic

evidence in the form of expert testimony or technical dictionaries regarding the meaning of the phrase "based on." The plain and ordinary meaning of the term "based on" denotes a closed group limited to specified bases.[3] For example, when a "score" is "based on" certain factors, the plain meaning is that the score is determined only by the delineated list of factors. If a teacher tells students, "Your grade will be based on the final exam and the midterm," students would be surprised if their grade was also based on class participation. That is particularly so when score is "based on" a list "consisting of" specific factors. That formulation is inconsistent with an open-ended group.

**F. Claim term "real-time" in '906 patent, claims 6, 14; '943 patent, claims 1, 16, 17; '733 patent, claims 1, 2, 4; '422 patent, claims 1, 15, 16, 20.**

This term is construed as "at the time or immediately after (but less than one second)." Omnitracs stated at the hearing that it did not object to this definition. Motive contends that the term is indefinite or, in the alternative, that it should be construed as "[send/transmit/receive] data pushed over a preexisting communication channel less than one second from when the data is collected without storing the data."

Claim 1 of the '943 patent is representative:

> A system for managing a vehicle fleet of a plurality of vehicles comprising:
>
> > a data acquisition device . . .
> > a portable wireless data transfer and display device; and
> > a remote network device for managing the vehicle fleet of the plurality of vehicles,
> > wherein the data acquisition device includes a first short-range wireless communication module configured to wirelessly transmit, in real-time or at intervals that approximate real-time, the vehicle data to the portable wireless data transfer and display device, wherein the portable wireless data transfer and display device includes a second short-range wireless communication module configured to wirelessly receive the vehicle data from the data acquisition device, in the real-time or at the intervals

[3] Because the term is not a technical one, it is appropriate to refer to general use dictionary. *Phillips*, 415 F.3d at 1314 ("general purpose dictionaries may be helpful" where the construction involves "the application of the widely accepted meaning of commonly understood words"). Merriam-Webster Dictionary defines "based" as "having a specified type of base or basis[.]" *See* https://www.merriam-webster.com/dictionary/based, last visited Aug. 1, 2024

> that approximate real-time, when the data acquisition device is mounted in the vehicle and the portable wireless data transfer and display device is in close proximity to the vehicle . . .

The specifications provide examples of "real-time" communications occurring at the time or immediately after. "In some examples, the real-time communication is less than 1 second, and may also be less than 0.1 seconds, less than 50 milliseconds, less than 20 milliseconds, or even less than 20 milliseconds." '906 Patent at 14:45–49; '943 patent at 14:43–47; '733 Patent at 14:43–47; '422 Patent at 14:43–47. Dictionaries used in the field confirm that definition. For example, *A Dictionary of Computing* (2008) describes a "real-time system" as one in which the "lag from input time to output time" is "sufficiently small for acceptable timeliness." (Dkt. No. 73-3 ¶ 28.)

Numerous courts have found that "real-time" is not indefinite and have defined the term in a similar fashion based on similar intrinsic evidence. *See, e.g.*, *Omnitracs, LLC v. Platform Science, Inc.*, No. 3:20-cv-00958-CAB-DDL (S.D. Cal. Apr. 14, 2023), Dkt. No. 295 at 4–5 (construing "real-time" in a patent from the same family with the same specification language in a lawsuit involving the same parties and counsel); *B.E. Tech., LLC v. Twitter Inc.*, 2024 WL 579076, at *3 (D. Del. Feb. 13, 2024) (construing "real-time" to mean "at the time of user interaction, or immediately following"); *Contour IP Holding, LLC v. GoPro, Inc.*, No. 17-CV-04738-WHO, 2018 WL 3428606, at *4 (N.D. Cal. July 16, 2018) (construing "real-time" to mean "without perceived delay").

The extrinsic evidence confirms that the term "real-time" is generally well-understood by persons of ordinary skill in the art and is not indefinite. (*See* Dkt. No. 73-3 ¶ 28 (expert declaration describing how persons of ordinary skill in the art understand the term).) Although the examples in the specifications do not specifically impose an upper bound of "less than one second," the "examples … provide[] guidance and points of comparison for skilled artisans." *Sonix Tech. Co., Ltd. v. Publ'ns,* 844 F.3d 1370, 1378 (Fed. Cir. 2017). As such, the "intrinsic record provides objective boundaries by which a skilled artisan could determine the scope of the claims." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1349 (Fed. Cir. 2022)

(finding that "examples in the written description helped provide sufficient guidance to render the claims not invalid as indefinite").

Motive counters that the patentee sought to act as its own lexicographer by stating in the specification that "[a]s referred to herein, real-time communications represent data pushed over a communication channel that is active once the data is collected." *See, e.g.*, '906 patent at 14:39–41. "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to redefine the term." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1378 (Fed. Cir. 2022) (cleaned up). The statement quoted by Motive does not satisfy that standard.

Rather than defining the term "real-time," the statement instead appears to be discussing its use in a specific embodiment. The statement comes in the midst of a discussion of a particular embodiment of the invention depicted in Figures 2 and 3. '906 patent at 14:21–49. The sentences immediately prior and immediately after the statement discuss characteristics of that embodiment. The specification then goes on to discuss "some implementations" that are variants of that embodiment. *Id.* at 14:50–53. *See Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1339 (Fed. Cir. 2014) (finding no lexicography where characterization of a claim term was "expressly qualified . . . as being exemplary").

At the hearing, Motive argued that the use of the phrase "as used herein" always conveys a definitional intent, citing *Parkervision, Inc. v. Vidal*, 88 F.4th 969 (Fed. Cir. 2023). But *Parkervision* does not make such a broad ruling. There, the specification recited: "The terms storage module and storage capacitance, as used herein, are distinguishable from the terms holding module and holding capacitance, respectively. Holding modules and holding capacitances, as used above, identify systems that store negligible amounts of energy . . . Storage modules and storage capacitances, on the other hand, refer to systems that store non-negligible amounts of energy from an input EM signal." *Id.* at 976. The Federal Circuit relied not only on the use of the phrase "as used herein," but also on the fact that the patentee evidenced an intent to define the "terms" and stated what the terms "refer to." *Id.*

(pointing to the "use of the phrases 'as used herein' and 'refer to'" and the fact that the language at issue "referr[ed] to 'storage module' and 'storage capacitance' as 'terms'").

Here, the patentee used the phrase "[a]s referred to herein, real-time communications represent . . ." While there are similarities to the language in *Parkervision,* the patentee here did not similarly evince intent to define the term real-time by, for example, writing "the term real-time, as used herein" or that "the term real-time refers to" a given definition. Indeed, the statement at issue does not employ the word "term," at all. This is in distinct contrast to instances in which the patentee did act as its own lexicographer here. In three other instances in the '906 Patent specification, the patentee identified the "term" to be defined and put that term in quotes. *See, e.g.*, '906 Patent, 28:60–63 ("the term 'processor,' as used herein may refer to . . ."); *id.* at 29:57–64 ("As used herein, the terms 'machine-readable medium' 'computer-readable medium' refers [sic] to any computer program . . ."); *id.* at 29:65–67 ("The term 'machine-readable signal' refers to any signal . . ."). The omission of that definitional language with respect to the statement about real-time communications undercuts a clear intent to redefine that term. The patentee was well-aware of how to use such definitional language, but elected not to do so here.

Moreover, treating the statement at issue as definitional would be inconsistent with other language in the specification. As counsel for Motive conceded at the hearing, if "real-time" encompassed any situation where the "data [is] pushed over a communication channel that is active once the data is collected," the term "real-time" would not require prompt transmission. '906 patent at 14:39–41. The "real-time" communication could be pushed three days later, as long as the channel was "active" once the data was collected. That definition conflicts with the specification's examples of real-time as being within "milliseconds." *Id.* It also conflicts with the specification's statements describing how the invention could improve safety monitoring by a fleet manager while trucks are driving. That portion of the specification states that "information may further be transmitted in real-time for better safety." *Id.* at 40:39–40. That statement makes no sense if "real-time" does not include any timing requirement.

Motive also contends that the prosecution history disavows systems in which the data is captured and stored before further transmission (such as through buffering), no matter how momentary the storage is. (Dkt. No. 93 at 20.) The applicant distinguished the prior art reference Davidson on the basis that it did not transmit in real-time because it "fails to specify a specific time period or intervals for the data transmission." (Dkt. No. 87-6 at 11.) "Without information to the contrary, the storing of captured data . . . indicates that the transmission of captured data does not happen not [sic] in real-time[.]" (*Id.*) The natural reading of the applicant's statement is that, if a system stores data without any specified timeline for transmitting it, the system is not transmitting the data in real-time. That does not clearly and unmistakably disavow systems that store data before transmitting it. Indeed, this prosecution history confirms that "real-time" has a temporal component requiring the transmission to occur quickly, and that the applicant did not intend to act as its own lexicographer by defining the term to refer to situations in which the data is being "pushed over a communication channel that is active once the data is collected."

The claim language, specification, and prosecution history all confirm the construction of real-time as "at the time or immediately after (but less than one second)."

**G. Claim term "intervals that approximate real-time" in '906 patent, claims 6, 14; '943 patent, claims 1, 17; '422 patent, claims 1, 15, 16, 20.**

This term is indefinite because it does not have ascertainable "objective boundaries" to a person skilled "in the art when read in the context of the invention." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370–71 (Fed. Cir. 2014). Claim 1 of the '422 patent is representative:

> A portable wireless data transfer and display device comprising:
> a user interface;
>
> a communication module;
> a display;
> a short-range wireless communication module . . . and
> a long-range wireless communication module configured to send the vehicle data and the driver information through the communication module in real-time or at intervals that approximate real-time to a remote network device via a long-

> range wireless network, wherein the portable wireless data transfer and display device is further configured to present at least one of: the vehicle data, the driver information, processed data, driver communications to the user via the display.

In many situations, this term could survive a definiteness challenge by simply relying on the common understanding of the word "approximate." *See, e.g.*, *Contour IP*, 2018 WL 3428606, at *3–4 (finding the term "near real time" not indefinite). However, when read in light of the specifications of the patents in issue, the term is indefinite. The examples of intervals that "approximate real-time" in the specifications are "intervals of less than 5 minutes, less than 3 minutes, less than 2 minutes, less than 1 minute or even less than 30 seconds." *See, e.g.*, '943 patent at 9:42–46. Those examples vary widely. They do not provide objective boundaries for how long an interval approximates real-time. For example, four minutes would be 240 times longer than the one-second maximum applicable to "real time." That is beyond the ordinary meaning of "approximate," and does not include any clear limiting principle.

Omnitracs proposes to treat five minutes as the upper boundary. However, the specification is clear that "less than 5 minutes" is an example, not an upper boundary. *Id.* Also, such an interpretation would be inconsistent with the dependent claims. For example, claim 15 of the '422 patent recites:

> The device of claim 1, wherein the intervals that approximate real-time are selected from a group consisting of:
>
> intervals less than 5 minutes;
> intervals less than 3 minutes;
> intervals less than 2 minutes;
> intervals less than 1 minute; and
> intervals less than 30 seconds.

Claim 20 of the '422 patent and claim 17 of the '943 patent recite similar language. If "intervals that approximate real-time" are always less than 5 minutes, any such interval would automatically satisfy the additional limitations of the dependent claims. Any interval that approximates real time, under Omnitracs's definition, would also be an "interval less than 5 minutes." Reading the term to include an upper boundary of 5 minutes would therefore render those dependent claims superfluous. Omnitracs's proposed definition violates the precept that

"dependent claims . . . are presumed to be narrower than the independent claims on which they depend[.]" *Trustees of Columbia Univ. in City of New York v. Symantec Corp*., 811 F.3d 1359, 1370 (Fed. Cir. 2016).

Moreover, to avoid indefiniteness, the claim terms still must "reasonably apprise those skilled in the art" as to their scope and be "as precise as the subject matter permits[.]" *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985). Within the wide range from one second to five minutes, some intervals will still be too long to approximate real-time. For example, a system that deliberately withholds transmission for four minutes for no apparent reason would not be one that approximates real-time. However, the specification provides no way to determine which intervals approximate real-time within the one-second to five-minute range. Nothing in the specification provides any criteria on which those skilled in the art can rely to determine if an interval approximates real-time. Nor does Omnitracs's expert declaration shed any light on that issue. Dr. Wicker states only that the term would be understood in light of the "benefits of regular communication without expending bandwidth, power, and other resources necessary to engage in real-time communication, particularly in situations where resources such as bandwidth or power are limited." (Dkt. No. 73-3 ¶ 38.) That does not provide any objective criteria to know when an interval is too long.[4]

*Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200 (Fed. Cir. 1991), is instructive. The court found the term "at least about 160,000" to be indefinite. *Id.* at 1217–18. The term was "an effort to recapture a mean activity somewhere between 120,000, which the patent examiner found was anticipated by the prior art, and the 160,000 IU/AU claims which were previously allowed." *Id.* at 1218 (cleaned up). Although those numbers provided clear upper and lower

[4] The Court declines to consider the additional evidence presented for the first time in Omnitracs's reply brief in support of its Motion for Clarification of the Court's Claim Construction Disposition Order, concerning what skilled artisans understand the term approximating real-time to mean. (Dkt. No. 155-1.) If Omnitracs wanted the Court to consider that evidence, it should have submitted it in the claim construction hearing and briefing, when Motive would have had an opportunity to respond. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence presented in a reply should not be considered without giving the non-moving party an opportunity to respond).

boundaries, the term was still indefinite because it "gives no hint as to *which mean value* between the Miyake et al. value of 128,620 and the mean specific activity level of 160,000 constitutes infringement." *Id.* (emphasis added). The indefiniteness of the term here is not cured by placing an upper boundary of five minutes and a lower boundary of one second because, within that wide range, there is still no objective basis to determine which intervals approximate real-time.

The situation would be different if the specification disclosed some criteria by which skilled artisans could know whether an interval was too long. For example, in *Niazi Licensing*, the court found the term "resilient" was not indefinite as applied to a catheter, because the written description required the catheter to have "sufficient shape memory to return to its original shape when undistorted" and explained that resilience provides for "torque control and stiffness." 30 F.4th at 1349–50. That description allowed a person of skill in the art to know that a resilient catheter is "one that has shape memory and stiffness such that it can return to its original shape." *Id.* at 1349. No similar criteria is evident here in the claim language, specifications, or prosecution history. Nor is there extrinsic evidence as to what criteria skilled artisans would apply to define that term.

Omnitracs argues that, even if the term is indefinite in the independent claims, its meaning is sufficiently definite in dependent claims 15 and 20 of the '422 patent and claim 17 of the '943 patent, whose language is quoted above. The dependent claims, however, present the same problem. In addition to satisfying the limitation that the interval be less than 5 minutes, less than three minutes, etc., the interval must also be one that "approximate[s] real-time." To hold otherwise would read the term "approximate real-time" out of the claim. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."). Such an approach would also contravene the requirement that a "claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112 ¶ 4 (2006); 35 U.S.C. § 112(d).

Because the interval must still be one that approximates real-time, in addition to being less than five minutes, the dependent claims do not cure the indefiniteness of the term. For example, as discussed above, if an interval is four minutes, it might still not approximate real-time if it is a system that deliberately delays transmitting information for no apparent reason. As in *Amgen*, the indefiniteness of that term is not cured by the imposition of an upper bound.

**H. Claim term "driver summary electronic report" in '906 patent, claims 1–4, 10–13; '943 patent, claims 1, 3, 4; '733 patent, claim 1; '628 patent, claims 15, 17; '422 patent, claims 2, 13, 19.**

The term is construed according to its plan and ordinary meaning, as proposed by Omnitracs. Motive proposes the construction "an electronic collection of driver information that includes at least driver identification information and driver hours of service information."

The term is used in a variety of different ways throughout the patents at issue. One example is Claim 1 of the '906 patent, which recites:

> A network device for managing a vehicle fleet of a plurality of vehicles comprising:
> a memory;
> a processor;
> a display; and
> a network communication module . . .
> wherein the processor is configured to process at least one of:
>
> > the vehicle data, the driver information, and the driver communications into a driver summary electronic report, wherein the driver summary electronic report includes a composite driver score based on a plurality of a group consisting of:
> >
> > > fuel efficiency;
> > > occurrences of stop idle;
> > > occurrences of speeding;
> > > occurrences of hard braking;
> > > occurrences of high speed braking; and
> > > occurrences of safety violations,
> >
> > wherein the network device is configured to send the driver summary electronic report via the network communication module to the at least one portable wireless data transfer and display device via the long-range wireless network for managing the vehicle fleet of the plurality of vehicles, and wherein the network device is configured to present the driver summary electronic report to a user via the display.

The intrinsic evidence does not support the narrow scope of the term proposed by Motive. The claim language indicates that the content of the "driver summary electronic report" varies across different claims. For example, claim 1 of the '943 patent requires "a driver summary electronic report including hours of service records for a driver of the vehicle," whereas claim 1 of the '628 patent recites "a driver summary electronic report with the associated vehicle data and driver information," and claim 1 of the '906 patent require the report to contain "at least one of: the vehicle data, the driver information, and the driver communications[.]" Motive correctly notes that some examples of the report in the specification include driver identification information and driver hours of service, but the specifications are clear that these are just examples. *See, e.g.*, '943 patent at 3:10-32 (describing "another example"); 11:59-60 ("driver summary electronic reports may include identification information for the driver, and hours of service information"); 12:51-55 (referring to "some implementations").

Nothing in the ordinary meaning of the term requires that the report specifically include driver identification or driver hours of service information. Absent "some indication in the patent" that the term "was meant to have a more restrictive meaning as used in the patent," the term should be given its ordinary meaning. *Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1331 (Fed. Cir. 2007). Motive has identified no such basis in the specifications.

Furthermore, claim 3 of the '943 patent, which is dependent on claim 1, adds a limitation that the "driver summary electronic report includes identification information for the driver and hours of service information for the driver." If the "driver summary electronic report" from claim 1 already included those requirements, claim 3 "would add nothing to claim 1 and the two would cover identical subject matter." *Saunders*, 492 F.3d at 1331. As such, "the doctrine of claim differentiation supports the inference that claim 1 encompasses" the driver summary electronic report without requiring the identification and hours of service information. *Id.*; *see also Phillips*., 415 F.3d at 1314–15 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the

independent claim.”).

**I. Claim term “hours of service record” in ’906 patent, claims 1, 10; ’943 patent, claim 1; ’733 patent, claim 1; ’628 patent, claim 15.**

The term is construed as “record[s] that include hours of service information for a driver and any co-driver(s).” The parties agreed upon this construction at the hearing, and it is hereby adopted.

**J. Claim term “image processing device” in ’130 patent, claims 1, 6, 9, 16.**

The term is construed as “a device that captures images or video, and may capture other data, for determining the speed or distance of objects in relation to the device.” The parties agreed upon this construction at the August 1 hearing, and it is hereby adopted. As discussed at the hearing, the final phrase (“for determining the speed or distance of objects in relation to the device”) modifies both the phrases “images or video” and “other data.”

**IT IS SO ORDERED.**

Dated: August 26, 2024

RITA F. LIN
United States District Judge

Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
T: (415) 439-1400
adam.alper@kirkland.com
akshay.deoras@kirkland.com

Michael W. De Vries (SBN 211001)
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
T: (213) 680-8400
michael.devries@kirkland.com

Leslie M. Schmidt (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800
leslie.schmidt@kirkland.com

Kat Li (*pro hac vice*)
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
T: (512) 678-9100
kat.li@kirkland.com

*Attorneys for Plaintiffs Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.*
*[Additional counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| OMNITRACS, LLC, XRS CORPORATION, AND SMARTDRIVE SYSTEMS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MOTIVE TECHNOLOGIES, INC. (F/K/A KEEPTRUCKIN, INC.),<br><br>Defendant. | Case No. 3:23-cv-05261-RFL<br><br>**OMNITRACS' SELECTION OF NARROWED ASSERTED CLAIMS** |

Pursuant to the Court's April 4, 2025 Order (Dkt. 409), Plaintiffs Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc. (collectively, "Omnitracs") identifies the following selection of narrowed asserted claims:

U.S. Patent No. 9,014,906, claims 1, 10, and 15;

U.S. Patent No. 9,390,628, claims 15, 17, and 18;

U.S. Patent No. 9,402,060, claims 1 and 12;

U.S. Patent No. 9,911,253, claims 1 and 11.

Dated: April 7, 2025

Respectfully submitted,

*/s/ Kyle A. Calhoun*

Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
Kyle A. Calhoun (SBN 311181)
Yan-Xin Li (SBN 332329)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
T: (415) 439-1400
adam.alper@kirkland.com
akshay.deoras@kirkland.com
kyle.calhoun@kirkland.com
yanxin.li@kirkland.com

Michael W. De Vries (SBN 211001)
Justin Singh (SBN 266279)
Ingrid Petersen (SBN 313927)
Andrew Morrill (SBN 316447)
Jiaxiao Zhang (SBN 317927)
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, California 90071
T: (213) 680-8400
michael.devries@kirkland.com
justin.singh@kirkland.com
ingrid.petersen@kirkland.com
drew.morrill@kirkland.com
jiaxiao.zhang@kirkland.com

Gianni Cutri (*pro hac vice*)
Jeremy Roux (*pro hac vice*)

KIRKLAND & ELLIS LLP
333 W Wolf Point Plaza
Chicago, IL 60654
T: (312) 862-2000
gianni.cutri@kirklalnd.com
jeremy.roux@kirkland.com

Leslie M. Schmidt (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800
leslie.schmidt@kirkland.com

Kat Li (*pro hac vice*)
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
T: (512) 678-9100
kat.li@kirkland.com

*Attorneys for Plaintiffs Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OMNITRACS, LLC, et al.,

Plaintiffs,

v.

MOTIVE TECHNOLOGIES, INC.,

Defendant.

Case No. 23-cv-05261-RFL

**FINAL VERDICT FORMS**

**VERDICT FORM (PHASE 1)**

When answering the following questions (which begin on the next page) and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

Answer each of the following Questions 1–3 by following the Jury Instructions and the instructions given on this Verdict Form.

- "The '906 Patent" refers to U.S. Patent No. 9,014,906
- "The '628 Patent" refers to U.S. Patent No. 9,390,628
- "The '060 Patent" refers to U.S. Patent No. 9,402,060
- "The '253 Patent" refers to U.S. Patent No. 9,911,253

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of the Court as the verdict in our case.

**QUESTION 1 – INFRINGEMENT**

Did Omnitracs prove by a preponderance of the evidence that Motive infringed the following claims of the ’906, ’628, ’060, and ’253 Patents?

Check “Yes” (for Omnitracs) or “No” (for Motive) for each claim:

| **’906 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 1** | | |
| **Claim 10** | | |
| **Claim 15** | | |

| **’628 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 15** | | |
| **Claim 17** | | |
| **Claim 18** | | |

| **’060 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 1** | | |
| **Claim 12** | | |

| **’253 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 1** | | |
| **Claim 11** | | |

**Continue to Question 2 if you checked “Yes” for at least one Asserted Claim in Question 1.**

**If not, go directly to Question 3.**

**QUESTION 2 – WILLFUL INFRINGEMENT**

Did Omnitracs prove by a preponderance of the evidence that Motive's infringement was willful? Check "Yes" (for Omnitracs) or "No" (for Motive).

**Do not check a box below for any asserted claim where you answered "No" in Question 1.**

| **'906 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 1** | | |
| **Claim 10** | | |
| **Claim 15** | | |

| **'628 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 15** | | |
| **Claim 17** | | |
| **Claim 18** | | |

| **'060 Patent** | **Yes** (for Omnitracs) | **No** (for Motive) |
|---|---|---|
| **Claim 1** | | |
| **Claim 12** | | |

**Continue to Question 3.**

**QUESTION 3 – INVALIDITY**

**Answer Questions 3A and 3B for each asserted claim regardless of your answers in Questions 1 or 2.**

**QUESTION 3A – PATENT ELIGIBILITY**.

Did Motive prove by clear and convincing evidence that the elements in the following claims of the ’906 and ’628 Patents, considered individually and as an ordered combination, involve only activities which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional at the time the patent application was filed?

Check “Yes” (for Motive) or “No” (for Omnitracs).

| **’906 Patent** | **Yes** (for Motive) | **No** (for Omnitracs) |
|---|---|---|
| **Claim 1** | | |
| **Claim 10** | | |
| **Claim 15** | | |

| **’628 Patent** | **Yes** (for Motive) | **No** (for Omnitracs) |
|---|---|---|
| **Claim 15** | | |
| **Claim 17** | | |
| **Claim 18** | | |

**QUESTION 3B – INVALIDITY**

Did Motive prove by clear and convincing evidence that any of the following asserted claims of the ’906, and ’628 Patents are invalid?

Check “Yes” (for Motive) or “No” (for Omnitracs).

| **’906 Patent** | **Yes** (for Motive) | **No** (for Omnitracs) |
|---|---|---|
| **Claim 1** | | |
| **Claim 10** | | |
| **Claim 15** | | |

| **’628 Patent** | **Yes** (for Motive) | **No** (for Omnitracs) |
|---|---|---|
| **Claim 15** | | |
| **Claim 17** | | |
| **Claim 18** | | |

**Continue to final page of the Verdict Form.**

You have now reached the end of the Verdict Form and should review it to ensure it accurately reflects your unanimous determinations. The Presiding Juror should then sign and date the Verdict Form in the spaces below and notify the Clerk that you have reached a verdict. The Presiding Juror should retain possession of the Verdict Form and bring it when the jury is called back in to read the verdict.

**Please have the Presiding Juror date and sign this form.**

Dated: ______________

__________________________________

Presiding Juror

# VERDICT FORM (PHASE 2)

When answering the following questions (which begin on the next page) and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

Answer each of the following Questions 1–3 by following the Jury Instructions and the instructions given on this Verdict Form.

- "The '906 Patent" refers to U.S. Patent No. 9,014,906
- "The '628 Patent" refers to U.S. Patent No. 9,390,628
- "The '060 Patent" refers to U.S. Patent No. 9,402,060
- "The '253 Patent" refers to U.S. Patent No. 9,911,253

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of the Court as the verdict in our case.

**QUESTION 1 – LOST PROFITS**

Did the SmartDrive Plaintiffs prove by a preponderance of the evidence that they are entitled to lost profits damages for infringement of the ’253 Patent?

YES __________ NO _________

**Continue to Question 2 if you checked "Yes."**

**If not, go directly to Question 3.**

**QUESTION 2 – LOST PROFITS AMOUNT**

What amount of lost profits, if any, did the SmartDrive Plaintiffs prove by a preponderance of the evidence that they are entitled to through the date of trial for infringement of the '253 Patent?

**Do not fill in a number below if you answered "No" in Question 1.**

$________________________________________

**Continue to Question 3.**

**QUESTION 3 – REASONABLE ROYALTY**

For the ’906, ’628, and ’060 Patents, and any claims of the ’253 Patent not fully compensated by lost profits awarded in Question 2 above, what amount do you determine to be a reasonable royalty to compensate Plaintiffs for Motive’s infringement through the date of trial?

| | **Amount** |
|---|---|
| **’906 Patent**<br>(the XRS Plaintiffs) | $__________ |
| **’628 Patent**<br>(the XRS Plaintiffs) | $__________ |
| **’060 Patent**<br>(the SmartDrive Plaintiffs) | $__________ |
| **’253 Patent**<br>(the SmartDrive Plaintiffs) | $__________ |
| **Total:** | $__________ |

**Continue to final page of the Verdict Form.**

You have now reached the end of the Verdict Form and should review it to ensure it accurately reflects your unanimous determinations. The Presiding Juror should then sign and date the Verdict Form in the spaces below and notify the Clerk that you have reached a verdict. The Presiding Juror should retain possession of the Verdict Form and bring it when the jury is called back in to read the verdict.

**Please have the Presiding Juror date and sign this form.**

Dated: ______________

_________________________________

Presiding Juror

Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
T: (415) 439-1400
adam.alper@kirkland.com
akshay.deoras@kirkland.com

Michael W. De Vries (SBN 211001)
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
T: (213) 680-8400
michael.devries@kirkland.com

Leslie M. Schmidt (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800
leslie.schmidt@kirkland.com

Kat Li (*pro hac vice*)
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
T: (512) 678-9100
kat.li@kirkland.com

*Attorneys for Plaintiffs Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.*
*[Additional counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

OMNITRACS, LLC, XRS CORPORATION, AND SMARTDRIVE SYSTEMS, INC.,

Plaintiffs,

v.

MOTIVE TECHNOLOGIES, INC. (F/K/A KEEPTRUCKIN, INC.),

Defendant.

Case No. 3:23-cv-05261-RFL

**OMNITRACS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW AND A NEW TRIAL**

**PUBLIC REDACTED VERSION**

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE that Plaintiffs Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc., (collectively, "Omnitracs" or "Plaintiffs") respectfully move this Court for Judgment as a Matter of Law and a new Trial. Pursuant to the Court's instruction that an argument will be scheduled if necessary, Omnitracs is not noticing this Motion for a hearing date. *See* Trial Tr. 1861:15–17.

This Motion is supported by the following Memorandum of Points and Authorities below, the concurrently lodged proposed order, the filings in this action, the testimony and trial exhibits admitted at trial; and any additional material or argument submitted to the Court before its decision on this Motion.

## ISSUES TO BE DECIDED

1. Whether Omnitracs is entitled to judgment as a matter of law on the following issues:
   - Motive infringes the Asserted Claims of the '628 Patent;
   - Motive infringes the Asserted Claims of the '060 Patent;
   - Motive infringes the Asserted Claims of the '253 Patent; and
   - The Asserted Claims of the '628 and '906 Patents are not well-understood, routine, and conventional.
2. Whether Omnitracs is entitled to a new trial on all issues.

# TABLE OF CONTENTS


**I. Introduction ..... 1**

**II. Legal Standard ..... 3**

A. Judgment as a Matter of Law ..... 3

B. New Trial ..... 3

**III. Omnitracs Is Entitled To JMOL of Infringement ..... 4**

A. No Jury Could Reasonably Find that Motive Does Not Infringe the ’628 Patent ..... 4

B. No Jury Could Reasonably Find that Motive Does Not Infringe the ’060 Patent ..... 7

C. No Jury Could Reasonably Find that Motive Does Not Infringe the ’253 Patent ..... 10

D. Omnitracs Is Entitled to JMOL on Alice Step Two for the ’628 and ’906 Patent ..... 14

**IV. Motive’s Trial Conduct Warrants a New Trial ..... 16**

A. Motive’s Improper Religious and Racial Insinuations, Factual Misrepresentations, and MIL Violations Highly Prejudiced Omnitracs and Warrant a New Trial ..... 16

1. Motive Made Improper and Factually Unsupported Assertions Regarding Mr. Khan’s Muslim Heritage ..... 16

2. Motive’s CEO Repeatedly Testified Regarding Motive’s Alleged Legal Investigation In Violation Of This Court’s MIL Orders ..... 18

3. Motive Repeatedly Misrepresented Facts or Made Irrelevant Arguments That Only Served to Prejudice and Confuse the Jury ..... 20

B. Bifurcation of the Verdict Form and Motive’s Comments During Closing Regarding the Verdict Form Unfairly Prejudiced Omnitracs ..... 22

C. Motive’s Improper and Incorrect Claim Construction Arguments Confused the Jury And Undermined Dr. Wicker’s Credibility ..... 24

D. The Jury’s Finding of No Infringement Is Against the Weight of the Evidence ..... 25

**V. Conclusion ..... 27**

**TABLE OF AUTHORITIES**


**Page(s)**

**Cases**

*Anheuser-Busch Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337 (9th Cir. 1995) ....3

*Apple Inc. v. Wi-LAN Inc.*, 25 F.4th (Fed. Cir. 2022) ....13

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016)....16

*Cellspin Soft, Inc. v. Fitbit*, 927 F.3d 1306 (Fed. Cir. 2019)....16

*Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632 (2015)....3, 18

*Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361 (Fed. Cir. 2013)....3, 18

*Cones v. Cnty. of Los Angeles*, No. CV 14-8281 PSG, 2016 WL 7438817 (C.D. Cal. Sept. 28, 2016) ....4, 21

*Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319 (Fed. Cir. 2009)....24

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168 (Fed. Cir. 2005)....24

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829 (9th Cir. 2014) ....4

*G. David Jang, M.D. v. Bos. Sci. Corp.*, 872 F.3d 1275 (Fed. Cir. 2017)....3

*GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304 (Fed. Cir. 2014)....13

*Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229 (Fed. Cir. 2017)....25

*Impinj, Inc. v. NXP USA, Inc.*, No. 19-CV-03161-YGR, 2023 WL 10352284 (N.D. Cal. Sept. 28, 2023) ....3

*Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283 (9th Cir. 1984) ....4

*Maricopa Cnty. of State of Ariz. v. Maberry*,
555 F.2d 207 (9th Cir. 1977) ....................20

*Molski v. M.J. Cable, Inc.*,
481 F.3d 724 (9th Cir. 2007) ....................3, 4

*Passantino v. Johnson & Johnson Consumer Prods.*,
212 F.3d 493 (9th Cir. 2000) ....................3

*Pavemetrics Sys., Inc. v. Tetra Tech, Inc.*,
652 F. Supp. 3d 1098 (C.D. Cal. 2023) ....................18, 20, 21, 24

*Regents of Univ. of California v. Micro Therapeutics, Inc.*,
No. C 03 05669 JW (RS), 2007 WL 2069946 (N.D. Cal. July 13, 2007) ....................19

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
279 F.3d 1357 (Fed. Cir. 2002)....................14

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011)....................21

*Waddington N. Am., Inc. v. Sabert Corp.*,
No. CIV.A. 09-4883 GEB, 2011 WL 3444150 (D.N.J. Aug. 5, 2011) ....................20

*Z4 Techs., Inc. v. Microsoft Corp.*,
507 F.3d 1340 (Fed. Cir. 2007)....................8

**Rules**

Fed. R. Civ. P. 50(a) ....................3, 4

Fed. R. Civ. P. 59(a)(1)(A) ....................3, 4

## I. Introduction

Omnitracs presented extensive evidence at trial of Motive's infringement of the four asserted patents, laying out in detail how Motive infringed each element of each asserted claim, with reference to Motive documentation, source code, testimony, and physical testing, based squarely on the claim language and this Court's constructions. Motive, on the other hand, sped through its non-infringement presentations with cursory arguments and little reference to evidence, while failing to adhere to the actual boundaries of the claims. In lieu of actual non-infringement evidence, Motive relied on a host of improper and irrelevant assertions designed to prejudice the jury against Omnitracs. When cross examining Omnitracs' technical expert, for instance, Motive lobbed an accusation that Omnitracs (and its witness) were racially and religiously insensitive for not explaining that Motive's co-founder allegedly used an American-sounding email alias to avoid discrimination from truck drivers against Muslim. There may not be a more prejudicial statement to make to a jury in the Northern District of California, particularly when one of the jurors was born and raised in [redacted] and wore a head scarf every day of trial. What's more, Motive's accusations were not supported by the record and were not substantiated by any later witness. This was just the start: Motive continued to violate the Court's MILs, make misrepresentations, and raise improper arguments throughout the rest of the trial. This behavior, combined with Motive's seizure of the Court's bifurcated verdict form to give the jury a "everyone-gets-to-go-home" early option, guaranteed that this case would not be decided on the evidence presented.

Because the evidence of record clearly demonstrates Motive's infringement and confirms that the jury's verdict is not supported by substantial evidence, Omnitracs respectfully moves the Court to grant judgment as a matter of law ("JMOL") on infringement for the '628 patent, '060 patent, and '253 patent. With respect to the '628 patent, Motive's primary non-infringement argument concerned the "accepting inputs . . ." requirement of claim 15, but that argument clearly contradicted the claim language and the Court's claim construction. Motive's two other non-infringement arguments—which Motive blazed through in seconds without citing ***any*** evidence—were conclusory and failed to rebut the infringement evidence Omnitracs presented. As to the '060 patent, Motive's sole argument that the Vehicle Gateway product did not include a "web server" that communicated via HTTP was

inconsistent with the '060 patent and the claim language as construed by the Court. As Omnitracs set forth, and as Motive did not dispute, the Vehicle Gateway contains internet-related functionality that receives and responds to external requests and communicates over HTTP with the Motive back-end; nothing more is required to meet the claims. Finally, for the '253 patent, Omnitracs presented significant evidence demonstrating that Motive's AI Dashcam met all the elements of the claims, and Motive's expert was forced to concede on cross examination that frames of the event video were assigned confidence values, that confidence values decreased with time away from the event, and that frames were overwritten from the buffer memory based on the values. The only other non-infringement argument Motive raised concerned the preamble of claim 1 of the '253 patent, which the Court determined was not a limitation. JMOL of infringement of these patents is warranted.

At a minimum, Omnitracs respectfully submits that it is entitled to a new trial on all issues for four independent reasons. ***First***, Motive's suggestions of racial and religious insensitivity and factual misrepresentations were highly prejudicial and never cured, despite Omnitracs' objections. Motive followed up these accusations by ***repeatedly*** violating this Court's MIL order prohibiting references to the alleged legal investigation that Motive conducted but withheld from discovery, in addition to numerous other improper arguments. ***Second***, the highly unusual split verdict form—and the language the Court used in explaining the verdict form—severely and unfairly prejudiced Omnitracs by suggesting that the Court believed Omnitracs' liability case was deficient. This prejudice was compounded by Motive's comments during closing, where Motive significantly amplified the Court's "choose-your-own-adventure" comment by explicitly telling the jurors—who had not yet seen what they would be required to do in the damages phase—that they could go home early simply by finding no infringement. ***Third***, multiple non-infringement arguments that Motive raised at trial were in fact claim construction arguments that should never have been presented to the jury. Specifically, for the '628 patent, Motive's primary non-infringement argument—which it raised through a fact witness, an expert witness, and in multiple cross examinations of Dr. Wicker—was based on the incorrect assertion that "inputs of driver information" needed to be transmitted to the data acquisition device to meet the claims. This was improper, forced Omnitracs to waste considerable time addressing issues of claim construction on direct and cross examination, and undoubtedly confused the jury. Likewise,

Motive's argument that the preamble of claim 1 of the '253 patent was limiting—a pure (incorrect) claim-construction argument that Motive waived by not raising earlier—was similarly highly prejudicial, suggested that Dr. Wicker did something wrong, and needlessly confused the jury. ***Fourth***, the weight of the evidence demonstrates that Motive infringes the asserted claims. Stripped of their improper claim construction elements, Motive's non-infringement arguments were conclusory, divorced from the claim language, and contradicted by the evidence.

## II. Legal Standard

### A. Judgment as a Matter of Law

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Put differently, the Court should grant judgment as a matter of law when, viewed in the light most favorable to the nonmoving party, there is not substantial evidence to support the verdict. *See Impinj, Inc. v. NXP USA, Inc.*, No. 19-CV-03161-YGR, 2023 WL 10352284, at *2 (N.D. Cal. Sept. 28, 2023); *see also G. David Jang, M.D. v. Bos. Sci. Corp.*, 872 F.3d 1275, 1287 (Fed. Cir. 2017) (entering JMOL because substantial evidence did not support the jury verdict).

### B. New Trial

Under Rule 59, the Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A new trial should be granted when "the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). A new trial should also be granted when defense counsel insolubly prejudices the jury "through irrelevant references to ethnicity and religion." *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1370 (Fed. Cir. 2013), *vacated on other grounds*, 575 U.S. 632 (2015); *see also Anheuser-Busch Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 346 (9th Cir. 1995) ("A new trial is warranted on the ground of attorney misconduct during the trial where the 'flavor of misconduct ... sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by

passion and prejudice in reaching its verdict.'" (quoting *Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286 (9th Cir. 1984))). "Unlike a rule 50 determination, a Rule 59 motion for a new trial does not require the district court judge to 'view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses.'" *Cones v. Cnty. of Los Angeles*, No. CV 14-8281 PSG (PLAx), 2016 WL 7438817, at *7 (C.D. Cal. Sept. 28, 2016) (citing *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014)); *see also Molski*, 481 F.3d at 729. Thus, even if a Court finds substantial evidence supports a jury's verdict under Rule 50, the Court may still grant a new trial under Rule 59 if "the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Id.*

## III. Omnitracs Is Entitled To JMOL of Infringement

### A. No Jury Could Reasonably Find that Motive Does Not Infringe the '628 Patent

Omnitracs established at trial that Motive directly and indirectly infringed the asserted claims of the '628 patent, and a reasonable jury would not have a legally sufficient basis to conclude otherwise. The extensive evidence of infringement at trial, and the lack of any sufficient evidence to the contrary, warrants JMOL in Omnitracs' favor. Omnitracs' expert Dr. Wicker walked the jury through Motive's infringement of the '628 patent and explained—using Motive documents, source code, and testimony—how Motive's products meet all the elements of the claims. Motive raised three arguments to the contrary. Its primary argument—that its products did not meet the requirement of "accepting inputs of driver information . . ."—was wrong and violated the Court's construction of the term. Under the proper construction, there is no dispute that Motive infringes. Although Motive half-heartedly made two other non-infringement arguments for this patent, it failed to provide evidence sufficient to support a finding of non-infringement on those grounds either, such that JMOL in Omnitracs' favor is warranted.

Dr. Wicker explained, on an element-by-element basis, how Motive's system met all the requirements of asserted claims 15, 17, and 18 of the '628 patent, citing Motive documents, source code, and testimony. Trial Tr. 636:24-668:16; EX388.12, EX452, EX456, EX492, EX526, EX1313 (testing results) and EX1397 (testing results), EX4293 (source code); Dkt. 485-6 (Choi Dep. Tr.),

154:6-10; Dkt. 485-5 (Camacho Dep. Tr.) 40:19-41:07, 44:22-45:3, 66:2-10, 68:09-68:17, 68:21-69:07. In particular, Dr. Wicker explained how Motive's products meet the "accepting inputs of driver information" requirement by accepting the driver's log-in information, transmitting the logged-in driver's ID information from the back-end server to the Driver App, and then transmitting the driver information from the Driver App to the Vehicle Gateway. Trial Tr. 639:5-642:11, 647:3-23; EX452, EX526, EX1313 (testing results). This was confirmed by Motive's fact witnesses. *See, e.g.*, Dkt. 485-5 (Camacho Dep. Tr.) 40:19-41:07. Dr. Wicker further explained how Motive met the requirement of sending the driver summary electronic report to the back-end server. Trial Tr. 652:24-659:15. He pointed to Motive documentation describing how the driver and vehicle data on the Driver App is "[redacted]" and source code demonstrating the content of the individual messages sent by the Vehicle Gateway to the server. *Id.*; EX492; EX4293. In addition to walking through the elements, Dr. Wicker also explained how Motive directly infringed by using this functionality and how Motive's drivers use this functionality to directly infringe. Trial Tr. 637:4-14. He then explained how Motive indirectly infringed the claims. *Id.* at 763:15-765:18; EX272, EX273.

None of Motive's non-infringement arguments is sufficient to avoid JMOL. First, Motive contended that it did not meet the "accepting inputs of driver information . . ." requirement because the driver's username and password—which were input by the driver on the portable device—were not transmitted to the Vehicle Gateway. Trial Tr. 1304:12-1305:15, 1306:13-25. Instead, according to Motive, it sends a unique driver ID to the Vehicle Gateway. *Id.* at 1143:5-23, 1305:11-24, 1307:1-1308:1. But this argument proves infringement, not ***non***-infringement. The claims require "accepting inputs of ***driver information***" and "transmitting the ***driver information***" to the data acquisition device. *See, e.g.*, EX3 ('628 patent) at cl. 15. As the Court explained in its construction, nothing in the claims requires that the "inputs of driver information" must be the same sequence of data as the "driver information" transmitted to the data acquisition device. Dkt. 465-1 (Final Jury Instructions) at 6. And Motive's witnesses confirmed that inputs (*e.g.*, the driver user name and password) for a particular driver (*e.g.*, the driver information) were input by the driver, and then driver information (the unique ID associated with that particular driver) is sent to the Vehicle Gateway. Trial Tr. 1143:5-23, 1145:2-22, 1306:13-1307:9, 1349:2-11, 1351:13-1352:12. As such, the driver information sent to the Vehicle

Gateway is the ***same*** driver information for which that particular driver input his or her user name and password. *Id.* at 1145:2-1146:22, 1152:6-1153:8, 1306:13-1307:19, 1351:13-1352:7. Accordingly, Motive's products satisfy the "accepting inputs" requirement.

Second, Motive argued that it did not infringe because no single actor performed all the steps of the claim. *See* Trial Tr. 1310:8-10. Specifically, Motive's expert Christopher Wilson contended that the "processing" step was performed by the Motive back-end server. *Id.* at 1308:14-18 ("Q. Okay. And then skipping down to the processing, the vehicle data and other information into an electronic Driver Scorecard, who is performing that step here allegedly? A. This step would be performed in the back end, the Motive back end."), 1310:8-10 ("No single entity performs all the steps. It's what the lawyers call a split -- a split -- I don't know. I can't remember what it is."). This testimony from Mr. Wilson was the sum total of the evidence Motive presented in support of its "no single actor" non-infringement argument. This conclusory statement is insufficient to provide substantial evidence to support the jury's verdict. It also failed to address Omnitracs' actual infringement evidence concerning what the driver does on the Driver App in the cab: Dr. Wicker explained in detail how this "processing" functionality is carried out by ***both*** by the driver using the Motive Driver App (*id.* at 659:16-661:3; EX1313.52 (testing results); PDX7.76) ***and*** by the back-end Motive Fleet Dashboard (Trial Tr. 661:6-12; EX1397.48 (testing results); PDX7.77). Notably, Motive never cross examined Dr. Wicker about these opinions, nor did it present ***any*** evidence suggesting that the Driver App did not perform the claimed processing. Accordingly, Motive's "defense" was mere misdirection: because Omnitracs presented significant evidence that the "processing" step was carried out by the driver when using the Motive Driver App, and because Motive did not address that evidence at all but instead focused exclusively on other evidence concerning the back end, JMOL is appropriate.

Third, Motive argued that it did not infringe because it allegedly did not satisfy the requirement of "sending the driver summary electronic report" to the back-end server. But here again, Motive's non-infringement arguments were cursory and unsubstantiated and thus insufficient to provide substantial evidence supporting the jury's verdict. Motive's expert Mr. Wilson testified that the logs or ELD messages sent by the Motive Driver App to the back-end server are "not a report." *See, e.g.*, Trial Tr. 1309:4-11 (Q. And do you remember that [Dr. Wicker] testified that there was an optional

way to send logs to an officer via the driver app? A. I do recall that. Q. Okay. Is it your opinion that the logs, even if they were sent, or anyone ever did that, are those reports under the claim? A. No. Those are not reports. Those are specified in the regulation. They are events, but they are not a report."), 1309:21-25 ("Q. But is this an idea of an ELD message that Mr. Choi talked about in his testimony? A. Yes. This is an ELD message. Q. Okay. Is this a report? A. This is not a report, no."), 1310:11-13 ("Finally, there is no sending of a -- the Driver Summary Electronic Report, only sending data and information. The report is not sent as required."). But the claims are not limited to any particular form of "report," and Motive's attempt to limit the report to an "electronic collection of driver information that includes at least driver identification information and driver hours of service information" was rejected during claim construction. Dkt. No. 185 at 22-23. Motive's argument to the contrary improperly rehashed its failed claim construction position and provided no evidence (or explanation) as to why the logs and messages sent by the Motive Driver App did not satisfy the claims. Notably, Motive did not dispute that what was displayed on the Motive Driver App was a summary electronic report, and Motive also did not dispute that the driver and vehicle data on the Driver App is "[redacted]." Trial Tr. 652:24-659:15; EX492; EX4293. With no evidence to dispute these facts, the jury's verdict cannot be supported by substantial evidence and JMOL of infringement is appropriate.

**B. No Jury Could Reasonably Find that Motive Does Not Infringe the '060 Patent**

Omnitracs established at trial that Motive directly and indirectly infringed the asserted claims of the '060 patent. The extensive evidence of infringement at trial, and the lack of any sufficient evidence to the contrary, warrants JMOL in Omnitracs' favor. Omnitracs' expert Dr. Wicker walked the jury through Motive's infringement of the '060 patent and explained—using Motive documents, source code, and testimony—how Motive's products meet all the elements of the claims.

Specifically, Dr. Wicker explained how Motive's Smart Dashcam, AI Dashcam, and AI Omnicam systems include a "vehicle event recorder." Trial Tr. 718:2-10. He also explained how they include "[a] video camera configured to acquire visual information representing a vehicle environment, the vehicle environment including spaces in and around an interior and an exterior of a vehicle." *Id.* at 718:11-719:4; EX542, EX395. He explained how they include "a memory configured

to electronically store information." Trial Tr. 719:8-22. He also explained how they include "an event trigger configured to detect a vehicle event responsive to an event parameter breaching an event trigger threshold level," and a microprocessor configured to, "responsive to detection of the vehicle event, effectuate storage of visual information associated with the vehicle event in the memory. *Id.* at 720:1-725:12; EX287, EX561, EX521, EX522, EX524, EX542, EX894, EX4293. Dr. Wicker also explained how Motive's products "facilitate wireless communication of information between a web server in the vehicle event recorder and a remotely located computing device using HTTP," specifically pointing to Motive documentation and source code. Trial Tr. 725:13-734:11; EX568, EX557, EX731, EX111. Finally, he explained how Motive's products "receive settings information from the remotely located computing device, wherein the settings information is operable to adjust vehicle event recorder settings pertaining to operation of one or both of the video camera and the event trigger" and "adjust the vehicle event recorder settings based on the received settings information." Trial Tr. 734:16-737:8. He explained how his analysis for claim 1 mirrored that for claim 11, and then explained how Motive's products met the additional requirement of dependent claim 12. *Id.* at 737:9-739:11.

The ***only*** non-infringement argument Motive raised with respect to infringement of the '060 patent related to the "facilitate" element—namely, Motive contended that its products did not include a "web server" in the Vehicle Gateway device that communicates with a remotely located computing device using HTTP. Trial Tr. 1443:13-1445:24; MDX12.40-.51. Motive did not contest any of the other limitations. Motive's arguments, however, are irrelevant and insufficient to avoid infringement—even taking all of Motive's arguments as true, its products meet the requirements of the asserted claims and thus infringe.

First, Motive contended that it did not use a "web server" in its Vehicle Gateway because the Vehicle Gateway allegedly operated as a client. Trial Tr. 1480:19-1481:2, 1482:2-4, 1482:9-13. But once again, Motive failed to address Omnitracs' evidence of infringement: whether Motive's Vehicle Gateway operates as a client in some instances is irrelevant to whether it also operates as a server in other instances, as its expert admitted, and thus cannot be a point of distinction from the claims (which require "facilitat[ing] wireless communication of information between ***a web server in the vehicle event recorder***"). *Id.* at 1483:24-1486:3; *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350

(Fed. Cir. 2007) ("[I]nfringement is not avoided merely because a non-infringing mode of operation is possible."). Moreover, Motive's arguments contradict the description of "web server" in the '060 patent. In the "Glossary of Special Terms" in the '060 patent specification, the inventors explained that a web server is a module of a computer that receives requests and returns responses to external parties:

> A web server ***is implemented as a special module of a computer and is operable for exchanging information via computer files***—generally files in XML/HTML formats. A web server ***receives requests and returns responses to external parties via a communications link***.

EX4 ('060 patent) at 7:25-29.[1] It is undisputed that all of these requirements are met by the accused products. As Dr. Wicker explained—and as Motive did not dispute—the Vehicle Gateway contains functionality to ***receive requests from the back-end server*** for ELD messages (*e.g.*, for image breadcrumbs and composite driver performance event files) and to ***send responses to the back-end server*** containing those requested ELD messages:

[redacted]

EX282.47; Trial Tr. 889:10-24. Motive's own source code running on the Vehicle Gateway thus appropriately refers to this functionality as a "[redacted]," something its own expert could not square with Motive's non-infringement argument. Trial Tr. 1483:21-25, 1484:23-1485:3

[1] All emphasis added unless otherwise noted.

("They've named it the [redacted]. I have no idea why they would have named it that . . . .").

Second, Motive contended that the functionality within the Vehicle Gateway could not meet the claim requirement that communication occur "using HTTP." Specifically, while Motive conceded that the Vehicle Gateway sent responses to the back-end server using HTTP, Motive contended that the requests from the back-server were sent using a different protocol known as MQTT. *Id.* at 1488:20-1489:3 (Andrews). But whether the Motive Vehicle Gateway uses MQTT to communicate with the back-end server ***in addition to*** HTTP is irrelevant to the claims. *Id.* at 1623:2-12 (Wicker). Instead, the claims only require that the accused functionality "facilitate wireless communication of information between a web server in the vehicle event recorder and a remotely located computing device using HTTP." Because Motive's expert conceded that the Vehicle Gateway wirelessly transmits, *i.e.*, communicates, information to a remotely located computing device (the Motive K2Web back-end server) using HTTP, this claim requirement is met. *Id.* at 1485:23-1486:3 (Andrews); 1622:1-10 (Wicker).

### C. No Jury Could Reasonably Find that Motive Does Not Infringe the '253 Patent

Omnitracs also established at trial that Motive directly and indirectly infringed the asserted claims of the '253 patent. Omnitracs' expert Dr. Wicker used Motive's documents and source code to explain how Motive's AI Dashcam, Vehicle Gateway, and backend system (the "Accused '253 Products") meet all the elements of the asserted claims of the '253 patent, particularly when used to detect certain safety events, such as "close following" and "cell phone use." Trial Tr. 746:3-757:1, 759:5-763:24. None of Motive's three non-infringement arguments is sufficient to overcome JMOL. Critically, the evidence presented at trial revealed that Motive does not actually dispute how the Accused '253 Products' memory management scheme operates to detect, transfer, and save frames of event videos. In the absence of any material dispute of fact or evidence sufficient to support a finding of non-infringement, JMOL in Omnitracs' favor is required.

Motive first argued that the Accused '253 Products do not meet the claim 1's preamble specifying "[a] vehicle event recorder system configured to be mounted to a vehicle." Trial Tr. 1428:9-1429:5. But as the Court held, the preamble of the '253 patent, claim 1 "is not a limitation on the

claim." Dkt. 465 at 7 (Instruction No. 11). This argument accordingly fails as a matter of law.

Motive next argued that the Accused '253 Products do not "determine values of individual frames . . . wherein the values of the individual frames decrease with increasing time away from the particular time of the particular vehicle event," because the accused confidence values merely determine how confident the AI Dashcam is "that it has recognized an object in the [] image." Trial Tr. 1429:6-1430:8. But as Dr. Wicker and Motive's own documents explain, when Motive's AI Dashcam determines "confidence values" for each individual frame to detect certain events (e.g., cell phone events), higher confidence values correspond to the event and will decrease with increasing time away from the event. Trial Tr. 751:7-755:3; EX521.3, 6. Motive's own source code expert (Mr. Znidarsic) and expert addressing the '253 patent (Mr. Andrews) admitted that this is precisely how Motive's products operate. Trial Tr. 1282:18-1285:12 (in showing an example of "how Motive's product actually works," Mr. Znidarsic conceding that values of frames decrease in time away from the event video), 1459:13-1460:11 (Mr. Andrews confirming that the confidence values for frames decrease in time away from the event). Accordingly, no jury could reasonably find that the Accused '253 Products failed to meet this requirement of the claims.

Finally, Motive argued that the Accused '253 Products do not "facilitate overwriting of the individual frames . . . based on the determined values," as further required by the claims. The undisputed evidence and expert testimony at trial showed otherwise. As Dr. Wicker explained, Motive's AI Dashcam uses each frame's confidence value to identify and extract out the "event video" frames from the eMMC buffer's loop memory, saving them to a special folder in that same eMMC buffer memory before transferring them to the long-term storage memory in Motive's backend. Trial Tr. 754:14-756:14, 1625:6-1626:3. In doing so, the Accused '253 Products use the confidence values to identify the non-event video frames that should remain and be overwritten on the eMMC's loop memory, thereby facilitating overwriting of frames based on the determined confidence values. *Id.*; *see also* EX517.3 (internal email describing Motive's development of "a confidence measure to be able to ***discard events with low confidence***"); EX4293; Dkt. 485-8 (Gorski Dep. Tr.) at 128:19-25. In rebuttal, Motive's expert offering opinions on the '253 patent (Mr. Andrews) did not materially dispute the operation of Motive's products, but instead explained what he claimed was the "important flaw"

in Dr. Wicker's infringement opinions for this limitation:

> But there's kind of an important flaw here, and that is if you just let this [animation of Motive's loop memory] continue to run, Dr. Wicker shows that the system just keeps on overwriting. And it just overwrites the oldest frames first. And now we have – ***other than the ones we saved***, we have no record in the buffer of the events that actually represented the event.

Trial Tr. 1440:2-7. Far from rebutting Dr. Wicker's explanation of infringement, Mr. Andrews concedes that the non-event video frames—*i.e.,* those with low confidence values—are the frames that are overwritten, in contrast to the event videos, which are "the ones we saved." *Id.* Mr. Andrews confirmed his material agreement with Dr. Wicker on cross examination, testifying that event videos are "***excerpted***" from the buffer's loop memory based on the confidence values determined for each frame, and that the frames remaining on the loop memory based on their confidence values will be sequentially overwritten. Trial Tr. 1472:21-23, 1473:2-1474:10, 1477:7-1478:3. No jury could reasonably find that this undisputed operation fails to "facilitate overwriting of the individual frames . . . based on the determined values," as prescribed by the asserted claims of the '253 patent.

Faced with the undisputed operation of the Accused '253 Products, Motive argued non-infringement by contrasting those accused products with the ***embodiments*** disclosed in the '253 patent's specification and the exemplary problems they solved, not the actual independent claims of the '253 patent. *See e.g.*, Trial Tr. 1422:10-1424:25, 1437:20-1438:22 (Andrews), 1818:6-25 (Motive closing argument distinguishing the accused products based on "what the ['253] patent is trying to do to extract just a little bit more memory out of 30 seconds"). In particular, and despite conceding that the claims of the '253 patent are not limited to the examples from the specification, Trial Tr. 1453:10-1454:21 (Andrews), Mr. Andrews presented the below annotated figure as illustrating how "the claims of the '253 patent" claim an "interleaving different frame rate concept," where the system saves the frames annotated in red and overwrites the interleaving "green frames that were left." Trial Tr. 1422:10-1426:24.




MDX12.14.

But the asserted ***independent claims*** of the '253 patent are not limited to this interleaving embodiment. Indeed, ***dependent claims*** 4 and 14 instead claim that specific embodiment, requiring that "every n-th frame" is assigned a higher value than the frames immediately surrounding it. '253 claims 4, 14; *see GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014) ("The doctrine of claim differentiation . . . creates a presumption that the[] dependent claim limitations are not included in the independent claim."). Mr. Andrews nonetheless testified that there can be no infringement because Dr. Wicker did not show that the accused products "skip any frames" when overwriting the buffer memory. Trial Tr. 1440:8-17. Such "skip[ping]" of frames is not required by the asserted claims, and Motive's efforts to read example embodiments into the claims cannot serve as a basis for non-infringement. *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th at 960, 967 (Fed. Cir. 2022) ("Embodiments in the specification—even if there is only one embodiment—cannot limit the scope of the claims absent the patentee's words or expressions of manifest exclusion or restriction." (internal citation and quotation marks omitted)).

Motive further argued that it cannot infringe because the accused products use a prior art "first-in, first-overwrite" scheme to delete video frames from the buffer memory. Trial Tr. 1438:23-1441:20 (Andrews); 1819:17-23 (Motive closing argument explaining that the supposed "first in/first out"

memory management used in the accused products is why Motive does not infringe). This related argument fails for two reasons. First, no jury could reasonably find that Motive's buffer memory merely overwrites frames according to a pure first-in, first-overwrite approach in light of the evidence presented at trial. As explained above, and in agreement with Dr. Wicker's own analysis, Mr. Andrews conceded that the event video frames are "excerpted" from the eMMC buffer's loop memory "and stored on the AI Dashcam eMMC separate from the more complete loop video," thereby leaving the non-event videos to be overwritten in the loop memory. Trial Tr. 1440:2-7, 1473:21-1474:7. Second, Motive's argument that it cannot infringe because it uses a first in, first overwrite approach that existed in the prior art amounts to an improper "practicing the prior art" defense, which the Federal Circuit has repeatedly held to be a legally improper basis for rebutting infringement. *See Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002) ("[T]here is no 'practicing the prior art' defense to literal infringement.") (citation omitted). At bottom, nothing in the claims excludes an embodiment like that implemented in the Accused '253 Products, where facilitation of overwriting frames "based on determined values" is accomplished by excerpting out frames with high values and overwriting the remaining frames with low values on a first in, first overwrite basis. No jury could have reasonably found that the undisputed operation of Motive's products failed to meet the requirements of the claims.

### D. Omnitracs Is Entitled to JMOL on Alice Step Two for the '628 and '906 Patent

Although the jury found that the '628 and '906 patents were well-understood, routine, and conventional, that verdict is not supported by substantial evidence. Because no jury could reasonably find that the '628 and '906 patents lacked an inventive concept, Omnitracs is entitled to JMOL, or at least a new trial.

Motive argued at trial that the '628 and '906 patents failed step two of *Alice* because they encompassed concepts that were merely well-understood, routine, and conventional. In the Court's Order denying Motive's motion for judgment on the pleadings, the Court pointed to the '628 patent's two-step hardware solution and the inventors' decision to split the functionality of the vehicle event recorder into two devices (an onboard recorder and portable unit) as at least sufficient to raise a factual dispute over step two. *See* Dkt. 131 at 8-9. At trial, however, Motive failed to present any evidence,

let alone substantial evidence, that the two-step hardware solution was conventional. In fact, the ***only*** instances that Motive presented at trial where anyone in the world had ever used a similar two-step hardware setup were the Turnpike System and the '568 patent. Trial Tr. 1313:19-1315:11. But the Turnpike System and the '568 patent were both created by ***Christopher Sekula***, an inventor on the '628 and '906 patents. *Id.* at 325:22-326:4, 331:14-16. Motive's argument thus cannot stand: it cannot be that the two-step hardware solution claimed in the '628 and '906 patents is routine and conventional when all the evidence of record confirms that, before the '628 and '906 patents were filed, ***the only person who had ever implemented this hardware solution was the inventor of the '628 and '906 patents***. *Id.*; *see also id.* at 1611:8-12. Moreover, the undisputed evidence presented by Omnitracs confirmed that all the other companies who were offering vehicle event recorders at the time were not using the two-step hardware solution, but were instead using a single monolithic device that had to be connected to the vehicle:




EX1638 (illustrating single form-factor devices from 2010 from Qualcomm, DriverTech, PeopleNet, Xata, and Cadec). Motive never challenged this evidence or provided any evidence to the contrary.

Shane Brun (SBN #179079)
sbrun@kslaw.com
Thomas J. Friel, Jr. (SBN #80065)
tfriel@kslaw.com
KING & SPALDING LLP
245 Lytton Ave., Suite 150
Palo Alto, CA 94301
Telephone: (650) 422-6700

Angela Tarasi (*Pro Hac Vice*)
atarasi@kslaw.com
Mark Zambarda (SBN #314808)
mzambarda@kslaw.com
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Telephone: (720) 535-2319

Brent Ray (*Pro Hac Vice*)
brent.ray@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
70 W Madison St # 4200
Chicago, IL 60602
Telephone: (312) 583-2300

***Attorneys for Defendant Motive Technologies, Inc.***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| OMNITRACS, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MOTIVE TECHNOLOGIES, INC.,<br><br>Defendant. | Case No. 3:23-cv-05261-RFL<br><br>**DEFENDANT MOTIVE TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF**<br><br>Courtroom: 15, 18th Floor<br>Judge: Honorable Rita F. Lin |

respond to requests over HTTP(S), and that the VG source code confirms that the VG operates as a client (as opposed to server). Therefore, substantial evidence supports the jury's conclusion.

**C. '253 Patent Noninfringement**

Any reasonable jury would have recognized how far afield Motive's products are from the claims of the '253 patent and would have reached the same conclusion as this jury. *First*, the evidence established that the confidence values, assigned by Motive's AI Dashcam, are not determined based on time away from the event as required by the claims of the '253 patent. *Second*, it is undisputed that Motive's cameras facilitate overwriting of its buffer memory first-in, first-out, and, therefore, do not "facilitate overwriting of the individual frames … based on the determined values." Not surprisingly, Plaintiffs' attempt to fit new technology into the claims of an obsolete patent fell flat in front of the jury. Substantial evidence supports the jury's conclusion.

To the first point, a reasonable jury could find that Motive's AI Dashcam's do not "determine values of individual frames in the set of consecutive frames, wherein the values of the individual frames decrease with increasing time away from the particular time of the particular vehicle event." The claims require a linear relationship between the values of the frames and the time of an event—"values … decrease with increasing time away from the particular time of the particular vehicle event." The evidence presented at trial, however, established that Motive's AI Dashcam determines "confidence values" based on the likelihood that the camera's vision model detected an object—not based on time or proximity to "the particular vehicle event." Dkt. 480, D. Znidarsic 4/21/25 Tr. at 1267:23-7, J. Gorski at 1406:6-21, S. Andrews at 1429:6-1430:8, 1433:14-1434:3. Because the "confidence value" is determined based on the camera's likelihood that it detected an object, there is no direct temporal relationship between an event and the confidence value as required. Dkt. 480, S. Andrews 4/21/25 Tr. at 1499:4-19. Indeed, as Messrs. Znidarsic, Gorski, and Andrews testified, the confidence values may include frames of increasing and decreasing value along the timeline leading away from an event. *Id.* at D. Znidarsic 1270:3-20; 1284:10-19, J. Gorski 1407:1-1408:4, S. Andrews 1433:14-1434:3. 1499:4-19.

The evidence further established that because some events, like stop signs events, trigger the detection of an event when the confidence value that a stop sign is detected drops to zero,

Motive's AI Dashcams may have low confidence values at the time of the event. Dkt. 480, J. Gorski 4/21/25 Tr. at 1407:1-1408:4, S. Andrews 1433:14-1434:3. In other words, the stop sign is an example of an event where the *determined value of the frame* "[increased] with increasing time away from the event," or vice versa. This is directly contrary to the claimed invention, which makes sense because Plaintiffs' interpretation of the claimed "determined values of frames" tries to shoehorn a modern technology into obsolete patent claims. Because Motive's confidence values are not determined based on their time away from an event, substantial evidence supported the jury's finding that Motive's AI Dashcams do not "determine values of individual frames in the set of consecutive frames, wherein the values of the individual frames decrease with increasing time away from the particular time of the particular vehicle event."

A reasonable jury could also find that Motive's cameras do not "facilitate overwriting of the individual frames stored in the buffer memory based on the determined values." As Plaintiffs concede, the parties do not disagree on how Motive's products operate. Mot. at 10. In particular, all witnesses, including Dr. Wicker, agreed that the AI Dashcam's loop memory is deleted first-in, first-out. Dkt. 478, S. Wicker 4/17/25 Tr. at 873:24-875:14. Thus, it was legally sufficient for the jury to disagree with Plaintiffs' tortured read of the claims—disregarding how Motive's memory is overwritten in favor of attempting to make selective storing meet the language of the claims—and find that Motive's products do not overwrite memory in the way claimed by the '253 patent. *Id.* at 871:5-10, 872:13-19.

The '253 patent claims "effectuat[ing] storage of the set of consecutive frames of visual information in the buffer memory," "determine[ing] values of individual frames in the set of consecutive frames," and "overwrit[ing] of the individual frames … based on the determined values." Ex. 5, '253 Patent, cl. 1. Plaintiffs put on evidence that some frames are selectively stored. *See, e.g.*, Dkt. 482, S. Wicker 4/22/25 Tr. at 1625:23-1626:3. But Plaintiffs presented no evidence that frames in the buffer memory are ever *overwritten* based on their determined value. The evidence at trial was clear: Motive's AI Dashcam only overwrites frames based on which is the oldest in the loop. Dkt. 480, J. Gorski 4/21/25 Tr. at 1410:6-11, S. Andrews 1434:10-19. Because Motive's AI Dashcam overwrites frames first-in, first-out, rather than overwriting frames based

on their determined values, substantial evidence demonstrates that Motive's products do not "facilitate overwriting of the individual frames stored in the buffer memory based on the determined values."

**D. The '906 and '628 Patents Claim Well-Understood, Routine and Conventional Activities**

As set forth in Motive's Post-Trial Motion that the '628 and '906 patents are ineligible under 35 U.S.C. § 101 ("Motive Motion"), the jury's verdict is supported by substantial evidence and warrants entry of judgment that the asserted claims of the '628 and '906 patents are ineligible for patenting. Dkt 486. Plaintiffs fail to show, as they must in a Rule 50 motion, that the evidence permits only one reasonable conclusion contrary to the jury's verdict on these issues, especially when all factual inferences and all issues of credibility are resolved in favor of the jury's verdict. *C.B. v. City of Sonora*, 769 F.3d 1005, 1022 (9th Cir. 2014); *Shafer*, 868 F.3d 1115.

Plaintiffs' JMOL relies solely on this Court's prior ruling that the decision to split the functionality of the vehicle event recorder into two devices (an onboard recorder and a mobile device) raised factual issues for the jury on *Alice* step two. Mot. at 14-15 (citing Dkt. 131 at 9). Plaintiffs wrongly assert that "Motive failed to present any evidence, let alone substantial evidence, that the two-step hardware solution was conventional." Mot. at 14-15.

*First*, the alleged two-part hardware solution argument does not apply to the '906 patent claims. Those asserted claims do not require the "two-step hardware solution" because a "data acquisition device" is not required to meet any of these claims. Ex. 1 at Cls. 1, 10, 15.[2]

*Second*, the patents themselves indicate that the "two-part" hardware solution—a data acquisition device and a portable wireless device—is conventional. The Background sections acknowledge that data acquisition devices are known. *See, e.g.*, Ex. 1, '906 Patent, 1:17-26 ("Fleet vehicles may be equipped with devices that are configured to track the vehicles' geographic locations, speeds, headings … engine performance parameters, and other data. Such information is used, for example, to maintain the vehicles … and to evaluate driver performance."); Ex. 3, '628

---

2 While claim 15 includes a "data acquisition device," it is recited in the alternative to a portable wireless data transfer and display device. Therefore, claim 15 does not require the two-part hardwire solution.

Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
T: (415) 439-1400
adam.alper@kirkland.com
akshay.deoras@kirkland.com

Michael W. De Vries (SBN 211001)
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
T: (213) 680-8400
michael.devries@kirkland.com

Leslie M. Schmidt (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800
leslie.schmidt@kirkland.com

Kat Li (*pro hac vice*)
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
T: (512) 678-9100
kat.li@kirkland.com

*Attorneys for Plaintiffs Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.*
*[Additional counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| OMNITRACS, LLC, XRS CORPORATION, AND SMARTDRIVE SYSTEMS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MOTIVE TECHNOLOGIES, INC. (F/K/A KEEPTRUCKIN, INC.),<br><br>Defendant. | Case No. 3:23-cv-05261-RFL<br><br>**OMNITRACS' REPLY ISO MOTION FOR JMOL AND NEW TRIAL** |

**C. No Jury Could Reasonably Find that Motive Does Not Infringe the '253 Patent**

As with the '628 and '060 patents, the two arguments Motive raises in opposition for the '253 patent rely on new, unsupported claim constructions and functionality that is irrelevant to Omnitracs' evidence of infringement. Neither is a sufficient basis to avoid JMOL. ***First***, Motive argues that the jury could have found non-infringement in view of evidence that the confidence values assigned by Motive's AI Dashcam "are not determined ***based on*** time away from the event[.]" Opp. at 12 (citing Messrs. Andrews, Znidarsic, and Gorski). Here, Motive injects a causality requirement into the claims: that the time away from the event must ***directly cause*** the determined confidence value to decrease. *Id.* ("[T]here is no ***direct*** temporal relationship between an event and the confidence value as required."). But the claims do not require a direct, causal relationship between the time away from the event and the determined value, Motive never sought a construction imposing that requirement, and it is too late to add that requirement now. *Hewlett-Packard*, 340 F.3d at 1321.

Instead, the plain language of the claims requires that "the values of the individual frames decrease with increasing time away from the particular time of the particular vehicle event." If that requirement is met, there is infringement. And here, the values of the frames undisputedly do decrease with increasing time for at least Motive's "close following" and "cell phone event" features, as Motive's expert admitted. Trial Tr. 1267:23-1268:7, 1282:18-1285:12, 1459:13-1460:11; *see also* EX521.3, EX521.8. Motive does not disagree, but instead pivots by identifying an unaccused "stop sign" event detection feature where the confidence values "may" be low at the time of the event and increase with increasing time away from the event. Opp. at 12-13. But Motive cannot avoid infringement by identifying non-accused features that are included in an otherwise infringing product. *See Vulcan Eng'g Co. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1376 (Fed. Cir. 2002) ("[W]hen all of the claimed features are present in the accused system, the use of additional features does not avoid infringement."); *SunTiger, Inc. v. Sci. Rsch. Funding Grp.*, 189 F.3d 1327, 1336 (Fed. Cir. 1999) (a claim that "reads merely on a part of an accused device [] is enough for infringement").

***Second***, Motive argues that the jury could have reasonably found that the accused AI Dashcams do not "facilitate overwriting of the individual frames stored in the buffer memory based on the determined values." Opp. at 13. In particular, Motive argues that the jury's verdict was

supported by evidence that the camera's "loop memory" overwrites non-event video frames on a first in, first out basis. *Id*. at 13-14. Again, Motive injects a non-existent requirement into the claims. This time, Motive excludes any embodiment that uses any form of first in, first out overwriting schemes, even if only applied to a subset of video frames (e.g., non-event video frames). *Id*. That exclusory requirement appears nowhere in the claims, and Motive never sought such an exclusion during *Markman*. Nor could it, as the specification explicitly discloses an embodiment where an event "causes data stored in the memory buffer to be transferred to a more permanent memory facility" and the remaining, non-event data on the buffer is overwritten in a "first-in, first-overwritten" manner. '253 patent at 5:11-18. Critically, Motive never disputes (and, in fact, its expert admitted) that the accused AI Dashcam products operate in the same way described in the patents, where the non-event video frames—*i.e.,* those determined to have low confidence values—remain in the loop memory to be overwritten, while event video frames—*i.e.*, those determined to have sufficiently higher confidence values—are "excerpted" and saved in another folder within the buffer to be transferred to the long term storage memory. Trial Tr. 1440:2-7, 1472:21-23, 1473:2-1474:10, 1477:7-1478:3; Opp. at 13-14. Because the accused products use confidence values to determine (1) which frames will be "excerpted" and saved and (2) which frames will remain and be overwritten (*id.* 1472:21-23, 1473:2-1474:10, 1477:7-1478:3), Motive's argument that the latter are overwritten in a first-in, first-overwritten manner is irrelevant. Because the parties agree "on how Motive's products operate" (Opp. at 13) and because Motive's only non-infringement arguments rely on improper, untimely constructions and unclaimed requirements, the jury's verdict is not supported by substantial evidence.

### D. Omnitracs Is Entitled to JMOL on Alice Step Two for the '628 and '906 Patents

Motive fails to identify substantial evidence supporting the jury's verdict as to step two of the *Alice* inquiry for the '628 and '906 patents. ***First***, Motive contends that the '906 patent does not claim a two-step hardware solution. Opp. at 14. This is incorrect for the reasons stated in Omnitracs' opposition to Motive's JMOL motion (Dkt. 497 at 16).[4] ***Second***, Motive's contention that the patents

---

[4] Motive concedes that the "data acquisition device" is required in claim 15, but contends that it is only claimed "in the alternative." Opp. at 14 n.2. That misunderstands the claim. The fact that the "data acquisition device" is described in claim 15 confirms that the "portable wireless data transfer and display device" is one part of the two-part hardware solution described and claimed.

indicate that the two-step solution is conventional (Opp. at 14-15) is wrong. The patent background does not refer to a two-step solution, but instead merely explains that devices were used to track and maintain vehicles. *Id.* at 14. The specifications' discussion of various forms of devices (Opp. at 14-15) also does not indicate conventionality; "non-conventional and non-generic arrangement of known conventional pieces" are patent-eligible under step two. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). ***Third***, Motive disputes that the evidence of conventionality it presented at trial was limited to Mr. Sekula's systems (Opp. at 15-17), but it cites no admitted evidence supporting that position. The testimony Motive cites (Trial Tr. 324:19-325:4) refers to Turnpike and the '568 patent, the prior art about which Mr. Sekula was cross-examined extensively. And the 2010 DOT Regulations' stray reference to "mobile phone solutions" was never explained and does not refer to a split two-device solution. EX4147 at 23-24. Motive's failure to present any such evidence is definitively confirmed by Motive's improper attempt in its opposition to rely on ***new*** evidence not introduced at trial by adding annotations of EX489 to show an alleged two-device system. Opp. at 16. This new evidence was not presented at trial and cannot serve as support for the jury's verdict. *See Schudel v. General Elec. Co.*, 120 F.3d 991, 995 (9th Cir.1997) (the "record should be taken as it existed when the trial was closed"). Because the evidence ***of record*** confirms that the inventors used an unconventional system, the patents satisfy step two. *See BASCOM*, 827 F.3d at 1350; *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300–01 (Fed. Cir. 2016).[5]

## III. A New Trial Is Appropriate

### A. Motive's Religious and Racial Insinuations During Its Cross Examination of Dr. Wicker Were Improper and Inexcusable

Motive's primary attempt to justify its decision to inject religious and racial insinuations into its cross of Dr. Wicker is to blame Omnitracs. Opp. at 19 ("Plaintiffs placed the reason for Mr. Khan's use of the Frank Williams alias at issue."); *id.* at 20 (Omnitracs "[o]pen[ed] the door"). There are at least three problems with this argument. ***First***, Omnitracs did not "open the door" to introducing inflammatory racial and religious matters into the case merely by explaining who "Frank Williams" was, given that the email address appeared on multiple internal Motive emails but did not correspond

[5] Motive's cited authority (Opp. at 17-18) is inapposite, as it deals with situations involving generic components that were arranged in a conventional way.

Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
adam.alper@kirkland.com
akshay.deoras@kirkland.com

Michael W. De Vries (SBN 211001)
KIRKLAND & ELLIS LLP
695 Town Center Drive, Suite 1700
Costa Mesa, CA 92626
Telephone: (714) 982-8822
michael.devries@kirkland.com

Leslie M. Schmidt (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
leslie.schmidt@kirkland.com

Kat Li (*pro hac vice*)
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
Telephone: (512) 678-9100
kat.li@kirkland.com

*Plaintiffs Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.*

*[Additional counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OMNITRACS, LLC, XRS CORPORATION, AND SMARTDRIVE SYSTEMS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MOTIVE TECHNOLOGIES, INC. (F/K/A KEEPTRUCKIN, INC.),<br><br>Defendant. | Case No. 3:23-cv-05261-RFL<br><br>**PLAINTIFFS' NOTICE OF APPEAL**<br><br>District Judge: Hon. Rita F. Lin<br>Magistrate Judge: Hon. Laurel Beeler |

**PLAINTIFFS' NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs Omnitracs LLC, SmartDrive Systems, Inc. and XRS Corporation (collectively, "Omnitracs") appeal to the United States Court of Appeals for the Federal Circuit from the Judgment In A Civil Case entered on August 15, 2025 (D.I. 513), and all judgments, decrees, decisions, rulings, and opinions that merged into and became part of that judgment, that shaped that judgment, that are related to that judgment, and/or upon which that judgment is based. This includes, without limitation, all orders resolving motions in a manner in any way adverse to Omnitracs, as well as all rulings, orders, findings, conclusions, and decisions (interlocutory or final, oral or written) underlying such orders. *See* 28 U.S.C. §§ 1292(c), (d), 1295; Fed. R. App. P. 3, 4.

Concurrent with this notice, Omnitracs has remitted payment of the filing fee ($5.00) and the docketing fee ($600.00) as required by 28 U.S.C. § 1917, Federal Rule of Appellate Procedure 3(e), and the fee schedules of the Northern District of California and the Federal Circuit.

DATED: September 4, 2025

Respectfully submitted,

*/s/ Akshay S. Deoras*

Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
Kyle A. Calhoun (SBN 311181)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
T: (415) 439-1400
adam.alper@kirkland.com
akshay.deoras@kirkland.com
kyle.calhoun@kirkland.com

Michael W. De Vries (SBN 211001)
Ingrid Petersen (SBN 313927)
N. Yvonne Beeler (SBN 325321)
KIRKLAND & ELLIS LLP
695 Town Center Drive, Suite 1700
Costa Mesa, CA 92626
T: (714) 982-8822
michael.devries@kirkland.com
ingrid.petersen@kirkland.com
yvonne.beeler@kirkland.com

Gianni Cutri (*pro hac vice*)

Jeremy Roux (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 W Wolf Point Plaza
Chicago, IL 60654
T: (312) 862-2000
gianni.cutri@kirklalnd.com
jeremy.roux@kirkland.com

Leslie M. Schmidt (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800
leslie.schmidt@kirkland.com

Kat Li (*pro hac vice*)
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
T: (512) 678-9100
kat.li@kirkland.com

*Attorneys for Plaintiffs Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMNITRACS, LLC, et al.,<br>Plaintiffs,<br>v.<br>MOTIVE TECHNOLOGIES, INC.,<br>Defendant. | Case No. 23-cv-05261-RFL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 30 |

Motive's Motion to Dismiss is granted in part and denied in part. This order assumes the reader's familiarity with the factual allegations, the relevant law, and the parties' arguments.

***'873 Patent Validity.*** The '873 patent is directed at an abstract idea and is therefore not patentable under section 101. 35 U.S.C. § 101; *see also Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014). Beginning with step one of the *Alice* analysis, the '873 patent is directed at the abstract idea of combining and correlating data into a dataset, updating the dataset, and providing the dataset to a client. It claims "methods" (claims 1–7), "systems" (claims 8–19), and a "computer-readable medium" comprising various "instructions" (claims 20–25) that receive performance metrics from multiple vehicles, associate those metrics to specific drivers using timestamps, store and update that information in a "mapping table," and provide the resulting correlated dataset to a client. (Dkt. No. 1-4.) The Federal Circuit has repeatedly found that claims that focus on "collecting information, analyzing it, and displaying certain results of the collection and analysis" are directed to a patent-ineligible concept. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (collecting cases).

At the hearing, Omnitracs argued that, like in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d

1327 (Fed. Cir. 2016), the ’873 patent is directed to an innovative database model. But in *Enfish*, the patent claimed a “self-referential” database model that improved “computer functionality itself.” *Id.* at 1333, 1336. Omnitracs’s claimed “mapping table” does not “recite any assertedly inventive technology for improving computers as tools.” *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1344 (Fed. Cir. 2018). It may have been a novel and useful industry improvement, but it is not an improvement to the computer’s technology. The ’873 patent is also distinct from *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016), where the patents used specific, objective, “unconventional rules” to automate a 3-D animation process that could previously only be performed through subjective, artistic human action. *Id.* at 1303, 1313–14. By contrast, the ’873 patent carries out a process that a human manager could do by pen and paper: record information about a driver’s performance, figure out who was driving based on the timestamp written in paper records, copy that information to a central file organized by driver and car, and hand that file over to a client. The ’873 patent is therefore directed to an abstract idea. *See People.ai, Inc. v. SetSail Techs., Inc.*, 575 F. Supp. 3d 1193, 1207 (N.D. Cal. 2021), *aff'd sub nom. People.ai, Inc. v. Clari Inc.*, No. 2022-1364, 2023 WL 2820794 (Fed. Cir. Apr. 7, 2023).

Turning to step two of the *Alice* analysis, the claims do not recite inventive concepts. The claims do not describe the specific technological means by which these methods, systems, and mediums operate. Nor do the claims describe how the data fields are mapped to each other, and “claims to ‘an abstract idea implemented on generic computer components, without providing a specific technical solution . . . do not suffice at step two.’” *Int’l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1379 (Fed. Cir. 2022) (quoting *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016)). Omnitracs argues that the Court should read a “real time” requirement into the claims, but this would not transform the claims into patentable subject matter. *See id.* at 1371 (“Using a computer to ‘concurrently update’ the map and the list may speed up the process, but ‘mere automation of manual processes using generic computers does not constitute a patentable improvement in

computer technology.'") (quoting *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017)). The '873 patent thus fails to meet the standard for patent eligibility under section 101.

***'067 Patent Validity.*** The '067 patent likewise fails step one of the *Alice* inquiry, as it is also drawn to patent ineligible subject matter: the abstract idea of recording, storing, analyzing, and reporting data. The patent claims "systems" (claims 1–14) and "methods" (claims 15–28) that collect and organize data performance history by driver, "analyze" the data, store the data in a "dataset," and apply "algorithms" to the resulting information. (Dkt. No. 1-2.) Like the '873 patent above, the claims here "do not make a specific improvement on an existing computer-related technology." *PUREPREDICTIVE, Inc. v. H20.AI, Inc.*, No. 17-CV-03049-WHO, 2017 WL 3721480, at *5 (N.D. Cal. Aug. 29, 2017), *aff'd sub nom. Purepredictive, Inc. v. H2O.ai, Inc.*, 741 F. App'x 802 (Fed. Cir. 2018). While Omnitracs argues that the claimed "dataset" is directed at improving existing video surveillance technology, the claims do not disclose any particular method of storing the video surveillance data or associating it with other data to form a new dataset. Instead, the claim refers only to the abstract result of combining timing and driver identity data with event data. *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018) ("[A] result, even an innovative result, is not itself patentable."). Nor does Omnitracs save its claim by arguing that a manual process for having a human watch the video events and track the time and driver identity would be impossible, presumably due to its time-consuming nature. That "a computer can make calculations more quickly than a human does not render a method patent eligible." *PUREPREDICTIVE*, 2017 WL 3721480, at *5; *see also FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) ("While the claimed system and method certainly purport to accelerate the process of analyzing audit log data, the speed increase comes from the capabilities of a general-purpose computer, rather than the patented method itself.").

Turning to step two, the claim elements do not add "something more" to "transform" the abstract idea into a "patent-eligible application." *Alice*, 134 S.Ct. at 2354, 2357. As noted above, the claims broadly state the functions applied to the data (e.g., associating, analyzing,

storing, generating counseling information and performance scores) at a high level of abstraction without specifying the types of analyses or storage. *See Digitech Image Techs., LLC v. Elecs. for Imaging*, Inc., 758 F.3d 1344, 1351 (Fed. Cir. 2014). Omnitracs argues that claim construction is necessary for the terms "event record" and "dataset," specifically arguing that "event record" includes video and that "dataset" refers to "a combination of an event record, a vehicle operator identifier and an association between the two" that "includes identity and timing information along with video and vehicle data to perform a mathematical analysis of driver performance." (Dkt. No. 40 at 21.) Even construing those elements as Omnitracs asserts, the claims still do not recite any inventive concepts. Like in *Digitech*, the claims ultimately involve "taking two data sets and combining them into a single data set." 758 F.3d at 1351 (invalidating a patent for a method of digital image processing that generated and combined two datasets into a device profile). The '067 patent is therefore invalid under section 101.

***Direct Infringement of the XRS Patents.*** Omnitracs has sufficiently pleaded direct infringement of the '943, '906, and '733 patents (collectively, the "XRS patents"). The Complaint identifies by name multiple products (collectively, the "Accused Products"), which it alleges "meet each and every element of at least one claim" of the XRS patents. *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018) (quotation marks and citation omitted). (*See* Dkt. Nos. 1-12, 1-13, 1-14.)

Motive argues that the Accused Products cannot infringe as a matter of law because they do not meet one of the required elements of the XRS patents' claims. In relevant part, the XRS patents all incorporate a "composite driver score based on a plurality of a group consisting of . . . occurrences of speeding; occurrences of hard braking; . . . and occurrences of safety violations." (Dkt. No. 1 ¶¶ 200, 243, 285; Dkt. No. 1-12 at 84; Dkt. No. 1-13 at 29; Dkt. No. 1-14 at 41.) Omnitracs alleges that the Accused Products do exactly this: they calculate a composite driver score — Motive's DRIVE risk score — based on hard braking, speeding, and several other driver behaviors including running a red light, close following, cell phone usage, and drowsiness, among others. (*See, e.g.*, Dkt. No. 1-12 at 84–89.) Motive argues that the XRS

patents include a Markush group and are therefore limited to only the specific "occurrences" claimed therein. Since the Motive DRIVE risk score includes additional driver behaviors — running a red light, close following, etc., as described above, Motive argues that it cannot infringe the XRS patents. While these other behaviors are not written line-by-line in the patents, the Court cannot say as a matter of law that they are not "occurrences of safety violations." Holding otherwise would require the Court to engage in claim construction, which would be inappropriate at this stage. *See Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018). Nor can the Court hold as a matter of law that the patents are limited only to the listed criteria. Doing so would require an analysis of how Omnitracs amended its claim language during the prosecution of the patents, and would thus require claim construction. Simply put, "[a] motion to dismiss is not the proper time to raise claim construction arguments." *Fujitsu Ltd. v. Belkin Int'l, Inc.*, 782 F. Supp. 2d 868, 890 (N.D. Cal. 2011). Omnitracs has therefore sufficiently pleaded direct infringement of the XRS patents.

***Willful and Indirect Infringement of the XRS Patents.*** Omnitracs has also adequately pleaded willful and indirect infringement of the XRS patents. *See Sonos, Inc. v. Google LLC*, 591 F. Supp. 3d 638, 643 (N.D. Cal. 2022), *leave to appeal denied*, No. 2022-134, 2022 WL 1486359 (Fed. Cir. May 11, 2022) ("To establish willful patent infringement, the patent owner must prove knowledge of the patent and knowledge of infringement.").

First, Omnitracs alleges that Motive hired Dan Fuglewicz, a named inventor of the XRS patents and former Motive employee, that Fuglewicz "knew of at least the patented technologies when he worked at Motive," and that "[u]pon hiring Mr. Fuglewicz, Motive immediately began using XRS's technology to develop new and improved products," including the Accused Products. (Dkt. No. 1 ¶¶ 3, 24.) Omnitracs further alleges that "Motive's employment of Mr. Fuglewicz enabled Motive's rapid development and marketing of the Accused Products, despite its much later arrival in the fleet management industry." (*Id.* at 3.) Fuglewicz's knowledge and actions in developing the Accused Products are imputed to Motive under traditional principles of vicarious liability. *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Motive has therefore satisfied

Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
adam.alper@kirkland.com
akshay.deoras@kirkland.com

Michael W. De Vries (SBN 211001)
Jiaxiao Zhang (SBN 317927)
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
michael.devries@kirkland.com
jiaxiao.zhang@kirkland.com

Leslie M. Schmidt (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
leslie.schmidt@kirkland.com

*Attorneys for Plaintiffs Omnitracs, LLC, XRS Corporation, and SmartDrive Systems, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| OMNITRACS, LLC, XRS CORPORATION, AND SMARTDRIVE SYSTEMS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MOTIVE TECHNOLOGIES, INC. (F/K/A KEEPTRUCKIN, INC.),<br><br>Defendant. | Case No. 3:23-cv-05261-RFL<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR PATENT INFRINGEMENT

1. Plaintiffs Omnitracs, LLC ("Omnitracs"), XRS Corporation ("XRS"), and SmartDrive Systems, Inc. ("SmartDrive") (collectively, "Plaintiffs" or "Omnitracs") are leading providers of fleet management solutions to transportation and logistics companies. For over three decades, Plaintiffs have invested hundreds of millions of dollars in cutting-edge safety and fleet technologies that have transformed the fleet management and telematics industries. That investment has resulted in a variety of innovative hardware and software solutions, including artificial intelligence, driver safety, and vehicle dispatch technologies. Plaintiffs' novel technologies are foundational to the transportation and logistics industries and are increasingly relied upon by fleets around the world to manage fleet activity, improve driver safety, and reduce the costs of running transportation fleets.

2. In 2013, almost thirty years after Omnitracs' first satellite mobile communications system revolutionized the fleet management and telematics industry, Motive Technologies, Inc. (f/k/a KeepTruckin, Inc., collectively referred to as "Motive") entered the fleet management industry with an electronic logbook app for drivers to record their hours of service. Over the years, Motive expanded its platform to include products for vehicle and equipment tracking, driver safety, compliance, maintenance, and spend management, among others.

3. In December 2015, Motive (then known as KeepTruckin) hired Dan Fuglewicz, a senior engineering director, from XRS. Mr. Fuglewicz is listed as an inventor on several of the patents at issue in this case ("Patents-in-Suit" or "Asserted Patents"). Upon hiring Mr. Fuglewicz, Motive immediately began using XRS' technology to develop new and improved products to gain a larger share of the fleet management market—products Motive continues to market and sell to this day, including, *e.g.*, Motive's Fleet Dashboard, AI Dashcam, Smart Dashcam, AI Omnicam, Vehicle Gateway, Asset Gateway, Environmental Sensor, and Motive Driver App, and the hardware and/or software associated thereto (collectively, the "Accused Products"). Motive's employment of Mr. Fuglewicz enabled Motive's rapid development and marketing of the Accused Products, despite its much later arrival in the fleet management industry.

4. In July 2018, Omnitracs notified Motive at an in-person meeting and via letter correspondence its concerns about Mr. Fuglewicz's employment by Motive and how rapidly Motive's

products came to market after Mr. Fuglewicz joined Motive. Omnitracs also expressed that Motive's products look/looked strikingly similar to Omnitracs' products. Omnitracs further noted that it appeared that Motive's products use the same parts as Plaintiffs' products, and that Motive used the same product development contractor that Plaintiffs used. In August 2018 Motive responded to Omnitracs' concerns and informed Omnitracs that "Dan is no longer with our company, having decided to pursue another opportunity," and that KeepTruckin had conducted an investigation into the circumstances of Mr. Fuglewicz's time with KeepTruckin and discovered no issues. KeepTruckin "decline[d] to share any further details … regarding [their] evaluation of Mr. Fuglewicz's employment," citing privacy concerns.

5. Relying on Motive's representations that it was not using Omnitracs' technology, Omnitracs declined to file suit against Motive at the time. Years later, however, it has become clear that Motive not only started its business using technology that Omnitracs developed, but it has also continued to use that technology to expand its business and compete unfairly in the market.

6. Today, Motive offers fleet management, safety, and compliance software applications and in-vehicle telematics hardware. Rather than design and develop its own services and technologies to provide legitimate competition to Plaintiffs, Motive has taken shortcuts and used the innovative technologies designed, developed, and patented by Plaintiffs. Motive copied Plaintiffs' products and patented technology by leveraging the knowledge of former Omnitracs employees. It did so despite full knowledge of Plaintiffs' broad suite of patented technologies, and with full knowledge of the patents asserted by Plaintiffs in this Complaint. As a result of Motive's continuing and willful conduct, Plaintiffs now find themselves competing for the same customers against the very technologies they invented and patented.

7. Plaintiffs bring this lawsuit to protect their intellectual property investments and to hold Motive accountable for its willful infringement. Motive's actions have caused harm to Plaintiffs, as alleged below, by incorporating Plaintiffs' patented technologies into Motive's products. Motive's actions also significantly harm innovation and undermine the intent of the U.S. patent laws. If Motive's improper copying and use of Plaintiffs' technologies allows it to avoid what is needed to develop new products, other companies will be encouraged to simply copy others' proprietary technologies rather than hire their own engineers, invest in innovation, and develop new technologies independently and organically.

Plaintiffs therefore need injunctive relief to stop Motive's improper infringement of Plaintiffs' lawful patent rights.

## NATURE OF THE ACTION

8. Plaintiffs bring claims under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, for the willful infringement of the following nine United States patents: U.S. Patent Nos. 9,402,060 (the "'060 patent"); 10,957,130 (the "'130 patent"); 9,014,943 (the "'943 patent"); 9,014,906 (the "'906 patent"); 9,020,733 (the "'733 patent"); 9,064,422 (the "'422 patent"); 9,390,628 (the "'628 patent"); 9,911,253 (the "'253 patent"); and 9,208,129 (the "'129 patent") (collectively, the "Patents-in-Suit" or "Asserted Patents").

## PARTIES

9. Omnitracs is a Delaware limited liability company with its principal place of business at 1500 Solana Blvd, Suite 6300, Bldg. 6, Westlake, Texas 76262.

10. XRS is a Minnesota corporation and a wholly owned subsidiary of Omnitracs, and maintains its principal place of business at 1500 Solana Blvd, Suite 6300, Bldg. 6, Westlake, Texas 76262.

11. SmartDrive is a Delaware corporation and a wholly owned subsidiary of Omnitracs, and maintains its principal place of business at 1500 Solana Blvd, Suite 6300, Bldg. 6, Westlake, Texas 76262.

12. Defendant Motive Technologies, Inc. (f/k/a KeepTruckin, Inc.) is a Delaware corporation with its principal place of business at 55 Hawthorne Street, 4th Floor, San Francisco, California 94105.

## JURISDICTION AND VENUE

13. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

14. The Court has personal jurisdiction over Motive at least because Motive maintains a regular and established place of business in this District at 55 Hawthorne Street, 4th Floor, San Francisco, California 94105, and from that location conducts and/or directs the acts accused of infringement in this action. *See* https://gomotive.com/company/contact-us/. Moreover, Motive conducts business in this District by making, shipping, distributing, offering for sale, selling, and advertising (including the provision of an interactive company website) its products and services in both the State of California and in this District. Motive has, either directly or through intermediaries, purposefully and voluntarily placed

one or more of its infringing products and/or services into the stream of commerce with the intention and expectation that they will be purchased and used by customers in this District. Furthermore, on its company website Motive advertises that it has sold infringing products to customers in this District, including, for example, Biagi Bros., located in Napa, California, and Rosendin Electric Inc., located in San Jose, California. *See* https://gomotive.com/customers/biagi-bros-fleet-management; https://gomotive.com/customers/rosendin-electric/.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b) because Motive directs and regularly conducts business within this District, has a regular and established place of business in this District, and has committed acts of infringement within this District. Motive maintains a regular and established place of business in this District at 55 Hawthorne Street, 4th Floor, San Francisco, California 94105.

## BACKGROUND

### Omnitracs, XRS and SmartDrive

16. For more than 30 years, Omnitracs has been a global pioneer of fleet management solutions for transportation and logistics companies. Omnitracs provides innovative fleet management solutions, including integrated systems, software-as-a-service (SaaS) applications, and analytics platforms designed for commercial trucking fleets. Omnitracs applies its expertise in artificial intelligence and machine learning to provide end-to-end fleet intelligence.

17. XRS is a wholly-owned subsidiary of Omnitracs and is also a leader in fleet management solutions for transportation and logistics companies. XRS provides smartphone- and tablet-based solutions that enable trucking companies to manage their fleets, comply with regulations, and reduce operating costs. Omnitracs completed its acquisition of XRS on November 2, 2014.

18. SmartDrive is a wholly-owned subsidiary of Omnitracs and is also a leader in fleet management software for transportation and logistics companies. SmartDrive provides a transportation intelligence platform with AI-based driver monitoring to provide improved performance insights and analysis, and a video-based safety program that helps fleets improve driving skills, lower operating costs, and deliver significant return on investment. Omnitracs completed its acquisition of SmartDrive on September 9, 2020.

# Exhibit B

24

D. Fuglewicz
**Q. What was the reason you took those classes between 2009 and 2014?**
A. I was interested in transportation in general, sort of a car fanatic or car fan. I thought that the other part of me just wanted a Ph.D. after my name. That seemed like the easiest way or most interesting way to get a Ph.D.
**Q. So you started those classes while at Calspan?**
A. Uh-huh.
**Q. And you continued them for a number of years after?**
A. I did.
**Q. Let's go back to your time at XRS. You had mentioned that you were working on first the co-processer of the Turnpike product, is that right?**
A. Yes.
**Q. What was the Turnpike product?**
A. It was an embedded box that would talk to both SAE networks and GPS and it would take that data and send it to a phone via Bluetooth.

25

D. Fuglewicz
**Q. Was Turnpike a product that Xata or XRS purchased or acquired?**
A. They purchased the company.
**Q. Xata purchased Turnpike, the company?**
A. Yes.
**Q. Was the Turnpike product developed by Turnpike prior to the acquisition?**
A. Yes.
**Q. When you came over to XRS in 2011, were there former Turnpike employees at Xata who also came over with the acquisition?**
A. Yes.
**Q. Were those individuals also working on the Turnpike product?**
A. Yes.
**Q. Was it called the Turnpike product when you started at XRS in 2011 or did it have another name?**
A. The name was called Route Tracker.

26:6 -27:7 Motive Affirmative

26

00:36:18.0 - 00:38:01.760
**Duration:**00:01:43.760

**Q. So to the best of your recollection, approximately 20 employees were already working on the Route Tracker product at the time you started at XRS in 2011?**
A. Yes.
**Q. Are you familiar with a product**

**called the Relay?**
A. Yes.
**Q. What is the Relay product?**
A. I'm trying to remember now. The word is familiar. I don't know if that is the rebranded version of the Route Tracker that XRS had. That would be my guess.
**Q. So just trying to connect this lineage. Was Turnpike both a hardware and software solution?**
A. Yes.
**Q. Was Route Tracker, to your recollection, a rebrand of that hardware and software solution?**

27

**D. Fuglewicz**
A. The Route Tracker was the embedded solution for Turnpike.
**Q. And to the best of your recollection, was the Relay a rebrand of Route Tracker?**
A. Yes.

29:2 -32:6 | Motive Affirmative | 00:41:53.522 - 00:46:46.80 **Duration:**00:04:52.558

29

can you kindly describe the circumstances of your departure from XRS?
A. I believe a few months before -- how should I say this? Let me get it correct.
Yeah, a few months after Omnitracs bought XRS, the president and vice-president of XRS called me and said they no longer need my services in Buffalo.
**Q. How did you take that news?**
A. Disappointed because I enjoyed my work. I had grown to have some friends there, but I'm not exactly surprised because middle management often gets downsized when a company buys another.
(Fuglewicz Exhibit 2, documents bearing Bates stamp No. OMNI-MTV-00729970 through OMNI-MTV-00729976, marked for identification.)
**Q. So, Mr. Fuglewicz, I've marked as Exhibit No. 2 to the deposition, a document entitled Severance Agreement and General Release of All Claims. It bears the Bates**

30

**D. Fuglewicz**
**label OMNI-MTV-00729970 through 976. Do you recall seeing Exhibit 2 before?**
A. Now that I see it, yes.
**Q. What is this document?**
A. It's a document I had to sign, I

believe, in order to get termination.
**Q. On the first page of the document, element B reads, As a result of a reduction in force, employee's employment with the company will be terminated effective December 2, 2014, is that right?**
A. That's right.
**Q. If you refer please to the sixth page of the document ending in 975.**
A. Okay.
**Q. You acknowledge that you had certain obligations concerning XRS proprietary information in element No. 11 and you signed this document?**
A. Yes.
**Q. And the following page ending in 976 is your termination certificate concerning proprietary information and**

31

**D. Fuglewicz**
**inventions and you filled out this form and you signed it as well?**
A. Yes.
**Q. Mr. Fuglewicz, did you take with you any XRS confidential proprietary information when you left the company?**
A. No.
**Q. Did you take any source code?**
A. No.
**Q. Did you take any schematics?**
A. No.
**Q. Did you take any product specifications?**
A. No.
**Q. Why not?**
A. It was theirs for one and I didn't feel I needed them.
**Q. Why didn't you feel like you needed it?**
A. I had years of knowledge on how to do an embedded -- I didn't know where I was going to go next and, again, just I had enough general knowledge on how to do embedded electronics. I don't need to take a

32

D. Fuglewicz
company's product to do it.
**Q. That's from your years of experience and education leading up to this time?**
A. Yes.

| 34:2 -36:5 | Motive Affirmative | 34 | 00:49:53.760 - 00:53:34.160 **Duration:**00:03:40.400 |
|---|---|---|---|

Just to make sure the record is clear, I would also like you to refer to Exhibit No. 4?

(Fuglewicz Exhibit 4, signed signature page from the offer letter, marked for identification.)
**Q. Does Exhibit 4 appear to be the signed signature page from the offer letter?**
A. Yes.
**Q. Great. I would also like you to refer to Exhibit No. 5.**
**(Fuglewicz Exhibit 5, document entitled Confidential Information and Invention Assignment Agreement, Dan Fuglewicz, effective February 1, 2015, marked for identification.)**
A. Got it.
**Q. It's entitled Confidential Information and Invention Assignment Agreement with your name and an effective date of February 1, 2015?**
A. Yes.
**Q. If you turn to page 9 of the document which ends in 880 on the Bates**

35

**D. Fuglewicz**
**label.**
A. Yes.
**Q. Your signature appears there?**
A. Yes.
**Q. Can you turn to the next page which is Exhibit A which is a list of prior inventions and original works of authorship excluded under section 4(a) and conflicting agreements disclosed under 10(b), you indicate none?**
A. Yes.
**Q. And you signed this at the bottom?**
A. Yes.
**Q. You did not attach any additional sheets?**
A. Right.
**Q. If you can go please to Exhibit No. 6.**
**(Fuglewicz Exhibit 6, document entitled Confidential Information and Invention Assignment Agreement, Dan Fuglewicz, effective April 3, 2017, marked for identification.)**
A. Got it.

36

D. Fuglewicz
**Q. This is entitled Confidential Information and Invention Assignment Agreement again indicating your employee name am effective April 3, 2017.**

36:9 -42:11 Motive Affirmative 36 00:54:12.880 - 01:04:58.160 **Duration:**00:10:45.280

**Q. If you turn to page, there are no**

Volume 2

Pages 127 - 386

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RITA F. LIN

OMNITRACS, LLC, et al, )
)
Plaintiffs, )
vs. ) No. C 23-5261 RFL
)
MOTIVE TECHNOLOGIES, INC., et al, )
) San Francisco, California
Defendants. ) Monday
) April 14, 2025
) 8:15 a.m.

# TRANSCRIPT OF JURY TRIAL PROCEEDINGS

**APPEARANCES:**

**For Plaintiffs:** KIRKLAND & ELLIS, LLP
555 California Street
San Francisco, California 94104
**BY: ADAM R. ALPER, ESQ.**
**AKSHAY S. DEORAS, ESQ.**
**KYLE CALHOUN, ESQ.**

KIRKLAND & ELLIS, LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
**BY: N. YVONNE STODDARD BEELER, ESQ.**
**MICHAEL W. DE VRIES, ESQ.**

KIRKLAND AND ELLIS, LLP
601 Lexington Avenue
New York, New York 10022
**BY: LESLIE M. SCHMIDT, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

***Reported By:*** ***Debra L. Pas, CSR 11916, CRR, RMR, RPR***
*Official Reporter - US District Court*
*Computerized Transcription By Eclipse*

and they're very well known for having originated cellular wireless technologies.

But what many don't know is that the original business unit of Qualcomm was Omnitracs. And so Omnitracs was actually founded in 1988 as Qualcomm Enterprise Services. They are well known as the pioneer in fleet management technologies. And in 2013, they were spun out of Qualcomm and became their own company.

Okay. So last week you heard about three companies on our side. There's Omnitracs, XRS and SmartDrive. So I want to tell you a little bit about how they all fit together.

So let's talk about another pioneer in this space, and it's XRS. So XRS was also founded in the 1980s. They are also a pioneer in mobile fleet management technology.

And then a very interesting thing happened. So there was a group of engineers -- you're going to meet one of them in our case -- that formed a start-up called Turnpike. And in 2009, Turnpike and XRS realized that there were synergies between their fleet management products and they merged. And that led to some of the patented technologies that I'm going to tell you about that are in this case. They're XRS originated patents.

And then in 2014, because there was a good combination with Omnitracs, Omnitracs acquired XRS. So that shows you right there why XRS and Omnitracs are sitting here at the same table. They are part of the same company now.

All right. Let's talk about SmartDrive now. So SmartDrive is another key innovator in the industry, and where they come in is video technologies. And I'm going to talk about that a little bit once we get into the technology. They were founded in 2005 in San Diego. And in 2020, they acquired -- Omnitracs acquired them. I'm going to show you how their products fit together with the Omnitracs and XRS products.

So now they are all part of the same company. And you'll hear us over the course of the trial refer to them just so we're not using all the names repeatedly as Omnitracs. And that's the way the public refers to them as well at this point.

All right. It's important to remember in cases like this that it's not just the companies. It's the people that made the companies. And what we're going to do over the course of our presentation of our case to you is we're going to bring to you the people who created these technologies and made them a reality. And I'm showing some of them here. One of them is Mr. Andy Deninger. He's sitting here.

Mr. Deninger, if you could stand for just one moment.

(Mr. Deninger stands.)

He's the vice president of engineering at Omnitracs. Thank you. Thank you, Mr. Deninger.

He will be sitting here in the courtroom with us over the course of the trial. The other witnesses for both sides will

not be able to do that. Each side has one person who can sit with us, so you'll see him here.

And one of the takeaways that I wanted to present to you from this slide is that the people at Omnitracs, XRS, and so forth, who we're going to present to you, they have decades and decades of experience developing fleet management technologies and making them a reality and bringing them to market. And you're going to hear about that over the course of this case.

Okay. I would like to talk about the patented inventions. So I want to do a little bit of the -- get into the technology a bit. But before I do that, I'd like to kind of set the stage by showing you what it looked like out there before Omnitracs's technologies, and then I'll talk about what Omnitracs brought to the table.

Okay. So what I'm showing here, obviously, it's a map with a fleet of trucks. And before Omnitracs, the trucks would go around the city or state, or sometimes across the country, but there was no way to collect vehicle usage data or data about the drivers and get that back to the fleet manager. And that was an exponential problem when you had larger fleets of trucks, like dozens of trucks or sometimes hundreds of trucks that are crossing large distances. And that created a number of problems.

One of them is there are safety issues that can occur on the road. Everyone has seen the large 18-wheel trucks. And

Thank you again for your time. We'll talk again soon.

**THE COURT:** We'll now begin the evidence phase of the trial. It's Omnitracs's opportunity to call their first witness.

**MR. ALPER:** Thank you, Your Honor. Omnitracs calls Andy Deninger to the stand.

**ANDY DENINGER**,

called as a witness for the Plaintiff, having been duly sworn, testified as follows:

**THE WITNESS:** I do.

**THE CLERK:** Go ahead and have a seat.

Could you please state your full name for the record and spell your last name, and, also, just make sure you speak clearly into the microphone for our court reporter and slowly for her.

**THE WITNESS:** Thank you.

**THE CLERK:** Thank you.

**THE COURT:** My full legal name is Daniel Andrew Deninger, and that is spelled D-E-N-I-N-G-E-R.

**THE CLERK:** Thank you.

**THE COURT:** You may proceed.

**MR. ALPER:** Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. ALPER:**

**Q.** Mr. Deninger, where do you work?

**A.** I work at Omnitracs.

**Q.** And what is your position at Omnitracs?

**A.** At Omnitracs, I am the vice-president of engineering.

**Q.** How long have you been at Omnitracs?

**A.** I started at Omnitracs in 1994 as an intern. And with all of my time, including time at SmartDrive, which is now a subsidiary of Omnitracs, I've been there about 30 years.

**Q.** Now, what is Omnitracs?

**A.** So Omnitracs is a technology company that provides products and services to the transportation industry. And our goal is to help our customers stay within their regulatory requirements and to also help them improve safety and efficiency for their fleets.

**Q.** Today how many transportation companies and fleets in the United States use Omnitracs's products to manage their fleets?

**A.** Today we have over 10,000 customers using Omnitracs's products and services.

**Q.** And as vice-president of engineering, what do you do at Omnitracs?

**A.** So my role at the company as vice-president of engineering is to be responsible for the overall research and development of our products and services. I also interface with other business departments and customers of ours.

**Q.** And do you have personal knowledge of the Omnitracs, XRS and SmartDrive technologies that are at issue in this case?

**A.** I guess I do.
**Q.** Okay. I want to talk about those technologies in just a little bit, but I'd first like to briefly talk about your background.
Where do you live?
**A.** I live in Carlsbad, California, a suburb of San Diego.
**Q.** And how long have you lived there for?
**A.** I've been in Carlsbad since 1985.
**Q.** And where is your office?
**A.** Our San Diego office is located in Kearny Mesa.
**Q.** And do you have a family?
**A.** I do. My wife and I, Tina, will be married 24 years this summer. We have two children. Our son is a sophomore in college and our daughter is a junior in high school.
**Q.** How did you get involved in technology?
**A.** Yeah, my mom was the tech person of the family. We had an Apple computer when I was a kid. And I got really hooked and started writing some software programs. So it's because of her.
**Q.** And let me talk about your educational history. Where did you go to school?
**A.** I attended Humboldt State University in Northern California. I received a bachelor's degree in applied mathematics and a minor in computer information systems.
**Q.** And when did you graduate college?

**A.** I graduated in 1996.
**Q.** What did you do after graduating?
**A.** After graduating, I was hired by Qualcomm as a software engineer in the Omnitracs division.
**Q.** And what is Qualcomm?
**A.** So like many of you know, Qualcomm is a very large wireless company and responsible for a lot of the technologies used, like CDMA in our wireless phones and 4G technologies.
**Q.** Now, how does Omnitracs relate to Qualcomm?
**A.** So what most people don't know is that Omnitracs was the first business unit of Qualcomm and developed their first commercial products, and it was -- Omnitracs is now its own stand-alone company.
**Q.** Okay. What drew you to Omnitracs?
**A.** As a young engineer, I was really excited about getting to work on wireless technologies, do advanced algorithms, and I learned a lot about the transportation space and how important keeping our drivers and other people on the road safe and efficient. So I was really excited to join the company.
**Q.** Mr. Deninger, did you prepare some slides to help with your testimony today?
**A.** Yes, I have.
**MR. ALPER:** Your Honor, permission to publish PDX 2.
**THE COURT:** Any objection?
**MS. TARASI:** No objection.

**THE COURT:** You may.

**MR. ALPER:** Mr. Schlaifer, let's call up PDX 2.2. Thank you. You've got it up.

**BY MR. ALPER:**

**Q.** Mr. Deninger, what are you showing? Can you see it on your screen?

**A.** I apologize. I can't see it. It's blank.

**THE COURT:** And just so we have a clear record, is this a demonstrative or is it being admitted into evidence?

**MR. ALPER:** It is a demonstrative.

**THE COURT:** Just so that the jury understands, this isn't something you'll have in the jury room at the end of the trial. It's just to help the witness illustrate his testimony to you. So what you're seeing on the screen is not itself evidence.

**MR. ALPER:** Thank you, Your Honor.

(Photograph displayed.)

**BY MR. ALPER:**

**Q.** Are you able to see on your screen?

**A.** Yes. Yes, sir.

**THE CLERK:** What exhibit is this again?

**MR. ALPER:** It's PDX 2, and it's Page 2.

**BY MR. ALPER:**

**Q.** Mr. Deninger, can you tell the jury what are we seeing here?

**A.** Yeah, this is a photo in the year 2000. It was a celebratory launch lunch at the Omnitracs headquarters. We had just launched a product called untethered trailer tracking, which was a very revolutionary trailer product to track trailers and their cargo.

**Q.** And if we could go to PDX 2.3, where are you in this picture?

**A.** I'm in the back middle with the yellow circle.

**Q.** Thank you.

**MR. ALPER:** We can take that down.

(Document removed from display.)

**BY MR. ALPER:**

**Q.** When did you begin working on Omnitracs's products?

**A.** I began working on them in 1994, when I was an intern in college.

**Q.** Now, have you been working on Omnitracs's products continually since 1994?

**A.** No. I joined a company, another San Diego-based company called SmartDrive, and I worked there from 2014 until 2020.

**Q.** Why did you leave Omnitracs to join SmartDrive?

**A.** I had been there almost 20 years. It was my only commercial experience working since college. I was contacted by a couple of executives at SmartDrive. They were discussing what they were doing in what we call the video-based safety industry.

I thought it was a good opportunity to learn something new, both from a product perspective and market perspective, and, also, possibly new technology, so I took the chance to join.

**Q.** Now, how did you wind up back at Omnitracs?

**A.** Yeah. So funny enough, Omnitracs acquired SmartDrive in 2020. I was really enjoying the work I was doing at SmartDrive, and I had a real love for Omnitracs and I was excited to work on those products together --

**Q.** Now, if you take a step back and you think about your experience at Omnitracs over the years, what type of engineering work have you been responsible for and have you done?

**A.** Pretty much everything. I've been an individual contributor, writing software, doing hardware designs. I led our systems engineering and architecture group for many years. And for the past 15 or so years, I've been a -- head of -- head of the engineering group responsible for all of our development and our quality assurance.

**Q.** In your role as vice-president of engineering, how many people are in your team?

**A.** My current team is -- I have 70 direct full-time engineers.

**Q.** And how long -- all told, how long have you been working on Omnitracs's technologies?

**A.** All told, it's been about 30 years.
**Q.** All right. I'd like to talk a bit about Omnitracs and its technology. But first, what was fleet tracking like before Omnitracs?
**MR. ALPER:** And, actually, if we could call up PDX 2.4, please.
**BY MR. ALPER:**
**Q.** So I'll ask you: What was fleet tracking like before Omnitracs?
**A.** I can't see it.
**Q.** Oh, you can't see it?
**THE CLERK:** Sorry. Is this also for the jury to see?
**MR. ALPER:** Yeah.
**THE COURT:** This is part of the same demonstrative exhibit. It's fine to publish.
(Document displayed.)
**MR. ALPER:** Thank you, Your Honor. Thank you very much.
**BY MR. ALPER:**
**Q.** I'll -- so let me reask the question. What was fleet tracking like before Omnitracs?
**A.** Yeah, before Omnitracs, fleet dispatchers or fleet managers were very disconnected from their drivers and their vehicles. Also, there was a ton of information coming from the vehicle that was unable to be collected. And none of that

information was being able -- was able to get back to the fleet dispatcher in any type of timely manner for analysis.

**Q.** What did the lack of data about a driver's use of the trucks -- I'm sorry. Let me ask that again.

Did the lack of data about the driver's use of the trucks impact a fleet manager's ability to manage the fleets?

**A.** Yeah, it really did. It really impacted, especially in the areas of safety, efficiency, and also accuracy.

**MR. ALPER:** Let's call up PDX 2.5. And let's start with safety.

(Document displayed.)

**BY MR. ALPER:**

**Q.** How did the lack of data impact a fleet manager's ability to assess driver safety?

(Court reporter clarification.)

**MR. ALPER:** Sure.

**BY MR. ALPER:**

**Q.** How did the lack of data impact a fleet manager's ability to assess driver safety?

**A.** Yeah. So things like the driver's hours of service. Are they driving more than they should be per the federal regulations? Have they been speeding? Are they aggressively driving and hard braking? Before Omnitracs, this information wasn't able to be collected or sent for analysis.

**Q.** And what about efficiency? How did the lack of data

concerning driver efficiency impact a fleet manager's ability to manage fleets?

**A.** So for efficiency, it's a lot of the same, only for different types of metrics. So, for example, what kind of fuel economy is a vehicle and driver getting? How many miles are they driving? How many tasks are they completing in a day? And a lot of other things.

And so, before the Omnitracs system, not all this data was even able to be collected. And this data that they did have wouldn't be able to be looked at for a very long time, usually until the truck came back to the depot. So there was no good way to compare drivers and train them for improvement.

**Q.** Let's go to PDX 2.6. You also mentioned accuracy. What were the problems with accuracy in fleet tracking?

**A.** Yes. Again, before the Omnitracs system, the ELD mandate -- not the ELD mandate, but the requirement by the DOT to keep a driver's logs had to be done manually via pen and paper. This is an example of a traditional logbook.

As you can see, it's pretty complex to fill out. Drivers can make mistakes inadvertently, forget to fill out the forms. And so this could lead to a lot of inaccuracies and inefficiencies for the fleet.

**Q.** And you mentioned -- we can take that down.

(Document removed from display.)

//

**BY MR. ALPER:**

**Q.** You also mentioned that drivers were disconnected from fleet managers. How did that affect the fleet manager's ability to manage the fleets?

**A.** Again, not able to message the drivers, know where they are, get all of this, you know, types of data that we've been discussing. They weren't able to manage and coach these drivers, know whose drivers were -- what drivers were doing a great job and which drivers needed some improvement and training.

**Q.** Now, did Omnitracs, XRS and SmartDrive come up with solutions to those problems?

**A.** Yes, they did.

**Q.** I'd like to start with Omnitracs, and then get into what XRS and SmartDrive did.

So what did Omnitracs do?

**A.** So Omnitracs developed a solution that was able to collect all of this rich data coming from the vehicle and the driver, as well as a way to wirelessly send it back to the fleet manager in a timely fashion so they could actually take action on it in real-time.

**Q.** And did you bring any examples of that type of Omnitracs system?

**A.** I did.

**Q.** Okay. We have some devices to --

**MR. ALPER:** Your Honor, may Mr. Deninger step outside the box to pick up one of the physical exhibits?

**THE COURT:** You may.

**BY MR. ALPER:**

**Q.** If you could pick up Exhibit 2019, please, Mr. Deninger.

(Witness complied.)

**Q.** Okay. Thank you.

Can you explain to the jury what Exhibit 2019 is? I'm sorry, please let me ask that again.

**A.** Okay.

**Q.** Can you explain to the jury what Exhibit 2019 is?

**A.** Yes. So this is an actual Omnitracs device called the MCP50. This is a real production piece of hardware that is in the trucks.

**MR. ALPER:** Your Honor, we would move to admit Exhibit 2019.

**THE COURT:** Any objection?

**MS. TARASI:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 2019 received in evidence.)

**BY MR. ALPER:**

**Q.** Okay. Now, can you please explain to the jury, how would the MCP, that device, that Omnitracs device, how would that go into the truck and how would it be used?

**A.** Yeah. So this device is mounted in the -- in the actual

vehicle. This display unit and mobile computer is mounted to the dash. It's hard attached. And then this device here is installed, usually, typically under the dash, and then we have a hardwired connection to what we call an engine control unit or the ECU.

**Q.** And is there wireless functionality in that Omnitracs device?

**A.** Yes, there is. There's a cellular data modem. So all the data collected can be sent wirelessly over the internet back to the fleet manager.

**Q.** Okay. And was that Omnitracs device available before the XRS products?

**A.** Yes, it was.

**Q.** Okay. So let's talk about XRS and how XRS fits in.

What is XRS?

**A.** So XRS is another pioneer in the fleet transportation space. They were founded in 1985 out of Minnesota. And they were acquired by Omnitracs in 2014. They're the same company now.

**Q.** Okay. Why did Omnitracs acquire XRS?

**A.** There was a lot of natural fits between Omnitracs technology and the XRS.

**Q.** Let me call back up your demonstrative slides. And if we can look at PDX 2.7. And I'll ask you: What are you showing here?

(Document displayed.)

**A.** Yeah, so just three images here of areas that XRS identified that were areas for large improvements with the Omnitracs system. One, as you could tell, this has to be attached to the truck. There's all these cables. The driver can't take it outside of the vehicle.

Second, when there is, like, 3g to 4G, 4G to 5g, this entire thing has to be replaced as opposed to just the display with the cellular modem.

And lastly, the Omnitracs system and others like it, with these types of devices, you really could only run the software provided by the -- by the telematics provider. If you wanted to use third-party off-the-shelf applications, like you can on your smartphone today, you couldn't do that.

**Q.** Now, did XRS come up with solutions for those problems?

**A.** Yes, they did.

**Q.** Okay. What did XRS do?

**A.** So XRS took this device and they broke it into two distinct pieces. One is a data acquisition device that's permanently attached on the dash or inside the dash connected to the ECU. And the second is a portable device that has the wireless and the application processing power and the display for the driver to use.

**Q.** Okay. And what was that product called?

**A.** That product is called the XRS Relay System.

**Q.** All right.

**MR. ALPER:** Your Honor, may Mr. Deninger move outside the box again to the table there?

**THE COURT:** He may.

**BY MR. ALPER:**

**Q.** Okay. If you could bring the Omnitracs device over to the table, and if you could pick up Exhibits 2023 and Exhibit 2017.

(Witness complied.)

**Q.** Let's take a look at Exhibit 2023 first. Can you tell the jury what that is?

**A.** Yes, so this -- as part of the XRS Relay System, this is a device called the XRS Relay.

**Q.** And what's the purpose of that device?

**A.** So this is the device that is hard mounted on top of the dashboard. It has a connection to that ECU that gets all that rich vehicle data.

**Q.** What company name is on the cover of that device?

**A.** XRS.

**Q.** Okay. And then if you go to Exhibit 2017, what is that?

**A.** So this is an off-the-shelf mobile tablet commonly referred to as a BYOD or Bring-Your-Own-Device. This could be a smartphone or a tablet. It has a touch screen display and wireless technology to communicate over the internet.

**Q.** How do these devices work inside the truck?

**A.** Yeah. So the XRS Relay is mounted in the vehicle

collecting all the ECU data. It has a short range radio technology called Bluetooth that is able to transmit that data wirelessly between this device on the dash to the tablet running the XRS driver applications. That data is processed, summarized, and then that data is able to be sent, again, wirelessly over the cellular network back to the fleet manager.

**Q.** I'm going to talk about some of the other technologies from XRS in a minute, but why was that important?

**A.** Well, it was really important because now drivers could actually work outside of the vehicle.

**Q.** Okay. And why is that something that would be important for a driver in the fleet industry?

**A.** So what people may think is drivers are just driving all day long, and that is a big part of their job. But when they actually get to a destination to pick up a load or drop something off, they actually have a lot of tasks to do in the office or even outside of the vehicle.

Before this system, the driver had to leave the MCP device in the truck. You can't remove it. Go into the office. Do all of their administrative-type tasks. And either try to remember everything or have like a notepad and write everything down, and then come back into the vehicle and put that in. And that could lead to two major problems. Either, one, a lot of inefficiency. It takes a lot longer to do that. And you could also miss -- misremember or miswrite down stuff and you can

have a lot of accuracy issues.

**Q.** And did that XRS product solve that problem?

**A.** Yes, it did.

**Q.** Now, what, if any, new generations of the XRS Relay has Omnitracs released?

**A.** So Omnitracs developed a brand-new device that we call the AMG-C, and it's a next-generation data acquisition device designed and developed by Omnitracs.

**Q.** And what is the difference between the relay -- or what, if any, differences are there between the relay and the AMG-C?

**A.** So the primary difference is that the XRS Relay has Bluetooth connection, as does the AMG-C, but it doesn't have its own cellular radio to connect to the internet directly.

The AMG-C has all the functionality of the XRS Relay --

(Court reporter clarification.)

**A.** I apologize.

The AMG-C has all the capabilities of the Relay, but it also includes a wireless modem to connect to the internet on its own. And that can be -- it can act as a hotspot for this tablet. So the driver -- this tablet can continue to connect to the fleet manager over the internet with its own cellular radio or it can use the AMG-C as a hotspot to send that data.

**Q.** Now, are there any other problems that the XRS technologies addressed?

**A.** Yes.

**Q.** Okay. And what are those?

**A.** Previous to the XRS technology, all of this vehicle data and sensor data coming into the MCP or other telematics devices would be sending -- sent wirelessly back to the dispatcher. It's a tremendous amount of data and very difficult. And these companies have, you know, 10 trucks, 100 trucks, 1,000 trucks, and the same number of drivers. So all that data coming back, it became -- it's very, very difficult for the fleet manager to effectively understand what's actually happening and zero in on the drivers and vehicles that need assistance.

**Q.** And how did XRS address those problems?

**A.** So with the development of the XRS hardware and software, the XRS Relay System, the hardware and software solution, they also developed new data structures that allowed the wireless transmission of this data in a summarized platform. Summarized manner. And this allowed the fleet managers to now, you know, very quickly have summary reports to find out which drivers and vehicles needed that assistance and coaching.

**Q.** Do you have an understanding whether there will be another Omnitracs witness who will talk in more detail about that?

**A.** Yes.

**Q.** And who ask that?

**A.** Mr. Chris Sekula.

**Q.** And how does he relate to the XRS patent -- patents in this case?

**A.** Yeah. Mr. Sekula is a named inventor on the two XRS patents in this case.

**Q.** Thank you.

Let's talk about SmartDrive. What does -- at a high level, what does SmartDrive do?

**A.** So SmartDrive is another telematics company founded in San Diego in 2005. We focus on video -- what we called video-based safety solutions. And it's primarily focused on monitoring driver behavior and coaching those drivers to improve so they are not risky drivers.

**MR. ALPER:** And, Mr. Schlaifer, we can take this down. Thank you very much.

(Document removed from display.)

**BY MR. ALPER:**

**Q.** Why did Omnitracs acquire SmartDrive?

**A.** Similar to XRS, another real nice technical fit between Omnitracs and SmartDrive. SmartDrive took some of the things that I showed you, like being able to detect hard braking and other things to the next level. And also gave a holistic view with video and additional data to give better insights so those drivers could be coached.

**Q.** Why -- what products does SmartDrive offer?

**A.** So we offer products and solutions, again, that have a component that reside in the vehicle. They take a blend of video camera data as well as the sensor data from the ECU and

driver data to get a real holistic view of driver performance and risk.

**MR. ALPER:** And, Your Honor, may Mr. Deninger go to the table again?

**THE COURT:** Yes. You may step down.

**BY MR. ALPER:**

**Q.** If you could pick up Exhibit 2028-A, B and C. I think that's what you have.

What are Exhibits 2028-A and B?

**A.** So these exhibits are examples of the actual smart cameras that are used by the SmartDrive system. These are what are mounted on the windshield of the vehicle.

This is the road-facing camera. It points out towards the road, so we can see what's happening out there.

This is the driver or cabin-facing camera. And this one faces the driver, so we can understand driver behavior while they are driving the vehicle.

**Q.** And then what is Exhibit 2028-C?

**A.** So this is what we call the controller. This is the SmartRecorder 4. Again, this is mounted inside of the dash. It's hardwired to the vehicle's ECU, and collects all that data that we talked about.

**Q.** How do the cameras relate to that controller?

**A.** So in these samples I've removed the cables, but each has a cable that's routed down the headliner, and they're plugged

into the ports for both cameras to the SmartRecorder controller box.

**Q.** And, then, what can the controller do with respect to the cameras?

**A.** So it takes all of the video data, as well as the ECU data, GPS data, et cetera, and it blends all that data together into the SmartDrive proprietary algorithms and machine learning algorithms to understand how the vehicle is being driven. If it's being driven in a safe or risky manner.

**MR. ALPER:** If we could call up, Mr. Schlaifer, PDX 2.8.

(Document displayed.)

**BY MR. ALPER:**

**Q.** What were the problems that fleet managers were facing before technologies like SmartDrive's?

**A.** Yeah, so before technologies like SmartDrive, I'll use hard braking as an example. A fleet may be able to detect an occurrence of a hard braking event, but wouldn't be able to understand the hard braking event that was the result of a risky driving behavior by the driver, or a proactive driver driving defensively and doing the right thing.

**Q.** How does the use of the SmartDrive video technology address that problem?

**A.** So now that we have video evidence and video along with the event, the fleet manager is able to watch the actual video

and understand if it was a risky event or a good event, a safe driver after, and then interface with those drivers appropriately, either coach or reward.

**MR. ALPER:** We can take this slide down, please.

(Document removed from display.)

**BY MR. ALPER:**

**Q.** Were there other problems that the SmartDrive engineers were facing?

**A.** Yes, there were.

**Q.** And can you describe those to the jury, please?

**A.** So when you're dealing with video, it's a tremendous amount of data. Like I stated earlier, these vehicles are out for multiple hours, days, or even weeks at a time, depending on the type of fleet. So with all of the video coming in, it would be impossible or very, very difficult, it could take hours and hours and hours for the fleet manager to watch all of the video just for the little -- just for the parts that showed the risky events that needed to be coached.

The second issue was that with all of this video coming in, even with -- even with device advancements over the years, the amount of memory required to store all that video isn't really practical, even like a modern day device.

So what happened is video -- video would be stored in a -- in a memory buffer, and at some point we would exhaust that buffer and start to overwrite it. So the bad thing about that

is you start potentially overwriting previous video events that could be very important for review.

And the third part is fleets had no way to get the video information off the device for review without the driver actually coming back to the home base and manually offloading it.

**Q.** Okay. Let's talk about that first problem relating to fleet managers having too much data to sort through.

What, if anything, did SmartDrive do to address that problem?

**A.** So they developed what we call event triggers.

**Q.** Okay. And what are those?

**A.** So an event trigger is the output of these proprietary SmartDrive algorithms that are looking at all of this data, video, ECU, GPS, et cetera, and determining if a collision or a risky driving event occurred. When that occurs, we can tag that event. And then just know that just the video near that tag, that point in time, is the important part to be taken out of the temporary buffer and stored for later use, and eventually offload over the network to the fleet.

**Q.** If we could call up PDX 2.9.

(Document displayed.)

**Q.** What are you showing here?

**A.** So these are just a few examples of some of the event triggers that the SmartDrive system supports.

So, for example, with the inward camera, we can determine if a driver is using a cell phone while driving, even if the vehicle is driving straight and not swerving.

Again, with the inward camera, we can identify through driver facial patterns if they're getting tired and need a rest.

With the forward camera, one example is we can determine distance to vehicles in front of us and understand if we've got a driver that's what we call following too close or tailgating.

**Q.** Are these the only types of event triggers that SmartDrive implemented?

**A.** No. We literally have over 100 different types of event triggers to categorize all types of different risky events.

**Q.** Okay. And you mentioned issues -- we can take that down.

(Document removed from display.)

**Q.** You mentioned issues relating to memory storage. What were those issues?

**A.** So, again, with all of the video coming in, you had two core problems. The memory getting so large that you had too much video to review. And then, lastly, the ability to get that video information off the device. It was just too large.

**Q.** And what technologies did SmartDrive develop relating to that?

**A.** Well, we developed several advancements in memory buffer technology in order to solve that problem.

**Q.** And can you describe one of those technologies, please?

**A.** Yeah. So the first was a mechanism to -- as video frames are coming in at a high rate of speed, the first technology is to assign values to those video frames based on if the relevance of the frame had something to do with a high-risk driving event. The higher the value, the more likely that that frame was important and should be saved.

If the frame had a very low event value, it could be discarded. So then only those high event values could be stored -- in a durable storage and then for later transmission. The lower values could be deleted for new frames to come into the memory buffer.

**Q.** And when you said "durable storage," do you mean that they were copied over to long-term storage memories?

**A.** Yeah. "Durable storage" is a term that I use for, like, long-term storage, like, a hard disk on your computer, as opposed to, like, the RAM that would be running your applications.

**Q.** Okay. Now, you said that there were multiple approaches on the memory side of things. What's another of the technologies that SmartDrive developed relating to memory management?

**A.** So the other technology goes back to the event trigger mechanism that I was referring to. In that implementation and technology, the event -- the output of the algorithms for the

event trigger is tagged and then we just use a time-based approach, like 15 seconds before the event trigger, 15 seconds after, to take that -- that memory buffer, again, move it to long-term storage for later transmission and review.

**Q.** Okay. And which, if any, of those technologies that you described just now is implemented in the SmartDrive products?

**A.** Both of those methods are valid and proprietary to SmartDrive, but we chose the latter, the event trigger, time-based model in the SmartDrive products that are developed.

**Q.** Okay. And why is that approach implemented in the SmartDrive products and not the approach that assigns the values that you described?

**A.** We found that in the actual products that we were developing and the features that we wanted to offer, the event trigger, time-based buffer memory management model, was more practical and purposeful for the products we were developing.

**Q.** Okay. A better fit for your particular products?

**A.** Absolutely a better fit, yes.

**Q.** Okay. Now, you also mentioned there were problems with getting data back to the fleet managers. Before the SmartDrive technologies, how did truck drivers do that?

**A.** So before the Omni- -- or the SmartDrive technologies, the only way to do that was, again, for the driver to drive all the way back to the home base and then to, you know, manually offload that -- that data either via, like, a card or a cable.

**Q.** Okay. And what did SmartDrive do to solve that problem?
**A.** We -- we developed a mechanism to wirelessly transfer this video over the internet, as long as the device was in circular coverage.
**Q.** Okay. And how does that functionality relate to the SmartDrive SR4 system that you have in front of you?
**A.** The SR4 system has a 4G cellular data modem, and that's how the data's transferred.
**Q.** And that is over an internet connection?
**A.** Over the internet connection, over 4G, yes.
**Q.** And what is the importance of that type of a feature in terms of just at the fleet management level?
**A.** Yeah, it's super important because, in terms of improving driver performance and understanding risk, you really want to get that video off in real time and not wait for days or even weeks to get it off. It's important to do the coaching and intervention as soon as you can.
**Q.** And does that ability -- how does that relate to preventing accidents and making the drive -- the roads more safe?
**A.** Absolutely. So, again, if a driver's driving in a risky fashion and not getting feedback for weeks, there's a much more high likelihood of an accident.

Getting that data off, having those dispatchers review the video, contact the driver and do the coaching, the goal is to

get that driver to change that behavior from a risky behavior to a safe behavior right away.

**Q.** That's a good transition to my next question, which is: Do these Omnitracs products have an actual impact on people out in the world?

**A.** Oh, a very big impact.

**Q.** I'd like to call up your slide PDX 2.10, please.

(Document displayed.)

**Q.** And what are you showing here?

**A.** So I'm showing just a few high-level metrics about the impact that these products and services have for our customers and the general public. With the efficiency of items that I discussed during my testimony, we see an average of 15 percent reduction in driver overtime, which means they're able to get home more often and not work so much overtime because of the efficiency.

Again, because of all the technologies I discussed, our customers see an average of a 62 percent reduction in actual collisions, which has a huge impact on all of us out on the roadways.

And, again, because of all the efficiency and accuracy improvements, our customers are seeing an average of 75 percent reduction in product loss. And what that means is when you go to buy things at -- on the store shelves, they're at a lower price because they're not having as much loss of product that

they have to replace.

**Q.** And I just want to focus on one of those for a minute. How does accurately tracking and communicating driver and vehicle data using the Omnitracs technologies result in a reduction of dangerous collisions?

**A.** Primarily making sure that those drivers are driving within the hours of service regulations mandated by the Department of Transportation is a key one. If drivers are driving over those hours and they're fatigued, that's a very high leading indicator of collisions.

Things like over-speeding and other items that I discussed, hard braking, are also indicative of higher risk drivers that have a much higher frequency of collision.

**Q.** And that's enabled by your products?

**A.** Absolutely.

**Q.** And how does this affect the lives of people out in the world?

**A.** So when a vehicle, like, especially a large vehicle gets into an accident, it's not just about the truck. They typically are getting into collisions with passenger vehicles. Passenger vehicles hitting large vehicles typically results in loss of life or serious injury to the people in the passenger car. So that's a huge one that we're very proud of.

And, secondly, with the efficient delivery of goods, we get stuff on time and we get it at a much lower price as the

end consumer.

**MR. ALPER:** Mr. Schlaifer, we can take that down.

(Document removed from display.)

**BY MR. ALPER:**

**Q.** Let me switch gears just a little bit. How much effort went into developing the Omnitracs technologies?

**A.** A tremendous amount. On average, we spend about $70 million per year just on research and development in engineering.

**Q.** And how, if at all, does Omnitracs protect its technologies?

**A.** Well, one very important way is through our patents. Today we have over 350 patents that have been granted by the United States Patent Office. And that's a very important way for us to protect our intellectual property.

**Q.** What is Omnitracs's view on competitors who develop their own technology that is different from Omnitracs's patents?

**A.** Well, we think competition in the market is a good thing. It helps drive the market forward as long as that -- as long as that competition is done in a fair way. And a big part of being fair is not copying others' protected IP and copying that in their own products.

**Q.** Does Omnitracs expect others to avoid infringing its patent rights?

**A.** Absolutely, we do.

**Q.** Let's briefly talk about the patents in this case.

If you -- I think you have your -- actually, we can put the SmartDrive cameras back so...

(Witness complied.)

**Q.** Thank you.

And if you could turn in your binder to Exhibits 1, 3, 4 and 5. And I'll ask you: Do you recognize those documents?

**A.** Yeah, these are the four patents at issue in this case.

**MR. ALPER:** Your Honor, move to admit Exhibits 1, 3, 4 and 5.

**THE COURT:** Any objection?

**MS. TARASI:** No objection.

**THE COURT:** Admitted.

(Trial Exhibits 1, 3, 4 and 5 received in evidence.)

**MR. ALPER:** Okay. Let's call up PDX 2.11 now.

(Document displayed.)

**BY MR. ALPER:**

**Q.** And what are you showing the jury here?

**A.** These are the -- the cover pages of the four asserted patents in this case. Two originated with XRS and two originated with SmartDrive.

**Q.** And how do these four patents relate to the Plaintiffs in this case?

**A.** All of these were developed by the Plaintiff, which is, yeah, SmartDrive and Omnitracs.

**Q.** And the two on the left, those are XRS; and the two on the right are SmartDrive?

**A.** Yeah, the '906 and the '628 were developed -- or originated by XRS, and the '060 and the '253 originated with SmartDrive.

**Q.** Are you going to talk in detail about the patents?

**A.** No, I will not. For the two XRS-related patents, my colleague, Chris Sekula, who's a named inventor on those, will discuss those in more detail.

And we have an expert witness to talk about the two SmartDrive patents.

**Q.** And do you know who James Plante is?

**A.** Yes, I do. Mr. Plante was the founder of SmartDrive. He's the named inventor on the '060 and '253 patent. He left SmartDrive in 2008 before I joined.

**MR. ALPER:** Okay. We can take that down.

(Document removed from display.)

**BY MR. ALPER:**

**Q.** Are you aware of a concept called competitive intelligence?

**A.** Yes, I am.

**Q.** What is competitive intelligence?

**A.** So competitive intelligence entails companies looking at a competitor's publicly available information to understand how to differentiate themselves in the market. We don't find

anything wrong with competitive intelligence as long as it doesn't involve the use of proprietary IP for the development of their own -- of someone else's products.

**Q.** Okay. Thank you.

All right. Let's talk about Motive. Have you heard of Motive?

**A.** Yes, I have.

**Q.** All right. What is Motive?

**A.** They are a competitor in the fleet transportation space, and they offer products similar to ours.

**Q.** Okay. And, generally speaking, what products does Motive sell?

**A.** So they -- they offer a data acquisition device similar to what I discussed, like the Relay and the AMG-C. Their driver-based applications run on a BYOD tablet that connects wirelessly to their data acquisition device.

They also offer a video-based safety solution similar to SmartDrive that uses cameras.

**Q.** Okay. Now, have you ever communicated with anyone at Motive?

**A.** Yes, I have. In 2017, I was reached out by a third-party recruiter. Motive was looking for a hardware vice president. And I had two meetings, one with Mr. Makani and one with Mr. Johns from Motive.

**Q.** Okay. And Mr. Makani, he's the CEO and Mr. Johns is the

chief technical officer?

**A.** That's correct.

**Q.** And what came of that?

**A.** Nothing came. I had the meetings, and I was already happily employed at SmartDrive. But I did take the call and after discussing with those -- the recruiter and Mr. Makani and Mr. Johns, I realized that the -- it wasn't an offer as good as I had at SmartDrive, and I decided to stay.

**Q.** When did you first find out about Omnitracs's allegations in this case?

**A.** I first found out just by a news feed on the internet, a public article.

**Q.** You saw the Complaint?

**A.** I've also seen the Complaint, yes.

**Q.** And are you familiar with Omnitracs's allegations about Motive copying its technologies in this case?

**A.** Yes, I am.

**Q.** What impact have Motive's actions at issue in this case had on Omnitracs?

**A.** Well, they've had a tremendous impact. Like I said, we've spent, you know, tens of years, hundreds of people-years, developing our core products, spending tens of millions of dollars.

And when you find out that a competitor in your space has been using your patented technologies and copying those to have

an unfair advantage in the market, it's -- it's hurtful and surprising to hear that.

**Q.** As an employee of Omnitracs, are you permitted to use Omnitracs's patented technologies for your own personal benefit?

**A.** No, absolutely not.

**Q.** And when you left Omnitracs to join SmartDrive, how did you treat Omnitracs's patented technologies?

**A.** Well, I treated it as the property of Omnitracs, and I -- I ensured that all of the work that I did at SmartDrive made no use of those patented technologies.

**Q.** And has anyone at Motive, Mr. Makani, Mr. Johns, who knew how to reach out to you, or anyone else, ever asked you for permission to use Omnitracs's or XRS's or SmartDrive's patented technologies?

**A.** No, they have not.

**Q.** Okay. Are there any current products that you offer that have all of the technologies you've been talking about?

**A.** Yes.

**Q.** And what's the name of that product?

**A.** We call that product Omnitracs One.

**Q.** Okay. And if you turn in your binder to Exhibit 339, please.

(Witness complied.)

**A.** Okay. I see it.

**Q.** And what is that document?
**A.** This is a presentation entitled "Omnitracs Hardware Overview."
**MR. ALPER:** Move to admit, Your Honor, Exhibit 339.
**THE COURT:** Any objection?
**MS. TARASI:** No objection.
**THE COURT:** Admitted.
(Trial Exhibit 339 received in evidence.)
**MR. ALPER:** Thank you, Your Honor.
If we could pull the cover of that up, Mr. Schlaifer.
(Document displayed.)
**MR. ALPER:** Now that the jury can see it -- can you see it?
(Jury nodding affirmatively.)
**MR. ALPER:** Okay. Thank you.
**BY MR. ALPER:**
**Q.** Can you explain to the jury what this is?
**A.** Yeah, this is a PowerPoint presentation that just gives a very high level photo description of the components of the various Omnitracs hardware devices and products.
**Q.** And if we could go to Page 11 of Exhibit 339, please.
(Document displayed.)
**BY MR. ALPER**
**Q.** Can you explain to the jury what we're seeing on this page?

**A.** Yes. Again, this is a graphical description of the Omnitracs One system utilizing the SR4 as its data acquisition device and utilizing the SR4 and its cameras for its video-based safety solution.

It shows the SR4 being connected to the ECU in the vehicle. Sending that data over Bluetooth to the portable device, the BYOD device, running the Omnitracs One software, and also sending the event videos that we discussed earlier over cellular wirelessly back to the SmartDrive Cloud.

**Q.** Is this the only way that the Omnitracs One system can send data back and forth between the devices and to the Cloud?

**A.** There are others.

**Q.** Okay. What would be one other way?

**A.** So this -- this was depicted to be very high level. We also have a lot of forward messaging, what we call, you know, messaging that's originated from the fleet manager or the Cloud in order to inject -- inject data, set driver routes, configure the device, update logbooks, things of that nature.

**Q.** And what about using the mobile device? Can you send data from that?

**A.** Yes. There's also not an arrow leaving the mobile tablet, again, to the back office. That's also not depicted in this diagram.

**Q.** Okay.

**MR. ALPER:** All right. We can take that down.

(Document removed from display.)

**BY MR. ALPER:**

**Q.** Now, how has the industry responded to Omnitracs's technologies?

**A.** I think it's -- it's responded extremely favorably.

**Q.** If you can turn in your binder to Exhibit 155.

**A.** 155?

**Q.** Yes, 155. Thank you.

(Witness complied.)

**A.** Okay. I see it.

**Q.** And what is that?

**A.** This is a market intelligence report called "Fleet Management in the Americas" by a prominent market analyst called Berg Insight.

**Q.** Okay.

**MR. ALPER:** Your Honor, we would move to admit Exhibit 155.

**THE COURT:** Any objection?

**MS. TARASI:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 155 received in evidence.)

**MR. ALPER:** Okay. And, Mr. Schlaifer, if we could go -- first, if you call up just the cover of 155 just so the jury can now see it, they can be oriented.

(Document displayed.)

**BY MR. ALPER:**

**Q.** Mr. Deninger, can you once again just explain what we're seeing here?

**A.** Yeah. This is the cover page of the report by Berg Insight, a leading market analyst firm, and the title is "Fleet Management in the Americas" dated 2021.

**MR. ALPER:** And, Mr. Schlaifer, I'm going to ask you to pull up a couple of excerpts from this. It would be the -- on Page 193, the first half of the second full paragraph. And on Page 188, the last sentence of the first full paragraph, please. Thank you.

**BY MR. ALPER:**

**Q.** Mr. Deninger, what are we seeing here?

**A.** These are just a few snippets from the report. One of them states that Omnitracs is one of the pioneering players in the commercial vehicle telematics industry.

And the second says that the Omnitracs One mobile platform allows transportation professionals to, what they say, future proof their system.

**Q.** And what does that mean when they say "future proof" their system?

**A.** I believe it means that the technology is cutting-edge and designed to last in their vehicles for a long, long time.

**Q.** Thank you.

**MR. ALPER:** We can take that down now.

(Document removed from display.)

**MR. ALPER:** If we could call up lastly PDX 2.12, please.

(Document displayed.)

**MR. ALPER:** Can you all -- thank you.

**BY MR. ALPER:**

**Q.** What are you showing here on this slide?

**A.** This is a slide that shows just a handful of our customers that we're very proud of. We have customers in over 50 countries around the world. They are broken down into two primary types. One is a for-hire fleet, which picks up your goods and services and delivers for your business. People like Knight Transportation.

Another type is businesses that do their own business, like Coca Cola or Airgas, but they have decided to have their own in-house fleet of trucks to serve them.

**Q.** Okay. Thank you, Mr. Deninger.

**MR. ALPER:** Your Honor, we pass the witness.

I neglected to move to admit a few of the physical exhibits. So we would move to admit Exhibit 2023, 2017, and 2028-A, B and C.

**THE COURT:** Any objection?

**MS. TARASI:** No objection.

**THE COURT:** All are admitted.

//

(Trial Exhibits 2023, 2017 and 2028-A, B and C received in evidence.)

You may proceed with cross-examination.

**MS. TARASI:** Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MS. TARASI:**

**Q.** Mr. Deninger, my name is Angela Tarasi, and I have the privilege of representing Motive in this case. We have not met before, so it's nice to meet you and thank you for being here.

**A.** Nice to meet you.

**Q.** You have the heavy burden of representing three different entities, and I just get one.

So you talked a bit about your progression, and you started at Qualcomm in 1997; is that right?

**A.** 1994 as an intern. 1997 full-time.

**Q.** Amazing.

And so how many years total did you have experience as an engineer before you moved into management?

**A.** I probably moved into management sometime in the late 1990s, probably -- or, sorry, maybe about the year 2000, I would say is probably close.

**Q.** And while you were at Omnitracs, what was your product focus?

**A.** That's a broad question. We -- our product focus, we -- we focused on developing in-cab telematics, like the things

**A.** Yes.

**Q.** And when you left Omnitracs, how familiar were you with Omnitracs's patents?

**A.** I was pretty familiar. I was often called by business development or legal -- Dave Arnold, our chief counsel, to discuss patents.

**Q.** Okay. And how did you know whether or not you were using Omnitracs's patented technology when you went to SmartDrive?

**A.** Well, because of that familiarity. And also understanding the technologies and the functionality that we were building at SmartDrive was so drastically different than those products and features and patented technologies at Omnitracs. I was very confident.

**Q.** Okay. And how, if at all, is your departure from Omnitracs to SmartDrive an excuse for Motive to infringe on Omnitracs's patents?

**A.** It's not an excuse.

**MR. ALPER:** And if we could call up PDX 2.10, please.

(Document displayed.)

**BY MR. ALPER:**

**Q.** This is your slide about some statistics that you pulled together?

**A.** Yes.

**Q.** And is this data accurate?

**A.** I believe it's accurate, yes.

**Q.** And are the benefits that are shown here a result of the technologies from the patented XRS and SmartDrive -- I'm sorry.

Are the results that are shown here and the benefits shown here a result of the patented XRS and SmartDrive features?

**A.** Absolutely, they are.

**Q.** And if we focus in on the 62 percent reduced collisions, how does that affect people in the world?

**A.** It has a huge impact. Again, like I stated in my earlier testimony, a large vehicle colliding with a passenger vehicle typically results in serious injury or death of the occupants of that passenger vehicle. So reducing that is saving people's lives and keeping them safe.

**Q.** Thank you.

**MR. ALPER:** We can take that down.

(Document removed from display.)

**BY MR. ALPER:**

**Q.** You were asked a few questions about competitive intelligence. Do you recall that?

**A.** Yes, sir.

**Q.** And you said that it was okay so long as fair, it was fair. Do you recall that testimony?

**A.** I do.

**Q.** And what did you mean by that?

**A.** Fair meaning using publicly available information and definitely not using another company's protected IP to develop

those products and to copy those technologies in the development of those products.

**Q.** Now, you were asked some questions about whether you did ordinary competitive intelligence while you were at SmartDrive.

Do you recall that?

**A.** Yes.

**Q.** Now, at the time of that competitive intelligence, did SmartDrive already have the patented technologies that are at issue in this case?

**A.** Yes, we did, absolutely.

**Q.** How does that compare to what you've seen about what Motive did here?

**A.** I think it's very different. I don't believe Motive had any patented technologies until at least 2019. And I believe that they developed those products with the use of our patented technologies.

**Q.** Okay. And lastly, you were asked some questions about your conversation with Mr. Makani and then your conversation with Mr. Johns when they tried to recruit you?

**A.** Yes, sir.

**Q.** Okay. And I think the question that you were asked was that you didn't tell Mr. Makani and Mr. Johns that they were stealing Omnitracs's technology.

Do you recall that question?

**A.** I do recall that question.

**Q.** Okay. Is this case about stealing or is it about patent infringement?

**A.** It's about patent infringement.

**Q.** When did you first find out about Omnitracs's allegations that Motive had copied Omnitracs patented technologies?

**A.** From the press release that I saw about the -- the public article about the lawsuit.

**Q.** And how does that conduct impact Omnitracs?

**A.** Well, it has a great impact. Again, it gives a company like Motive an unfair advantage to develop their products at a much lower cost, sell them in the market at a cheaper price. And it undermines the investment in R&D and patents that we've -- that we've done for the last 30 years.

**Q.** Thank you very much, Mr. Deninger.

**MR. ALPER:** Thank you, Your Honor. I have no more questions.

**THE COURT:** Recross.

**MR. RAY:** No, Your Honor.

**THE COURT:** Let me just ask Ms. Hom to pause the clock for a minute. Thank you.

For the members of the jury. I promised you when I was giving you instructions in the case that you would have an opportunity at the end of the lawyer's questioning of each witness to submit written questions that you would like the court to ask, which I would go over with the attorneys.

**MR. DEORAS:** Mr. Schlaifer, can we pull up PDX -- or sorry. Yeah, PDX 3.3.

(Document displayed.)

**MR. DEORAS:** Thank you.

**BY MR. DEORAS:**

**Q.** What are we seeing on this slide, Mr. Sekula?

**A.** So these are two patents, the '906 patent and the '628 patent. '628 is listed first.

**Q.** Are you a named inventor on these patents?

**A.** Yes, I am.

**Q.** Who are the other folks that are listed here as inventors?

**A.** The other people are coworkers of mine at the time at XRS. They were involved in the device -- data acquisition device that resides in the vehicle, the development of that; mobile application development; back-end server development.

And there's also some people from product management and engineering leadership on the patent as well.

**Q.** Now, one of the people that's listed here, in both patents as an inventor, is Daniel Fuglewicz.

**A.** Yes.

**Q.** Who is he?

**A.** So Daniel is a coworker of mine. I work closely with him. Dan had some -- was responsible for XRS Relay development, the application software, and he made some enhancements to the hardware as well.

**Q.** And did you work with Mr. Fuglewicz during his time at XRS?

**A.** Yes, we worked closely together on the development of the XRS Relay and on some other aspects of the XRS system as well.

**Q.** When were the '628 and the '906 patents filed, first filed?

**A.** We filed an initial patent application on August 10th, 2012. And that initial application contained the ideas for the '628 and '906 patents.

**Q.** About how many years was that after XRS had acquired Turnpike?

**A.** It was a little more than ten years of accumulated experience actually.

**Q.** And the Turnpike acquisition was in 2009?

**A.** Yes, that's right.

**Q.** So this is about three years later?

**A.** Oh, I'm sorry, yes. After the acquisition in 2009, we filed in 2012. So it was about three years afterwards.

**Q.** Now, can you -- first at a high level tell me generally what were the problems that you were trying to solve with these patents?

**A.** Well, we were collecting a lot of data in the system, but we weren't -- we were having problems with the reporting of driver-based data.

**Q.** What do you mean by problems with the driver-based data

reporting?

**A.** Yeah. There were a number of issues we encountered. There were reliability and integrity issues with the driver-based reports. We had some inefficient processing of the data once it came to the back-end server for processing.

The transmission of the data from the mobile device to the back-end servers we found had inefficiencies. And we really didn't have a good way of presenting the data to individual drivers so that individual drivers could view it for themselves, view their performance and be able to self manage as well.

**Q.** Now, did the solutions that you came up with in the XRS patents help solve those problems?

**A.** Yes, they did.

**Q.** Okay. I want to talk about those in a little bit more detail.

**MR. DEORAS:** Mr. Schlaifer could you pull up Exhibit 3 at Figure 2, 3.6.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** What are we looking at here, Mr. Sekula?

**A.** So this is just kind of a high-level architectural view of the main components of the system.

**Q.** And this is a figure from the patent?

**A.** Yes. This is a figure from the patent.

or the industry. And so what we want to do is help educate them as to what the company does on behalf of -- to help these commercial fleets.

So the first thing we would do is to really help them understand the problem that fleets face as it pertains to collisions. So on the right side, you know, I would start with, you know, well, what happens when somebody gets injured? People don't really have an appreciation for that.

So as you go from, you know, I injured somebody to a death, you can see here in the red box here that the numbers actually grow very significantly. So that cost is an extremely high burden for commercial fleets.

But in addition to that, fleets also face a number of difficulties that go well beyond the direct expense of, you know, hurting somebody, which are often not thought about by folks.

So, for example, if the vehicle is damaged, well, I can't use that vehicle. I need to go find another vehicle that's at that company. Or if my employee is hurt, well, that person can't do his job; right? So I need to find somebody else to do that.

So there are a lot of downstream impacts as well beyond just those direct costs in the red box.

What I'd like to do is with our employees is kind of summarize for them and tell us: Look, our job is to help save

money, save time, but also to save lives, right? That's why we're in the business. And make sure that those employees and the people that, you know, our customers interact with in the public are able to go home to their families at night.

**MS. SCHMIDT:** Can we go to Page 5, please?

(Document displayed.)

**BY MS. SCHMIDT:**

**Q.** What are you showing on this slide?

**A.** So in the presentation that I would give to employees, this actually would be a video that would play. I'll describe that here for context. But on the right side you see the driver here. In his left hand he has a phone. In the video you would see this individual interacting with the phone. And they are coming up to an intersection.

What ends up happening is they almost t-bone somebody else; right? And so that's a very bad situation. And it's also something that the fleets would have no visibility to because it's not like that driver is going to go to his boss and say: Hey, I almost hit somebody.

And so this was to give that appreciation, then, to the employees about what was transpiring.

**Q.** So if we go to Page 10.

What was SmartDrive's solution for this problem?

**A.** Yeah, so it's actually quite a complex problem to solve for fleets. But to kind of boil it down, there's kind of two

things that you need to do is: One, identify the unsafe -- the risks to unsafe driving that's occurring, and then you need to take steps to address it.

So at the very front, we actually did spend a lot of time thinking about: Well, how can we identify that risk? So we developed a number of sensors and algorithms, which we typically would call triggers that would identify different types of maneuvers and things that are important to understand going out -- going on out there in the field.

So the first thing we wanted was to make sure that those triggers were carefully crafted to isolate out just those things that mattered; right? So the accuracy was extremely important.

The second thing we wanted to make sure that we were doing was to sample appropriately. So we needed to be confident that we were actually measuring the real risk that was out there. You don't want -- you want to be able to say that, yes, this unsafe behavior is actually existing within your fleet.

Now, at the same time we want to record information to also demonstrate the opposite. When fleets are doing the right things, we want to demonstrate and prove to ourselves, as well as the customer that, in fact, their driving better.

So you want to make sure that you've got the right volume and sampling methodology in place.

The third thing that was very, very important for us is

consistency. So in dealing with fleets, oftentimes you're talking about tens, hundreds, thousands of vehicles. And, also, similar numbers of employees. And so because you're dealing with people, you want to make sure that you're treating people fairly. So you have to have a consistency baked into your methodology that accounts for that, as well as for the physical differences in different types of vehicles. It's different driving a Ford F150 versus a large 18-wheeler.

**Q.** So you mentioned triggers. Did SmartDrive have documents that described its triggers?

**A.** Yes.

**Q.** Could you turn --

**MS. SCHMIDT:** Will you take this down please, Mr. Schlaifer?

(Document removed from display.)

**BY MS. SCHMIDT:**

**Q.** Could you turn in your binder to Exhibit 853 and 883.

(Witness complied.)

**A.** Okay.

**Q.** And are you familiar with those documents?

**A.** Yes.

**Q.** And are those documents prepared and maintained in the ordinary course of SmartDrive's and Omnitracs's business?

**A.** Yes.

**MS. SCHMIDT:** Omnitracs moves to admit Exhibits 853

Volume 3

Pages 387 - 585

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RITA F. LIN

OMNITRACS, LLC, et al, )
)
Plaintiffs, )
vs. ) No. C 23-5261 RFL
)
MOTIVE TECHNOLOGIES, INC., et al, )
) San Francisco, California
Defendants. ) Tuesday
) April 15, 2025
) 8:15 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

**For Plaintiffs:** KIRKLAND & ELLIS, LLP
555 California Street
San Francisco, California 94104
**BY: ADAM R. ALPER, ESQ.**
**AKSHAY S. DEORAS, ESQ.**
**KYLE CALHOUN, ESQ.**

KIRKLAND & ELLIS, LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
**BY: N. YVONNE STODDARD BEELER, ESQ.**
**MICHAEL W. DE VRIES, ESQ.**

KIRKLAND AND ELLIS, LLP
601 Lexington Avenue
New York, New York 10022
**BY: LESLIE M. SCHMIDT, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

***Reported By: Debra L. Pas, CSR 11916, CRR, RMR, RPR***
*Official Reporter - US District Court*
*Computerized Transcription By Eclipse*

technology.

And so it's -- it's always been a company I've admired. I used other competitive products over the years, so I've had a pretty good feel for the market. And, you know, they've been the Number 1 provider. They've been one of the leaders in innovation.

And I think as the digital transformation in industry has taken place, they've, you know, been at the forefront of that.

**Q.** How did Omnitracs get its start?

**A.** It was created inside a semiconductor company called Qualcomm out of San Diego.

**Q.** Is Omnitracs still a part of Qualcomm?

**A.** No.

**Q.** And did Omnitracs get spun out of Qualcomm at one point?

**A.** Yes. So the parent company Qualcomm decided to divest Omnitracs. And I think they had other strategic priorities. And the company was carved out and the firm I worked with acquired it from Qualcomm.

**Q.** And how much was Qualcomm paid for Omnitracs at the time it was spun out of the -- out of Qualcomm?

**A.** 800 million.

**Q.** What products and services does Omnitracs provide and did they provide when you were CEO?

**A.** It was a broad array of products, roughly 34 different software products that spanned from compliance applications,

navigation. Navigation for trucking is much different, including routing and dispatch capabilities. It had a fairly broad suite of fleet management solutions for carriers of all sizes.

**Q.** And were those both hardware and software products?

**A.** Yes.

**Q.** And had you ever personally used Omnitracs's products before you became their CEO?

**A.** I used the satellite product of Omnitracs at Ryder for government-related activities. I used the precursor to XRS, which I know is part of this trial at Ryder. Their name at that time was called Xata.

You know, I've used, like I mentioned, two or three different telematics companies over the years.

**Q.** And who are Omnitracs's customers?

**A.** So the -- it's an industry comprised of about 500,000 carriers. And then if you get into long term, other forms of services, you know, roughly there's about 8 million vehicles in the United States that we would identify as our targeted market.

But we serve clients from -- well, FedEx was a client. All the top carriers in the country, food and beverage companies, all the way down to a single individual that owned their own truck.

So it was a very wide range of customers that Omnitracs

had. I think we touched over a million vehicles, had roughly about 13,000 customers.

**Q.** And so just to be clear, when you were the CEO of Omnitracs, did Omnitracs serve small carriers? Carriers that had five trucks, ten, you know, less than 50?

**A.** Yes.

**Q.** And was that a substantial part of the Omnitracs business?

**A.** It was. It makes up the lion's share of heavy-duty trucking. It was comprised of carriers that have 50 trucks or less.

**Q.** Okay. I'd like to show you a document. You have a binder that's in front of you. Could you please take a look at Exhibit 1959?

(Witness complied.)

**A.** Okay.

**Q.** Do you recognize that document?

**A.** I do.

**Q.** What is it?

**A.** It's a management presentation that we prepared. This is dated May of 2019. So it would have been in development the first quarter of 2019.

**MR. DE VRIES:** Your Honor, we move to admit Exhibit 1959.

**MS. TARASI:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 1959 received in evidence.)

**MR. DE VRIES:** Mr. Schlaifer, if we could please display the first slide there just to orient the jury.

(Document displayed.)

**BY MR. DE VRIES:**

**Q.** Is that the presentation that you were looking at?

**A.** Yes.

**Q.** And you said this is from May of 2019, about a year after you started working as the CEO?

**A.** Yes.

**Q.** Okay. I'd like to ask you just about a couple of pages here.

**MR. DE VRIES:** Mr. Schlaifer, could you please display Page 96.

(Document displayed.)

**BY MR. DE VRIES:**

**Q.** And it says "High Retention Rates" at the top there.

"Operations is responsible for driving customer success and satisfaction. Team has helped drive industry-leading retention rates in excess of 95 percent."

**MR. DE VRIES:** If you could perhaps highlight that last sentence, Mr. Schlaifer.

Thank you.

//

was -- a lot of that research indicated that they had a -- kind of a new user experience or user interface, which is, you know, what's displayed on the screen.

And so I asked -- you know, at the time anybody could walk in a truck stop, anybody in this room, and buy the KeepTruckin telematics device. You could -- anybody could download it from the Google Store. And so I just asked one of the drivers who supported field testing for us: Hey, go buy it. Use it. Tell us what you think. So I refer to that as kind of field testing.

**Q.** Okay. Let me -- I'm going to ask you about both of those things, the market intelligence and the field testing.

Let me start by asking you about market intelligence. Was Omnitracs looking at market intelligence for just KeepTruckin or was it for other competitors as well?

**A.** No. We would track probably upwards of 50 different companies, big and small.

**Q.** Could you please look at Exhibit 4074 in your binder?

(Witness complied.)

**Q.** What is that document?

**A.** It's a SMB business model. It's the -- it's a presentation done by the steering committee that oversaw the SMB market.

**Q.** Within Omnitracs?

**A.** Yes.

**MR. DE VRIES:** Your Honor, we move to admit Exhibit 4074.

**THE COURT:** Any objection?

**MS. TARASI:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit4074 received in evidence.)

**MR. DEVRIES:** Mr. Schlaifer, if you could please put up the first slide on 4074 so the jury can see it.

(Document displayed.)

**BY MR. DE VRIES:**

**Q.** Is this an Omnitracs presentation from September of 2018?

**A.** It is.

**MR. DE VRIES:** Okay. Could you please turn to slide 69, Mr. Schlaifer?

**BY MR. DE VRIES:**

**Q.** So in this slide it says "Telematics Competitive Analysis." And then there are some numbers. And then there are a variety of logos from different companies.

Just in general, what are -- what is shown here?

**A.** Yeah. So it's trying to give an executive summary of a handful of competitors and, you know, evaluate them from roughly seven categories on where they are on that continuum.

**Q.** And so just to orient. Like, if we look at "Compliance," the "Compliance" row, what in that far right there -- whose logo is that in the compliance row?

**A.** That's Omnitracs's logo to the far right.

**Q.** Is that under the "Leading Class" category?

**A.** Yes.

**Q.** Okay. And let's look at "Product Breadth."

Where is Omnitracs on the "Product Breadth" row at the bottom there?

**A.** It's, you know, to the far right again. I testified we had over 34 different products in market. We had the most product depth of any provider in the industry.

**Q.** And where, if anywhere, is KeepTruckin on the "Product Breadth" category for this slide?

**A.** They're in the "Product Breadth" "Immature" level. Meaning, that they're at the early stages of their development, not yet kind of mainstream.

**Q.** And let's look at the "Innovation" row there. Where is Omnitracs there?

**A.** Right in the center, under Number 3.

**Q.** And where is KeepTruckin?

**A.** To the far right.

**Q.** Okay. Can you explain -- please explain to the jury what is shown here.

**A.** It's effectively, you know, identifying, you know, from an innovation point of view. And innovation is a byproduct of what I referred to as kind of UI/UX, new colors, new schemes. But it -- innovation is directly correlated to product breadth.

The more products you have, the more innovation you've created.

And so the complexity of the industry is much different when you're small and you're just building things for the first time. And if you're only working on compliance, for instance, that's a different set of complexities than a -- relative to when you're dealing with 34 products that operate on a common platform.

So, you know, I think the team rightly said that Omnitracs is average. I would not mischaracterize it as not value creating, because the value created by the product breadth was unparalleled.

**Q.** Does this chart mean that KeepTruckin is more innovative than Omnitracs?

**A.** At the time they had a better UI/UX. I mean, that's really what they were known for was a fresh kind of way of interacting with a phone or a terminal.

**Q.** What about that lowest row, "Product Breadth"? How, if at all, does that row relate to innovation?

**A.** Innovation, in my mind, comes from the origination of thought, the new idea, like Sitting Duck, and turning that into a product.

And so the -- the product breadth of Omnitracs, to me, is indicative of the type of innovation they had done over, you know, decades.

**MR. DE VRIES:** We can take that down, Mr. Schlaifer.

(Document removed from display.)

**BY MR. DE VRIES:**

**Q.** So let me now go back to the field test that you mentioned. What -- just again for the jury, what was the field test that you asked to be performed about KeepTruckin in early 2018?

**A.** Yeah, it was to basically buy the device at a truck stop. Connect it to the vehicle. You know, it's a cable to the JBUS. And you know, take your phone, Bluetooth to it and drive. You know, tell us about your experience, what you thought, what you felt.

And then it would just inform product groups on, you know, what's out there in the market and how they think differently. We did this all the time with mobile phones, apps on mobile phones. There are certain companies that are best-in-class from a UI/UX.

So our product teams would look at these things all the time as they, you know, continued to evolve the user interfaces for our products.

**Q.** And did Omnitracs already have products at the time it was doing this field test?

**A.** Oh, yes. We were fully in market with all capabilities that KeepTruckin at that time was bringing to market.

**Q.** And what type of feedback did you receive through that field test from the test driver that you mentioned earlier?

**A.** Yeah, it was, you know, pros and cons, like any evaluation. There was a positive view on the UI/UX, the color scheme, kind of the way information's presented on a screen.

There were concerns, you know, but more of those kind of lean towards the bugginess of certain aspects of compliance and whether or not it was, you know, compliant by the ELD standards.

**Q.** Did your team conduct any additional research on KeepTruckin after this field test early in 2018?

**A.** Yeah, as hardware engineers do, they break things down and they kind of build them up. And they took the box. It's a -- you know, it's about that big (indicating) and, you know, broke it down to its basic components just to see what the guts of it looked like.

**Q.** And were those Omnitracs hardware engineers that you're referring to?

**A.** Yes. Out of San Diego.

**Q.** And what did they find when they broke down the KeepTruckin box and took a look inside?

**A.** Effectively they found the same -- highly correlated same bill of materials as what had been used to develop the XRS Relay.

And during this same time we knew they had hired one of the engineers from Omni that was on the patent of the XRS Relay, Mr. Fuglewicz. And we learned that they had used

the same -- I believe the firm's name is Augmentum. It's an offshore development shop that was used by XRS to develop the firmware and software that was on that device.

That's the point at which I became concerned about what we are, you know, seeing and dealing with.

**Q.** Did you ever raise your concerns based on what you had learned to KeepTruckin?

**A.** I did. I actually personally booked a meeting with Mr. Makani. I traveled to San Francisco to voice the concern in person. That's how I do business. And, you know, so I did that. It was sometime in the middle of July that I traveled here to San Francisco to inform him of the concern in our findings.

**Q.** And that was July of 2018?

**A.** Yes.

**Q.** And what did you tell Mr. Makani about your concern and findings in your in-person meeting with him in July of 2018?

**A.** Yeah, the three things I just mentioned. We knew he had hired Dan Fuglewicz. He's an inventor on these patents.

We knew the bill of materials were the name.

We knew you used the same development shop to go kind of build it, get it into market.

And that from our perspective, we were seeing indications of a copy and paste.

And it was very concerning to me as to how they went

about, you know, doing what they did.
**Q.** How did Mr. Makani react in that meeting?
**A.** I found him dismissive. He said Dan Fuglewicz doesn't work here anymore, so that's a non-event. We don't -- you know, we value the -- and respect other companies' patents.
So it was just kind of a dismissive response, I felt, at the time.
**Q.** What, if anything, did you do next?
**A.** Well, it was clear to me after that meeting when I got back to Dallas, I had put it in writing. I wanted it on record. Didn't want a lot of time to lapse from that personal conversation. So I sent a letter off, I believe, the following week.
**Q.** Would you look at Exhibit 163, please, in your binder, and tell me if that's the letter?
**A.** You said 1- -- I'm sorry, 1- --
**Q.** -63. 163.
(Witness complied.)
**A.** Yes, it is.
**MR. DE VRIES:** Your Honor, we move to admit Exhibit 163.
**THE COURT:** Any objection?
**MS. TARASI:** No objection.
**THE COURT:** Admitted.
(Trial Exhibit 163 received in evidence.)

(Document displayed.)

**MR. DE VRIES:** Thank you, Mr. Schlaifer.

**BY MR. DE VRIES:**

**Q.** So there's a date at the top, July 16th, 2018. And it's addressed to Shoaib Makani at KeepTruckin.

And then on the second page there is a signature. Is that your signature there, Mr. Greer?

**A.** Yes, it is.

**Q.** If we go back to the first page and blow up that first paragraph. You write:

"It was good meeting with you last week."

**MR. DE VRIES:** Yeah, that's perfect, Mr. Schlaifer.

(Document displayed.)

**BY MR. DE VRIES:**

**Q.** Did you send this letter to Mr. Makani about a week after you met with him?

**A.** Yes.

**Q.** And you identify certain patents here, including Number 5, U.S. Patent 9,390,628; is that right?

**A.** That's correct.

**Q.** Is that one of the patents that Mr. Fuglewicz was a named inventor on?

**A.** Yes.

**MR. DE VRIES:** And if we go to the Page 2, Mr. Schlaifer, that second paragraph, could you please blow

you please blow up that second paragraph?

The one above it.

(Document displayed.)

**MR. DE VRIES:** Thank you.

**BY MR. DE VRIES:**

**Q.** You say:

"With respect to your request for some additional reasons for our concerns here, it appears that, thanks to Dan and his intimate knowledge of the technology, your company had a significant head start in getting your products to market. It is also easy to see that your products look a lot like the XRS Relay Unit product. We do not consider this issue resolved at this point, and we would appreciate it if we could continue the dialogue."

Is that what you wrote?

**A.** Yes.

**Q.** And then if we look at the --

**MR. DE VRIES:** Could you pull up the last paragraph on this page, please, Mr. Schlaifer?

(Document displayed.)

**BY MR. DE VRIES:**

**Q.** Then you say:

"Turning next to the Driver Scorecard family, the '568, '873 and '628 patents provide techniques for the

fleet operator, for example, to monitor and collect a set of metrics relating to the operation of the vehicle and the driver."

Is that '628 patent referenced there one of the patents that are at issue in this lawsuit?

**A.** Yes.

**Q.** Okay. And then did --

**MR. DE VRIES:** Actually, on the next page, could you please blow up the last paragraph?

**BY MR. DE VRIES:**

**Q.** Last sentence you say:

"Please let me know your thoughts on discussing the potential of a business arrangement between our companies, including whether KeepTruckin would be interested in licensing our patents."

Why were you referring to licensing patents again?

**A.** You know, again, it was an olive branch, give them an easy exit around the issue. We weren't in the mindset at this time that we couldn't find a resolution, but certainly it requires both parties to be willing and able.

So I was pretty much in that frame of mind at the time, that, you know, let's continue -- it's not resolved. Let's keep talking about this. And we're open to, you know, alternatives here.

**Q.** Did Mr. Makani respond to your letter?

**A.** I did not receive another letter from him. I did receive a letter from their counsel.

**Q.** And if you'd please look at Exhibit 1965 in your binder.

(Witness complied.)

**Q.** Is that the letter that you received from Motive's legal counsel?

**A.** Yes.

**MR. DE VRIES:** Your Honor, we move to admit 1965.

**MS. TARASI:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 1965 received in evidence.)

(Document displayed.)

**BY MR. DE VRIES:**

**Q.** So there's a letter from KeepTruckin. And in the first sentence, it says:

"I am the new general counsel of KeepTruckin. Please direct all further correspondence on this matter to me."

Is that what you received?

**A.** Yes.

**MR. DE VRIES:** And then if you could please blow up the next paragraph.

**BY MR. DE VRIES:**

**Q.** The response says:

"We have not heard any specifics from Omnitracs,

other than a few vague assertions about Mr. Fuglewicz's intimate knowledge, our proposed head start, and products that you claim look a lot like each other."

Do you agree that you only provided vague assertions about your concerns?

**A.** No. I -- the letter prior further spelled out those patents, and, you know, the elements of them. These patents are public knowledge. At any time they could have pulled them, read them, reviewed them, assessed them.

So it -- you know, from my point of view, it was just kind of a delay or a -- you know, it's dismissive again, that, you know, you've got these claims. We don't agree. And so we were effectively, you know, at an impasse.

**Q.** And then they right after the part I just read:

"At this point, without the specifics we requested, it is unclear what value there is to continuing the dialogue as you suggest."

Did you ever respond to this letter?

**A.** No, I did not.

**MR. DE VRIES:** You can take that down, Mr. Schlaifer.

(Document removed from display.)

**BY MR. DE VRIES:**

**Q.** Why didn't you respond to this letter?

**A.** Well, it was from counsel. You know, in a way, we were

**BY MS. BEELER:**

**Q.** Do you have an understanding of what product features customers demand?

**A.** Yes, I do.

**Q.** And what is that understanding based on?

**A.** It's based on my role and my job.

**Q.** Are you familiar with Driver Scorecards in the telematics space?

**A.** Yes, I am.

**Q.** What importance, if any, do Driver Scorecards have to customers?

**A.** Driver Scorecards are critically important to customers. It allows them to manage their business efficiency and safety.

**Q.** And does Omnitracs offer Driver Scorecards?

**A.** Yes, we do.

**Q.** What about safety? You mentioned safety. Is that a key concern for Omnitracs's customers?

**A.** Yes. It is a key concern for many of our customers to have video-based -- a video based safety solution.

**Q.** Okay. And when it comes to video-based safety solutions, are you familiar with customizable event triggers?

**A.** Yes, I am.

**Q.** And are customizable event triggers a feature that is important to customers?

**A.** Yes. It's critically important to our customers. It

allows them to tailor the solution to their needs. It's not one size fits all.

**Q.** Okay. And just to be clear, does Omnitracs offer those customizable event triggers?

**A.** Yes, we do.

**Q.** And next, what about the ability to preserve video of critical events, is that an important feature to customers?

**A.** Yes. It's critically important to be able to preserve both before, during, and after a critical event.

**Q.** And do you have an awareness of whether or not Motive offers the product features we just discussed?

**A.** Yes, they do.

**Q.** Let's turn to the market and competition.

As part of your job, are you familiar with Omnitracs's competition in the market?

**A.** Yes, I am.

**Q.** And how does Omnitracs view competition?

**A.** Omnitracs views fair competition as necessary and desired to keep innovation going.

**Q.** Can you explain to the jury how as a part of your job you keep track of the market and competition?

**A.** So we rely on customer interactions, customer feedback. And, also, we rely on third-party market analysis studies.

**Q.** And does Omnitracs use any particular market segmentation?

**A.** Yeah. We typically talk about our -- our market segments

in the small, medium, large, and our enterprise customer base.

**Q.** Okay. And can you explain what the sizes are for each of those segments?

**A.** Yes. So we typically look at it in terms of the number of vehicles. So anything under 100 trucks or 100 vehicles is considered small. Medium is anywhere from 100 to 500 trucks. Large would be anywhere from 500 to 700 or 1,000 trucks, depending on complexity. And then our enterprise customers are typically anybody over 700 to 1,000 trucks.

**Q.** And in which market segments, if any, does Omnitracs have customers?

**A.** We have customers in all market segments.

**Q.** Are any of those segments more important to Omnitracs than another segment?

**A.** All of Omnitracs's customers are important.

**Q.** And in which market segments, if any, do Omnitracs and Motive compete?

**A.** Omnitracs and Motive typically compete in the small to mid-size market.

**Q.** Are there other competitors in the small to mid-size market?

**A.** Yes, there are. For example, Samsara or Geotab.

**Q.** And at a high level, do you have an understanding of what type of products Motive offers that are -- that compete with Omnitracs solutions?

**A.** Yes. So we have our Omnitracs One solution. We have the Relay, the SR4, AMG-C. Plus, a mobile application which competes with Motive's vehicle gateway and driver app.

**Q.** And is that what's shown sort of on the top row of PDX 6.5?

**A.** Yes, it is.

**Q.** What are you showing in the middle of PDX 6.5?

**A.** So those are the camera solutions. And I'm -- on the Omnitracs side is the CEV camera, plus the SmartDrive devices, competing with Motive's smart dash cams.

**Q.** What are you showing on the bottom row of PDX 6.5?

**A.** So that shows Omnitracs Driver Scorecard and web dashboard competing with Motive's Driver Safety Score and Fleet Dashboard.

**Q.** Next we have some exhibits that are large spreadsheets that do not lend themselves to being printed. So I'd like to ask if we can turn off all monitors except for Ms. Dougherty's screen, please.

**THE COURT:** You might need to turn around the -- I think we discussed turning around the monitors for the gallery, if that's the request.

**MS. BEELER:** It's just for the jury not to see it because it's not admitted yet.

**THE COURT:** Oh, okay. It's fine then. I thought you were talking about something else.

**MS. BEELER:** Okay. Mr. Schlaifer, can you please pull up -- sorry, I should have said black out the juror's monitors.

Mr. Schlaifer, can you please pull up Exhibit 247 for Ms. Dougherty only.

(Document displayed.)

**BY MS. BEELER:**

**Q.** What is Exhibit 247?

**A.** It is financial information.

**MS. BEELER:** Mr. Schlaifer, can you also pull up Exhibits 248, 352, 358, 2043, and 2044.

(Documents displayed.)

**BY MS. BEELER:**

**Q.** What are these exhibits, Ms. Dougherty?

**A.** These are additional financial and billing.

**Q.** Can you say that again?

**A.** Financial and billing information.

**Q.** And what is the source of these exhibits?

**A.** Omnitracs internal services.

**Q.** Is the information in these exhibits prepared and maintained in the ordinary course of Omnitracs's business?

**A.** Yes, they are.

**MS. BEELER:** Your Honor, Plaintiffs move to admit Exhibits 247, 248, 352, 358, 2043 and 2044.

**MR. WHITTAKER:** No objection, Your Honor.

**THE COURT:** Admitted.

(Trial Exhibits 247, 248, 352, 358, 2043 and 2044 received in evidence.)

**BY MS. BEELER:**

**Q.** Can you also turn to Exhibit 159 in your binder?

**A.** Yes.

(Witness complied.)

**Q.** What is Exhibit 159?

**A.** It's an internal Omnitracs presentation on our leading competitors.

**MS. BEELER:** Your Honor, Omnitracs moves to admit Exhibit 159.

**THE COURT:** Any objection?

**MR. WHITTAKER:** No, Your Honor.

**THE COURT:** Admitted.

(Trial Exhibit159 received in evidence.)

**BY MS. BEELER:**

**Q.** What is this showing on Exhibit 159.1?

**A.** So this is showing Omnitracs's lead competitors and the customers that they serve, along with the common threats that we hear for Omnitracs.

**THE COURT:** Is this showing on the juror's monitors.

**MS. BEELER:** Can we publish to the jury, please?

**THE COURT:** Yes, we may publish to the jury.

(Document displayed.)

//

**BY MS. BEELER:**

**Q.** Okay. And sort of in the middle there you see there is a few dots.

**MS. BEELER:** Mr. Schlaifer, if you can highlight -- yes. Thank you.

**BY MS. BEELER:**

**Q.** Can you explain what you're showing to the jury there?

**A.** So that talks about the types of customers that we serve. Over-the-road would be the big rigs, the 18-wheelers that everybody drives down the freeway with.

Last mile is typically the delivery sector. So that would be, think Amazon, FedEx, Pepsi delivering to your local 7-Eleven.

Video safety would span both of those types of customers, plus additional customers that may not fall into the other categories but also need a video-based safety solution.

**Q.** And is Motive one of Omnitracs's competitors in these markets?

**A.** Yes, they are.

**Q.** And are they shown on this Exhibit 159.1?

**A.** Yes. You'll see in row 5, KeepTruckin. That is Motive.

**Q.** And which of the categories of customers are they a competitor with?

**A.** They compete for all of the three types of customers: Over-the-road, last mile and video-based safety.

**MS. BEELER:** Okay. Let's turn to Page 2, please, of Exhibit 159.

(Document displayed.)

**BY MS. BEELER:**

**Q.** What does this table show?

**A.** So this table is showing the major competitors and the market share as of 2019 to '20, 2020.

**Q.** Okay. And is Omnitracs on this list?

**A.** Yes, they are. It's the third one down, Solera Fleet Solutions. Solera is Omnitracs's current parent company.

**Q.** And what's the market share there listed for Omnitracs?

**A.** 16 percent.

**Q.** And is Omnitracs's market share in the ELD and video telematics space --

(Court reporter clarification.)

**MS. BEELER:** Sorry.

**BY MS. BEELER:**

**Q.** Is Omnitracs's market share in the ELD and video telematics space still 16 percent today?

**A.** No. We've come down a little bit from that. We're around 14 to 15 percent market share now.

**Q.** Okay. And what about that video safety market that you were discussing? What is Omnitracs's market share in that space?

**A.** About 8 to 9 percent.

above the 25 percent buffer?

**A.** We would ramp up manufacturing.

**Q.** How long would it take to ramp up manufacturing?

**A.** Typically it takes about one to two months to fully ramp up manufacturing, additional capacity.

**Q.** And are customers able to wait one to two months to get that additional hardware beyond the 25 percent buffer?

**A.** Yeah. Typically if we have a -- a customer, we have a set of customers that are large enough to go above the forecasted demand, they are not going to want to take all of their trucks off of the road at one time, so it's going to be a slow-paced rollout, so we're able to handle the capacity.

**Q.** And what about with respect to customer support? Would Omnitracs have the capacity to handle onboarding several new customers at the same time from a customer support perspective?

**A.** Yes, we would.

**Q.** And what would Omnitracs do if it was overwhelmed by customers such that the customers required more support than originally expected?

**A.** We have the ability to onboard additional resources to help with customer support, if necessary.

**Q.** Has Omnitracs recently added any new customers that use Omnitracs One?

**A.** Yes, we have. We just recently on-boarded Airgas, a 5,000 truck fleet.

**Q.** And was Omnitracs able to provide hardware and customer support for all the trucks in the Airgas fleet to their satisfaction?

**A.** Yes, we were.

**Q.** And when did that occur?

**A.** The rollout finished last year.

**Q.** And so what would you say to someone who thinks that Omnitracs is falling behind because it can't compete in the market?

**A.** I would say that -- I would not agree with that statement. I would say it's completely untrue.

**Q.** Why not?

**A.** We have thousands of customers on our legacy systems still that are very happy. Just because a solution is old, doesn't mean that it doesn't work or it's not desirable.

**Q.** And does Omnitracs continue to innovate despite having thousands of customers on those other systems?

**A.** Yes, we do, as evidenced by our Omnitracs One solution and the onboarding of Airgas last year.

**Q.** Okay. And is Omnitracs a successful company or not?

**A.** Yes, Omnitracs is a successful company. We have over 10,000 fleets and -- spanning over 500,000 vehicles on our Omnitracs solutions.

**MS. BEELER:** I pass the witness.

**THE COURT:** Cross examination.

**MR. WHITTAKER:** Thank you, Your Honor.

May it please the Court.

**CROSS-EXAMINATION**

**BY MR. WHITTAKER:**

**Q.** Ms. Dougherty, pleasure to meet you. My name's Andrew Whittaker, and I represent Motive.

I have questions for you this afternoon. We are short on time, and I'm going to try to move as quickly as I can. So if you see me looking down and flipping pages, that's a good sign for everyone because I'm skipping questions.

I'll ask that if you're capable -- I'm going to ask a lot of "yes" or "no" questions while I'm up here. If you're capable of giving me a "yes" or "no" answer, I would appreciate that so we can move through this as quickly as we can. All right?

**A.** All right.

**Q.** Thank you.

All right. Let's begin with, you have worked for Omnitracs for 20 years, two decades; is that right?

**A.** Yes.

**Q.** And you're the director of product management; isn't that true?

**A.** Yes.

**Q.** Okay. And that's a big role in the company; right?

**A.** Define "big."

Volume 4

Pages 586(A) - 802

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RITA F. LIN

OMNITRACS, LLC, et al, )
)
Plaintiffs, )
vs. ) No. C 23-5261 RFL
)
MOTIVE TECHNOLOGIES, INC., et al, )
) San Francisco, California
Defendants. ) Wednesday
) April 16, 2025
) 8:15 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:** KIRKLAND & ELLIS, LLP
555 California Street
San Francisco, California 94104
**BY: ADAM R. ALPER, ESQ.**
**AKSHAY S. DEORAS, ESQ.**
**KYLE CALHOUN, ESQ.**

KIRKLAND & ELLIS, LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
**BY: N. YVONNE STODDARD BEELER, ESQ.**
**MICHAEL W. DE VRIES, ESQ.**

KIRKLAND AND ELLIS, LLP
601 Lexington Avenue
New York, New York 10022
**BY: LESLIE M. SCHMIDT, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

***Reported By:*** ***Debra L. Pas, CSR 11916, CRR, RMR, RPR***
*Official Reporter - US District Court*
*Computerized Transcription By Eclipse*

**A.** Okay. So I've already mentioned the patents. Within those patents, there are numbered paragraphs at the end. Those paragraphs include specific claims that are asserted in this case.

For the '628, for example, it's 15, 17 and 18. I was asked to study those claims and with the Court's guidance determine what they covered and then to see if the accused products actually practiced those claims.

**Q.** And what is your opinion?

**A.** These asserted claims are indeed infringed by the accused products.

**Q.** Okay. So we'll get into the details of your opinions, but just as a kind of a sign posting and agenda, can you generally describe the subject matter that you will be talking about today?

**A.** So I'm going to start by talking about what the accused products actually do, so that we have an idea in our heads as to what's been accused.

I will then talk about the individual claims. And with those claims, I'm going to go one limitation at a time and show how they're practiced by the accused products.

**Q.** And, generally, how long is it going to take for us to go through all of this material?

**A.** It's going to take a while. I'm guessing on the order of three hours.

**Q.** Why is it so long?

**A.** Well, there's a lot of material to cover. And as we're going to see, the claims are rather long. They are very involved and they cover very specific technologies. And I studied these. And to explain why I came to my conclusions, it's going to take some work.

**Q.** Okay. So let's turn to slide 14.

(Document displayed.)

**Q.** And just to orient everybody, can you explain the general communication flows and components that you will be talking about today?

**A.** Okay. So this is the -- the foundation. This is the fundamental architecture of what's been claimed and what's been accused.

We start with a truck, which we see on the bottom left. And there's something called an engine control module. This engine control module has access to sensors, and it can detect when you step on the brakes, how hard you step on the brakes, how fast you're going, lots of different aspects of the truck.

That is connected by a cable to what I'll call the gateway. Okay. This is the vehicle gateway. It provides access to that data that's been collected about the -- the truck's operation.

There is then a wireless connection to a tablet or a handset, cell phone, something like that. And that tablet, in

turn, provides connectivity to the back-end system where a fleet manager is able to see how the trucks are being operated. You know, starting with the basics of where they are. But there are, also, you know, various other aspects of that operation, including the detection of events that are problematic. So we'll talk about that and how the detection of events leads to coaching of drivers and so forth.

But this is the -- the basic architecture on which the patents at suit build their technology, make their contributions.

**Q.** Okay. So let's start with the XRS patents first. And let me just jump head to Fig. 2 on slide 21.

(Document displayed.)

**Q.** And this is from the '906 and '628 patent. We've seen this figure already. Generally, what are we seeing here, Dr. Wicker?

**A.** Generally, what we're seeing are those three pieces that I just talked about. Here we have the vehicle gateway. Let's see (indicating). It collects vehicle usage information, and then connects with, in this case, a handset, a cell phone, or mobile device of some kind. It does so using a short-range communication system, like Bluetooth. That's the Bluetooth insignia, of course. That mobile device can then communicate long-range through cellular to the back-end fleet managers.

**Q.** Slide 22.

(Document displayed.)

**Q.** What do we see here from Fig. 12 from the patents?

**A.** This is one of the contributions of the asserted claims of the '628 and the '906. This is a scorecard, a Driver Scorecard. So it contains lots of information about how a particular driver is performing. We can see the driver's name over here. It's John Monsanto. We can see a number of events that may have occurred, and they're scoring on those events.

So, for example, we're looking at miles per gallon for fuel economy, stop idles, how much time is spent with that vehicle not moving. Speeding. Did he or she -- well, in this case it's a "he." Did he pass a particular threshold in terms of his speed? Violations of various kinds and so forth.

And the end result for the driver is a score. In this case it's pretty good, 96.4 percent. This score is something on the basis of which the driver can be coached or applauded, as the case may be.

**BY MR. DEORAS:**

**Q.** Let's go to the next slide. And then can you -- do the patents also describe the kinds of devices that are used on those back-end servers?

**A.** It does. This is what's called the network device. That is actually the back-end system. And what it says is this back-end system can be a number of different types of network devices. It can involve a server bank, blade servers,

multi-processor system. It can be -- there's lots of different implementations for that back-end system. But it goes on to say, you know, it's implemented a number of different ways, but the point is this is the place from which you manage the fleet, that you use all this information that's being accumulated.

**Q.** Now let's look at the claims. This is slide 24.

(Document displayed.)

**Q.** Which claims are at issue from the '628 patent?

**A.** Claim 15, 17 and 18.

**Q.** Now, are we going to be walking through these claims in detail later?

**A.** Yes.

**Q.** Generally, can you describe what we're looking at for 15, 17 and 18?

**A.** Okay. Again, this is -- these are three of the numbered paragraphs at the back of the '628 patent. And I have divided them up into limitations.

Each claim is actually just a single sentence, but easier to look at if you divide it up into pieces, which are called limitations. And I've color-coded them so you can see the individual ones.

And we've also got Claims 17 and 18, which use everything that's in Claim 15. At some point I'll have to read the whole thing.

**Q.** Okay. Let's go quickly to the '906 patent.

(Document displayed.)

**Q.** And which claims are at issue for the '906 patent?

**A.** One, 10 and 15.

**Q.** Now there's a lot of similarities between Claims 1 and 10 based on the colors.

What's the main difference between those claims?

**A.** Okay. So the main difference is up here at the very beginning. Claim 1 claims a network device. So it's talking about an apparatus, a system, a collection of devices.

Whereas, Claim 10 is a method claim. Instead of claiming an apparatus, it's claiming a method. It's a series of steps that have to be followed to practice the claim. And the same is true of Claim 15, excuse me.

**Q.** Now, in slide 26, has the Court given us definitions for certain terms that are used in the claims of the '628 and '906 patents?

**A.** Yes. This is the Court's claim construction. Determining what these words mean is a matter of law. So the judge tells us what certain terms mean, and I just apply what the judge says.

So, for example, a driver summary report is defined using its plain and ordinary meaning. So I think about what a person of skill would have thought those words meant.

But then there's some specific ones. For example, hours of service record is -- are records that include hours of

service information for a driver and any co-drivers.

**Q.** For completeness, I'll go to the next slide and finish out the terms.

(Document displayed.)

**Q.** Did you use and apply the judge's claim constructions when you were conducting your analysis?

**A.** Yes, I did.

**Q.** We'll be coming back to that.

So let's talk first about the Omnitracs products.

(Document displayed.)

**Q.** And in general, what kinds of categories of products does Omnitracs offer that are relevant to this case?

**A.** So there's five categories of devices. The first is the black box recorder. That is the vehicle gateway. That's the device that's collecting information and making it available to a mobile app, which in this case is on a handset of some kind. It can be on a tablet or something like that.

There's also associated Smart Dashcams. These are cameras. Sometimes they point one way. Sometimes they actually point two different directions at once. That collects video information.

There's a scorecard that is provided to the driver and to the fleet, so that we'll know how the driver is doing.

And, finally, there's a web dashboard that allows the fleet manager to see what the entire fleet is doing.

**Q.** Turning to slide 29. We'll get to this in more detail later, but just first, did you form any opinions as to whether the Omnitracs's products used the XRS patents, the '628 and '906 patents?

**A.** Yes, they do.

(Document displayed.)

**Q.** What are you showing on slide 29?

**A.** I'm showing two sets of products, the XRS Relay system and the Omnitracs One with Relay, SR4, and or AMG-C. These are products that actually use the asserted claims.

**Q.** Okay. Now let's turn to slide 30, and turn to Motive.

And which products does Motive offer that are relevant to this case?

(Document displayed.)

**A.** So we're seeing the same kind of devices. We have a vehicle gateway that's collecting all the information about the truck, making it available to a driver app.

We have cameras that point in one or two directions. And some of them have a certain intelligence, which I'll talk about.

We see the Driver Safety Score and the Fleet Dashboard.

**Q.** Let's turn to the next slide and talk about how these products for the Motive products were developed.

(Document displayed.)

**Q.** What are you showing on slide 31?

**A.** This is a timeline for the Motive product development. Motive was founded, as we've heard in the last day or two, in 2013. In 2015, Motive hired the XRS inventor. He's named on two of the patents, Mr. Fuglewicz.

In 2015 -- and I should note, the hiring was in January of 2015. And by December 2015, Motive was able to release its Vehicle Gateway. LBB is Little Black Box.

In 2017, they released their Safety Score.

2018, their Smart Dashcam.

And then their AI Dashcam in 2021.

**Q.** Now, based on the evidence that you've reviewed in this case, have you formed any opinions regarding the length of time between Motive's hiring of Mr. Fuglewicz and the release of their first product in late 2015?

**A.** Yes. It was very fast. So as I've mentioned, this occurred in -- in January of 2015. And this occurred in December of 2015. That's a very fast development process.

**Q.** If you would look at slide 32.

(Document displayed.)

**Q.** Who were the founders of Motive based on the evidence that you've looked at?

**A.** Ryan Johns, Shoaib Makani, and Obaid Khan.

**Q.** On slide 33, did those founders have experience in the trucking industry before they started?

(Document displayed.)

**A.** No, they did not.

**Q.** What does that tell you about their ability to build a product and release it in 2015, after they had started the company?

**A.** Well, what it shows is they needed a lot of help. In other words, they needed something to build on because they didn't themselves have the experience to develop these types of products.

**Q.** Okay. And have you seen any evidence in the case -- going to slide 34.

(Document displayed.)

**Q.** -- as to where they got that help from?

**A.** Yes. There are a number of emails and other documents that indicate that they were getting a lot of help from XRS and from Mr. Fuglewicz to develop their product. This is an email in which Mr. Khan sends Mr. Makani a particular URL. And that URL points to what's called an XRS primer. It's information about the XRS device.

**Q.** The top email is Exhibit 305.

And when is this email being sent?

**A.** It's being sent on the 23rd of June, 2013.

**Q.** Okay. So have you reviewed the document that's actually cited in the e-mail or that's linked in the email?

**A.** Yes. It shows, among other things, the basic connectivity down here that I've talked about earlier.

**Q.** And is that -- that's in Exhibit 897.

Is that describing a product that you found to be covered by the XRS patents?

**A.** Yes, it is. So, for example, we see the XRS Relay connecting through Bluetooth to the XRS mobile. Sorry, the -- there we go. I'll learn how to use this.

And then there's a cellular connection to the Cloud, which is where the -- where the back-end fleet managers will see all the data.

**Q.** Why is it important to you that, if at all, that Motive was looking at XRS functionality in 2013 when they were founded?

**A.** Well, this is -- is evidence of copying. And you're allowed to look at other people's stuff, but if what you're looking at is a patented -- is a device with patented features and you copy it, it's highly likely that you will be creating an infringing device.

**Q.** Have you seen any other evidence that Motive was looking at XRS's technology while they were developing their first products?

**A.** Yes, quite a bit.

**Q.** Let's look at slide 35.

(Document displayed.)

**Q.** This is from Exhibit 496 and 497.

What are you showing here?

**A.** This is an email from -- it says "Frank Williams," but there is no Frank Williams. As I understand it, this is an alias that was used by Mr. Khan to contact other companies.

So it's an email from Frank Williams to Mr. Makani, the CEO, and it's describing value assessment, XRS companies.

And what we see are, amongst the other things in this email, are two critical issues.

We see the notion of the Driver Scorecard. And in particular, hours of service being recorded here. And here we see safety concerns. And in particular, the use of particular characteristics, particular aspects of driving to create that safety score.

**Q.** What are the -- the screens that are shown in the screenshot on the left and the right-hand clips?

**A.** Okay. So on the right-hand side -- excuse me, the left-hand side, this hand, we see the hours of service screen, so it's showing records of how long various individuals have been driving, which is an important safety issue. Here we see additional safety information. These are key indicators. So we'll talk about specific events. This is how they are recorded: Hard braking, speeding, actual accidents, brake applications per mile. These would be indications that there's a safety problem with a particular driver.

**Q.** Now, are the screens that we're looking at, are they from the product that you found was using the XRS patented

development timeline on top of that."

So this is Mr. Johns explaining what he's learned from Mr. Fuglewicz.

**Q.** This is slide 219.

(Document displayed.)

**Q.** This is another email and similar time frame between Mr. Kraus and Mr. Makani. What are you showing here?

**A.** This is more discussion just before Mr. Fuglewicz was hired. This is an email from Mr. Makani in which he states:

"We have an opportunity to pick up the guy who led the development of the XRS Relay device."

Mr. Kraus responds:

"If we don't get him, we need someone with those insights. We need someone like him. But we're going to aggressively pursue him."

And it goes on to say that:

"I was really impressed with the level of detailed understanding of the problem -- the problems associated with developing this product."

And he says:

"My feeling was I was being overwhelmed with a fear that we're not ready for what we're getting into given all the corner-cases he's" -- Mr. Fuglewicz -- "has described and the level of expertise our competitors may have."

**Q.** So it says -- you mentioned the detailed understanding of the problem. I want to turn to that.

**MR. DEORAS:** And, Mr. Schlaifer, could you pull up Exhibit 1832?

If you could just blow up that top -- there you go. Thank you.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** Dr. Wicker, what is this email that we're looking at?

**A.** This is a long email from Mr. Fuglewicz to Mr. Makani, "Additional thoughts from our recent conversation."

He's been thinking about that conversation, Mr. Fuglewicz has, and he's adding a few thoughts. And he's talking about some of the problems you encounter when you develop these kinds of systems.

He says:

"There's hardware problems, software problems, and understanding how heavy trucks and fleets really operate."

And he said:

"Using my experience gained from being responsible for more than 100,000 embedded systems for XRS, Xata, and Turnpike, he offers the following."

And it's a long email, as I mentioned.

**Q.** Okay. So I want to step through this email and what

Mr. Fuglewicz is saying.

**MR. DEORAS:** Let's go a little bit further down in the email, if we could, Mr. Schlaifer, to the "Hardware" section.

Thank you.

**BY MR. DEORAS:**

**Q.** And what is Mr. Fuglewicz describing here to Mr. Makani about hardware-related issues?

**A.** He's noting that it's the details that are really important:

"There are many details that must be carefully considered when it comes to hardware, but real expertise must be applied to ensure success."

**Q.** And then what about software? If we go to the next -- further down in the page.

Now what is Mr. Fuglewicz describing about software?

**A.** What he's saying here is -- first off, it's embedded software. It's software is that is literally loaded into devices on the truck. They must be rock solid, adaptable, and field upgradable.

So once the software is in the truck, the work is not over. You have to be able to upgrade that software and maintain it over the years.

And he says:

"I know we put a few man-years of effort" -- a man-year, of course, is one man working for one year

is one man-year -- so multiple man-years would be lots of people working for years -- "of effort into the XRS Relay, Xata X5, XAM, Turnpike RouteTracker, et cetera."

"It was critical that we could communicate correctly with those trucks."

This is the heart of telematics, telecommunications, and he's saying: It's critical that we could communicate correctly.

"And once you get into black box data recording (such as crash events) and performance recording, there are issues of sampling rates, data storage, et cetera."

They're very important.

**MR. DEORAS:** Mr. Schlaifer, could you take down the callout and just pull up the Exhibit 1832.2?

(Document displayed.)

**BY MR. DEORAS:**

**Q.** We were just looking at a portion of this, but does the email go on further?

**A.** Several pages, yes.

**Q.** Will the jury have access to the full email in Exhibit 1832?

**A.** I believe so.

**Q.** Okay. So let's then -- in the interest of time, let me

just jump down to that last subheading "Understanding Heavy Truck Operations."

**MR. DEORAS:** Can you blow that up?

Go to the next.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** What is Mr. Fuglewicz saying here? This is on the third page of the email.

**A.** He's saying the fleets won't just want hours of service, though that's important. He said:

"They will also want vehicle performance, driver behavior monitoring, safety system data, crash data" --

(Court reporter clarification.)

**A.** The fleets won't just want hours of service information, they'll also want vehicle performance, driver behavior monitoring, safety system data, and crash data because they want to be able to do predictive maintenance and they also want to be able to coach the driver. They want to prevent accidents.

So fleets will buy the systems that provide the total package.

**Q.** Now, is this exhibit, Exhibit 1832, is this the email that Mr. Makani and Mr. Johns and Mr. Kraus are looking at when they are deciding whether or not to hire Mr. Fuglewicz?

**A.** That's exactly right.

**MR. DEORAS:** So, Mr. Schlaifer, can we go to the slides again and pull up slide 221?

(Document displayed.)

**BY MR. DEORAS:**

**Q.** And have you seen any testimony in the case that indicates why Motive decided to hire Mr. Fuglewicz?

**A.** Yes. This is from Mr. Makani's deposition. And again, I was able to read the transcript, but there's also been a video played here in court.

Mr. Makani was asked:

**"QUESTION:** The reason you wanted to have that additional discussion and bring Mr. Fuglewicz on was because you needed somebody with experience."

And he said:

**"ANSWER:** We needed someone who understood vehicle communications, and then we needed a hardware engineer.

**"QUESTION:** Mr. Fuglewicz had this experience?

**"ANSWER:** Yeah."

Okay. Now, you mentioned the side-by-side testing that they did. So I want to turn to that.

**MR. DEORAS:** Could we go to slide 38?

(Document displayed.)

**BY MR. DEORAS:**

**Q.** This is Exhibit 511. What are you showing here Dr. Wicker?

**A.** This is an email from Mr. Fuglewicz to Mr. Khan and Mr. Makani and Mr. Johns. And what it's describing is how Mr. Fuglewicz is looking for what he calls "a friendly fleet." There's a number of things he wants from this friendly fleet.

The seventh is the ability to compare two different telematic systems side-by-side.

So he wants a friendly fleet that's going to help him compare KeepTruckin and XRS devices side-by-side.

**Q.** And just to make sure I understand the timing, is this after they hired Mr. Fuglewicz, but before they released the product?

**A.** Yes. This is 21st of May, 2015. And Mr. Fuglewicz was hired in January of 2015. And their product came out in December of 2015.

**Q.** Let's go to slide 39.

(Document displayed.)

**Q.** Have you seen any evidence about the kind of side-by-side testing that Motive was conducting?

**A.** Yes. This is a picture of some testing that was being done at a company called Pariso Trucking. This test was conducted in February of 2016 -- or at least that's when this picture was taken.

And what we see are side-by-side, the Motive prototype and an XRS Relay. So what they're doing is they're putting their development box right next to an XRS system and comparing them, and learning what they can about the XRS system.

**Q.** This is Exhibit 446.1, Page 1, for the record.

How do you know that what they were looking at on the side-by-side was an XRS box?

**A.** It says XRS on the box. You can see that right here. I've blown it up a little bit for the slide.

**Q.** Is it possible that this is some other box other than the XRS box?

**A.** No. For a number of reasons, XRS was being used by Pariso Trucking at this time. And I'll note that if this box had been something else, it wouldn't work with the rest of the XRS system. So if this truck had XRS -- other XRS devices, but this Relay was not an XRS device, they wouldn't work together.

**Q.** Now, we heard some video testimony, I think, yesterday or the day before referring to a company called Turnpike and the Pariso Trucking work.What is Turnpike?

**A.** Turnpike is an earlier system. It goes back into the mid-2000s. And it also provided certain forms of monitoring. It wasn't as -- it wasn't as developed a product as XRS, but it could do some fundamental things.

**Q.** Now, does the evidence that you've seen in this case indicate that Pariso Trucking was using a Turnpike system when

Motive was comparing these side-by-side products?

**A.** No, that wouldn't have worked. Because, again, the Turnpike system won't work with the rest of the XRS materials. Mr. Sekula explained this to me. He said there are different data structures. There's a number of things that would prevent a Turnpike system from working with the rest of the XRS system.

**Q.** Okay. Let's turn to slide 40.

(Document displayed.)

**Q.** Have you seen any other evidence that Motive was looking at the XRS system while it was developing its products?

**A.** Yes. This is yet another email. It's about the -- the black box events. And this is reporting from the testing. It's saying: We have seen an example of a hard braking event alert. So someone slammed on the brakes. And this is what the XRS box generated.

And you can see the details here (indicating). This driver, Randy Baker, he had a particular average speed change. He slowed up dramatically. And it talks about the speed at the start of the trigger and other information.

So what is happening here is that the Motive team is looking at the outputs from the XRS device, so they can learn how the system works. And, in particular, which events are being detected.

**Q.** This is Exhibit 504, for the record.

Let's go to slide 41.

(Document displayed.)

**Q.** And this is Exhibit 505. What is this?

**A.** This is another example of information that's obtained from the testing. Here he's saying Mr. Fuglewicz -- let's see. Sorry.

Mr. Gronberg is reporting to Mr. Fuglewicz and Ryan Johns. And he says: Here's an example of a speeding alert from XRS.

Once again, we have the driver, Randy Baker. And in this case he's going 74 miles an hour. Apparently, that's not the speed limit. The alert speeding threshold was 70. So he's four miles an hour over. And this is the information that's generated by the XRS box, which they are testing.

**Q.** Now, also in some of the videos that we were seeing over the last couple of days, I think we heard some Motive witnesses say that they weren't comparing the Motive products with the XRS products.

How does that compare with your understanding of the evidence that you've reviewed?

**A.** Well, that's not what we're seeing here. What we're seeing are email reports of testing of the XRS device. We've seen a picture that has the Motive device right next to the XRS box.

**Q.** If we go to slide 42.

(Document displayed.)

**Q.** How quickly was Motive able to spin off a full system

after they hired Mr. Fuglewicz?
**A.** One year. Slightly less than a year. January to December.
**Q.** What is Exhibit 315, that we're showing on this slide?
**A.** This is a Motive presentation that prevents -- presents, excuse me, what they're now doing. They've got an electronic logging device that creates various logs. They've got a fleet manager dashboard, and they are generating Driver Scorecards.
**Q.** Has Motive also explained how quickly they were able to build a product after they hired Mr. Fuglewicz?
**A.** Yes. This is from a Motive document. And we see right here those dates.

> "January 2015, we hired Dan Fuglewicz as our director of embedded systems. He quickly built up a very strong embedded engineering team. By December 2015, we had a functioning device that was ready for mass manufacturing."

**Q.** This is Exhibit 492.
(Document displayed.)
**Q.** We also heard some -- I think some references to an open source device. Do you recall that?
**A.** Yes, I do.
**Q.** Have you studied evidence in this case about what Motive means when they're referring to an open source device?
**A.** Yes.

**Q.** Did Motive actually start with an open source product when they were developing their system?

**A.** No. No. They started with an open source development platform.

So this was a tool that they used to develop their system. So the tool was open source, but not -- not -- they did not have an open source XRS-type system.

**Q.** So now I want to switch gears and go into the infringement analysis, the claim by claim walk-through. But before I do that, just one point that I wanted to address.

**MR. DEORAS:** Mr. Schlaifer, can you pull up Motive's opening slide 21?

(Document displayed.)

**BY MR. DEORAS:**

**Q.** And were you here for the opening, Dr. Wicker?

**A.** Yes.

**Q.** Do you recall seeing this slide, Dr. Wicker?

**A.** Yes, I did.

**Q.** And Motive's counsel said: Who knows it better? And they put a picture of you, or some sort of picture of you on the left, and then some pictures of the Motive witnesses on the right.

Do you remember that?

**A.** Yes, I definitely do.

**Q.** Okay. How -- how is it that you are qualified to talk

**A.** Yes. In other words, you can see, this box itself is labeled back end and there's the storage (indicating).

**Q.** This is Exhibit 282.

Okay. Let's go to slide 101, Exhibit 931.

(Document displayed.)

**Q.** Have you seen other documents that indicates that Motive stores this information?

**A.** Yes. This is a Motive document that talks about self-service data retention. Of course, data retention is storage.

**Q.** Let's go to element 1(d). What is element 1(d)?

**A.** 1(d) calls for:

"Wherein the processor is configured to process at least one of the vehicle data, the driver information, and the driver communications into a Driver Summary Electronic Report, wherein the Driver Summary Electronic Report includes a composite driver score.

**Q.** Okay. Let's look at the first part of that requirement, the process part. And have you seen evidence that that requirements is met? This is Exhibit 440.

**A.** Yes. For example, in this technical document, there's reference to that Snowflake processing. The drive score for the drivers is computed every Monday in Snowflake through a series of jobs and push to Safety-DB Postgres. "DB" being

database.

**Q.** And then on the right-hand side, does that produce a Driver Summary Electronic Report with a composite driver score?

**A.** Yes, it does.

**Q.** What is the screen that you're showing on the right-hand side?

**A.** This is the Fleet Dashboard. So this is the back-end screen that the fleet manager will see. And we can see a lot of information. There's vehicle data and there's our score (indicating).

**Q.** That is Exhibit 1397.

Okay. So then the rest of this element is going to be on the next slide, and that's 103.

(Document displayed.)

**Q.** And then -- so can you read the rest of the element 1(d)?

**A.** Yes. It's:

"A composite driver score based on a plurality of a group consisting of: Fuel efficiency; occurrences of stop idle; occurrences of speeding; occurrences of hard braking; occurrences of high-speed braking; and occurrences of safety violations."

**Q.** Now, before we go on further, I want to jump back to the Court's constructions.

**MR. DEORAS:** Mr. Schlaifer, can we jump to slide 27?

(Document displayed.)

**BY MR. DEORAS:**

**Q.** And what is the Court's construction for the term that we just looked at?

**A.** The Court construed that long phrase as:

"Closed and encompasses a composite driver score based on two or more factors from the recited group and no other unrecited factors."

**Q.** What is your understanding of that -- the Court's construction, requirements that the Court has imposed?

**A.** Okay. So the claim term lists a number of factors that are used in computing a score. And what the Court said was that you have to use at least two of those factors, and you can't use any that aren't listed. It's a closed group. You can't go outside the group and use factors that aren't on the list.

**MR. DEORAS:** Okay. Let's go back to slide 103, Mr. Schlaifer.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** Did you find that Motive's safety score, the score that they show, met the requirements of using at least two of those factors but no other factors that aren't in that group?

**A.** Yes, I did.

**Q.** Okay. And what are you showing on slide 103?

**A.** Okay. So I've got two columns. The first one is Motive's

**Q.** Now, is that score presented to a user?

**A.** Yes, it is.

**Q.** And what do we see here from 715 -- Exhibit 715 and 711?

**A.** What we see is the app on the -- in this case it looks like a cell phone. And what it's showing, it's giving our driver a score, among other things. And it's also giving a score history that will indicate, you know, how -- in this case it's a he -- has been doing overtime.

**Q.** Okay. And then let's go to the last element -- oh, let's -- sorry. Let's -- I think the last element was on the prior slide.

**A.** Yes.

(Document displayed.)

**Q.** Does the network device display the summary report to a user on the back end?

**A.** Yes, the fleet manager would see a summary of the same information.

**Q.** So in sum, do the Omnitracs XRS Relay and Omnitracs One products meet all the requirements of the claims of the '628 patent and the '906 patent?

**A.** Yes.

**Q.** Okay. So I want to switch gears now and I want to move to the SmartDrive patents. So let's start first with the '060 patent. So we're on slide 136.

(Document displayed.)

**Q.** And at a high level can you explain what the invention of the '060 patent is?

**A.** Okay, so what's being called for here is some camera technology. And, in particular, it's a camera that acquires visual information representing vehicle environment. And that's what we see over here on the right. It's a camera that's able to record events, store them in memory, and, as needed, provide them to the back-end service system.

This is a system that allows you to get data, video data, associated with events so that you can evaluate, was it the driver at fault? Was it someone else at fault? And related issues.

**Q.** Now, there's the event trigger that's referenced in the second -- or the third colored element. What is that?

**A.** The event trigger is basically the detection of something occurring that we would associate with a safety problem. So, for example, if the driver was speeding, that would cause an event trigger if they were speeding more than a certain amount. These triggers are settable. They have thresholds.

If the driver takes a hard corner, that might cause a threshold to be exceeded, and that would be a trigger as well.

**Q.** And if we go to the -- I'm a little color blind, so pink or purple element, the "responsive to" element, what's happening in that element?

**A.** Okay. So this is:

"Responsive to detection of the vehicle event, effectuate storage of visual information."

It's a fancy way of saying store the video associated with a vehicle event in memory.

**Q.** And then the yellow highlighted element -- well, first, what is that element?

**A.** The yellow element is:

"Facilitate wireless communication of information between the vehicle event recorder" -- it's got the video, it's been triggered, so it's important information to the back end -- "and a remotely located computing device using HTTP."

**Q.** Now, has the Court given us a construction for that term?

**A.** Yes, the Court has.

**Q.** And what is that construction?

**A.** It is basically to facilitate -- and that's -- by the way, it's right here (indicating):

Facilitate wireless communication of the information between a web server in the vehicle event recorder and a remotely located computing device, again, using HTTP.

**Q.** Can you explain what this element refers to?

**A.** Yes, this element is referring to the use of something called the hypertext transfer protocol, HTTP. It's -- it was developed in 1990. It's what makes the worldwide web possible. Okay? It's a way of requesting information from a server. For

example, obtaining a web page. You use it every time you use a browser to access a web page.

So HTTP is to be used to send wireless information from the -- between a web server in the event recorder and a remotely located computing system.

So HTTP is to be used to communicate between the event recorder and the back end.

**Q.** Okay. So if we go to slide 137.

(Document displayed.)

**Q.** What is the benefit of having the communication between the event recorder and the remote device -- between a web server of the event recorder and a remote device over HTTP?

**A.** HTTP is very well known, it's very robust, it's also supported very nicely by the internet. HTTP is actually an application that is designed to ride on top of the internet. So it is a very good choice for moving information back and forth.

**Q.** So if you go to the next element that's highlighted in red, what does that refer to?

**A.** This refers to:

"Receive settings information from the remotely located computing device" -- back end -- "wherein the settings information is operable to adjust vehicle event recorder settings pertaining to operation of one or both of the video camera and the event trigger."

So what this is calling for is basically allowing the remote system, the back end, to have some control over how the events are defined, what causes triggering, and how the video camera operates.

**Q.** And then what is the final element?

**A.** It is:

"Adjusting the vehicle event recorder settings based on the received settings information."

So the settings has been transmitted from the back end. The vehicle event recorder is going to put the requested changes in place.

**Q.** Let's turn to slide 138.

(Document displayed.)

**Q.** Which claims are we going to be looking at for the '060 patent?

**A.** Claims 1 and 12.

**Q.** We'll go through those in detail. First, did you analyze whether Omnitracs has products that use the '060 patent?

**A.** Yes.

**Q.** And which products are you identifying here?

**A.** Okay. Three of them actually, or three sets: SmartRecorder 3, SmartRecorder 4 and the Intelligent Vehicle Gateway with Critical Event Video.

**Q.** So, now, we'll get to that in more detail, but I want to turn now to Motive. And have you seen any evidence that

Motive -- we saw evidence Motive was looking at XRS.

Did you see evidence that Motive was looking at SmartDrive as part of your analysis?

**A.** Yes, I did.

**Q.** Slide 140 and this is Exhibit 361.

(Document displayed.)

**Q.** What are you looking at here?

**A.** This is a document that was developed by Motive under their name KeepTruckin in which they actually discuss what they've learned about SmartDrive. "Competitive Learnings" is the title.

**Q.** Is that a -- we'll go to slide 141.

(Document displayed.)

**Q.** And what is the kind of -- the context of the document in Exhibit 361?

**A.** Well, what the document states is that they -- meaning Atech Logistics, which is a competitor -- or, excuse me, a KeepTruckin customer, they are willing to switch over to KeepTruckin safety solutions once we're able to match SmartDrive's capabilities.

**Q.** So did Motive look to see what SmartDrive's capabilities were in this document?

**A.** Yes, they did.

**Q.** Let's go to slide 142.

(Document displayed.)

**Q.** And this is Pages 5 through 7 from that exhibit, 361.

What are we looking at here, Dr. Wicker?

**A.** This -- these are three pages that show some of the things that were learned about SmartDrive in this effort.

So, for example, there is a tear down of the device that describes the hardware that's used in the SmartDrive system.

There is a video event review, what is seen when one logs in and is participating in the system that SmartDrive developed? And here we have driver monitoring. Again, being able to determine where drivers, are, their scores, et cetera.

**Q.** Do the functions that we see on this slide or the features that we see on this slide, did they relate to the patented technology that we just looked at?

**A.** Yes, they do.

**Q.** In what way?

**A.** So the -- the hardware, we've already discussed the kinds of hardware that are required. The video event review, that's our ability to look at videos that are associated with events. And then the driver monitoring, that is part of the system of triggering events so that we know when a given driver is having issues.

**MR. DEORAS:** Let's go to slide -- Mr. Schlaifer, can we go to slide 144.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** This is Exhibit 122.

Did you also see evidence that Omnitracs documentation about its patent-practicing product was in Motive's files?

**A.** Yes. This is an Omnitracs document. It's -- Omnitracs produced this document. And it talks about the Critical Event Reporting application. This document was found in Motive's files in the course of this litigation.

**Q.** What is it -- here it's talking about Critical Event Reporting. Is that also a functionality that's relevant to the patented technology?

**A.** Yes, that's what this particular technology is all about. It's about triggering events when certain kinds of behavior are present and then providing that data to the back end. Critical Event Reporting.

**Q.** And does this Omnitracs documentation also discuss video technology, Dr. Wicker?

**A.** Yes, it does.

**MR. DEORAS:** Slide 145 for the record. It's Page 19 of Exhibit 122.

**BY MR. DEORAS:**

**Q.** Okay, so now we want to move to the claim-by-claim analysis. And I'll go -- just jump to slide 147.

(Document displayed.)

**Q.** What -- which claim, again, are we referring to first?

**A.** This is Claim 1 of the '060 patent.

**Q.** All right. So let's start with claim element 1(a) on slide 148. And this is Exhibit 749.

(Document displayed.)

**Q.** What is element 1(a)?

**A.** It's a vehicle event recorder comprising, which means includes.

**Q.** Does Motive's system have a vehicle event recorder?

**A.** Yes. It's the electronic logging device coupled with a dashcam. So that's what we see within this box here.

**Q.** Let's go to slide 149 to element 1(b).

(Document displayed.)

**Q.** What is this element?

**A.** (As read):

"A video camera configured to acquire visual information representing a vehicle environment, the vehicle environment including spaces in and around an interior and an exterior of a vehicle."

**Q.** Motive's products -- excuse me. This is -- there's Exhibit 542 and 395 on this slide.

Do Motive's products meet this requirement?

**A.** Yes, they do. I wish I had one of these to show you, but this box actually has cameras on both sides. So it's not only watching you while you drive, it's looking out as well. And so you'll see scenes outside the vehicle and scenes inside the

vehicle.

And it's described in Motive's documents as the road-facing and the driver-facing cameras. Again, all within one box.

**Q.** Let's go to slide 150.

(Document displayed.)

**Q.** And this is Exhibit 888 and 395.

What is element 1(c)?

**A.** Element 1(c) is a memory configured to electronically store information.

**Q.** Is this element met by Motive's products?

**A.** Yes, it is. In this document you can see a discussion of the vehicle gateway. Again, it is a vehicle gateway. We're using different terms, but it is that gateway we've been talking about. It generates tons of data, including high-frequency telematics info, dashcam footage and sensor logs. This data is stored in the files on the local file estimate of the vehicle gateway.

So there's memory in that gateway that's storing all this information. The camera itself has over 100 hours of -- well, depends on the rate at which you're taking frames. But it has 88 -- sorry, 68 to 104 hours of memory on the camera itself.

**Q.** All right. Let's go to slide 151.

(Document displayed.)

**Q.** And this is Exhibit 561 and 287.

And we're looking at elements 1(d) and 1(e). What are elements 1(d) and 1(e)?

**A.** 1(d) is:

"An event trigger configured to detect a vehicle event responsive to an event parameter breaching an event trigger threshold level; and a microprocessor configured to: Responsive to detection of the vehicle event, effectuate storage of visual information associated with the vehicle event in the memory."

**Q.** Okay. So let's start with element 1(d), the event trigger element. Is that something that you found in Motive's products?

**A.** Yes. And I am showing examples of it on the bottom. Event triggers were basically defined to be behavior that when it passes a certain threshold causes some things to take place: Storage of video.

And sample triggers are shown here. This system can detect when the driver's using their cell phone. It can detect close following, if you're too close to the person in front of you, obviously a safety concern. And it can detect slamming on the brakes, hard braking --

**Q.** Now, what happens --

**A.** -- among other things. Excuse me.

**Q.** Sorry, Dr. Wicker, I didn't mean to speak over you.

What happens in the Motive products if it -- an event

trigger is -- occurs and one of these events is identified?

**A.** Okay. So if an event trigger occurs -- I -- I tested these -- you will hear in many cases an audio cue saying, you're going too fast, or something like that, which is a little alarming.

But you also -- you can't see this, but what will happen is video surrounding the event will be stored in memory. So it will take the event and some information, video information on the sides of the event and store it all as a file for later viewing.

**Q.** And is that something that that's referenced in Exhibit 561 in the middle of the slide here?

**A.** Yes. It says:

> "Recordings are triggered" -- recordings, video recordings -- "are triggered by unsafe driving tendencies, such as close following, cell phone use, and hard braking."

And there are other triggers as well. It can tell when you're not wearing your seat belt, for example.

**Q.** Okay. Let's look at some Motive technical documentation about this functionality. I'm on slide 152, Exhibits 522 and 521.

(Document displayed.)

**Q.** And what are you showing -- let's take the top one first. What are you showing on the top one?

**A.** Okay. So this is a Motive technical document, and what it's saying, it's talking about two sensors, GPS, vehicle and IMU. When you cross 0.2G within a span of three seconds, this is indicating -- if I remember correctly, this is indicating braking too fast. And so an event is generated when two or more sensors drop below 0.2G. This is basically how events are detected.

**Q.** Okay. And which -- which device is detecting the event in the top excerpt?

**A.** This is telematics DPEs on the ELD, so it's on the electronic logging device.

**Q.** Now, what about the dashcam, does the dashcam also have event triggers that detect events?

**A.** Yes, it does. In particular it can detect close following.

So what we see here is the Hubble camera unit. That's what they call it. It's equipped with a camera, as I've noted. It analyzes every frame and detects lanes and vehicles, determines their respective distance from -- they call it the ego-vehicle -- it's the vehicle you're in -- with a certain confidence level.

**MR. DEORAS:** Let me go to slide 153, but that's a source code slide, so I think we'll need to move the monitors back.

(Brief pause.)

(Document displayed.)

**BY MR. DEORAS:**

**Q.** Now, Dr. Wicker, did you actually analyze the Motive source code that detects these event triggers?

**A.** Yes, I did.

**Q.** Let's look at an example on slide 153 from Exhibit 4293.

What is the code that you've shown here?

**A.** Okay. So this is the code that's designed to detect that you're using your cell phone while you're driving. And it's actually kind of interesting. Shall I walk through it?

**Q.** Sure.

**A.** Okay. This is a variable -- let's see if I can be more accurate. There we go. (indicating). It's a Boolean. It's true or false. And so the question is: Is mobile usage underway? So we initially set it to false.

But then we go through a series of if-then-elses. So if something's occurring that's described in this next chunk of the code here, we're just going to return is mobile usage, which is currently false. So the answer's no.

If we look within it, what it's saying is we want to check to see if the distraction score is below a certain confidence level, or if the vehicle speed is too low. If either one of those is occurring, we're going to say there's no phone in use.

But if -- and that's the code we see here (indicating). If the distraction score is above a certain threshold and

the -- the road speed is above a certain speed in kilometers per hour, then we set our variable to true. Okay? So now we're saying: Is mobile usage, the variable is equal to true, and that's what we return.

So basically it's a decision-making piece of code that checks a number of things: How fast are we going? How certain am I that that phone's in use? And either returns false, no, there's no phone in use, no problem; or, yes, the phone is in use.

**MR. DEORAS:** We can move on. And I think we can move the monitors back, Your Honor.

Okay. So I want to turn to slide 154. I'll give you a second to...

(Document displayed.)

**BY MR. DEORAS:**

**Q.** And this is Exhibit 894.

Are there any other technical documents that you've seen from -- from Motive that show the use of event triggers and video recording based on those event triggers?

**A.** Yes. This is more technical documentation. And the question is -- or the statement is:

"We detect DPE Candidates on the ELD side."

In other words, driver performance events are being detected in the vehicle. The ELD saves the video generated when something's detected.

On the right-hand side we see the basic tools and the processing and data storage elements that cause this to happen.

**Q.** And then on slide 155 from Exhibit 524, is this more of the same?

(Document displayed.)

**A.** Yes, this is talking about the smart dashcam. And it says:

"When our vehicle gateway device detects a driving event," with examples, "it will send a message to the camera to recompile the looping videos into a new video for the specific times the event occurred." This is then saved on the camera's RAM disk.

**Q.** All right. Let's go to the next element now, and this is element 1(f). And I'm on slide 156.

(Document displayed.)

**Q.** And can you remind the jury what element 1(f) is?

**A.** This is:

"Facilitate wireless communication of information between the vehicle event recorder and a remotely located computing device using HTTP."

**Q.** And what was the Court's construction of that term?

**A.** The Court said that this meant:

"Facilitate wireless communication of the information between a web server in the vehicle event recorder and a remotely located computing device using

HTTP."

**Q.** Okay. Let's go to slide 157.

(Document displayed.)

**Q.** What does the '060 patent describe a web server as?

**A.** It describes it as you see here. This, by the way, is from Column 7, Lines 16 through 36.

And the inventor said:

"A web server is implemented as a special module of a computer and is operable for exchanging information via computer files."

It goes on to say:

"The web server receives requests and returns responses to external parties via a communication link."

**Q.** Let me go to slide 158 and look at Fig. 1.

(Document displayed.)

**Q.** What do you see here, Dr. Wicker? Specifically with respect to the web server?

**A.** Okay. So this is Fig. 1 of the '060 patent. And here we have someone who is a fleet manager. And she is typing into her workstation a request for particular data, video of a particular event.

That request will go to a web server in the vehicle event recorder. The web server will then respond and send it back to the requester.

**Q.** So let's go through that in more detail.

Did you find, Dr. Wicker, that a web server is present in the Motive products?

**A.** Yes, I did.

**Q.** Let's go to slide 159.

(Document displayed.)

**Q.** And so, first, do the Motive vehicle gateways communicate with the back end -- over a remotely located computing device in the back end?

**A.** Yes.

**Q.** What are you showing on slide 159 in Exhibits 568 and 888?

**A.** So this is describing the cellular-enabled vehicle gateway, and it's talking about how it facilitates a connection between the vehicle gateway that we see here and the back end.

**Q.** Let's go to slide 160.

(Document displayed.)

**Q.** And then this is Exhibits 557 and 731.

What are you showing here?

**A.** The discussion of the APIs. API is an application programming interface. It's a tool coders use to hopefully simplify the coding process in some -- some cases.

An API basically lets you send commands without knowing all of the details of what goes on beneath it?

Well, Motive is saying our APIs can all be accessed through HTTPS requests to URLs. So simple looking requests for

data like that are able to get that data from their -- through their APIs.

**Q.** Now, the document from -- the Motive document that's shown here says HTTPS requests. What is the distinction, if anything, between HTTPS requests and HTTP?

**A.** So you may have seen this pop up on your browser. HTTPS is secure HTTP. Basically it is the HTTP application operating on top of something called TLS, transport layer security.

**Q.** So if you're using HTTPS, are you necessarily using HTTP?

**A.** Yes.

**MR. DEORAS:** Okay. I'm going to next turn to a little bit of source code, and so we'll need to turn the monitors again.

(Brief pause.)

**BY MR. DEORAS:**

**Q.** Okay. We'll go to slide 161. And the source code here is Exhibit 111.

(Document displayed.)

**Q.** And there's a -- the file name on the top -- and I'll just read the last file name -- Relay.c.

Now, Dr. Wicker, first can you just explain what this file is, then we can talk about it?

**A.** This file is going to talk about the communications between the vehicle gateway and the remote system.

**Q.** Okay. And the -- what is -- there's a -- there's a first

excerpt on the top of the file. Can you describe what that is?
**A.** This is a description of a particular function. It's called -- the function is main. It is part of communication server main. And so what it's doing is its function is to support or enable the communication between the vehicle gateway and the remote device, the remote system.
**Q.** Okay. So then if we turn to the -- the actual source code -- and I'll try to use the line numbers so I don't read the source code all into the record because it's confidential. At Line 817, what is happening?
**A.** The comments in this situation are actually helpful. This comment notes that: Open socket transport channel for HTTP.com -- or, sorry, HTTP com.
So a socket is a connection, if you will, between two devices, sometimes over the internet typically but not necessarily. You can think of a socket as an application being able to just send information into a socket on one end and it pops out on the other. There's a lot happening, but that's -- as far as the application's concerned, that's how it works.
So here we're opening the socket transport channel for communications using HTTP.
**Q.** If you look further down in the code, what are the kinds of messages that will eventually be sent over that socket after it's opened?
**A.** Well, we can see it right here. There's a lot of

information that can go into the socket. But let's note ELD messages, electronic logging device messages.

**Q.** So these ELD messages, are these going to be sent from the vehicle gateway to the back end?

**A.** Yes.

**Q.** Okay. Now, are -- what -- can you give me an example of some -- of ELD messages that the gateway will be sending?

**A.** It might be a notification of an event. It might be that structure that we talked about earlier that has information about the driver and the vehicle.

**Q.** Okay. Now, this is showing the communication from the vehicle gateway to the server.

Does the server request ELD messages from the gateway?

**A.** Yes, it can.

**Q.** How?

**A.** It will use HTTP in the reverse direction. So we have HTTP messaging endpoints being set up on both ends. The requests can go in both direction.

**Q.** And how do you know this functionality is communicating using HTTP?

**A.** It's discussed throughout, but we can note in the comments themselves: "Copy HTTP URL path."

"Copy HTTP base URL."

"Set up connection to HTTP messaging endpoint."

And there are references to HTTP throughout.

**Q.** Let's go to slide 162. This is some additional source code from that file.

(Document displayed.)

**Q.** And this is from Exhibit 111, just for the record.

And what are you showing here, Dr. Wicker?

**A.** So this, again, is another portion of the code. And what it's showing is, you can work your way through it and you can see that it is waiting for reception of ELD messages. If the receive timer reaches a certain point, we then trigger the transmission of a message. So it's talking about -- and then we schedule our message for ELD messages endpoint.

**Q.** So if you go to slide -- let's go to slide 163.

(Document displayed.)

**Q.** And this is some deposition testimony from one of the Motive engineers. What does this show?

**A.** This is testimony by Mr. Miller regarding the communication protocol used to transmit formatted information. This JSON is JavaScript Object Notation, if I remember correctly.

Mr. Miller answered that it is sent over HTTPS, as we just saw.

**Q.** So is that another indication that the communications between the gateway and the server are using HTTP?

**A.** That's correct.

**MR. DEORAS:** Now, if we go back to slide 157,

Mr. Schlaifer.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** Now, does the functionality that you've identified in the Motive products provide a web server in the Motive vehicle gateway, as it's described here in the '060 patent?

**A.** Yes, it does.

**Q.** And can you explain how?

**A.** Certainly. When you use HTTP, the -- the application is designed to have a client and a server. So the object, the device sending the request is the client, and the object or device that responds is the server.

So when the back end sends a request to the ELD or to the gateway and the gateway responds, the gateway is acting as a server.

**Q.** Now, if you -- you were here for the opening statement from Motive's counsel; right?

**A.** Yes, I was.

**MR. DEORAS:** And let me pull up, Mr. Schlaifer, Motive's opening slide 29.

(Document displayed.)

**MR. DEORAS:** Sorry, 31.

(Document displayed.)

**MR. DEORAS:** 32.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** Okay. Did you see this slide, Dr. Wicker?

**A.** I did.

**Q.** Okay. Now, what was your understanding of Motive's argument as to why they don't use the technology in the '060 patent?

**A.** This slide -- actually, I think it's from a movie. I've never seen a server system like that. But it shows a huge server system. Many, many, many racks of computers acting as a collection of servers. And they're trying to say -- I understood what was being said as a server is too big to be in that little gateway box.

**Q.** Is that consistent with your understanding of what's required to be a server, a web server?

**A.** No. A web server can be extremely small. All it's got to do is be able to respond to one request for information using HTTP. A big server might -- like an Amazon server or some other web server might have to respond to literally millions of requests at once, so that's going to be pretty big.

But if you only have to occasionally respond to a single request, you can be quite small.

**Q.** Is there anything in the '060 patent that indicates that you have to have a server that's this big inside the vehicle to meet the patent claims?

**A.** No. There's no reference whatsoever to the size of the

server.

**MR. DEORAS:** Actually, if we go back to the slides, Mr. Schlaifer, to slide 158.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** What does the -- what does the 16- -- or the '060 patent say about how big that web server actually is?

**A.** Well, it's showing us that it's within the vehicle event recorder. So it's going to be quite small. And that vehicle event recorder, of course, is within this automobile. So it's not going to be very large.

**MR. DEORAS:** Okay. Let's go ahead, then, to slide 164, Mr. Schlaifer.

(Document displayed.)

**BY MR. DEORAS**

**Q.** So we've touched on element 1(f), and so let's go to element 1(g) and 1(h).

Can you first read element 1(g)?

**A.** Certainly.

"Receive settings information from the remotely located computing device, wherein the settings information is operable to adjust vehicle event recorder settings pertaining to operation of one or both of the video camera and the event trigger."

**Q.** Now, is that element met by the Motive products?

**A.** Yes, it is.

**Q.** What are you showing on slide 164 related to that?

**A.** This is Mr. Gorski's testimony. If I remember correctly, that was this morning.

And he was asked:

**"QUESTION:** Is motive at least capable of adjusting operating parameters of the smart dashcam remotely?

**"ANSWER:** Yes.

**"QUESTION:** Can the server send a control signal to the AI dashcam, for example, that relates to settings?

**"ANSWER:** "Yes" --

Or he said:

**"ANSWER:** Yeah. I would refer to that as a config update."

He was then asked:

**"QUESTION:** The server can send configuration updates to the AI dashcam; true?

**"ANSWER:** Yes.

**"QUESTION:** And that would likewise be through the internet; correct?

**"ANSWER:** Yes."

**Q.** Okay. And so does that meet element 1(g)?

**A.** Yes, it does.

**Q.** Let's talk about element 1(h). What is element 1(h)?

**A.** (As read):

"Adjust the vehicle event recorder settings based on the received settings information."

**Q.** And does the same testimony we looked at also relate to element 1(h)?

**A.** Yes, it does.

**Q.** In what way?

**A.** What's happening, 1(h), we see the vehicle event recorder, the vehicle gateway, responding to the request by changing the settings. And that's, of course, what Mr. Gorski has described here.

**Q.** So Exhibit 160 -- sorry, slide 165 and Exhibit 521.

Have you seen any documentation from Motive discussing changing the video [sic] event recorder settings based on information from a remote device?

**A.** Yes. This is a document that shows configurable parameters for the close following event. So that's the particular event where the dashcam is watching ahead and seeing how close you are to a vehicle you're -- you're coming up to. And so the parameters, the triggers that determine when that event becomes an issue can be set as it's described here.

**Q.** And if you look at the first sentence under the heading, does that indicate to you whether these come from the remote device?

**A.** Yes. It says:

"These configurations can be updated as

parameters from the server end."

From the remote end.

**Q.** So does that mean -- I think 1(h) is the last element of the claims. Does that mean, Dr. Wicker, what -- what is your opinion for whether Motive's products meet all the requirements of Claim 1?

**A.** They -- they practice all of the limitations. We've gone through all of them in some detail.

**Q.** Let's turn to the next claim, which is Claim 11.

(Document displayed.)

**Q.** We've seen a similar slide before, but can you explain what you're showing here on slide 166?

**A.** This, once again, is two different ways of claiming something. We have a vehicle event recorder here, and we have a method here (indicating).

So for all the reasons that I've described that the limitations on the left are practiced, are found in the accused device, the accused device performs the steps that are found on the right.

**Q.** And who would be performing the steps in the method on the right in the Motive vehicles?

**A.** In this case it would be -- it's a computer-implemented method.

**Q.** So it would be the Motive products?

**A.** Exactly.

**Q.** And who would be using the Motive products as they are operating the vehicle?

**A.** The Motive products would be used by both drivers and by fleet managers.

**Q.** Now, let's turn to the next claim, which is -- the next claim element, I should say, which is claim 12(a).

What is claim 12(a)?

**A.** It's the method of Claim 11. So it's a dependent claim:

"Furthering comprising, causing communication of the visual information associated with the vehicle event stored in the memory to the remotely located computing device."

**Q.** There's a lot of words there, but what does that refer to?

**A.** Sending video to the back end.

**Q.** Okay. Now, does the Motive product send the video to the back end over the network connection?

**A.** Yes, it does.

**Q.** What are you showing here on slide 167 from Exhibit 894?

(Document displayed.)

**A.** This is more Motive technical documentation, and it's describing how:

"If an event's intensity surpasses the fleet manager's threshold" -- we talked about how all that was set -- "the ELD uploads the relevant video to the Cloud and generates a DPE event."

DPE is driver performance event.

"The video, along with the telematics data, is moved to an annotation pipeline."

It provides more detail, but basically, the video, along with its assigned tags, becomes available for fleet managers to view.

**Q.** Let's go to slide 168, and I want to turn to the Omnitracs -- actually, no. Let me stop here.

So does that mean that the Motive products meet all the requirements of Claim 12 of the '060 patent?

**A.** That's correct.

**Q.** Okay. Is the '060 patent important to the Motive.

**A.** It's extremely important.

**Q.** Why -- why do you say that?

**A.** This lies at the heart of what these systems are doing. What is happening here is video is being used to detect driver performance events that could lead to accidents or even fatal accidents. And so what this is doing is it's setting up, using visual information, the ability to coach a driver to drive better and to avoid potential accidents.

**Q.** So we talked about the Motive products with respect to this patent. Let's talk about the Omnitracs products.

We've already looked at these two devices, but can you remind us which devices you analyzed that Omnitracs uses?

**A.** Yes. That would be the SmartRecorder 4 and the

Intelligent Vehicle Gateway with Critical Event Video.

**Q.** Now, do the Omnitracs products that you've identified here use the -- the patented invention in Claim 1 of the '060?

**A.** Yes, they do.

**MR. DEORAS:** Let's go to slide 169.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** And which -- what functionality are you pointing to here?

**A.** First we've got in purple the vehicle event recorder. That's what we're seeing in these purple boxes.

But then I'm pointing to:

> "A video camera configured to acquire visual information representing a vehicle environment, the vehicle environment including spaces in and around an interior and an exterior of a vehicle."

**A.** So you've got to see it both inside and outside.

**Q.** This is from Exhibit 876 for the SR4 and 851 for the IVG.

Let's go to Exhibit 170.

(Document displayed.)

**Q.** And do the products have a memory?

**A.** Yes. Yes, they do. Here we see on the left some detail regarding IVG with CEV, one of the practicing systems. And here we have always recording camera plus DVR storing information.

On the right for SR4, we have internal storage as well as

external storage, which is optional, of 16 gigabytes up to 512 gigabytes.

**Q.** Okay. And this is from Exhibit 342 and 876.

Okay, now, let's go to the event trigger functionality.

(Document displayed.)

**Q.** Is that something that you found in the SR4 products?

**A.** Yes, it is.

**Q.** What are you showing here on slide 171?

**A.** What I'm showing here, this is a discussion of the trigger. And there are multiple types of event triggering: Risky maneuvers, speeding, et cetera. These cause video event recordings to be created that are used for coaching drivers. The same idea.

Some events remain on the SmartRecorder where they can be offloaded through either a push -- that means without a request, you just send the data out -- or an on-demand event. It's requested from the back end for some period of time. Other events are automatically offloaded.

And there is a discussion here at the bottom, and it shows how a video is created where there's a -- there's a trigger point and then you grab the ten seconds before and the ten seconds after.

**Q.** And this is from Exhibit 875 and 853?

**A.** That's correct.

**Q.** Okay. In the interest of time, I'll skip ahead to

slide 173. And this is Exhibit 852.

(Document displayed.)

**Q.** What are you showing on this slide with respect to the SR4?

**A.** I'm showing the use of HTTP.

**Q.** So the SR4 uses HTTP to communicate with the back end?

**A.** It does.

**Q.** Okay. Now let's turn to the IVG with the Critical Event Recorder.

(Document displayed.)

**Q.** What does -- what is your opinion as to whether this uses all the elements of the claim?

**A.** It does. I'll note that this camera looks in two directions, and it's got flexible recording options. You can configure specific video triggers, what gets sent and how frequently to save on data. Critical details for drill events. It consolidates event information with data capture before, during and after an event.

The before and after, of course, are those ten seconds on each side so you can put the event into context.

**Q.** This is from Exhibit 341.

So we go to Exhibit -- slide 175, and Exhibit 851.

(Document displayed.)

**Q.** What have you shown here with respect to the last element?

**A.** Okay. What's being called for here is Critical Event

Reporting. And that's exactly what we see described here. What type of events are reported? And there's a list. You can see there's lots of safety issues there.

And then incident video capture. Okay? The Critical Event Video supports a diagnosis for what's happened. It, again, provides the detail of what triggered that event.

**Q.** Does the IVG with the CEV functionality communicate with the remotely located device using HTTP as required by the claim?

**A.** Yes, it does.

**Q.** Let's go to the last few claim elements here.

Does the SR4 receive setting information and update the settings from a remote device?

(Document displayed.)

**A.** Yes. That's what we see here:

"Configuration settings and trigger settings will be communicated separately via distinctive web service endpoints."

**Q.** Let's go to the last element, the Omnitracs IVG device.

Does that also adjust settings based on received settings from a remote device?

**A.** Yes. If you take a look, this is from the Omnitracs IVG document. You control the configuration. And this is a summary of what you can change regarding that configuration.

**Q.** Okay. So now I want to go to slide 178.

(Document displayed.)

**Q.** And so this is the fourth, the last patent that we'll talk about today, the '253 patent. This is Exhibit 5.

So let me go to slide 179, and this is Fig. 9.

(Document displayed.)

**Q.** Dr. Wicker, can you just at a high level explain the kind of functionality that we're going to be talking about with respect to the '253 patent?

**A.** Certainly. We have a camera up here. Video, digital video data takes up a lot of room. Very large amount of room. And so what happens is the camera has an interim memory, a buffer memory, where it's storing data. But it's only got so much room in that buffer. If, you know, you try to store everything for an entire day, let's say, that would take up a great deal of room.

Now, that interim memory in this invention allows us to move to long-term memory videos that are critical, videos that are associated with an event and videos that will be diagnostic to determining whether the driver needs some coaching.

So this patent is about using memory in an intelligent way but only saving for the long term the important stuff.

**Q.** Let's go to the next slide and look at how exactly the patent talks about how somebody would use that memory and decide which -- which parts of the video it needs to keep and which parts it does not want?

**A.** So what the patent does is it takes advantage of the presence of the memory and our ability to overwrite memory.

So some of the frames, those that are deemed less important, those that get a lower grade, if you will, they are overwritten over time. So it says: Overwritten and erased.

The critical frames, though, are denoted as you see here, and those are kept. Those are not overwritten.

So what we're doing is we're identifying memory that can be erased by putting new material on it and identifying other memory where we want to keep it because it's associated with something that's happened and we want to be able to review it.

**Q.** Can you explain what frames are in the context of a video?

**A.** Yes. This is actually a very old concept. I think it goes back to Edison, the notion of creating moving pictures by having frames that are shown relatively rapidly. The frames change over time, and they give our brains the perception of movement.

That hasn't changed. We still store video by frames. We're just much better at it and do it digitally, et cetera.

But what's happening here is the video that we're seeing is being recorded in digital frames, one shot at a time, if you will.

**Q.** Okay. So let's go to the claims, and I think we can walk through some of the key claim elements that relate to this decision-making process.

I'm on slide 181.

(Document displayed.)

**Q.** And, Dr. Wicker, can you explain what we see in claim 1?

**A.** Yes. Claim 1 is a vehicle event recorder system that is to be mounted in a vehicle. And then there's a series of requirements regarding a camera, memory, long-term memory, and sensors that generate signals at certain times.

And then there's a controller that detects vehicle events, determines values of individual frames. Is this important? Is it not? Facilitates overwriting of less important frames and responds to detecting events by collecting the frames that have the higher values that are associated with an event like close following or something along those lines.

**Q.** Okay. We've seen -- we see two different claims, Claim 1 on the left and Claim 11 on the right. What's the relationship between those two?

**A.** Again, we see the same idea. Here we've got the vehicle event recorder system. And here we have the method. So we have a device or an apparatus on the left, and a method, a series of steps on the right.

**Q.** Okay. Let's go to slide 182.

(Document displayed.)

**Q.** This is Claim 1 broken down. And then we'll start with the first element, 1(a).

What is element 1(a)?

"A vehicle event recorder system configured to be mounted in a vehicle. The video event recorder system comprising."

**Q.** Okay. And does the Motive product satisfy this element? We're looking at Exhibit 542 again.

**A.** Yes. This device -- and it's about that size -- can be mounted in a vehicle. It happens to have two cameras, so you can see in and out.

**Q.** Slide 184.

(Document displayed.)

**Q.** What is element 1(b)?

**A.** (As read):

"The camera configured to capture image data, wherein the camera has a field of view that includes an environment in and/or around the vehicle, wherein the image data includes a set of consecutive frames of visual information."

**Q.** Okay. And the Court gave us a definition for frames of visual information. What is that?

**A.** Video frames.

**Q.** Did you find element 1(b) met in Motive's products?

**A.** Yes, I did.

**Q.** Let's go to 185. And this is Exhibit 395 and 542.

(Document displayed.)

**Q.** What is this?

**A.** Once again, this is noting that we have a dual-facing camera. So that gives us the environment in and/or around the vehicle. The image data is consecutive frames. We are capturing frames. And you can see a discussion of the dashcam here. The two cameras. There's a particular resolution. A particular frame rate.

So there are frames. 30 frames per second for the road-facing camera, 15 for the driver-facing.

**Q.** Let's go to slide 186 and element 1(c).

(Document displayed.)

**Q.** What is that?

**A.** This is:

"A buffer memory configured to electronically store information, wherein the information includes the image data."

**Q.** Now, does the AI Dashcam, Motive's AI Dashcam, include a buffer memory on the camera?

**A.** It does. And it's fairly large. It's 68 to 104 hours, depending on the frame rate. If you take frames very quickly, you're going to have less time. If you take them more slowly, you'll have more time.

**Q.** From Exhibit 395 and Exhibit 542.

I'll turn to slide 187. This is element 1(d).

(Document displayed.)

**Q.** What is that element?

**A.** This is:

"A long-term storage memory configured to store information, wherein the stored information includes a subset of the set of consecutive frames of visual information."

So this is the long-term storage that's going to be associated with the storing of frames that are deemed important.

**Q.** What are you showing here on slide 187 from Exhibit 521?

**A.** Okay. So over here on the right we have the camera, and it's two engines. Data is flowing from right to left. And here we have the long-term storage. There's a database. And then some post-processing that can be done on what's been received.

So what this shows is that data from the camera makes its way to the back end where it can be processed.

**Q.** Okay. Let's go to slide 188, and look at elements one -- 1(d), 1(e) and 1(f).

(Document displayed.)

**Q.** What is element 1(d) here?

**A.** It's:

"One or more sensors configured to generate output signals conveying vehicle information related to a particular vehicle event at a particular time."

**Q.** And why don't you read the next two elements, too, to save

some time.

**A.** (As read):

"A controller configured to detect the particular vehicle event based on the generated output signals; and effectuate storage of the set of consecutive frames of visual information in the buffer memory."

**Q.** Okay. So let's first on the sensors, does the Motive AI Dashcam have sensors configured to generate output signals conveying vehicle information as claimed?

**A.** Yes. The sensors in this case are video sensors. They're camera sensors. And we can see one right in the middle there (indicating).

But these sensors are watching, in this case, close following. They're looking to see if the car in front is getting a little too close.

**Q.** And is there something in the camera that effectuates storage of the frames of video information in the buffer memory?

**A.** Yes. There is a circular buffer that is receiving these frames and storing them temporarily.

**Q.** Okay. Let's go to -- this is from Exhibits 395 and 542.

Let's go to slide 189. I want to read the next element 1(g).

(Document displayed.)

**Q.** What is that element?

**A.** (As read):

"Determine values of individual frames in the set of consecutive frames, wherein the values of the individual frames decrease with increasing time away from the particular time of the particular vehicle event."

**Q.** Okay. And do the Motive products meet this element?

**A.** Yes, they do. Basically there is a score associated with the individual frames. And if you've got an event in the middle, if you go outwards, away from that event, you will find the score is going down.

**Q.** So I want to talk about that in a little more detail. This is from Exhibit 521 from Motive's documentation.

What is the top excerpt that we've called out?

**A.** This is from a Motive technical document, and it's describing the Hubble camera unit. And what it notes is that it determines their respective different -- distance, excuse me, what there is. The distance of the cars in front from the ego-vehicle, the car you're driving in, with a certain confidence level.

**Q.** So how does that confidence level relate to the patented claim element that we're looking at above?

**A.** Well, this is a confidence regarding whether or not there is close following. So as the confidence level goes up, it becomes more and more likely that this is an event. And when

it passes a certain threshold, it is declared a close following event. You're driving too close to the people in front of you.

**Q.** Now, are these confidence values assigned to each frame that the Motive AI Dashcam records?

**A.** Yes. You can see that right here (indicating). It's talking about the perception engine. For each frame there is a number of things that are associated with it, but one of the things is that confidence value.

**Q.** And the last part of this claim element says that:

"The values of the frames decrease with increasing time away from the event."

Is that functionality met here?

**A.** Yes, it is.

**Q.** How?

**A.** So what happens is before you're too close, your confidence values are going to be lower. After the event and you're warned, the values will be lower as well.

**Q.** So let's go to slide 190.

(Document displayed.)

**Q.** Have you prepared an animation that helps explain this functionality?

**A.** Yes, I have.

**Q.** Okay. So let's go to slide 190, and I'll hit the slide. Can you explain what we're seeing on this animation?

(Document displayed.)

**A.** So we're taking frames. This is a picture of the road in front of us. Everyone is happy. The confidence that we're close following is zero. So that value is associated with these frames.

But in a moment we're going to be getting a little too close to the car in front of us. Two, seven, eight. The confidence value is going up. The threshold happens to be 60 in this example. So we're getting kind of close as you can see -- there we go. We've crossed the threshold.

So now we have three frames in which we have a high confidence value that there has been a close following event.

**Q.** Okay. So now in the Motive system, what happens after you determine that there's been a close following event based on these confidence intervals?

**A.** Frames are collected to form a video that can be reviewed later. The frames consist, first, of everything that is over the threshold, which happens to be 60. So the threshold is my red dotted line here. And some of the frames have crossed that threshold. That's terrible. There we go.

Some of the frames have crossed that threshold. So all the frames that are above, I'm saving those. But I also want to keep the ones that are 10 seconds on each side. So I'm also going to keep frames, for example, over here (indicating) that are just before and just after the event.

**Q.** So what happens next in the Motive system -- I'll play the

animation -- after you've detected the event and decided that you want to pick the frames on either side?

**A.** So what we've been seeing are frames being stored in a local buffer. It's called a ring buffer, a circular buffer. And basically what happens in such buffers is once you've recorded, used all the room, you start to erase by writing over things that are the oldest or the lowest confidence in the buffer.

Well, what's going to happen here before these frames can be overwritten, they're going to be saved to long-term storage. These frames being those that indicate a close following event.

So when you push the button, what you'll see is that we're going to save --

**Q.** All right. I skipped ahead. There we go.

**A.** There we go. Okay.

So what's happened is we've grabbed the high confidence frames that show close following, and then two frames before and two frames after. So now we've got a complete video of this event which we're going to store in long-term storage.

And now we are free to overwrite what's still in the loop buffer.

**Q.** So now I'll hit the button again.

What are we seeing here?

**A.** Now we've got no event and we're overwriting what's still in the buffer, the short-term buffer.

**Q.** Now, isn't this overwriting the frames that relate to the event that we just recorded?

**A.** It is. But we have a permanent copy in long-term storage.

**Q.** So, in this situation is -- let me go back.

**MR. DEORAS:** Let me go to slide 194, Mr. Schlaifer.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** Is the animation we just looked at -- we'll get to the testimony in a second, but is the animation we just looked at overwriting frames based on the values?

**A.** Yes, it is.

**Q.** Okay. So can you read element 1(h)?

**A.** (As read):

"Facilitate overwriting of the individual frames stored in the buffer memory based on the determined values."

**Q.** How, if at all, is the functionality that we just looked at in the Motive system, how does that meet this claim requirement?

**A.** It meets it because we are keeping the frames that have the high confidence values and those immediately before and after. We move those to long-term storage.

The short-term storage is continually overwritten. So things that are kept in short-term storage will be overwritten because they have the low confidence values.

**Q.** Let me just go back to that animation for a second.

So which frames, again, are the ones that we would like to keep?

**A.** This one, this one and this one (indicating). Those that are -- whose confidence values exceed the threshold, which in this case is 60.

**Q.** Which frames are we going to overwrite?

**A.** We're going to overwrite these (indicating). They are overwritten. They will no longer exist.

**Q.** After the video is saved and sent to long-term storage, what happens?

**A.** That will be available for viewing by the fleet manager. Everything that remains on the loop buffer, the circular memory will be overwritten.

**Q.** Let's turn to slide 194.

(Document displayed.)

**Q.** This is testimony we heard earlier today. What is Mr. Gorski saying here?

**A.** He's saying -- Mr. Gorski is saying that:

**"QUESTION:** Event videos will also be deleted from the AI Dashcam after it receives confirmation from the server, true?"

He says:

**"ANSWER:** The vehicle gateway gets the confirmation and then send the command to the camera for it to

delete that file."

**MR. DEORAS:** So now I'm going to get into a little bit of source code, so I think we need to move the TVs. Thank you.

**THE COURT:** Actually, this is a good time for our afternoon break. So let's take our afternoon break while you do that. It's a 15-minute break. Remember the admonition not to do outside research or talk to anyone about the case, and keep an open mind. We'll see you back here at 2:45.

(Whereupon there was a recess in the proceedings from 2:30 until 2:51 p.m.)

**THE COURT:** We're back on the record outside the presence of the jury. Just one housekeeping thing it occurred to me I meant to talk to the parties about.

The other day Omnitracs filed a trial brief concerning a potential claim construction issue that is anticipated to come up in evidentiary motions, and you all said you were going to meet and confer about filing briefs on that.

I would -- I would prefer to have any briefs on that filed the day before I need to decide that claim construction issue by 5:00 p.m. the day before. I don't know if that's feasible or what day you all anticipate this coming to a head but wanted to check in with you about that.

**MS. TARASI:** Sure. Angela Tarasi, Your Honor.

We did confer, and you will have the brief today, hopefully in the next hour. And the plan, I believe, is to

argue tomorrow morning.

Is that still the plan, if you need it?

**MR. CALHOUN:** Yes, I think so. Tomorrow morning makes sense.

(Court reporter clarification.)

**MR. CALHOUN:** Oh, Kyle Calhoun for Omnitracs, Your Honor. Yes, we discussed and that's the -- that's the plan.

**THE COURT:** Great. Thank you. Yep.

**MR. ALPER:** Your Honor, I just had one question about that. So we met-and-conferred and I think we received their side of the story. We're not planning to file a new brief. We can just discuss -- we figure we would discuss it further when it comes up whether it's tomorrow morning or whenever, if that makes sense to, Your Honor.

**THE COURT:** That's fine. Thank you.

Let's bring in the jury.

(Jury enters the courtroom at 2:53 p.m.)

**THE COURT:** You may be seated.

Welcome back from the break. We're going to continue with Dr. Wicker's testimony. Another reminder that you're still under oath, sir.

**THE WITNESS:** Yes, Your Honor.

**THE COURT:** You may continue, Mr. Deoras.

**MR. DEORAS:** Thank you, Your Honor.

I think we need to move the screens back for the next

slide. Oh, it's already done.

Mr. Schlaifer, could we jump to slide 195.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** Okay. Dr. Wicker, before we were -- the break we were looking at the animation that you had prepared about the functionality in Motive's products.

Did you also analyze source code related to this functionality to create that animation?

**A.** Yes, I did.

**Q.** Okay. So this is from Exhibit 4293.

(Document displayed.)

**Q.** And what are you showing here just at a high level?

**A.** This is a set of excerpts from something called Camera Media Manager dot C. So it's a source code file.

And what we see here are what are called static definitions. And there are several functionalities that are described here. And those functionalities are copying video files from camera to little black box. It's that particular function there.

Deleting videos from the camera. That function there.

And checking storage of camera and deleting files above a threshold. That's what we see right there.

Okay. So let's go to slide 196. We want to turn to element 1(i).

(Document displayed.)

**Q.** What is element 1(i)?

**A.** Element 1(i) is responsive to detecting the particular vehicle event. Transfer information stored in the buffer memory to the long-term storage memory. Wherein, the transferred information includes frames of visual information for a period of time that begins before the particular vehicle event and lasts until after the particular vehicle event.

**Q.** So what have you shown here? Let's start with the figure. This is all from Exhibit 521.

What have you shown in the figure here that relates to this claim element?

**A.** The figure has a lot of functionality in it. But we see, our camera is here. That's the Hubble camera. And we see a path that the video takes. Audio video images go from the camera to the electronic logging device. And from there to the gateway. Excuse me, the Cloud. It's not the same gateway. It's a Cloud gateway, an entrance into the Cloud. And from there to the database.

**Q.** What do the two -- the two text excerpts below the figure indicate?

**A.** This is a description of what we're seeing in the figure. It's a pretty busy figure. The Hubble camera unit:

"The AE output event data that is sent to ELD for transmission to the Cloud."

And then:

"ELD, that's our logging device, receives event data, video/images from Hubble and transmits it to the Cloud."

And again, the Cloud is our route to the back end server.

**Q.** Let's go to slide 197. And I want to focus on the last part of element 1(i), the period of time before and after.

(Document displayed.)

**Q.** Did you find that met by Motive's products?

**A.** Yes. I showed it as 10 seconds before and 10 seconds after in my animation. And it's exactly what we see here as Number 4 in this Motive document.

"After the event is over, it will send the sensor and the PE data for the event duration," the video for example, "along with the 10 seconds before and after the event (pre and post duration)."

**Q.** And I think the screens are still turned around, so I will go to slide 198, and the source code in Exhibit 4293.

(Document displayed.)

**Q.** Did you find code that related to the functionality where the video is sent to the remote device?

**A.** Yes. And once again, these are a series of definitions. Note the comment. Many of you probably know this, but a comment is not actually executed, but it helps us understand what the programmer thought he or she was writing. Uploads

video from the little black box to the server. And here we see the function definition: Media manager upload media.

Further down we see upload complete request.

And then: Checks if the record is for a triggered video or not.

So is what we just uploaded triggered or otherwise?

**Q.** Okay. So that's all the elements of Claim 1 of the '253 patent.

So in your opinion, Dr. Wicker, does the Motive AI Dashcam product meet all of those requirements?

**A.** Yes, it does.

**Q.** I will just go to the next slide.

(Document displayed.)

**Q.** What are you showing on slide 199?

**A.** This is, once again, that situation in which we have two kinds of claims. This is a claim for the vehicle event recorder. It's an apparatus that has a number of capabilities, and this is for a method.

But the limitations align. So my evidence that these steps are followed on the right is the same as my evidence for what we see on the left.

**Q.** So in your opinion, does the Motive dashcam also meet Claim 11 of the '253 patent?

**A.** Yes, it does.

**Q.** Okay. So let's take a step back.

Did you analyze or come to an opinion as to how important the '253 patent functionality is to the AI Dashcam product that Motive offers?

**A.** Yes, I did.

**Q.** And what is that opinion?

**A.** What's called for in these claims is fundamental to how the AI Dashcam works.

What the AI Dashcam does is it video -- it takes images of what's going on, and then determines whether or not certain events are occurring. It does within the camera the event detection that we see described here, and then saves the videos in a manner that's very efficient in terms of its use of memory.

So it's -- it's fundamental to the AI Dashcam.

**Q.** Okay. So I want to stop here and switch gears slightly, and I want to talking about something called indirect infringement.

Did you also analyze indirect infringement?

**A.** Yes, I did.

**Q.** First, let's go to slide 200, and I want to talk -- I want to start with induced infringement. It's a type of indirect infringement.

(Document displayed.)

**Q.** What's the framework that you used for your induced infringement analysis?

**Q.** Let me go to slide 212.

(Document displayed.)

**Q.** What are you showing here for the XRS patents?

**A.** So we've got four columns now. We've got the patent. The Motive features enabled. And then I connected them to comparable Omnitracs features.

So with regard to the '628, and the '906, there's performance monitoring in Omnitracs, uses vehicle telematics data to process and prepare driver reports, and hours of service logging. These I have an associated value for because I know what Omnitracs charges for them. The additional charge per month per subscriber.

**Q.** So let's go to slide 213.

(Document displayed.)

**Q.** Now for the SmartDrive patents, did you do a similar analysis?

**A.** Yes, I did.

**Q.** What have you shown on this slide?

**A.** So once again there's the '060. The Motive features enabled we've talked about.

And then the comparable Omnitracs features: Critical event reporting near real time. It's doing it really quickly.

And then something called Sitting Duck, which we haven't talked about too much. But this is an important Omnitracs feature in which you determine that you are in an unsafe place

and you're not moving. You may pull over to the side of the road and think you're safe, but this technology will tell you: No, you're not safe. You need to find another spot.

**Q.** Okay. So that -- we'll put that aside and I want to switch gears, I think, to the last part of your testimony today. And I think I previewed this: The knowledge of the patents.

**MR. DEORAS:** And so let me go to slide 226, Mr. Schlaifer.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** So first starting with the XRS patents, did Motive have knowledge of the '628 and '906 patents?

**A.** Yes.

**Q.** Why would you say that?

**A.** First off, one of their employees at the time, Dan Fuglewicz, is actually an inventor on these patents. As you can see, his name -- it's highlighted -- is listed under inventors for the '628 and '906.

**Q.** Slide 228.

(Document displayed.)

**Q.** What are you showing on this slide?

**A.** This is Mr. Fuglewicz's LinkedIn page. And as we discussed much earlier today, you know, Mr. Fuglewicz interacted with -- with Motive's senior executives while he was

attempting to get a job. So the LinkedIn page would have been a natural place for Motive's executives to be looking. And what he does here is he actually lists his patents on his LinkedIn page.

**Q.** All right. Let's go to slide 229.

(Document displayed.)

**Q.** We heard this testimony, I think, yesterday.

What do we see here?

**A.** This is Mr. Pulver and he was asked:

**"QUESTION:** What do you recall about Mr. Fuglewicz?"

And he said -- Mr. Pulver said:

**"ANSWER:** He brags about patents and having them."

**Q.** What does that tell you about whether other people at Motive would have known about Mr. Fuglewicz's patents?

**MR. RAY:** Objection. Calls for speculation.

**THE COURT:** Sustained.

**BY MR. DEORAS:**

**Q.** Let me actually go to slide 230, Exhibit 508.

What is this document?

**A.** This is an email from Mr. Makani to Mr. Fushman.

**Q.** What is Mr. Makani saying?

**A.** What he is saying -- and, by the way, Mr. Fushman is an investor. And he's talking about his prospective people. And here we have Dan Fuglewicz.

And Mr. Makani explicitly says, "He holds six U.S. patents

all for electronic data systems."

**Q.** This is Exhibit 508. Let me go to slide 231.

(Document displayed.)

**Q.** This is Exhibit 525 on top and then some deposition testimony at the bottom. Let me start at the top.

What is the email that we see in Exhibit 525 at the top?

**A.** It's an email from Mr. Fuglewicz to Mr. Makani. From the XRS co-inventor to a Motive founder.

**Q.** And --

**A.** Actually, I'm sorry, Mr. Makani and Mr. Johns.

**Q.** And what is the date of this email?

**A.** The date is 14 July, 2016.

**Q.** And what is Mr. Fuglewicz saying -- you can see in the subject line of his email and in the first line. What is he saying to Mr. Makani and Mr. Johns?

**A.** He's saying that concerning KT, KeepTruckin, I think they're saying KT copied their system.

He goes on to say:

"We are on their radar and should be prepared to quickly and firmly respond if they take action."

**Q.** Now, did you also see testimony from Mr. Makani relating to what he and others at Motive did after receiving this email?

**A.** Yes.

**Q.** What does Mr. Makani say at the bottom?

**A.** He's asked:

**"QUESTION:** Did you do anything after you got this email to investigate any XRS patents?"

And he said?

**"ANSWER:** Not that I recall.

**"QUESTION:** Do you know if anyone at Motive did anything to investigate any XRS patents after Mr. Fuglewicz sent this email?

**"ANSWER:** Not that I recall."

**Q.** And let me go to slide 232.

(Document displayed.)

**Q.** This is Exhibit 303, which I think we've already seen earlier.

What is this exhibit?

**A.** This is a July 16th, 2018 letter that's addressed to Mr. Makani. It says:

"As we discussed, I'm writing to you to provide more information about certain patents in our portfolio. I would like to bring five particular patents to your attention at this time."

This is Omnitracs -- if I recall correctly, it's Omnitracs' CEO sending Mr. Makani a note. And he says: "These are important patents."

And one of those patents is the '628, which, of course, is at issue in this litigation.

**Q.** Okay. I want to go to slide 234. This is Exhibit 1964.

(Document displayed.)

**Q.** What is -- this is another letter.

What does it say in the -- kind of in the middle of this letter?

**A.** This, again, is Mr. Greer, the CEO of Omnitracs, former CEO.

And what he's saying is that his patents, these patents, and I'm reading right here (indicating):

"Can be categorized into two distinct families: The electronic logging device, compliance family, which includes the '668 and '422; and the Driver Scorecard family, which includes the '568, 873, and '628 patents."

**Q.** Now, based on your analysis in this case, is the '906 patent also part of the Driver Scorecard family with the '628 patent?

**A.** Yes, it is.

**Q.** And is Mr. Fuglewicz also a named inventor on the '906 patent?

**A.** Yes, he is.

**Q.** So as to the SmartDrive patents, have you seen any evidence that Motive has had knowledge of the SmartDrive patents?

**A.** Yes.

**Q.** And in what context?

**A.** SmartDrive patents, they would have been informed of the concern in the Complaint that was served on them for patent infringement.

**Q.** Have you seen any evidence that Motive has changed the functionality of its products or how its products operate since receiving the Complaint that asserted those patents?

**A.** No.

**Q.** Okay. Let me go to slide 235.

(Document displayed.)

**Q.** What are you showing on this slide, Dr. Wicker?

**A.** This is testimony by Mr. Miller and Mr. Gupta. They were asked similar questions:

"**QUESTION:** Are you aware of any efforts by Motive to design around or avoid the patents that are asserted in this case?"

Mr. Miller said:

"**ANSWER:** I don't believe I'm aware of any such knowledge or actions."

Mr. Gupta said:

"**ANSWER:** No, I'm not familiar with any changes made."

**Q.** Go to slide 236.

(Document displayed.)

**Q.** This is similar testimony from Mr. Makani.

What have you shown here?

**A.** Mr. Makani was asked:

**"QUESTION:** Has Motive made any changes to its products to avoid infringing any of Omnitracs, XRS, or SmartDrive's patents?

**"ANSWER:** Not that I'm aware of.

**"QUESTION:** Did you make any changes to Motive's products as a result of receiving the letter?

**"ANSWER:** I don't recall any changes to the product that we made."

And then finally:

**"QUESTION:** Did you do anything to change the design of the vehicle gateway to ensure that you weren't using any information from XRS?

**"ANSWER:** Not that I'm aware of."

**MR. DEORAS:** Pass the witness.

**THE COURT:** Cross-examination.

(Brief pause.)

**CROSS-EXAMINATION**

**BY MR. RAY:**

**Q.** Dr. Wicker, good afternoon.

**A.** Good afternoon.

**Q.** Sorry for all the fuss with the boxes, but you have a lot of opinions in this case.

**A.** I do.

**Q.** All right. Well, we won't finish your cross-examination today, but we'll try and get through as much as we can.

I'd like to start by reading you a quote, and I would like you to tell me if you know who said it.

"The source code is the final arbiter device. If you have the source code that runs on a given device, that source code will tell you how that device works."

Do you know who said that?

**A.** It sounds like me.

**Q.** It was you.

And by "final arbiter," you mean that if you really want to tell how something works, you look to the source code; right?

**A.** That's correct.

**Q.** Okay. Now, Motive's source code was made available to you for review starting in around April of 2024; correct?

**A.** I think that's right, yes.

**Q.** All right. And you've had then since that time over 300 days to review Motive's source code; right?

**A.** That's correct.

**Q.** And the number of days you've actually spent reviewing Motive's source code computer was one day?

**A.** With the source code computer, that's correct.

**Q.** And by that one day we're talking about a workday, about seven hours; right?

(Brief pause.)

**A.** I think it was a long day, but yes, on the order of seven;

Volume 5

Pages 803 - 1067

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RITA F. LIN

| | |
|---|---|
| OMNITRACS, LLC, et al, Plaintiffs, vs. MOTIVE TECHNOLOGIES, INC., et al, Defendants. | No. C 23-5261 RFL<br>San Francisco, California<br>Thursday<br>April 17, 2025<br>8:15 a.m. |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**
KIRKLAND & ELLIS, LLP
555 California Street
San Francisco, California 94104
BY: **ADAM R. ALPER, ESQ.**
**AKSHAY S. DEORAS, ESQ.**
**KYLE CALHOUN, ESQ.**

KIRKLAND & ELLIS, LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
BY: **N. YVONNE STODDARD BEELER, ESQ.**
**MICHAEL W. DE VRIES, ESQ.**

KIRKLAND AND ELLIS, LLP
601 Lexington Avenue
New York, New York 10022
BY: **LESLIE M. SCHMIDT, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

***Reported By:*** ***Debra L. Pas, CSR 11916, CRR, RMR, RPR***
*Official Reporter - US District Court*
*Computerized Transcription By Eclipse*

**A.** It was not produced, as far as I know.
**Q.** Okay. Just to make sure the record is clear, you didn't take the photo?
**A.** That's right.
**Q.** And you didn't examine any of the things in the photo that were actually in the photo?
**A.** That's correct.
**Q.** Okay. And -- so we're not speaking so esoterically, let me find the slide.

(Brief pause.)

**MR. RAY:** 7.39, please, Mr. Reed.

(Document displayed.)

**MR. RAY:** Thank you.

**BY MR. RAY:**

**Q.** All right. This is the photograph we're talking about?
**A.** Yes, it is.
**Q.** Okay. So because you didn't have an opportunity to inspect these specific devices, you don't know how these devices were used; correct?
**A.** Well, again, there was evidence in the form of emails that provided test reports that showed how certain events were reported. And I do have some experience and a chance to talk to Mr. Sekula about how these devices were labeled. But I actually didn't get to pick up and inspect that particular device.

**Q.** Okay. And to make sure we're being very clear here, you understand that you can use both of these devices without using hours of service information; correct?

**A.** Both of these, meaning the Motive prototype and the XRS Relay?

**Q.** Yes.

**A.** Yes, you can.

**Q.** And you don't know, because you didn't inspect these devices, one way or the other, whether these devices were being used with HOS information; correct?

**A.** I know that they were reporting the name of the driver and events, but I didn't see any evidence of actual hours of service associated with that truck.

**Q.** Okay. So because the '628 and the '906 patent require use of hours of service information, you cannot sit here today and tell the jury that what we see in this photograph is covered by either of those patents; correct?

**A.** That's right. This particular set of tests, as far as I know, let's just say there's no evidence that it had hours of service information.

**Q.** All right. Let's switch gears to the '060 patent.

Dr. Wicker, you do not dispute that the web server in the claims of the '060 patent must be inside the vehicle; right?

**A.** That's correct.

**Q.** And if the only web server that you identify is outside

the vehicle, then Motive does not infringe the '060 patent; correct?

**A.** That's right. If it doesn't satisfy the web server limitation, it does not infringe.

**Q.** And on the term web server, I believe you testified yesterday that it's something that receives requests and returns responses over HTTP; is that right?

**A.** That's an example of a web server, yes.

**Q.** But that's what you testified yesterday; correct?

**A.** Yes.

**Q.** And that's consistent with how the patent describes a web server; correct?

**A.** That's correct.

**Q.** All right. And just for context, we'll go ahead and put up your slide from yesterday. 7.157.

(Document displayed.)

**Q.** This is from the '060 patent itself; correct?

**A.** That's correct.

**Q.** And the entity that communicates with the web server is called the client; right?

**A.** That's correct.

**Q.** And it is the client who generates the requests that go to the web server; right?

**A.** That's right.

**Q.** And these requests are often called GET requests, G-E-T?

**A.** HTTP does include GET requests. That's typical of what we use, but there are a couple of other commands as well. Post. There are others.

**Q.** But that's a common example of a client who is generating a GET request and they are sending it to the web server?

**A.** That's right. That's a common usage of HTTP.

**Q.** Now going to slide 7.173.

(Document displayed.)

**Q.** You moved through this a bit quickly yesterday because I know we were probably trying to get through this presentation. But I want to focus on the content of the slide just a bit.

We see examples of GET requests in your proof, or attempt to prove that the SR4 system, which is SmartDrive system, uses the '060 patent; right?

**A.** That's correct.

**Q.** And so on the --

**MR. RAY:** Zoom in a bit, Mr. Reed, on the diagram. Perfect. Thank you.

**BY MR. RAY:**

**Q.** On the top in green, this is the SmartDrive Cloud; right?

**A.** That's correct.

**Q.** And this is acting as a client, in your opinion; right?

**A.** Yes. When it actually requests data from the Vehicle Gateway, it's acting as a client in the client server architecture.

**Q.** Okay. And it is sending a request over HTTP -- again, according to your diagram -- to the event recorder; right?

**A.** That is correct.

**Q.** All right. And part of the reason you know it's doing that, according to you, is because it has a GET request --

**MR. RAY:** Mr. Reed, if you can highlight the big G-E-T, there in the green box.

**BY MR. RAY:**

**Q.** The GET request is coming from that client?

**A.** Yes, that's correct.

**Q.** Okay. And at the bottom of this diagram, we have what you labeled to be an event recorder in blue; right?

**A.** That's correct.

**Q.** And this is inside the vehicle; right?

**A.** Yes. The event recorder is the Vehicle Gateway.

**Q.** Okay. And so your opinion, then, is that the -- well, sorry.

The event recorder here is not the Vehicle Gateway; right? This is SR4?

**A.** Oh, I'm sorry. Yes, that's right.

**Q.** Okay. So just to back up. This is SmartDrive's device?

**A.** That's right. I was using that term generically.

**Q.** All right. But here you're referring only to SmartDrive?

**A.** That's right.

**Q.** Okay. So in your opinion, though, the event recorder here

is acting as a web server because it is receiving the GET request sent by the Cloud over HTTP; correct?

**A.** That is correct.

**Q.** Now, let's turn to your allegations relating to Motive's system, slide 7.154.

**MR. RAY:** And let's highlight the diagram on the right once again.

(Document displayed.)

**MR. RAY:** Thank you, Mr. Reed.

**BY MR. RAY:**

**Q.** Is this your understanding of Motive's system architecture?

**A.** Yes, it is.

**Q.** Okay. The blue portion you have highlighted here is labeled "ELD". Is that in the vehicle?

**A.** Yes, it is. It's the Electronic Logging Device.

**Q.** The yellow portion is labeled "server". Is that inside or outside of the vehicle?

**A.** That is referring to the server that is in the back end.

**Q.** So it's outside the vehicle?

**A.** That's correct.

**Q.** Is that sometimes referred to in Motive's documents as the K2 server?

**A.** That's exactly right.

**Q.** And the -- just debating whether it's pink, orange.

The salmon portion on the bottom? Go with salmon?

**A.** Yes, that's good.

**Q.** The salmon portion on the bottom that has a number of labels, those are all outside the vehicle as well; right?

**A.** That's correct. We can see, for example, the fleet manager here. So that would be the fleet manager's dashboard, what he or she is actually seeing to control the fleet.

**Q.** All right. So the only thing inside this diagram that's inside the vehicle is the ELD; right?

**A.** In this diagram, that's correct.

**Q.** And the arrows on this diagram flow from, at least from the ELD's perspective, from the ELD to the server; right?

**A.** In this particular diagram, that's right.

**Q.** They do not go the other way around?

**A.** It does not show the request from the back end to the ELD, and specifically to the web server in the ELD, for the video.

**Q.** So this diagram, you would agree, does not show the ELD receiving the request over HTTP; correct?

**A.** That's correct. It's simply showing the architecture. The description of the events you just described are shown next to it.

**Q.** Okay. So let's take a look, then, at what you cited a little bit further.

**MR. RAY:** And I'm going to be, I believe, referring to some source code here. So if we wouldn't mind turning around

the monitors for just a moment?

**THE COURT:** Yes, please. Thank you.

(Brief pause.)

**MR. RAY:** Thank you.

Mr. Reed, let's put up slide 7.161.

(Document displayed.)

**BY MR. RAY:**

**Q.** All right. So you cited some code here. This code is running on the ELD; right?

**A.** That is correct.

**Q.** Okay. And you'd agree that this source code reflects the ELD sending a GET request over HTTP in your view?

**A.** What this code is actually doing is something called setting up a socket. We talked about socket transport. And so this code is setting up the socket and then leads to a flow of data, in particular, ELD messages to the back end.

**Q.** Okay. My question was slightly different.

You'd agree this source code reflects the ELD sending a GET request over HTTP?

**A.** That is correct.

**Q.** Okay. And we can see that because at about Line 826 we see LBBEnv_get?

**A.** That's correct.

**MR. RAY:** All right. The monitors can come back around. Thank you so much.

(Brief pause.)

**BY MR. RAY:**

**Q.** Dr. Wicker, before we get into the last of the four patents, the '253, let's be clear on the record here as well.

The Plaintiffs do not use this patent; correct?

**A.** The last patent? No, no, they don't. They had their own proprietary system.

**Q.** Okay. Yet you'd agree that the Plaintiffs have products that, at least they contend, compete with Motive; right?

**A.** Yes.

**Q.** And so the Plaintiffs compete in the marketplace with Motive without using the '253 patent; right?

**A.** That's right. Again, they have their own system, proprietary system.

**Q.** And it's reasonable to think that if using the '253 patent would have been advantageous, they would use it?

**A.** Well, again, they -- they have their own alternative to the '253 patent. So the '253 patent definitely provides a useful invention, but they have another way -- Motive -- excuse me. Omnitracs has another way of doing it.

**Q.** So, again, my question was -- well, let me phrase it a bit differently.

You would agree that the Plaintiffs have chosen to use something other than the '253 patent and, yet, they can still compete in the marketplace with Motive?

**A.** That is correct.

**Q.** All right. We talked earlier, again, how patents need to claim something new, but the '253 patent explicitly talks about something in the specification that it believes is old.

And that's called first in/first out architecture; correct?

**A.** First in/first out buffers. They're definitely old, yes.

**Q.** Okay.

**MR. RAY:** So let's go ahead and pull up, if you wouldn't mind, Mr. Reed, Exhibit No. 5, which is already in evidence.

(Document displayed.)

**MR. RAY:** And, thankfully, we're not going to be reading anything that small. We're going to go to Fig. 2.

Thank you, Mr. Reed.

**BY MR. RAY:**

**Q.** And this is labeled "prior art" at the bottom under Fig. 2; is it not?

**A.** Yes, it -- yes, thank you. Yes, it is.

**Q.** Okay. And this shows first in/first out; right?

**A.** Yes, it does.

**Q.** And it shows that because we have a buffer that is 30 seconds in length. And once the buffer is full, the oldest data is deleted to make room for the newest data to be stored; is that right?

**A.** That's correct. You can think of it like a pipe. You put things in one end, eventually the pipe fills up. And now every time you put something new in the pipe, it falls out -- something old falls out the other end.

**Q.** Okay. And so you'd agree with me that if what Motive is doing is first in/first out, it would not infringe the '253 patent; correct?

**A.** If it was purely a first in/first out buffer and there was no way to access things in the middle of the pipe, so to speak, then, yes, I would agree with you.

**Q.** And by "access," do you mean make a copy for something in the middle?

**A.** Yes. It's no longer a first in/first out buffer if you're going into the buffer and selectively copying -- excuse me, selectively copying things that are in the middle of the buffer.

**Q.** And by "copy," do you -- you're referring to not -- like, when I make a copy, I still have the original; right?

**A.** Yes.

**Q.** All right. And so just to make sure the record is clear, when you're talking about making a copy of something in the buffer, you're not talking about deleting the original. You're just talking about making another copy of it?

**A.** I think we're talking a little bit past each other.

What I'm talking about is if you have a buffer -- let's

talk about a pipe -- and I'm putting things in one end and the oldest thing comes out the other. That's a first in/first out buffer.

But if I'm reaching in and selecting things in the middle of the buffer, that's no longer a first in/first out buffer.

**Q.** You used the word "selecting." I just want you to be really precise here.

So in your experience, if you have your pipe analogy and you have highlighted a portion of that information along the pipe and say, I'd like a copy of that, but the data stays and then goes through the pipe as normal, is that first in/first out?

**A.** No. Because you're taking things in the middle. The copy may still exist, but -- of the original -- still exists, but by making copies of what's in the middle, you're no longer treating that buffer as a first in/first out buffer.

**Q.** Okay. So in your technical expertise, if you do anything to copy data on the buffer before it is deleted, you are no longer first in/first out?

**A.** That's correct, because things are coming out sooner.

**Q.** Okay. So what I'd like to do now is put up the animation you worked on and make sure I understand what it means.

**A.** Okay.

(Document displayed.)

**Q.** So this is your interpretation of Motive's AI Dashcam

buffer memory?
**A.** Yes.
**Q.** And how it works in conjunction with long-term storage; right?
**A.** That's correct.
**Q.** And the loop buffer you have here, you're interpreting that to be on the camera itself; right?
**A.** That's correct.
**Q.** That is the buffer that you indicated earlier was between 68 and 104 hours in length?
**A.** That is correct.
**Q.** And the long-term storage you're referring to here by the folder on the left-hand side of the slide, that is not on the camera; correct?
**A.** That is connected to the camera, but, no, it's not on the camera.
**Q.** Okay. It's somewhere else?
**A.** That's right.
**Q.** All right.
**MR. RAY:** So let's go ahead and start the animation.
(Animation played.)
**MR. RAY:** And let's stop it now.
**BY MR. RAY:**
**Q.** All right. We have gone all the way around. We have zero value slides. And the first slide that came in at the

beginning of the loop has now been deleted; is that right?

**A.** That's right. That first frame did get deleted.

**Q.** Okay. And it got deleted because the buffer was full and you needed to make room for the new file to come on?

**A.** That's correct.

**Q.** All right.

**MR. RAY:** Let's go ahead and play again.

(Animation played.)

**BY MR. RAY:**

**Q.** And now we start to see our yellow car.

**MR. RAY:** And let's stop it now.

**BY MR. RAY:**

**Q.** What we just saw at the end was the first slide, the first frame, if you will, with a confidence value of something other than zero, was deleted in the same manner; correct?

**A.** That's correct.

**Q.** All right. So then let's continue.

(Animation played.)

**Q.** All right. And now this is when you are saying there is a video that is copied over --

**MR. RAY:** Let's stop it right there.

**BY MR. RAY:**

**Q.** -- that is copied over and put into long-term storage; right?

**A.** That's correct.

**Q.** And as the loop goes --

**MR. RAY:** Let's run it.

(Animation played.)

**MR. RAY:** And let's stop.

**BY MR. RAY:**

**Q.** Those files, too, were deleted in the same fashion as those before?

**A.** Yes, but a copy was retained. So the files -- or the frames still exist.

**Q.** Wasn't my question. My question was: Those frames were deleted just like the ones before?

**A.** That is correct.

**Q.** To make room for new data to come onto the buffer?

**A.** That is correct.

**MR. RAY:** You may take this down.

(Animation removed from display.)

**BY MR. RAY:**

**Q.** I just have a few more questions for you, Dr. Wicker. I appreciate you being here and your patience. I have a couple more things to cover.

You testified yesterday on a number of emails involving Mr. Dan Fuglewicz; correct?

**A.** That is correct.

**Q.** You have never spoken to Mr. Fuglewicz before, have you?

**A.** No, I've never met him.

**Q.** And you testified earlier on a number of emails involving Motive employees, past and present; correct?

**A.** That's correct as well.

**Q.** You've never spoken to these employees before, have you?

**A.** No. No, I haven't.

**Q.** You were not personally part of any of the conversations that occurred in this correspondence, were you?

**A.** That's correct.

**Q.** Many of which happened years ago; right?

**A.** That's right.

**Q.** Yet you don't see any problem sitting here and telling the jury what you think of them?

**A.** No. I was asked my opinion, and I've given it.

**Q.** You also set forth some opinions yesterday about the value of Motive's features; correct?

**A.** That's correct.

**Q.** And that list of features came from a Motive document; right?

**A.** That's right.

**Q.** You did not select this document, though, did you?

**A.** I chose to use it as a source of my list of features.

**Q.** But you did not select it, though, did you?

**A.** I'm not sure what you mean. I -- it was produced by Motive. It was provided to me, along with many, many other documents. So I chose to use it in expressing my opinion.

opinion that was undisclosed concerning the loop memory issue. I have looked at the testimony and the paragraphs cited, and I am denying the Defense motion.

And I believe Mr. Deoras had a correction to the exhibits. Was it Exhibit 52 that is withdrawn?

**MR. DEORAS:** I was going to just do that on the record, Your Honor.

**THE COURT:** We are on the record, but we could do it with the jury --

**MR. DEORAS:** In front of the jury, I meant, but yes. Okay.

**THE COURT:** Okay. Great. Let's bring in the jury.

(Jury enters the courtroom at 10:25 a.m.)

**THE COURT:** You may be seated. Welcome back from the break. We're back on the record with all the members of our jury as well as counsel and Dr. Wicker.

You're still under oath, sir.

**THE WITNESS:** Yes, Your Honor.

**THE COURT:** You may proceed, Mr. Deoras.

**MR. DEORAS:** Thank you, Your Honor. And before I proceed, just one correction for the record. Exhibit 52, which I had mentioned yesterday, that was a typo. So that exhibit was not used with Dr. Wicker in the direct testimony.

**THE COURT:** So I will note the exhibit is withdrawn.

(Trial Exhibit 52 was withdrawn.)

## REDIRECT EXAMINATION

**BY MR. DEORAS:**

**Q.** Okay. Good morning, Dr. Wicker.

**A.** Good morning.

**Q.** I want to ask you a few questions about some things you were asked about on cross-examination.

Yesterday do you remember, you were asked some questions about your source code analysis?

**A.** Yes.

**Q.** And specifically counsel for Motive suggested that you had only spent around seven to eight hours reviewing source code. Do you remember that?

**A.** Yes.

**Q.** Is that accurate?

**A.** No.

**Q.** Now, why not?

**A.** Because I spent a day with the source code computer. Actually, I spent a little more than that. I saw it again later. But the point is, I spent a day identifying code that I wanted printed out. The printouts were handed to me. I spent a little over 50 hours studying the printouts and the code.

So I had quite a bit of time with the source code.

**Q.** And kind of putting the hours to the side for one second, did counsel for Motive put a single piece of source code in front you during your cross-examination that called into

question any of your opinions?

**A.** No.

**Q.** Okay. You were also asked some questions about working for plaintiffs in patent lawsuits. Do you remember that?

**A.** Yes, I do.

**Q.** And to be clear, have you also done work on behalf of defendants?

**A.** Yes, I have.

**Q.** Have you provided testimony that patents were not infringed or invalid?

**A.** Yes.

**Q.** Well, you were -- you were asked how many times you had declined to work with a patent owner after you had been retained as an expert. Do you --

**A.** That's right.

**Q.** Okay. And now, I think you were drawing a distinction there. Can you explain what you were saying?

**A.** Certainly. The distinction was, I don't always get as far as being engaged, in other words, signing a retainer letter.

When people call me or they email, what they do is they say: We'd like to talk to you. Here's what the case is about. Here's what our side is. Here's what the patents look like.

And I generally spend about a day looking at the patents and thinking about it before I get as far as saying: Okay. This looks interesting. I can help you.

Ninety -- more than 90 percent of the time, I say no.

**Q.** You were also asked some questions about your expertise and, again, in particular whether you had ever designed an ELD device. Do you remember that?

**A.** Yes, I do.

**Q.** Do you need to have designed an ELD device to render opinions about the patents in this case?

**A.** No. No. The patents don't get into the detailed circuitry. One would have to be an expert in circuits to talk about that. But even in that case, one would not have to specifically have designed those particular circuits before. But with regard to these patents at suit, no, one does not have to know the circuitry of an ELD.

**Q.** Okay. You were also asked some questions about an email alias Motive had used in some of the emails that we had reviewed.

Do you recall that?

**A.** Yes, I do.

**Q.** As part of that questioning, you mentioned someone named Obaid Khan. Do you remember that?

**A.** Yes, I do.

**Q.** Do you remember that Mr. Khan was not actually deposed at all in this case? He didn't give a deposition?

**A.** That's correct.

**Q.** Now, do you recall that Mr. Makani was deposed?

**THE COURT:** Yes, please.

(Brief pause.)

**MR. DEORAS:** Mr. Schlaifer, can you pull up PDX 7.161?

(Document displayed.)

**BY MR. DEORAS:**

**Q.** Okay. Now, Dr. Wicker, you were asked about this slide in your cross-examination, and you were explaining what -- what this slide did in terms of opening a socket.

Can you refresh the jury on what that issue is?

**A.** That's correct. So what this piece of code does, is it opens a socket transport channel for HTTP communications. So, again, a socket is a construct that has all the necessary information, so that the application just has to literally drop a communication into the socket and it comes out the other end.

**Q.** And then you were asked on cross-examination about a GET command. That's on Line 826.

What is this code right here that's at Line 824 to 827?

**A.** Okay. So this is a GET command. It's getting various kinds of information, requesting various kinds of information using HTTP.

**Q.** So there's a comment on 824. What does it say that this, this function is doing?

**A.** What it's doing is it's copying the HTTP base URL. It's making a copy of the locator that's used to access information.

**Q.** Does that tell you that this functionality is only sending

GET requests to the web server?

**A.** No, it does not say that. It's copying the URL, so you could have other types of requests as well.

**Q.** Okay.

**MR. DEORAS:** And so if we could turn, Mr. Schlaifer, to Exhibit 282, which was one of the documents that we had talked about in your testimony yesterday, and go to Page 47.

(Document displayed.)

**BY MR. DEORAS:**

**Q.** Does the Vehicle Gateway send ELD messages to the server and receive requests from the server?

**A.** Yes, it does.

**Q.** What are you showing on this slide?

**A.** What this slide shows is how the Vehicle Gateway communicates through two different ways.

First, we have ELD messages, Electronic Logging Device messages. The vehicle generator generates these messages to build features, and these are sent to the K2 web.

We also have core IT services that allow the back end and mobile to request additional data. So this is when the back end decides it's interested, for example, in a video. And so it will send a request in the other direction. And when that other direction is being used, it is the Vehicle Gateway that's the server, and the client as the back end.

**Q.** We'll move to the '628 patent.

You were asked some questions about the Driver I.D. information.

Do you recall that?

**A.** Yes, I do.

**Q.** Let's go to slide PDX 7.64.

(Document displayed.)

**Q.** Okay. So I'm just going to use this slide because it has the claim language on it. I want to ask you some questions about the claim language.

Now, the first part of the claim language says (as read):

"Accepting inputs of driver information from a user."

And what have you identified as the inputs of driver information from a user?

**A.** That would be the driver inputting their user name and password.

**Q.** And does that relate to the identity of the driver?

**A.** Yes, it points towards the driver.

**Q.** Is that information then transmitted to the Motive back end?

**A.** Yes.

**Q.** Is it associated with additional information that relates to the identity of the driver?

**A.** Yes. The Motive back end will then provide the device with the driver's unique I.D.

(Document displayed.)

**Q.** Did you also look at information about -- other information about whether Omnitracs and Motive compete?

**A.** I do. So, like I said, it was important for me to understand the industry as a whole. So my understanding is that this is a -- it's a pretty big market. In 2023, it was estimated to be about 7.4 billion.

And then what I'm showing down at the bottom here is the overall market share for just the camera only. So what's on the left, it says "Video Telematics." This is the camera only market share. And you can see that Motive is about 14 percent. Omnitracs is about 8 percent.

And then to the right is the connected truck telematics. And this is more like the ELD compliance side of the market. And you can see Omnitracs and Motive, their positions within that overall market.

**Q.** And, now, before Motive had the products that we've been discussing in this case, how competitive was Motive in these markets?

**A.** So they're very competitive in these markets. So the two companies compete direct, head to head as we saw, as we've seen all week.

**Q.** And now -- when Motive first started, it offered a free app. Do you recall that?

**A.** I do, yes.

**Q.** And when Motive was offering that free app, was it competitive in these markets?

**A.** It was not. I mean, that free app, I think we just saw, it provided logging, but it didn't provide things like compliance.

**Q.** And, now, over the time period that you studied, what were Motive's sales for the products accused in this case?

**A.** I believe it was over a billion dollars.

**Q.** So if we go to the next slide.

(Document displayed.)

**Q.** Did you see any other information about whether Omnitracs and Motive compete?

**A.** I have. So there's obviously lots of documents, and we've seen a number of them over the week, about how they -- the parties compete. What I'm showing here, this is a transcript from a conversation from a company called Tegus, who interviewed a former general manager and senior director at KeepTruckin, which we know is Motive. And it's a long conversation, but one of the questions was asked was about competitors. And this person said (as read):

"Our Number 1 competitor was, and I think still is, Omnitracs.

And separately said (as read):

"Number 1, I think KeepTruckin should be worried about Omnitracs."

**Q.** Now, if we could just go back to 8.5 briefly. I forgot to note just for the record that on this slide was Exhibits 176, 236 and 3140.

And now if we go to slide PDX 8.7.

(Document displayed.)

**Q.** Were there any internal documents that Motive created that factored into your analysis?

**A.** There were. So what I'm showing on this slide is actually Motive's battle card about Omnitracs. So we had plenty of convers- -- there was plenty of discussion over the last couple of days about Omnitracs's battle card about Motive. This -- what I'm showing here is this is a very similar one that Motive had about Omnitracs.

**Q.** And if you look in the -- I know it's very small. But on the -- in the green part up at the top, it says -- there's a reference to traps and how to win.

**MS. SCHMIDT:** Thank you, Mr. Schlaifer.

**BY MS. SCHMIDT:**

**Q.** Is that similar to information that we saw in Omnitracs's battle card?

**A.** Yeah. If I remember correctly, these titles were almost exactly the same as what we saw in Omnitracs's battle card against Motive. So this is a very common format to use in these battle cards.

**Q.** And when one company has a battle card with another

**THE COURT:** Good afternoon.

**THE WITNESS:** Good afternoon.

**THE COURT:** Please remain standing to be sworn.

**SHOAIB MAKANI**,

called as a witness for the Defense, having been duly sworn, testified as follows:

**THE WITNESS:** Yes, I do.

**THE CLERK:** Thank you. Go ahead and have a seat.

**THE WITNESS:** Thank you.

**THE CLERK:** Make sure you speak clearly into the microphone for our court reporter and slowly so they can get every word.

**THE WITNESS:** Yes.

**THE CLERK:** Can you please state your full name for the record and spell your last name.

**THE WITNESS:** Shoaib Makani. Last name Makani, M-A-K-A-N-I.

**THE COURT:** You may proceed.

**MR. RAY:** Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. RAY:**

**Q.** Good afternoon, Mr. Makani.

**A.** Good afternoon.

**Q.** Would you please introduce yourself to the jury?

**A.** Hi. My name is Shoaib Makani. I'm the founder and CEO of

Motive. I live in San Francisco with my wife, my daughter and our dog Pico.

**Q.** Mr. Makani, how long have you been CEO of the company?

**A.** I have been the CEO of the company more or less since inception. So 2013.

**Q.** Could you currently provide the jury a brief overview of your educational background?

**A.** Yeah. I grew up in Texas. Went to high school at the Texas Academy of Mathematics and Science. After which I went to the London School of Economics to get a degree in government and econ.

**Q.** And after university, what did you set out to do?

**A.** I knew I wanted to build things. I wanted to solve problems. And so I took a job at Google. This was in 2006. So earlier days of Google I guess you could say. And I went there to learn how technology products were built and to contribute in a small way.

And then ultimately left Google to, you know, continue that journey.

**Q.** And what brought to you Motive?

**A.** I -- I very much went to Google, and then into venture capital after that, with the intention of building something and finding a meaningful problem in the world to solve. And in that pursuit took me into a number of different industries.

And I arrived in trucking principally because -- and

Motive, ultimately, because I wanted to solve a real world problem, something physical and tangible. I wanted to solve a problem in an industry that was big and impactful.

And then importantly, I wanted to go after a problem that was relatively underserved from a technology perspective. I wanted to go after an industry that -- where great tools had not been built for these people. And that ultimately led to what we started with Motive.

**Q.** And broadly speaking, what does Motive do?

**A.** Motive -- our mission is to build tools to improve the safety and productivity of organizations that do physical work. And very specifically what that means is we build hardware to bring vehicles and physical equipment online and connect it. And importantly, also build AI powered cameras that observe drivers, observe the road, detect unsafe behaviors, prevent collisions, and, you know, ultimately save lives.

**Q.** Today how many employees does Motive have?

**A.** We have almost 4,000 employees.

**Q.** And about how many customers does Motive have?

**A.** Around 100,000 customers.

**Q.** Where are Motive's offices located?

**A.** We're headquartered here in San Francisco. This was where the company was founded. We have offices in Nashville, Buffalo, New York, Austin, Texas now, Canada, Taiwan, Pakistan, India, Mexico, and soon the UK.

**Q.** Thank you.

Did you prepare a few demonstratives to facilitate your testimony today?

**A.** I have.

**MR. RAY:** Your Honor, I request permission to publish Mr. Makani's demonstratives, MDX 4.

**THE COURT:** You may.

Just a reminder to the jury that this is a demonstrative, so it's not something you will have in evidence, but just so the witness can explain his testimony to you.

**MR. RAY:** If we can go, Mr. Reed, to the next slide.

(Document displayed.)

**BY MR. RAY:**

**Q.** Mr. Makani, has Motive received any awards or recognitions for its work?

**A.** Yes. Yeah. We have received -- I think we have been recognized for two things: Building great technology products as judged and evaluated by our customers in the market, and then also building an exceptional culture at the company where we're able to track great talent. People feel enabled and empowered to do great work. We have incredible retention.

I think it's one of the great joys of building the company is getting great people together to solve a hard problem.

**Q.** All right. We can go to the next slide.

(Document displayed.)

**A.** Yes, I do. He has been working on hardware systems and vehicle telematics systems for 35 years and has -- he had a breadth of knowledge.

**Q.** Finally, at the end of this email, the last dashed sentence he says (as read):

"XRS may bring up the issue of patents. I'm not familiar with many of the XRS patents, but I do know that their Turnpike product does basically the same thing the XRS product does. And the Turnpike product is several years older than the XRS product and has been in the field for several years."

Do you see is that?

**A.** I do.

**Q.** Now, taking into stock this entire email, did you think there was a possibility at this time in 2016 that XRS would sue Motive?

**A.** No.

**Q.** Why not?

**A.** I think having first-hand knowledge of how we designed our products, how we implemented them, and then of course confirmed by the contents of this email which breaks it down and makes it so clear, I'd say I had no doubt that we had built our technology independently.

And, also, that our technology was better. And better inherently means different. And you just have to talk to

customers to understand how and why we were better. That was very clear.

**Q.** Now, two years later in 2018 --

**MR. RAY:** You may take that down Mr. Reed, thank you

(Document removed from display.)

**BY MR. RAY:**

**Q.** -- Ray Greer, the CEO of Omnitracs reaches out to you; right?

**A.** That's right.

**Q.** What did he want?

**A.** I wasn't sure initially, but I invited him to the office and he -- he came.

**Q.** And what was your impression of the first meeting?

**A.** It was, I guess, odd. He made overtures that we should combine or that Omnitracs should acquire Motive. Yeah.

**Q.** And about when did that meeting occur, if you recall?

**A.** I think it was sometime in mid, early 2018.

**Q.** Okay. And, thereafter, did he send you a letter?

**A.** He did.

**Q.** All right. Let's go put up on the screen Exhibit 163, which is already been admitted into evidence.

(Document displayed.)

**Q.** Mr. Makani, is this the first letter that Mr. Greer sent to you?

**A.** Yes.

**Q.** And what was your reaction when you received this letter?
**A.** I was, I'd say, surprised, but he -- he alluded to -- when I said we were not interested in being acquired and that we were going to continue to be independent in that -- in that initial meeting, he said something about patents and brought that up and so in some ways telegraphed perhaps this letter.
**Q.** So the letter lists five patents. Did you personally analyze any of these patents after receiving the letter?
**A.** I did not.
**Q.** Why not?
**A.** Patents are hard to understand if you're not an expert in patent law, I would say. And so I knew I wasn't going to be able to decipher them, and so I shared it with our legal team, who are experts in that.

**MR. DE VRIES:** Sidebar, Your Honor.

(Proceedings held at sidebar.)

**THE COURT:** So we just -- let's just repeat what we said.

**MR. DE VRIES:** I specifically told him not to say that. I told him that was off limits.

**THE COURT:** What remedy does Plaintiff propose?

**MR. DE VRIES:** Well, two things. One is it was obviously a violation of the Motion in Limine in a way that is unexcusable.

I think that we're going to need an instruction from the

Volume 6

Pages 1068 - 1223

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RITA F. LIN

| | |
|---|---|
| OMNITRACS, LLC, et al,<br><br>Plaintiffs,<br>vs.<br><br>MOTIVE TECHNOLOGIES, INC., et al,<br><br>Defendants. | No. C 23-5261 RFL<br><br>San Francisco, California<br>Friday<br>April 18, 2025<br>8:15 a.m. |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

**For Plaintiffs:**

KIRKLAND & ELLIS, LLP
555 California Street
San Francisco, California 94104
**BY: ADAM R. ALPER, ESQ.**
**AKSHAY S. DEORAS, ESQ.**
**KYLE CALHOUN, ESQ.**

KIRKLAND & ELLIS, LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
**BY: N. YVONNE STODDARD BEELER, ESQ.**
**MICHAEL W. DE VRIES, ESQ.**

KIRKLAND AND ELLIS, LLP
601 Lexington Avenue
New York, New York 10022
**BY: LESLIE M. SCHMIDT, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

***Reported By:*** ***Debra L. Pas, CSR 11916, CRR, RMR, RPR***
*Official Reporter - US District Court*
*Computerized Transcription By Eclipse*

which is what you asked about.

**Q.** And if you go to the top email -- I'm sorry, the middle email. Teresa Coey writes an email that says (as read):

"Hey guys, our portal for Omnitracs is up and running if anyone wants to play around or look at it."

Is that right?

**A.** Yes.

**Q.** And then if we look at your response, you write (as read):

"Awesome. I will put this in my Honda Pilot. See below."

And then you provide the VIN number for your vehicle; is that right?

**A.** That's right.

**MR. DE VRIES:** Mr. Schlaifer, you can take that down.

(Document removed from display.)

**A.** This wasn't for the XRS product, though. There's a distinction between the XRS product and the MCP50.

**BY MR. DE VRIES:**

**Q.** You took an Omnitracs product and you put it in your vehicle?

**A.** You asked about the XRS product. Those are two different products. You know that; right?

**Q.** Okay. So you took an Omnitracs product and you put it in your vehicle?

**A.** MCP50, which is a -- a very distinct product from the XRS

product.

**Q.** Okay. And you took that product and you put it in your vehicle?

**A.** It seemingly -- I suggested that it should be installed in my vehicle, yes.

**Q.** Okay. You testified during your direct examination about a meeting that you had, an in-person meeting, with Ray Greer in the middle of 2018.

Do you recall that?

**A.** Yes.

**Q.** And you testified that during that meeting, Mr. Greer made overtures that we should combine or that Omnitracs should acquire Motive; right?

**A.** Yes.

**Q.** And you also told the jury that when you said that we were not interested in being acquired, he said something about patents; right?

**A.** He got aggressive and -- and tried to bully, yes.

**Q.** Right. And you told the jury that when you said you were not interested in being acquired, Mr. Greer said something about patents; right?

**A.** He said that we -- he brought up patents, yes, in an attempt to essentially bully us, yes.

**Q.** Last year all you could recall about that meeting was that you talked about the fact that you were kind of complimentary,

they are upmarket, you were an SMB. Mr. Greer expressed interest in -- in what you were doing. He was interested in what you were up to.

That's all you could remember about that meeting last year; right?

**A.** If that's what's in the record, yes.

**Q.** And last year you didn't recall Mr. Greer bringing up the topic of any Omnitracs or XRS patents at that meeting; isn't that the truth?

**A.** I'm not sure what the record says.

**Q.** Okay. Could you please turn to your deposition testimony? It's that first one in the binder.

(Witness complied.)

**Q.** If you could look at Page 239 at Line 11.

**A.** Yep.

**Q.** You were asked (as read):

"**QUESTION:** Did Mr. Greer ever bring up the topic of any Omnitracs or XRS patents?

"**ANSWER:** I -- I don't recall from that meeting, but I've seen the communication afterwards in the -- in the process of this deposition prep, but I don't remember in the meeting specifically."

Was that your sworn testimony last year?

**A.** That was the testimony. I've clearly since then remembered.

**A.** Sure. My name is Abhishek Gupta. I'm here from -- locally here from the Bay Area. Grew up in the East Bay, and now live in San Francisco with my wife and four-month-old son.

**Q.** Mr. Gupta, who do you work for?

**A.** I work for Motive Technologies.

**Q.** And what's your current role?

**A.** Currently, I'm vice president of product management.

**Q.** Can you tell the jury what you do as the vice president of product management?

**A.** Sure. My responsibilities are to deliver high value, quality products for our customers. I'm responsible for managing a broad product portfolio and developing the strategy, roadmap, and subsequent execution against that product portfolio.

I am also a champion for our customers, trying to deeply understand our customers's pain points, needs and requirements in order to be able to translate those into winning products.

I'm also responsible for bringing products successfully to the market. That means working with a very cross-functional group across sales, marketing, finance, engineering, you know, design data science.

And I'm also responsible for setting the goals and objectives for our organization. Setting the key performance indicators that, you know, help us measure our success, as well as setting the pace of innovation.

**Q.** Thank you. How big is your product management team at Motive?

**A.** My team is an organization of 40-plus individuals.

**Q.** Mr. Gupta, have you ever testified in front of a jury before?

**A.** No.

**Q.** Have you ever been in court before?

**A.** Yes.

**Q.** Are you nervous?

**A.** Yes, but also optimistic.

**Q.** All right. Let's talk just a bit about how you became the vice president of product management at Motive.

Where did you go to school?

**A.** I went to school across the -- across the Bay at University of California, Berkeley.

**Q.** And when did you start at Motive?

**A.** I started in the summer of 2019.

**Q.** Now, the jury has heard quite a bit about Motive's products, but could you just briefly explain what the current offerings are at Motive right now?

**A.** Sure. Motive offers the AI-powered integrated operations platform. That means that there are multiple products that help our customers reach better business outcomes. We offer our Driver Safety products, which allow them to detect and monitor and improve unsafe driving behaviors.

We also offer our fleet management products, which are meant to help them manage their vehicles at scale.

We also offer our equipment monitoring products, which are for monitoring equipment and assets.

Then, lastly, we offer our Spend Management Suite, which is for monitoring and tracking spend through the Motive card.

**Q.** And could you explain to the jury how your product management team fits at Motive? Is it related to marketing, engineering? Can you just give them an idea where it fits in product development?

**A.** Sure. Product management team, and product management in general, is at the center of bringing products to market. We work across the board with various departments within a company. Primarily we work with engineer as their business counterpart, but we also work very closely with marketing teams.

And so, for us, product development is an extremely important process.

**Q.** Thinking about inception when you're just starting to develop a product, can you list some of the factors that you consider when deciding to develop a product?

**A.** Sure. When we think about developing new products and where to invest, we look at, I would say, four major factors.

First, we understand the market. Is this a market -- how is this market being served and how is its customers being

served today? What are the various customer segments? What are the key value propositions and use cases and challenges that they have? What is the, you know, total opportunity size and addressable market, and, you know, customer's willingness to pay within that market?

We also look at industry. Industry, it's a little bit different than market in the sense that it's on a different horizon, and we really look at more factors that are pushing the industry.

So, for example, we look at where is this industry going in five years? Or other certain technology trends that are pushing that industry in a certain direction, or are there regulatory components or barriers to entry within that industry?

We also try to deeply understand our customers's workflows. This means understanding what are our customers trying to accomplish? What are the jobs that they have? How do existing products in the market today that they're using either meet those requirements or don't meet those requirements?

And then, lastly, we look at what we would consider competitive data. We look at existing products in the market. We try to understand those products in the -- in relation to our customers's workflows to be able to say: Are these products -- are -- is there room for improvement on these

products? Is there room for innovation or differentiation?

Using all these four factors, you know, we'll typically decide whether it's worth investing or developing a new product.

**Q.** Thank you.

You talked a little bit about competition. Who do you consider to be Motive's main competitors today?

**A.** We consider our main competitors across three areas: Safety, operations and finance.

In safety, we consider our main competitors to be Lytx, Samsara, Netradyne and SmartDrive.

**Q.** Omnitracs and XRS are not on that list. Are they not Motive competitors?

**A.** They are competitors, but they're not the primary competitors that we typically see in most competitive situations.

Generally where we see them is when customers are trying to replace them with some of the newer -- the newer products in the market.

**Q.** You told the jury a bit about competitive analysis and how that factors into your decision to bring products to market.

Can you describe for them a bit about what competitive analysis looks like at Motive?

**A.** Sure. Competitive analysis is really about synthesizing a variety of different inputs and, you know, from different

sources. So, for example, you know, we look at, you know, financial information that, you know, companies are sharing. Quarterly earnings reports or, you know -- you know, various quarterly updates.

We look at marketing information, information on the website, press releases, trade shows. We look at training or support material. Any sort of guides that they publish.

We also, you know, will use -- utilize their product. We will try to understand how their product works. We will take all of these various pieces and synthesize it into, using my team or the competitive intelligence team at Motive, to be able to distill it into what we consider things like competitive battle cards. These help our -- you know, our internal employees determine how to position Motive's value against our competitors. And once we develop these, we'll obviously disseminate them within the company.

**Q.** Thank you.

The jury has heard the term "feature parity" throughout the case. Do you have an understanding of what that term means?

**A.** Yes. To me, feature parity means really understanding the universe of capabilities that companies provide to customers, and really trying to understand the similarities and differences between them.

So, for example, in the Driver Safety domain for our

customers, our -- you know, many of our customers consider the -- having an AI-powered Dashcam to be a similar capability across all these competitors. It's considered table stakes. You have to be competitive in order to be able to, you know, win these customers.

However, feature parity also allows us to see the differences between all of these different competitors. It allows us to see what is each competitor uniquely good at? What are they different at? And it also allows us to determine whether it's something that is worthwhile for us to invest in, or, more importantly, not invest in.

So feature parity is really understanding this universe and mapping all the capabilities across competitors.

**Q.** Do you do this type of analysis for all Motive competitors?

**A.** Yes.

**Q.** And are you aware of your competitors doing this to Motive?

**A.** Yes. It's a very common industry practice done across technology. And, you know, we're aware our competitors do it as well.

**Q.** Do your customers ever talk to you about competitors's products?

**A.** Yes, all the time.

**Q.** And the jury has heard about an instance from your

deposition testimony that was played earlier in this case about a customer called Atech Logistics.

Can you tell the jury who Atech Logistics?

**A.** Sure. Atech Logistics is a distributor. They're actually based here locally in Santa Rosa. They've been with Motive since about 2017, and utilize our Vehicle Gateways for fleet management and cameras for Driver Safety.

**Q.** Do you recall having a conversation with Atech Logistics about competitor products in 2019?

**A.** Yes.

**Q.** And which competitor was that?

**A.** SmartDrive.

**Q.** And why was Atech Logistics talking you to about SmartDrive?

**A.** Sure. So back in 2019, you know, Atech was trying to consolidate their use of vendors into a single vendor. At the time, they used Motive for -- you know, for ELDs and for fleet management, and utilized SmartDrive for Driver Safety.

They were utilizing or trialing our Smart Dashcam product at the time, and wanted to provide us some feedback on how it doesn't necessarily meet the requirements for what their business needs at the time.

In order to explain the requirements that they have as a business, the challenge that they're facing, they explained within the context of the SmartDrive product that they were

using at the time to be able to articulate what their needs are. And, you know, how SmartDrive and Motive at the time didn't necessarily meet their needs.

We told them we were also working on an AI Dashcam at the time, so they were very interested in consolidating to that, to Motive, because they liked us and wanted to give us feedback on what we could do with the AI Dashcam to be able to meet the requirements.

**Q.** So if I'm understanding, it sounds like Atech Logistics, they were -- were they both a Motive and SmartDrive customer at the time?

**A.** Yes.

**Q.** So they had two systems, and one of them was for ELD, and one of them was for cameras?

**A.** Right.

**Q.** Okay. And then it sounds like they were giving you feedback about the Smart Dashcam; is that what you said?

**A.** Yes, which was a Motive product at the time.

**Q.** And then there was a later camera product; is that right?

**A.** That's right.

**Q.** And what was that one called?

**A.** The AI Dashcam.

**Q.** Okay. But that had not been released yet at this time?

**A.** No.

**Q.** But was development already in progress of the AI Dashcam?

**A.** Yes. We had already kicked off development and design decisions.

**Q.** Okay. And it sounds like Atech was describing what they needed and you had a conversation about it.

Did you take that information back to Motive?

**A.** Yes. I utilized it as a part of our product development process.

**Q.** Why?

**A.** Because we listen to what our customers have to say. It's important to ensure their feedback is taken into account as we develop new products.

**Q.** I'd like to bring up Trial Exhibit 361. And I believe this is already admitted.

(Document displayed.)

**Q.** Mr. Gupta, what is this presentation?

**A.** This is the presentation that was made after the -- the visit to Atech Logistics summarizing the key takeaways that we learned about Atech, as well as SmartDrive product from them.

**Q.** Thank you.

And is this the presentation that summarizes the conversation with Atech Logistics?

**A.** Yes.

**MS. TARASI:** If we can flip down two slides, I think, Karl?

Keep going.

One more.

(Document displayed.)

**BY MS. TARASI:**

**Q.** Okay. What is this --

**MS. TARASI:** Actually, can you go to the next slide, Karl? Let's start and do this in reverse of whatever Mr. Gupta did.

(Document displayed.)

**BY MS. TARASI:**

**Q.** Mr. Gupta, can you tell the jury what they're seeing here?

**A.** Sure. These are photos taken of the SmartDrive platform that, you know, was demonstrated during the meeting.

Atech Logistics was trying to articulate various shortcomings that they had in the SmartDrive platform, as well as the Motive platform, and they logged into their -- you know, their computers and wanted to show us, you know, some shortcomings, specifically focusing on video quality, for example.

**THE COURT:** Just for the record, will you say what page it is --

**MS. TARASI:** Oh, sorry.

**THE COURT:** -- of the exhibit?

**MS. TARASI:** It is Page 6 of the exhibit. Thank you. So 361.6.

**BY MS. TARASI:**

**Q.** It sounds like this was something that was happening while you were having the conversation with Atech Logistics; is that right?

**A.** Yes.

**Q.** So this is while you were there?

**A.** Yes.

**Q.** Understood.

**MS. TARASI:** And then if you can go up, Karl, to 361.5.

(Document displayed.)

**BY MS. TARASI:**

**Q.** Mr. Gupta, what is this showing?

**A.** This is showing some -- the SmartDrive hardware that Atech Logistics had at their office. And they were highlighting it to us within the context of some product decisions that we were making.

The key takeaway is we had decided to build a camera product that was the exact opposite that this -- you know, this -- these capabilities were, and Atech Logistics helped us validate our decision.

**MS. TARASI:** Karl, could we bring up Mr. Gupta's slides?

**BY MS. TARASI:**

**Q.** Mr. Gupta, did you prepare a couple slides for the jury to

help understand this concept of the difference?

**A.** Yes.

**Q.** And are these your slides?

**A.** Yes.

**MS. TARASI:** Permission to publish?

**THE COURT:** You may.

This is another demonstrative exhibit, which won't be in evidence, but will help Mr. Gupta explain his testimony to you.

**MS. TARASI:** If we can go to MDX 2.2.

(Document displayed.)

**BY MS. TARASI:**

**Q.** Mr. Gupta, what is this slide showing?

**A.** This slide is showing how SmartDrive's camera product, the hardware components that made their camera product at the time.

What this slide explains is, you know, SmartDrive at the time in order to provide AI camera capabilities had three different hardware components. There's the camera, which is the blue box, which is, you know, could be installed to the windshield, which is connected to a green box, which is the AI box, which is doing some of the AI processing. And then that was connected to the red box, which is playing the audible alerts.

SmartDrive's solution at the time, in order to provide AI camera capabilities, utilized these three components to make up the product.

**Q.** Yes. Okay. So this is the -- this is the opportunity for Motive.

And in the second row under "Driver Monitoring," you say (as read):

"Significantly behind with lack of edge AI detection."

You see that?

**A.** Yes.

**Q.** You meant that Motive was significantly behind SmartDrive with the lack of edge AI detection; right?

**A.** Yeah. I mentioned it's a opportunity area for Motive, yes.

**Q.** But currently, as of November 2019, Motive was significantly behind; right?

**A.** Yes.

**Q.** Okay. Now, over a year later, Motive decided to release its AI Dashcam product; right?

**A.** Yes.

**Q.** And so --

**MR. DEORAS:** You can take that down, Mr. Schlaifer.

(Document removed from display.)

**BY MR. DEORAS:**

**Q.** You'd agree that one of the companies that Motive looked at when it was developing its AI Dashcam product was SmartDrive; right?

**A.** Sorry. Can you rephrase that question?
**Q.** Sure. One of the -- one of the specific companies that Motive looked at when it was developing its AI Dashcam product was SmartDrive; right?
**A.** Yes, one of -- yes, multiple -- yes, we looked at multiple companies, and SmartDrive was one of them.
**Q.** Okay. And Motive uses information about a competitor's offerings to determine what features to include in its new products, like the AI Dashcam; right?
**A.** Yes, as I mentioned, we look at it in the context of our customers. And so any competitive data is generally used in the context of what our customers care about.
**Q.** Okay. But you and your team don't do any research to figure out if the features that you're adding from those competitor products are covered by any competitor patents; right?
**A.** Can you repeat that question again?
**Q.** Sure. You and your team don't do any research to see if the features that you're going to be adding from those competitor products are covered by any competitor patents?
**A.** No, that is not within my responsibilities.
**Q.** Okay. And so when you get these requests, like the request you got from Atech, from customers, to say: Hey, please match the capabilities of this competitor, you don't do any research beforehand to see if those features might be

covered by a patent that that competitor has; right?

**A.** No, I -- I -- no, those are not part of my responsibilities.

**MR. DEORAS:** No further questions, thank you.

**THE COURT:** Further redirect?

**MS. TARASI:** Nothing further. Thank you.

**THE COURT:** This is the jury's opportunity to submit any questions you would like the Court to ask Mr. Gupta. If you have a written question you'd like to submit, please raise your hand.

(No response.)

**THE COURT:** I don't see any hands. I will excuse Mr. Gupta.

Thank you, sir.

**THE WITNESS:** Thank you.

(Witness excused.)

**THE COURT:** Will Motive call its next witness.

**MS. TARASI:** This is where we need to bring a chair to the witness stand -- or to the attorney stand, Your Honor.

**THE COURT:** Fine.

(Brief pause.)

**MR. FALIK:** Motive would like to call Mr. Albert Choi.

**ALBERT CHOI**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

**THE CLERK:** Make sure you speak clearly into the microphone for our court reporter. Will you please state your name for the record and spell your last name.

**THE WITESS:** My name is Albert Hyun Jong Choi, C-H-O-I.

**THE COURT REPORTER:** Could you please spell Hyun Jong, please?

**THE WITNESS:** H-Y-U-N, J-O-N-G.

**THE COURT:** Would you move the microphone just a little bit closer to you, but not too close. That's perfect.

You may proceed.

**MR. FALIK:** Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. FALIK:**

**Q.** Good morning, Mr. Choi. Could you please introduce yourself to the jury?

**A.** Hi. My name is Albert Choi. I am a Bay Area native. I was born and raised here, and I went to school here as well. I went to San Jose State.

I currently live in Castro Valley and I am raising my two boys there with my wife.

**Q.** And did you prepare a set of slides for us today?

**A.** Yes.

**MR. FALIK:** Could we pull those up, Mr. Reed?

Also, I apologize. You're going to be one of the only

Mr. Choi TX-1824, please?

(Document published to the witness.)

**THE COURT:** Do we have it switched over for just the witness and attorneys?

**MR. FALIK:** Sorry. I have the wrong one. I meant 3502. My apologies. We had duplicates.

Thank you, Mr. Reed.

**BY MR. FALIK:**

**Q.** Can you see that, Mr. Choi? Not yet.

**A.** No, I have a blank screen.

There it goes.

(Document published to the witness.)

**Q.** Mr. Choi, is this a Motive architectural diagram?

**A.** Yes.

**Q.** Have you seen this document before?

**A.** Yes.

**MR. FALIK:** Move to admit TX-3502.

**MS. SCHMIDT:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 3502 received in evidence.)

**MR. FALIK:** Pull it up for the jury now, please.

(Document displayed.)

**BY MR. FALIK:**

**Q.** Mr. Choi, could you talk to us about -- could you speak to us about where the mobile apps fit into this diagram?

**A.** Mobile app, the driver app is on the upper left-hand corner of the -- of this diagram.

**Q.** And what are we seeing here specifically?

**A.** So you see the driver application and how it relates to and talks to our server here through the internet. And then also our communication to our Vehicle Gateway. In this diagram we show Bluetooth here.

**MR. FALIK:** Mr. Reed, could we highlight the mobile app where it shows the mobile phone?

Thank you.

And then the Vehicle Gateway right above that? Not that one, please. Right above the mobile app.

Thank you.

**BY MR. FALIK:**

**Q.** Mr. Choi, why do the VG and the driver app need to be connected?

**A.** So for our compliance product, we need both the Vehicle Gateway and the driver application for the driver to be compliant. So the Vehicle Gateway will collect information from the vehicle. So we take telematics data, such as speed, odometer readings, and then we associate that information on the Vehicle Gateway with GPS location and time stamp.

We'll take that information and then send that over to the driver application to be processed, and then turn into the logs that you saw in the video.

**MR. FALIK:** We can take that down. Thank you, Mr. Reed.

(Document removed from display.)

**BY MR. FALIK:**

**Q.** Mr. Choi, I want to ask you specifically about the log-in process that you showed us in your demonstrative.

When a user enters their user name and password, would it be correct to say that the user name and password is sent from the driver app on the phone to the Vehicle Gateway?

**A.** No, it is not.

**Q.** Why not?

**A.** Because this information is sent to our servers to authenticate and log in our user. And with that, then, we will have the user information from our servers.

**Q.** And what user information is sent to the Vehicle Gateway?

**A.** For the user, we will send over our Driver I.D. number. So this is a value that is created and unique to that user. It is a numerical value. And when we send the user object back from our server when we authenticate the user, this is stored on the driver app.

And then from there, this is how the Vehicle Gateway will identify that driver for the drive and the -- any telematics data that it generates.

**Q.** Do drivers know their vehicle -- I'm sorry, driver identification number?

**P R O C E E D I N G S**

**Friday, April 18, 2025 1:05 p.m.**

**---000---**

(Proceedings held in open court in the presence and hearing of the jury.)

**THE COURT:** Welcome back from lunch, everyone. We are back on the record in the Omnitracs versus Motive trial. I'm here with all the members of the jury as well as counsel for both sides.

I understand Motive is prepared to play a video deposition.

**MR. VALUYEV:** Good afternoon, Your Honor. Eric Valuyev for Motive.

Defendant will now play video selected by both sides from the deposition of Dan Fuglewicz. Dan Fuglewicz is a former employee of XRS and Omnitracs. He is an inventor on the XRS patents. He is also a former employee of Motive.

Motive's designations total 48 minutes. Omnitracs's designations total 14 minutes, 10 seconds, totaling 1 hour, 2 minutes, 10 seconds.

The parties have agreed to admit with this video Exhibit 16, 1827, 1832, 1834, 1836, 1838, 1839, 3466, 3470, 3584 and 4119.

**THE COURT:** Admitted.

(Trial Exhibits 16, 1827, 1832, 1834, 1836, 1838,

1839, 3466, 3470, 3584 and 4119 received in evidence.)

**MR. VALUYEV:** The following exhibits, which have already been moved into evidence, are referenced in this video as well: Exhibit 498 and 525.

Thank you, Your Honor.

**DANIEL FUGLEWICZ**,

called as a witness for the Defendant herein, testified via videotaped deposition played in open court, not reported.)

(Time noted: 1:07 p.m. to 2:10 pm.)

**THE COURT:** Will Motive call its next witness.

**MR. WHITTAKER:** Yes, Your Honor. Motive calls Mr. Pat Miller.

**PATRICK MILLER**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

**THE WITNESS:** I do.

**THE CLERK:** Please make sure you speak clearly into the microphone for our court reporter. And could you state your full name for the record and spell your last name.

**THE WITNESS:** Yes. Patrick Thomas Miller. It's M-I-L-L-E-R.

**THE CLERK:** Thank you.

**MR. WHITTAKER:** May it please the Court. Andrew Whittaker from Motive.

**DIRECT EXAMINATION**

**BY MR. WHITTAKER:**

**Q.** Good afternoon, Pat, members of the jury.

**A.** Good afternoon.

**Q.** Is this your first time in court, Mr. Miller?

**A.** Yes, it is.

**Q.** Are you nervous?

**A.** A little bit, yep.

**Q.** I'm going to ask you questions. You've been sworn to tell the truth. If at any point you need me to rephrase or ask a different question, say you don't understand something, please just let me know and I'll be happy to do that.

And if I ask you a question and you can answer it with a "yes" or a "no," it's Friday afternoon on Easter weekend, so we'd like to move as quickly as we can. All right?

Start off, what's your position at Motive? What do you do for a living?

**A.** So I'm an engineer. I'm the director of telematics at Motive currently.

**Q.** And how long have you been at Motive?

**A.** I've been at Motive for ten years as of next week.

**Q.** Ten years? Over a decade?

**A.** Yeah, it's my second job.

**Q.** I was -- I was in law school when you started. So you started at the company in 2015.

**A.** Yes.

**Q.** What -- you're here to talk about this (indicating); right?

**A.** Yes, absolutely.

**Q.** And what is this?

**A.** That looks like the Vehicle Gateway designed by Motive.

**Q.** Is this the Little Black Box?

**A.** Yes, we use that name interchangeably.

**MR. WHITTAKER:** Your Honor, I'd like to move this into evidence as --

**THE COURT:** Isn't it already in evidence?

**MR. WHITTAKER:** I don't think this one is.

**THE COURT:** Okay. What exhibit number is it?

**MR. WHITTAKER:** 4315.

**MR. ALPER:** No objection, Your Honor.

**THE COURT:** Admitted.

(Trial Exhibit 4315 received in evidence.)

**MR. WHITTAKER:** May I approach the witness?

**THE COURT:** You may.

**BY MR. WHITTAKER:**

**Q.** Pat, why is it called the Little Black Box?

**A.** Well, the name stems from an aircraft crash box essentially, essentially one of those data recorders that every aircraft have where if there was an accident or some kind of malfunction, they could look at data, audio recordings before

and during the accident. So that's where this name came from.

**Q.** And within the industry -- and this jury's heard a lot of evidence about a Vehicle Gateway. Is that a Vehicle Gateway?

**A.** This is a Vehicle Gateway, yes.

**Q.** For the rest of this examination, I'm going to use LBB, or Little Black Box, and Vehicle Gateway.

Are those terms interchangeable when it comes to Motive?

**A.** Yes.

**Q.** Where is that installed?

**A.** So this would typically be in the vehicle cab. It's got a connector on one side that plugs into the vehicle, and it would usually go on top of the dash or inside the dash.

**Q.** And were you involved in the development --

(Court reporter clarification.)

**Q.** Were you involved in the development of that product?

**A.** Yes, I was.

**Q.** Before we talk about the development, I want to talk about you a little bit and your history. Okay?

**MR. WHITTAKER:** Karl, could you please bring up Exhibit 30- -- I'm sorry, flip in your binder --

May I -- may I approach, Your Honor?

**THE COURT:** You may.

**MR. WHITTAKER:** Want to make sure that that's yours.

**BY MR. WHITTAKER:**

**Q.** Flip in your binder to Exhibit 3544.

**A.** Okay, I'm looking at 3544.

**Q.** What are you looking at, sir?

**A.** This is my resume.

**Q.** Did you write it?

**A.** I did, yes.

**Q.** Is it accurate? You didn't embellish on anything in your resume?

**A.** No, it should be accurate, yes.

**MR. WHITTAKER:** Your Honor, I'd move to admit 3544.

**MR. ALPER:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 3544 received in evidence.)

**MR. WHITTAKER:** Karl, pull that up for me.

(Document displayed.)

**BY MR. WHITTAKER:**

**Q.** I looked at this before I ever met you. And I want to draw something to the jury's attention. On the first bullet, underneath University of Buffalo, The State University of New York, I -- the jury can tell that you're a very good engineer because it says "Electrical Engineering, Magna Cum Laud." And you misspelled "Laude." There's an "e" on there. It's a Latin word.

Tell me about your education, sir. Where did you go to school? What did you study?

**A.** Yeah, so I went to the University of Buffalo. I started

Volume 7

Pages 1224 - 1463

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RITA F. LIN

| | |
|---|---|
| OMNITRACS, LLC, et al, Plaintiffs, vs. | No. C 23-5261 RFL |
| MOTIVE TECHNOLOGIES, INC., et al, Defendants. | San Francisco, California<br>Monday<br>April 21, 2025<br>8:15 a.m. |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**SEALED PROCEEDINGS REDACTED**

**APPEARANCES**:

**For Plaintiffs:**

KIRKLAND & ELLIS, LLP
555 California Street
San Francisco, California 94104
**BY: ADAM R. ALPER, ESQ.**
**AKSHAY S. DEORAS, ESQ.**
**KYLE CALHOUN, ESQ.**

KIRKLAND & ELLIS, LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
**BY: N. YVONNE STODDARD BEELER, ESQ.**
**MICHAEL W. DE VRIES, ESQ.**

KIRKLAND AND ELLIS, LLP
601 Lexington Avenue
New York, New York 10022
**BY: LESLIE M. SCHMIDT, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

***Reported By:*** ***Debra L. Pas, CSR 11916, CRR, RMR, RPR***
*Official Reporter - US District Court*
*Computerized Transcription By Eclipse*

(Court reporter clarification.)

**MR. FALIK:** My name is Roy Falik, F-A-L-I-K. And please tell me if the microphone is in a good spot.

**THE COURT:** Good morning. Please remain standing to be sworn. Thank you.

(The following proceedings, Page 1250, Line 8 through Page 1286, Line 14 are sealed by Order of the Court.)

| | |
|---|---|
| **Dkt. 480 (public)**<br>**Dkt. 481 (sealed)** | **Appx11258-11260,**<br>**Appx11273-11282,**<br>**Appx11288-11292** |

# FILED UNDER SEAL

# PAGES FOUND IN CONFIDENTIAL VOLUME

(The following proceedings were held in open court.)

**MR. RAY:** Your Honor, Motive calls as its next witness Mr. Chris Wilson.

**CHRISTOPHER WILSON**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

**THE WITNESS:** I do.

**THE CLERK:** Thank you. Please be seated.

State your full name and spell your last name for the record.

**THE WITNESS:** My full name is Christopher Kenneth Hoover Wilson, W-I-L-S-O-N.

log on your phone; right? I read that correctly?
**A.** You did read that correctly. But obviously, as we've seen, the Turnpike was an electronic log on the phone.
**Q.** Now, XRS had the idea of electronic logging on a phone before Motive decided to do this; right?
**A.** Again, I believe Turnpike, in my opinion, was an electronic log on a phone well before Motive decided to do this.
**Q.** But that's not the way that we saw in the documents in evidence in this case. That's not the way it's referred to in the documents; right?
**A.** I'm sorry. What is not referred to?
**Q.** I'll show you. Let's call up Exhibit 305. This is an admitted exhibit.
And if we could pull up about the first half. Yeah.
(Document displayed.)
**Q.** This is an email from Mr. Khan in June 2013 to Mr. Makani and others at KeepTruckin; right?
And if we go down to the first full paragraph, at the end Mr. Khan says (as read):
"The story that caught my eye was the XRS Corp. one."
And if we go down to the next paragraph, the second paragraph below that, it says (as read):
"XRS Corp. Monday debuted its new XRS product,

what the company labeled the trucking industry's first and only complete mobile platform for compliance and fleet optimization."

Do you see that?

**A.** I do.

**Q.** That does not sound routine and conventional; correct?

**A.** That does not sound routine and conventional but there's quite a bit more here.

**Q.** Okay. And that's in June, 2013; right?

**A.** Yes.

**Q.** That's when Motive was founded; right?

**A.** Somewhere around there, yes.

**Q.** And Mr. Makani is on this email; right?

**A.** Correct.

**Q.** But if we now call up PDX 13.6 again.

(Document displayed.)

**Q.** He got up in front of the jury to testify here; right? Yes?

**A.** Yes, he did.

**Q.** And he says. That. Concept didn't exist when they started their company; right?

**A.** He did say that, but, again, we know that the Turnpike was already out there. So maybe he was just unaware of it. I don't know.

**Q.** And if we look at Exhibit 305, when the Motive folks are

talking about this, they are talking about XRS and not Turnpike; right?

**A.** I believe by this time Turnpike had been incorporated into XRS. But they are talking about XRS here, yes.

**Q.** Okay. Let's talk a little bit about Turnpike. A good transition.

You testified that you believed that the patent claims are obvious in view of the Turnpike system; right?

**A.** I did.

**Q.** Okay. Now, Turnpike was founded by Mr. Sekula and his team; right?

**A.** That's my understanding, yes.

**Q.** Okay. And Mr. Sekula is also an inventor on the XRS patented issue here; right?

**A.** Correct.

**Q.** And he also developed the XRS system; right?

**A.** He was involved in that, yes.

**Q.** Yes. And one of your tasks in this case was to identify prior art to show that Mr. Sekula's patents are invalid; right?

**A.** That's correct.

**Q.** Okay. And as part of that task, you could look at any prior art in the whole world; right?

**A.** That's true.

**Q.** And of all the prior art in the world, the only prior art that you presented to the jury for the independent claims of

prior art that they thought was relevant, that they thought would create an issue, they did not raise Turnpike. Turnpike did not make the cut; right?

**A.** That is my recollection, yes.

**Q.** And Turnpike is the only prior art you rely on for invalidity of the independent claims of the '628 and '906 patents; right?

**A.** The Turnpike evidence found here as well as the Turnpike evidence we've seen in this trial, such as the source code, yes.

**MR. ALPER:** Thank you.

I pass the witness, Your Honor.

**THE COURT:** Redirect examination?

**MR. RAY:** No redirect, Your Honor.

**THE COURT:** This is an opportunity for the members of the jury to submit any questions you'd like the Court to ask Mr. Wilson. If you have a question you'd like the Court to ask, please raise your hand.

(No response.)

**THE COURT:** I don't see any hands.

You are excused, Mr. Wilson. Thank you.

**THE WITNESS:** I really hoped to get a question out of those guys. Thank you.

(Witness excused.)

**THE COURT:** Thank you.

Will Motive call its next witness?

**MR. ALPER:** May I grab the binders, Your Honor?

**THE COURT:** You may. Thank you.

(Brief pause.)

**MR. COOTS:** Good afternoon, Your Honor.

Good afternoon, jurors. My name is Zachary Coots. I'm of King & Spalding, representing Defendant Motive.

Motive calls Jim Gorski to the stand.

**JAMES GORSKI**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

**THE WITNESS:** Yes.

**THE CLERK:** Thank you. Please be seated.

State your full name and spell your last name for the record.

**THE WITNESS:** My name is James Andrew Gorski. G-O-R-S-K-I.

**DIRECT EXAMINATION**

**BY MR. COOTS:**

**Q.** Good afternoon, Jim.

**A.** Good afternoon.

**Q.** Would you please introduce yourself to the jurors?

**A.** Yes. My name is Jim Gorski. I live in Buffalo, New York, where I was born and raised. I currently work at Motive Technologies as an engineering manager.

**Q.** Can you explain to the jury how it is you came to become employed by Motive?
**A.** Yes. So I was working as a contractor for Northrop Grumman. And I just didn't see that being a good fit for me long term.
So I was looking at who else was hiring in Buffalo. And I came across Motive. Had a couple rounds of interviews there and I really liked what I heard about being able to get in on the ground floor and have a large impact. So when they made an offer, I accepted.
**Q.** And about what year was that?
**A.** This was November of 2017.
**Q.** And when you first joined Motive, what were you working on?
**A.** When I first joined, I was just kind of a junior engineer, kind of just getting familiar with the code base, doing some odds and end type stuff. Nothing major for the first couple months.
**Q.** Can you describe how it is you became involved with Motive's cameras?
**A.** Yes. So after I got familiar with the code base, my manager, Joe Pulver at the time, kind of like set me up to start working on the camera products. We didn't really have much in place at the time, just the idea that we wanted to do cameras.

We had driver performance events, which are when the driver, you know, stops too fast or accelerates or goes around a corner too fast will create an event. And what we wanted to do was tie that event to a video and show that to the fleet manager.

**Q.** I failed to ask you this earlier, but you mentioned you became familiar with the code base. Can you explain to the jury your educational background?

**A.** Yes. I have a bachelor's degree in computer science from the University of Buffalo.

**Q.** And you can write code?

**A.** Yes.

**Q.** Have you written Motive code?

**A.** Yes.

**Q.** You started talking about the development of the cameras. What was the first camera Motive released?

**A.** The first camera we released was what we call the DC2.

**Q.** And what was the motivation behind DC2?

**A.** Mainly to be able to provide the video evidence that the drivers were doing these harsh events to the fleet manager, and then also they were able to recall video for any time period, which was helpful for exoneration cases. If they got into an accident that we didn't detect, we would still have video that they could pull up and use for exoneration.

**Q.** Approximately when did Motive release DC2?

**A.** It would have been around June of 2018.

**Q.** About how many months after you began working on Motive's cameras did Motive release the DC2?

**A.** Roughly eight months.

**Q.** Eight months.

And what was the progress of the cameras when you first started with the project?

**A.** Yeah, there was -- the camera itself was picked out. We knew which hardware we were going to use. But the manufacturer at that time didn't yet customize the firmware that ran on the camera for us to use and integrate with our Vehicle Gateway.

So a lot of the early work was just kind of figuring out the requirements for what that firmware needed to do on the camera. So I was going back and forth with the manufacturer to figure out how they can customize it to work with our Vehicle Gateway.

**Q.** And you got all that done in eight months?

**A.** Yeah. It was definitely a lot of late nights and long hours, but I kind of took this approach where I was using my personal vehicle to always test this. So I was able to -- on my drive in, first thing I would do every day while I was directing my coffee was look at the events, you know, logs from my drive in to make sure the camera was working okay. And then I would make an iteration, and then load it on my VG before I drove home. And then at home I would kind of do the same

thing. Look at the logs and then -- this method allowed me to kind of iterate twice a day and get this done as quick as we did.

**Q.** After the DC2, what is the next camera Motive released?

**A.** After the DC2, we released our Smart DC.

**Q.** And if you look at the table to I guess your left, there should be a set of cameras sitting there. Do you see the DC2?

(Brief pause.)

**A.** No DC2, just a Smart DC.

**Q.** Okay. So the Smart DC, do you see -- apologies. Is there an exhibit number on that?

**A.** Yes, 4314.

**Q.** And do you recognize that exhibit?

**A.** Yes.

**Q.** And what is it?

**A.** This is our DC 34, the dual facing model.

**Q.** And that's a Smart Dashcam?

**A.** Yes.

**MR. COOTS:** Your Honor, permission to publish to the jury?

**THE COURT:** You may.

(Exhibit published to the jury.)

**THE CLERK:** Is it admitted?

**BY MR. COOTS:**

**Q.** And was Motive's motivation behind releasing the Smart

Dashcam?

**A.** The main motivation was to offer a dual facing dashcam, which just means we're recording the road as well as the driver.

So we will be able to see, like, for example, if they were on their cell phone or something, and that's what caused the driver performance event, that was a big interest in a lot of the larger fleets that we were talking to about cameras.

**Q.** And beyond --

**THE COURT:** Mr. Coots, I just wanted to confirm, is that already in evidence what we passed out to the jury? I had assumed it was since you asked to publish. Has it been admitted?

**MR. COOTS:** Did I ask to -- I thought I asked to admit it on the record. But if I failed to ask, I apologize.

**THE COURT:** You had not. But would you like to move it into evidence?

**MR. COOTS:** I would like to Your Honor. Thank you.

**MR. DEORAS:** No objection.

**THE COURT:** Admitted, thank you.

(Trial Exhibit 4314 received in evidence.)

**THE COURT:** Next time just make sure to ask that formally before you publish. Thank you.

**MR. COOTS:** Thank you, Your Honor.

**BY MR. COOTS:**

**Q.** So we were talking about the Smart Dashcam had dual facing camera. Were there any other motivations for Motive to develop the Smart Dashcam?

(Court Reporter clarification.)

**BY MR. COOTS:**

**Q.** So you mentioned that the motivation behind the Smart Dashcam was to release the dual facing camera.

Were there any other motivations?

**A.** Yeah, the camera sensor is a little higher quality. The Smart DC is 1080p where the older one was only 720p. And it has -- we're able to store a little bit more hours of storage on it because it has a larger storage, 128 gig verse 64 gig, as well as the Smart DC could do hardware and coding. So the videos are compressed and encoded in H.265.

**Q.** After the Smart Dashcam, what was the next camera Motive released?

**A.** After the Smart dash camera, we released our AI dash camera.

**Q.** What year did you release the AI Dashcam?

**A.** The AI dash camera, I believe was September -- or the summer of 2021.

**Q.** What was the motivation behind the AI Dashcam?

**A.** Yes. So we really wanted to be able to run AI models on the edge to alert drivers and detect unsafe behaviors, like

using your cell phone, or rolling a stop sign, or following too closely.

The AI dash camera was able to run these models on the edge and not only create in-cab alerts, but the events as well, and provide video for these types of events, which we were unable to do with just the Smart dash camera.

**THE COURT:** Counsel, will you collect the exhibit from the jury?

Thank you.

**BY MR. COOTS:**

**Q.** If you look to your left again, do you recognize the AI Dashcam?

**A.** Yes.

**Q.** And what exhibit number is written on the AI Dashcam?

**A.** 4309.

**Q.** And do you recognize that to be an authentic AI Dashcam?

**A.** Yes.

**MR. COOTS:** Your Honor, permission to move into evidence Exhibit -- sorry, Jim.

**THE WITNESS:** 4309.

**MR. COOTS:** 4309.

**MR. DEORAS:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 4309 received in evidence.)

**MR. COOTS:** May I publish to the jury?

**THE COURT:** You may.

(Exhibit published to the jury.)

**BY MR. COOTS:**

**Q.** After Motive released AI Dashcam, what was the next camera Motive released?

**A.** We released a -- the AI Omnicam, which is a side camera. This allows you to mount this camera on -- you know, on each side of your vehicle as well as a rear if you want. It's kind of just there to provide almost a 360-degree view to give the entire context.

When one of these events happens, you can see if someone was, you know, in your blind spot or you react too slowly from someone. So it's meant to give the entire picture, field of view around the vehicle at the time of an event.

**Q.** You mentioned Omnicam. I think the first two you discussed, or maybe even the first three, were dash cams.

Is there a difference between a Dash cam and an Omnicam?

**A.** Yeah, so a dash cam is meant to be mounted, you know, on the side of your windshield. It looks out as well as in, in the case of the dual facing one.

Where the Omnicam is a kind of stand-alone camera. It has its own LTE modem. So it can transmit all the data to our back end by itself. And it really just needs a connection to power and then it can work by itself.

**Q.** And what year did you release the Omnicam?

**A.** It would have been 2023 sometime.

**Q.** And if you look to your left, do you see an Omnicam on the table?

**A.** Yes.

**Q.** What is the exhibit number on that?

**A.** 4310.

**Q.** Does that appear to be an authentic Omnicam?

**A.** Yes.

**MR. COOTS:** Your Honor, I'd like to move into evidence 4310.

**MR. DEORAS:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 4310 received in evidence.)

**MR. COOTS:** May I publish to the jury?

**THE COURT:** You may.

(Published to the jury.)

**BY MR. COOTS**

**Q.** Jim, I'd like to turn next to Motive's architecture. And if you can look in your exhibit binder to Tab 824.

And, specifically, I'd like you to look at the fourth page, which is 1824.4.

(Witness complied.)

**A.** All right.

**Q.** Have you seen this before?

**A.** Yes.

**Q.** And what is this?

**A.** This is a high level, like, architecture diagram of how our device communicates to our back end.

**Q.** Does this appear to be authentic?

**A.** Yes.

**MR. COOTS:** Your Honor, with permission, I would like to move into evidence Exhibit 1824.

**MR. DEORAS:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 1824 received in evidence.)

**MR. COOTS:** Can we publish Page 4 to the jury?

**THE COURT:** You may.

(Document displayed.)

**BY MR. COOTS:**

**Q.** Okay. Jim, does Motive's architecture have a web server?

**A.** Yes, it does.

**Q.** Where is it?

**A.** It is in -- in this diagram, it's the box, K2 web. But more generally it's hosted in the Cloud by AWS web services.

**Q.** The jury has heard testimony that the Vehicle Gateway is a web server because it communicates over HTTP.

What is your impression of that?

**A.** That's not true. And that architecture wouldn't really work for us because -- for a couple reasons. Our Vehicle Gateways are frequently offline. They're not connected to the

internet. And this is due to a couple reasons. One is they drive all around North America. They're in and out of cell coverage, so they're not always connected to the internet. They wouldn't always be reachable.

And then, as well as depending how it's wired, sometimes when you turn off the vehicle, our Vehicle Gateway will lose power and will just turn off. And then that will also be when our Vehicle Gateway is not connected to the internet. So there's -- yeah, it's not accessible for some of the time. If it was a web server and you were trying to make a request to it, and it wasn't available, it would be like you're going to check the weather and the page just doesn't load. You would have to sit there and just keep refreshing, hoping it comes online.

In addition to that, our Vehicle Gateways when they do connect to the internet, they don't get a public IP address. So there's really no way for anyone else on the internet to connect directly to a specific VG that they would want to.

So because of these issues, we actually use AWS, IoT, which is built on the MQTT protocol.

So kind of how this works, if I give an example, it's like having a P.O. Box at your Post Office. Anyone can send a message to the Post Office. It will go to that P.O. Box. And when you're able to, you can go check it out yourself and get all your messages.

So that's, like, kind of how our architecture actually works is our back end K2 web will send a message. It will go to that P.O. Box. And when the VG is connected to the internet, it can check in and get all of its messages. This allows messages to be sent to the Vehicle Gateway even when it's not online at the time. It will still get it eventually.

**Q.** You mentioned HTTP and you mentioned MQTT. If you look on their diagram, and I think you can use your -- I guess your pointer finger, can you write on the diagram where the HTTP path is and where the MQTT path is.

**A.** Yes. Can you zoom back out on the diagram?

Yes. So this first path, this will be an HTTP request to our back end. Everything on this path will be IoT. All of this will be MQTT. And then when we upload a video, that also goes directly to an S3 bucket, which is an Amazon web service as well. And that is another HTTP request initiated from the client, which is the Vehicle Gateway.

**MR. COOTS:** Your Honor, I would like to turn next to Exhibit 3294. I believe this has already been admitted into evidence.

**THE COURT:** You may.

**MR. COOTS:** And I would like to publish to the jury.

**BY MR. COOTS:**

**Q.** In particular, I'd like to direct your attention, Jim, to Page 21.

(Document displayed.)

**Q.** I don't know if you can clear off the writing, but do you recognize this image?

**A.** Yes, I do.

**THE CLERK:** I'm not sure this has been admitted.

**MR. COOTS:** Can we take it down, then?

**THE COURT:** You may.

(Document removed from display.)

**THE CLERK:** 3294; correct?

**MR. COOTS:** Yes.

**THE CLERK:** No.

**MR. COOTS:** All right.

**THE COURT:** Would you like to move it into evidence?

**MR. COOTS:** Yeah. I'd like to ask the witness if --

**BY MR. COOTS:**

**Q.** Do you recognize this image, Jim?

**A.** Yes.

**Q.** And what is it?

**A.** This is a more simplified view of all the flows that happen when a video recall request is made from our back-end services. Well, it's to the VG.

**Q.** Does it appear to be authentic to you?

**A.** Yes.

**MR. COOTS:** Your Honor, I'd like to move into evidence Exhibit 3294.

**MR. DEORAS:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 3294 received in evidence.)

(Document displayed.)

**BY MR. COOTS:**

**Q.** Jim, in about 90 seconds, can you walk the jury through what's happening here?

**A.** Yeah. So this is a video recall request flow. This is initiated by the fleet manager requesting a specific video from their dashboard or a driver performance event being created that our back end wants a video for. Passed all their filtering.

So this -- the first arrow there labeled 1, this request is an MQTT request over AWS IoT from our back end to the vehicle --

(Court reporter clarification.)

**THE COURT:** The court reporter has to write every word, so just go nice and slow for her.

**THE WITNESS:** No problem.

**A.** Yeah. So the first request is a MQTT request from the back-end K2 web to the Vehicle Gateway. So this is that process of K2 web putting a message.

Think of it as, you know, sending a message to your PO box. And if the Vehicle Gateway's online, it'll go grab it right away or it'll get it the next time it comes online.

So then once we have this request for a video recall, we'll go get this video off the camera and we'll copy it to the Vehicle Gateway.

And then step two is an HTTP request that the VG initiates, which will make it a client to our back-end K2 web, the web server.

Arrow 3 is that response back, which is a URL to upload the video to, which goes directly to AWS S3.

So, yeah, flow 4 is that upload from the Vehicle Gateway, putting that videos in an S3 bucket.

Step 5 is we upload it because we have dual-facing dashcams, we have the videos that are stored in a tar file. So step 5 is just untarring it is so that it's available.

And then once the back end knows that the video's uploaded, we also will transcode the video because we record in H.265 format, which isn't very friendly for browsers yet. So we'll transcode that video to H.264.

And then once all that transcoding's done, another message is kind of sent back to the back end saying this video's fully uploaded, it's processed and it's ready to be shown to our customers.

**Q.** So the first request says here, it's -- the first step is a video recall request, and that goes to the Vehicle Gateway.

The jury has heard testimony that because it's a request, the Vehicle Gateway is a web server. What is your impression

of that?

**A.** Yeah, because this is an MQTT transaction, which is a different protocol entirely than HTTP, yeah, it doesn't make the Vehicle Gateway a web server. It's not handling a web request.

**Q.** I wanted to turn next to the vision models. And in particular the jury has heard testimony about how the vision models use confidence values. Can you describe a little bit more about confidence values?

**A.** Yes. So in our AI models, the --

(Court reporter clarification.)

**A.** AI models, it outputs a -- we run a frame through it and it'll output the confidence value for the various things we care about. It might be a stop sign, for example. If the image has a stop sign in it, and it's very confident that there's a stop sign in that image, the value might be, like, very close to 1, like .99.

If there's no stop sign in it, the confidence value would be very low. So the confidence value is really just how confident we are that this thing we were looking for is in that particular frame or not.

**Q.** Could it be the case that during the time of an event, all the frames would have a high confidence value?

**A.** That's possible.

**Q.** Okay. And what would make it so?

So I guess let me -- let me ask: When -- once you determine confidence values for the frames of a video, how do you generate a video from that?

**A.** Yeah. So after we have a confidence value for what we care about, it has to be analyzed with the other telematics data that the Vehicle Gateway is sending the AI dash camera. So let's -- if we go through our stop sign event, for example, which is if you roll through a stop sign, the state machine will basically go in progress as soon as we start seeing a high confidence value for a stop sign, which means there's one in front of you.

So then we'll start tracking this, and we're going to keep the state machine in progress until you drive past the stop sign. As soon as you drive past the stop sign and it's no longer in frame, the confidence value for the stop sign will go low.

So then we'll key off that to know that you are now past the stop sign, and then we'll be able to look at, you know, the history of what your vehicle speed was in the previous five to seven seconds. And if we see that it didn't ever get to zero, then that's when we'll create a stop -- rolling stop event and we send up all this metadata, along with the start time and end time as metadata. And then that is the time period that the server will make a request for, to upload that video.

**Q.** So am I understanding you correctly that during a stop

sign event, the event would include low confidence frames at the end?

**A.** Yes. Our stop sign events will always include frames that have high confidence and low confidence.

**Q.** You talked about how the event video is created. I want to understand a little bit more -- wondering if you can tell the jury a little bit more about how Motive's cameras capture and store video during recording.

**A.** Yeah. So our cameras are always recording when the engine is on or the GPS is moving. So during this time period, they're constantly recording and kind of the memory's just one big loop. As soon as the storage fills up, every time we -- and then the video files on the camera theirself are stored in five-minute chunks. So every time we record five minutes, we close the file and open a new one.

During that check of when we close and open a new file, we make sure there's enough storage free. And if there's not, we'll delete the oldest video that we have recorded and saved on the storage to make room for the new ones.

**Q.** When you delete the oldest video, is that the first video captured?

**A.** Yes. It would be the oldest video that exists on the camera, which would be the first one if you're -- just with respect to every video that's on the camera.

**Q.** Are you familiar with, like, first in/first overwrite

memory systems?

**A.** Yes.

**Q.** Is this an example of a first in/first overwrite memory system?

**A.** First in/first out is what we would refer to it as.

**Q.** I want to move one last exhibit into evidence. If you could take a look 3459, and that would be Page 1.

(Witness complied.)

**Q.** Do you recognize this?

**A.** Yes.

**Q.** And what is it?

**A.** This is the release notes for the AI dash camera up until -- looks like Version 11 here.

**Q.** And does this appear to be accurate?

**A.** Yes.

**MR. COOTS:** Okay. At this time, Your Honor, I'd like to move into evidence Exhibit 3459.

**MR. DEORAS:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 3459 received in evidence.)

**MR. COOTS:** And you would please publish to the jury?

(Document displayed.)

**BY MR. COOTS**

**Q.** And can you -- can you explain what is described here at "audio/video recording"?

**A.** Yeah. So this was just our -- kind of reiterate some of what I said, but these were all the kind of requirements we had for -- related to the AIDC and when it should be recording, the format it should be recording in. You can see there that it records in five-minute clips.

And then as well it calls out here (as read):

"The camera shall delete the oldest files to make room for new files. Recording shall never stop."

That's just, you know, the requirement that we initiated from where we'll delete the oldest file to make room for the newest ones.

**Q.** I guess, Jim, last question: How long have you been at Motive?

**A.** I've been at Motive for -- it'll be seven and a half years next month.

**Q.** Are you proud to be an employee of Motive?

**A.** Yes, I am. It's been a tremendous opportunity for me in my -- my own career growth. It's been a lot of long hours and late nights, but I've always been rewarded and recognized for it.

The team we have in Buffalo specifically has been great for mentorship. It's a very tight-knit community. I think most of the Buffalo office came to my wedding, actually.

And the work we do really matters, I think. The customers -- we hear testimonials all the time that we're

saving them money. Their drivers are safer. They're not on their cell phones as much. And, like, it's just -- just really proud to be a part of that. And I was able to experience this firsthand, actually.

Unfortunately, my wife was in a car accident one morning on her way to work. And she calls me up and she's like: Do you have the video? You've got to meet me. We've got to go to the hospital.

And so I'm getting ready. I'm getting dressed. And I'm logging in to the website to see -- you know, I was going to recall the video and send it to her, but the video was already there. We detected that event as a harsh event.

So I had the video already there. I was able to quickly send it to her and, you know, ultimately the other driver ended up being ticketed and we didn't have anything to worry about as far as insurance goes. You know, it wasn't -- didn't have to have, like, any sort of insurance lawsuit hanging over us for a long time.

So it was really firsthand I was able to see the -- how impactful the work I have been doing was.

**MR. COOTS:** Thank you, Jim.

At this time, no further questions.

**THE COURT:** Let's take our afternoon break now. It's a little bit after 2:30. Let's meet back here at 2:50.

Just reminder to the jury to remember to keep an open

mind. Don't talk to anyone about the case and don't do any outside research. Thank you.

(Whereupon there was a recess in the proceedings from 2:33 p.m. until 2:53 p.m.)

**THE COURT:** Welcome back from the break. We're back on the record with all the members of the jury as well as counsel in the Omnitracs versus Motive trial.

Mr. Gorski, just a reminder that you're still under oath.

You may proceed with cross examination, Mr. Deoras.

**MR. DEORAS:** Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. DEORAS:**

**Q.** Good afternoon, Mr. Gorski. My name is Akshay Deoras. I have a few questions for you, if that's okay.

**A.** Yes.

**Q.** Okay. So you testified just now that you've been at Motive for about seven and a half years?

**A.** Yes.

**Q.** And you started out working on the camera products?

**A.** The first major task I had, yes.

**Q.** Okay. And you still are working on the camera products?

**A.** Yeah. I work on a little bit of everything at the moment.

**Q.** Okay. So, but about seven -- almost seven and a half years of your work has been on the camera products; right?

**A.** Yes.

**Q.** And you testified on direct a little bit about how the Motive Vehicle Gateway doesn't have a web server.
Do you remember that?
**A.** Yes.
**Q.** Okay. But despite the fact that you've been at Motive for seven and a half years, you've worked on the camera products and the Gateway. You didn't review any of the patents that are at issue in this case; right?
**A.** Correct.
**Q.** You didn't do any analysis of infringement to determine whether Motive uses any of the patents; right?
**A.** Yes.
**Q.** Okay. And your testimony on direct about whether there's a web server in the product, that's unrelated to the patents; right?
**A.** Yes. I don't know what's in the patents, so I don't know.
**Q.** Okay. You don't know -- you didn't review the patents to see how the patents describe a web server, if at all; right?
**A.** Yes.
**Q.** And you don't know whether your understanding of a web server is the same as what's described in the patents; right?
**A.** Right.
**Q.** And you don't know if what you just testified about, what Motive does, you don't know if that infringes any of the patents in the case; right?

**A.** That's correct.

**Q.** Okay.

**MR. DEORAS:** No further questions.

**THE COURT:** Redirect.

**MR. COOTS:** No redirect, Your Honor.

**THE COURT:** This is an opportunity for the members of the jury to submit any written question that you would like the Court to consider asking Mr. Gorski. Please raise your hand if you have a written question you'd like to submit.

(No response.)

**THE COURT:** I don't see any hands. You are excused Mr. Gorski.

**THE WITNESS:** Thank you.

(Witness excused.)

**THE COURT:** Motive calls its next witness.

**MR. COOTS:** Your Honor, Motive next calls to the stand, Mr. Andrews.

**SCOTT ANDREWS**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

**THE WITNESS:** Yes, I do.

**THE CLERK:** Thank you. Please be seated.

State your full name and spell your last name for the record.

**THE WITNESS:** My name is Scott Sturges Andrews,

A-N-D-R-E-W-S.

**THE COURT:** You may proceed.

**DIRECT EXAMINATION**

**BY MR. COOTS:**

**Q.** Good afternoon, Mr. Andrews.

**A.** Good afternoon.

**Q.** Have you prepared a demonstrative for the jury today?

**A.** Yes, I have.

**MR. COOTS:** Mr. Reed, can we go ahead and publish that to the jury?

(Document displayed.)

**BY MR. COOTS**

**Q.** Mr. Andrews, why are you here today to testify?

**A.** I'm here to testify relative to the non-infringement of the -- what is called the '253, and the '060 patent.

**Q.** I wanted to start, Mr. Andrews, with your educational background. Would you tell the jury about that?

**A.** Sure. I have a Bachelor of Science degree in electrical engineering from the University of California at Irvine. And I have a master's degree in electronic engineering from Stanford University.

**Q.** And we're going to be talking about vehicle telematics systems today. Can you describe how your employment history relates to those?

**A.** Sure. I have been working in telematics pretty much since

the field was invented back in the early 1990s. There were a handful of research projects before that, but I started -- started my career originally in aerospace, and ended up at a company called TRW doing satellite systems mostly. And right around the beginning of early 90s, I moved over to -- started to work with what was then TRW's automotive electronics business. They made a lot of air bag systems and other sorts of things. And they wanted me to bring all of the advanced technology from the satellite systems into the automotive division.

So I started working on what was at the time called Intelligent Transportation Systems, which was really kind of a -- connecting computers and GPS and communication, cellular communication all together to provide various kinds of services for cars.

And so I have spent all the last 35 years developing those sorts of systems. First at TRW. Then Toyota poached me away from TRW and moved me to Japan. And I worked at Toyota headquarters in Toyota City essentially doing the same thing, telematics systems, vehicle -- systems to collect data from vehicles and provide it to a back-end server for various things; crash detection, diagnostics, things like that.

I left Toyota around 2000, 2001, and started my own consulting company. And I've been doing that for the last 25 -- 24 years. Primarily doing projects either with the car

companies, telematics-related projects with the carmakers, and more recently doing a lot of work in what we call connected vehicles for the U.S. Department of Transportation.

**Q.** I see on this PowerPoint you're the named inventor on 30 patents. How many of those, approximately, are related to telematics?

**A.** Gosh, a whole lot of them are related to vehicle information or vehicle data and collecting vehicle data. Maybe only tangentially telematics related. But probably about four or five of them are specific to -- various aspects of telematics.

**MR. COOTS:** At this time, Your Honor, I would like to tender Mr. Andrews as an expert in the technological field of vehicle systems, vehicle telematics, and onboard fleet management.

**MR. ALPER:** No objection.

**THE COURT:** He will be so qualified.

**MR. COOTS:** Thank you, Your Honor.

**BY MR. COOTS:**

**Q.** Mr. Andrews, how did you come to be involved with this case?

**A.** I was contacted -- I can't remember by whom. I think it was maybe Mr. Ray. Almost a year ago, thereabouts.

**Q.** And when you were first contacted, did you review the patents in this case?

**A.** I did.

**Q.** And after -- were you retained before or after you reviewed the patents?

**A.** Generally when I'm asked to work on a case, I have to first look at things like conflicts to see if I have any relationships with any of the parties. And, also, look at the patents to see if I'm qualified to really opine on those patents. So it's almost always -- I guess always I look at the patents beforehand.

**Q.** Are you being compensated for your work on this case?

**A.** Yes, I am.

**Q.** And about how much are you being compensated?

**A.** $500 an hour.

**Q.** Is any of that compensation related to the success of Motive's case?

**A.** No, it's not.

**Q.** I wanted to begin and ask you to give the jury a little bit of background about the history of the technology at issue.

**A.** Sure. In working on this case, I happened to cross a very early patent from 1933. It's not exactly electronics, because it didn't really exist back then, but this is a system that used, I think, kind of like a seismograph with a stylus and a pen on a rotating paper drum. And it would actually keep a log of the speed of a truck so that the fleet manager or the owner of the truck could see how fast the truck had been driven over

the course of a day and he used that to manage his drivers.

So this concept of collecting data from vehicles, especially trucks, and using it to improve drivers to -- you know, understand driver safety and things like that has been around for a long time.

**Q.** And how has that technology progressed over the years?

**A.** It's progressed steadily as computers and communications and things have gotten more capable.

(Document displayed.)

**A.** This is a patent from 1979. And as you can see here, what we have is in a truck on the left-hand side we have a vehicle recorder. So this is a device that's looking at parameters in the vehicle and saving them.

We have a communications link. And that communications link sends the data that's collected for the truck to a back-end server.

So the concept of collecting data electronically, communicating it to a back-end server, has also been around since -- I'd have to do the math, but a long time. Since I was just out of college. That was awhile ago.

**Q.** I wanted to turn next to a summary of the materials you considered. What did you look at in forming your opinions related to this case?

**A.** Well, first of all, I obviously looked at the patents. And what we call the prosecution history, which is kind of the

back and forth between the inventor and the Patent Office.

I looked at what we call prior art. So these are patents and publications that were published before the filing date of the patent. And we'll get to those -- actually, I guess we won't get to those today.

But I looked at a variety of materials from the case. So depositions and various kinds of transcripts.

And then I looked at the Motive -- accused Motive products, specifically with regard to documents associated with those products. So user's manuals and specifications.

And I also looked at some of the source code. But like Mr. Wilson, I also relied on the testimony and the research work of Mr. Znidarsic. I hope I got that right. It's a very hard name.

And I've also had conversations with some Motive employees.

(Document displayed.)

**Q.** I see here you have listed trial testimony. Have you been present throughout the entire trial?

**A.** I have.

**Q.** I wanted to turn to the overview of your opinion.

So not to keep the jury in suspense, what were the ultimate conclusions you reached?

**A.** Well, I reached a lot of conclusions. The ones I'm going to provide to the jury today are that the '060 -- the asserted

claims of the '060 patent, which are Claims 1 and 12, don't infringe -- are not infringed by the Motive accused products. And that Motive doesn't infringe Claims 1 or 11 of the '253 patent.

**Q.** Let's turn to the '253 patent and your opinions in particular. What is the '253 patent?

(Document displayed.)

**A.** The '253 patent was written at a time when memory was expensive and you couldn't put a lot of it in a -- because of the cost and because of the size, couldn't put a lot of it in a recording device. So this is back in 2005.

So it's specifically written to describe a special way of storing data, specifically video data, in a very small memory so that you can record as much time as possible and essentially trade off the resolution of the video in terms of number of frames per second against how much -- how much duration of video you can store.

**Q.** And what was the problem? I think you've mentioned this briefly, but can you describe what the prior art was at the time of the '253, and how those problems related to the patent?

(Document displayed.)

**A.** Sure. Shown on this slide here on the left-hand side, I've highlighted it. The '253 patent describes what they call the prior art system way of doing this, which was that you used a certain length of memory, and you'd start writing into the

memory at the beginning. And you'd write until you got to the end, and then you'd start back over at the beginning again, and just overwrite the data that you had written in first.

The patent uses two -- actually, three different ways of describing. This one is round-robin, which is a pretty non-technical term. But most importantly, they call it first in/first overwrite. And then they also refer to it as first in/first out. But I prefer first in/first overwrite because that's more descriptive of what's actually done.

**Q.** How did the '253 patent solve this problem with first in/first overwrite systems?

**A.** It gets a little complicated. It's an interesting approach. What I have shown here on the top, the very top of this is a timeline. And in the middle what we have are a set of memory locations. And each little vertical line here represents a spot where you're going to put a frame of video. And, remember, video is kind of like a whole -- it's like a film.

There's, like, a sequence of little single images, and you drop an image into each one of these slots. And one of the problems you have is you don't know exactly when an event is going to occur. Obviously an event is some unexpected thing.

And so you're just recording away. And the event occurs. And what you want to do is make sure that you've stored video from before the event occurred so that you have a record of

kind of what led up to the event and then video after the event occurred so you can better understand what happened after the event.

And one of the problems they have in this case this is a 30-second memory, so it's not very much time. And they wanted to be able to record more time before the event and more time after the event.

So how they do that is they record at -- in this case they call it four frames per second. So you're going to see four video frames in one second. And that's shown in blue here. And they record it at that rate the entire time through this video. So when it's just running, they're recording at that rate.

When an event occurs -- and they show the event here. I'm going to touch the screen. I hope I can make it go away. That little X there (indicating) is the event. And you can see it's a T equals 29 seconds.

How does one make it go away?

(Brief pause.)

There we go.

So what they do is after that event occurs, they define a certain amount of memory that was at the beginning that you're allowed to write over.

But they're not going to do the prior art, which is to just start writing at the beginning. And the reason they don't

want to do that is they don't want to lose some of the video that happened just before the event.

So what they do is -- some of it gets overwritten, and that's the stuff in green here. But they then identify certain frames, which are the ones shown in red, and they say: You can't overwrite those.

So now what's going to happen is as they start writing video after the event, they're writing it into spots that every now and then they skip one. And the skipped one is now a frame of video that happened before the event. And then they can do the same thing after the event as well.

**Q.** And how does that -- what is the result of doing that?

**A.** Well, what happens here is that -- remember I said it was a 30-second video -- or 30-second memory. What happens is that for 20 seconds, you record at one frame per second. So it's really slow and you're -- it's kind of like those security cameras where the guy's here and then he's there (indicating); right?

And then for ten seconds before the event you have full motion video. And for ten seconds after the event you have full motion video. And then for 20 seconds after that, you go back to the herky-jerky storage.

And so you end up here, if you add all these up, you have 60 seconds of video, but you're storing it in what would have otherwise been stored in only 30 seconds of memory.

**Q.** Have you put together an animation here?

(Animation played.)

**A.** Yeah. This is from an old -- they call it a zoetrope. It's one of the very first kinds of animations where they had little still images and you could spin the thing around and watch it and it would just -- it would play like an animation.

And what I did was I cut the pictures out and I put them in, timed them at one frame per second leading up to the point where the dancer spins the woman. And when he spins her, you see all of a sudden that she moves very fluidly. And then we go back to one frame per second.

And we'll start at the beginning. And we'll show it one more time. And now he's going to spin her.

And so you can kind of see that at the -- before the event, you're getting a little bit of information, but it's pretty sparse. And then right at the event, you have this very smooth video. And then after the event, you have some sparse video again.

**Q.** And so we've discussed this whole interleaving different frame rate concept. How is that captured in the claims of the '253 patent?

**A.** So this is a portion of Claim 1 from the '253 patent. And I've taken out the -- the parts that -- of the claim that really deal with this process for storing the video.

And the first one is to effectuate storage of a set of

consecutive frames of video information in what they call the buffer memory. That's what this 30 seconds of memory is. And I've colored that blue because that kind of is what you're doing at the beginning, you're just storing video.

And then you determine -- the claim says that you (as read):

"Determine values of individual frames in the set of consecutive frames, where the values of the individual frames decrease with increasing time from the particular time of the particular vehicle event."

So it's kind of a mouthful, but what we're saying is that around the event, as you move farther away from the event on both sides, you assign values to those frames to decide which ones you want to keep and which ones you want to get rid of.

And that's the red ones that I showed in the picture before. Somebody is -- in this example it's one of several examples in the patent, where you've assigned a high value to those frames and low value to the green ones.

And then the last limitation here is to:

"Facilitate overwriting of the individual frames in the buffer memory based on the determined values."

So that's -- that's overwriting into the green frames that were left and you decided that they were low value. So they're available to write into.

(Document displayed.)

**Q.** I see on this slide you've labeled Claim 1 of the '253 patent, and you've identified three X's. What are these three X's?

**A.** These are the limitations that we're going to focus on. The other limitations of this claim kind of cover those normal things that have been around since the '70s, you know, camera, buffer memory, sensors, microprocessors, things like that. There's no dispute about those things.

But I will be addressing the three limitations that have the X's.

**Q.** Fair enough. And then I see on Claim 11 you only have two X's.

(Document displayed.)

**A.** Yeah. Claim 11 -- I don't know whether we've covered much of this with the jury, but there are two kinds of claims. There are system claims or apparatus claims, which claim physical things, and there are method claims, which describe more like a recipe. So it's steps that you would go through.

And if you look closely, Claims -- Claim Limitations 11(e) and (f) here are exactly the same steps. They're just the method steps that were shown in Claim 1.

And what's missing is the physical thing, the buffer memory, because this is just a method claim.

(Document displayed.)

**Q.** In rendering your opinions, did you consider the Court's

claim construction?

**A.** Yes, I did. In the claim limitation there's a -- the thing that is stored are these consecutive frames of visual information. And to make that clear, the Court construed that particular term as "video frames" so that there's no uncertainty about it.

**Q.** I want to turn now specifically to your opinions.

(Document displayed.)

**Q.** And in particular 1(c), you say that the long-term storage memory is not met for Claim 1. Can you explain your opinions?

**A.** Sure. This is a slide that was actually presented by Dr. Wicker last week. And he pointed -- I've singled out two parts of this claim.

One is the -- what we call the preamble. It's the very beginning of the claim. And I've highlighted in red, it says:

"A vehicle event recorder system configured to be mounted in a vehicle."

So everything about this vehicle event recorder system has to be mounted in a vehicle. That's what the claim says.

And Dr. Wicker, in his testimony, put this slide up and he pointed to the camera and the Vehicle Gateway, which is on the right-hand side. It's blue. And that is, indeed, mounted in the vehicle.

But the thing that he pointed to for the next limitation, which is the long-term memory, is actually back at the data

center. And that's not in the vehicle.

So my opinion is that Dr. Wicker has not shown that this claim limitation is infringed because he's pointed to something that isn't part of the vehicle as being the long-term buffer memory or a long-term storage memory.

**Q.** And I wanted to -- I wanted to jump to the next limitation. And we've heard -- we've heard about confidence values in context of the Motive products.

What is your opinion on whether the confidence values meet the limitation, determine values of individual frames in the set of consecutive frames or in the values of the individual frames decrease with increasing time away from the particular time of the particular vehicle event?

**A.** In my opinion, the Motive system doesn't do that. We have some -- first of all, Dr. Wicker's testimony was that the confidence value was the equivalent of this determined value.

As we just heard from Mr. Gorski -- I didn't have his trial testimony here because he went just before me, but this is from his deposition, that this is how confident is the system. And this is the back-end server. How confident is it that it has recognized an object in the -- in the image?

And it's -- it's designed to recognize certain objects. So one of them is whether the driver is wearing a seat belt. So it's got -- obviously looking for some kind of a seat belt-looking thing across his -- across his body.

It's looking for whether there's a vehicle ahead of this vehicle in the lane. Or, actually, a vehicle ahead anywhere.

It's looking for stop signs so that it can detect rolling stop events.

And it's also, based on the size of the vehicle in the image ahead, it's able to make a rough estimation of the distance that that vehicle is ahead of the vehicle with the camera.

(Document displayed.)

**Q.** Can you explain this slide to the jury?

**A.** I made this slide because I really wanted to illustrate what this actually means in a simple way.

So cameras -- or computers are not really very smart. There's a lot of talk about AI, but they're not really very smart. And they have a hard time recognizing things unless it's really obvious.

And so I've shown some examples here of -- in this case the question is: Is it a dog? I mean, obviously Motive doesn't look for dogs. They're going to look for stop signs and seat belts and things.

But the picture on the left is pretty high confidence. You can look at that and it's got a lot of characteristics of a dog. It's got a curved tail. It's got ears. It's lifting a paw up. So you have certain cues that tell you that's a dog. So you can say with high confidence that's a dog.

The picture in the middle is a little weird because you have -- if you're not a smart human, you're just a silly dumb computer, you look at this and it's like: Well, the ears are kind of the same. The eyes are the same. The feet are in the same kind of position. I'm not really sure if that's a dog or a cat. Not -- I'm kind of a little ambiguous that -- I have low confidence -- or moderate confidence that it's a dog.

And then this other picture on the right, you know, the computer wouldn't have any idea. Someone -- you know, it could be a dog, it could be a muffin, because they all look mostly the same.

**Q.** A few moments ago we heard Mr. Gorski testify about stop sign events. And, in particular, he explained that stop sign events, as you pass them, the confidence value drops essentially to zero.

How does this impact your analysis of Claim Limitation 1(e.3)?

(Document displayed.)

**A.** Well, really, it is that -- from everything that I've seen here, the confidence values are really associated with detecting objects. And those objects may or may not be associated with an event. You could detect a stop sign that's far away and it's not really meaningful until maybe you run the stop sign.

So I -- I showed -- first, there were a couple things

being shown here.

The first one is some examples of high, medium and low confidence images, or images where the computer would have high, medium or low confidence in recognizing them.

On the far left, you can see there is a stop sign there, but it's off on the side. It's kind of in the shadows. And it's got a pretty complicated visual background that you're going to pick the stop sign out from.

The next one over, the guy in the mountains, he's holding a stop sign up and it's a little clearer. There's not as much confusion in the background, and you can see that that's pretty much a stop sign.

Then you just get this close-in stop sign, but apparently it's all faded out. I'm not sure how that happened. But the only cue there might be the shape, but it's certainly not red. It doesn't say "stop." So if you're programmed to look for a red octagon that says "stop," you're probably not going to have a lot of confidence that that's a stop sign. Again, a human would, but a computer wouldn't.

And the second from the right is very obviously a stop sign and you're almost on top of it. But the problem is, and this is the second half of what I'm showing in this slide, is that if you're trying to detect a rolling stop, which means that you came up to a stop sign but you didn't stop, the event actually occurs when the stop sign disappears. And so there's

no confidence. There's zero confidence value in whether you detected a stop sign because the event is actually occurring when the stop sign disappears.

So here you have a situation where I have confidence, maybe high confidence, for quite a long time before the event that I have a stop sign. But the event occurs when the stop sign disappears.

So we have two different confidence values. You can't really say that the confidence value was high or low before the event and highest at the event and it tapered off after the event. It's -- the event is the change in the -- in the confidence value.

(Document displayed.)

**Q.** I think last week the jury heard Dr. Wicker testify that the way confidence values work before the event, your confidence values are going to be lower, but then after the event and you're warned, the values will be lower as well but that the confidence values will be high during the event.

What is your impression of that?

**A.** I recall that testimony, and I completely disagree with it. The example I just gave is one where the confidence value might be high for a long time, as you see the stop sign and you approach it and the confidence value is 100 percent. And then the stop sign disappears and that's when the event occurs. And now the confidence is zero.

So it doesn't ramp up until the event occurs and then ramp down. It has nothing to do, really, with where the event occurs.

Keep going back to the dogs.

(Document displayed.)

**Q.** I wanted to turn next to your opinions regarding limitation 1(e.3) and 1(e.4). And this pertains to facilitate overwriting of the frames based on their determined values.

**A.** Okay.

**Q.** A moment ago we heard Mr. Gorski testify that the camera deletes the oldest videos in its loop memory.

How does this relate to your opinion with respect to these claim limitations?

**A.** That's what was described in the prior art as first in/first overwrite. You write frames into the video. And when you get to the end, you start back at the beginning and start writing over them. And they don't do that on the basis of any values associated with those frames. It's just you start at the beginning. And that's one.

And then the second part is that they're writing -- they're talking about overwriting whole files. Remember, Mr. Gorski testified that it's five minutes of video. So they're not assigning values to individual frames in that five minutes of video. They're just overwriting the entire video.

**Q.** During Dr. Wicker's testimony, he showed the jury source

code --

**MR. COOTS:** Actually, apologies, Your Honor. For this can we turn the monitors?

**THE COURT:** You may.

(Brief pause.)

(Document displayed.)

**BY MR. COOTS:**

**Q.** During Dr. Wicker's testimony, he put this source code on the screen and explained that -- and I'm looking at line 233 on this slide. There's a check if storage of camera and deletes files above a threshold.

Have you reviewed this portion of the code?

**A.** I have.

**Q.** What is your opinion on whether or not these thresholds pertain to what is claimed in these limitations?

**A.** These are not thresholds associated with these determined values that Mister -- or Dr. Wicker has pointed to.

The threshold here is actually when you have, I think it's three gigabytes of storage left. The camera has 100 gigabytes of storage or 128 or something. And when you're down to three gigabytes left, then you start overwriting at the beginning.

So this is really just the check to see: Is the camera full? Or is it getting full? And if it is, then we're going to start overwriting from the beginning.

**MR. COOTS:** Mr. Reed, would you pop up Animation 1,

please?

(Animation played.)

**BY MR. COOTS:**

**Q.** And Mr. Andrews, would you walk the jury through this animation?

**A.** Sure. This is video that's similar to the one that Dr. Wicker showed you. And here we're looking down a road, and just a second we see a car, and it's hard to see. I think if we -- somewhere it's going to pause here. And it's hard to see, but right here, the car had -- has -- actually, the frame just before it had a deer, and now the deer is over in the woods here (indicating).

And so we've had an incident where a car is driving down the road. A deer runs across the road. And now we're going to see the car starting to brake, and we'll see that next.

So the car is getting closer and closer in these images. And we can move on.

And now we have a braking event. So the car got closer and closer and closer. We say: Oh, it's so close now we have to have a braking event.

So we have a bunch of frames, including when the deer first ran out in front of the car and when the deer was a little more visible on the side of the road after running in front of the car. And then a bunch of frames of the car getting closer and closer.

And then this camera is going to continue overwriting. And it's basically going to just continue overwriting until all of the frames have been overwritten. So I think we can just keep moving forward.

Remember, this is a -- the prior art way of doing this. And we just continue to write over these frames. We've now lost the frames that had the initial event, which was the deer running over -- running in front of the car.

So if you just continue to write over things like this in the prior art, you're going to lose those events.

**MR. COOTS:** Karl, can we bring up the second video, please?

**A.** I should say, if you're going to continue to write in a short memory, so 30-second memory, if -- if it took more than 30 seconds from the time the deer ran in front of the car to when the braking event occurred, you are never going to have the video from when the deer ran in front of the car.

(Animation displayed.)

**BY MR. COOTS**

**Q.** Mr. Andrews, would you walk the jury through what's happening in this video?

**A.** So this is the way that the '253 patent is -- purports to do this. And you can see here, here is where the -- I'm sorry it's so small, but here's where the car -- or the deer ran in front of the car. And here's where the deer is off on the side

of the road by the car.

So it's the same kind of event. But let's keep our eyes on the image where the deer is on the side of the road. It's right on the far right now, and it's coming around. And pretty soon we're going to get our braking event. Right there.

So we have a braking event. And let's see the -- the image that we're going to be concerned about is this one here where the deer is on the side of the road. And we've decided that that's an important image because it tells us why this guy put his brakes on in front of us.

And so we want to make sure we save that in the set. And so now let's continue. And it's going to continue taking pictures and writing over the old ones. And now we get to just before the frame with the deer on the side of the road is going to come under the guillotine here. And what we'll see is that it skips it.

We can move forward.

And it doesn't overwrite that particular frame. It's still in this loop. Because we wanted to make sure we saved it. So this is one of those -- one of those red frames in the picture I showed earlier. Say, this is one I want to save, and you don't write own it.

**MR. COOTS:** Mr. Reed, can we bring up Dr. Wicker's video that he played during his testimony?

(Animation displayed.)

**A.** So you recall this is Dr. Wicker's video. And the numbers here are his supposed confidence values. And we are recording an empty road here for awhile. And pretty soon we'll see a car appear out in the distance.

And inexplicably, Dr. Wicker has decided that somehow the distance of the car is related to how well you can recognize the car. But either you recognize that there's a car or you don't. It doesn't -- it's not like you recognize it more.

So your confidence value is going to go from: I don't see anything to I see a car.

So that's kind of the first flaw in this -- in this video; that they don't ramp up and then ramp down like that.

So we can continue now.

(Animation resumed.)

And eventually these are going to continue until you get some kind of a high confidence value. He's going to frame them in red. So he's decided that this is the threshold for what high value means and he's put these two frames, this one and this one (indicating), in red and then he's going to let the camera run awhile.

And you'll notice now for some reason the confidence values are coming down. And he said: Oh, I'm going to define some range of confidence values that I'm going to want to save those images for. And he shows them going into this long-term storage, which this is certainly how you could make a system

work. It's kind of how the Motive system works.

But there's kind of an important flaw here, and that is if you just let this continue to run, Dr. Wicker shows that the system just keeps on overwriting. And it just overwrites the oldest frames first. And now we have -- other than the ones we saved, we have no record in the buffer of the events that actually represented the event.

**Q.** In your opinion, does what's illustrated here, the Motive AI Dashcam, does this infringe the claims of the '253 patent?

**A.** No, it doesn't. You'll notice that he didn't skip any frames. He didn't assign frames with a certain value, and then choose to overwrite frames with some value and not overwrite frames with another value. He just overwrites them all.

The fact that he set them off into long-term storage is sort of neither here nor there. The claim has this overwriting limitation, and we saw all of them got overwritten, regardless of what their value was.

**MR. COOTS:** Mr. Reed, would you mind to pop up testimony from Dr. Wicker's cross-exam. That's Page 871 of the transcript.

(Document displayed.)

**Q.** And Dr. Wicker was asked (as read):

**"QUESTION:** So you'd agree with me if what Motive is doing is first in/first out, it would not infringe the '253 patent, correct?"

And then he said (as read):

**"ANSWER:** If it was purely a first in/first out buffer, and there was no way to access things in the middle of the pipe, so to speak, then, yes, I would agree with you."

What is your opinion?

**A.** Remember what I said at the beginning. This memory is talked about as a first in/first overwrite. And they also call it a first in/first out. There's nothing in the claim that -- that limits when or how you read anything out of that memory. It's only about when or how you overwrite things in the memory.

So the fact that Dr. Wicker's opinion is, you're not allowed to read out of a FIFO memory except out the other end of the pipe is what I think he said, you know, that's just not -- not the case. You could -- if you -- depending on how you set your memory up, there's no reason you couldn't read out of the middle it.

**Q.** So if I understood you correctly, where you copy from a memory has nothing to do with the '253 patent claims?

**A.** No. No.

**MR. COOTS:** Thank you, Mr. Reed.

(Document removed from display.)

**BY MR. COOTS:**

**Q.** So just to -- if you can, quickly recap your opinions with respect to Claim 1 of the '253 patent.

(Document displayed.)

**A.** Sure. As I showed earlier, 1(c), which is this long-term memory, Dr. Wicker pointed to a memory that's not in the vehicle. And since the first limitation of the claim, the preamble says that it's configured to be mounted in a vehicle. Obviously that doesn't infringe.

And then I've just shown that (e)3 and (e)4 don't determine -- Motive doesn't determine values. And it more importantly doesn't use those determined values to determine which frames to overwrite. Remember, they just overwrite anything that's -- that was the first thing in the camera when the camera starts to run out of memory. That's the only basis they use for overwriting.

**Q.** And what are your opinions with respect to Claim 11?

**A.** They are exactly the same because the same two limitations appear in Claim 11.

(Document displayed.)

**Q.** I think you mentioned earlier memory systems have changed in terms of value. How valuable is the '253 patent?

**A.** Today, in my opinion, it doesn't have any value. You know, we -- we saw in '253, that we're talking about how to preserve or how to extend a 30-second memory. But the Motive Dashcam has something like 60 to 100 hours of memory storage.

So the need to somehow get a few more seconds of storage in the AI Dashcam, doesn't exist. And that's really because

memory has become cheaper and cheaper every single year since the beginning of memory.

**Q.** Thank you, Mr. Andrews.

Let's turn to your opinions next on the '060 patent. And what is the '060 patent?

(Document displayed.)

**A.** This is a patent that describes a vehicle event recorder that has a web server inside the event recorder. And the goal of this was that the -- discussing in the patent is that this made it easier to read the data out of the vehicle event recorder because you could use just a standard web browser, like you would go to a website.

**Q.** And what problems did the '060 describe in the art?

**A.** So, it -- well, not really the problems, but what it is trying to show here is that you collect vehicle operational data and you store it. But you store it in a web server or in a web page that's in a web server in the vehicle.

And then when you bring the vehicle or when you connect to the vehicle with a standard computer -- we have a person here with a workstation with a web browser -- they can then access that web page and view the data. And they don't need -- argument is they don't need specialized software to do that.

**Q.** And can you explain to the jury what a web server is?

**A.** Sure. We've all used web browsers, Internet Explorer, Safari, Chrome, things like that. And what happens is if you

pay attention to the address bar at the top, where what we call the URL is, it usually says "http://" and then "google.com" or whatever -- your bank or whatever.

That is a request that is sent over the Internet or over a communications path to a web server. The web server knows how to respond to that request. And it generally responds by sending you back the data that the browser can read that creates a web page that's displayed on your computer.

(Document displayed.)

**Q.** I wanted to jump to your specific opinions, and I see Claim 1 on the screen here. What does this X signify?

**A.** This X is really the only claim limitation that I'm going to address here.

As with the '253, there are a lot of things that are pretty common in these sorts of systems that are not particularly unusual. Microprocessors, memories, things like that.

But the one limitation that I'm going to focus on is the one where we have (as read):

"Facilitate wireless communication of information between a web server and the vehicle event recorder, and a remotely located computing device using HTTP."

So the claim is very specific that it's got to be -- it's got to use this HTTP protocol, which is a certain way that computers talk to one another.

**Q.** And I notice here you have a web server in brackets in red. Why have you done that in brackets?

**A.** This was -- if we maybe go to the next slide, we can see this. This was a result of the Court's claim construction.

The claim, as it was published in the patent, was that you would facilitate wireless communication of information between the vehicle event recorder and a remotely located computing device using HTTP. But because of the way the patent had described this, the Court construed that as actually facilitating wireless communication of the information between a web server in the vehicle event recorder and a remotely located computing device using HTTP.

(Document displayed.)

**Q.** I'm seeing here Claim 12. You have two Xs here. Can you explain that to the jury?

**A.** Yeah. So Claim 12 is what we call a dependent claim. It basically just adds one more limitation to the claim that it depends from is how we phrase it.

And it depends from Claim 11. So you can see it has the method of Claim 11 further comprising some more stuff it's got to do.

And because I'm going to show that we don't -- or Motive doesn't infringe the 11(d) limitation, if Claim 11 isn't infringed, Claim 12 can't be infringed.

**Q.** Let's turn specifically to your opinion. And I actually

wanted to start with Dr. Wicker's opinion.

(Document displayed.)

**Q.** We have on this presentation a slideshow that he showed the jury, and he pointed to the source code to suggest that the ELD is a web server because it communicates over HTTP.

What is your opinion?

**A.** I -- I don't think there's any -- any dispute that it communicates over HTTP, but it does so as a client. So it's not acting as the web server. It's acting like a web client. So it's going to make a request to the server. And, in fact, if you -- I can't blow it up, but if you look down here (indicating), the request that it's going to send is an ELD message. And that's the message that contains the information about a candidate event that may have occurred.

And so the request is really to the server to say: I think an event occurred. Here is the data for that event. You know a lot more about this than I do, so you tell me if there was an event. So that's the request that's made from the vehicle event recorder to that K2 web server.

Could we go back?

All right. Dr. Wicker testified and I have his testimony from the trial here. And basically, honestly, just kind of waved his hands and said. There's lots f HTTP here, so it must be a server. And I completely disagree with that.

(Document displayed.)

**Q.** I wanted to turn next to Motive's architecture, and Mr. Gorski testified and walked the jury through the architecture a few moments ago.

You have here marked up MQTT, HTTP.

Can you explain to the jury why that distinction matters?

**A.** Sure. Mr. Gorski testified to this, but it's really important. A server, like, you know, Google or Yahoo, or whatever place you might go to, whatever place might have a server, it doesn't know who the clients are. It doesn't know that any of us are out there with our laptops until we send it a request. And it doesn't even know what our address is.

You know, Google doesn't just pop up on my computer and say: Hi, I thought you might be interested in this. I have to ask it something. And when I ask it that, I'm giving it my address. So now it knows where I am. And so when it responds, it responds to whatever address I sent the request from.

And the problem with that is that if you're the server and you wanted to get in touch with a client, I mean, Google doesn't want to do that with me, but Motive wants to do it with an event recorder, they have to have some other way of doing it.

Mr. Gorski also pointed out that the vehicle event recorder might be turned off. The vehicle might be parked and turned off. It might be out in the middle of nowhere out in Nevada somewhere with no cell coverage. So all kinds of

reasons why you might not be able to immediately when you want to, as a server, send something to the vehicle event recorder, be able to do that.

So instead they use this kind of Post Office Box approach where they send this MQTT message. And MQTT is a terrible name. It's Message Queuing Telemetry Transport protocol. But it basically sends a message to this green box here, which is a essentially kind of like a Post Office Box, or, you know, some kind of an Inbox, if you will.

And when the vehicle event recorder turns on or gets into coverage, it goes out to the MQTT broker and it says: Do you have any jobs for me? And if the -- if the server put a job into that broker, it will say: Yeah. Okay. Now I have the job.

And then it responds by making a request back. I think we may have a slide on this. I'm not sure if we're going to skip it. But it makes a request back to the server saying: Where do you want me to send this data? And then eventually it sends it off to a different bucket.

**Q.** In your opinion, is communicating a request over MQTT, does that make Motive's Vehicle Gateway a web server?

**A.** No, absolutely not.

**Q.** And why not?

**A.** Well, MQTT is not HTTP, first of all. It's not a web request from a web server. And there is some information

that's exchanged back and forth, but that doesn't turn a server into a client and a client into a server.

(Document displayed.)

**Q.** I wanted to go and bring up one of the presentations Dr. Wicker showed the jury. And this is a list of VG communications.

And you have these marked up HTTP and MQTT. Can you walk the jury through that?

**A.** Sure. And I've tied these to the descriptions that Dr. Wicker has. He said: First we have ELD messages, Electronic Logging Device messages. And those are the ones that are sent -- you can see ELD messages right here (indicating). Those are the ones that are sent from the client, ELD, or Vehicle Gateway, to the server.

Remember, that's the one that says: I think an event happened. Can you confirm that for me?

Then he says (as read):

"We also have Core IT services that allow the back end and mobile to request additional data."

And that's true, but that's clearly done by what's called -- it's a terrible name also -- AWS Core IoT services, which is that MQTT broker.

So that request is not a web request. And that means that the -- first of all, MQTT is not HTTP. And it also means that the web server is not acting like a client and the Vehicle

Gateway is not acting like a server.

And I already made the point that, you know, just because data is exchanged in both directions doesn't mean that suddenly my laptop is Google and Google is my laptop; right? They are not the same thing.

**Q.** I wanted to quickly jump back one slide.

(Document displayed.)

**Q.** You have this first request. This is number one (as read):

"Server pushes a video recall request to the ELD via IoT."

Does this request transform the Vehicle Gateway into a server?

**A.** No. This is that MQTT job request where you're sending it to the P.O. Box. And then the -- the ELD is going to check its P.O. Box and see if something got assigned to it.

(Document displayed.)

**Q.** Mr. Andrews, just, if you would, recap for the jury your opinions on Claim 1 of the '060 patent?

**A.** For all the reasons that I've just described, no HTTP, no web server, no swapping of roles between client and server. Motive doesn't infringe Claim 1(d.3) of this patent.

**Q.** What are your opinions with respect to Claim 12?

(Document displayed.)

**A.** With respect to Claim 12, Claim 12, as I said, depends

from Claim 11. And Claim Element 11(d) is the same as the corresponding claim element in Claim 1. And so because that's not infringed, for all the same reasons, Claim 11 isn't infringed. And because of that, Claim 12 isn't infringed.

**Q.** Thank you, Mr. Andrews.

I have one last topic I wanted to cover with you, and that is the benefits Dr. Wicker showed the jury.

(Document displayed.)

**Q.** How, if at all, do these benefits relate to the claims of the '060 and '253 patent?

**A.** I have no idea. I look at these features enabled by the patents, and the claims don't have anything about real time alerts for unsafe driving or automated AI event detection. AI isn't even mentioned in the patent.

So to me, Dr. Wicker has just picked attributes of the Motive system out of the air and said: Oh, these are somehow enabled by the patent. And I don't see any connection between these elements that he's -- or these features that he's identified and what's actually in the claim.

**Q.** Thank you. Thank you for your time, Mr. Andrews.

**MR. COOTS:** We pass the witness.

**THE COURT:** Cross-examination.

You may proceed.

**MR. ALPER:** Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. ALPER:**

**Q.** Good afternoon, Mr. Andrews.

**A.** Good afternoon.

**Q.** My name is Adam Alper and I'm going to ask you a few questions if that's okay.

**A.** Of course.

**Q.** Okay. I just want to start off by getting a sense for where we're at with your opinions on the '060 and '253, the SmartDrive patents. Okay?

**A.** Okay.

**Q.** You offered some opinions on non-infringement; right?

**A.** That's correct.

**Q.** But you did not offer any opinions to the jury that the '060 and '253 patents are invalid; right?

**A.** That's correct.

**Q.** As a result, the jury can conclude in listening to your testimony, that SmartDrive was first when it comes to the claimed inventions; right?

**A.** I don't think they can conclude that from anything I've said.

**Q.** You didn't offer any opinion in your testimony today that any person or entity came up with the claimed inventions of the '060 and '253 patents before SmartDrive; right?

**A.** I didn't say that they did or didn't.

**Q.** Okay. Right. You didn't say the patents were invalid; right?

**A.** Correct.

**Q.** You showed some very old patents. I think there was a 1933 patent and a 1979 patent; right?

**A.** That's correct.

**Q.** But that wasn't you saying the patents are invalid, the SmartDrive patents are invalid; right?

**A.** Yes, that's correct.

**Q.** Okay. All right. Let's talk a little bit about the '253 patent.

You showed some portions of the '253 patent specification concerning what is referred to as a preferred embodiment of the claims; right?

**A.** That's correct.

**Q.** And that is an example of how you could practice the claims; right?

**A.** It's one of several examples that are provided in the '253 patent.

**Q.** And you would agree that the claims are not limited or restricted to those examples; right?

**A.** That's correct.

**Q.** Okay. Let's call up your slide MDX 12.16.

(Document displayed.)

**Q.** Okay. And this is showing Claim 11 of the '253 patent;

right?

**A.** That's correct.

**Q.** And these are the 11(e) and 11(f) are the two elements, the claim elements that you say are not met by Motive's products; right?

**A.** That's right.

**Q.** And I want to talk about them in sequence. But you would agree that neither one of these elements says you need to skip frames; right?

**A.** Well, it doesn't say it explicitly, but it's basically saying that based on the determined values, you're going to overwrite frames. And that means that if the value is sufficiently high, then you would not overwrite them, and that would be skipping them.

**Q.** Okay. But the claim language says -- doesn't -- withdrawn.

The claim language doesn't say: Overwriting by skipping frames. That's not in the language of the claims; right?

**A.** No. And you could skip or you could overwrite frames in any order that you chose to as long as it was based on those determined values.

**Q.** Okay. So let's kind of drill down into this just a little bit. Let's first talk about 11(e), and your opinions there.

So if we could zoom into element 11(e).

(Document displayed.)

**Q.** That element requires (as read):

"Determining values of individual frames in the set of consecutive frames."

And then I just want to highlight the next part of it, where it says (as read):

"Wherein the values of the individual frames decreases with increasing time away from the particular time of the particular vehicle event."

Right?

**A.** That's correct.

**Q.** Okay. And you were here during Mr. Znidarsic's testimony?

**A.** Yes, that's right.

**Q.** And you relied on Mr. Znidarsic's analysis of the code in this case?

**A.** Yes, I do.

**Q.** And you found that to be accurate; right?

**A.** Yes.

**Q.** And you have not had any issue with how Mr. Znidarsic has described the code in this case; right?

**A.** I have had no reason to, no.

**Q.** Okay. So I want to ask you a few questions about Mr. Znidarsic -- Znidarsic -- I apologize, Znidarsic's analysis. And I'm going to show you one of his slides that he presented here in court today.

And what I'd like to do is call up the slide, but also,

Mr. Schlaifer, if you're able to keep the part of this that has the claim element on it? Or as much of it as you can.

And so if we could call up MDX 8.23, please.

(Document displayed.)

**Q.** Great. And I'd like to talk about the issue of confidence values in connection with events in the Motive products and how that relates to the claim language?

**A.** Okay.

**Q.** Okay. So what we're looking for in the claim language is: Values of the individual frames that decrease with increasing time away from a particular vehicle event; right?

**A.** Correct.

**Q.** Okay. Now, on the right-hand side, that's Mr. Znidarsic's slide where he's describing how the Motive products work; right?

**A.** Right.

**Q.** And you can see at the very bottom highlighted in yellow, that's an event; right? That's what he said?

**A.** I think the event is shown by the blue arrow. But the -- the part that is in the yellow arrow is the video associated with the event that he's chosen to capture.

**Q.** Okay. And you can see it says on the left: Driver performance event; right?

**A.** Correct.

**Q.** And the -- what's highlighted in yellow are the video

frames associated with the event; right?

**A.** Yes.

**Q.** Okay. And you can see on the far -- we talked about this earlier, so I'm going to do it a little more quickly.

The far right-hand side, that's the most recent video frame; right?

**A.** Correct.

**Q.** And the far left-hand side, that's the farthest in time video frame of the video frames in the event; right?

**A.** It depends on how it's written, but one of them is the most recent. One of them is the farthest.

**Q.** Right. One's new and one's old?

**A.** If you start writing from the beginning and you write the next frame after, one after another, then the one on the left would be the oldest. But if you're sliding them, then the one on the right would be the oldest.

**Q.** For purposes of our discussion, can we call the frame on the right the most recent and the one on the left the oldest?

**A.** Sure. That's fine.

**Q.** Okay, great.

All right. And the most recent frame of the frames in the event has a confidence value assigned to it; right?

**A.** Yes.

**Q.** It's 100 percent?

**A.** The most recent -- are you talking about the bottom here?

**Q.** Yes. The one on the right --
**A.** That is 100 percent the most recent.
**Q.** And in your testimony you referred to -- you said, I wrote it down, "supposed confidence values."
Do you recall saying that?
**A.** Yes.
**Q.** But Motive's products actually have confidence values that are assigned to frames; correct?
**A.** Yes. I think I misspoke. It should have been supposed values associated with the claim limitation, but that's a minor point.
**Q.** Okay. But the confidence values, that's not something our side made up; right?
**A.** No.
**Q.** Those are -- Motive assigns confidence values to every video frame; correct?
**A.** Yes, they do.
**Q.** Okay.
**A.** Well, all the confidence values of all the frames are zero until they detect an object in the frame at which time it would have a confidence value associated with the detected object.
**Q.** Thank you for the correction.
Motive assigns confidence values to frames, to video frames; right?
**A.** When there's an object that's detected, yes.

**Q.** Okay. And the confidence value for the frame that's the oldest in the event, it's 100 percent also; right?

**A.** In this particular example.

**Q.** Okay. Now, if we look up one row, we can see video frames that are not within the video frames of the event; correct?

**A.** Yes.

**Q.** And there's one on the right that's even more recent in time; right?

**A.** Right.

**Q.** And there's one on the left that's older than the video frames of the event; right?

**A.** Correct.

**Q.** And the confidence value -- let me pause there a second.

So what we're looking for is values of the individual frames that decrease with increasing time away from the event. That's the claim language; right?

**A.** Right.

**Q.** And if we look at the frame that's outside the event on the far right side, that has a confidence value of 10 percent; right?

**A.** That's what this picture shows, yes.

**Q.** And when you go from 100 percent to 10 percent, that's a decrease; right?

**A.** Yes. And then when you go from 50 percent to 0, it's also a decrease, and that's inside the frame.

**Q.** Okay. That -- but when you're comparing from the edge of the event to the frames that are now farther away in time from the event, you go from 100 percent to 10 percent, and that's a decrease; right?

**A.** Sure.

**Q.** And on the left-hand side, you've got the same thing; right?

**A.** Sure. In this particular example.

**Q.** One hundred percent to 10 percent, that is a decrease; right?

**A.** Yes.

**Q.** Okay. And -- okay.

**MR. ALPER:** Let me pause there, Your Honor. Should -- I would move on to another --

**THE COURT:** Good stopping point. We're one minute from the end. So unless you're going to wrap up in the next minute, we should probably --

**MR. COOTS:** This is a good stopping point for me, Your Honor.

**THE COURT:** Great.

For the members of the jury, please remember the instruction I keep giving you to keep an open mind. Don't talk to anybody about the case or do outside research. We'll pick up tomorrow at 8:45 a.m. for you to arrive and 9:00 a.m. for us to start on the record. Thank you.

(Jury exits the courtroom at 4:00 p.m.)

**THE COURT:** We're on the record outside the presence of the jury.

I just want to be clear. I know that you all have ordered dailies from the court reporter. The portions of the transcript that are sealed may be sent to counsel for both parties in this case.

Also, I wanted to check in with you on the timing in terms of where the parties are just housekeeping-wise.

What is the anticipation in terms of when Motive anticipates resting? And what is Omnitracs's current anticipation as to its rebuttal case?

**MR. RAY:** Thank you, Your Honor, we were going to bring this up as well if you were not. So thanks for anticipating needs.

So after Mr. Andrews we have two more witnesses after this, Ms. Distler and then Mr. Johns. And I -- I think the total duration of that, obviously it depends on how long cross-examination goes, but it should likely wrap before lunch tomorrow.

And then I believe the plan -- I won't speak for the Plaintiffs. I believe they are planning to put up Dr. Wicker in their rebuttal case. And I believe he's their only witness.

And so I would imagine that we'll wrap sometime by mid-afternoon tomorrow. And then I believe the parties would

Volume 8

Pages 1464 - 1712

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RITA F. LIN

OMNITRACS, LLC, et al, )
)
Plaintiffs, )
vs. ) No. C 23-5261 RFL
)
MOTIVE TECHNOLOGIES, INC., et al, )
) San Francisco, California
Defendants. ) Tuesday
) April 22, 2025
) 8:15 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

**For Plaintiffs:**
KIRKLAND & ELLIS, LLP
555 California Street
San Francisco, California 94104
**BY: ADAM R. ALPER, ESQ.**
**AKSHAY S. DEORAS, ESQ.**
**KYLE CALHOUN, ESQ.**

KIRKLAND & ELLIS, LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
**BY: N. YVONNE STODDARD BEELER, ESQ.**
**MICHAEL W. DE VRIES, ESQ.**
**ARGIE L. MINA, ESQ.**

KIRKLAND AND ELLIS, LLP
601 Lexington Avenue
New York, New York 10022
**BY: LESLIE M. SCHMIDT, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

***Reported By: Debra L. Pas, CSR 11916, CRR, RMR, RPR***
*Official Reporter - US District Court*
*Computerized Transcription By Eclipse*

Just a reminder that you are still under oath, sir.

**THE WITNESS:** Yes. Thank you.

**THE COURT:** You may continue, Mr. Alper.

**MR. ALPER:** Thank you, Your Honor.

Good morning, Mr. Andrews.

Good morning, everyone.

**SCOTT ANDREWS**,

called as a witness for the Plaintiff herein, having been previously sworn, resumed the stand and testified further as follows:

**CROSS-EXAMINATION RESUMED**

**BY MR. ALPER:**

**Q.** Okay. I'd like to start by talking about the facilitating overwriting aspect of the '253 patent claims.

**MR. ALPER:** And if we could call up Mr. Andrews MDX 12.27 slide.

(Document displayed.)

**BY MR. ALPER:**

**Q.** And here's the element. It says (as read):

"Facilitating overwriting of the individual frames stored in the buffer memory based on the determined values."

And you had an opinion on that; right?

**A.** Yes.

**Q.** Okay. Let me -- let's talk about that a bit.

**MR. ALPER:** If we could actually excerpt the claim element, Mr. Schlaifer, and then call up Mr. Andrews's 8.23.

And you can -- yeah, we can put that claim element, just so we have it up there.

(Document displayed.)

**BY MR. ALPER:**

**Q.** So we talked yesterday -- I'm referring to the slide on the right. We talked yesterday about the video frames for an event.

And those are at the bottom of the slide in the -- under the yellow highlighting; right?

**A.** Yes.

**Q.** Okay. And when it comes to -- I want to talk about how video frames, including the event video frames and the loop video frames, are stored and overwritten in Motive's system, okay?

**A.** Okay.

**Q.** Okay. Loop video is stored on a memory referred to as the eMMC in Motive's products; correct?

**A.** That's my understanding, yes.

**Q.** Okay. And the eMMC memory is what Dr. Wicker points to for the buffer memory in the '253 patent claims?

**A.** That's my understanding, yes.

**Q.** Okay. And that's in the claim language right there on -- above; right?

**A.** Yes.
**Q.** Okay. And Motive stores both loop videos and event videos in the eMMC memory; correct?
**A.** Yes, I believe in different place, yes.
**Q.** Okay. And the event video is excerpted from the loop video, and it's stored in the eMMC memory separate from that loop video; right?
**A.** My understanding is it's copied from the loop memory and stored in another location in the eMMC memory.
**Q.** Okay. And I'd like to -- you provided expert reports in this matter, of course?
**A.** Yes.
**Q.** And if you could -- just to your left there's a binder that says "Volume 2." That's one of your expert reports. And if you could turn to Paragraph 237, please.
(Witness complied.)
**A.** Of which report?
**Q.** It's -- I think there's only one in your Volume 2 there. So if you just go to Paragraph 237.
**A.** I'm there.
**Q.** Okay. And about four lines down from the top of that paragraph, I'm going to read what you wrote. You wrote (as read):
"The event video is excerpted from and stored on the AI Dashcam eMMC separate from the more complete

loop video."

Was that what you opined on in your expert report?

**A.** Yeah. And that's what I just said, too.

**Q.** Okay. Now, the loop video frames in the eMMC memory, which Dr. Wicker says is the buffer memory, are overwritten in a first in/first out scheme; right?

**A.** That's my understanding, yes.

**Q.** And the event video is stored in a separate folder on that eMMC buffer memory?

**A.** That's my understanding.

**MR. ALPER:** Okay. Now, if we could -- instead of the screen on the right, if we could call up -- replace that with Mr. Andrews's MDX 12.7 -- I'm sorry, 12.27.

Thank you.

(Document displayed.)

**BY MR. ALPER:**

**Q.** You presented this graphic to illustrate how Motive handles overwriting video frames in the AI Dashcams; right?

**A.** Umm...

**Q.** Oh, I'm sorry.

**MR. ALPER:** Could we go -- advance one.

Yeah, there. That's the one I wanted.

(Document displayed.)

**BY MR. ALPER:**

**Q.** Okay. You presented that graphic to illustrate -- this

is, for the record, MDX 12.28.

You presented this graphic to illustrate how Motive handles overwriting video frames in the AI Dashcams; right?

**A.** No, I didn't. This is overwriting based on determined values. This is how the '253 patent overwrites.

**Q.** Okay. I see. Now, and that's what you say there (as read):

"Overwriting based on determined values"; right?

**A.** Correct.

**Q.** And what you don't show here in this video -- I'm sorry. What you don't show in this graphic is how event video is being stored separately from the loop video in that same memory; right?

**MR. COOTS:** Objection, misstates prior testimony.

**THE COURT:** Overruled.

**BY MR. ALPER:**

**Q.** What you don't show in this graphic is how event video is being stored separately from loop video in the same memory; correct?

**A.** If you play this animation, I think, to the end, there's a point where some of the frames from the event are put into this long-term storage, which is in that same eMMC memory. It's just in different locations.

**Q.** Okay. I see. And so, just to be clear, the long-term storage and the circle, those are in the same eMMC memory;

correct?
**A.** You have a set of memory locations that you've defined as this loop. And then there's a different set of memory locations, which is the place where you temporarily store the video clips that you decide to keep and ultimately send offboard.
**Q.** Okay. And so you have -- and there are -- I think we established this yesterday. Motive assigns confidence values to every video frame; right?
**A.** There are confidence values associated with objects that are detected, if they're detected, in a video frame. Every video frame may not have an object in it that warrants having a confidence value. So I wouldn't say that they assign a confidence value to every frame.
**MR. ALPER:** If we could call up the trial transcript from yesterday at Page 1458, Lines 15 through 17.
(Document displayed.)
**BY MR. ALPER:**
**Q.** And you were asked (as read):
"**QUESTION:** Those are -- Motive assigns confidence values to every video frame; correct?"
And you answered (as read):
"**ANSWER:** Yes, they do."
Do you recall that testimony from yesterday?
**A.** I do. I think I didn't state that as clearly as I just

stated it a second ago.

**Q.** Okay. And if we go back to what we had shown on the screen before.

So you didn't show the confidence values on this slide concerning the overwriting element; right?

**A.** No, I didn't.

**Q.** But you've got event video with confidence values; right?

**A.** There may be confidence values associated with objects in certain frames as detected by the perception engine.

**Q.** Okay. And those -- that event video, those event video frames are being stored in the eMMC memory, the buffer memory; right?

**A.** Those event videos? You're talking about the clip that's stored or the ones that are stored in the loop?

**Q.** The event video frames that are -- are -- you said -- your testimony was excerpted or stored in the eMMC buffer memory; right?

**A.** Correct.

**Q.** And everything else is overwritten; right?

**A.** "Everything else" being what?

**Q.** Everything else in the loop is overwritten; right?

**A.** Well, only the oldest frames when the buffer memory is out of -- out of memory storage.

**Q.** Right. Things will be overwritten in the first in/first out scheme in the loop; right?

**A.** You said that everything is overwritten, but it's not.

**Q.** It -- it is overwritten sequentially?

**A.** Sequentially, yes.

**MR. ALPER:** Okay. We can take that down.

(Document removed from display.)

**MR. ALPER:** Okay. Let's talk -- let's call up MDX 12.18 and talk about long-term storage.

(Document displayed.)

**BY MR. ALPER:**

**Q.** And you had an opinion that the long-term storage memory requirement is not met because that aspect is not mounted in the vehicle; is that right?

**A.** That's correct. The long-term storage memory identified by Mr. -- or Dr. Wicker is in the K2 web server, and that's not configured to be mounted in a vehicle.

**Q.** Okay. And the aspect of your testimony that relates to mounting in a vehicle, that comes from that row up at the top that says "one pre"; right?

**A.** That's correct.

**Q.** And it says there (as read):

"A vehicle event recorder system configured to be mounted in a vehicle."

Right?

**A.** That's correct.

**Q.** And that is the preamble of the -- of Claim 1 of the

'253 patent; right?
**A.** Yes, it is.
**Q.** And you understand that the preamble of a claim is not a requirement; right?
**A.** It depends on whether the preamble of the claim recites structure that is a part of the next -- part of the claim.
If you left the -- the "configured to be mounted in a vehicle" part of this preamble out, all of the rest of the claim could be done anywhere. So this particular preamble actually recites structure that is relevant and germane to the rest of the claim.
**Q.** And you understand, by default, preambles of claims are not requirements on the claims; correct?
**A.** I understand that's a presumption, unless the preamble recites structure that's necessary to put the rest of the claim in context. And here that's the case.
**Q.** And you agree there has been no construction from the Court, from Her Honor in this case, that the preamble of Claim 1 of the '253 patent is a requirement; right?
**A.** There's been no construction one way or the other on that.
**Q.** And if the preamble of the '253 patent is not a requirement, then the long-term storage memory does not need to be in the vehicle; correct?
**A.** If the preamble wasn't a requirement, nothing in the rest of the claim would need to be in the vehicle, and it wouldn't

make any sense.

**Q.** And so then this argument of yours would go away; right?

**A.** Well, the entire claim would be meaningless because you could do it on the moon. It wouldn't matter.

**Q.** But if the preamble isn't a requirement, this argument just goes away; right?

**A.** If the preamble isn't a requirement, yes, this argument would go away because the claim would be irrelevant.

**MR. ALPER:** We can take that down.

(Document removed from display.)

**BY MR. ALPER:**

**Q.** Let's talk about web servers.

**A.** Okay.

**Q.** Let's go to your MDX 12.40, please.

(Document displayed.)

**Q.** And now we're talking about the '060 patent. So I'm shifting to the other SmartDrive patent, and we're looking at Claim 1.

And you testified that the claim element regarding the web server is not met by Motive's products; correct?

**A.** That's right.

**Q.** And you testified -- you gave some testimony that the patent was about the use of a web server; right?

**A.** Among other things, but that's one of the key limitations.

**Q.** Now, you'd agree that there are many other requirements of

Claim 1 of the '060 patent; right?

**A.** Yes.

**Q.** Various other technologies beyond a web server; right?

**A.** Yes. And all of those are the technologies that one would find in a vehicle event recorder dating back to the 1970s.

**Q.** I see. And, but you didn't offer an opinion on invalidity in this case; right?

**A.** No.

**Q.** So you're just kind of throwing that out there, but you're not saying the patents -- the claims of the '060 are invalid; right?

**A.** No.

**Q.** Okay. And you can see there's technology here about video cameras; right?

**A.** Yes.

**Q.** And memories and event triggers and event thresholds; right?

**A.** Yep.

**Q.** And detecting events and effectuating storage of information concerning events.

Do you see all that?

**A.** Yep. All the same old stuff. Been done for a long time.

**Q.** And then down at the bottom, receiving settings information from computing devices and adjusting the recorder settings and so forth; right?

**A.** That's right.

**Q.** And you have not offered an opinion to the jury that any of those technologies are not in Motive's products; right?

**A.** I haven't offered an opinion either way.

**Q.** Okay. So your focus, though, on web server, that's the only thing that you say Motive isn't using; right?

**A.** That's the only thing that I'm focusing on in this particular claim, then saying that Motive doesn't do that.

**Q.** Okay. And your opinion is that the Vehicle Gateway in Motive's products is not a web server; right?

**A.** That's correct.

**Q.** You say it's a client?

**A.** It acts like a client, yes.

**Q.** And you would agree that if the Vehicle Gateway is a web server, the fact that it may also at times act as a client is not a basis for non-infringement; right?

**A.** I haven't looked at the possibility that it is a web server, because there's nothing about it that would be a web server. So I'm not sure quite how to understand your question.

**Q.** Okay. Your opinion is that there's nothing about -- nothing that you've seen shows that the Vehicle Gateway operates as a web server?

**A.** That's correct.

**Q.** Okay. Let's call up your -- and as a result, you haven't reached the question of whether, if it's a web server, the fact

that it's a client doesn't actually matter; right?

**A.** There's nothing about it that looks like or acts like a web server, so yes.

**Q.** Okay. Let's go to your MDX 12.44, please.

(Document displayed.)

**Q.** And you presented this slide as one of your slides to show that the Vehicle Gateway is not a web server; right?

**A.** Correct.

**Q.** And what you're showing on the left, there's some code there.

**MR. ALPER:** Do we need to turn the monitors?

**THE COURT:** Turn the screens around, please.

(Brief pause.)

**MR. ALPER:** I'll continue.

**BY MR. ALPER:**

**Q.** There's some code on the left in -- well, there's some code on the left; right?

**A.** That's correct.

**Q.** And that is referring to Relay.c code; right?

**A.** That's correct.

**Q.** And you say it down at the bottom left of the slide in that first bullet (as read):

"The Relay.c code only runs on the Vehicle Gateway"; right?

**A.** That's my understanding.

**Q.** And if we go to the file path that's just at the top of the slide there, up at the top, you can see it refers to LBB in a couple places; right?

**A.** Yes, that's the Little Black Box.

**Q.** And that's the Vehicle Gateway, the Little Black Box; right?

**A.** That's right.

**Q.** And if we back out for a minute. What you're showing here on the left, that's actually, you've taken one of Dr. Wicker's slides and you've put it on your slide; right?

**A.** That's correct.

**Q.** And Dr. Wicker opined that the Vehicle Gateway is a web server; right?

**A.** That's what he says.

**Q.** But your opinion is that the Vehicle Gateway is not a web server; right?

**A.** That's my opinion, yes.

**Q.** Okay. Let's talk about what Motive's engineers think about the Vehicle Gateway.

**MR. ALPER:** And if we could blow up the top, the header of that file, that source code file.

**BY MR. ALPER:**

**Q.** And my question is: When Motive's engineers are thinking about what the Vehicle Gateway is when it is running the Relay.c code, they think it is a server; right?

**A.** They've named it the communication server main. I have no idea why they would have named it that, but it doesn't act like a server.

**Q.** Okay. So the engineers at -- at Motive, when they are writing the functionality for the -- the Vehicle Gateway, they describe that as the communication server; correct?

**A.** That's what they've named -- that's the description of this file. It doesn't say a web server, first of all.

And it -- all the code that's associated with this is not web server code. So I don't know why they named it that.

**Q.** I'll get to the web part in a second.

But it says: "Server."

Not client, but "server"; right?

**A.** It does say that, yes.

**Q.** And you said -- you can kind of see it down on the bottom in the background -- this code, the Relay.c code, that code only runs on the Vehicle Gateway; right?

**A.** That's correct.

**Q.** Okay. And if we kind of call up the code. Let's talk about whether it's a web server. HTTP is a web protocol; right?

**A.** Yes.

**Q.** And you would agree that this Relay.c code that is described as a code for the communications server, it shows over and over and over again that this -- that the Vehicle

Gateway is running HTTP; right?
**A.** It's using HTTP to send requests to the K2 web server, yes.
**Q.** And if we could -- and it just says it over and over and over again throughout the file; right?
**A.** The fact that there's a lot of HTTP here doesn't mean that this client has become a server. It's still a client.
**Q.** Okay. And if we call up your MDX 12.41.
(Document displayed.)
**Q.** We're looking for a web server; right?
**A.** Yes.
**Q.** And if you look down at the bottom, it says: Using HTTP; right?
**A.** That's right.
**Q.** Okay.
**A.** Clients use HTTP, too.
**Q.** And if we could go back to your slide, MDX 12.44, and call that header of the file up again.
(Document displayed.)
**Q.** This code was -- the Relay.c code that's described as the communications server, that was created in September 2015; right?
**A.** That's the date on this, yes.
**Q.** And that was about eight years before this lawsuit was filed; right?

**A.** I don't know -- I don't know exactly when this lawsuit was filed, but it was 2015 that the code was written.

**Q.** A long time before the lawsuit was filed; right?

**A.** Presumably, yes.

**Q.** And now after the lawsuit was filed, Motive's position is that the Vehicle Gateway is a client, not a communication server; right?

**A.** Vehicle Gateway has always been a client. It's not that they changed that position. It's always been a client. Regardless of what they named this file or how they described it, it's always acted like a client.

**Q.** Okey-doke.

You see the author of the file is Mr. Joe Pulver?

**A.** Yep.

**Q.** And Mr. Pulver, he's a principal embedded engineer at Motive?

**A.** I don't know what his title is.

**Q.** He still works there today; right?

**A.** I don't know.

**MR. ALPER:** If we could call up MDX 1.21.

(Document displayed.)

**BY MR. ALPER:**

**Q.** You were here during opening statements; right?

**A.** Yes.

**Q.** And you heard Motive say that they were going to bring

lots of engineers to testify about the products; right?
**A.** A number of engineers, yes.
**Q.** But Motive did not call Mr. Pulver to testify; right?
**A.** Not that I recall.
**Q.** They didn't call him to the stand; right?
**A.** Not that I recall.
**Q.** Motive had him stay back?
**A.** I don't know why they didn't call him. Perhaps he didn't have anything to say.

**MR. ALPER:** If you could call up MDX 12.44, and bring up the header again.

(Document displayed.)

**BY MR. ALPER:**

**Q.** He's the one who wrote this file?
**A.** Okay.
**Q.** Okay. All right. Just a couple of other questions.

**MR. ALPER:** If we could call up MDX 12.47, please.

(Document displayed.)

**BY MR. ALPER:**

**Q.** And you talk about how there's the -- one of the things that's involved in the communications here is a protocol called MQTT?
**A.** That's right.
**Q.** And you testified that's different from HTTP?
**A.** Yes.

**Q.** And I believe that you testified that Motive's back end makes MQTT requests over AWS IoT?
**A.** It's a mouthful, but, yes, that's what it says.
**Q.** Okay. And you said that that was not a web request from a web server; right?
**A.** It's not, yes.
**Q.** Okay. And if we look at the lower box here. And maybe we can zoom in on just the whole, like, box on the left side so we can see a little bit better.
That's where you point to MQTT; right?
**A.** That's right.
**Q.** And you associate that with AWS Core IoT Services. Do you see that?
**A.** Yes.
**Q.** And AWS refers to Amazon Web Services; right?
**A.** AWS is an entire ecosystem of servers and data centers and functions in a company called Amazon Web Services.
**Q.** AWS stands for Amazon Web Services, right?
**A.** That's what the company's name is, yes.
**Q.** It doesn't stand for Amazon private network services; right?
**A.** That's because they mostly host web servers. But most of the -- or many of the functions in AWS have nothing to do with the web. They are databases and data lakes and other things.
**Q.** Okay. MQTT is what -- one of the things Amazon Web

Services uses to communicate; right?

**A.** Well, MQTT is a protocol that reside -- or that exists whether you're in Amazon Web Services or not. It's a protocol like HTTP that was developed by some standards group. And it happens to be the protocol that is used for this particular function in AWS Core IT.

**Q.** AWS, Amazon Web Services?

**A.** If you care to always refer to the company name as that, yes. But that's not a web function.

**Q.** And MQTT, that uses the TCP/IP protocol; right?

**A.** Almost everything on the internet uses TCP/IP.

**Q.** And that acronym, TCP/IP, the IP stands for internet protocol; right?

**A.** That's right. That's another protocol like MQTT and HTTP. It's a little bit lower level protocol.

**Q.** IP refers to internet protocol; right?

**A.** That's right.

**Q.** MQTT uses that; right?

**A.** That's right.

**Q.** And the internet, that refers to the web; right?

**A.** The web is one function that's carried by the internet. There are all kinds of other things that the internet carries that are not web things. The web was actually invented well after the internet and IP came into existence.

**Q.** The internet is -- you click on there and you go search

the web; right?

**A.** That -- the internet is one of the tools that you can use to search the web, but email, all kinds of -- videos, other things are not running on HTTP. But they are running on the internet.

**Q.** And MQTT uses the internet protocol; right?

**A.** It can.

**MR. ALPER:** Thank you.

I pass the witness.

**THE COURT:** Redirect examination.

**REDIRECT EXAMINATION**

**BY MR. COOTS:**

**Q.** Good morning, Mr. Andrews.

**A.** Good morning.

**MR. COOTS:** Mr. Reed, would you pull up MDX 12.14, please.

(Document displayed.)

**BY MR. COOTS:**

**Q.** Mr. Andrews, do you recall yesterday Mr. Alper asked you if the figure shown here on your PowerPoint is only an example provided by the '253 patent?

**A.** I recall that.

**Q.** And you recall you did tell him it was just an example?

**A.** Yeah. The '253 patent provides a number of different examples of ways that you could do this to get different sorts

of data rates in your video -- or saved videos.

**MR. COOTS:** Mr. Reed, I'd like to pull up Exhibit 5.

(Document displayed.)

**MR. COOTS:** We can start at the first page.

**THE CLERK:** Has that been admitted?

**MR. COOTS:** I believe Exhibit 5 has been admitted.

**BY MR. COOTS:**

**Q.** And, Mr. Andrews, you recognize this as the '253 patent?

**A.** Yes, I do.

**Q.** Now, I'd like to actually kind of play a game with this, and I'd like to go through the figures. And as we go through the figures, I'd like you to tell the jury whether the image reflects a first in/first overwrite system or whether it reflects facilitating based on the determined values of the frames.

**MR. COOTS:** So if we could, Mr. Reed, could we jump to Page 8?

(Document displayed.)

**BY MR. COOTS:**

**Q.** What is this reflecting, Mr. Andrews?

**A.** This appears to be a first in/first overwrite because they're -- you start at the beginning, you write to the end and you start to the beginning again.

And it's identified as prior art, which means it is not what the patent is about.

to understand the argument; right? If you replace overwriting with copying, you would gather frames based on their determined value. Do you understand that?

**A.** If I replace overwriting with copying, so I just copy out the frames that are based on determined value?

**Q.** Yes.

**A.** Yeah, that's -- that's correct.

**Q.** And so if you look at Mr. Znidarsic's PowerPoint here, you see you have 100, zero, 50 percent, 75 percent, 100 percent.

Do you see that?

**A.** I see that.

**Q.** And based on what Mr. Znidarsic's showing, which you said yesterday you agree with, all of those frames are copied as part of this video?

**A.** Yes.

**Q.** And so wouldn't it be correct when you're facilitating copying of these frames, you're copying even the low value frames?

**A.** Yes.

**Q.** And do you recall yesterday you were asked about the frames on the edges, so these 10 percent frames.

**A.** Yes.

**Q.** And you were asked: These are not included with the video; correct?

**A.** They're not included with the video that's copied out.

**Q.** I'd like to bring up MDX 1223. And I think we skipped through this yesterday.

(Document displayed.)

**Q.** And I wanted to talk about confidence values that are not part of a video. And can you walk the jury through what we're seeing here?

**A.** Sure. This is a sequence of images from a video that's on the Motive website. And in the upper left, we see a view through the camera of the road ahead.

And it's a little hard to see, but the car that's on the side of the road, on the other side of the road over here (indicating), that is -- has a purple box, kind of a transparent purple box over it. And that's indicating that the perception engine back at the server has identified that as a car.

And it -- there's no event, because the car is on the other side of the road going the other way, but it's identified that with enough confidence to put a purple box around it.

In the second picture from the left, this one here (indicating), the system has detected the car in the road ahead. And you can see the purple box, it's a little small, but you can see it's put a purple box around that car. And it's also identified that those -- that's in the lane ahead of it.

So this is a car that it cares about. There's still no

event, but it knows it's a car. It's detected that it's a car. And it's not going to detect that it's more of a car. Once it's detected that it's a car, it's got confidence that it's a car.

**Q.** So would it be fair to say, then, in this example there would be high confidence value frames that are not copied?

**A.** Yeah. And high confidence value frames that are constant confidence value leading up to the event. If you continue through this, you look at the second from the right and the vehicle's closer. There's no more confidence that it's a vehicle. It's still a vehicle. It's closer.

And then, finally, at the far right, you still have the same confidence value, but you've detected that it's a brake event.

So the point here is that this brake event isn't -- it's not as if, as Dr. Wicker showed, as you get closer to the braking event, the confidence value goes up. It's constant the whole time, from the time you detect the car to when the event occurs, you know that there's a car there.

**MR. COOTS:** I'd like to go next, Mr. Reed, if you will, to MDX 12.44.

(Document displayed.)

**BY MR. COOTS:**

**Q.** And I'll represent we're going to start talking about the server.

Perfect. Do you recall Mr. Alper asking you questions about your demonstrative here?

**A.** I do.

**Q.** And do you recall he -- he blew up the page, and he talked about the title of the source code?

**A.** Yes.

**Q.** Did Mr. Alper point any evidence to you in the actual source code functionality that demonstrated this Vehicle Gateway was acting as a server?

**A.** No, he didn't. And I've looked at this code and there isn't any functionality like that.

**MR. COOTS:** Can we go to -- I think the next slide, Mr. Reed. The next slide.

And I think the following slide. Perfect. Thank you.

(Document displayed.)

**BY MR. COOTS:**

**Q.** Do you recall Mr. Alper asking you about MQTT?

**A.** Yes.

**Q.** I see here that the claim limitation, it's pasted on the top, and the claim recites HTTP; is that correct?

**A.** That's correct.

**Q.** Did Mr. Alper present any evidence to you that MQTT is communicated over HTTP?

**A.** No. Neither did Mr. -- or Dr. Wicker.

**MR. COOTS:** No further questions, Your Honor.

part of this, Mr. Schlaifer, and then the middle section.

Yeah. Sorry, the thing -- great. Thanks.

**BY MR. DEORAS:**

**Q.** What are you showing here, Dr. Wicker?

**A.** What I'm showing here in this document, which has many safety violations listed, that excessive acceleration is explicitly discussed as being something that's problematic. No person shall accelerate or change directions so rapidly as to allow either his or her vehicle to slide to the side.

It's a problem and it's considered a violation explicitly in this document.

**Q.** So let me switch gears. And in the interest of time, I'm going to jump to the '060 patent.

What is Motive's argument as to why they don't infringe the '060 patent?

**A.** I have a slide on that, if we could put that up.

**Q.** Can we pull up MDX 12.47.

(Document displayed.)

**Q.** And this is Mr. Andrews' slide that he presented yesterday and today.

What is Mr. Andrews' argument as to why Motive doesn't meet this claim?

**A.** He's basically saying that there is no web server that is receiving requests at the Vehicle Gateway.

**Q.** Now, I just want to point out what we're actually seeing

on the slide. Now, if you look at the document on the left, what is the box that's labeled HTTP?

**A.** Okay. So on the left we have two types of communication. And the box that's labeled HTTP talks about how those ELD, the Electronic Logging Device messages are sent from the Vehicle Gateway to the back end. And that is done using the HTTP protocol.

**Q.** Now, does this show that the Vehicle Gateway sends responses and receives requests?

**A.** Yes, it does.

**Q.** Does that mean the Vehicle Gateway is a web server in the context of the '060 patent?

**A.** If the Vehicle Gateway is responding to a request, it is -- and providing information in response to that request, it is acting as a server.

**Q.** Now, Mr. Andrews also mentioned the MQTT protocol that's highlighted on the bottom. Do you see that?

**A.** Yes, I do.

**Q.** Now, is the -- is it correct to say that the MQTT protocol is not a web protocol?

**A.** No, that is incorrect.

**Q.** Why do you say that?

**A.** MQTT, like HTTP, is used on the internet using TCP and IP. It literally rides on top of the Internet Protocol as it makes its way true the internet. HTTP does that. MQTT does it

exactly the same way.

**Q.** Just because the Motive system uses MQTT in addition to HTTP, does that mean Motive doesn't infringe?

**A.** No.

**Q.** Why not?

**A.** The claims call for the use of HTTP, and they call for a web server in the vehicle. Those are two separate requirements. We have HTTP clearly in use in the accused system, and we also have the Vehicle Gateway acting as a server. It's something called an MQTT broker. It literally is a server there in the Vehicle Gateway.

So those two different requirements are both met.

**MR. DEORAS:** Can we jump quickly to the '253 patent? And I want to turn to MDX 12.14.

Actually, let's go to 12.15. 16. Sorry.

The next slide, Mr. Schlaifer. Thanks.

One more.

(Document displayed.)

**MR. DEORAS:** Let me -- actually, go back two slides, Mr. Schlaifer. I must have had a typo in my notes.

**BY MR. DEORAS:**

**Q.** Did you see Mr. Andrews's argument that element 1(c) was not met in the Motive products?

**A.** Yes, I did.

**Q.** And do you agree with that?

**A.** No.

**Q.** Why not?

**A.** This is clearly met. What's called for in 1(c) is (as read):

"A long-term storage memory configured to store information" -- well, there is a long-term storage memory in the back end -- "wherein the stored information includes a subset of the set consecutive frames of visual information."

**Q.** Now, did Mister -- Mr. Andrews pointed to the 1pr as requiring the long-term storage memory be mounted in the vehicle.

Do you agree that that's how you should read the claim?

**A.** No. No, I don't.

**Q.** Why not?

**A.** What's being called for here -- and first off, it's in the preamble. So there's some question as to whether that's a limitation. But in my mind it doesn't matter because the preamble says (as read):

"A vehicle event recorder system configured to be mounted in a vehicle. That vehicle event recorder system comprising or including..."

And then there's a couple things. And the long-term storage information (as read):

"Wherein the stored information includes a subset

of the set of consecutive frames, there is longer-term storage within the camera that's accused, and there's also storage in the back end."

But there's nothing that says everything has to be in the back end -- excuse me, everything has to be in the vehicle.

**Q.** Okay. And then last point, I want to touch on this overwriting requirement that's at the bottom of the claims. I think there was some questions about that this morning.

Have you prepared an animation or a diagram that shows how this works in Motive's products?

**A.** Yes.

**Q.** Let's go to slide PDX 12.93.

(Document displayed.)

**Q.** What are you showing here, Dr. Wicker?

**A.** Okay. So there was a lot of discussion of this loop memory. And some referred to it as a first in/first overwrite memory. That's essentially correct. The loop here does operate like that. But the loop is just one piece of the buffering that's on this card.

This, by the way, is the embedded multimedia card. The embedded multimedia card not only has that loop. It's also got separate storage for event frames.

So when something is saved from the loop because it corresponds to an event, and just a little bit before the event and just a little bit afterward, it's going to be stored in the

event frames, and so it will not be deleted.

What's deleted permanently are those non-event frames that are going around the loop.

**Q.** Thank you. No further questions.

**THE COURT:** Cross-examination.

**CROSS-EXAMINATION**

**BY MR. RAY:**

**Q.** Good afternoon, Dr. Wicker.

**A.** Good afternoon.

**Q.** It's nice to see you again.

Let's talk first about your opinions on invalidity.

Now, I think we've established you've had a long career as an expert. And you have argued or submitted opinions before in patent cases where you've worked for the defendant, like Motive; right?

**A.** That's correct.

**Q.** And you've taken a position in those cases over your career that the -- the patent at issue was invalid over 100 times; right?

**A.** I don't know the number, but, yes. It could be that high.

**Q.** And in that instance when you are arguing that the patent is invalid over prior art, you are arguing that the Patent Office made a mistake; correct?

**A.** I wouldn't put it quite like that, because often the situation is one in which there is what's called system art.

In other words, there's some artifact that someone has made, but it's not in a patent. It's not in a publication.

And so the Patent Office may not have been aware of that, in which case I wouldn't call it a mistake. But there are some times when the Patent Office misses other patents. I would agree with that.

**Q.** Dr. Wicker, do you have a cross binder in front of you currently?

**A.** I don't think so.

**Q.** Bear with me just a moment, please.

(Brief pause.)

**MR. RAY:** The answer to my question was no because you didn't have it yet.

Permission to approach, Your Honor.

**THE WITNESS:** Thank you.

**THE COURT:** Do you have a copy for the Court?

(Brief pause.)

**THE COURT:** It's fine. Let's just see if it comes up.

**MR. RAY:** Thank you, Your Honor.

You would think with all the paper in the courtroom the answer would be yes.

**BY MR. RAY:**

**Q.** In the interest of time, Dr. Wicker, why don't I move on for a moment. Why don't we come back to this. It may not be an issue.

Volume 9

Pages 1713 - 1851

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RITA F. LIN

| | | |
|---|---|---|
| OMNITRACS, LLC, et al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. C 23-5261 RFL |
| | ) | |
| MOTIVE TECHNOLOGIES, INC., et al, | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | Wednesday |
| | ) | April 23, 2025 |
| | ) | 8:15 a.m. |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**

KIRKLAND & ELLIS, LLP
555 California Street
San Francisco, California 94104
**BY: ADAM R. ALPER, ESQ.**
**AKSHAY S. DEORAS, ESQ.**
**KYLE CALHOUN, ESQ.**

KIRKLAND & ELLIS, LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
**BY: N. YVONNE STODDARD BEELER, ESQ.**
**MICHAEL W. DE VRIES, ESQ.**
**ARGIE L. MINA, ESQ.**

KIRKLAND AND ELLIS, LLP
601 Lexington Avenue
New York, New York 10022
**BY: LESLIE M. SCHMIDT, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

***Reported By: Debra L. Pas, CSR 11916, CRR, RMR, RPR***
*Official Reporter - US District Court*
*Computerized Transcription By Eclipse*

inaccurate, incomplete, or misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial. Remember that you have taken an oath to follow the rules and it's very important that you follow those rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the Court immediately.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the Clerk signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any questions. Remember that you are not to tell anyone, including the Court, how the jury stands, whether in terms of vote count or otherwise, until you have reached a unanimous verdict or have been discharged.

A verdict form has been prepared for you with questions you must answer. I have already instructed you on the law that you are to use in answering these questions. You must follow my instructions and the form carefully.

You must consider each question separately. Although you may discuss the evidence and the issues to be decided in any order, you must answer the questions on the verdict form in the order they appear. After you answer a question, the form tells you what to do next. All nine of you must agree on an answer before you can move on to the next question.

The verdict form in this case has two parts. You will be given only part one of the verdict form when you retire to deliberate. When you have finished filling out part one according to your deliberations, your presiding juror should sign and date the verdict form and advise the clerk that you are ready to return to the courtroom.

After part one of the verdict form has been completed, you will be provided part two of the verdict form, based on your answers to part one. This two-part process is intended to simplify the instructions on the verdict form. Please do not read into the verdict form, the two-part process, or these instructions that I have an opinion regarding the evidence or what your verdict should be.

I do want to just show you the verdict form briefly and walk you through some of the instructions on there.

(Document displayed.)

So each of you should have a copy of this with your instructions. I'm showing you part one of the verdict form. Like I said, part two, we'll give you later on to reduce the number of instructions.

Some of you when you were kids may have done that choose-your-own-adventure books where it says: If you want to visit the troll in the cave, go to Page 62. If you want to do something else, go to Page 36.

There is a choose-your-own-adventure component to this in that, as you're going through, it will give you instructions as to what question to answer next and in what order. So I just want to walk you through that.

So the first page has some instructions that are basically about how the verdict form is set up. And then the first question you'll get on the form is about infringement.

Then you'll be asked this question: Did Omnitracs prove by a preponderance of evidence that Motive infringed the following claims of the '906, '628, '060 and '253 patents?

And then for each of the claims, you're going to need to check "yes" for Omnitracs or "no" for Motive. So each of these -- Claim 1, you'll pick either "yes" or "no."

Claim 10 you'll pick "yes" or "no."

All the way through the form for each of the claims that are being asserted in this lawsuit.

Then if you checked "yes" as to at least one asserted claim -- so if you have something in the "yes" box from question one -- then you go to question two. This is the choose-your-own-adventure thing I was saying earlier.

So let's go to question two. So if you end up at question two, then you'll be asked to decide: Did Omnitracs prove, by a preponderance of the evidence, that Motive's infringement was willful?

And for each of the claims that you checked "yes" in question one, you would need to answer that. If you checked "no" to everything in question one, you would be skipping this question.

But do not check any box if you answered "no" in question one. So you only need to fill out the boxes where you checked "yes" in question one.

Then regardless you go on to Question 3. You should answer Question 3A and Question 3B regardless of how you answer Questions 1 and 2. You still need to answer Question 3 anyway.

So then question 3A is a question about patent ineligibility. I won't read the question because it's so long, but you can see that there's a question about that concept of well understood, routine and conventional. You need to answer that question as to each of the claims listed here. So for each row you should be checking either "yes" or "no."

Then you get to question 3B, which you again need to

answer regardless of how you answered the prior questions. You need to answer "yes" or "no" for each of these claims.

Then the final page of the verdict form is for the presiding juror to sign and date.

You each have a copy of the form in your packet so that you can refer to it as you're working on your deliberations, but there will be one official version of the form that does not have the word "copy" in the watermark, and that will be the one that the presiding juror will bring into the courtroom when you have returned your verdict as to part one.

After you return your verdict as to part one, I will give you part two of the form to reduce the number of choose-your-own-adventure instructions.

Let's take a quick break, a 15-minute break, before we start the -- before we start the closing arguments. I do want to remind you all that you haven't started deliberations yet, so you're still under the same instruction to keep an open mind. Don't talk to anyone, including each other yet, about the case. And don't do any outside research still.

We'll see you back here in 15 minutes at 10:45. Thank you.

(Jury exits the courtroom at 10:30 a.m.)

**THE COURT:** We're on the record outside the presence of the jury.

That was a little longer than I had anticipated. So I

think -- Mr. Alper, do you have a sense of how long you're intending to reserve for rebuttal or how long your opening closing is?

**MR. ALPER:** I was hoping to do about 50 minutes up front and then 15 for rebuttal.

**THE COURT:** So we would be at -- I think it'll be okay. We'll be done with the jury around 1:30. I'll give them a heads-up that we'll be going through 1:30 so they can eat a few extra snacks in the back. We've got pastries for them and stuff. So I don't think the blood sugar will be a problem.

I'll just give them a heads-up about that when -- after you finish your presentation and before we start the defense presentation. Thank you.

(Whereupon there was a recess in the proceedings from 10:31 a.m. until 10:47 a.m.)

**THE COURT:** You may bring in the jury.

(Jury enters the courtroom at 10:47 a.m.)

**THE COURT:** You may be seated.

Welcome back from the break, everyone. I'm here with the jurors as well as counsel for both sides.

It's now Omnitracs opportunity to provide you with their closing argument. Please give Mr. Alper your close attention.

**MR. ALPER:** Thank you, Your Honor.

May I proceed, Your Honor?

**THE COURT:** You may.

close to call, Omnitracs has not met its burden.

And we figure out whether they've met that burden by following the Court's clear instructions on what infringement means. With only one exception in this case, every single claim element must be proven literally. Is it there, or is it not?

If you remember the water bottle example, it's not enough to have your finger close (indicating). You actually need to touch it. That's literal infringement.

Now, we've heard some statements made this morning about what these patents are about. And let's be clear about something. We didn't write the patents in this case. Motive did not choose to create the items on their list. That was the plaintiffs. They wrote their patents the way they wanted to. We didn't create these requirements, as trivial as they might be, as numerous as they might be. They did.

And they chose to bring this lawsuit and present them to you. And they need to prove each and every element is met. They chose these patents. Not us.

And so when you're going through this in deliberations, remember our grocery list example. And this is why the parties during this case showed you the claims like a list. All right? And we know now that if you're missing just one thing on your list, there is no infringement.

Now, the milk example seems a little bit stark. Okay. I

get that. There's no milk in my cart. I didn't complete my list. But details matter. Every limitation matters.

And so I offered this example as well. Proof that mother nature has a sense of humor, the difference between parsley and cilantro.

And I think grocery stores are in on it too because they put them right next to each other. They should literally be at opposite ends of the store. I'll reserve that suggestion box for later.

But the reason I bring this up is because parsley and cilantro have a lot of similarities: They're herbs, they're green, they have leaves, they have stems. But if you examine them, if you just smell your fingers after you're done, you'll know the difference.

But the details matter. And the details in Omnitracs patents matter, too. Each and every one. Close is not enough.

And you've heard about the verdict forms that you'll see in this case. There are two. If you find, which Motive suggests that you should, that Omnitracs has not proven that Motive infringes any claim of any patent, you can set that second one completely aside.

A finding of non-infringement for Motive ends the case. In the choose-your-own-adventure, it's the everyone-gets-to-go-home choice.

So let's get to it. And everything I'm going to talk to

you about in terms of non-infringement is not going to be new. In fact, it relates back to everything we talked about in the opening. All of this will seem familiar to you. Our arguments have never changed at all, from the beginning to the end of this case.

So let's start with the '628 patent. The important part of this construction, the most important part, is the underlined language. This phrase of accepting inputs and then transmitting them requires that the driver information transmitted be the same driver information whose inputs were accepted. The same.

Is a user name and password the same information as a Driver I.D.? No. Very simple. The answer is no. The driver never has access to its own -- his or her own I.D. They're two independent types of data. They are not the same. They are different. There is no infringement.

And this was highlighted to you on the first day of trial, where this is the way they chose to do it in their patent. Their patent. That when you input data into the phone, that driver information has to go to the box in the car.

And we, for very good reasons, said: No. We want to make sure we check this on the back end first to authenticate the driver somewhere secure. We do it different because it's better. It's not trivial. It's actually purposeful.

And, of course, to prove it, we turn to the final arbiter,